# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| AMERICAN COUNCIL OF LEARNED SOCIETIES, et al., | |
| *Plaintiffs*, | |
| v. | Case No. 1:25-cv-03657 |
| MICHAEL MCDONALD, in his official capacity as Acting Chairman of the National Endowment of the Humanities, et al., | |
| *Defendants*. | |

# MEMORANDUM IN SUPPORT OF PLAINTIFFS' <u>MOTION FOR PRELIMINARY INJUNCTION</u>

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................1

BACKGROUND ...............................................................................................................3

   A. Congress Established and Continuously Funds NEH with Specific Mandates ..................3

   B. The NEH Funded a Broad Range of Research, Education, and Related Scholarship,
      Including to Plaintiffs and Their Members ...........................................................5

   C. DOGE Terminated Nearly All NEH Grants and Directed Layoffs and Downsizing ..........6

   D. NEH Seeks to Use Grant Funds to Build a Garden of Heroes .............................................9

LEGAL STANDARDS .....................................................................................................9

ARGUMENT ..................................................................................................................10

   A. Plaintiffs Are Likely to Succeed on the Merits of Their Claims ......................................10

      1. Defendants' Decisions in Dismantling NEH Are Arbitrary and Capricious ................11

      2. Defendants' Actions to Dismantle NEH Violate the Separation-of-Powers ................14

      3. Defendants' Actions Violate the Impoundment Control Act ........................................16

      4. Defendants' Diverting Funds to the "Garden of Heroes" Violates the APA ...............17

      5. DOGE's Termination of Grants Was Ultra Vires ........................................................18

   B. Absent Relief, Plaintiffs and Their Members Will Suffer Irreparable Harm ...................20

   C. The Balance of Equities and Public Interest Merit a Preliminary Injunction ...................24

CONCLUSION ...............................................................................................................25

# TABLE OF AUTHORITIES

## CASES

*In re Aiken Cnty.*,
  725 F.3d 255 (D.C. Cir. 2013) ..........................................................................14, 16

*AIDS Vaccine Advoc. Coal. v. U.S. Dep't of State*,
  No. 25-cv-400, 2025 WL 752378 (D.D.C. Mar. 10, 2025) ..............................................13, 24

*Am. Fed'n of Lab. & Cong. of Indus. Org. v. Dep't of Lab.*,
  No. 25-cv-339, 2025 WL 1129227 (D.D.C. Apr. 16, 2025) ...................................................20

*Am. Fed'n of Gov't Emps., AFL-CIO v. U.S. Off. of Pers. Mgmt.*,
  No. 25-cv-1237, 2025 WL 996542 (S.D.N.Y. Apr. 3, 2025) .................................................20

*Am. Libr. Ass'n v. Sonderling*,
  No. 25-cv-1050, 2025 WL 1262054 (D.D.C. May 1, 2025) ...................................................24

*City & Cnty. of San Francisco v. Trump*,
  897 F.3d 1225 (9th Cir. 2018) ............................................................................16

*Dopico v. Goldschmidt*,
  687 F.2d 644 (2d Cir. 1982) ..........................................................................11, 12

*Encino Motorcars, LLC v. Navarro*,
  579 U.S. 211 (2016) ..................................................................................12, 18

*Fed. Commc'ns Comm'n v. Prometheus Radio Project*,
  592 U.S. 414 (2021) .......................................................................................11

*Fed. Election Comm'n v. Cruz*,
  596 U.S. 289 (2022) .......................................................................................18

*La. Pub. Serv. Comm'n v. FCC*,
  476 U.S. 355 (1986) .......................................................................................19

*Make the Rd. New York v. Cuccinelli*,
  419 F. Supp. 3d 647 (S.D.N.Y. 2019) ......................................................................25

*Michigan v. EPA*,
  576 U.S. 743 (2015) ...................................................................................11, 13

*Nat. Res. Def. Council v. EPA*,
  658 F.3d 200 (2d Cir. 2011) ..........................................................................11, 12

*Nat'l Fed. of Indep. Bus. v. OSHA*,
  595 U.S. 109 (2022) ...................................................................................................18

*New York v. Dep't of Homeland Sec.*,
  969 F.3d 42 (2d Cir. 2020) ........................................................................................13

*Nken v. Holder*,
  556 U.S. 418 (2009) .....................................................................................................9

*Planned Parenthood of New York City, Inc. v. HHS*,
  337 F. Supp. 3d 308 (1972) .......................................................................................22

*Pub. Citizen, Inc. v. Mineta*,
  340 F.3d 39 (2d Cir. 2003) ........................................................................................11

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
  429 U.S. 252 (1977) ...................................................................................................21

*Widakuswara v. Lake*,
  No. 25-cv-2390, 2025 WL 945869 (S.D.N.Y. Mar. 28, 2025) ............................13, 14, 15, 24

*Winter v. Nat. Res. Def. Council, Inc.*,
  555 U.S. 7 (2008) ...................................................................................................9, 25

*Youngstown Sheet & Tube Co. v. Sawyer*,
  343 U.S. 579 (1952) ...................................................................................................16

**STATUTES**

2 U.S.C. § 682 ................................................................................................................16

2 U.S.C. § 683 ..................................................................................................................6

5 U.S.C. § 706 ..........................................................................................................11, 17

20 U.S.C. § 951 ......................................................................................................3, 13, 14

20 U.S.C. § 952 ...............................................................................................................17

20 U.S.C. § 954 ...............................................................................................................17

20 U.S.C. § 956 ......................................................................................................3, 4, 13, 17

## INTRODUCTION

Plaintiffs the American Council of Learned Societies, American Historical Association, and Modern Language Association move for a preliminary injunction to enjoin Defendants' unlawful dismantling of the National Endowment for the Humanities ("NEH"), an agency that Congress created sixty years ago to foster the humanities throughout this country.

Under our Constitution, Congress sets the policies of the nation. Congress creates federal agencies and assigns them duties in furtherance of those policies, and Congress appropriates funds so that agencies have the means to carry out those duties. The President's responsibility is to faithfully execute these congressional choices. The President accrues many powers upon being elected to office, but disregarding statutory requirements is not among them.

Yet that is exactly what the Executive Branch has been doing at agencies across the government since January, including now at NEH. Two operatives from the U.S. DOGE Service ("DOGE") swept into NEH, demanded hundreds of millions of dollars in program and staffing cuts, and personally chose nearly 1,500 grants to terminate and sent out the termination notices themselves. Upon pressure from the DOGE officials, Defendants eliminated six entire divisions, 19 entire substantive programs, and nearly three-quarters of NEH staff. Defendants have given no real explanation for these actions, let alone an explanation of how, with these extreme cuts, NEH will be able to spend all of its appropriations and carry out all of its statutory mandates to promote and foster the humanities in various ways.

Plaintiffs are overwhelmingly likely to succeed on their claims in these circumstances. Defendants' institutional actions in eliminating divisions and progress, mass firing staff, and refusing to spend appropriations are arbitrary and capricious several times over. Defendants did not clearly set forth the bases for their actions, did not consider the necessary statutory factors,

did not explain their change in decisions, and did not address the many reliance interests they were upending. These actions also violate the constitutional separation of powers because Congress, and not the President, has the exclusive power to set the duties of federal agencies and decide how federal funds must be spent. The indiscriminate cuts to programs and staff also violate the Impoundment Control Act by delaying spending funds for purely policy reasons.

DOGE's termination of grants held by Plaintiffs and their members is also unlawful because Congress has not provided DOGE authority to carry out the statutory activities of another agency. Congress has not provided DOGE the power to do anything. This is not a case where DOGE operated in the shadows, but rather one where DOGE had its finger on the button. DOGE's direct termination of the grants was *ultra vires* under the Constitution.

Absent an injunction, Plaintiffs and their members will suffer immense irreparable harm. As explained in the many declarations attached to this motion, numerous important projects in which Plaintiffs and their members have invested substantial time and resources—in some cases, over years—will be lost. Plaintiffs and their members will not be able to apply for critical funding opportunities that had been announced but have since been cancelled. More broadly, the support system that the eliminated divisions, programs, and staff provided Plaintiffs in fulfilling their missions, will be gone absent swift relief.

Finally, the balance of harms and public interest overwhelmingly support Plaintiffs. Defendants have no legitimate interest in tearing down a duly created and funded federal agency. And the public at large will suffer all of the many harms that Congress sought to prevent in establishing NEH in the first place. Congress believed NEH to be essential to the functioning of our democracy, and the public interest would be served by honoring that determination.

## BACKGROUND

### A. Congress Established and Continuously Funds NEH with Specific Mandates

Congress created NEH and its sister agency, the National Endowment for the Arts

("NEA") nearly fifty years ago through the National Foundation on the Arts and Humanities Act

of 1965 ("NFAHA" or "the Act"). Pub. L. 89-209, 79 Stat. 845 (Sept. 29, 1965) (codified at 20

U.S.C. §§ 951-60). In establishing NEH, Congress found that "it is necessary and appropriate for

the Federal Government to complement, assist, and add to programs for the advancement of the

humanities and the arts by local, State, regional, and private agencies and their organizations."

*Id.* § 951(5). Congress declared that the Federal government has a key role in "help[ing] create

and sustain not only a climate encouraging freedom of thought, imagination, and inquiry but also

the material conditions facilitating the release of this creative talent." *Id.* § 951(7).

Accordingly, Congress established NEH to fund organizations and individuals involved

in research, publication of scholarly works, and promotion of the humanities. *See* 20 U.S.C. §

956. To that end, Congress provided that the Chairperson of NEH may "enter into

arrangements," including "contracts, grants, loans, and other forms of assistance," to further

specific purposes, such as to "initiate and support research and programs to strengthen the

research and teaching potential of the United States in the humanities"; "support the publication

of scholarly works in the humanities"; and ensure "that the benefit of its programs will also be

available to our citizens where such programs would otherwise be unavailable due to geographic

or economic reasons." 20 U.S.C. § 956(c). Congress also stressed that NEH should fund

individuals and institutions "that have traditionally been underrepresented." *Id.*

To effectuate Congress's directives, the NEH had until recently maintained a robust

organizational structure consisting of around 180 staff members and numerous program offices

and divisions. Robinson Decl. Ex. 2 ("NEH Annual Report") at 6-8; John Doe Decl. ¶ 4. NEH

maintained the following seven program offices to administer specific grant programs and related activities: (1) the Office of Challenge Programs; (2) the Office of Digital Humanities; (3) the Division of Education Programs; (4) the Office of Federal/State Partnership; (5) the Division of Preservation and Access; (6) the Division of Public Programs; and (7) the Division of Research Programs. *See* Robinson Decl. Ex. 1 ("Organizational Chart"). Each of these offices performed work critical to meeting NEH's statutory mandates. *See* NEH Annual Report at 7-8.

These program offices were further supported by more than a dozen other supporting offices. For instance, the Office of Data and Evaluation was created to use data and analysis to fund "broadly impactful humanities initiatives, and to convey the importance of those initiatives…to the public." NEH Website, Office of Data and Evaluation, https://perma.cc/3V2Q-5LKC. Two offices also focused specifically on outreach. NEH Annual Report at 6, 17-18.

This structure has allowed the NEH to play a significant role in both expanding access to the humanities and funding a wide range of research, professional development, and education. Indeed, "[a]s the largest federal funder of the humanities," NEH has until now offered "47 grant programs to support museums, historic sites, colleges, universities, K-12 teachers, libraries, public television and radio stations, research institutions, independent scholars, and nonprofits nationwide." NEH Website, Grants, https://perma.cc/282U-ENAJ.

Congress has consistently funded the NEH generally and its grantmaking programs in particular through annual appropriations. In the 2024 Appropriations Act, Congress appropriated $207,000,000 to NEH, of which $192,000,000 "shall be available for support of activities in the humanities, pursuant to section [20 U.S.C. § 956(c)] of the Act and for administering the functions of the Act." Pub. L. 118-42, 138 Stat. 25, 281 (Mar. 9, 2024) (the "2024 Appropriations Act"). As such, $192,000,000 was designated for final awards to further the

enumerated purposes under § 956(c), as well as administrative support. 2024 Appropriations Act at 282. On March 15, 2025, Congress enacted a continuing resolution that re-appropriated all of the funds appropriated to NEH in 2024, with the same breakdown in designated expenditures. Pub. L. 119-4, §§ 1101-08, 139 Stat. 9, 10-12 (Mar. 15, 2025) (the "2025 Continuing Resolution"). NEH thus received an additional $207,000,000, including an additional $192 million for grants and other assistance programs under § 956(c).

**B.    The NEH Funded a Broad Range of Research, Education, and Related Scholarship, Including to Plaintiffs and Their Members**

Using Congressional appropriations, NEH has for decades funded important humanities projects, including to Plaintiffs and their members. Plaintiff ACLS has received millions of dollars in NEH grants over the years. Just before NEH mass terminated previously approved grants, ACLS in February 2025 received an award of up to $500,000 in Federal matching funds to support a national initiative on graduate education in the humanities. Connolly Decl. ¶¶ 9-16. ACLS members have also received millions of dollars in NEH grants. Across the University of California's campuses—all ACLS members—projects were operating under at least 30 grants worth over $6.3 million as of April 1, 2025.[1]

Plaintiff American Historical Association ("AHA") has likewise received millions of dollars from NEH across 50 different awards. Grossman Decl. ¶ 9. In August 2024, , AHA was notified of a March 2025 award of $194,261 to fund a three-week program for higher-education faculty on U.S. environmental history. *Id.* ¶¶ 11. NEH has also funded projects by AHA

---

[1] *See* Newman Decl. ¶ 17; *see also* Kotz Decl. ¶¶ 4-5 (detailing NEH awards to ACLS member Dartmouth College); Druschke Decl. ¶¶ 4-6 (University of Wisconsin); Wenc Decl. ¶¶ 4-5 (same); Martoccio Decl. ¶¶ 3-4 (same); Hoyt Decl. ¶¶ 5-6 (same); Urbach Decl. ¶¶ 4-7 (Georgetown University); Mocarski Decl. ¶¶ 3-5 (Northern Illinois University); Caballero Decl. ¶ 2 (Bard College); Kite Decl. ¶ 3 (same); Priya Decl. ¶ 4 (University of Minnesota); Walsh Decl. ¶ 3 (University of Illinois).

members. For example, Dr. Laura Morreale served as a project director for an NEH-funded grant to digitally publish a critical edition and translation of an early-fifteenth-century textbook designed to introduce Italian merchants to the cosmos, the natural world, and Mediterranean geography. Morreale Decl. ¶ 3. NEH committed to funding the project over two years, having recently awarded it a new $99,599 grant. *Id.* ¶ 6; *see also* Tilton Decl. ¶¶ 4-12; Weise Decl. ¶¶ 3-11.

Plaintiff MLA has also received millions of dollars from NEH across 45 awards, including grants to support MLA's national census of higher education enrollments in modern languages. Krebs Decl. ¶ 7. In June 2023, NEH awarded MLA a $58,201 "Spotlight in the Humanities Grant" to develop a workshop for college faculty on humanities coursework. Krebs Decl. ¶ 20. As of April 2, 2025, MLA was also working under an NEH award of a $30,000 grant to support a two-year development workshop on the current and future state of humanities data. *Id.* ¶ 17. MLA members have also received millions of dollars in grants. For example, the University of Oregon, an MLA member, received a $350,000 grant in September 2024 to upgrade, expand, and sustain the London Stage database, an online resource that documents the history of British theater. *See* Burkert Decl. ¶¶ 6-14.

As these examples illustrate, consistent with its Congressional mandates, NEH has funded a broad array of projects across the country, awarding grants large and small to both large institutions and independent researchers.

### C. DOGE Terminated Nearly All NEH Grants and Directed Layoffs and Downsizing

On January 20, 2025, the President established DOGE as a new component of the Executive Office of the President. E.O. 14,158 § 3(a) (Jan. 20, 2025). The Executive Order required agencies to work with a "DOGE Team Lead" who would "advise" the agency "on implementing the President's DOGE Agenda." *Id.* § 3(c). In a subsequent Executive Order, the

President directed agencies to work with DOGE to "terminate or modify . . . contracts and grants to reduce overall Federal spending or reallocate spending to promote efficiency and advance the policies of my Administration." E.O. 14,222 § 3(b) (Feb. 26, 2025).

In March 2025, shortly after the White House terminated NEH Chair Shelly Lowe, two operatives from DOGE—Defendants Nate Cavanaugh and Justin Fox—arrived at NEH. John Doe Decl. ¶ 2; Jane Doe Decl. ¶ 8.[2] Cavanaugh and Fox met with senior NEH leadership to discuss DOGE's plans for NEH's future. Jane Doe Decl. ¶ 12. On April 1, 2025, Acting Chairman of the NEH, Defendant McDonald, told NEH staff that DOGE sought to "claw back" $170 million in grants. Jane Doe Decl. ¶ 12. At the end of March or the beginning of April, Cavanaugh and/or Fox reviewed a list of open NEH grants and personally chose the grants to terminate. John Doe Decl. ¶ 3; Richard Roe Decl. ¶ 2. On April 2, Fox emailed nearly 1,500 grantees on the list informing the grantees that their grants were being terminated. *See* Richard Roe Decl. ¶ 2; John Doe Decl. ¶ 3; Mark Moe Decl. ¶ 1. This included nearly all grants awarded during the Biden administration. Richard Roe Decl. ¶ 2. Cavanaugh and Fox did not process the grant terminations through NEH's grants management system, Jane Doe Decl. ¶ 14, and the termination notification to grantees did not come from an NEH email address, but rather from Grant_Notifications@nehemail.onmicrosoft.com, Robinson Decl. Ex. 9. The emails attached a grant termination letter purportedly signed by Acting Director of NEH Michael McDonald. However, the termination letters were not hand-signed by McDonald or digitally signed with a verifiable digital signature. Instead, the signature was typed by someone as "/s/ *Michael McDonald*." *Id.*

---

[2] *See also* Jennifer Schuessler, DOGE Demands Deep Cuts at Humanities Endowment, NYTIMES (Apr. 1, 2025), https://www.nytimes.com/2025/04/01/arts/trump-doge-federal-cuts-humanities.html.

The terminations were nearly identical, without any specific information about the grants or how to appeal. *See, e.g.*, Robinson Decl. Ex. 9; Krebs Decl. ¶ 26; Grossman Decl. ¶ 18. As justification, the termination notices claimed that Executive Order 14217 required that NEH eliminate non-statutory-required activities and functions, Robinson Decl. Ex. 9; however, that Executive Order did not name NEH and focused only on four non-NEH entities, three of which Defendants Fox and/or Cavanaugh have been affiliated with.

Following the grant terminations, NEH personnel repeatedly made clear, both in internal and external communications, that Cavanaugh and/or Fox themselves issued them. As described in greater detail *infra*, Acting Chair McDonald appeared to acknowledge in a staff meeting that DOGE, not McDonald, decided which grants to terminate and drafted the termination letters.[3] On April 4, NEH emailed recipients of grants for its summer institutes program acknowledging the terminations and stating that "DOGE has made the decision to terminate NEH awards, including 2025 professional development programs" and that "[a]t this time, NEH does not know the full scope of which awards have been terminated and who has been notified." Robinson Decl. Ex. 12.

On April 9, NEH staff received a notice alerting them to an upcoming "multi-step approach to restructuring" that promised to include a RIF and stated: "This restructuring will consolidate administrative and programmatic offices to enhance efficiency and streamline functions. As a result, the agency will be forced to reduce the total number of positions." Jane Doe Decl. ¶ 18 & Ex. BB. The next day, 65-70% of NEH staff members received RIF notifications that they would be terminated as of June 10, 2025. Jane Doe Decl. ¶ 19; John Doe Decl. ¶ 4; Richard Roe Decl. ¶ 3.

---

[3] NEH SLT Meeting Recording - 04/03-2025,
https://www.rev.com/app/transcript/NjgxMTE2MjgzOGFiYWRjZGM5NTIxYjk5ZEpYN0hBcV
NYY0xJ/o/VEMw NDc3NTI1NjEz (last visited May 13, 2025).

Together, the RIFs and grant terminations have led to the effective elimination or near elimination of entire divisions and programs, including but not limited to the Office of Digital Humanities, the Office of Data and Evaluation, the Office of Challenge Programs. Jane Doe Decl. ¶¶ 10-11; Richard Roe Decl. ¶ 3. Relatedly, NEH has announced that it is cancelling programs for which NEH had previously announced funding opportunities, eliminating at least 19 programs in full. Jane Doe Decl. ¶¶ 9-10.; Robinson Decl. Ex. 14.

### D.  NEH Seeks to Use Grant Funds to Build a Garden of Heroes

On April 24, 2025, NEH announced a new grant program to fund statues for a "National Garden of American Heroes."[4] The proposed program calls for NEH to issue grants to artists to "create life-size statues in marble, granite, bronze, copper, or brass depicting historical figures tied to the accomplishments of the United States." Robinson Decl. Ex. 13. Unlike prior programs, the Notification of Funding Opportunity did not include limitations on using NEH funds for projects "outside of . . . the humanities," including the "creation…of art." *Compare id. with e.g.* Notice of Funding Opportunity: Fellowships, https://perma.cc/T8RB-DAYY; Notice of Funding Opportunity: Awards for Faculty, https://perma.cc/KWS9-6H9B.

**LEGAL STANDARDS**

To obtain a preliminary injunction, Plaintiffs must establish (1) a likelihood of success on the merits; (2) that irreparable harm is likely without preliminary relief; (3) that the balance of equities tips in Plaintiffs' favor; and (4) that a preliminary injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Where the government is the opposing party, the final two factors merge. *Nken v. Holder,* 556 U.S. 418, 435 (2009).

---

[4] *See* Press Release, *NEH Announces Grant Opportunity to Create Statues of Iconic Americans for the National Garden of American Heroes*, https://perma.cc/BR7Y-U87N.

9

## ARGUMENT

### A. Plaintiffs Are Likely to Succeed on the Merits of Their Claims

Plaintiffs assert two categories of claims. First, Plaintiffs challenge the institutional actions taken at NEH, including by DOGE, to eliminate divisions and programs, to mass fire staff, to fund the Garden of Heroes, and to delay spending or outright refuse to spend the funds Congress appropriated to NEH (the "Institutional Claims"). These claims do not challenge the termination of any existing grant or seek to restore or compel payments under any such grant.

Second, Plaintiffs assert claims challenging the termination of the grants of Plaintiffs and their members (the "Grant Termination Claims"). For purposes of this preliminary injunction, the only Grant Termination Claim that Plaintiffs are pursuing are based on DOGE's unconstitutional, *ultra vires* actions in directly carrying out the grant terminations. Plaintiffs do not pursue any Grant Terminations Claims under the Administrative Procedure Act ("APA").

Plaintiffs are likely to succeed on the merits of both sets of claims. On the Institutional Claims, Defendants' decisions to eliminate divisions and programs, to mass fire staff, and to not spend NEH's appropriations are all textbook arbitrary-and-capricious actions. Defendants' actions fail to meet the bare minimum requirement of reasoned decisionmaking, as Defendants have not even explained the purported bases for their actions. Defendants' actions are also arbitrary and capricious because Defendants did not consider the factors that Congress required them to consider under NEH's organic statute, they did not provide good reasons for changing policies, and they utterly failed to consider the reliance interests of the individuals and organizations depending on NEH's programs and activities. Defendants' institutional actions also violate the separation of powers in entirely disregarding the duties that Congress assigned to NEH, and in refusing to spend the funds that Congress appropriated to NEH for specific

purposes. Similarly, Defendants' actions violate the Impoundment Control Act in delaying the spending of appropriations based on policy disagreements with Congress' objectives for the funds.

Regarding the Grant Termination Claim, DOGE lacked any legal authority to terminate the NEH's grants. It is black-letter law that agencies possess only those powers given to them by Congress, and Congress has given DOGE none. The overwhelming evidence shows that the DOGE operatives, Cavanaugh and Fox, personally chose the grants to terminate and personally sent the emails terminating the awards. Their actions were *ultra vires* under the Constitution.

### 1. Defendants' Decisions in Dismantling NEH Are Arbitrary and Capricious

Defendant's decisions to eliminate divisions and programs, to mass fire staff, and to refuse to spend appropriations are arbitrary and capricious. 5 U.S.C. § 706(2)(A).

"The APA's arbitrary-and-capricious standard requires that agency action be reasonable and reasonably explained." *Fed. Commc'ns Comm'n v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). At bottom, this standard requires that "Federal administrative agencies . . . engage in reasoned decisionmaking." *Michigan v. EPA*, 576 U.S. 743, 750 (2015) (quotations omitted). "Not only must an agency's decreed result be within the scope of its lawful authority, but the process by which it reaches that result must be logical and rational." *Id.* (quotations omitted).

Agencies must comply with several requirements to meet this standard. First, the agency must "clearly set forth" the bases for its action. *Dopico v. Goldschmidt*, 687 F.2d 644, 654 (2d Cir. 1982). The agency's explanation for its actions must be contemporaneous; the agency may not offer "*post hoc* rationalizations." *Pub. Citizen, Inc. v. Mineta*, 340 F.3d 39, 53, 61 (2d Cir. 2003) (quotations omitted). Second, the agency must examine the relevant facts, and "the agency's decision must reveal a rational connection between the facts found and the choice made." *Nat. Res. Def. Council ("NRDC") v. EPA*, 658 F.3d 200, 215 (2d Cir. 2011) (quotations

omitted). Third, the agency may not rely "on factors which Congress has not intended it to consider." *Id.* Fourth, where an agency changes course from a prior policy, it must "display awareness that it is changing position" and "show that there are good reasons for the new policy." *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016) (quotations omitted). Finally, particularly where an agency is changing positions, the agency must analyze and account for the "serious reliance interests" that may be affected. *Id.* (citation omitted).

NEH's institutional actions fail to meet any of these requirements. NEH fails at the most basic step—to "clearly set forth" explanations for its decisions. *Dopico*, 687 F.2d at 654. NEH has provided no public explanation at all for its mass firing of staff. NEH has not acknowledged, let alone explained, its decision to eliminate entire divisions such as the Office of Digital Humanities and the Office of Data and Evaluation. Jane Doe Decl. ¶ 11. NEH has ended 19 programs, but for none has it provided an individualized explanation as to why that program is being shut down. Rather, NEH has simply posted to its website that funding opportunities for these programs have been "cancelled" or "will not be reoffered."

The only public explanation NEH has offered for the recent flurry of actions is a "Statement on NEH Priorities," which NEH posted on April 24, weeks after taking most of the relevant actions. Robinson Decl. Ex. 15. The "Statement" asserts that NEH is now focused only on "projects related to the nation's semiquincentennial and American exceptionalism," and that "NEH has recommitted itself to ensuring that its funding, as required by statute, contributes to public confidence in how it expends taxpayer funds." *Id.* The Statement provides no explanation for why staff are being mass fired and why specific programs and divisions have been eliminated. NEH thus has not adequately explained its actions, and it certainly has not provided a "rational connection between the facts . . , and the choice made." *NRDC*, 658 F.3d at 215. NEH's

actions should be enjoined on this ground alone. *See, e.g.*, *id.* at 217; *Widakuswara v. Lake*, No. 25-CV-2390 (JPO), 2025 WL 945869, at *5 (S.D.N.Y. Mar. 28, 2025*); *AIDS Vaccine Advoc. Coal. v. U.S. Dep't of State*, No. CV 25-00400 (AHA), 2025 WL 752378, at *10 (D.D.C. Mar. 10, 2025).

The Court's analysis need go no further, but Defendants' actions are also arbitrary and capricious because they did not rely on the factors Congress required them to consider. Agencies are "bound" by the "ultimate purposes Congress has selected," and "the means [Congress] has . . . prescribed[] for pursuit of those purposes." *New York v. Dep't of Homeland Sec.*, 969 F.3d 42, 82 (2d Cir. 2020). Here, Congress has set forth 12 different purposes that NEH must fulfill, 20 U.S.C. § 951, and it has directed NEH to run grant programs to fulfill these purposes, 20 U.S.C. § 956(c). NEH's Statement addresses only 1 of the 12 § 951 statutory purposes, to "contribute to public support and confidence in the use of taxpayer funds." Robinson Decl. Ex. 16. NEH entirely ignores the other 11 § 951 statutory mandates, as well as all the specific objectives for NEH grants made under § 956(c). "We are thus left with an agency justification that is unmoored from the nuanced views of Congress." *New York*, 969 F.3d at 82; *see also Michigan*, 576 U.S. at 751-54.

Defendants' actions are arbitrary and capricious for yet more reasons: they did not provide good reasons for their change in policies, and they failed to consider the "serious reliance interests" of those that relied on the prior policies. *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 591 U.S. 1, 30 (2020). Even for the one statutory factor that NEH has addressed, promoting public confidence in Federal spending, NEH has not explained why the eliminated divisions, programs, and staff were not an effective use of public funds. And "nothing in the record suggested that Defendants considered and had a rational reason for disregarding the

massive reliance interests" at stake. *AIDS Vaccine*, 2025 WL 752378, at *10; *see also Widakuswara*, 2025 WL 945869, at *5. NEH has nowhere addressed the reliance interests of students, scholars, universities, and organizations, including Plaintiffs and their members, that have depended on the eliminated divisions, programs, and staff for their work and their communities. *See, e.g.*, Krebs Decl. ¶ 30; *see also* Exs. ##-##..

In short, Defendants' actions are arbitrary and capricious in every way that agency action can be arbitrary and capricious, and should not stand a moment longer.

### 2.  Defendants' Actions to Dismantle NEH Violate the Separation-of-Powers

Defendants' institutional actions violate the separation-of-powers. Under our constitutional system, it is Congress—not the President—that prescribes the duties of Federal agencies and maintains the exclusive power of the purse in directing how Federal funds must be spent. "[T]he President may not decline to follow a statutory mandate or prohibition simply because of policy objections." *In re Aiken Cnty.*, 725 F.3d 255, 259 (D.C. Cir. 2013) (Kavanaugh, J.). Rather, "[t]he President must follow statutory *mandates* so long as there is appropriated money available and the President has no constitutional objection to the statute." *Id.* Similarly, while the President might sometimes have "policy reasons" for "wanting to spend less than the full amount appropriated by Congress," the President "does not have unilateral authority to refuse to spend the funds." *Id.* at 261 n.1. From these principles, it is self-evident that "[w]ithholding congressionally appropriated funds, and effectively shuttering a congressionally created agency simply cannot be construed as following through on [the President's] constitutional mandate." *Widakuswara*, 2025 WL 945869, at *7.

But that is what Defendants are doing here. Congress established NEH to carry out specified purposes, and Congress directed NEH to achieve those purposes by creating "programs for the advancement of the humanities." 20 U.S.C. §§ 951(5), (10). Congress has funded NEH to

perform these activities, including specifically through grants. *See, e.g.*, 2024 Appropriations Act, 138 Stat. 281-82.

Congress' objectives have been nullified in the blink of an eye. Defendants have decimated the agency's robust organizational structure, eliminating at least six divisions and 19 grant programs, and firing 65-70% of NEH's 180-person staff. Jane Doe Decl. ¶¶ 9-10, 12; John Doe Decl. ¶ 4; Richard Roe Decl. ¶ 3. NEH is left as a shell of the agency that Congress established and consistently funded, and one that cannot possibly spend its appropriations and carry out its statutory duties. John Doe Decl. ¶ 5; Jane Doe Decl. ¶ 21; Richard Roe Decl. ¶ 4 (noting that NEH has so far spent less than $10 million of its $200+ million allocation for fiscal year 2025). That, indeed, was the very point of the recent actions. Cavanaugh and Fox arrived at NEH with a mission to claw back $170 million in previously approved grant funds, no matter how they had to do so. Jane Doe Decl. ¶ 12. Even though McDonald originally devised plans to reduce NEH's staff by 20-25%, after pressure by DOGE, Defendants ended up firing nearly triple that number. Jane Doe Decl. ¶¶ 7, 12, 19. All of these actions are in service of DOGE's broader agenda to cut spending throughout the Federal government, and to hollow out agencies whose missions do not align with the President's preferred policies. *See* E.O. 14,210 (Feb. 11, 2025); E.O. 14,222 (Feb. 26, 2025).

Defendants' actions strike at the heart of our constitutional structure. Congress's powers are at their apex when assigning responsibilities to agencies and deciding how appropriations must be spent by those agencies, as the Constitution "exclusively grants the power of the purse to Congress, not the President." *City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1231 (9th Cir. 2018); *see also Widakuswara*, 2025 WL 945869, at *7. And because Congress has directly spoken to the functions that NEH must perform and how much money it should spend in

performing them, the President's power to contravene those directives is "at its lowest ebb." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637-38 (1952) (Jackson, J., concurring). The President must show that the Constitution affords him "conclusive and preclusive" authority over these issues, *id.*, which he cannot possibly show given that the Constitution affords Congress the power of the purse and the power to set agencies' functions. The Executive Branch does not get to decide "cheapest is best" when Congress has decided otherwise. *Pub. Citizen*, 340 F.3d at 58.

In short, "[t]his case has serious implications for our constitutional structure. *Aiken Cnty.*, 725 F.3d at 266-67. "It is no overstatement to say that our constitutional system of separation of powers would be significantly altered if [courts] were to allow executive . . . agencies to disregard federal law in the manner" done by Defendants here. *Id.*

### 3. Defendants' Actions Violate the Impoundment Control Act

Defendants' actions also violate the Impoundment Control Act (ICA). Congress passed the ICA in response to President Nixon's refusal to spend funds on numerous statutory programs. As then-Judge Kavanaugh explained, under the ICA, if the President has policy reasons for wanting to spend less than the full amount appropriated by Congress for a particular project or program, the President "must propose the rescission of funds, and Congress then may decide whether to approve a rescission bill." *Aiken County*, 725 F.3d at 261 n.1; *see also* 2 U.S.C. § 683.

Similarly, under the ICA, the President may "defer" spending funds only in limited circumstances. The ICA defines a "deferral" to include any "withholding or delaying the obligation or expenditure of" funds, and "any other type of Executive action or inaction which effectively precludes the obligation or expenditure of" funds. 2 U.S.C. § 682(1). When the Executive Branch wishes to defer funds, it must send a message to Congress detailing the money

to be deferred and the reasons for deferral. There are only three permissible grounds for deferrals. *Id.* § 684(b). "Policy reasons," including ensuring funds are spent in accord with the President's policy preferences, are not a proper basis for deferrals. GAO, Office of Management and Budget—Withholding of Ukraine Security Assistance, B-331564, at 6 (Jan. 16, 2020).

Here, the President has not followed the ICA's required procedure for proposing a rescission or deferral of NEH's appropriations. Defendants' actions likely will result in a rescission of much of the nearly $400 million that Congress has appropriated to NEH over the last two years. But at a minimum, Defendants' actions unquestionably are unlawful deferrals of the spending of these funds. There can be no reasonable dispute that the mass firing of staff and elimination of divisions and programs will "delay[] the obligation or expenditure of" appropriated funds. 2 U.S.C. § 682(1). Defendants have undertaken these actions for policy reasons, leaving no doubt that these deferrals violate the ICA. *See* B-331564, at 6.

### 4. Defendants' Diverting Funds to the "Garden of Heroes" Violates the APA

Defendants' decision to spend up to $17 million in NEH funds on the "Garden of Heroes" also is illegal. Congress carefully delineated which projects may be funded by NEH versus NEA, defining the "humanities" and "the arts" as distinct. 20 U.S.C. § 952(a)-(b). NEA may fund projects "concerned with the arts," 20 U.S.C. § 954(c), defined to include "sculpture," *id.* § 952(b) (emphasis added). NEH is authorized to fund projects in "the humanities," *id.* § 956, defined to include "the study and interpretation of . . . language . . . ; linguistics; literature; history; jurisprudence; philosophy," and so on, *id.* § 952(a). Consistent with these statutory restrictions, the NEH has not traditionally funded art itself (as opposed to the study of art), and NEH notices of funding opportunities have long stated that no NEH funds could be used for projects "outside of the humanities," including the "creation . . . of art." *See, e.g.* Notice of

Funding Opportunity: Fellowships at 17, https://perma.cc/T8RB-DAYY; Notice of Funding

Opportunity: Awards for Faculty, https://perma.cc/KWS9-6H9B.

Contrary to this statutory scheme and longstanding practice, NEH's notice of funding

opportunity for the Garden calls for NEH funds to "create life-size statues in marble, granite,

bronze, copper, or brass depicting historical figures." *See* Robinson Decl. Ex. 14. While NEA

could potentially fund such a project, since Congress defined its remit to include funding of

"sculptures," NEH may not. NEH's decision to fund sculptures is contrary to law. 5 U.S.C. §

706(2)(A)(2).

NEH's proposed funding for the Garden is also arbitrary and capricious because it

contravenes long-standing policy not to fund the "creation . . . of art," Notice of Funding

Opportunity: Fellowships, *supra*, without displaying "awareness that it is changing position" and

showing "that there are good reasons for the new policy." *Encino Motorcars*, 579 U.S. at 221-22.

This "unexplained" change in policies renders the action arbitrary and capricious. *Id.*

### 5.  DOGE's Termination of Grants Was *Ultra Vires*

With respect to the sole claim in this motion related to the termination of the grants of

Plaintiffs and their members, DOGE's termination of the grants was unconstitutional because

DOGE has no legal authority to terminate another agency's grants.

The Constitution gives Congress the authority to create Federal agencies and prescribe

their duties. U.S. Const. art. I, § 8, cl. 18. Agencies thus "possess only the authority that

Congress has provided." *Nat'l Fed. of Indep. Bus. v. OSHA*, 595 U.S. 109, 117 (2022). "[A]n

agency literally has no power to act … unless and until Congress confers power upon it." *La.*

*Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986). An agency may not "operate

independently of" statutory authority. *Fed. Election Comm'n v. Cruz*, 596 U.S. 289, 301 (2022) (quotations omitted).

Defendants cannot dispute that DOGE, rather than the NEH itself, terminated thousands of NEH grants, including the grants of Plaintiffs and their members. Former or current NEH employees with personal knowledge attest to this fact in their declarations. Mark Moe Decl. ¶ 1; John Doe Decl. ¶ 3; Richard Roe Decl. ¶ 2. McDonald also repeatedly conceded that DOGE carried out the terminations in a meeting with staff the day after the terminations. He described "they"—meaning DOGE—as having written and transmitted the terminations, saying that "*they* said in the notification letter…[that] *they* would not be adhering to the traditional notification processes."[5] McDonald described the rationale for the terminations as "because that's the way DOGE had operated at other agencies and they applied the same methodology here." He could not even answer a question about the number of grants terminated, stating it would be "conjecture" on his part. NEH communications with grantees in the days following the terminations also repeatedly said DOGE was responsible. Robinson Decl. Ex. 11, Ex. 12; Grossman Decl. ¶ 20.

In addition to this direct evidence, the circumstantial evidence of DOGE's direct role in terminating the grants is overwhelming. The terminations were not processed in NEH's grants management system, Jane Doe. Decl. ¶ 14, and did not come from an NEH email address, but were sent from a Microsoft email address, Robinson Decl. Ex. 9. The termination letters cited Executive Order 14216's mandate to "eliminate all non-statutorily required activities and functions," Robinson Decl. Ex. 9, but that Executive Order did not apply to NEH. It applies to

---

[5] NEH SLT Meeting Recording - 04/03-2025, https://www.rev.com/app/transcript/NjgxMTE2MjgzOGFiYWRjZGM5NTIxYjk5ZEpYN0hBcVNYY0xJ/o/VEMw NDc3NTI1NjEz (last visited May 1, 2025).

other agencies at which Cavanaugh and Fox have operated. And of course, the mass termination of grants has been the *modus operandi* for DOGE at agencies throughout the government.

DOGE has no legal authority to terminate NEH's grants. Congress did not create DOGE and has not vested DOGE with any powers. Rather, as a creation of the President, DOGE's authority is limited, at best, to advising the President. It lacks any legal power to carry out or alter the statutorily prescribed functions and programs of another agency. Other courts have recognized that DOGE lacks such legal authority. In denying a motion to dismiss, Judge Bates found that the government "points to no legal source that grants [DOGE] the authority to" "direct[] operations and personnel decisions at Congressionally-created agencies that Congress has imbued with the authority to exercise specific responsibilities. *Am. Fed'n of Lab. & Cong. of Indus. Org. v. Dep't of Lab.*, 2025 WL 1129227, at *22 (D.D.C. Apr. 16, 2025). Judge Cote similarly concluded that plaintiffs sufficiently alleged that DOGE has "no statutory authority with respect to OPM records." *Am. Fed'n of Gov't Emps., AFL-CIO v. U.S. Off. of Pers. Mgmt.*, 2025 WL 996542, at *20 (S.D.N.Y. Apr. 3, 2025) (quotations omitted)).

Because DOGE lacked legal authority to terminate the grants of Plaintiffs and their members, the termination of those grants was *ultra vire*s and should be enjoined.

**B. Absent Relief, Plaintiffs and Their Members Will Suffer Irreparable Harm**

Defendants' illegal actions have already caused and will continue to cause Plaintiffs and their members to suffer multiple forms of irreparable harm.

*First*, Plaintiffs and their members are suffering irreparable harm as a result of Defendants' mass termination of their grants. Together, Plaintiffs had six active NEH awards totaling over $1 million, all of which were terminated. *See* Connolly Decl. ¶¶ 9-18; Grossman Decl. ¶¶ 11-15; Krebs Decl. ¶¶ 17-22. For each Plaintiff, the abrupt termination of their grants

wastes the months or years of work that Plaintiffs dedicated to developing the relevant grant applications, building the programs, and completing work that will now be of no value. Krebs Decl. ¶ 29; Connolly Decl. ¶¶ 10-11; Grossman Decl. ¶ 12. The loss of time and resources invested in a project constitutes serious cognizable harm. *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 262 (1977). The loss of expected grant money will also seriously impact Plaintiffs' finances and operations. *See, e.g.*, Grossman Decl. ¶ 20.

Plaintiffs' members are also suffering irreparable harm as a result of the mass terminations. Many educational institutions are facing both the loss of individual projects and the loss of educational and financial opportunities for their students. *See e.g.*, Druschke Decl. ¶ 11; Mocarski Decl. ¶ 10; Burkert Decl. ¶ 21; Urbach Decl. ¶ 12; Kuo Decl. ¶ 12; Newman Decl. ¶ 17. The harm has been particularly acute for individual members. AHA member Laura Morreale had been working for two years on an NEH-funded open-access edition of a fifteenth century textbook, but will not be able to complete the project, creating a void on her resume and harming her relationships with institutions. Morreale Dec. ¶¶ 2, 3, 11. Independent writer Christine Wenc had dedicated approximately one-third of her time to researching and drafting a book on the history of the ventilator, but is now facing economic and professional hardship and cannot spend time completing her book. Wenc Decl. ¶¶ 4, 12. Given the significant financial and reputational benefits of NEH awards, Plaintiffs' members forwent other professional opportunities to work on NEH grants that have now been abruptly terminated. *See, e.g.*, Weise Decl. ¶ 8; Morreale Decl. ¶ 11; Martaccio Decl. ¶ 10; Hoyt Decl. ¶ 13; Newman Decl. ¶ 17; Tilton Decl. ¶¶ 16-17.

*Second*, Plaintiffs and their members are suffering irreparable harm from the elimination of NEH programs, including programs for which Plaintiffs had planned to apply. For example, ACLS and AHA were planning to apply for funding opportunities issued by the Office of Digital

Humanities, but that office's programs have all been eliminated. Connolly Decl. ¶¶ 27-28; Grossman Decl. ¶¶ 27-29. AHA spent months preparing its proposal that, if awarded, would have led professional development opportunities central to its mission. Grossman Decl. ¶¶ 27-28. MLA was also planning to apply for a grant from the "State and Impact of the Humanities" program, which has likewise been eliminated. Krebs Decl. ¶ 23. MLA and its members had also been involved in work to provide a humanities' perspective on developments in Artificial Intelligence, but NEH has canceled the programs that supported that work. Krebs Decl. ¶ 8.

Plaintiffs' members also were relying on these grant programs that have been eliminated. For example, MLA members have relied on the now-eliminated "Humanities Connections" program to support collaborative work between the sciences and the humanities. Krebs Decl. ¶¶ 8-9. The loss of this program will mean that the sciences and humanities will remain in separate silos. *Id.* The loss of an opportunity to compete for grants for Plaintiffs and their members constitutes concrete irreparable harm to Plaintiffs. *See Planned Parenthood of New York City, Inc. v. HHS*, 337 F. Supp. 3d 308, 320 (S.D.N.Y. 2018).

*Third*, Defendants' shuttering of entire NEH offices and divisions with whom Plaintiffs had regularly and closely interacted will also irreparably harm Plaintiffs and their members. The shuttering of the Office of Digital Humanities and the Office of Data and Evaluation will cause particular harm on this front. Each Plaintiff has worked closely with the Office of Digital Humanities, which has been at the forefront of bringing the study of humanities to the modern age, and losing this division will irreparably injure Plaintiffs as leaders in this field. Krebs Decl. ¶ 8; Grossman Decl. ¶¶ 27-28; Connolly Decl. ¶ 23. The elimination of this office also will likely deprive Plaintiffs and their members access to future grants. Grossman Decl. ¶¶ 27-28; Connolly Decl. ¶¶ 21-23, 27. The Office of Data and Evaluation, meanwhile, is critical to MLA's and

ACLS's university members, who need that office to address the crisis of falling enrollments in majors across the humanities. *See, e.g.*, Connolly Decl. ¶ 24. Further, as MLA's Executive Director explains, the elimination of this office will "prevent[] the correction of a longstanding lack of data and evaluation across humanities fields, which has disproportionately disadvantaged the humanities relative to" other fields. Krebs Decl. ¶ 26.

*Fourth*, Plaintiffs and their members are suffering immeasurable irreparable harm due to Defendants' broader dismantling of NEH. As three of the most preeminent humanities associations, Plaintiffs rely on NEH for far more than just grant funding. NEH "is, in essence, the convener of humanities disciplines," Grossman Decl. ¶ 4, and "[m]ost advances in the humanities in the last decades have sprung from work in which the NEH has had a hand," Krebs Decl. ¶ 8. NEH, through its longstanding grant programs and experienced staff, "sets the agenda for the humanities across the United States." Connolly Decl. ¶ 3; *see also* Newman Decl. ¶ 19 ("The University of California benefits immeasurably from the support of NEH . . . . All of this is at risk if a key infrastructure for humanities research either disappears, drastically shrinks in scope, or loses the benefits of stringent peer review."). Plaintiffs and their members "have no entity to replace the essential functions of the NEH." Grossman Decl. ¶ 7; *see also* Krebs Decl. ¶ 31 (describing harm to MLA resulting from loss of institutional knowledge).

The irreparable harm to Plaintiffs and their members is particularly acute in this context given the important role NEH plays in supporting and legitimizing the humanities research that Plaintiffs and their members conduct. *See* Connolly Decl. ¶ 4; Grossman Decl. ¶ 6; Krebs Decl. ¶ 11. As MLA's Executive Director put it, "[r]eceiving an NEH award is a recognition by one's peers of research achievement and promise, a credential that directly contributes to career advancement, promotion, and (in appropriate cases) tenure for the researchers, scholars, and

teachers who receive them." Krebs Decl. ¶ 11. Plaintiffs' members have relied on NEH's peer-review process as providing "the imprimatur of each discipline's most respected scholars." Newman Decl. ¶ 12. By mass terminating grants and slashing the agency down to a fraction of what Congress funded, NEH will no longer be able to perform this essential function.

Federal courts have repeatedly recognized in recent months the hollowing out of Federal agencies on which the public relies "would clearly cause" irreparable harm. *Widakuswara*, 2025 WL 945869, at *9; *see also Am. Libr. Ass'n v. Sonderling*, No. CV 25-1050 (RJL), 2025 WL 1262054, at *2 (D.D.C. May 1, 2025); *AIDS Vaccine*, 2025 WL 752378, at *18.

**C. The Balance of Equities and Public Interest Merit a Preliminary Injunction**

The balance of equities and public interest overwhelmingly support Plaintiffs' requested relief. Absent a robust NEH operating as directed by Congress, historians, linguists, researchers, and other humanists will be left without a major source of funding, innovation, knowledge, resources, and popular diffusion. *See, e.g.*, Grossman Decl. ¶¶ 4-9; Krebs Decl. ¶ 30.

NEH seminars, institutes, and workshops for educators have been central to making new research available for curriculum development. *See* Connolly Decl. ¶ 6; Grossman ¶ 22. These seminars are the only national structure designed to translate humanities research into humanities teaching. With NEH being the only public funder of the humanities, the loss of its broad range of activities and support will affect secondary school teachers, undergraduate and graduate students, researchers, and practitioners across the United States. This void is the exact outcome Congress sought to address in establishing the NEH.

NEH has further served as a primary means by which researchers, scholars, and teachers, including Plaintiffs and their members, receive credentialing recognition for purposes of advancement, promotion, and tenure. *See* Connolly Decl. ¶ 4; Krebs Decl. ¶ 13. The loss of

entire grant programs at NEH affects recognition, ranking, and competitiveness of scholars and institutions within the higher education marketplace.

Many terminated grants focused on topics that are particularly timely and the terminations will bring significant delays to bringing the work to the public. Professor Julie Weise, for example, is expecting at least a year and a half delay in publishing her book meant to "re-frame a polarized debate" about migrant workers Weise Decl. ¶¶ 9, 15, 17. Many now-terminated projects also promised to create open-source work or otherwise create learnings for use by less-funded institutions, who will now no longer benefit from this work, or to create an infrastructure to support work that is not NEH-funded. *See, e.g.,* Caballero Decl. ¶ 8; Burkert Decl. ¶ 8; Martaccio Decl. ¶ 10; Kite Decl. ¶ 9; Mocarski Decl. ¶ 6; Newman Decl. ¶ 17.

Preventing these harms "provides a significant public benefit" that extends beyond Plaintiffs and their members. *See Make the Rd. New York v. Cuccinelli*, 419 F. Supp. 3d 647, 665–66 (S.D.N.Y. 2019), *aff'd*, 969 F.3d 42 (2d Cir. 2020); *Winter*, 555 U.S. at 24 (courts must consider "the public consequences" of entering a preliminary injunction).

In contrast, restoring the pre-termination status quo does not impose any cost on the Federal government, as it would require only that the government take steps it is already legally required to take. Indeed, the public interest is always served by requiring the government to comply with the law. *See Planned Parenthood*, 337 F. Supp. 3d at 343. While this case plays out over months or years, NEH should not languish as a rump body unable to perform the functions that Congress assigned to it. An injunction is needed now.

## CONCLUSION

For the above reasons, the Court should issue a preliminary injunction.

May 14, 2025                           Respectfully submitted,

                                       */s/ John Robinson*
                                       Daniel F. Jacobson[+]
                                       Lynn D. Eisenberg*
                                       John Robinson
                                       JACOBSON LAWYERS GROUP PLLC
                                       *1629 K Street NW, Suite 300*
                                       *Washington DC, 20006*
                                       *(301) 823-1148*
                                       *dan@jacobsonlawyersgroup.com*
                                       *lynn@jacobsonlawyersgroup.com*
                                       *john@jacobsonlawyersgroup.com*

                                       [+] *Pro hac vice motion forthcoming*
                                       * *Of Counsel, admitted pro hac vice*

                                       *Counsel for Plaintiffs*