**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

AMERICAN COUNCIL OF LEARNED SOCIETIES,
     633 Third Avenue, 8th Floor New York, NY 10017,

AMERICAN HISTORICAL ASSOCIATION,
     400 A Street SE Washington, DC 20003,

MODERN LANGUAGE ASSOCIATION,
     85 Broad Street, New York, NY 10004,

          *Plaintiffs,*

       v.

MICHAEL MCDONALD, in his official capacity as Acting
Chairman of the National Endowment for the Humanities,
     400 7th St SW, Washington, DC 20506,

NATIONAL ENDOWMENT FOR THE HUMANITIES,
     400 7th St SW, Washington, DC 20506,

UNITED STATES DOGE SERVICE,
     736 Jackson Pl NW Washington, DC 20503,

AMY GLEASON, in her official capacity as Acting
Administrator of the United States DOGE Service,
     736 Jackson Pl NW Washington, DC 20503,

NATE CAVANAUGH, in his official capacity as an employee
of the U.S. DOGE Service or the General Services
Administration,
     1800 F St NW Washington, DC 20006,

JUSTIN FOX, in his official capacity as an employee of the
U.S. DOGE Service or the General Services Administration,
     1800 F St NW Washington, DC 20006,

          *Defendants*.

No. 25 Civ. 3657 (CM)

THE AUTHORS GUILD, WILLIAM GOLDSTEIN,
ELIZABETH KADETSKY, VALERIE ORLANDO,
KATALIN BALOG, BENJAMIN HOLTZMAN,
LEE JASPERSE, and NICOLE JENKINS,
on behalf of themselves and all others similarly situated,

*Plaintiffs,*

v.

NATIONAL ENDOWMENT FOR THE HUMANITIES;                    No. 25 Civ. 3923 (CM)

MICHAEL MCDONALD, in his official capacity as Acting
Chairman of the National Endowment for the Humanities;

UNITED STATES DOGE SERVICE;

AMY GLEASON, in her official capacity as Acting
Administrator of the United States DOGE Service;

NATE CAVANAUGH, in his official capacity as an employee
of the U.S. DOGE Service or the General Services
Administration; and,

JUSTIN FOX, in his official capacity as an employee of the
U.S. DOGE Service or the General Services Administration,

*Defendants.*

## MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTIONS

JAY CLAYTON
United States Attorney for the
Southern District of New York
86 Chambers Street, 3rd Floor
New York, New York 10007
Tel.: (212) 637-2699 / 2652
Email: rachael.doud@usdoj.gov

MARY ELLEN BRENNAN
RACHAEL DOUD
Assistant United States Attorneys
– Of Counsel –

# TABLE OF CONTENTS

**PAGE**

PRELIMINARY STATEMENT.................................................................................................1

BACKGROUND ....................................................................................................................2

LEGAL STANDARD .............................................................................................................6

ARGUMENT .........................................................................................................................6

    I.       Plaintiffs Do Not Demonstrate a Likelihood of Success on the Merits ........................7

    II.      Plaintiffs Have Not Shown Irreparable Harm .................................................8

    III.    The Balance of the Equities and Public Interest Weigh Against Relief.....................13

    IV.    Any Injunctions Should Be Narrowly Tailored ...........................................16

    V.     Any Injunctive Relief Should Be Stayed Pending Appeal and Accompany a Bond ...18

CONCLUSION......................................................................................................................18

# TABLE OF AUTHORITIES

**PAGE(S)**

**CASES**

*A.H. by & through Hester v. French*,
  985 F.3d 165 (2d Cir. 2021) ...................................................................................... 6

*Am. Meat Inst. v. U.S. Dep't of Agric.*,
  968 F. Supp. 2d 38 (D.D.C. 2013) ............................................................................ 12

*Bionpharma Inc. v. CoreRx, Inc.*,
  582 F. Supp. 3d 167 (S.D.N.Y. 2022) ...................................................................... 13

*Califano v. Yamasaki*,
  442 U.S. 682 (1979) .................................................................................................. 16

*Church v. Biden*,
  573 F. Supp. 3d 118 (D.D.C. 2021) ............................................................................ 9

*Davis v. Pension Ben. Guar. Corp.*,
  571 F.3d 1288 (D.C. Cir. 2009) ................................................................................ 13

*Dep't of Education v. California*,
  145 S. Ct. 966 (2025) .......................................................................................... 11, 15

*Dep't of Homeland Sec. v. New York*,
  140 S. Ct. 599 (2020) ................................................................................................ 17

*Elrod v. Burns*,
  427 U.S. 347 (1976) .................................................................................................. 13

*Florida v. Dep't of Health & Hum. Servs.*,
  19 F.4th 1271 (11th Cir. 2021) ................................................................................. 17

*Freedom Holdings, Inc. v. Spitzer*,
  408 F.3d 112 (2d Cir. 2005) ....................................................................................... 8

*Grand River Enterprises Six Nations, Ltd. v. Pryor*,
  481 F.3d 60 (2d Cir. 2007) ..................................................................................... 6, 9

*Greater Chautauqua Fed. Credit Union v. Quattrone*,
  No. 1:22-cv-2753 (MKV), 2023 WL 6037949 (S.D.N.Y. Sept. 15, 2023) .............. 17

*Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*,
   596 F.2d 70 (2d Cir. 1979) ................................................................. 11

*Kane v. DeBlasio*,
   19 F.4th 152 (2d Cir. 2021) .............................................................. 17

*Lewis v. Casey*,
   518 U.S. 343 (1996)........................................................................... 16

*Maryland v. King*,
   567 U.S. 1301 (2012)......................................................................... 14

*New Mexico v. Musk*,
   No. 25-cv-429 (TSC), 2025 WL 520583 (D.D.C. 2025).......................... 9

*New York v. U.S. Dep't of Homeland Security*,
   969 F.3d 42 (2d Cir. 2020) .......................................................... 8, 10

*Nken v. Holder*,
   556 U.S. 418 (2009).................................................................... 2, 13

*RECO Equip., Inc. v. Wilson*,
   No. 20-4312, 2021 WL 5013816 (6th Cir. Oct. 28, 2021) ..................... 13

*Register.com, Inc. v. Verio, Inc.*,
   356 F.3d 393 (2d Cir. 2004) ............................................................. 12

*Rodriguez ex rel. Rodriguez v. DeBuono*,
   175 F.3d 227 (2d Cir. 1999) ............................................................... 8

*Sampson v. Murray*,
   415 U.S. 61 (1974).................................................................... 10, 11

*Solus Alternative Asset Mgmt. LP v. GSO Capital Partners LP*,
   No. 18-cv-232 (LTS) (BCM), 2018 WL 620490 (S.D.N.Y. Jan. 29, 2018)........... 10

*Students for Fair Admissions v. U.S. Military Acad. at West Point*,
   709 F. Supp. 3d 118 (S.D.N.Y. 2024) ................................................. 6

*Univ. of Tex. v. Camenisch*,
   451 U.S. 390 (1981)........................................................................... 17

*Viamedia, Inc. v. WideOpenWest Finance, LLC*,
   No. 20-cv-4064, 2020 WL 8991776 (S.D.N.Y. May 27, 2020)............... 12

*Winter v. Natural Resources Defense Council, Inc.*,
   555 U.S. 7 (2008)............................................................................... 6

*Wis. Gas Co. v. FERC*,
  758 F.2d 669 (D.C. Cir. 1985) .................................................................................. 12

*Wisdom Imp. Sales Co. v. Labatt Brewing Co.*,
  339 F.3d 101 (2d Cir. 2003) .................................................................................... 11

*Yang v. Kosinski*,
  960 F.3d 119 (2d Cir. 2020) ...................................................................................... 6

**REGULATIONS**

2 C.F.R. § 200.340 .......................................................................................................... 15

**RULES**

Fed. R. Civ. P. 65 ........................................................................................................... 18

**STATUTES**

5 U.S.C. § 1214 .............................................................................................................. 10

20 U.S.C. § 951 ............................................................................................................... 2

20 U.S.C. § 956 ............................................................................................... 2, 3, 7, 15

28 U.S.C. § 1491 ............................................................................................................ 11

Defendants Michael McDonald, in his official capacity as Acting Chairman of the National Endowment for the Humanities ("NEH"), NEH, United States DOGE Service, Amy Gleason, in her official capacity as Acting Administrator of the U.S. DOGE Service, Nate Cavanaugh, in his official capacity as an employee of the U.S. DOGE Service or the General Services Administration, and Justin Fox, in his official capacity as an employee of the U.S. DOGE Service or the General Services Administration (together, "Defendants"), by their attorney Jay Clayton, United States Attorney for the Southern District of New York, respectfully submit this memorandum of law in opposition to the motions for preliminary injunctions filed by Plaintiffs American Council of Learned Societies, American Historical Association, and Modern Language Association ("ACLS Plaintiffs"), *see* Dkt. No. 24, and The Authors Guild, William Goldstein, Elizabeth Kadetsky, Valerie Orlando, Katalin Balog, Benjamin Holtzman, Lee Jasperse, and Nicole Jenkins ("Authors Guild Plaintiffs" and, together with "ACLS Plaintiffs," "Plaintiffs"), *see* Dkt. No. 65.[1]

## PRELIMINARY STATEMENT

Plaintiffs challenge certain categories of actions recently taken with respect to NEH, namely the termination of grants, reduction-in-force of staff members, the elimination of certain programs and divisions, and delaying or refraining from spending appropriated funds.  Much of this alleged conduct does not directly harm Plaintiffs, who are non-profit entities and individuals who allege their grants, or grants of their members, have been terminated.  Plaintiffs nonetheless seek broad injunctions reversing these actions and requiring NEH to reinstate all of the terminated grants and employees placed on leave, restore all discontinued programs and divisions, and spend the full amount of funds that Congress has appropriated to NEH.  Plaintiffs are not entitled to this

---

[1] Unless otherwise indicated, docket numbers cited are those in Case No. 1:25-cv-03657 (CM).

relief.

First, for the reasons discussed in Defendants' Memorandum of Law in Support of Their Motion to Dismiss Plaintiffs' Complaints, which was filed on May 30, 2025, *see* Dkt. No. 77 ("Defendants' Motion" or "Defs' Mot."), Plaintiffs are unlikely to succeed on the merits of their claims, including because the Court lacks jurisdiction to consider them. Plaintiffs also have not demonstrated that they will suffer irreparable harm absent injunctive relief, given that the harms from the termination of their grants are primarily economic in nature and they can challenge those terminations in the Court of Federal Claims. The remaining factors—public interest and balance of the equities, which merge when the government is the party opposing a motion for preliminary injunctive relief, *see Nken v. Holder*, 556 U.S. 418, 435–36 (2009)—also weigh in favor of Defendants. Accordingly, Plaintiffs' motion for preliminary injunctions should be denied. Finally, if the Court were to impose a preliminary injunction, it should be narrowly tailored, extending only to Plaintiffs' own grants.

## BACKGROUND

NEH was created by statute in 1965. *See* National Foundation on the Arts and the Humanities Act, Pub. L. 89-209, 20 U.S.C. § 951(12) (Sept. 29, 1965). The statute provides that "[t]he Endowment shall be headed by a chairperson, who shall be appointed by the President, by and with the advice and consent of the Senate." 20 U.S.C. § 956(b). "The Chairperson, with the advice of the National Council on the Humanities . . . , is authorized to enter into arrangements, including contracts, grants, loans, and other forms of assistance, to" carry out various specified purposes, including to "initiate and support research and programs to strengthen the research and teaching potential of the United States in the humanities by making arrangements with individuals or groups to support such activities," and to "initiate and support programs and research which

have substantial scholarly and cultural significance and that reach, or reflect the diversity and richness of our American cultural heritage, including the culture of, a minority, inner city, rural, or tribal community." *Id.* § 956(c).

On May 1, 2025, the ACLS Plaintiffs filed suit, asserting claims against Defendants. Dkt. No. 1. On May 12, 2025, the Authors Guild Plaintiffs filed suit against the same defendants. Case No. 1:25-cv-3923 (CM), Dkt. No. 1. On May 14, 2025, the Court consolidated the two cases. Dkt. No. 52. The ACLS Plaintiffs are non-profit entities that have received grants from NEH and have members who received grants from NEH, and the Authors Guild Plaintiffs are individuals who received grants from NEH and The Authors Guild, an association that has members who have received grants from NEH. ACLS Compl. ¶¶ 12-14; Authors Guild Compl. ¶¶ 11-24. The Authors Guild Plaintiffs filed an amended complaint on May 23, 2025. Dkt. No. 75.

On May 14, 2025, the ACLS Plaintiffs filed a motion for a preliminary injunction. Dkt. No. 24. In its May 14, 2025, Order consolidating the cases, the Court ordered that if the Authors Guild Plaintiffs intended to join the ACLS Plaintiffs' motion for a preliminary injunction, or wanted to file their own motion, they had until May 23, 2025, to do so. Dkt. No. 52. The Authors Guild Plaintiffs filed a motion for a preliminary injunction on May 23, 2025. Dkt. No. 65.

Defendants summarize Plaintiffs' allegations in their Motion. *See* Defs' Mot. at 3-5. In short, while they characterize their case as one challenging "the recent dismantling" of NEH, ACLS Compl. ¶ 1, they challenge four specific categories of actions: termination of grants, reduction-in-force of staff members, the elimination of certain programs and divisions, and delaying or refraining from spending appropriated funds. *Id.* ¶¶ 5-6; Authors Guild Compl. ¶¶ 6-7, 55, 116, 119. Plaintiffs allege that these actions violated the APA, separation of powers, the

3

Impoundment Control Act of 1974, appropriations legislation, and the First Amendment and that they were *ultra vires*. ACLS Compl.; Authors Guild Compl.

The ACLS Plaintiffs seek a preliminary injunction enjoining Defendants "from (1) enforcing their decisions to eliminate or nearly eliminate [NEH] divisions, programs and offices; mass-terminate staff; delay spending or fail to spend appropriated funds; [and] (2) enforcing and giving effect to the termination of Plaintiffs' grants and the grants of their grant members." Dkt. No. 24. They also seek an injunction requiring Defendants "to obligate and spend funds appropriated to NEH by Congress without intentional delay." *Id.*

The Authors Guild Plaintiffs seek a preliminary injunction: "(1) enjoining Defendants from enforcing or giving effect to the" termination of grants, including to Plaintiffs and their members; (2) "enjoining Defendants from any similar future action"; (3) "enjoining Defendants from re-obligating funds used to support the covered grants"; and (4) "enjoining Defendants to take all steps necessary to ensure that the National Endowment for the Humanities disburses funds on covered grants in the customary manner and in customary timeframes." Dkt. No. 65.

Plaintiffs acknowledge, however, that NEH did not terminate all existing grants, and, since the challenged actions occurred, has continued to award new grants. *See* ACLS Compl. ¶ 67 and Authors Guild Compl. ¶ 120 (alleging that a portion of grants were terminated); Authors Guild Compl. ¶¶ 122-23 (noting that on May 8, 2025, NEH announced that it awarded $9.55 million in grants for 68 humanities projects, and on May 16, 2025, NEH announced a new grant program). Indeed, many NEH grant recipients continue to receive NEH funding for awards that were ongoing in early April 2025. Declaration of Michael McDonald dated June 5, 2025, Dkt. No. 80 ("McDonald Decl.") ¶ 14. Moreover, since mid-April of this year, the NEH Chairman has instituted three new grant programs and has continued at least fifteen existing grant programs that

are either currently accepting applications or have upcoming deadlines in the next several months. *Id*. ¶ 19.  Through nine such programs, NEH awarded $9.55 in grants in April alone for 68 humanities projects across the country.  *Id.* ¶ 21; *see also* Press Release, NEH Announces $9.55 Million for 68 Humanities Projects, May 8, 2025, https://www.neh.gov/news/neh-announces-955-million-68-humanities-projects ("May 8, 2025, Release"); NEH Grant Awards and Offers, May 2025, available at https://www.neh.gov/sites/default/files/Spring%202025%20grants%20state%20by%20state%20list%20FINAL.pdf (May 2025 Grant Awards List).  Those projects include, among other things, support for production of a documentary about a 14-year-old Jewish girl whose diary was found in the rubble of Auschwitz in 1945, a discussion program for veterans focusing on the legacies and public memorialization of the Civil War and the Vietnam War, the digitization of archival materials held by Rochester Institute of Technology documenting Deaf history and culture and records relating to the National Institute for the Deaf, research regarding the early drawings and engravings of William Blake, an online database of 3D models of the Great Marble Map of Rome, preparation of a book examining how T.S. Eliot's childhood experiences are reflected in his poetry, a two-year project to develop online courses in Micronesian studies, a two-year project to create educational resources on African American art history with a focus on the South, a one-year initiative to increase access to humanities internships for underrepresented and underserved students, and the implementation of a traveling exhibition examining African American photojournalism from the 1940s through the 1980s.  McDonald Decl. ¶ 21; May 8, 2025, Release; May 2025 Grant Awards List.  The agency intends to award additional grants following anticipated meetings with NEH's advisory committee, the National Council on the Humanities, in July 2025 and November 2025.  McDonald Decl. ¶ 22.

## LEGAL STANDARD

"A preliminary injunction 'is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion.'" *Students for Fair Admissions v. U.S. Military Acad. at West Point*, 709 F. Supp. 3d 118, 129 (S.D.N.Y. 2024) (quoting *Grand River Enterprises Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007)); *see also Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 24 (2008) ("A preliminary injunction is an extraordinary remedy never awarded as of right."). To demonstrate its entitlement to this "extraordinary and drastic remedy," *id.*, a movant must clearly demonstrate: "(1) irreparable harm absent injunctive relief, (2) a likelihood of success on the merits, [] (3) public interest weighing in favor of granting the injunction," and (4) "that the balance of equities tips in his or her favor." *A.H. by & through Hester v. French*, 985 F.3d 165, 176 (2d Cir. 2021) (quotation marks and footnotes omitted). Where, as here, a movant seeks "to modify the status quo by virtue of a 'mandatory preliminary injunction' (as opposed to seeking a 'prohibitory preliminary injunction' to maintain the status quo)," the "standard for obtaining preliminary injunctive relief is higher." *A.H.*, 985 F.3d at 176 (quoting *Yang v. Kosinski*, 960 F.3d 119, 127 (2d Cir. 2020)). "In this circumstance, the movant must . . . make a *strong* showing of irreparable harm and demonstrate a *clear or substantial* likelihood of success on the merits." *Id.* (emphasis added; quotation marks omitted).

## ARGUMENT

Plaintiffs are not entitled to injunctive relief because they do not make a clear showing that they are likely to succeed on the merits of their claims, that they will be harmed irreparably absent an injunction, or that the balance of equities and the public interest weigh in their favor.

6

## I.    Plaintiffs Do Not Demonstrate a Likelihood of Success on the Merits

For the reasons explained in Defendants' Motion, Plaintiffs are unlikely to succeed on the merits of their claims.  First, the Court lacks jurisdiction over those claims.  The Tucker Act vests the Court of Federal Claims with exclusive jurisdiction over claims related to grant agreements, which are contracts.  Defs' Mot. at 6-9.  Additionally, through the Civil Service Reform Act, Congress created an exclusive mechanism for federal employees to challenge adverse personnel actions.  That exclusive mechanism precludes Plaintiffs, who are not even federal employees, from challenging those personnel actions in this court.  *Id.* at 9-11.  Plaintiffs' claims are also unreviewable under the APA, as the above statutory schemes preclude APA review of grant terminations and personnel actions, adequate, alternative remedies exist for the claims, the challenged actions are committed to agency discretion by law, and the claims constitute impermissible programmatic challenges, rather than challenges to discrete, final agency actions.  *Id.* at 15-20.  Plaintiffs also lack standing as to any of their claims not related to the terminations of their own grants, and many claims are unripe.  *Id.* at 11-15.

Finally, even if Plaintiffs could overcome these threshold issues, many allegations in their complaints fail to state a claim.  *Id.* at 20-25.  For one thing, Plaintiffs do not sufficiently allege a violation of the separation of powers doctrine because they do not plausibly allege that Defendants violated any federal statute by engaging in the challenged actions.  As explained in Defendants' Motion, Plaintiffs have pointed to no statute that prohibits NEH from cancelling grant agreements, reducing staff, or eliminating divisions or programs.  To the contrary, the governing statute establishing NEH authorizes the agency head to disperse grants in accordance with broadly stated objectives, and does not entitle any particular individuals or entities to grant proceeds.  *See* 20 U.S.C. § 956(c); *see* McDonald Decl. ¶¶ 8-11 (noting that nothing in NEH

7

governing statute, or in any other law or regulation, prevents the NEH Chairman from terminating or rescinding grant awards in his sole discretion or requires NEH to maintain or award a particular number of grants, make grants to particular recipients, or expend a particular amount of grant funds in a given time frame). Further, contrary to Plaintiffs' suggestion, NEH is not required to spend all funds appropriated by Congress within a particular year. *See* Consolidated Appropriations Act, 2024, Pub. L. 118-42 (Mar. 9, 2024); March 15, 2025, Continuing Resolution, Pub. L. 119-4; McDonald Decl. ¶¶ 23-24. Indeed, it is common for NEH to spend only a portion of its appropriated funds in any given year, and to simply carry unspent funds forward. McDonald Decl. ¶ 25.

Based on these deficiencies, which are explained at length in Defendants' Motion, Plaintiffs cannot establish a likelihood of success on the merits of their claims.

## II.    Plaintiffs Have Not Shown Irreparable Harm

Plaintiffs have also failed to show irreparable harm. "Irreparable harm is injury that is neither remote nor speculative[.]" *New York v. U.S. Dep't of Homeland Security*, 969 F.3d 42, 86 (2d Cir. 2020). Such injuries "cannot be remedied if a court waits until the end of trial to resolve the harm." *Freedom Holdings, Inc. v. Spitzer*, 408 F.3d 112, 114 (2d Cir. 2005) (citation omitted). Accordingly, "[o]nly when the threatened harm would impair the court's ability to grant an effective remedy is there really a need for preliminary relief." *Rodriguez ex rel. Rodriguez v. DeBuono*, 175 F.3d 227, 235 (2d Cir. 1999) (quotation marks omitted).

First, much of the conduct Plaintiffs seek to enjoin is not tied to the injuries they allege to have suffered themselves. This means both that Plaintiffs do not have standing to challenge this conduct, *see* Defs' Mot. at 11-14, and that Plaintiffs cannot rely on that conduct to establish irreparable harm. Specifically, while Plaintiffs' primary alleged injuries relate to the termination

of their own grants, both sets of Plaintiffs seek injunctions extending broadly to all terminated grants, and the ACLS Plaintiffs also seek an injunction concerning the elimination of programs and divisions, the firing of staff, and NEH's ability to spend appropriated funds.  ACLS Compl. Request for Relief; Authors Guild Compl. Prayer for Relief; Dkt. No. 24; Dkt. No. 65.  However, "[t]o satisfy the irreparable harm requirement, Plaintiffs must demonstrate that absent a preliminary injunction *they* will suffer an injury" meeting the requisite requirements.  *Grand River Enterprises*, 481 F.3d at 66 (emphasis added, citation omitted).  "[H]arm that might befall unnamed third parties does not satisfy the irreparable harm requirement in the context of emergency injunctive relief, which must instead be connected specifically to the parties before the Court." *New Mexico v. Musk*, --- F. Supp. 3d ---, Case No. 25-cv-429 (TSC), 2025 WL 520583, at *4 (D.D.C. 2025) (quoting *Church v. Biden*, 573 F. Supp. 3d 118, 146 (D.D.C. 2021)).

Any purportedly irreparable harms Plaintiffs allege to themselves from challenged actions beyond the termination of their grants are remote and speculative.  For example, the ACLS Plaintiffs allege that they "and their members are suffering irreparable harm from the elimination of NEH programs, including programs for which Plaintiffs had planned to apply."  ACLS Plaintiffs' Memorandum of Law in Support of Their Motion for Preliminary Injunction, Dkt. No. 25 ("ACLS Br.") at 21.  In support, one member asserts that it "anticipated" certain types of grants in the future but they "likely" will not now be offered.  Dkt. No. 27, Connolly Decl. ¶¶ 27-28.  This chain of possible events is clearly speculative.  Other Plaintiffs assert that they have been harmed because they worked on grant applications for which the funding has been canceled.  Dkt. No. 28, Grossman Decl. ¶¶ 27-28; Dkt. No. 29, Krebs Decl. ¶¶ 23-25.   Whether these Plaintiffs would have received specific grants for which they applied or planned to apply is speculative.   In any

event, such allegations would at most establish harm with respect to those specific grant opportunities.

The ACLS Plaintiffs also assert that the closing of offices and divisions will harm them because they have worked with these offices in the past and they want them to continue to serve certain functions in the future, such as "address[ing] the crisis of falling enrollments in majors across the humanities." ACLS Br. at 22-23. Similarly, they note "the important role NEH plays in supporting and legitimizing the humanities research that Plaintiffs and their members conduct" and suggest NEH will not continue to play such a role. *Id.* at 23. Such harms, which are both "remote" and "speculative," do not suffice to demonstrate irreparable harm. *New York*, 969 F.3d at 86.

As to the agency's challenged employment actions, it is also worth noting that, even if Plaintiffs did have standing to challenge adverse employment actions affecting individuals other than themselves (which they do not, *see* Defs' Mot. at 12-14), loss of government employment generally does not constitute irreparable injury even to those who suffered it. *See Sampson v. Murray*, 415 U.S. 61, 91-92 & n.68 (1974). This is especially so since employees seeking to challenge their termination or placement on administrative leave may seek emergency stays from the Office of Special Counsel and the Merit Systems Protection Board, *see* 5 U.S.C. § 1214(b). Accordingly, employment decisions, even up to a loss of employment, are only irreparable in "genuinely extraordinary situation[s]." *Sampson*, 415 U.S. at 89–92; *see also id*. at 92 n.68. Losses of income or reputation are not such extraordinary situations. *Id.*

As to the termination of Plaintiffs' grants, economic harms generally are not sufficient to establish irreparable harm. *See, e.g.*, *Solus Alternative Asset Mgmt. LP v. GSO Capital Partners LP*, Case No. 18-cv-232 (LTS) (BCM), 2018 WL 620490, at \*5-6 (S.D.N.Y. Jan. 29, 2018).

This is because "it has always been true that irreparable injury means injury for which a monetary award cannot be adequate compensation and that where money damages is adequate compensation a preliminary injunction will not issue." *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d 70, 72 (2d Cir. 1979); *see also Wisdom Imp. Sales Co. v. Labatt Brewing Co.*, 339 F.3d 101, 113–14 (2d Cir. 2003) ("[O]nly harm shown to be non-compensable in terms of money damages provides the basis for awarding injunctive relief."). Plaintiffs' alleged injuries arising from the termination of their grants are primarily economic in nature, even if also accompanied by lost time and energy. *See Sampson*, 415 U.S. at 90 ("The key word in this consideration is irreparable. Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay, are not enough. The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm.").

As explained in Defendants' Motion, Plaintiffs can challenge the termination of their grants in the Court of Federal Claims. Defs' Mot. at 6-9. In that forum—which is, in fact, the exclusive forum for such claims, *see id.*, Plaintiffs can seek to recover damages arising from the termination of their grants, as well as other contract remedies. *See* 28 U.S.C. § 1491(a)(1). Because any financial harms Plaintiffs have suffered or will suffer due to the termination of their grants are recoverable in that forum, such harms do not establish irreparable injury. *See Dep't of Education v. California*, 145 S. Ct. 966, 969 (2025) (finding that "respondents would not suffer irreparable harm" where "they have the financial wherewithal to keep their programs running" and "can recover any wrongfully withheld funds through suit in an appropriate forum"). That is so even though damages are not available under the APA. *See id.* (plaintiffs filed suit under the

11

APA, which does not permit suits for damages, but could file suit in the Court of Federal Claims under the Tucker Act).

Aside from financial losses, Plaintiffs also allege that the termination of their grants will harm their careers, including through the potential loss of good will in the academic community. Authors Guild Plaintiffs' Memorandum in Support of Their Motion for Preliminary Injunction, Dkt. No. 65-1 ("Authors Guild Br.") at 23-24; ACLS Br. at 21.  While the loss of reputation and goodwill may constitute irreparable harm, *see Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 404 (2d Cir. 2004), Plaintiffs cannot rely on assertions of such harm that are conclusory or unsubstantiated.  *See, e.g.*, *Viamedia, Inc. v. WideOpenWest Finance, LLC*, Case No. 20-cv-4064, 2020 WL 8991776, at *1 (S.D.N.Y. May 27, 2020) (rejecting assertion of irreparable harm based on conclusory and unsupported assertion of harm to reputation and citing cases).  Here, the assertion that the termination of a single grant will materially damage Plaintiffs' careers is conclusory and speculative.  Further, the alleged harm must "directly result from the action which the movant seeks to enjoin." *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985).  When a harm is "based on independent market variables such as how [a company's] customers and/or retail consumers might react," that harm does not flow directly from the challenged action.  *Am. Meat Inst. v. U.S. Dep't of Agric.*, 968 F. Supp. 2d 38, 81 (D.D.C. 2013).  Plaintiffs' claim that their reputations and careers will be permanently damaged as a result of the termination of their grants necessarily relies on independent variables concerning both the projects at issue and their careers generally.

Finally, the Authors Guild Plaintiffs assert that they have demonstrated irreparable harm with respect to the viewpoint discrimination they allege motivated their grant terminations, because "[t]he loss of First Amendment freedoms, for even minimal periods of time,

unquestionably constitutes irreparable injury." Authors Guild Br. at 25 (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)). For the reasons discussed in Defendants' Motion, Plaintiffs fail to plausibly allege that Defendants violated their First Amendment rights. Defs' Mot. at 22-24. Accordingly, any harms arising from Plaintiffs' alleged First Amendment violations cannot justify a preliminary injunction. *See, e.g.*, *RECO Equip., Inc. v. Wilson*, Case No. 20-4312, 2021 WL 5013816, at *2 (6th Cir. Oct. 28, 2021) ("When a movant seeks a preliminary injunction on multiple claims, courts evaluate each claim separately.").

### III.    The Balance of the Equities and Public Interest Weigh Against Relief

The final two factors, balance of the equities and the public interest, also weigh in Defendants' favor. *See Nken*, 556 U.S. at 435–36 (final two factors merge when the government is the party opposing a motion for preliminary injunctive relief). "In determining whether the balance of the equities tips in the plaintiff's favor and whether granting the preliminary injunction would be in the public interest, the Court must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief, as well as the public consequences in employing the extraordinary remedy of injunction." *Bionpharma Inc. v. CoreRx, Inc.*, 582 F. Supp. 3d 167, 178 (S.D.N.Y. 2022) (quotation marks omitted).

As an initial matter, because Plaintiffs cannot establish the first two factors necessary to obtain a preliminary injunction, "it is clear they cannot make the corresponding strong showings [on the second two factors] required to tip the balance in their favor." *Davis v. Pension Ben. Guar. Corp.*, 571 F.3d 1288, 1295 (D.C. Cir. 2009). To argue that the public interest weighs in their favor, Plaintiffs repackage their arguments regarding the merits of their claims and the harms they allege the public, as well as "historians, linguists, researchers," "humanists," and the "broader academic infrastructure," will suffer as a result of the cancellation of grants and programs

generally.  ACLS Br. at 24-25; Authors Guild Br. at 25-26.  As discussed above, such arguments are insufficient to meet the exacting standard needed to obtain a preliminary injunction.  *See supra* Parts I and II.

The final two factors also tip in Defendants' favor for other reasons.  First, the injunctions Plaintiffs seek would disrupt NEH's efforts to implement the President's directives while complying with the agency's statutory obligations.  *See generally* McDonald Decl.  In particular, Executive Order 14222 required, among other things, that agency heads review, in consultation with DOGE, "all existing covered contracts and grants and, where appropriate and consistent with applicable law, terminate or modify [them] to reduce overall Federal spending or reallocate spending to promote efficiency and advance the policies of [the] Administration."  Exec. Order. No. 14222, 90 F.R. 11095, 11-96-96 (Pres. 2025).  Plaintiffs' requested preliminary injunctions would disrupt NEH's lawful execution of that process.  *See* McDonald Decl. ¶ 13-14, 17-18, 21-22.  "Any time [the government] is enjoined by a court from effectuating [laws], it suffers a form of irreparable injury."  *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers).

Contrary to Plaintiffs' suggestions, imposing the requested injunctions would do far more than simply "require . . . that the government take steps it is already legally required to take."  ACLS Br. at 25; *see also* Authors Guild Br. at 26.  As discussed, NEH has continued to carry out its statutory functions, and NEH is not required to disburse the entirety of the funds appropriated by Congress in this fiscal year or by any date certain.  *See supra* pages 4-5, 7-8; Defs'. Mot. at 14-15, 18, 20-22; McDonald Decl. ¶¶ 14, 17-19, 21-25; May 8, 2025 Release.  Accordingly, Plaintiffs are not requesting that the Court merely require Defendants to abide by the law; they, instead, are effectively asking the Court to step in and direct NEH as to which grants it may legally terminate and which grants it may legally fund—an exercise that would interfere with the agency's discretion

14

to enter into grant agreements that serve any of a number of broad statutory goals and to terminate a grant award if it "no longer effectuates . . . agency priorities." *See* 20 U.S.C. § 956(c); 2 C.F.R. § 200.340(a)(4); Defs' Mot. at 19-20; McDonald Decl. ¶¶ 8-13, 15, 16, 18, 21-22.

Further, the injunctions Plaintiffs seek could irreparably harm the public fisc. Where the Government is legally entitled to make decisions about the disbursement or allocation of federal funds but is nonetheless ordered to release the funds, such funds may not be retrievable afterwards. *See Department of Education v. California*, 145 S. Ct. at 968-69 (noting "the Government's representation that it is unlikely to recover the grant funds once they are disbursed" as among the reasons supporting a stay of a temporary restraining order enjoining the Government from terminating various education-related grants). Plaintiffs, in contrast, "can recover any wrongfully withheld funds through suit in an appropriate forum" if they prevail on their claims in this action. *Id.* at 969.

As discussed above, Plaintiffs will not suffer irreparable harm from the denial of their preliminary injunctions, because the potential harms that Plaintiffs have identified as to themselves are fundamentally economic, and thus not irreparable, and the remaining harms are remote, speculative, or would not harm Plaintiffs themselves. And in light of NEH's continuing efforts to administer grants and foster the humanities, Plaintiffs' general pronouncements that the challenged actions "deprive[] the public of its access to scholarship and new ideas" lacks merit. Authors Guild Br. at 25-26; *see also* ACLS Br. at 24. In an April 24, 2025, press release, NEH reiterated its mission to "bring the wisdom of the humanities to all Americans" through "research projects that advance humanistic learning, preservation projects that ensure access to significant humanities resources, education projects that strengthen teaching in the humanities, and public programing that conveys the best of the humanities to all Americans." Press Release, An Update on NEH

Funding Priorities and the Agency's Recent Implementation of Trump Administration Executive Orders, Apr. 24, 2025, https://www.neh.gov/news/update-neh-funding-priorities-and-agencys-recent-implementation -trump-administration-executive; *see also* McDonald Decl. ¶¶ 6-7, 17 (discussing NEH's "mission" and attesting that NEH "continues to exist and, consistent with its Congressional mandate, to fund projects that strengthen humanities research, education, teaching and scholarship in a wide variety of humanities disciplines").  Consistent with these goals, as discussed, NEH announced in May that it had awarded millions of dollars in grants to support research, scholarship, or other projects in subjects including the Holocaust, the history of the Deaf, William Blake, ancient Rome, German Expressionist art, and African American photojournalism. *See supra* page 5; May 8, 2025, Release; May 2025 Grant Awards List; McDonald Decl. ¶ 21.  All of this refutes the notion that Defendants' actions will "deprive[] the public of its access to scholarship and new ideas" absent an injunction.  Authors Guild Br. at 25-26; ACLS Br. at 24-25.

Accordingly, the balance of the equities and the public interest militate against the requested preliminary injunctions.

### IV.    Any Injunctions Should Be Narrowly Tailored

Finally, if the Court were to consider entering preliminary relief here, which would not be warranted, that relief should be narrowly tailored to address the injuries that Plaintiffs have demonstrated their standing to assert.  It is a bedrock principle of equity that "injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979); *see also Lewis v. Casey*, 518 U.S. 343, 360 (1996) (explaining that an injunction should not provide "a remedy beyond what [is] necessary to provide relief" to the injured parties).  In accordance with these principles, to the extent the Court intends to grant Plaintiffs' request for a preliminary injunction, such relief should

be narrowly tailored to apply only to Plaintiffs.

There is no basis for extending relief to non-parties to this suit. Accordingly, any preliminary injunction should confirm that all obligations in the injunctive order apply only with respect to any grants or contracts involving Plaintiffs specifically. *See Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981) ("The purpose of a preliminary injunction is merely to preserve the relative positions *of the parties* until a trial on the merits can be held." (emphasis added)); *see also Dep't of Homeland Sec. v. New York*, 140 S. Ct. 599, 600 (2020) (Gorsuch, J., concurring) ("Universal injunctions have little basis in traditional equitable practice."); *Florida v. Dep't of Health & Hum. Servs.*, 19 F.4th 1271, 1282 (11th Cir. 2021) (noting that the "appropriate circumstances" for issuing a nationwide injunction "are rare").

Further, any preliminary injunction should be carefully tailored to apply only to the named Authors Guild Plaintiffs, and not to all members of the classes proposed by those Plaintiffs, because no class has been certified to date. *See Greater Chautauqua Fed. Credit Union v. Quattrone*, Case No. 1:22-cv-2753 (MKV), 2023 WL 6037949, at *6 (S.D.N.Y. Sept. 15, 2023) (discussing "the Second Circuit's warning that 'the rule that injunctive relief should be narrowly tailored to prevent harm to the *parties before the court* 'applies with special force where,' as here, 'there is no class certification'") (emphasis in original) (quoting *Kane v. DeBlasio*, 19 F.4th 152, 174 (2d Cir. 2021)). As discussed in Defendants' motion to dismiss, it would not be appropriate for the Court to certify the classes proposed by the Authors Guild Plaintiffs because their claims are premised on challenges to grant terminations, which can only be brought in the Court of Federal Claims. Defs' Mot. at 9.

**V.     Any Injunctive Relief Should Be Stayed Pending Appeal and Accompany a Bond**

To the extent the Court issues any injunctive relief, Defendants respectfully request that such relief be stayed pending the disposition of any appeal that is authorized by the Solicitor General, or at a minimum, administratively stayed for a period of seven days to allow the United States to seek an emergency, expedited stay from the court of appeals if an appeal is authorized.

Defendants also respectfully request that any injunctive relief accompany a bond under Fed. R. Civ. P. 65(c), which provides that "[t]he court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."  A bond is appropriate here given that any preliminary relief would potentially mandate that the Executive spend money that may not be recouped once distributed.

## CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' motions for preliminary injunctions.

Dated: New York, New York
      June 5, 2025

                            Respectfully submitted,

                            JAY CLAYTON
                            United States Attorney for
                            the Southern District of New York
                            Attorney for Defendants

By:  */s/ Mary Ellen Brennan*_____
                            MARY ELLEN BRENNAN
                            RACHAEL DOUD
                            Assistant United States Attorneys
                            86 Chambers Street, 3rd floor
                            New York, New York 10007
                            Telephone: (212) 637-2652/-2699

MaryEllen.Brennan@usdoj.gov
Rachael.Doud@usdoj.gov