# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

THE AUTHORS GUILD, WILLIAM
GOLDSTEIN, ELIZABETH KADETSKY,
VALERIE ORLANDO, KATALIN BALOG,
BENJAMIN HOLTZMAN, LEE JASPERSE,
and NICOLE JENKINS, on behalf of themselves
and all others similarly situated,

      Plaintiffs,

      v.

NATIONAL ENDOWMENT FOR THE
HUMANITIES, et al.,

      Defendants.

Case No. 1:25-cv-03923

Consolidated with No. 1:25-cv-03657

## MEMORANDUM IN SUPPORT OF PLAINTIFFS'
## MOTION FOR PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .................................................................................................ii

INTRODUCTION ............................................................................................................. 1

STATEMENT OF FACTS ................................................................................................. 2

      A.     The National Endowment for the Humanities ........................................... 2

      B.     The NEH's Grant Programs ....................................................................... 3

      C.     The Mass Termination ................................................................................ 4

LEGAL STANDARD ....................................................................................................... 6

ARGUMENT .................................................................................................................... 6

    I.     This Court Has Jurisdiction To Grant The Requested Relief ............................... 6

      A.     This Court Has Jurisdiction Over Plaintiffs' APA Claims ........................ 7

      B.     Plaintiffs' Non-APA Claims Are Also Properly Before the Court........... 11

    II.    Plaintiffs Have A Strong Likelihood Of Success .................................................. 12

      A.     The Mass Termination Violated the APA ................................................. 12

      B.     The Mass Termination Violated the First Amendment ............................ 17

      C.     The Mass Termination Was *Ultra Vires* .................................................. 21

    III.    The Mass Termination Is Inflicting Irreparable Harm.......................................... 22

    IV.    The Balance Of Equities And The Public Interest Overwhelmingly Favor
         Relief.................................................................................................................... 25

CONCLUSION................................................................................................................ 26

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*725 Eatery Corp. v. City of N.Y.*,
408 F. Supp. 3d 424 (S.D.N.Y. 2019) ..................................................................... 12

*AIDS Vaccine Advoc. Coal. v. Dep't of State*,
2025 WL 752378 (D.D.C. Mar. 10, 2025) .............................................................. 25

*Alliance for Open Soc'y Int'l, Inc. v. USAID*,
430 F.Supp.2d 222 (S.D.N.Y. 2006) ....................................................................... 21

*Am. Ass'n of Colleges for Tchr. Educ. v. McMahon*,
2025 WL 863319 (D. Md. Mar. 19, 2025) .................................................... 7, 13, 14

*Am. Fed'n of Gov't Emps. v. O.P.M.*,
2025 WL 996542 (S.D.N.Y. Apr. 3, 2025) .............................................................. 11

*Am. Near E. Refugee Aid v. USAID*,
703 F.Supp.3d 126 (D.D.C. 2023) ............................................................................ 8

*Amerijet Int'l, Inc. v. Pistole*,
753 F.3d 1343 (D.C. Cir. 2014) .............................................................................. 14

*Ass'n of Am. Univs. v. DOE*,
2025 WL 1414135 (D. Mass. May 15, 2025) .................................................. 6, 14, 15

*Atterbury v. U.S. Marshals Serv.*,
805 F.3d 398 (2d Cir. 2015) .................................................................................. 7, 9

*Bowen v. Massachusetts*,
487 U. S. 879 (1988) ................................................................................... 7, 9, 10, 11

*Brooklyn Inst. of Arts & Scis. v. City of New York*,
64 F. Supp. 2d 184 (E.D.N.Y. 1999) ...................................................................... 18

*Chicago Women in Trades v. Trump*,
2025 WL 1114466 (N.D. Ill. Apr. 14, 2025) ............................................................. 6

*Colorado v. HHS*,
2025 WL 1426226 (D.R.I. May 16, 2025) ...................................................... 6, 7, 16

*Crowley Gov't Servs., Inc. v. GSA*,
38 F.4th 1099 (D.C. Cir. 2022) ........................................................................... 7, 10

*Dep't of Com. v. New York*,
　588 U.S. 752 (2019) ................................................................................................ 15

*Dep't of Educ. v. California*,
　145 S. Ct. 966 (2025) .......................................................................................... 7, 10

*DHS v. Regents of the Univ. of Cal.*,
　591 U.S. 1 (2020) ............................................................................................ 13, 15

*Elrod v. Burns*,
　427 U.S. 347 (1976) .............................................................................................. 25

*Encino Motorcars, LLC v. Navarro*,
　579 U.S. 211 (2016) .............................................................................................. 12

*Esperanza Peace & Justice Center v. San Antonio*,
　316 F. Supp. 2d 433 (W.D. Tex. 2001) ................................................................ 18

*FCC v. Fox TV Stations, Inc.*,
　556 U.S. 502 (2009) ........................................................................................ 13, 16

*Freedom Holdings, Inc. v. Spitzer*,
　408 F.3d 112 (2d Cir. 2005) ................................................................................. 22

*Heffernan v. City of Paterson*,
　578 U.S. 266 (2016) .............................................................................................. 20

*Iancu v. Brunetti*,
　588 U.S. 388 (2019) .............................................................................................. 18

*Larson v. Domestic & Foreign Com. Corp.*,
　337 U.S. 682 (1949) .............................................................................................. 12

*League of Women Voters of United States v. Newby*,
　838 F.3d 1 (D.C. Cir. 2016). ................................................................................ 26

*Legal Servs. Corp. v. Velazquez*,
　531 U.S. 533 (2001) .............................................................................................. 18

*Maine v. U.S Dep't of Agric.*,
　2025 WL 1088946 (D. Me. Apr. 11, 2025) ........................................................... 7

*Massachusetts v. Kennedy*,
　2025 WL 1371785 (D. Mass. May 12, 2025) ........................................................ 6

*Megapulse, Inc. v. Lewis*,
　672 F.2d 959 (D.C. Cir. 1982) ...................................................................... 7, 8, 9

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983) ................................................................................................ 12, 16, 17

*Nat'l Air Traffic Controllers Ass'n v. United States*,
    160 F.3d 714 (Fed. Cir. 1988) .............................................................................. 11

*Nat'l Council of Nonprofits v. OMB*,
    763 F.Supp.3d 36 (D.D.C. 2025) .......................................................................... 24

*Nat'l Endowment for the Arts v. Finley*,
    524 U.S. 569 (1998) ................................................................................................ 18, 21

*Nat'l Urb. League v. Trump*,
    2025 WL 1275613 (D.D.C. May 2, 2025) ............................................................ 21

*Nemer Jeep-Eagle, Inc. v. Jeep-Eagle Sales Corp.*,
    992 F.2d 430 (2d Cir. 1993) .................................................................................. 22

*New York v. DHS*,
    969 F.3d 42 (2d Cir. 2020) .................................................................................... 17

*New York v. Trump*,
    2025 WL 1098966 (D.R.I. Apr. 14, 2025) .......................................................... 6

*Nken v. Holder*,
    556 U.S. 418 (2009) ................................................................................................ 6

*NRDC v. Dep't of Energy*,
    362 F. Supp. 3d 126 (S.D.N.Y. 2019) .................................................................. 14

*Pacito v. Trump*,
    2025 WL 893530 (W.D. Wash. Mar. 24, 2025) .............................................. 7, 16, 25

*Pieczenik v. Cambridge Antibody Tech. Grp.*,
    2004 WL 1118500 (S.D.N.Y. May 14, 2004) .................................................... 12

*Planned Parenthood of N.Y.C. v. HHS*,
    337 F. Supp. 3d 308 (S.D.N.Y. 2018) .................................................................. 26

*Rhode Island Latino Arts v. Nat'l Endowment for the Arts*,
    2025 WL 1009026 (D.R.I. Apr. 3, 2025) ............................................................ 21

*Rhode Island v. Trump*,
    2025 WL 1303868 (D.R.I. May 6, 2025) ..................................................... 6, 11, 13, 14, 15

*Ridley v. Mass. Bay Transp. Auth.*,
    390 F.3d 65 (1st Cir. 2004). .................................................................................. 18

iv

*Roso-Lino Beverage Distribs., Inc. v. Coca-Cola Bottling Co.*,
749 F.2d 124 (2d Cir. 1984) ................................................................. 22

*SEC v. Chenery Corp.*,
332 U.S. 194 (1947) .............................................................................. 14

*Semmes Motors, Inc. v. Ford Motor Co.*,
429 F.2d 1197 (2d Cir. 1970) ............................................................... 22

*St. Bernard Par. Gov't v. United States*,
134 Fed. Cl. 730 (2017) .......................................................................... 8

*TikTok Inc. v. Trump*,
490 F. Supp. 3d 73 (D.D.C. 2020) ....................................................... 26

*Tom Doherty Assocs., Inc. v. Saban Entm't, Inc.*,
60 F.3d 27 (2d Cir. 1995) ..................................................................... 23

*trueEX, LLC v. MarkitSERV Ltd.*,
266 F. Supp. 3d 705 (S.D.N.Y. 2017) .................................................. 22

*Winter v. Nat. Res. Def. Council, Inc.*,
555 U.S. 7 (2008) .................................................................................... 6

## Statutes

20 U.S.C. § 951 ............................................................................... 2, 9, 25

20 U.S.C. § 956 ................................................................. 2, 3, 9, 17, 18

28 U.S.C. § 1491 ...................................................................................... 6

31 U.S.C. § 6301 ...................................................................................... 8

5 U.S.C. § 706 ..................................................................................... 9, 12

## Other Authorities

Exec. Order No. 14151, Ending Radical and Wasteful Government DEI Programs and
Preferencing,
90 Fed. Reg. 8339 (Jan. 20, 2025) ....................................................... 19

Exec. Order No. 14168, Defending Women from Gender Ideology Extremism and Restoring
Biological Truth to the Federal Government,
90 Fed. Reg. 8615, (Jan. 20, 2025) ...................................................... 19

Exec. Order No. 14190, Ending Radical Indoctrination in K–12 Schooling,
90 Fed. Reg. 8853 (Jan. 29, 2025) ....................................................... 19

**Regulations**

2 C.F.R. § 200.340 ................................................................................................................ 15

## INTRODUCTION

For nearly six decades, the National Endowment for the Humanities ("NEH") has played a critical role in encouraging freedom of thought, supporting scholarly inquiry, and making the fruits of that inquiry available to all. It achieves these ends principally by awarding grants to support scholars' research and publication of culturally significant works. This suit involves about 1,500 such grants, which NEH issued after its highly competitive, months-long, expert-led review process determined that the funded projects were intellectually significant, of high quality, and worthy of the honor and prestige of an NEH grant.

Then, over the course of a few days in April, two operatives from the U.S. DOGE Service ("DOGE") swept into NEH and terminated the grants *en masse* via late-night emails sent from a non-government email address (the "Mass Termination"). There was no expert review, no individualized assessment, and no meaningful explanation. Instead, the Mass Termination rested on the conclusory assertion that the grants "no longer effectuate the agency's needs and priorities"—a rationale applied identically to every terminated project regardless of its subject matter or merit.

Plaintiffs are likely to succeed on their claims challenging these unlawful actions. The Mass Termination bears exactly none of the hallmarks of the reasoned agency action required by the Administrative Procedure Act ("APA"). The letters attached to the termination emails provide no real explanation for the Mass Termination, much less one that would account for the grievous harms it inflicts on grantees. Instead, the letters consist of identical, boilerplate, conclusory statements that cite no evidence, misidentify governing law, and ignore the substantial reliance interests at stake. Equally troubling, the Mass Termination appears to target grants based on their perceived viewpoints and association with the prior administration—a form of viewpoint discrimination prohibited by the First Amendment.

The harm to Plaintiffs is both immediate and irreparable. Scholars have structured their professional lives around these grants, obtaining leaves of absence, performing substantial work on their projects, and forgoing other opportunities in reliance on NEH's commitment. With grant affiliation and funding terminated midstream or on the eve of disbursement, they are left without time to replan and without viable alternatives to advance their projects and their careers. The Mass Termination cuts them off from rare, time-sensitive opportunities that form the basis of career advancement and scholarly contribution, threatening to derail their long-term reputations and the very viability of their work in the public humanities.

Finally, the balance of harms decisively favors Plaintiffs. Defendants have no legitimate interest in maintaining unlawful agency action, while the public interest lies in preserving the expert-driven process that Congress established to advance the humanities and in benefitting from the works that NEH grants enable. Preliminary relief is both warranted and necessary.

## STATEMENT OF FACTS

### A.    The National Endowment for the Humanities

The NEH is an independent federal agency that aims to promote excellence in the humanities, convey the lessons of history, and strengthen the nation. When creating the NEH, Congress expressly declared that "the humanities belong to all the people of the United States," and recognized that "[a]n advanced civilization must not limit its efforts to science and technology alone, but must give full value and support to the other great branches of scholarly and cultural activity in order to achieve a better understanding of the past, a better analysis of the present, and a better view of the future." 20 U.S.C. § 951(1), (3).

To advance this mission, Congress authorized the NEH to provide funding for individuals and organizations involved in research, publication of scholarly works, and promotion of the humanities. *See* 20 U.S.C. § 956. Specifically, Congress provided that the NEH may "enter into

arrangements," including "contracts, grants, loans, and other forms of assistance," to serve ten enumerated purposes, including "promot[ing] progress and scholarship in the humanities," *id.* § 956(c)(1), "foster[ing] the interchange of information in the humanities," *id.* § 956(c)(6), and "support[ing] the publication of scholarly works in the humanities," *id.* § 956(c)(8).

Over its history, the NEH has awarded over $6 billion to support museums, historic sites, universities, teachers, libraries, documentary filmmakers, public TV and radio stations, research institutions, scholars, and local humanities programming nationwide, cementing the United States' role as a global leader in the humanities. *See* Lieberman Decl., Ex. A at 4. NEH grants have supported the building blocks of American civil society, helping to examine the human condition, promote civics education, understand our cultural heritage, foster mutual respect for diverse beliefs and cultures, develop media and information literacy, create documentaries and podcasts, facilitate groundbreaking research, and preserve and expand access to cultural and historical artifacts. *Id.*

### B.    The NEH's Grant Programs

Prior to the actions at issue in this case, the NEH offered 47 grant programs to support the humanities nationwide. *See* Lieberman Decl., Ex. B. These programs were highly competitive and prestigious. Plaintiffs and Plaintiffs' members were among the recipients of these prestigious grants, including through the Public Scholars Program; the Fellowships Program; the Summer Stipends Program; the Awards for Faculty at Hispanic-Serving Institutions (HSIs) Program; the Awards for Faculty at Historically Black Colleges and Universities (HBCUs) Program; and the Fellowship Programs at Independent Research Institutions (FPIRI):

- Plaintiff Authors Guild is a national non-profit membership association of more than 16,000 professional, published writers of all genres. Authors Guild has many members who received grants from the NEH, including grantees under the Public Scholars, Fellowship, and Summer Stipend programs. Rasenberger Decl. ¶¶ 2-3.

- Plaintiff Elizabeth Kadetsky, a professor at Penn State University, received a Public Scholars Award for a book detailing the journeys of Indian sculptures to the most

eminent museums in the West, opening a window into a larger conversation about the ethics of museums and art collecting. Kadetsky Decl. ¶ 2.

- Plaintiff Bill Goldstein, an independent scholar, received a Public Scholars Award for his biography of Larry Kramer, an AIDS activist whose work pushed the government to confront its neglect of the AIDS crisis and helped reframe how marginalized communities organize for survival. Goldstein Decl. ¶ 2.

- Plaintiff Benjamin Holtzman, an Assistant Professor at Lehman College, received an Award for Faculty at HSIs for his book project on the activist networks that took root to combat the national resurgence of white supremacist organizing in the late 1970s and 1980s. Holtzman Decl. ¶ 3.

- Plaintiff Katalin Balog, a professor at Rutgers University-Newark, received a Fellowship Award for her book exploring changes in the concept of mind during the last 300 years and critiques current views on philosophical and moral grounds. Balog Decl. ¶ 2.

- Plaintiff Valerie Orlando, a professor at the University of Maryland, was awarded a Summer Stipend Award for research on a book project about history and memory in contemporary Algerian literature. Orlando Decl. ¶ 3.

- Plaintiff Nicole Jenkins, an Assistant Professor at Howard University, received an Award for Faculty at HBCUs to complete her book examining Black women's navigation of beauty norms, family, and Black women's identity-making. Jenkins Decl. ¶ 2.

- Plaintiff Lee Jasperse, a Teaching Fellow at the University of Chicago, received a fellowship at the Massachusetts Historical Society that was supported fully by an FPIRI grant. Jasperse Decl. ¶ 2.

Each of these grants was awarded after a highly competitive, expert-led review process determined that the projects were intellectually significant, of high quality, and worthy of the honor and prestige of an NEH grant. Each year, NEH conducted more than 200 review panels, involving nearly 1,000 outside experts, in its evaluation of approximately 5,700 applications across all grant programs. Lieberman Decl., Ex. C.

**C.    The Mass Termination**

On January 20, 2025, President Trump established DOGE as a new component of the Executive Office of the President. E.O. 14,158 § 3(a) (Jan. 20, 2025). The Executive Order required agencies to work with a "DOGE Team Lead" who would "advise" the agency "on implementing the President's DOGE Agenda." *Id.* § 3(c). In a subsequent Executive Order, the

President directed agencies to work with DOGE to "terminate or modify ... contracts and grants to reduce overall Federal spending or reallocate spending to promote efficiency and advance the policies of my Administration." E.O. 14,222 § 3(b) (Feb. 26, 2025).

In March 2025, two DOGE operatives—Defendants Nate Cavanaugh and Justin Fox—arrived at NEH. John Doe Decl., ECF 31 ¶ 2; Jane Doe Decl., ECF 32 ¶ 8. Cavanaugh and Fox met with senior NEH leadership to discuss DOGE's plans for NEH's future. Jane Doe Decl. ¶ 12. On April 1, 2025, Defendant McDonald, NEH's Acting Chairman, told NEH staff that DOGE sought to "claw back" $170 million in grants. *Id*. At the end of March or the beginning of April, Cavanaugh and/or Fox began reviewing a list of open NEH grants and personally choosing which grants would be terminated. John Doe Decl. ¶ 3; Richard Roe Decl., ECF 30 ¶ 2.

Across the first few days of April, Fox emailed nearly 1,500 grantees and informed them that their grants were being terminated (hereinafter, the "Mass Termination"). *See* Richard Roe Decl. ¶ 2; John Doe Decl. ¶ 3; Mark Moe Decl., ECF 50 ¶ 1. This included nearly all grants awarded during the Biden administration. Richard Roe Decl. ¶ 2. The termination notification to grantees did not come from an NEH email address, but rather from Grant_Notifications@nehemail.onmicrosoft.com. *Id.*; Goldstein Decl., Ex. B. The emails attached a grant termination letter purportedly signed by McDonald. *See* Kadetsky Decl., Ex. B; Goldstein Decl., Ex. C; Holtzman Decl., Ex. D; Orlando Decl., Ex. B.

The termination letters received by Plaintiffs and their members as part of the Mass Termination were nearly identical, with boilerplate language and no specific information about any grantee or the reasons their specific grants were being terminated. The letters uniformly stated:

> Your grant no longer effectuates the agency's needs and priorities and conditions of the Grant Agreement and is subject to termination due to several reasonable causes, as outlined in 2CFR§200.340. For instance, NEH has reasonable cause to terminate your grant in light of the fact that the NEH is repurposing its funding

allocations in a new direction in furtherance of the President's agenda. The President's February 19, 2025 executive order mandates that the NEH eliminate all non-statutorily required activities and functions. *See* Commencing the Reduction of the Federal Bureaucracy, E.O. 14217 (Feb. 19, 2025). Your grant's immediate termination is necessary to safeguard the interests of the federal government, including its fiscal priorities…. The termination of your grant represents an urgent priority for the administration, and due to exceptional circumstances, adherence to the traditional notification process is not possible.

*Id.* Grantees who tried to appeal the termination were ignored or told that "dispute resolution was not available." Goldstein Decl. ¶ 6; Kadetsky Decl. ¶ 9; Orlando Decl. ¶ 7; Balog Decl., Ex. D.

## LEGAL STANDARD

A preliminary injunction is warranted if Plaintiffs establish (1) a likelihood of success on the merits; (2) that irreparable harm is likely without preliminary relief; (3) that the balance of equities tips in Plaintiffs' favor; and (4) that a preliminary injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). When the government is the opposing party, the final two factors merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

## ARGUMENT

### I.    This Court Has Jurisdiction To Grant The Requested Relief.

This Court has subject matter jurisdiction and authority to grant the relief requested. As many agencies have done in similar cases, however, Defendants are likely to argue that this suit must be brought in the Court of Federal Claims under the Tucker Act, 28 U.S.C. § 1491(a)(1). This Court should reject that argument, just as courts around the country have done repeatedly in recent weeks. *Colorado v. HHS*, 2025 WL 1426226, at *6-*9 (D.R.I. May 16, 2025); *Ass'n of Am. Univs. v. DOE*, 2025 WL 1414135, at *5-*7 (D. Mass. May 15, 2025); *Massachusetts v. Kennedy*, 2025 WL 1371785, at *3-*9 (D. Mass. May 12, 2025); *Rhode Island v. Trump*, 2025 WL 1303868, at *5-*7 (D.R.I. May 6, 2025); *Chicago Women in Trades v. Trump*, 2025 WL 1114466, at *8-*10 (N.D. Ill. Apr. 14, 2025); *New York v. Trump*, 2025 WL 1098966, at *1-*3 (D.R.I. Apr. 14, 2025);

*Maine v. U.S Dep't of Agric.*, 2025 WL 1088946, at \*18-\*20 (D. Me. Apr. 11, 2025); *Pacito v. Trump*, 2025 WL 893530, at \*3-\*6 (W.D. Wash. Mar. 24, 2025); *Am. Ass'n of Colleges for Tchr. Educ. v. McMahon*, 2025 WL 863319, at \*2-\*5 (D. Md. Mar. 19, 2025) (all rejecting same jurisdictional argument).

**A. This Court Has Jurisdiction Over Plaintiffs' APA Claims.**

The APA generally waives the federal government's immunity from lawsuits challenging agency action and "seeking relief other than money damages." 5 U.S.C. § 702. That waiver covers this lawsuit, which challenges agency action and seeks only declaratory and injunctive relief. *See* Am. Compl., ECF 65 at 58. Under long-established Supreme Court precedent, the fact that complying with an injunction may result in the Government's disbursement of grant funds does not transform the action into one for "money damages" under the APA. *Bowen v. Massachusetts*, 487 U. S. 879, 910 (1988). As the Supreme Court recently confirmed, "a district court's jurisdiction is not barred by the possibility that an order setting aside an agency's action may result in the disbursement of funds." *Dep't of Educ. v. California*, 145 S. Ct. 966 (2025) (per curiam) (quoting *Bowen*, 487 U.S. at 910); *see also, e.g.*, *Colorado*, 2025 WL 1426226, at \*6-\*9.

The Tucker Act divests district courts of APA jurisdiction only when the plaintiff's APA claim is really a contract action in disguise—*i.e.*, if it both involves an actual "contract" and is "'at its essence' a contract action." *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 968 (D.C. Cir. 1982). That implied exception is narrow; courts routinely reject the "'broad' notion 'that any case requiring some reference to or incorporation of a contract is necessarily on the contract and therefore directly within the Tucker Act.'" *Crowley Gov't Servs., Inc. v. GSA*, 38 F.4th 1099, 1107 (D.C. Cir. 2022); *see Atterbury v. U.S. Marshals Serv.*, 805 F.3d 398, 407-08 (2d Cir. 2015) (applying same test). The Government's Tucker Act argument therefore "hinges on characterizing Plaintiffs' claims as disguised contract claims rather than legitimate APA challenges." *Pacito*, 2025 WL 893530, at \*4.

That characterization is wrong, for two independent reasons. First, federal law carefully distinguishes between "grants" and "contracts"; this case involves the former and the Tucker Act applies only to the latter. Second, even if NEH grants were "contracts," there still would be no Tucker Act jurisdiction because this lawsuit "is not 'at its essence' a contract action." *Megapulse*, 672 F.2d at 968.

***This Case Does Not Involve Contracts.*** Before even applying the *Megapulse* test, the court must first find that the instrument at issue is, in fact, a contract. For it to be a contract, it "must contain the four required elements of offer, acceptance, consideration, and proper government authority." *Am. Near E. Refugee Aid v. USAID*, 703 F.Supp.3d 126, 131 (D.D.C. 2023). In this context, the "consideration" requirement is satisfied only if the instrument provides a "tangible" and "direct" benefit to the federal government, rather than a "generalized" or "incidental" one. *Id.* Merely advancing U.S. "policy interests" or providing a "generalized benefit" for the public is not enough; the benefit must be direct, such as a "financial benefit." *Id.* at 133. For example, in *St. Bernard Par. Gov't v. United States*, 134 Fed. Cl. 730 (2017), the Court of Federal Claims lacked Tucker Act jurisdiction because plaintiff's removal of debris from public spaces did not provide a "direct" benefit to the government, only a "generalized benefit" to the public. *Id.* at 736; *see also Refugee Aid*, 703 F.Supp.3d at 132-33 (same with respect to government-funded construction of infrastructure in the West Bank).[1]

Likewise here, NEH grants do not confer "tangible" and "direct" benefits to the government, only "generalized" ones to the public. NEH grants to scholars, writers, and

---

[1] In distinguishing between contracts and other instruments, courts also look to the Federal Grant and Cooperative Agreements Act, 31 U.S.C. § 6301 *et seq.* Consistent with the cases, the FGCAA defines a "contract" as an instrument with the "principal purpose of … acquir[ing] … property or services for the direct benefit or use of the [] Government," 31 U.S.C. § 6303(1), while it defines a "grant" as an instrument with the principal purpose of "carry[ing] out a public purpose of support or stimulation," *id.* § 6304(1).

institutions advance the humanities and public understanding as articulated in 20 U.S.C. § 951, supporting books, research, and cultural works that benefit the general public, not the government specifically. That makes NEH awards "grants" rather than "contracts." Indeed, NEH itself has recognized as much: while it has statutory authority to use both "contracts" and "grants," 20 U.S.C. § 956(c), it consistently calls the awards at issue here "grants." *See* Am. Compl. ¶¶ 59, 68, 75, 83, 92 (quoting NEH website). Accordingly, the Tucker Act does not apply and does not displace this Court's jurisdiction.

**This Is Not "At Its Essence" A Contract Claim.** Even where an actual "contract" is involved, the Tucker Act precludes jurisdiction only when the plaintiff's claim "is at its essence a contract claim." *Megapulse*, 672 F.2d at 968. The mere fact "that a court may have to rule on a contract issue does not, by triggering some mystical metamorphosis, automatically transform" an APA action into a contract action. *Id.* Instead, to determine whether a case is "at its essence" a contract action, courts consider "the source of the rights upon which the plaintiff bases its claims, and … the type of relief sought (or appropriate)." *Id.*; *see Atterbury*, 805 F.3d at 406 (applying this test). Here, both factors favor this Court's jurisdiction.

First, Plaintiffs root their claims in federal statutes, not contract terms. They claim that Defendants' actions violate the APA, the Impoundment Control Act, the NEH's organic statute, and the First Amendment, not the terms of any contract. Am. Compl. ¶¶ 144-89. The "source of the rights" here, *Megapulse*, 672 F.2d at 968, is thus not contractual. Plaintiffs are challenging agency overreach and failure to comply with required administrative procedures—the heartland of the APA. *Bowen*, 487 U.S. at 904-05. Second, "the type of relief sought" differs from the relief available from a Tucker Act claim. Plaintiffs are not asking the Court for money damages or specific performance of grant terms, but simply to "hold unlawful and set aside agency action," 5 U.S.C. § 706(2)—*i.e.*, to set aside the Mass Termination and restore the *ex ante* status quo. *See*

Am. Compl. at 58. This "is not a suit seeking money in compensation for the damage sustained by the failure of the Federal Government to pay as mandated; rather, it is a suit seeking to enforce the statutory mandate itself." *Bowen*, 487 U.S. at 900. The fact that an injunction may lead to the government making grant payments does not strip this Court of jurisdiction. *Crowley*, 38 F.4th at 1108.

The Government will likely argue—as it has in other cases—that the Supreme Court's emergency-docket order granting a stay in *Dep't of Education v. California*, 145 S. Ct. 966, changes all of this. It does not. As courts have explained in rejecting that argument, *California* "announces no new rule of law"; it merely reaffirmed the long-standing rule that the APA's waiver of sovereign immunity "does not extend to orders to enforce a contractual obligation to pay money." *Pacito v. Trump*, 2025 WL 1077401, at *3 (W.D. Wash. Apr. 9, 2025); *accord Cmty. Legal Servs. in E. Palo Alto v. HHS*, 2025 WL 1168898, at *3 (N.D. Cal. Apr. 21, 2025) ("[T]he Government fails to identify anything different about the law following the Supreme Court's order."); *Woonasquatucket River Watershed Council v. Dep't of Agric.*, 2025 WL 1116157, at *14 (D.R.I. Apr. 15, 2025) ("The Government overreads the three-page stay order."). As already explained, Plaintiffs do not seek to enforce a contractual obligation to pay money.

Even if *California* made new law, it would not apply to these facts. In *California*, Plaintiffs' claims put "the terms and conditions of each individual grant award [] at issue," *California v. DOE*, 132 F.4th 92, 96–97 (1st Cir. 2025), and the district court's order "require[d] the Government to pay out past-due grant obligations." 145 S. Ct. at 968. Because the plaintiffs were suing based on the grant terms and seeking payment of past-due sums, they were plainly seeking "to enforce a contractual obligation to pay money." *California*, 145 S. Ct. at 968.[2] Here, in contrast, Plaintiffs'

---

[2] The plaintiffs in *DOE* did not argue that their awards were not "contracts."

claims relate to Defendants' blanket termination of grants, not the terms and conditions of each individual grant, and they seek an order setting aside agency action—the quintessential APA remedy—not one mandating payment of past-due sums. *See Rhode Island*, 2025 WL 1303868, at *7 ("Because the [] challenges are based on alleged statutory and constitutional violations and the relief they seek is equitable, the essence of their claims are not contractual.").

 ***Plaintiffs' APA claims seek to redress harms that money damages cannot redress.*** A final reason Plaintiffs' APA claims are properly before this Court is that, given the nonmonetary nature of the harms, "the doubtful and limited relief available in the Claims Court is not an adequate substitute for review in the District Court." *Bowen*, 487 U.S. at 901. As discussed in more detail in Part III, *infra*, absent an injunction, Plaintiffs will suffer far more than lost dollars; they will lose career opportunities, the prestige and publishing opportunities associated with an NEH grant, and in some cases the ability to complete projects they have worked on for years. The Court of Federal Claims cannot issue relief for nonmonetary harms, *see Nat'l Air Traffic Controllers Ass'n v. United States*, 160 F.3d 714, 716 (Fed. Cir. 1988), making it impossible for Plaintiffs to get "complete relief" there, *Bowen*, 487 at 910. Accordingly, courts regularly hold that APA actions may proceed in district court when money damages would not make plaintiffs whole. *See, e.g.*, *Am. Fed'n of Gov't Emps. v. O.P.M.*, 2025 WL 996542, at *18 (S.D.N.Y. Apr. 3, 2025). The Court should hold the same here.

### B. Plaintiffs' Non-APA Claims Are Also Properly Before the Court.

 Separate from their APA claims, Plaintiffs bring implied-right-of-action claims to enjoin the individual Defendants' *ultra vires* actions. *See* Am. Compl. ¶¶ 163-89. These claims do not rely on the APA's waiver of sovereign immunity; they proceed under the *Larson-Dugan* doctrine, pursuant to which officials have no sovereign immunity from suits to enjoin them from exceeding constitutional or statutory mandates. *See Larson v. Domestic & Foreign Com. Corp.*, 337 U.S.

11

682, 689 (1949); *Pieczenik v. Cambridge Antibody Tech. Grp.*, 2004 WL 1118500, at *3 (S.D.N.Y. May 14, 2004) (noting that "no separate waiver of sovereign immunity is needed" when a government official acts *ultra vires*). Like Plaintiffs' APA claims, these claims seek only non-monetary relief and could not be heard under the Tucker Act, making this the proper forum.

## II. Plaintiffs Have A Strong Likelihood Of Success.

Plaintiffs are likely to succeed on the merits because the Mass Termination violates the APA, violates the First Amendment, and was undertaken without authority. *See 725 Eatery Corp. v. City of N.Y.*, 408 F. Supp. 3d 424, 459 (S.D.N.Y. 2019) (plaintiffs "need only show a likelihood of success on the merits of at least one of [their] claims.").

### A. The Mass Termination Violated the APA.

The Mass Termination several times over runs afoul of the APA's prohibition on arbitrary and capricious agency action. 5 U.S.C. § 706(2)(A). The APA requires an agency to provide a reasoned basis for its actions and to "cogently explain why it has exercised its discretion in a given manner." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 48 (1983). An agency must "examine[] the relevant data and articulate[] a satisfactory explanation for its action, including a rational connection between the facts found and the choice made." *Id.* at 43. If the agency fails "to provide even that minimal level of analysis, its action is arbitrary and capricious and so cannot carry the force of law." *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016); *see also State Farm*, 463 U.S. at 43 (agency action is "arbitrary and capricious if the agency ... entirely failed to consider an important aspect of the problem" or "offered an explanation ... so implausible that it could not be ... the product of agency expertise."). Moreover, if an agency reverses a prior position, it must "display awareness that it is changing position," "show that there are good reasons for the new policy" and, where the prior policy has engendered

12

serious reliance interests, provide a "detailed justification" for its change of course. *FCC v. Fox TV Stations, Inc.*, 556 U.S. 502, 515 (2009).

Here, NEH's justification for the Mass Termination consists, in its entirety, of the following:

> Your grant no longer effectuates the agency's needs and priorities and conditions of the Grant Agreement and is subject to termination due to several reasonable causes, as outlined in 2CFR§200.340. For instance, NEH has reasonable cause to terminate your grant in light of the fact that the NEH is repurposing its funding allocations in a new direction in furtherance of the President's agenda. The President's February 19, 2025 executive order mandates that the NEH eliminate all non-statutorily required activities and functions. See Commencing the Reduction of the Federal Bureaucracy, E.O. 14217 (Feb. 19, 2025). Your grant's immediate termination is necessary to safeguard the interests of the federal government, including its fiscal priorities.

Kadetsky Decl., Ex. B; Goldstein Decl., Ex. C; Holtzman Decl., Ex. D; Orlando Decl., Ex. B.[3] This conclusory, boilerplate justification fails the APA's bedrock requirements.

That the Mass Termination was arbitrary and capricious is most evident in the fact that Defendants canceled nearly 1,500 grants *en masse* with form letters. Those form letters not include even a basic level of analysis as to any one grant; nearly 1,500 grantees were told in boilerplate fashion that their grant "no longer effectuates the agency's needs and priorities." *Id*. Such "boilerplate" explanations, "devoid of ... any independent explanation, are grossly insufficient and fall far short of reasoned analysis." *Rhode Island,* 2025 WL 1303868, at *11; *see also Am. Ass'n of Colls.*, 2025 WL 833917, at *21 ("[T]he Department's use of a template or boilerplate letter issued to all Grant Recipients further strengthens Plaintiffs' argument.").

---

[3] "[J]udicial review of agency action is limited to the grounds that the agency invoked when it took the action." *DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 20 (2020). Here, the termination letters provide the only contemporaneous explanation for the Mass Termination.

The conclusory statements in the form letters do not provide the required "reasoned explanation" for the Mass Termination. *See Amerijet Int'l, Inc. v. Pistole*, 753 F.3d 1343, 1352 (D.C. Cir. 2014) ("programmatic boilerplate" is not a "reasoned explanation"); *NRDC v. Dep't of Energy*, 362 F. Supp. 3d 126, 144 (S.D.N.Y. 2019) (A "conclusory statement ... falls well short of the APA's requirement that an agency provided reasoned explanation."). They begin by asserting that the grants "no longer effectuate[] the agency's needs and priorities and conditions of the Grant Agreement," but they do not explain what those "needs and priorities" are, what "conditions" are being referenced, or "how or why the [agency] concluded" that each individual grantee's project would not effectuate those criteria. *Ass'n of Am. Univs.*, 2025 WL 1414135, at *12. These "conclusory statements do not 'reasonably' explain agency action." *Rhode Island*, 2025 WL 1303868, at *10; *see also, e.g.*, *Am. Assoc. of Colleges*, 2025 WL 833917, at *20-21 (agency's conclusory statement that grants were "inconsistent with, and no longer effectuat[ed], Department priorities" was not "reasonable explanation" for mass termination of grants).

The termination letters next assert that the grants are "subject to termination due to several reasonable causes, as outlined in *2CFR§200.340* [sic]," but they do not specify any of the four disjunctive grounds for termination in that regulation or explain the basis on which it concluded that any such ground applied with respect to any particular grant. An agency cannot point to *possible* reasons for action; it must provide a reasoned explanation of why it acted: "It will not do for a court to be compelled to guess at the theory underlying the agency's action." *SEC v. Chenery Corp.*, 332 U.S. 194, 196–97 (1947); *see also Am. Ass'n of Colleges*, 2025 WL 833917, at *21 (arbitrary and capricious for termination letters to "merely list, disjunctively, five vague ways in which the specific grants at issue might be 'inconsistent'"). That lack of clarity is compounded by the termination letters' statement that "NEH is repurposing its funding allocations in a new direction in furtherance of the President's agenda," as the regulation does not list a President's

14

changing preferences as one of the enumerated bases for termination. 2 C.F.R. § 200.340. And even if it did, Defendants again provide no explanation of how or why—or whether—they concluded that any given grant was not "in furtherance of the President's agenda."

The termination letters next state that a February 19, 2025, Executive Order "mandates that the NEH eliminate all non-statutorily required activities and functions," but the cited Executive Order does not even mention the NEH, let alone "mandate" any action with respect to NEH grants. This "disconnect between the decision made and the explanation given" is the very definition of "arbitrary." *Dep't of Com. v. New York*, 588 U.S. 752, 785 (2019). And even if the E.O. mentioned the NEH, the letters still do "not show[] that any analysis was conducted to determine which '[activities] and functions' of [NEH] are statutorily required, and which are not." *Rhode Island*, 2025 WL 1303868, at *10.

The letters claim that termination is "necessary to safeguard the interests of the federal government, including its fiscal priorities," but, again, provide no explanation for why that is the case or why it provides a basis for termination. Indeed, it is nonsensical to claim "fiscal priorities" are safeguarded by abandoning projects after significant taxpayer investment but before they are completed and made available to enrich the public. Stating an "aspirational goal[]" of saving money is "not the same as reasoned explanations for why an action is chosen or how the chosen action will effectuate the stated goals." *Ass'n of Am. Univs.*, 2025 WL 1414135, at *12.

Defendants also failed to provide sufficient reasons for their change in policy and consider grantees' "serious reliance interests." *Regents of the Univ. of California*, 591 U.S. at 30. Defendants provided no "reasoned explanation" for why NEH "change[d] course," *id.*, reversing nearly 1,500 decisions it had previously made through a rigorous, expert-guided review process. Nor could it. Defendant McDonald admitted in an NEH staff meeting that the Mass Termination was completely untethered from any consideration of each grant's merits. Instead, the agency's

15

"rationale" for the change in course "was simply because that's the way DOGE had operated at other agencies and they applied the same methodology here."[4]

Defendants also did not consider, or even acknowledge, the reliance interests of grantees, which are significant. *See Fox,* 556 U.S. at 515-16 (explaining that it is arbitrary and capricious to ignore reliance interests). For example, many grantees already spent significant time and resources on funded projects put in jeopardy by Defendants' change of course. *See, e.g.*, Holtzman Decl. ¶¶ 7, 9; Goldstein Decl. ¶¶ 5, 7. Likewise, many abandoned other funding and employment opportunities to work on the grant-funded projects. *See, e.g.,* Goldstein Decl. ¶ 4; Jenkins Decl. ¶¶ 7-9; Kadetsky Decl. ¶ 7; Jasperse Decl. ¶ 4; *see also infra* Part III (detailing other actions taken in reliance on grants). Defendants did not acknowledge any of these reliance interests, much less provide a reasoned basis for acting despite them. Defendants' failure to "assess the reliance interests" violates the APA. *Pacito,* 2025 WL 893530, at *11; *see Colorado*, 2025 WL 1426226, at *17.

Defendants' actions are also arbitrary and capricious because their stated justification "is so implausible that it could not be . . . the product of agency expertise." *State Farm*, 463 U.S. at 43. It is utterly implausible that almost 1,500 projects suddenly and all at once stopped furthering "agency priorities"—*i.e.*, advancing the humanities—despite having been selected from among thousands of applications as the *most* meritorious humanities projects. Indeed, far from relying on agency expertise, Defendants expressly eschewed the NEH's standard, expert-guided process for evaluating grant applications. Richard Roe Decl. ¶¶ 1-2; John Doe Decl. ¶ 3. The Mass Termination was instead directed by Defendants Cavanaugh and Fox, two DOGE staffers who

---

[4] Recording, 4/3/2025 NEH Meeting,
https://www.rev.com/app/transcript/NjgxMTE2MjgzOGFiYWRjZGM5NTIxYjk5ZEpYN0hBcV
NYY0xJ/o/VEMwNDc3NTI1NjEz/transcript (last accessed May 23, 2025).

appeared at the agency only days before implementing it, John Doe Decl. ¶ 3, and who do not purport to be experts in evaluating humanities projects. Nothing in the record suggests they (or anyone with humanities expertise) evaluated the scholarly or artistic merit of any of the projects before the Mass Termination.

Defendants' actions were arbitrary and capricious in other respects as well. Defendants "entirely failed to consider … important aspect[s] of the problem," *State Farm*, 463 U.S. at 43, including the significant consequences the termination will have on the grantees, the state(s), and congressional district(s) in which the works are being produced, and the broader public that would benefit from completion and release of the funded works. Defendants also "offered an explanation for [the] decision that runs counter to the evidence before the agency." *State Farm*, 463 U.S. at 43. As NEH itself previously determined, the evidence showed that each grantee's project was worthy of an NEH grant. No new evidence came before the agency; it simply ignored the evidence on which it had previously relied and terminated the grants *en masse*. Finally, Defendants failed to consider whether the Mass Termination would advance NEH's statutory purposes, 20 U.S.C. §§ 951, 956. Agencies are "bound ... by the ultimate purposes Congress has selected," *New York v. DHS*, 969 F.3d 42, 82 (2d Cir. 2020), but Defendants failed entirely to consider how its Mass Termination could possibly advance Congress's purposes to, *e.g.*, "develop and encourage the pursuit of a national policy for the promotion of progress and scholarship in the humanities," 20 U.S.C. § 956(c)(1).

For all these reasons, Plaintiffs are likely to succeed on the grounds that Defendants acted unreasonably, arbitrarily, and capriciously in terminating Plaintiffs' grants.

### B. The Mass Termination Violated the First Amendment.

The First Amendment rests on "[t]he bedrock principle of viewpoint neutrality," which "demands that the state not suppress speech" due to "disagreement with the underlying ideology

or perspective that the speech expresses." *Ridley v. Mass. Bay Transp. Auth.*, 390 F.3d 65, 82 (1st Cir. 2004). Even "in the provision of subsidies, the Government may not 'aim at the suppression'" of ideas it disfavors. *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 587 (1998). The NEH's charge is to make value-based judgments about which projects will advance "progress and scholarship in the humanities," 20 U.S.C. § 956(c)(1), not to "leverage[s] its power to award subsidies … into a penalty on disfavored viewpoints." *Finley*, 524 U.S. at 587.

*Finley* in particular is instructive. There, the Supreme Court upheld a provision requiring the National Endowment for the Arts to consider "general standards of decency and respect" in awarding grants, finding that the requirement was "merely hortatory." 524 U.S. at 580. But it made clear that it "would confront a different case" if an agency were to deny grants to projects because they expressed disfavored viewpoints. *Id.* at 587. Even in the context of a public grant program, the government may not impose "a disproportionate burden calculated to drive 'certain ideas or viewpoints from the marketplace,'" or "threaten[] to suppress the expression of particular ideas or viewpoints.'" *Id.*

Decisions regarding other government benefits echo this rule. Congress may not condition its funding of the Legal Services Corporation on its attorneys' agreement not to express viewpoints the government disfavors. *Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 540-49 (2001). Congress likewise may not impose viewpoint-based restrictions on granting the government benefit of a trademark. *Iancu v. Brunetti*, 588 U.S. 388, 392 (2019). Cities may not withdraw funding from a museum "because of the perceived viewpoint of the works." *Brooklyn Inst. of Arts & Scis. v. City of New York*, 64 F. Supp. 2d 184, 202 (E.D.N.Y. 1999). And cities likewise may not discontinue an organization's arts funding because of the organization's viewpoints on social issues. *Esperanza Peace & Justice Center v. San Antonio*, 316 F. Supp. 2d 433, 447-56 (W.D. Tex. 2001).

18

In violation of those principles, Defendants withdrew funding from projects they believed promoted or were associated with viewpoints they disfavor. The sequence of events surrounding the Mass Termination and Defendants' proffered justifications make that unmistakable. During the Biden Administration, NEH awarded grants to Plaintiffs and members of the proposed class after concluding that the speech and thought reflected in their projects constituted "contributions to the humanities" that would advance the agency's statutory purposes. *E.g.*, Kadetsky Decl., Ex. A. Then, after a change in administration, Defendants began terminating those grants *en masse*, not based on a reassessment of their contributions to the humanities but, it appears, on their perceived viewpoints and associations—ultimately terminating almost every grant awarded during the prior administration. *See* Richard Roe Decl. ¶ 2.

First, in February 2025, before the Mass Termination, NEH staff was informed that grants would be terminated if they expressed any disfavored viewpoints—*i.e.*, if they "violated the new Executive Orders on K-12 education, gender ideology, and DEI." *Id*. ¶ 1.[5] Those Executive Orders refer to disfavored views on these subjects as "illegal and immoral," DEI EO, 90 Fed. Reg. at 8839; "corrosive … on the validity of the entire American system," Gender EO, 90 Fed. Reg. at 8615; and "anti-American, subversive, harmful, and false," Schooling EO, 90 Fed. Reg. at 8853. The DEI EO and Gender EO highlight the Biden Administration's association with and support for these disfavored ideas. *See* DEI EO, 90 Fed. Reg. at 8839; Gender EO, 90 Fed. Reg., at 8616. Many of the termination letters issued to implement the Mass Termination cited those same Executive Orders. *See, e.g.*, Ex. B, Kadetsky Decl.

---

[5] The referenced Executive Orders are Exec. Order No. 14151, Ending Radical and Wasteful Government DEI Programs and Preferencing, 90 Fed. Reg. 8339 (Jan. 20, 2025) ("DEI EO"); Exec. Order No. 14168, Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government, 90 Fed. Reg. 8615, (Jan. 20, 2025) ("Gender EO"); and Exec. Order No. 14190, Ending Radical Indoctrination in K–12 Schooling, 90 Fed. Reg. 8853 (Jan. 29, 2025) ("Schooling EO").

Moreover, shortly after the Mass Termination, NEH released a statement that it had terminated awards "at variance with agency priorities, including but not limited to those on diversity, equity, and inclusion, and environmental justice," Lieberman Decl., Ex. D, confirming that the termination was not based on humanistic merit, but to root out disfavored viewpoints. At the same time, NEH began specifically soliciting projects that promote viewpoints *favored* by Defendants, such as projects that "promote" the Nation's "record of advancing liberty" and the idea of "American exceptionalism." Lieberman Decl., Ex. E at 1. NEH further noted that while projects on "the suffragist movement or a history of conservation policies in the United States" might be allowed grant funding, those deemed unfavorable by the Administration would not. Lieberman Decl., Ex. D. The Mass Termination therefore was not a termination of *all* projects touching on gender or race or the environment, but of projects Defendants perceived as having a disfavored viewpoint on those topics. That is textbook viewpoint discrimination.

To be clear, Plaintiffs' projects did not promote any particular political, religious, or ideological points of view—their grant terms prohibited as much. Yet, given the absence of any individualized analysis, the termination of almost every grant issued during the Biden Administration, and the repeated references to disfavored viewpoints associated with that administration, it appears that Defendants broadly (and haphazardly) acted on their belief that any grantee's association with an opposing political party's administration meant they espoused disfavored views. Even if "the [government] makes a factual mistake about" the speaker's message, it violates the First Amendment when it rescinds funding based on its perception of the speaker's message or associations. *Heffernan v. City of Paterson*, 578 U.S. 266, 272 (2016); *see*

*Finley*, 524 U.S. at 580.[6] Defendants' "selections among recipients of public subsidies that favor and strengthen those friendly to the government's message while placing at a disadvantage and thus weakening the opponents and skeptics" is the kind of hand on the scale that is constitutionally verboten. *Alliance for Open Soc'y Int'l, Inc. v. USAID*, 430 F.Supp.2d 222, 258 (S.D.N.Y. 2006); *see also Rhode Island Latino Arts v. Nat'l Endowment for the Arts*, 2025 WL 1009026, at *14 (D.R.I. Apr. 3, 2025).[7]

Defendants' termination of grants based on association with a prior administration has a particularly coercive effect, as it discourages grantees from even associating with groups that might have views disfavored by the current administration. Thus, the manner of the termination extends its impact beyond these particular grants and into Plaintiffs' associational choices, even in unrelated contexts. That interference with Plaintiffs' associational rights is likewise prohibited. *See Alliance for Open Society*, 570 U.S. at 218 (invalidating a requirement that a federal grantee broadly adopt a specific policy position because "the condition by its very nature affects 'protected conduct outside the scope of the federally funded program'").

## C.    The Mass Termination Was *Ultra Vires*.

Plaintiffs join in and incorporate by reference the arguments in Part A.5 (pp. 18-20) of the Memorandum in Support of Plaintiffs' Motion for Preliminary Injunction in the consolidated case,

---

[6] Defendants' failure to assess each project individually before labeling it as disfavored speech is yet another reason the Mass Termination was arbitrary and capricious.

[7] Some courts have rejected direct, facial First Amendment challenges to the DEI and Gender EOs, while recognizing that their conclusions may be different in as-applied challenges. *See, e.g.*, *Nat'l Urb. League v. Trump*, 2025 WL 1275613, at *26 (D.D.C. May 2, 2025) (rejecting facial challenge but "reserve[ing] judgment on the merits of any as-applied challenges to specific enforcement actions"); *see also Latino Arts*, 2025 WL 1009026, at *14 (in as-applied challenge, finding "clear First Amendment violation"). In any event, Plaintiffs are not directly challenging the Executive Orders, or even their application. Instead, the Executive Orders provide evidence that Defendants used the Mass Termination to suppress particular viewpoints.

No. 1:25-cv-03657, which argues that the Mass Termination was unconstitutional because DOGE has no legal authority to terminate another agency's grants. *See* ECF 52 (noting that Plaintiffs may "join the motion for a preliminary injunction" in the consolidated case).

## III.    The Mass Termination Is Inflicting Irreparable Harm.

Plaintiffs—public scholars, literary researchers, cultural historians, and early-career academics—face irreparable harm to their career trajectories and their immediate livelihoods. They stand to lose not only the support needed to complete individual projects, but the foundational opportunities that make a career in the humanities possible. These harms cannot be reversed later with money damages or delayed resolution. They are, in the clearest legal sense, irreparable. Separately, Plaintiffs' First Amendment injuries constitute immediate, irreparable harm as a matter of law. The Mass Termination has thus caused, and will continue to cause, harm that is "actual and imminent, not remote or speculative," and incapable of being remedied by money alone. *Freedom Holdings, Inc. v. Spitzer*, 408 F.3d 112, 114 (2d Cir. 2005).

First, Plaintiffs face irreparable harm to their careers and livelihoods. When the deprivation of a key opportunity threatens the continued viability of one's professional standing, injunctive relief is appropriate. *See, e.g.*, *Semmes Motors, Inc. v. Ford Motor Co.*, 429 F.2d 1197, 1205 (2d Cir. 1970) (the right to continue a business "is not measurable entirely in monetary terms"); *Roso-Lino Beverage Distribs., Inc. v. Coca-Cola Bottling Co.*, 749 F.2d 124, 125-26 (2d Cir. 1984) (loss of "ongoing business representing many years of effort and the livelihood of its owners" constitutes irreparable harm). Moreover, "[m]ajor disruption of a business can be as harmful as termination" of it, *Nemer Jeep-Eagle, Inc. v. Jeep-Eagle Sales Corp.*, 992 F.2d 430, 435 (2d Cir. 1993). as can "a threatened loss of good will and customers, both present and potential," *trueEX, LLC v. MarkitSERV Ltd.*, 266 F. Supp. 3d 705, 727 (S.D.N.Y. 2017). And when unlawful conduct threatens the viability of a planned professional undertaking, through lost opportunities or future

prospects that are inherently difficult to quantify, those harms also qualify as irreparable. *See Tom Doherty Assocs., Inc. v. Saban Entm't, Inc.*, 60 F.3d 27, 38-39 (2d Cir. 1995).

Here, Plaintiffs' careers face similarly irreparable harm. Their professional survival and advancement depend on their sustained scholarly productivity and associated earned goodwill in the academic community. The scholarship funded by the NEH grants was so essential to their professional endeavors that Plaintiffs structured their lives around them, forgoing other jobs, taking leaves of absence, committing to months of grant-supported full-time research, and arranging travel for time-sensitive interviews and archival research. *See* Kadetsky Decl. ¶¶ 4–7; Jasperse Decl. ¶¶ 4, 6–8; Orlando Decl. ¶¶ 5–6; Goldstein Decl. ¶¶ 4–5; Jenkins Decl. ¶ 8; Authors Guild Decl. ¶ 4. For many, their grant terms expressly required them to turn down all other work. With grant affiliation and funding terminated midstream or on the eve of disbursement, they are left without time to replan and without viable alternatives to advance their projects and their careers. *See, e.g.*, Jasperse Decl. ¶¶ 10–11; Jenkins Decl. ¶ 14; Kadetsky Decl. ¶¶ 10–13; Authors Guild Decl. ¶ 4.

These harms cannot be remedied with money. To take just one example: Plaintiff Lee Jasperse, a University of Chicago teaching fellow at the beginning of his career in academia, secured a long-term NEH-funded fellowship to support the completion of his first book. Jasperse Decl. ¶ 2. The grant would have supported his living expenses while he conducted critical archival research at the Massachusetts Historical Society. *Id.* ¶ 3. But when the NEH terminated his grant, Dr. Jasperse was left without prospective income and without institutional affiliation that would have carried him into the next academic hiring cycle. He also had to stall relocation efforts that were already underway, and his book is imperiled. *Id.* ¶¶ 5–7. His situation exemplifies the real-life consequences of termination for many early-career scholars affected by the Mass Termination:

they do not have the resources to absorb the blow, and they may not get another opportunity to stay in the profession.

All plaintiffs face similar concrete, career-defining harm that cannot be remedied by later compensation. Without NEH support, they cannot complete time-sensitive research critical to books, tenure, and advancement—opportunities that are not deferrable. *See, e.g.*, Balog Decl. ¶ 6 (book facing "significant delay ... and more likely indefinite postponement"); Orlando Decl. ¶ 8 (grant-supported research travel scheduled to begin this June involves materials "not accessible year-round" and "cannot be replaced by remote work"); Holtzman Decl. ¶ 9 ("These trips were central to advancing the project and may now be canceled or indefinitely delayed."). Others face lost job-market opportunities and publication risks. *See* Kadetsky Decl. ¶¶ 10–12 (forced to return to teaching midyear and facing potential loss of expected promotion tied to NEH grant and book completion); Goldstein Decl. ¶¶ 7, 11 (postponed "essential travel to archival collections" and now uncertain "whether I can maintain the quality and scope of the project envisioned"); Jenkins Decl. ¶¶ 14–15 (grant loss jeopardizes book completion and undermines tenure application). For this cadre of scholars, an NEH fellowship or grant is not just a cash reward, it is the scaffolding for their career. Their terminations halt concrete, time-sensitive work and thrust into jeopardy hard-earned and significant but ephemeral career opportunities like tenure and book publication. This type of harm is precisely what preliminary injunctions are designed to prevent.

Recognizing these and similar realities, courts across the country have found that the Trump Administration's analogous grant terminations risk irreparable harm absent court intervention. *See, e.g., Nat'l Council of Nonprofits v. OMB*, 763 F.Supp.3d 36, 57 (D.D.C. 2025) ("Because the funding freeze threatens the lifeline that keeps countless organizations operational, [plaintiffs] have met their burden of showing irreparable harm."); *Massachusetts v. N.I.H.*, 2025 WL 702163, at *1, *31 (D. Mass. Mar. 5, 2025) (NIH funding freeze that "impacts thousands of

existing grants … without regard for on-going research and clinical trials" constitutes irreparable harm because "it is impossible to measure the value of discovery from scientists who choose to leave, or of the potential students who now never become scientists at all"); *AIDS Vaccine Advoc. Coal. v. Dep't of State*, 2025 WL 752378, at *19 (D.D.C. Mar. 10, 2025) (actions that "make it more difficult for the [plaintiffs] to accomplish their primary mission" inflict irreparable harm); *Pacito*, 2025 WL 655075, at *22–*23 (similar). The same conclusion is compelled here.

In addition, Plaintiffs have suffered irreparable harm from the viewpoint discrimination reflected in Defendants' Mass Termination. "[T]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976).

## IV.    The Balance Of Equities And The Public Interest Overwhelmingly Favor Relief.

The balance of the equities and public interest favor granting Plaintiffs their requested relief. As Congress found decades ago, "[t]he humanities belong to all the people of the United States." 20 U.S.C. § 951(1). The Mass Termination deprives the public of its access to scholarship and new ideas that, through careful review, NEH found would bolster democracy, further educational endeavors, and celebrate the country's cultural heritage. *See* 20 U.S.C. § 951(2)-(11); *see also, e.g.*, Jenkins Decl. ¶ 2 ("I believe the book ... will spark people to think about the beauty industry and Black womanhood in ways they haven't before."); Holtzman Decl. ¶¶ 3, 11 (noting book project "is designed to reach both scholars and a broader audience" and "deepen public understanding of the humanities and of our nation's historical challenges"). Some of the works will be lost indefinitely and, for those for which some funding already had been distributed, the public may never receive the benefit of the taxpayer investment in them. *See* Goldstein Decl. ¶¶ 5, 11 (noting "I have received a portion of the NEH funding" but also that "I will likely be forced to delay my timeline or scale back elements of the book that serve the public interest" due to the grant

cancellation); Jasperse Decl. ¶ 7 (describing how his book project has "stalled"); Orlando Decl. ¶ 8 ("Without this support, I cannot carry out the core research for my book.").

The Mass Termination also undermines the broader academic infrastructure that supports public-facing scholarship. These grants do more than fund discrete projects; they serve as public affirmations of the value of intellectual and humanistic inquiry. Their sudden cancellation sends the opposite message: that even after peer review, Council endorsement, and federal approval, a scholar's project can be discarded without warning. This erodes the fundamental basis of trust between scholars and their institutions, students, and the public, and it depresses the development of future leaders who could contribute to societal advancement for decades to come. *See* Jasperse Decl. ¶¶ 6-9 (describing how, as a junior scholar, the loss of funding could hinder or destroy his future in his field); Orlando Decl. ¶ 10 (describing the importance of the supported research to "generational transmission of insight, critical thinking, and intellectual exploration").

The public interest in enjoining the Mass Termination is particularly strong because "there is a substantial public interest 'in having governmental agencies abide by the federal laws that govern their existence and operations." *League of Women Voters of United States v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016). "[T]here is generally no public interest in the perpetuation of unlawful agency action." *Planned Parenthood of N.Y.C. v. HHS*, 337 F. Supp. 3d 308, 343 (S.D.N.Y. 2018). And while the burden on the public is great without preliminary relief, there is no harm to the Government because "the government cannot suffer harm from an injunction that merely ends an unlawful practice." *TikTok Inc. v. Trump*, 490 F. Supp. 3d 73, 85 (D.D.C. 2020).

## CONCLUSION

Plaintiffs respectfully request that this Court issue a preliminary injunction.

26

Respectfully submitted,


By:    */s/ Jamie Crooks*
Jamie Crooks (*pro hac vice*)
Michael Lieberman (*pro hac vice*)
Amanda R. Vaughn (*pro hac vice*)
Yinka Onayemi
FAIRMARK PARTNERS, LLP
400 7th Street, NW, Suite 304
Washington, DC 20004
Tel: 619.507.4182
jamie@fairmarklaw.com
michael@fairmarklaw.com
amanda@fairmarklaw.com
yinka@fairmarklaw.com

*Attorneys for Plaintiffs and the Proposed Classes*


Dated:  May 23, 2025

**<u>CERTIFICATION PURSUANT TO LOCAL CIVIL RULE 7.1</u>**

I hereby certify that this Memorandum in Support of Plaintiffs' Motion for Preliminary Injunction complies with Local Civil Rule 7.1  The word count of the Memorandum is 8,744. Per the rule, this count does not include the caption, table of contents, table of authorities, signature block, or this certification.

Signed this 23rd day of May, 2025.

/s/ <i>Jamie Crooks</i>
Jamie Crooks
