**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

AMERICAN COUNCIL OF LEARNED SOCIETIES,
     633 Third Avenue, 8th Floor New York, NY 10017,

AMERICAN HISTORICAL ASSOCIATION,
     400 A Street SE Washington, DC 20003,

MODERN LANGUAGE ASSOCIATION,
     85 Broad Street, New York, NY 10004,

              *Plaintiffs,*

        v.

MICHAEL MCDONALD, in his official capacity as Acting
Chairman of the National Endowment for the Humanities,
     400 7th St SW, Washington, DC 20506,

NATIONAL ENDOWMENT FOR THE HUMANITIES,
     400 7th St SW, Washington, DC 20506,

UNITED STATES DOGE SERVICE,
     736 Jackson Pl NW Washington, DC 20503,

AMY GLEASON, in her official capacity as Acting
Administrator of the United States DOGE Service,
     736 Jackson Pl NW Washington, DC 20503,

NATE CAVANAUGH, in his official capacity as an employee
of the U.S. DOGE Service or the General Services
Administration,
     1800 F St NW Washington, DC 20006,

JUSTIN FOX, in his official capacity as an employee of the
U.S. DOGE Service or the General Services Administration,
     1800 F St NW Washington, DC 20006,

             *Defendants.*

No. 25 Civ. 3657 (CM)

THE AUTHORS GUILD, WILLIAM GOLDSTEIN, ELIZABETH KADETSKY, VALERIE ORLANDO, KATALIN BALOG, BENJAMIN HOLTZMAN, LEE JASPERSE, and NICOLE JENKINS, on behalf of themselves and all others similarly situated,

*Plaintiffs,*

v.

NATIONAL ENDOWMENT FOR THE HUMANITIES;

MICHAEL MCDONALD, in his official capacity as Acting Chairman of the National Endowment for the Humanities;

UNITED STATES DOGE SERVICE;

AMY GLEASON, in her official capacity as Acting Administrator of the United States DOGE Service;

NATE CAVANAUGH, in his official capacity as an employee of the U.S. DOGE Service or the General Services Administration; and,

JUSTIN FOX, in his official capacity as an employee of the U.S. DOGE Service or the General Services Administration,

*Defendants.*

No. 25 Civ. 3923 (CM)

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' COMPLAINTS FOR DECLARATORY AND INJUNCTIVE RELIEF**

JAY CLAYTON
United States Attorney for the
Southern District of New York
86 Chambers Street, 3rd Floor
New York, New York 10007
Tel.: (212) 637-2699 / 2652
Email: rachael.doud@usdoj.gov

MARY ELLEN BRENNAN
RACHAEL DOUD
Assistant United States Attorneys
– Of Counsel –

# TABLE OF CONTENTS

**PAGE**

PRELIMINARY STATEMENT............................................................................................1

BACKGROUND ...............................................................................................................2

ARGUMENT .....................................................................................................................6

I.    The Court Lacks Subject-Matter Jurisdiction Over Plaintiffs' Claims Concerning Grant Termination ..................................................................................................6

II.    The Court Lacks Subject-Matter Jurisdiction over Employee Termination Claims......9

III.    Plaintiffs Lack Standing as to Any Claims Not Challenging the Termination of Their Own Grants ...................................................................................................11

IV.    Many of Plaintiffs' Claims Are Unripe .......................................................14

V.    Plaintiffs' Claims Are Not Reviewable Under the APA.................................15

    A.  APA Review Is Unavailable Because Statutes Preclude Judicial Review, and Alternative Remedies Exist for Such Review.........................................15

    B.  Plaintiffs' APA Claims Fail Because They Do Not Seek Judicial Review of a Discrete Agency Action .........................................................................16

    C.  APA Review is Unavailable Because the Challenged Actions Are Committed to Agency Discretion by Law ....................................................................18

VI.    Plaintiffs Have Not Plausibly Alleged Violations of the Separation of Powers, the Impoundment Control Act, any Appropriations Laws, or the First Amendment.........20

A.  Plaintiffs Have Not Plausibly Alleged a Separation of Powers Violation ............20

B.  Plaintiffs Have Not Identified Any Violation of an Appropriations Provision ......22

C.  Plaintiffs Have Not Stated a Claim Under the Impoundment Control Act............22

D.  Plaintiffs Have Not Stated a Viable First Amendment Claim................................22

VII.   Plaintiffs Fail to State an *Ultra Vires* Claims.................................................................24

CONCLUSION....................................................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.,*
570 U.S. 205 (2013) ............................................................................................... 23, 24

*Am. Ass'n of Colls. For Tchr. Educ v. McMahon.,*
No. 25-1281 (4th cir. Apr. 10, 2025) ............................................................................ 8-9

*Alabama- Coushatta Tribe of Tex. v. United States,*
757 F.3d 484 (5th Cir. 2014) ....................................................................................... 17

*Citizens for Const. Integrity v. Census Bureau,*
115 F.4th 618 (D.C. Cir. 2024) .................................................................................... 12

*Cobell v. Kempthorne,*
455 F.3d 301 (D.C. Cir. 2006) ..................................................................................... 17

*Crowley Gov't Servs., Inc. v. Gen. Servs. Admin.,*
38 F.4th 1099 (D.C. Cir. 2022) ..................................................................................... 7

*Dalton v. Specter,*
511 U.S. 462 (1994) .................................................................................................... 21

*Dart v. United States,*
848 F.2d 217 (D.C. Cir. 1988) ..................................................................................... 25

*DCH Reg'l Med. Ctr. v. Azar,*
925 F.3d 503 (D.C. Cir. 2019) ..................................................................................... 25

*Department of Education v. California,*
145 S. Ct. 966 (2025) ................................................................................................. 6-9

*Dorce v. City of New York,*
2 F.4th 82 (2d Cir. 2021) ............................................................................................ 13

*Eagle Tr. Fund v. USPS,*
365 F. Supp. 3d 57 (D.D.C. 2019) ............................................................................... 25

*Elgin v. Dep't of the Treasury,*
567 U.S. 1 (2012) ....................................................................................................... 10

*Erickson Air Crane Co. v. United States,*
731 F.2d 810 (Fed. Cir. 1984) ..................................................................................... 11

*FedEx v. Dep't of Comm.*,
    39 F.4th 756 (D.C. Cir. 2022) .................................................................. 25

*Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt.*,
    460 F.3d 13 (D.C. Cir. 2006) .................................................................... 16

*Gen. Land Off. v. Biden*,
    722 F. Supp. 3d 710 (S.D. Tex. 2024) ...................................................... 16

*Grosdidier v. Chairman, Broad. Bd. of Governors*,
    560 F.3d 495 (D.C. Cir. 2009) .................................................................. 10

*Hartz Mountain Corp. v. Dotson*,
    727 F.2d 1308 (D.C. Cir. 1984) ................................................................ 25

*Heckler v. Chaney*,
    470 U.S. 821 (1985) .................................................................................. 19

*Independent Equip. Dealers Ass'n v. EPA*,
    372 F.3d 420 (D.C. Cir. 2004) .................................................................. 16

*Lujan v. Nat'l Wildlife Fed'n*,
    497 U.S. 871 (1990) ........................................................................... passim

*Murthy v. Missouri*,
    603 U.S. 43 (2024) .................................................................................... 12

*National Endowment for the Arts v. Finley*,
    524 U.S. 569 (1998) .................................................................................. 23

*National Urban League v. Trump*,
    No. 25-471 (TJK), 2025 WL 1275613 (D.D.C. May 2, 2025) ................. 24

*Nat'l Veterans Legal Servs. Program v. United States Dep't of Def.*,
    990 F.3d 834 (4th Cir. 2021) .................................................................... 17

*Norton v. S. Utah Wilderness All.*,
    542 U.S. 55 (2004) ......................................................................... 11, 16, 18

*Nyunt v. Chairman, Broad. Bd. Of Governors*,
    589 F.3d 445 (D.C. Cir. 2009) .................................................................. 10

*Penhurst State Sch. & Hosp. v. Halderman*,
    465 U.S. 89 (1984) .................................................................................... 25

*Perdeaux v. United States*,
    33 F. Supp. 2d 187 .................................................................................... 10

*Pippenger v. U.S. DOGE Service*,
    No. 25-CV-1090 (BAH), 2025 WL 1148345 (D.D.C. Apr. 17, 2025)..........................................8

*Presidential Gardens Assocs. v. U.S. ex rel. Sec. of Housing and Urban Development*,
    175 F.3d 132 (2d Cir. 1999) ........................................................................................8

*Ransom v. United States*,
    900 F.2d 242 (Fed. Cir. 1990) ..................................................................................11

*Regan v. Tax'n With Representation of Wash.*,
    461 U.S. 540 (1983)....................................................................................................23

*Rust v. Sullivan*,
    500 U.S. 173 (1991)....................................................................................................23

*Sealed v. Sealed*,
    332 F.3d 51 (2d Cir. 2003) ........................................................................................19

*Sols. in Hometown Connections v. Noem*,
    No. 8:25-cv-885, 2025 WL 1103253 (D. Md. Apr. 14, 2025) ...............................8-9

*Steenholdt v. FAA*,
    314 F.3d 633 (D.C. Cir. 2003)..................................................................................19

*Susan B. Anthony List v. Driehaus*,
    573 U.S. 149 (2014)....................................................................................................13

*Tiltti v. Weise*,
    155 F.3d 596 (2d Cir. 1998) ......................................................................................10

*Trump v. New York*,
    592 U.S. 125 (2020)..............................................................................................14-15

*U.S. Conf. of Catholic Bishops v. State.*,
    No. 25-5066 (D.C. Cir Mar. 28, 2015) .....................................................................9

*Vill. of Bald Head Island v. U.S. Army Corps. of Eng'rs*,
    714 F.3d 186 (4th Cir. 2013) ....................................................................................16

*Vt. Yankee Nuclear Power Corp. v. Natural Resources Defense Fund,*
    435 U.S. 519 (1978)....................................................................................................19

*Webster v. Doe*,
    486 U.S. 592 (1988)....................................................................................................19

*Widakuswara v. Lake*,
    No. 25-5144, 2025 WL 1288817 (D.C. Cir. May 3, 2025) ...............................passim

*Yale New Haven Hosp. v. Becerra*,
    56 F.4th 9 (2d Cir. 2022) ................................................................. 24

**Statutes**

2 U.S.C. § 682 ..................................................................................... 22

2 U.S.C. § 687 ..................................................................................... 16

5 U.S.C. § 701 ............................................................................... 15, 18

5 U.S.C. § 704 ............................................................................... 15-16

5 U.S.C. § 1204 ................................................................................... 10

20 U.S.C. § 951 ........................................................................ 3, 14, 19

20 U.S.C. § 952 ................................................................................... 21

20 U.S.C. § 956 ............................................................................ passim

22 U.S.C. § 4107 ................................................................................. 10

28 U.S.C. § 1491 ................................................................................... 6

41 U.S.C. §§ 7103–05 ......................................................................... 10

## PRELIMINARY STATEMENT

While Plaintiffs style their claims as challenging the "dismantling" of the National Endowment for the Humanities ("NEH"), they challenge four specific categories of actions: termination of grants, reduction-in-force of staff members, the elimination of certain programs and divisions, and delaying or refraining from spending appropriated funds. *American Council of Learned Societies v. McDonald*, No. 25-cv-3657 (CM), Complaint, Dkt. No. 1 ("ACLS Compl.") ¶¶ 5-6; *The Authors Guild v. National Endowment for the Humanities*, No. 25-cv-3923 (CM), Amended Complaint, Dkt. No. 22 ("Authors Guild Compl."). The Court lacks jurisdiction over these claims. First, the Tucker Act vests the Court of Federal Claims with exclusive jurisdiction over claims related to grant agreements, which are contracts. Second, through the Civil Service Reform Act, Congress created an exclusive mechanism for federal employees to challenge adverse personnel actions. That exclusive mechanism precludes Plaintiffs, who are not even federal employees, from challenging those personnel actions in this court. Third, Plaintiffs' claims are unreviewable under the APA, as the above statutory schemes preclude APA review of grant terminations and personnel actions, adequate, alternative remedies exist for the claims, the challenged actions are committed to agency discretion by law, and the claims constitute impermissible programmatic challenges, rather than challenges to discrete, final agency actions.

Plaintiffs' complaints also suffer from other deficiencies. Plaintiffs lack standing as to any of their claims not related to the terminations of their own grants, and many claims are unripe.

Even if Plaintiffs could overcome these threshold issues, many allegations in their complaints fail to state a claim. They do not sufficiently allege a violation of the separation of powers doctrine because they do not plausibly allege that Defendants violated any federal statute by engaging in the challenged actions. Plaintiffs' *ultra vires* claims also fail as a matter of law, because they simply repackage allegations that Defendants violated statutes governing NEH

funding and appropriations.

Finally, Plaintiffs have not pled any cognizable First Amendment claim.  The Supreme Court has long rejected the notion that the government's refusal to fund certain viewpoints or speech infringes the speaker's constitutional rights.

The Court should dismiss both complaints.

## BACKGROUND

On May 1, 2025, Plaintiffs in *American Council of Learned Societies v. McDonald*, No. 25-cv-3657 (CM), filed suit, asserting claims against Michael McDonald, in his official capacity as Acting Chairman of NEH, NEH, United States DOGE Service, Amy Gleason, in her official capacity as Acting Administrator of U.S. DOGE Service, Nate Cavanaugh, in his official capacity as an employee of U.S. DOGE Service or the General Services Administration, and Justin Fox, in his official capacity as an employee of U.S. DOGE Service or the General Services Administration. Dkt. No. 1.[1]  On May 12, 2025, Plaintiffs in *The Authors Guild v. National Endowment for the Humanities*, No. 25-cv-3923 (CM), filed suit against the same defendants.  No. 25-cv-3923 (CM), Dkt. No. 1.  On May 14, 2025, the Court consolidated the two cases.  Dkt. No. 52.  Plaintiffs in *American Council of Learned Societies* ("*ACLS*") ("ACLS Plaintiffs") are non-profit entities that have received grants from NEH and have members who received grants from NEH, and Plaintiffs in *The Authors Guild* ("Authors Guild Plaintiffs") are individuals who received grants from NEH and The Authors Guild, an association that has members who have received grants from NEH. ACLS Compl. ¶¶ 12-14; Authors Guild Compl. ¶¶ 11-24.  The Authors Guild Plaintiffs filed an amended complaint on May 23, 2025, which is similar to the ACLS Complaint.  Dkt. No. 75.

NEH was created by statute in 1965.  *See* National Foundation on the Arts and the

---

[1] Unless otherwise indicated, docket numbers cited are those in Case No. 25-cv-03657 (CM).

Humanities Act, Pub. L. 89-209, 20 U.S.C. § 951(1) (Sept. 29, 1965).  The statute provides that "[t]he Endowment shall be headed by a chairperson, who shall be appointed by the President, by and with the advice and consent of the Senate."  20 U.S.C. § 956(b).  "The Chairperson, with the advice of the National Council on the Humanities . . . , is authorized to enter into arrangements, including contracts, grants, loans, and other forms of assistance, to" carry out various specified purposes, including to "initiate and support research and programs to strengthen the research and teaching potential of the United States in the humanities by making arrangements with individuals or groups to support such activities . . ." and to "initiate and support programs and research which have substantial scholarly and cultural significance and that reach, or reflect the diversity and richness of our American cultural heritage, including the culture of, a minority, inner city, rural, or tribal community."  *Id.* § 956(c).

The ACLS Plaintiffs characterize their case as one challenging "the recent dismantling" of NEH.  ACLS Compl. ¶ 1.  They assert that NEH's "history of fostering the humanities came to a crashing halt earlier this month, at the hands of the United States DOGE Service," when "[t]wo DOGE operatives . . . indiscriminately terminated the vast majority of grants." *Id.* ¶ 5.  According to the ACLS Plaintiffs, these included their own grants.  *Id.*  ¶ 73.  The ACLS Plaintiffs also allege that Plaintiffs "Cavanaugh and Fox subsequently demanded that NEH mass terminate its staff, resulting in the abrupt issuance of reduction-in-force notices to roughly 75% of its workforce." *Id.* ¶ 5.  They further allege that "NEH has eliminated or nearly eliminated entire agency programs and divisions, including several programs and divisions from which Plaintiffs and their members have received grants and anticipated applying for new grants in the future." *Id.* ¶ 6.

The ACLS Plaintiffs allege that "Defendants' actions in eliminating programs and divisions, mass firing staff, and refusing to spend appropriations" violate "the constitutional

separation-of-powers" and the Impoundment Control Act of 1974 and that they are "arbitrary and capricious" under the Administrative Procedure Act ("APA"). *Id.* ¶¶ 7-8. They assert that "all of these actions were taken or directed by DOGE, a body not created or authorized by statute" which has "no lawful authority to carry out the work of another agency, let alone dismantle it." *Id.* ¶ 9. The ACLS Plaintiffs also allege that "after terminating tens of millions of dollars in previously approved grants, NEH issued a Notice of Funding Opportunity to award up to $17 million in grants to build a 'National Garden of American Heroes'"—a project the ACLS Plaintiffs allege does not fall within NEH's purview because it involves the arts and not the humanities. *Id.* ¶¶ 85-86.

The ACLS Plaintiffs assert two categories of claims. *Id.* ¶ 125. First, they challenge what they describe as "institutional actions taken at NEH," including eliminating divisions, shutting down programs, firing staff, funding the Garden of Heroes, and "delay[ing] spending or outright refus[ing] to spend" appropriated funds ("Institutional Claims"). *Id.* ¶ 126. Plaintiffs assert these claims under the APA and "nonstatutory" bases arising from alleged "unconstitutional and *ultra vires* actions." *Id.*; *see* Counts 1-9. Second, the ACLS Plaintiffs assert claims challenging the termination of grants ("Grant Termination Claims"). *Id.* ¶ 127. They assert these challenges "only through nonstatutory claims based on Defendants' unconstitutional and *ultra vires* actions." *Id.*; *see* Counts 2, 4, 8-9. Both categories of claims include contentions that Defendants violated the First Amendment because their "termination of nearly all NEH grants awarded during the prior Administration, and leaving in place existing and future grants that align with particular political ideological viewpoints," constitutes unlawful viewpoint discrimination. *Id.* Count 7; *see also* Count 8. The ACLS Plaintiffs ask the Court to "declare unlawful and set aside" Defendants' actions and enjoin Defendants from "enforcing and giving effect to" the various decisions they challenge. ACLS Compl., Request for Relief. The ACLS Plaintiffs also ask the Court to "[e]njoin

Defendants to obligate and spend the full amount of funds that Congress has appropriated." *Id.*

The Authors Guild Plaintiffs (together with ACLS Plaintiffs, "Plaintiffs") raise similar claims. They allege that all of the individual Authors Guild Plaintiffs "had their grants terminated" as part of what they characterize as "the Mass Termination." Authors Guild Compl. ¶ 114. They also allege that "[m]ost or all open grants of Authors Guild members were also terminated as part of the Mass Termination." *Id.* Further, they challenge the placement of NEH staff members on administrative leave and the alleged "eliminat[ion] or near[] eliminat[ion of] entire divisions and programs," as well as the Notice of Funding opportunity for the National Garden of American Heroes. *Id.* ¶¶ 116, 119, 121. They acknowledge, however, that on May 8, 2025, NEH announced that it awarded $9.55 million in grants for 68 humanities projects, and on May 16, 2025, NEH announced a new grant program. *Id.* ¶¶ 122-23. The Authors Guild Plaintiffs seek to bring their action as a class action on behalf of two proposed classes: first, "All individual NEH grant recipients whose grants were terminated as part of the Mass Termination," and second, "All NEH grant subrecipients whose sponsors' grants were terminated as part of the Mass Termination." *Id.* ¶ 135. They claim that Defendants violated the APA by engaging in actions that were arbitrary and capricious and contrary to law, including the Impoundment Control Act of 1974, appropriations statutes, NEH's authorizing statute, and the First Amendment. *Id.* Counts 1-2. They also assert claims under an "implied right of action" for *ultra vires* actions in violation of the Impoundment Control Act, the appropriations acts, separation of powers, and the First Amendment. *Id.* Counts 3-6. Like the ACLS Plaintiffs, they ask the Court to "declare as unlawful and set aside" Defendants' actions and enjoin Defendants from "giving effect to" the various decisions they challenge. Authors Guild Compl., Prayer for Relief.

## ARGUMENT

**I.    The Court Lacks Subject-Matter Jurisdiction Over Plaintiffs' Claims Concerning Grant Termination**

Many of Plaintiffs' claims focus on the termination of grants and seek the reinstatement of those grants and continued payment thereunder. *See* ACLS Compl. Request for Relief; Authors Guild Compl. Prayer for Relief.  This Court lacks subject-matter jurisdiction over such claims because no waiver of sovereign immunity authorizes Plaintiffs to enforce contracts with the federal government in federal district court.  Instead, through the Tucker Act, Congress vested the Court of Federal Claims with exclusive jurisdiction over such claims, which relate to contracts with the United States. *See* 28 U.S.C. § 1491(a)(1).  As the Supreme Court recently explained in *Department of Education v. California*, 145 S. Ct. 966 (2025) (per curiam), when staying a district court's injunction in another challenge to programmatic grant terminations, "the Government is likely to succeed in showing the District Court lacked jurisdiction to order the payment of money under the APA" because "the Tucker Act grants the Court of Federal Claims jurisdiction over suits based on 'any express or implied contract with the United States.'" *Id*. at 968 (quoting 28 U.S.C. § 1491(a)(1)).  A panel of the D.C. Circuit recently came to the same conclusion in *Widakuswara v. Lake*, No. 25-5144, 2025 WL 1288817 (D.C. Cir. May 3, 2025), in which it granted a stay of district court preliminary injunctions pending appeal in cases challenging, among other things, the termination of grants by the United States Agency for Global Media ("USAGM").[2]

For purposes of the Tucker Act, whether a claim is "founded upon" a contract depends on

---

[2] On May 28, 2025, the D.C. Circuit granted *en banc* reconsideration and vacatur of the court's May 3, 2025, decision on this issue.  The May 28 order stated that "the jurisdictional argument advanced by the government . . . raises an important issue, as indicated by its recurrence in a number of recent cases," and "[a]t this initial stage, substantially for the reasons explained [in the dissent to the panel decision], the government has not made the requisite strong showing of a likelihood of success on the merits of its appeals in these cases."  Nos. 25-5144, 25-5145, 25-

"the source of the rights upon which the plaintiff bases its claims, and upon the type of relief sought." *Crowley Gov't Servs., Inc. v. Gen. Servs. Admin.*, 38 F.4th 1099, 1106 (D.C. Cir. 2022). "[A]n action against the United States which is at its essence a contract claim lies within the Tucker Act and . . . a district court has no power to grant injunctive relief in such a case." *Id.*

As in *Department of Education v. California*, the grants at issue in this case are contracts. The statute that created NEH authorizes its "Chairperson, with the advice of the National Council on the Humanities . . . to enter into arrangements, including contracts, grants, loans, and other forms of assistance, to," *inter alia*, "initiate and support research and programs to strengthen the research and teaching potential of the United States in the humanities . . . ." 20 U.S.C. § 956(c). Likewise, the governing appropriation statute allocates specific funding amounts for grants. Consolidated Appropriations Act, 2024, Pub. L. 118-42 (Mar. 9, 2024); March 15, 2025, Continuing Resolution, Pub. L. 119-4; *see* National Foundation on the Arts and the Humanities Act of 1965 § 7(c) (authorizing Chairman of NEH to, among other things, "award fellowships and grants"). None of these statutes require NEH to award grants or provide funds to specific grant holders, including Plaintiffs here. *See generally* 20 U.S.C. § 956; Consolidated Appropriations Act, 2024; March 15, 2025, Continuing Resolution. Plaintiffs' claims to the grant funds thus derive not from these statutory authorities, but from the grants themselves, which NEH had discretion to award. As alleged in Plaintiffs' complaints, with regard to the grants at issue, NEH promised to pay the appropriated funds to various recipients. *See, e.g.*, ACLS Compl. ¶¶ 92-110

---

5150, 25-5151, May 28, 2025 Order. The referenced dissent, among other things, distinguished the arguments raised by the networks in *Widakuswara* from the plaintiffs' arguments in *Department of Education v. California* on the basis that the plaintiffs in the latter case "were not entities created by statute and designated by Congress to receive specified sums" and that their "only claim was to sums awarded to them in previously awarded discretionary grants." *Widakuswara*, 2025 WL 1288817, at *13 (Pillard, J. dissenting). The order otherwise left the stay granted by the original panel in place.

and Authors Guild Compl. ¶¶ 12-24 (describing grants awarded to Plaintiffs). In return, the grantees promised to use the funds in accordance with NEH's requirements. *See* General Terms and Conditions for Awards to Organizations, https://www.neh.gov/grants/manage/organizations and Grants Management Policy and Guidance for Awards to Individuals, https://www.neh.gov/grants/manage/individuals (describing applicable terms and conditions, including "[r]ecipient responsibilities"); *see also* ACLS Compl. ¶¶ 92-93, 96-98, 100-103, 107-110 and Authors Guild Compl. ¶¶ 2, 4, 14, 16, 18, 20-21, 23 (describing specifications of grants awarded to plaintiffs, including limitations on other employment). These exchanges of promises constitute government contracts for Tucker Act purposes. *See Presidential Gardens Assocs. v. U.S. ex rel. Sec. of Housing and Urban Development*, 175 F.3d 132, 141 (2d Cir. 1999) ("[A]ny agreement can be a contract within the meaning of the Tucker Act, provided that it meets the requirements for a contract with the Government, specifically: mutual intent to contract including an offer and acceptance, consideration, and a Government representative who had actual authority to bind the Government."). Further, the relief Plaintiffs seek with respect to the grants is effectively specific performance of the grant agreements—a contract remedy. *Id.* at 143.

Plaintiffs cannot evade this jurisdictional bar by avoiding describing their claims as challenges to specific grant terminations. *See, e.g.*, *Pippenger v. U.S. DOGE Service*, No. 25-CV-1090 (BAH), 2025 WL 1148345, at *5 (D.D.C. Apr. 17, 2025) (concluding court was "deprive[d]" of "authority to consider claims sounding in contract or to enjoin further termination of contracts, even if they are styled as APA claims"); *Sols. in Hometown Connections v. Noem*, No. 25-cv-885, 2025 WL 1103253, at *11 (D. Md. Apr. 14, 2025) (denying motion for emergency relief challenging termination of grants in light of Supreme Court's order in *Department of Education* and concluding that plaintiffs' APA claims were "in essence contract claims"); Order, *Am. Ass'n*

*of Colls. For Tchr. Educ. v. McMahon*, No. 25-1281 (4th Cir. Apr. 10, 2025), Dkt. No. 30 (staying district court's preliminary injunction involving education-related grants in light of Supreme Court's *Department of Education* decision); Order, *U.S. Conf. of Catholic Bishops v. State*, No. 25-5066 (D.C. Cir. Mar. 28, 2015), Dkt. No. 2108313 (denying motion for injunction pending appeal from district court's order, which denied motion for preliminary injunction solely on the basis that the Tucker Act deprived it of jurisdiction to enjoin the government from pausing or terminating funding agreements).

Further, this Court lacks jurisdiction over all of Plaintiffs' claims relating to grant terminations, whether styled as claims under the APA, violations of the separation of powers, Impoundment Control Act or Appropriations Act, *ultra vires* claims, or something else. However styled, these claims ultimately challenge grant terminations, and should be heard in the Court of Federal Claims. *See, e.g.*, *Sols. in Hometown Connections*, 2025 WL 1103253, at *10 (rejecting "argument that the source of [plaintiffs'] APA claims in this case is statutory, regulatory and constitutional in nature" and "conclud[ing] that the source of the rights with regards to [plaintiffs'] APA claims here is their respective Grant agreements with DHS").

Finally, the Government notes that the Authors Guild Plaintiffs seek to bring their case as a class action on behalf of two proposed classes: first, "[a]ll individual NEH grant recipients whose grants were terminated as part of the Mass Termination," and second, "[a]ll NEH grant subrecipients whose sponsors' grants were terminated as part of the Mass Termination." Compl. ¶ 135. It would not be appropriate to certify such classes, which are premised on Plaintiffs' ability to challenge their grant terminations—something they can only do in the Court of Federal Claims.

## II.    The Court Lacks Subject-Matter Jurisdiction over Employee Termination Claims

The Court also lacks jurisdiction over Plaintiffs' claims concerning personnel actions.

Congress has established comprehensive statutory schemes for adjudicating employment disputes with the federal government. *See, e.g.*, 5 U.S.C. §§ 1204, 7121-22, 7701 (Merit Systems Protection Board); *id.* § 1214 (Office of the Special Counsel); *id.* § 7104 (Federal Labor Relations Authority); 22 U.S.C. § 4107 (Foreign Service Labor Relations Board); *id.* § 4136 (Foreign Service Grievance Board); 41 U.S.C. §§ 7103–05 (Civilian Board of Contract Appeals). These remedial schemes provide the exclusive procedures by which federal employees may pursue employment-related claims. *See Elgin v. Dep't of the Treasury*, 567 U.S. 1, 5, 10-15 (2012) ("The [Civil Service Reform Act ("CSRA")] established a comprehensive system for reviewing personnel action taken against federal employees" and provides the "exclusive" avenue to judicial review of such claims). Further, "[f]ederal employees may not circumvent [these statutes'] requirements and limitations by resorting to the catchall APA to challenge agency employment actions." *Grosdidier v. Chairman, Broad. Bd. of Governors*, 560 F.3d 495, 497 (D.C. Cir. 2009); *see also Perdeaux v. United States*, 33 F. Supp. 2d 187, 190 (E.D.N.Y. 1999) (same) (citing *Tiltti v. Weise*, 155 F.3d 596, 601 (2d Cir. 1998)). Further, "that principle applies to a systemwide challenge to an agency policy . . . just as it does to the implementation of such a policy in a particular case." *Nyunt v. Chairman, Broad. Bd. Of Governors*, 589 F.3d 445, 449 (D.C. Cir. 2009) (citation omitted).

In *Widakuswara*, as in this case, the plaintiffs challenged personnel actions in addition to grant terminations. As here, the plaintiffs attempted to avoid the framework applicable to personnel actions by arguing that, rather than challenging individual personnel actions, they challenged the "wholesale shuttering of [Voice of America]" and the "dismantl[ing of] an entire federal agency." *Widakuswara*, 2025 WL 1288817 at *3. The court observed that "plaintiffs may not use the APA to mount 'wholesale' challenges to an agency's 'entire program,'" but rather "[t]he APA cause of action, like its sovereign-immunity waiver, provides for judicial review of

'discrete agency actions.'" *Id.* (quoting *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 893 (1990); *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004)). The court found that the alleged "'dismantling'" was "a collection of many individual actions that cannot be packaged together and laid before the courts for wholesale correction under the APA." *Widakuswara*, 2025 WL 1288817 at *3. Thus, while the employees might have "viable, discrete claims" with respect to "individual personnel actions, those claims must be pursued through other remedial channels." *Id.*[3]

This reasoning is directly applicable here. The Court lacks jurisdiction to review the personnel decisions Plaintiffs challenge.

### III.    Plaintiffs Lack Standing as to Any Claims Not Challenging the Termination of Their Own Grants

Plaintiffs lack standing for the vast majority of the relief they seek. As an initial matter, as discussed above, claims concerning grant terminations can only be brought in the Court of Federal Claims, while personnel decisions can only be challenged via the statutory schemes Congress has created for that purpose. *Supra*, Sections I and II. Further, those avenues are only available to those directly harmed by the adverse action: for grant terminations, the grantee whose grant was terminated, and for personnel actions, the employee who experienced an adverse employment action. *See, e.g.*, *Ransom v. United States*, 900 F.2d 242, 244 (Fed. Cir. 1990) ("To maintain a cause of action pursuant to the Tucker Act that is based on a contract, the contract must be between the plaintiff and the [G]overnment."); *Erickson Air Crane Co. v. United States*, 731 F.2d 810, 813 (Fed. Cir. 1984) (pursuant to the Tucker Act, "[t]he [G]overnment consents to be to be sued only by those with whom it has privity of contract[.]"). Accordingly, even if they were proceeding in

---

[3] The May 28 order vacating the stay and granting rehearing with respect to the grant termination claims in *Widakuswara*, *see supra* note 2, denied rehearing with regard to the portion of the decision finding that the district court lacked subject-matter jurisdiction over the personnel actions. *See* May 28, 2025 Order.

the appropriate forum, Plaintiffs could only challenge the termination of their own grants. Further, because none of the Plaintiffs is an employee of NEH who suffered an adverse employment action, Plaintiffs could not challenge those actions through the designated statutory scheme. Even putting this aside, however, Plaintiffs have not plausibly alleged that they have standing to challenge anything other than the termination of their own grants.

To meet the constitutional requirement of standing, Plaintiffs must establish that they "[have] suffered, or will suffer, an injury that is concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling." *Murthy v. Missouri*, 603 U.S. 43, 57 (2024) (internal cites omitted). The Supreme Court recently emphasized that "standing is not dispensed in gross." *Id.* at 61 (quotation omitted). Thus, "plaintiffs must demonstrate standing for each claim that they press" against each defendant, "and for each form of relief that they seek." *Id.* Further, "when the plaintiff is not himself the object of the government action or inaction he challenges, standing," though "not precluded," is "ordinarily substantially more difficult to establish." *Lujan*, 504 U.S. at 562 (internal quotation marks omitted).

Plaintiffs fail to plausibly allege the required elements with respect to any claims other than those relating directly to their own grant terminations. First, Plaintiffs' allegations that they were harmed because their grants were terminated do not give them standing to challenge the other agency actions they challenge—namely, the broader termination of grants, NEH employees being placed on administrative leave, and the discontinuation of certain programs and divisions. Plaintiffs have not plausibly alleged that NEH would have to maintain its current staffing levels, offer all of the grants that were terminated, or continue all of the programs that were discontinued in order to continue to make Plaintiffs' grants available. *See Citizens for Const. Integrity v. Census Bureau*, 115 F.4th 618, 628 (D.C. Cir. 2024) (because plaintiffs could not show that the

government "action or inaction" challenged was "causally connected to [their] injury" they could not demonstrate Article III standing" (citation omitted)).

The ACLS Plaintiffs also allege two other categories of harm, neither of which suffices to give them standing to support their broad claims. First, in addition to alleging that their existing grants were terminated, the ACLS Plaintiffs allege that they were "planning on applying for upcoming grant opportunities that have been abruptly cancelled." ACLS Compl. ¶¶ 94, 99, 104; *see also id.* ¶ 111. As Plaintiffs appear to acknowledge, however, they have no entitlement to any particular grant. *See* ACLS Compl. ¶ 111. Whether Plaintiffs would have received specific grants for which they allegedly would have applied had those grants been offered is speculative. *See Dorce v. City of New York*, 2 F.4th 82, 95 (2d Cir. 2021) ("[A]n allegation of future injury will be sufficient only if 'the threatened injury is certainly impending, or there is a substantial risk that the harm will occur.'" (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014)). In any event, for the same reasons discussed above with respect to Plaintiffs' terminated grants, this theory would at most give Plaintiffs standing to challenge the termination of the specific grant opportunities for which they were allegedly planning to apply.

Second, the ACLS Plaintiffs allege that NEH has historically benefitted them in various ways, including by hosting meetings that provided "professional development and networking opportunities" and allowed them to "learn about funding opportunities and receive guidance on how to apply for Federal funding," and by offering "seminars, institutes, and workshops for educators." ACLS Compl. ¶¶ 112-24. Plaintiffs allege that, in light of the "mass firing of NEH staff" and "[t]he loss of entire grant programs," it will be "more difficult" for Plaintiffs and their members to reap certain of these benefits. *Id.* ¶¶ 114-15, 119-20. However, Plaintiffs' claim that NEH will no longer engage in activities like hosting meetings and offering seminars—and, further,

that the loss of those activities will harm Plaintiffs in a concrete way—is speculative.  Moreover, Plaintiffs have not alleged—nor could they—that the governing statute, or any other statute, specifically requires NEH to host such meetings, provide Plaintiffs with professional development and networking opportunities or "credentialing recognition," or offer seminars, institutes, and workshops.  *See id.* ¶¶ 112-22; *see generally* 20 U.S.C. §§ 951 *et seq.*

Plaintiffs also do not have standing to challenge NEH's decision to fund the "Garden of Heroes."  They do not articulate any way in which NEH's decision to fund that project harms them.

## IV.    Many of Plaintiffs' Claims Are Unripe

In addition to challenging specific actions taken by NEH, including grant terminations, Plaintiffs mount a broad challenge to the alleged "dismantling" of NEH and assert that NEH will be unwilling or unable to spend the funds appropriated to it.  *See, e.g.*, ACLS Compl. ¶¶ 1, 7, 8, 10; Authors Guild Compl. ¶¶ 7, 158-160.  These claims, which are based on predicted future events that may not come to pass, are unripe.  *See Trump v. New York*, 592 U.S. 125, 131 (2020) (claim unripe if it is "dependent on contingent future events that may not occur as anticipated, or indeed may not occur at all").

Despite Plaintiffs' allegations that NEH has been "dismantl[ed]" and its activities have come to a "crashing halt," *see* ACLS Compl. ¶¶ 1, 5, their allegations as a whole make clear that NEH continues to have employees and administer ongoing grants.  *See, e.g.*, ACLS Compl. ¶ 74 and Authors Guild Compl. ¶ 116 (alleging that a portion of staff were placed on administrative leave); ACLS Compl. ¶ 67 and Authors Guild Compl. ¶ 120 (alleging that a portion of grants were terminated).  Indeed, as Plaintiffs acknowledge, NEH continues to fund new projects and make new grants.  *See* Authors Guild Compl. ¶¶ 122-23.  Accordingly, Plaintiffs' claims that NEH will not spend the funds appropriated to it are "dependent on contingent future events that may not

14

occur." *Trump v. New York*, 529 U.S. at 131 (quotation marks omitted).

Plaintiffs are also incorrect that NEH is required to spend all allocated funds in a given year. *See, e.g.*, Authors Guild Compl. ¶ 54 (alleging that NEH "must spend" $207 million in 2025). Instead, the legislation appropriating funds to NEH makes clear that the allocated funds are "available to" NEH, and that they will "remain available until expended"—even if that does not occur within the year. *See* Consolidated Appropriations Act, 2024, Pub. L. 118-42. Accordingly, even if NEH does not spend all of its appropriated funding—which, again, is speculative—that would not be inconsistent with Congress's appropriation.

## V.    Plaintiffs' Claims Are Not Reviewable Under the APA

Plaintiffs' claims under the APA fail for multiple reasons: (1) statutes preclude judicial review of some claims, and other adequate alternative remedies exist for such claims; (2) Plaintiffs have not alleged the requisite discrete, final agency action and, instead, mount impermissible programmatic challenges; and (3) the alleged actions challenged by Plaintiffs' APA claims—the termination of grants, the reduction of personnel, the termination of departments, divisions, or programs, and delays or pauses in grant funding—are committed to agency discretion by law.

### A.    APA Review Is Unavailable Because Statutes Preclude Judicial Review, and Alternative Remedies Exist for Such Review

APA review is not available to the extent that other "statutes preclude judicial review," 5 U.S.C. § 701(a)(1), and the APA only provides a cause of action where "there is no other adequate remedy in a court," 5 U.S.C. § 704. As discussed in Parts I and II, *supra*, the Tucker Act and the statutory scheme for challenging employment actions preclude APA claims challenging grant terminations and personnel actions. Moreover, the remedial schemes created by those statutes provide adequate remedies to challenge the grant terminations and personnel reductions alleged by Plaintiffs. Additionally, APA review is not available with respect to Plaintiffs' allegations that

Defendants violated the Impoundment Control Act, *see* ACLS Compl. Count 3; Authors Guild Compl. Count 2, as that statute provides that the Act shall be enforced exclusively by the Comptroller General in the United States District Court for the District of Columbia.  2 U.S.C. § 687; *see Gen. Land Off. v. Biden*, 722 F. Supp. 3d 710, 734-35 (S.D. Tex. 2024).

### B. Plaintiffs' APA Claims Fail Because They Do Not Seek Judicial Review of a Discrete Agency Action

Plaintiffs' APA claims also fail because they do not identify a discrete and circumscribed final agency action that the Court can redress.  Instead, Plaintiffs challenge a collection of personnel actions, programmatic activities, and funding delays or pauses.  *See* ACLS Compl. ¶¶ 5-6, 74-90, 126; Authors Guild Compl. ¶¶ 6, 98-115.

The APA contemplates judicial review only of "agency action."  5 U.S.C. § 704.  As the Supreme Court has explained, a reviewable "action" is limited to the set of "circumscribed, discrete agency actions" identified in the APA's definition of "action."  *See S. Utah*, 542 U.S. at 62.  This definition, while expansive, is "not so all-encompassing as to authorize [courts] to exercise judicial review [over] everything done by an administrative agency."  *Independent Equip. Dealers Ass'n v. EPA*, 372 F.3d 420, 427 (D.C. Cir. 2004).  Importantly, the APA does not permit "general judicial review of [an agency's] day-to-day operations," *Lujan*, 497 U.S. at 899, like "constructing a building, operating a program, or performing a contract," *Vill. of Bald Head Island v. U.S. Army Corps. of Eng'rs*, 714 F.3d 186, 193 (4th Cir. 2013).  Nor does it authorize courts to oversee "the common business of managing government programs."  *Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt.*, 460 F.3d 13, 20 (D.C. Cir. 2006).  Instead, Plaintiffs must plead an "identifiable" action and "direct [their] attack against some particular 'agency action' that causes [them] harm."  *Lujan*, 497 U.S. at 890-91; *see also Norton*, 542 U.S. at 62.

The APA thus contains "a prohibition on programmatic challenges," meaning "challenges

16

that seek 'wholesale improvement' of an agency's programs by court decree." *Alabama-Coushatta Tribe of Tex. v. United States*, 757 F.3d 484, 490 (5th Cir. 2014) (cleaned up). "Because 'an on-going program or policy is not, in itself, a final agency action under the APA,' [a court's] jurisdiction does not extend to reviewing generalized complaints about agency behavior." *Cobell v. Kempthorne*, 455 F.3d 301, 307 (D.C. Cir. 2006) (citation omitted).

Here, Plaintiffs' claims and requests for relief present exactly the type of wholesale challenge that the APA forbids. Plaintiffs do not simply challenge the cancellation of their or their members' individual grants (which, as discussed *supra*, this Court lacks jurisdiction to review). Instead, they seek review of the termination of a sweeping and unspecified number of grants, the reduction of agency personnel, the elimination of divisions, departments, or programs, the delay in spending appropriated funds, and decisions about what to fund going forward. *See, e.g.*. ACLS Compl. ¶ 126; Authors Guild Compl. ¶ 6. In essence, Plaintiffs' APA claims challenge NEH's entire recent courses of conduct. That is the opposite of the discrete, circumscribed agency action that is required for review under the APA. *See Lujan*, 497 U.S. at 891; *Nat'l Veterans Legal Servs. Program v. United States Dep't of Def.*, 990 F.3d 834, 839 (4th Cir. 2021).

To the extent Plaintiffs argue that the "dismantling" of the NEH, *see* ACLS Compl. ¶¶ 1, 7, 10, 91, 130, 134; Authors Guild Compl. ¶¶ 116-23, is the "discrete" and final agency action, that assertion lacks legal and factual merit. As discussed above, the D.C. Circuit rejected that argument in *Widakuswara*, explaining that the "dismantling plaintiffs allege[d]" in that case was "a collection of 'many individual actions' that cannot be packaged together and 'laid before the courts for wholesale correction under the APA.'" 2025 WL 1288817, at *3 (quoting *Lujan*, 497 U.S. at 893). Indeed, the ACLS complaint in particular reflects that Plaintiffs seek wholesale judicial review of the government's management of the agency—its day-to-day decisions about staffing, allocation

of resources, and organizational structure—rather than review of a discrete action. Addressing the claims in each case would require the Court to supervise agency activities, determine how the agency should accomplish statutory functions, and monitor grant determinations going forward. Such review would circumvent the purpose of the APA's discrete agency action requirement, which is to "protect agencies from undue judicial interference with their lawful discretion and to avoid judicial entanglement in abstract policy disagreements which courts lack both expertise and information to resolve." *S. Utah*, 542 U.S. at 66-67.

Factually, Plaintiffs cannot plausibly allege that there has been a final decision to shut down the agency or to cancel all grants. As noted *supra* in Part IV, the Authors Guild Plaintiffs acknowledge that NEH continues to fund new projects and make new grants, *see* Authors Guild Compl. ¶¶ 122-23, and Plaintiffs in both cases appear to recognize that not all staff was eliminated and not all grants were terminated, *see, e.g.*, ACLS Compl. ¶¶ 67, 74; Authors Guild Compl. ¶¶ 116, 120. NEH's homepage is current, *see* NEH, https://www.neh.gov/, and contains a link to current "Funding Opportunities," *see* Grants, https://www.neh.gov/grants (allowing applicants to apply for grants through the website); *see also* Press Release, National Endowment for the Humanities, https://essentials.neh.gov/taxonomy/term/281 (announcing new grant programs). In sum, Plaintiffs have not alleged a final, discrete, circumscribed agency action that can be redressed by the Court—a prerequisite to bringing a claim under the APA.

### C. APA Review Is Unavailable Because the Challenged Actions Are Committed to Agency Discretion by Law

APA review is also unavailable to Plaintiffs because the actions Plaintiffs challenge are "committed to agency discretion by law." 5 U.S.C. § 701(a)(2). None of the authorities Plaintiffs cite limit the agency's inherent discretion to make independent decisions about staffing, organizational structure, the amount of appropriations to expend during a given time period,

whether to award or maintain particular grants, and the number of grants to award or maintain over a particular time frame.

Courts have explained that agency action is "committed to agency discretion by law" when a "statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion," rendering "meaningful judicial review . . . impossible." *Steenholdt v. FAA*, 314 F.3d 633, 638 (D.C. Cir. 2003) (quoting *Heckler v. Chaney*, 470 U.S. 821, 830 (1985)). This is true "even where Congress has not affirmatively precluded review." *Heckler*, 470 U.S. at 830. Hallmarks of a decision committed to agency discretion include a statute that puts the onus on the agency, not the courts, to apply a standard, *see Webster v. Doe*, 486 U.S. 592, 600 (1988), and general criteria that make it difficult for courts to meaningfully second-guess an agency determination, *see id.*

The Act establishing NEH, the National Foundation on the Arts and Humanities Act of 1965, 20 U.S.C. §§ 951-960, is such a statute. For one thing, it authorizes the NEH Chairperson to "enter into arrangements, including contracts, grants, loans, and other forms of assistance" aimed at various humanities-related objectives—but does not *require* NEH to enter into particular grants, maintain specific levels of staffing, create or retain the programs or departments that Plaintiffs identify in their complaints, or fund particular grants or a certain number of grants within a given time frame. 20 U.S.C. § 956(c); *see Vt. Yankee Nuclear Power Corp. v. Natural Resources Defense Fund*, 435 U.S. 519, 545 (1978) (explaining that a court may not "dictat[e] to the agency the methods, procedures, and time dimension" to make an agency decision); *see also Sealed v. Sealed*, 332 F.3d 51, 56 (2d Cir. 2003) (distinguishing between a statute that "channels official discretion by mandating a defined administrative outcome" and a statute that "merely *authorizes* particular actions"). Moreover, the statute's authorization to fund grants encompasses broadly

19

drawn topics and guidelines that would not provide a meaningful rubric for court review.  For example, it authorizes the chairperson to administer grants pertaining to: "the pursuit of a national policy for the promotion of progress and scholarship in the humanities"; "research and teaching potential of the United States in the humanities"; "training and workshops in the humanities"; "programs and research" with "substantial scholarly and cultural significance"; and programs and research that "reach, or reflect the diversity and richness of our American cultural heritage," including "a minority, inner city, rural, or tribal community." 20 U.S.C. § 956(c).  The statute thus gives the agency wide latitude to enter into grant agreements that serve any of several expansive statutory goals like supporting "scholarship in the humanities," "research and teaching potential of the United States in the humanities," and "interchange of information in the humanities."  *Id.*

Nor does the relevant appropriations legislation limit the agency's discretion by compelling it to spend all of the funds appropriated to it by a date certain.  The most recent appropriations legislation states simply that the $207 million appropriated by Congress shall "remain available until expended."  *See* Consolidated Appropriations Act, 2024.

### VI.    Plaintiffs Have Not Plausibly Alleged Violations of the Separation of Powers, the Impoundment Control Act, any Appropriations Laws, or the First Amendment

Even assuming Plaintiffs' claims could withstand the threshold hurdles addressed in Parts I-V (they cannot), Plaintiffs have not plausibly alleged violations of the separation of powers, the Impoundment Control Act, relevant appropriations laws, or the First Amendment.

### A.  Plaintiffs Have Not Plausibly Alleged a Separation of Powers Violation

As an initial matter, to the extent Plaintiffs cast their separation of powers claims as constitutional to avoid jurisdictional and threshold obstacles (*see* ACLS Compl. Count 2; Authors Guild Compl. Count 4), such claims are still barred because their essence is statutory.  The Supreme Court has made clear that "claims simply alleging that the President has exceeded his statutory

authority are not 'constitutional' claims, subject to judicial review" for constitutionality. *Dalton v. Specter*, 511 U.S. 462, 472-74 (1994). Here, Plaintiffs' separation of powers claims hinge on whether Defendants acted in accordance with their statutory obligations. *See* ACLS Compl. ¶¶ 140-43; Authors Guild Compl. ¶¶ 172, 174.

Even if Plaintiffs had an avenue to bring their separation of powers claims, however, such claims would fail because Plaintiffs have not identified any actions taken by Defendants that violate any act of Congress. *See* ACLS Compl. Counts 1-2; Authors Guild Compl. Counts 2, 4. They have pointed to no statute that would prohibit NEH from cancelling grant agreements, reducing staff, or eliminating divisions or programs. As discussed, the governing statute establishing NEH authorizes the agency head to disperse grants in accordance with broadly stated objectives. *See* 20 U.S.C. § 956(c). It does not entitle the Plaintiff grant holders to their grant proceeds. *Id.* Plaintiffs allege that the challenged activities have violated Congressional mandates by "precluding NEH from carrying out its statutory functions and purposes," *see* ACLS Compl. ¶ 141—but, as discussed above, the agency continues to operate, *see supra* pages 14-15, 18, and Plaintiffs do not identify anything in any relevant statute that requires the agency to maintain particular levels of staff, dispense particular quantities of grant funds over a specified time frame, or maintain any particular grant awards. Further, Plaintiffs' claim that the governing statute prohibits NEH from creating the "Garden of Heroes" is simply incorrect. *See* ACLS Compl. ¶ 168. Section 952(d) of the National Foundation on the Arts and the Humanities Act contains in its definition of "project" programs "to foster American artistic creativity" and "commission works of art." 20 U.S.C. § 952(d). This definition applies to all agencies created under the Act. The functions of NEH, as laid out in Section 956, include fostering "programs and projects" pertaining to the humanities. *Id.* § 956(c)(10).

21

**B.  Plaintiffs Have Not Identified Any Violation of an Appropriations Provision**

Plaintiffs also have not identified any appropriations provision that Defendants' actions have violated.  As Plaintiffs acknowledge, Congress appropriated $192 million "for support of activities in the humanities" pursuant to § 956(c) and $15 million "to carry out the matching grants program" in § 959(a)(2).  *See ACLS* Compl. ¶ 149.  Neither the agency's termination of particular grants, nor the agency's alleged delay in awarding new grants, contravenes that instruction. Consolidated Appropriations Act, 2024.  As discussed above, the 2024 appropriations law did not specify a time frame within which the agency was obligated to spend the entirety of the appropriated funds, and Plaintiffs have identified no appropriations provision that would impose such a requirement.  *See id*; March 15, 2025, Continuing Resolution.

**C.  Plaintiffs Have Not Stated a Claim Under the Impoundment Control Act**

Plaintiffs also have not stated a claim under the Impoundment Control Act of 1974, Pub. L. No. 93-344, tit. X, 88 Stat. 297, 333 (1974) (codified as amended at 2 U.S.C. §§ 682 *et seq*.), because again, Plaintiffs identify no provisions in congressional appropriations legislation that mandate that Plaintiffs (or any specific grantees) continue to receive funding.

**D.  Plaintiffs Have Not Stated a Viable First Amendment Claim**

Plaintiffs also have not plausibly stated a First Amendment challenge.  *See* ACLS Compl. Counts 7-8; Authors Guild Compl. Count 5.  They vaguely assert that Defendants "terminated . . . grants based on viewpoint" while "leaving in place existing and future grants that align with particular political and ideological viewpoints."  ACLS Compl. ¶ 176; *see also* Authors Guild Compl. ¶ 181 (alleging Defendants terminated grants "based on recipients' perceived viewpoint, in an effort to drive such views out of the marketplace of ideas").  However, they do not identify any particular viewpoints that allegedly prompted Defendants to terminate their grants—or any

grants.  *See generally* ACLS Compl. ¶¶ 171-81; Authors Guild Compl. ¶¶ 176-82.  To the contrary, they suggest that Defendants broadly and indiscriminately terminated all, or nearly all, grants "awarded during the prior administration."  ACLS Compl. ¶ 176; Authors Guild Compl. ¶ 181.

Even if Plaintiffs had sufficiently pled that the grant terminations were made on the basis of ideology, that would not make out a claim that Defendants interfered with constitutionally protected speech.  The Supreme Court has long held that, with respect to the government's decisions of what to fund, a "decision not to subsidize the exercise of a fundamental right does not infringe the right."  *Rust v. Sullivan*, 500 U.S. 173, 193 (1991) (quoting *Regan v. Tax'n With Representation of Wash.*, 461 U.S. 540, 549 (1983)); *see also National Endowment for the Arts v. Finley*, 524 U.S. 569, 587-88 (1998) (explaining that the "Government may allocate competitive funding according to criteria that would be impermissible were direct regulation of speech or a criminal penalty at stake").  Congress, for example, is permitted to "selectively fund a program to encourage certain activities it believes to be in the public interest, without at the same time funding an alternative program," and that does not mean that it "discriminated on the basis of viewpoint." *Id.* at 588 (quoting *Rust*, 500 U.S. at 193).  Generally, "if a party objects to a condition on the receipt of federal funding, its recourse is to decline the funds."  *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc. (AID)*, 570 U.S. 205, 214 (2013) (collecting cases).

While government funding is not divorced from the First Amendment in all respects, the relevant First Amendment limitation is the prohibition against unconstitutional "condition."  *Id.* at 213-15.  Under this limitation, the government may "specify the activities [it] wants to subsidize," but it cannot "leverage funding to regulate speech outside the contours of the programs itself."  *Id.* at 214-15.  Thus, for example, limitations on the use of federal funds for a specific purpose—such as "promot[ing]  or  advocat[ing]  [for]  the  legalization  or  practice  of  prostitution  or  sex

trafficking"—are constitutionally permissible, *id.* at 217-18, but outright conditioning of federal funds on a pledge to a policy "explicitly opposing prostitution or sex trafficking" is not, *id.* at 210. The latter amounts to an unconstitutional condition because it regulates speech even on the recipients' "own time and dime." *Id.* at 218-19. Consistent with these principles, another court held earlier this month that executive order provisions targeting "the federal funding of gender ideology" did not run afoul of the First Amendment because they did not "reach beyond the scope of the grant or fund at issue" by "tell[ing] agencies to cancel contracts with entities doing equity-related work outside their contracts or to ensure that federal funds do not support grantees promoting gender ideology with non-federal funds." *See National Urban League v. Trump*, No. 25-471 (TJK), 2025 WL 1275613, at *21 (D.D.C. May 2, 2025).

Here, Plaintiffs have not alleged that Defendants imposed an unconstitutional condition on their speech, nor that the termination of any grant was premised on any grant holder's support for or expression of a specific viewpoint on its own "time and dime." *AID*, 570 U.S. at 218. Accordingly, even accepting Plaintiffs' allegations as true and adequately pled, they do not make out a claim for infringement of speech protected by the First Amendment.

### VII.   Plaintiffs Fail to State an *Ultra Vires* Claim

Finally, Plaintiffs' *ultra vires* claims (ACLS Compl. Counts 2-4; Authors Guild Compl. Counts 3-6) should be dismissed. An *ultra vires* claim "is only available in the extremely limited circumstance when three requirements are met: (i) the statutory preclusion of review is implied rather than express; (ii) there is no alternative procedure for review of the statutory claim; and (iii) the agency plainly acts in excess of its delegated powers and contrary to a specific prohibition in the statute that is clear and mandatory." *Yale New Haven Hosp. v. Becerra*, 56 F.4th 9, 26-27 (2d Cir. 2022) (cleaned up). The third requirement is especially demanding. "Only error that is

patently a misconstruction of the" pertinent statute, "that disregards a specific and unambiguous statutory directive, or that violates some specific command of a statute will support relief." *FedEx v. Dep't of Comm.*, 39 F.4th 756, 764 (D.C. Cir. 2022) (cleaned up).  An *ultra vires* claim has been referred to as "essentially a Hail Mary pass," *DCH Reg'l Med. Ctr. v. Azar*, 925 F.3d 503, 509 (D.C. Cir. 2019) (citation omitted), because of its "extraordinarily narrow" scope, *Hartz Mountain Corp. v. Dotson*, 727 F.2d 1308, 1312 (D.C. Cir. 1984).

Here, as discussed *supra*, specific statutes provide remedies for parties to challenge grant terminations and employment actions.  This precludes this Court from providing supplemental remedies for those actions, including through *ultra vires* review.  Similarly, because the Impoundment Act channels review through the Comptroller General, an *ultra vires* claim premised on the Impoundment Act is not available to Plaintiffs.  *FedEx*, 39 F.4th at 763.

And for the reasons discussed in Part VI above, Plaintiffs' *ultra vires* claims also fail on the third prong of the test, because Defendants have not violated any "clear and mandatory" statutory command.  Allegations of constitutional error do not establish *ultra vires* action.  *See Eagle Tr. Fund v. USPS*, 365 F. Supp. 3d 57, 68 n.6 (D.D.C. 2019).  Neither do claims that "simply involve a dispute over statutory interpretation." *Dart v. United States*, 848 F.2d 217, 231 (D.C. Cir. 1988).  Rather, an officer may be said to act *ultra vires* "only when he acts 'without any authority whatever.'" *Penhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 101-02 n.11 (1984).

## CONCLUSION

The Court should grant Defendants' motion and dismiss the complaints in both cases.

Dated:  New York, New York
        May 30, 2025

                              Respectfully submitted,

                              JAY CLAYTON
                              United States Attorney for
                              the Southern District of New York
                              Attorney for Defendants


                         By:  /s/ Mary Ellen Brennan_____
                              MARY ELLEN BRENNAN
                              RACHAEL DOUD
                              Assistant United States Attorneys
                              86 Chambers Street, 3rd floor
                              New York, New York 10007
                              Telephone: (212) 637-2652
                              MaryEllen.Brennan@usdoj.gov