# UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| THE AUTHORS GUILD, WILLIAM GOLDSTEIN, ELIZABETH KADETSKY, VALERIE ORLANDO, KATALIN BALOG, BENJAMIN HOLTZMAN, LEE JASPERSE, and NICOLE JENKINS, on behalf of themselves and all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> NATIONAL ENDOWMENT FOR THE HUMANITIES, et al., <br><br> Defendants. | Case No. 25-cv-03923 |

## MEMORANDUM IN SUPPORT OF MOTION TO COMPEL

# TABLE OF CONTENTS

I.  INTRODUCTION ..................................................................................1

II. BACKGROUND .................................................................................4

    A.  Factual Background .........................................................................4

    B.  Documents Produced to Date and Objections at Issue. ...................6

    C.  The Government Has Repeatedly Sought to Delay and Avoid
        Discovery in this Case in Direct Violation of this Court's
        Directives. .......................................................................................8

III. ARGUMENT.....................................................................................13

    A.  The Court Should Compel The Government To Complete The
        Administrative Record. ..................................................................13

    B.  The Court Should Overrule The Government's Objections To
        Plaintiffs' Discovery Requests and Deposition Notices and
        Subpoenas. .....................................................................................17

## TABLE OF AUTHORITIES

**Cases**

*Amfac Resorts, LLC v. Dep't of the Interior,*
   143 F. Supp. 2d 7 (D.D.C. 2001) .......................................................................... 16

*Blue Ocean Inst. v. Gutierrez,*
   503 F. Supp. 2d 366 (D.D.C. 2007) ...................................................................... 14

*Camp v. Pitts,*
   411 U.S. 138 (1973) .............................................................................................. 22

*Cheney v. U.S. Dist. Court for Dist. of Columbia,*
   542 U.S. 367 (2004) ........................................................................................ 23, 24

*Citizens for Resp. & Ethics in Washington v. U.S. DOGE Serv.,*
   349 F.R.D. 1 (D.D.C. 2025) ................................................................................. 24

*Fort Sill Apache Tribe v. Nat'l Indian Gaming Comm'n,*
   345 F. Supp. 3d 1 (D.D.C. 2018) ......................................................................... 14

*Hayden v. Paterson,*
   594 F.3d 150 (2d Cir. 2010) ................................................................................. 21

*In re U.S. DOGE Serv.,*
   2025 WL 1393222 (D.C. Cir. May 14, 2025) ...................................................... 24

*In re U.S. DOGE Service, et al.,*
   No. 24A1122 (2025) ....................................................................................... 24, 25

*Mayor & City Council of Baltimore v. Trump,*
   429 F. Supp. 3d 128 (D. Md. 2019) ........................................................... 19, 20, 21

*Mendez v. Aviles-Ramos,*
   2025 WL 2962007 (S.D.N.Y. Oct. 20, 2025) ...................................................... 19

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,*
   463 U.S. 29 (1983) ............................................................................................... 20

*Nat'l TPS All. v. Noem,*
   2025 WL 2419266 (N.D. Cal. Aug. 21, 2025) ..................................................... 20

*New York v. U.S. Dep't Commerce,*
   345 F. Supp. 3d 444 (S.D.N.Y. 2018) .................................................................. 21

*Oceana, Inc. v. Ross,*
   290 F. Supp. 3d 73 (D.D.C. 2018) ....................................................................... 13

*Pickering v. Bd. of Ed. of Twp. of High Sch. Dist. 205, Will Cty.*,
    391 U.S. 563 (1968) .................................................................................................... 20

*Thakur v. Trump*,
    148 F.4th 1096 (9th Cir. 2025) ...................................................................................... 6

*Thakur v. Trump*,
    No. 25-cv-04737-RFL (N.D. Cal.), ECF 32 ................................................................ 20

*Univ. of Colo. Health at Mem'l Hosp. v. Burwell*,
    151 F. Supp. 3d 1 (D.D.C. 2015) .................................................................................. 14

*Vidal v. Duke*,
    2017 WL 8773110 (E.D.N.Y. Oct. 17, 2017) .............................................................. 21

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
    429 U.S. 252 (1977) .................................................................................................... 21

## Other Authorities

Sophia Cai and Daniel Lippman, *Inside the DOGE Succession Drama Elon Musk Left Behind*,
    Politico (Nov. 21, 2025) .............................................................................................. 15

## I.    INTRODUCTION

The Government is refusing to comply with this Court's directives regarding the Administrative Record and discovery. Plaintiffs The Authors Guild, William Goldstein, Elizabeth Kadetsky, Valerie Orlando, Katalin Balog, Benjamin Holtzman, Lee Jasperse, and Nicole Jenkins (collectively, "Plaintiffs") hereby request an order (1) compelling the Government to complete the Administrative Record in accordance with this Court's instructions; (2) overruling the Government's general objection to all discovery; and (3) overruling the Government's general objection to discovery on the United States DOGE Service ("DOGE"), the General Services Administration ("GSA"), and Defendants Fox and Cavanaugh.[1]

The Court gave the Government clear marching orders months ago. At the hearing on September 25, 2025, the Parties and the Court discussed discovery, specifically what the Administrative Record should contain and whether Plaintiffs were entitled to discovery beyond that record. When the Court learned that, by that point, the Government had turned over only 23 documents, the Court said, "If the Government wishes to say that that's the administrative record, already you're in default."  ECF 150 ("Sept. 25, 2025 Hr'g Tr.") at 7. The Court then made clear that the Government must conduct "a thorough search going all the way up to the White House and down to the NEH and every place in between, including this entity known as DOGE, and [to] locate[] all the paper that is relevant to the decisions that were made to terminate the grants, including any general directives that monies were to be terminated on the basis of race, gender, []

---

[1] Plaintiffs are aware of Rule § V.B of Your Honor's Individual Practices and Procedures, but do not believe a letter seeking an order of reference is necessary because this is not a traditional discovery dispute as contemplated by that Rule; nor is it the first dispute on these issues. Rather, this dispute concerns the Government's refusal to comply with this Court's prior, explicit directives regarding the scope of the Administrative Record and of discovery beyond the Administrative Record. In addition, Your Honor previously indicated that she may handle discovery disputes without referring them to a Magistrate Judge. *See* Sept. 25, 2025 Hr'g Tr. at 14.

race ideology, gender ideology, [or] content." *Id*. at 10; *see id.* at 7 ("You have to go up to the White House, and you have to start there; and you have to go through DOGE, and you have to go there; and you have to turn over everything that has anything to do … directly or indirectly with the … ultimate making of decisions at the National Endowment for the Humanities, or any other agency.").

The Court has also made clear—repeatedly—that Plaintiffs are entitled to discovery beyond the Administrative Record: "The government is NOT correct that this is a case in which we are limited to the administrative record. It is primarily (though not exclusively) a first amendment lawsuit, as to which discovery is entirely appropriate." ECF 131; *see also* Sept. 25, 2025 Hr'g Tr. at 7 ("[I]f that's what they've turned over, you're in a position to ask for extra record discovery."); *id.* at 9 (to Government: "I'm going to give them full discovery on that."); *id.* at 11 (to Government: "But if you're telling me you haven't [compiled the Administrative Record described above], I'm not going to make them wait any longer to issue discovery requests while you do what you should have done in the first place."). Plaintiffs thus served document requests and deposition notices four days after the September 25 hearing.

The Government has since produced just 4 more documents, bringing the total number of documents produced since this Court's July 25 order denying the Government's motion to dismiss to 27. The Government also made clear in its first Responses and Objections, served last week, as well as in a subsequent meet-and-confer, that it will not comply with this Court's order, instead continuing to object to full discovery; maintaining that it will not search any agency other than NEH; and stating that it will not consent to depositions of witnesses (including named Defendants) until Plaintiffs make some further showing of need. Indeed, when Plaintiffs asked the Government whether it conducted the searches this Court ordered, the Government admitted that it had not and

that it was objecting to doing so. *E.g.*, Ex. 1 (Nov. 26 Doud Email) at 1-6.[2]

Thus, in the months since the September 25 hearing, the Government has not produced—or even looked for—relevant documents from any agency other than NEH, despite this Court's orders and the undisputed record demonstrating that officials from DOGE were involved in the Mass Termination, used GSA email accounts while doing so, and were receiving directions from others in government outside of NEH. Even the 27 NEH documents produced so far, moreover, do not appear to include all relevant documents from NEH, as detailed below. Plaintiffs accordingly seek an order compelling the Government to produce all relevant documents, whether as part of the Administrative Record or in response to Plaintiffs' discovery requests. Plaintiffs further seek an order overruling the Government's general objection to all discovery and to all discovery outside of NEH, including its objections to written discovery and depositions on those bases.[3]

The Court should not tolerate the Government's transparent attempts to evade scrutiny through procedural obstruction. Plaintiffs allege, and the evidence to date suggests, that the Government terminated grants based on impermissible viewpoint discrimination—canceling funding simply because they deemed projects too focused on "DEI," women's accomplishments, or the history of people of color, or too associated with political views the Government disfavors. The Court should reject, yet again, the Government's baseless attempt to shirk their obligations and avoid accountability.

---

[2] All "Ex." citations refer to exhibits to the Declaration of Jamie Crooks.

[3] To be clear, Plaintiffs are not presently seeking an order compelling discovery from the White House itself or requesting any relief directed at the White House.

## II.     BACKGROUND

### A.     Factual Background

Since its founding in 1965, the National Endowment for the Humanities ("NEH") "has been the largest and most prestigious funder of advanced humanities research in this country." Decision and Order, ECF 116 at 1.[4] But over the first three days of April 2025, more than 1,400 recipients of NEH grant funding had their grants abruptly terminated ("the Mass Termination"). *Id.* at 3.

As Plaintiffs allege and available evidence shows, the Mass Termination was carried out either by or at the direction of representatives of a newly-created office now known as the U.S. DOGE Service[5] ("DOGE")—specifically, Defendants Nate Cavanaugh and Justin Fox, at the direction of unknown supervisors, using "@gsa.gov" email addresses. NEH_AR_000016. For example, on March 31, 2025, shortly before the Mass Termination was carried out, Defendant Fox emailed Defendant McDonald, the Acting Chairman of NEH, twice within an hour asking for a call. NEH_AR_000010. After not receiving a response within twenty minutes, Fox emailed a third time, saying "Mike - Call me when you get the chance. We need a game plan for effectuating … final grant terminations …. We will carry these plans out before the end of the week. We're getting pressure from the top on this and we'd prefer that you remain on our side but let us know if you're no longer interested." *Id.* Fox also directed NEH staff to generate a list of

---

[4] Unless otherwise noted, all ECF citations are to the docket in 25-cv-3657.

[5] The structure of DOGE is still not clear to Plaintiffs. As described further below, Defendants Fox and Cavanaugh used GSA emails when communicating about the Mass Termination, but Defendant McDonald has repeatedly referred to them by their affiliation with DOGE. *See, e.g.*, NEH_AR_000023; Ex. 3 (McDonald *Thakur* Declaration) at ¶ 21. Accordingly, Plaintiffs use DOGE herein to refer to Defendants Cavanaugh and Fox, even to the extent they were working with GSA at the time of the events at issue.

grants according to his instructions and explained that it was because he "would like to have a source of truth from you all *as we're reviewing*." NEH_AR_000015 (emphasis added).

As the time for executing the Mass Termination grew closer, Fox kept up the pressure, at one point telling McDonald that "[w]e need your final approval on grants to keep which are related to America 250, otherwise they will be terminated. I'll call you in about an hour to check on progress, call me with questions given the time sensitivity." NEH_AR_000022. And once the grant terminations were almost in process, Fox told McDonald that Fox would "follow-up with documents and language for the termination notices," NEH_AR_000021, indicating it was the DOGE employees who would be directing the communications to NEH grant recipients who were about to have their funding unceremoniously terminated. Indeed, on April 3, 2025, Fox emailed McDonald, "[c]onfirming 1,208 of 1,220 grants to organizations were delivered tonight with effective terminations as of April 2, 2025…. Will get sign-off for termination language on Individuals and State / Fed partnerships. We'll be on the lookout for the updated census tomorrow, feel free to call with any questions." NEH_AR_000086. Defendant Fox copied Defendant Cavanaugh on these communications.

NEH employees recognized that DOGE was in charge, too. When McDonald told Fox that McDonald and Adam Wolfson, another senior staff member of NEH, had reviewed Fox's spreadsheet of grants for potential termination, he explained to Fox that they had done so "[a]s you instructed" and that "[w]e understand that you will cancel this list of projects as well." NEH_AR_000013.

The available evidence also demonstrates, in stark and unmistakable fashion, that Defendants carried out the terminations based on the grants' association or perceived association with disfavored viewpoints and disfavored political parties. *See, e.g.,* NEH_AR_000001 ("Please

identify any funded projects that 'advance Marxist equity, transgenderism, or green new deal social engineering policies.'"); NEH_AR_000003 ("Attached is a list of grants that were awarded during President Biden's administration."); NEH_AR_000005 ("The directors reviewed the grants made through their office and entered comments for the three relevant categories (i.e., DEI/DEIA; gender ideology; and environmental justice."). As this Court recognized at the preliminary injunction stage, the available evidence strongly suggests that "the Mass Termination was carried out in violation of the First Amendment." ECF 116 at 67; *see also Thakur v. Trump*, 148 F.4th 1096, 1108 (9th Cir. 2025) (in parallel case challenging NEH grant terminations, ruling that "the record at this stage shows that the agencies selected grants for termination based on viewpoint").

### B.    Documents Produced to Date and Objections at Issue.

On September 23, 2025, the Government produced 23 documents that it claimed were the entire Administrative Record in this case. This production was plainly incomplete in several respects. First, the documents were solely records held by NEH, with nothing from any other agency or part of the Executive Branch, even though the involvement of other agencies is undisputed. Second, the production did not include several email attachments that were referenced in the produced emails. *See* Ex. 2 (Deficiency Letter) at 2. Third, the records appear to start in the middle of the consideration of the Mass Termination. The earliest record provided is a February 7, 2025, email from NEH's Chief Information Officer giving NEH staff instructions on how to access and mark a spreadsheet to identify grants that "advance Marxist equity, transgenderism, or green new deal social engineering policies." NEH_AR_000001. But McDonald has stated that "[b]etween January 20 and February 7, 2025, Chair Lowe directed NEH program staff to review open grants in light of the new Executive Orders." Ex. 3 at ¶ 7. The Administrative Record contains no trace of this directive or any other documents about events between January 20 and February 7.

On December 2, 2025, the Government produced four more documents that Plaintiffs had identified in a deficiency letter: two documents that were attached to an email produced on September 23 but inexplicably not produced at that time, and a complete list of all finally terminated grants, which had not been previously provided. The Government still has not produced the several other missing email attachments that Plaintiffs highlighted in their November 13 deficiency letter. *See* Ex. 2 at 2 (noting that NEH_AR_000021-22 reference three separate attachments that were not provided to Plaintiffs).

Also on December 2, 2025, the Government provided their responses to discovery requests Plaintiffs had served on September 29, 2025. *See* Exs. 12, 13, 14 (Requests); *see also* Exs. 4, 5, 6, 10 (Responses). For the most part, the Government refused to provide the requested information. The Government objected generally to all discovery, and even for the handful of requests they agreed to answer, they refused to provide any information held by any individuals or personnel outside of NEH, despite Defendants Fox and Cavanaugh's deep involvement in the Mass Termination while working at DOGE and their use of GSA email addresses. For example, the Government responded to a request for "[a]ll Documents and Communications of Defendants U.S. DOGE Service, Fox, Cavanaugh, and Gleason Relating To NEH," by agreeing only to search NEH records—not DOGE or GSA records. Ex. 4 (RFP Responses) at 2-3, 5-6. As another example, the Government responded to an interrogatory requesting a list of all individuals who "participated in any way in the preparation, consideration, decision-making, or execution of the Mass Termination," by providing only the names of Fox, Cavanaugh, McDonald and a list of McDonald's subordinates at NEH. Ex. 5 (Interrogatory Responses), at 6-7. This, despite Fox acknowledging in an email during the relevant time period that he was directing McDonald to undertake certain tasks as a result of "pressure from the top." NEH_AR_000010.

Also on December 2, 2025, the Government sent a letter objecting to the noticed and subpoenaed depositions of McDonald, Wolfson, Cavanaugh, and Fox. The stated basis for the objections was that "Plaintiffs have not established that information is missing from the administrative record produced by the Government, nor identified whether and to what extent deposition testimony would fill any alleged gaps in the record or advance their claims." Ex. 6 (Brennan Letter) at 1. The letter does not address this Court's orders authorizing discovery or its express statement that "there will be depositions." Sept. 25, 2025 Hr'g Tr. at 8.

### C.    The Government Has Repeatedly Sought to Delay and Avoid Discovery in this Case in Direct Violation of this Court's Directives.

From the beginning of this case, the Government has taken every opportunity to delay and avoid turning over relevant documents, despite this Court's repeated orders and directives requiring them to do exactly that. Shortly after filing their Complaint on May 14, 2025, Plaintiffs tried to negotiate a discovery plan with the Government, but the Government refused on the basis that the parties had not had an initial pretrial conference. Plaintiffs, working in good faith, agreed to seek such a conference and, in the meantime, attempted to negotiate a proposed case management plan with the Government. After several conferrals by phone and email, it became clear that the Government would not agree to full discovery in this case or a case management plan that contemplated it. Moreover, even as the Government asserted discovery should be limited to the administrative record, by mid-August, the Government still could not tell Plaintiffs what would be in the administrative record or when they intended to produce it. *See* ECF 124 at 1-2. So, on August 20, Plaintiffs filed their proposed case management plan and requested the conference for which the Government kept insisting they were waiting. *Id*. On August 25, the Court scheduled the initial conference for September 25, 2025. ECF 128.

Even before the initial conference, the Government had notice that the Court rejected its limited view of discovery in this case. In its July 25, 2025, Order on the Plaintiffs' Motion for Preliminary Injunction, the Court noted that "[t]here will be further proceedings ... as well as *full discovery into the process that was used to select grants for termination* – a process that, aside from the few damning facts discussed above, remains opaque." ECF 116 at 80 (emphasis added). Likewise, on September 9, 2025, the Court issued a memo endorsement stating: "The government is NOT correct that this is a case in which we are limited to the administrative record. It is primarily (though not exclusively) a first amendment lawsuit, as to which *discovery is entirely appropriate*. We will discuss exactly what that entails on 9/25 at 10am." ECF 131 (emphasis added). Nevertheless, on September 23, when the Government produced only a 23-document "administrative record," they ignored the Court's directives and asserted that Plaintiffs must affirmatively justify any additional discovery. ECF 138 at 2.

At the September 25, 2025, conference, the Court again rejected the Government's limited view of the scope of discovery. After Government counsel asserted that "[w]e do take a different view than you do of what the scope of the record should be," the Court made clear that "[y]ou are the litigant, I'm the judge, so you have to abide by my order." Sept. 25, 2025 Hr'g Tr. at 11. And when the Government continued to assert that "the principle behind the rule that discovery in a case challenging agency action should be limited to the administrative record is based in part or largely on the recognition that separation of powers," the Court explained to counsel that "[c]onstitutional claims have been asserted here. Violations of the Constitution. There's an allegation that the executive branch—and it is not an incredible allegation on the limited record I have before me—allegations that the executive branch has, in violation of the oath of office taken by every member of the executive branch, failed to preserve and defend the Constitution of the

United States in connection with these particular decisions … and I'm going to give them full discovery on that." *Id*. 11-12.

Moreover, the Court made clear that with respect to an administrative record, the Government was "already ... in default" with its 23-document production from one agency. *Id*. at 7 ("[The government is] wrong. They're wrong. If the government wishes to say that that's the administrative record, already you're in default. Already you're not right. Okay? You have to go up to the White House, and you have to start there; and you have to go through DOGE, and you have to go there; and you have to turn over everything that has anything to do with the -- indirectly or indirectly, directly or indirectly with the making of the ultimate making of decisions at the National Endowment for the Humanities, or any other agency, because it was all a seamless web as we know."); *see also id*. at 3 ("First of all, I undoubtedly have a much broader definition of the administrative record than the government does, because the administrative record that went into making this decision starts in the White House with directives to DOGE. That's part of the administrative record and includes all the conversations that went on within DOGE and between DOGE and the NEH about how this particular set of decisions was going to be carried out."). The Court explained that unless the Government had searched broadly for directives, communications, and any other records relating to the terminations at issue in this case, it had not satisfied even its obligations with respect to Administrative Record, let alone "full discovery." *Id*. at 10-12.

The Court thus stated that it was not going to make Plaintiffs wait any longer, *id.* at 10, that it was "perfectly happy, perfectly content that [plaintiffs] should issue discovery requests," *id*. at 9:19-20, and it ordered that the Government "has 14 business days to respond or object, and the objections will be adjudicated promptly," *id*. 18:1-3.

10

Plaintiffs served discovery consistent with the Court's rulings on September 29, 2025, including Requests for Production ("RFPs"), Interrogatories, Requests for Admission ("RFAs"), and four deposition notices. The Government's conduct demonstrates a strategy of delay and avoidance. First, despite representing to the Court in October (in resisting the ACLS Plaintiffs' motion to lift the government-shutdown-related discovery stay) that the shutdown made it difficult for counsel to confer with their "DOGE contacts," ECF 148 at 2, the Government now argues—more than two months later—that it will not search DOGE's files until it is ordered to by the Court. *E.g.*, Ex. 4 at 3.B.

After the shutdown ended, at 9:30 p.m. on November 25, 2025, less than a week before the court-imposed deadline to respond to discovery, the Government informed Plaintiffs that they intended not to respond to any of the discovery requests, and would instead file a motion for a protective order against all discovery beyond what the Government considers to be the Administrative Record. *See* Ex. 1 at 6 ("[W]e do not believe it is appropriate for plaintiffs to proceed with discovery requests."). As justification, the Government asserted yet again that Plaintiffs should have to justify any further discovery beyond the 23-document production the Government made on September 23 and that, because Plaintiffs disagreed, the parties were "at an impasse on this issue." *Id*. Plaintiffs responded that the Court already expressly rejected this argument at the September 25 conference, and that Plaintiffs reserved their rights to seek sanctions if the Government proceeded with its motion. Ex. 8 (Nov. 26 Crooks email) at 1-2. The Government then changed course yet again; instead of moving for a protective order, the Government stated that it would take the same position in the form of objections to discovery. Ex. 9 (Nov. 26 Brennan Email) at 1.

11

The Government's objections, served on December 2, demonstrated that, for the most part, they are maintaining the position they raised on November 25. While the Government did agree to propose search terms for custodial searches of NEH files in response to a handful of requests, they did not (and still have not) proposed custodians, search terms, or a date for production. More important, they objected to all depositions and refused to collect or produce any discovery that might be held outside of NEH. Ex. 4, Ex. 5, Ex. 10. The day after receiving the objections, Plaintiffs asked the Government to confirm that the parties were still at impasse on the issue of discovery outside of NEH—just as the Government had itself stated on November 25, *see* Ex. 1 at 6 (Government counsel stating: "we are at an impasse on this issue"), so that Plaintiffs could file this motion. Despite Plaintiffs' repeating the request three times, Government counsel would not agree and insisted on a meet-and-confer, delaying this motion by several days. *See* Ex. 11 (Dec. 3 Brennan Email) at 1-3.

Plaintiffs participated in the meet-and-confer on December 8, 2025—the first date the Government offered. At the meet-and-confer, the Government confirmed several relevant points: (1) it does not believe any discovery beyond the Administrative Record is warranted absent some further showing from Plaintiffs; (2) it has not searched for documents at any agency other than NEH; (3) it has not searched documents in the possession of Defendants Fox or Cavanaugh or their government files; (4) it has not searched for documents in GSA's files; (4) it has not searched for documents in Defendant DOGE's files; (5) it has made no effort to identify individuals outside of NEH involved in the grant terminations; (6) it believes the 27-document Administrative Record is complete, provided that Plaintiffs cannot identify "anything specific" they believe to be missing; and (7) it does not believe that depositions are warranted because "there's no written order about

depositions," despite this Court's statement at the September 25, 2025 hearing explicitly authorizing depositions.

At various times, the Government tried to stave off an impasse by insisting (despite its November 25 email stating that the parties were "at an impasse") that it would continue to consider whether and to what extent it would comply with its discovery obligations and this Court's orders. On that basis, the Government insisted that this motion would be premature.[6] However, given that the Court has already ruled on these issues and that the Government recognized an impasse before pivoting to sidestep motion practice, Plaintiffs believe in good faith that the parties are at an impasse on the issues presented by this motion such that the issues are ripe for this Court's consideration. The Government's reliance on already overruled objections to avoid responding to Plaintiffs' discovery requests any further are just the latest tactic in a long-running strategy to hide evidence of the Government's unlawful conduct from Plaintiffs and this Court. The Government's arguments are, in any event, baseless.

## III.   ARGUMENT

### A.   The Court Should Compel The Government To Complete The Administrative Record.

The administrative record must include "all documents and materials that the agency directly or indirectly considered" at the time it made its decision. *Oceana, Inc. v. Ross*, 290 F. Supp. 3d 73, 77 (D.D.C. 2018) (internal quotation marks omitted). An "agency may not skew the record by excluding unfavorable information"; it must "produce the full record that was before the

---

[6] After the meet and confer, the ACLS plaintiffs sent the Government an email requesting that it confirm its previously stated position that it would not search the records of Defendants DOGE, Fox, and Cavanaugh unless ordered to by the Court. The Government responded the next afternoon (the date of this filing) that it needed two additional days to formulate an answer to the question.

agency at the time the decision was made." *Blue Ocean Inst. v. Gutierrez*, 503 F. Supp. 2d 366, 369 (D.D.C. 2007). When the administrative record is not complete, a party may move for an order requiring the agency to include "evidence that should have been properly a part of the administrative record but was excluded." *Univ. of Colo. Health at Mem'l Hosp. v. Burwell*, 151 F. Supp. 3d 1, 13 (D.D.C. 2015). Supplementation is appropriate if the agency "did not include materials that were part of its record, whether by design or accident." *Id.* To prevail on a motion to complete the administrative record, "a plaintiff must only put forth concrete evidence and identify reasonable, non-speculative grounds for its belief that the documents were considered by the agency and not included in the record." *Fort Sill Apache Tribe v. Nat'l Indian Gaming Comm'n*, 345 F. Supp. 3d 1, 9 (D.D.C. 2018).

Here, there are reasonable, non-speculative grounds to believe that the meager, 27-document Administrative Record is incomplete. For example, Plaintiffs identified several email attachments that are referenced in Administrative Record documents but not included in the Administrative Record. *See* Ex. 2 (Deficiency Letter), at 2. While the Government responded to Plaintiffs' deficiency letter by producing four additional documents, they did not produce several other missing email attachments that Plaintiffs highlighted in their deficiency letter. *See* Ex. 2 at 2 (noting that NEH_AR_000021-22 references three separate attachments that were not provided to Plaintiffs).

Furthermore, Defendant McDonald stated in a declaration that "[b]etween January 20 and February 7, 2025, Chair Lowe directed NEH program staff to review open grants in light of the new Executive Orders," Ex, 3 ¶ 7, but no such direction appears in the Administrative Record produced to date. Instead, the first document in the current Administrative Record is a February 7, 2025 email in which Brett Bobley (NEH's Chief Information Officer) provides NEH Program

Directors with the "review criteria for reviewing all the awards from 2021 to the present," along with a link to a spreadsheet "that contains all the awards to review." NEH_AR_000001. The Administrative Record does not include any direction from Chair Lowe or any other information about events predating February 7, 2025. This once again strongly suggests that the Administrative Record is missing prior communications within NEH that were "relevant to the decisions that were made to terminate the grants." Sept. 25, 2025 Hr'g Tr. at 10.

The Administrative Record is also incomplete in that the process the Government used to compile it does not comply with this Court's orders. In particular, the Court made clear that "the administrative record that went into making this decision starts in the White House with directives to DOGE, … and includes all the conversations that went on within DOGE and between DOGE and the NEH about how this particular set of decisions was going to be carried out." Sept. 25, 2025 Hr'g Tr. at 3. Yet the Government admits that it did not search for or compile documents from any agency other than NEH. As a result, the Administrative Record produced by the Government does not include any White House directives to DOGE, any communications within DOGE, or any communications involving Fox or Cavanaugh other than those with NEH officials. The Government did not search or compile any records from GSA files, even though Fox and Cavanaugh used @gsa.gov emails for at least some of their communications regarding and with NEH staff. *See*, e.g., NEH_AR_000003. Nor did the Government search or compile any records from phone apps like Signal, which public reporting indicates was DOGE's "primary method of communication." Sophia Cai and Daniel Lippman, *Inside the DOGE Succession Drama Elon Musk Left Behind,* Politico (Nov. 21, 2025).

Even the few documents the Government has produced reveal that Fox and McDonald (DOGE staffers) received directives missing from the Administrative Record. For example, Fox,

in an email to McDonald, states that he is "getting pressure from the top" regarding "final grant terminations and contract cancellations." NEH_AR_000010. Yet the Administrative Record contains no information about who at DOGE or elsewhere directed Fox and Cavanaugh to inject themselves into NEH operations, what instructions they were following with respect to reviewing and terminating grants, who supervised their work, or any other documents that would shine light on this "pressure" or the grant terminations at issue here. Once again, these are reasonable, non-speculative grounds to believe that the Administrative Record produced to date is lacking "all documents and materials directly or indirectly considered by the agency." *Amfac Resorts, LLC v. Dep't of the Interior*, 143 F. Supp. 2d 7, 12 (D.D.C. 2001).[7]

All of that said, this Court may not need to resolve the parties' dispute about the proper scope of the Administrative Record. Even if the Government were correct that the Administrative Record should be limited to the 27 NEH documents it has produced, that would only underscore why Plaintiffs require extra-record discovery on their claims that the grant terminations violated the First Amendment and were carried out *ultra vires,* as discussed next. Indeed, the Court already recognized as much, stating at the September 25 hearing that Plaintiffs are entitled to "full discovery" and that "there will be depositions," Sept. 25, 2025 Hr'g Tr. at 8, 12. Whether through the Administrative Record or extra-record discovery (or both), Plaintiffs are entitled to the documents and testimony necessary to prove their claims.

---

[7] Plaintiffs specifically identified this "pressure from the top" email in their Interrogatories, asking the Government to identify "all individuals who Defendant Fox references as providing 'pressure from the top' in his March 31, 2025, email." Ex. 13 at Interrogatory 5. The Government refused to answer the Interrogatory on the grounds that "it seeks information beyond the administrative record produced by the Government in this case," Ex. 5 at 10, and did not supplement the Administrative Record with any document evidencing such pressure.

**B.**     **The Court Should Overrule The Government's Objections To Plaintiffs' Discovery Requests and Deposition Notices and Subpoenas.**

The Government is also refusing to accept the Court's orders regarding discovery beyond the Administrative Record. On September 29, 2025, following the Court's instruction to serve written and testimonial discovery, Plaintiffs issued discovery requests relating to their First Amendment claim, including RFPs, Interrogatories, and RFAs. *See* Exs. 12 (RFPs), 13 (Interrogatories), 14 (RFAs). Plaintiffs also served deposition notices on NEH officials Michael McDonald and Adam Wolfson, as well as subpoenas *ad testificandum* on former DOGE officials Nate Cavanaugh and Justin Fox. On December 2, 2025,[8] the Government responded to these requests without producing a single document. Beyond the usual handful of boilerplate objections, the Government's refusals to answer appear to rest on two equally improper objections: first, that *no* discovery outside of the purported Administrative Record is proper in this case until Plaintiffs make some further showing of need; and second, that *all* discovery from any agency other than NEH is improper in this case. Because both of those arguments directly contradict this Court's prior rulings and fail on their own terms, this Court should overrule these objections.

**1.   The Government's Blanket Objections To All Discovery and Depositions Are Improper And Directly Violate This Court's Orders.**

The Court has already ruled, on three separate occasions, that discovery beyond the Administrative Record is necessary. First, in its July 25, 2025 Decision and Order, the Court stated that "There will be further proceedings, including … full discovery into the process that was used to select grants for termination." ECF 116 at 80. Second, in its September 9 order, this Court rejected the Government's argument that the case would be limited to the Administrative Record:

---

[8] The Government's 14-day deadline to respond to these discovery requests was paused during the Government shutdown.

"The government is NOT correct that this is a case in which we are limited to the administrative record. It is primarily (though not exclusively) a first amendment lawsuit, as to which discovery is entirely appropriate." ECF 131. Third, the Court reiterated that discovery was appropriate at the September 25, 2025 hearing, stating: "I do not agree with the government's position that because this case involves an administrative decision with respect to a grant, that there's no discovery outside of the administrative record allowed on the First Amendment claim. It's a constitutional claim." Sept. 25, 2025 Hr'g Tr. at 3-4. The Court also made clear that the authorized discovery included depositions: "[Y]es, there will be depositions." *Id.* at 8.

Despite these statements and orders, the Government objected generally to all of Plaintiffs' requests on the ground that discovery beyond the Administrative Record is not proper in this case: "The Government objects to the Document Requests on the ground that this case challenges agency action and review is therefore limited to the administrative record produced by the Government." Ex. 4 at 2; *see also* Ex. 5 at 2 (same for Interrogatories); Ex. 10 at 2 (same for RFAs). In addition to that general objection, the Government raised the same objection in response to specific RFPs, Interrogatories, and RFAs: "The Government objects to this request because it seeks material beyond the administrative record produced by the Government in this case, without Plaintiffs having made a showing of entitlement to such material." *E.g.*, Ex. 4 at 6; *see also* Ex. 5 at 5 (same for Interrogatory); Ex. 10 at 9 (same for RFA).

While the Government agreed to conduct limited searches in response to certain RFPs and answered certain interrogatories and RFAs notwithstanding this objection, it interposed the objection generally and relied on it in refusing to answer other discovery. *See, e.g.*, Ex. 4 at 13 (refusing to produce documents in response to RFP); Ex. 10 at 9 (refusing to respond to RFA); Ex. 5 at 5 (refusing to respond to interrogatory). The government also objected to the deposition notices

and subpoenas on the same ground, and *only* that ground: "Defendants object to the notices and subpoenas because Plaintiffs have not established that information is missing from the administrative record produced by the Government." Ex. 6 at 1.

These blanket objections to discovery are improper and directly defy the Court's prior orders. By refusing to respond to discovery on a ground this Court has already rejected, forcing Plaintiffs to file this motion to compel as a result, the Government seeks to do what they cannot do directly: move this Court to reconsider its prior rulings. But they cannot meet the standard for obtaining such relief. "A court may grant reconsideration only when a movant demonstrates an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice…. The movant bears a heavy burden, as reconsideration will generally be denied unless the moving party can point to controlling decisions or data that the court overlooked—matters, in other words, that might reasonably be expected to alter the conclusion reached by the court." *See Mendez v. Aviles-Ramos*, 2025 WL 2962007, at *1 (S.D.N.Y. Oct. 20, 2025) (cleaned up). Here, the Government has made no effort to meet that burden, instead advancing the same arguments they have advanced from the beginning and that have been repeatedly rejected. The Court should reject the Government's attempt to relitigate settled issues and order the Government to respond to Plaintiffs' discovery requests immediately.

In any event, the Court's rulings were entirely appropriate exercises of its discretion in controlling discovery and align with established law. First, the general rule against discovery in APA cases does not apply when a plaintiff asserts constitutional claims alongside APA claims and the discovery at issue is relevant to those constitutional claims. *Mayor & City Council of Baltimore v. Trump*, 429 F. Supp. 3d 128, 138 (D. Md. 2019). That is precisely why Judge Lin, in another case challenging NEH's grant terminations on First Amendment grounds, authorized discovery

even at the preliminary injunction stage, explaining: "[T]o the extent that the proposed discovery seeks information that will be outside of the administrative record, that information is relevant to Plaintiffs' constitutional claims, including their First Amendment claim." *Thakur v. Trump*, No. 25-cv-04737-RFL (N.D. Cal.), ECF 32 at 1.

More broadly, while the law in this area is somewhat "unsettled," *Baltimore*, 429 F. Supp. 3d at 138 (collecting cases), the better-reasoned authority supports the view that normal discovery rules apply "where the plaintiff mounts a constitutional challenge to agency action" alongside an APA claim. *Id.*; *see also Nat'l TPS All. v. Noem,* 2025 WL 2419266, at *3 (N.D. Cal. Aug. 21, 2025) ("[E]xtra-record discovery is also warranted for Plaintiffs' constitutional claim."). As Judge Hollander cogently explained, "this view accords with the foundational tenet of constitutional adjudication that 'where constitutional rights are in issue,' courts must ensure that 'the controlling legal principles [are] applied to the actual facts of the case.'" *Baltimore*, 429 F. Supp. 3d at 138 (quoting *Pickering v. Bd. of Ed. of Twp. of High Sch. Dist. 205, Will Cty.*, 391 U.S. 563, 578 n.2 (1968) (emphasis omitted)).

That rule makes particular sense where, as here, the constitutional claims "diverge in some meaningful way from the APA claims." *Nat'l TPS All.*, 2025 WL 2419266, at *2. Here, Plaintiffs do have an APA claim alleging that the Government failed to "articulate[] a satisfactory explanation for its action." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). But this case is, as the Court put it, "primarily ... a first amendment lawsuit," ECF 131, that turns not on the sufficiency of the agency's stated rationale, but on the reasons *why* the grants were terminated—*i.e.*, whether the grant terminations were influenced by viewpoint-based discrimination. If they were, it would not matter for Plaintiffs' First Amendment claim whether such discriminatory influence was exerted by officials within NEH or by those at

DOGE (or elsewhere), or whether that discriminatory motive was expressly included in the agency's formal explanation for its action.

Indeed, courts have long recognized that "evaluating whether an official act was motivated by animus cannot be determined solely by examining the administrative record." *Baltimore*, 429 F. Supp. 3d at 140. For example, in *New York v. U.S. Dep't Commerce*, 345 F. Supp. 3d 444 (S.D.N.Y. 2018), the court rejected the government's argument that the plaintiff's Equal Protection claims had to be resolved on the administrative record: "It would be perverse … to suggest that litigants and courts evaluating whether government actors have engaged in invidious discrimination cannot look beyond the record that those very decisionmakers may have carefully curated to exclude evidence of their true 'intent' and 'purpose.'" *Id.* at 452. Furthermore, the administrative record that the agency assembles may not include direct evidence of impermissible animus. *See Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977) (directing courts to consider "circumstantial and direct evidence of intent"); *Hayden v. Paterson*, 594 F.3d 150, 163 (2d Cir. 2010) (observing that "discriminatory intent is rarely susceptible to direct proof"). In short, "no sound reason exists to limit the [First Amendment claims] to the administrative record merely because [Plaintiffs] also assert[] that the [grant terminations] are invalid on other grounds." *Baltimore*, 429 F. Supp. 3d at 140.

Second, even in APA cases, the "general rule that review of agency action is limited to the administrative record compiled by the agency is not absolute." *Vidal v. Duke*, 2017 WL 8773110, at *3 (E.D.N.Y. Oct. 17, 2017). Discovery outside the administrative record is appropriate when "the absence of formal administrative findings makes such investigation necessary in order to determine the reasons for the agency's choice" or when plaintiffs make a "strong showing in support of a claim of bad faith or improper behavior on the part of agency decisionmakers." *Id.*

21

For the same reasons just explained, those standards are satisfied here. NEH made no "formal administrative findings" about why it was terminating nearly every grant it had awarded during the Biden Administration, and in any event, the Administrative Record is unlikely to include "the reasons for the agency's choice" when those reasons were animus or viewpoint discrimination. Finally, to the extent the current, meager Administrative Record really does contain all extant documents relevant to the grant termination decisions, that would only confirm the existence of gaps in the record warranting discovery beyond it. *See Camp v. Pitts*, 411 U.S. 138, 142-43 (1973) (inquiry outside the administrative record appropriate when "there was such failure to explain administrative action as to frustrate effective judicial review"); *see also* Sept. 25, 2025 Hr'g Tr. at 8 ("[T]hat's not how these people work. That's not how they operate. I'm sure they operated with a deliberate decision not to create a paper trail.").

### 2. The Government's Blanket Objections To All Discovery Outside Of NEH Are Improper And Directly Violate This Court's Orders.

In addition to its general objection to all discovery, the Government is separately objecting to searching the files of or conducting any discovery at agencies or entities other than NEH—*i.e.*, it is refusing to conduct discovery regarding DOGE, GSA, any non-NEH agency, including any messaging apps or personal devices of officials who work or worked at those agencies. Specifically, the Government objected generally to all of Plaintiffs' discovery requests "to the extent they seek information from the United States DOGE Service, the Executive Office of the President, or the White House." Ex. 4 at 3; *see also* Ex. 5 at 3 (same for Interrogatories); Ex. 10 at 3-4 (same for RFAs). Even for requests for which the Government agreed to conduct some searches, it made clear that it will search *only* NEH: "Subject to and without waiving its objections, the Government agrees to undertake a search ***at NEH*** to identify responsive, non-privileged documents." *E.g.*, Ex. 4 at 6 (emphasis added). The Government likewise refused to answer

interrogatories seeking information beyond NEH—for example, it refused to respond to Plaintiffs'

Interrogatory No. 1, which asked the Government to "Identify … every individual *outside of NEH*

who participated in the decision to deploy Defendants Fox and Cavanaugh to NEH and in the

development and execution of Defendant Fox's and Defendant Cavanaugh's work at NEH." Ex. 5

at 5 (emphasis added); *see id.* ("[T]he Government does not intend to respond to this

interrogatory."). And the Government made crystal clear at the recent meet-and-confer that it had

not conducted any searches outside of NEH.

This objection is improper for the same reason as the Government's blanket objection to

all discovery—*i.e.*, because this Court already rejected it. As described above, this Court already

ruled that the relevant documents in this case include documents from outside of NEH, including

"directives to DOGE" and "all the conversations that went on within DOGE … about how this

particular set of decisions was going to be carried out," Sept. 25, 2025 Hr'g Tr. at 3, which would

include any such conversations conducted on GSA email accounts. The Court likewise stated that

the Government is required to "turn over everything that has anything to do … directly or indirectly

with the … ultimate making of decisions at the National Endowment for the Humanities, or *any*

*other agency*, because it was all a seamless web." *Id.* at 7 (emphasis added).

The Government's objection invokes *Cheney v. U.S. Dist. Court for Dist. of Columbia*, 542

U.S. 367 (2004), but Plaintiffs' discovery requests are perfectly consistent with the standards set

forth in *Cheney*. The *Cheney* case involved an "overly broad" third-party subpoena served on the

sitting Vice President, "ask[ing] for everything under the sky." *Cheney*, 542 U.S. at 386-87. The

district court allowed these discovery requests and the D.C. Circuit denied the government's

mandamus petition, but the Supreme Court reversed, explaining that "separation-of-powers

considerations should inform a court of appeals' evaluation of a mandamus petition involving the

President or the Vice President." *Id.* at 382. Unlike in *Cheney*, where the Vice President himself was subject to a wide-ranging third-party subpoena, see *id.* at 381-82, the discovery here is modest in scope and does not target the President, Vice President, or any close adviser personally. Plaintiffs do not seek "everything under the sky" about these agencies and their operations, *id.* at 387, but rather a narrow universe of documents directly related to specific grant terminations, and depositions on that same topic—all of which is necessary to adjudicate Plaintiffs' claims.

In its objections, the Government also cited the Supreme Court's docket entry in *In re U.S. DOGE Service, et al.*, No. 24A1122, June 6, 2025, Dkt. Entry, but that case is equally inapplicable. There, the ultimate question was whether DOGE is an "agency" subject to the Freedom of Information Act ("FOIA"). The plaintiffs served discovery purportedly aimed at uncovering facts relevant to that question, including interrogatories about whether DOGE's "purported 'recommendations' are always followed (or almost always followed)." *Citizens for Resp. & Ethics in Washington v. U.S. DOGE Serv.*, 349 F.R.D. 1, 9 (D.D.C. 2025). The district court and D.C. Circuit allowed that discovery based on their understanding that the test for "agency" status "depends on the practical realities of the entity's role, not merely on its formal placement or authority." *In re U.S. DOGE Serv.*, 2025 WL 1393222, at *1 (D.C. Cir. May 14, 2025).

The Supreme Court disagreed with that standard, holding that "whether an entity is an agency for the purposes of [FOIA] cannot turn on the entity's ability to persuade" others to follow its recommendations. *In re U.S. DOGE Service, et al.*, No. 24A1122, June 6, 2025, Dkt. Entry. It accordingly disallowed the specific discovery requests about the extent to which DOGE's recommendations were followed, as they were not relevant to whether DOGE was an "agency" under the newly announced standard. *Id*. Notably, however, the Supreme Court did not disallow *all* discovery on DOGE. It instead directed the lower courts merely "to narrow ... the discovery

24

order" to ensure that discovery was limited to relevant topics. *Id.* Here, Plaintiffs' discovery requests are narrowly tailored and directly relevant to the ultimate question in the case—namely, whether the motivations behind the grant terminations were infected with improper animus or viewpoint discrimination. Plaintiffs do not seek broad-ranging discovery about all of DOGE's operations or, indeed, *any* of its operations beyond those directly related to the grant terminations. The Government's blanket objection to all discovery outside NEH should promptly be overruled.

## CONCLUSION

For the foregoing reasons, the Court should grant the motion to compel, as set forth in the Proposed Order.

Dated: December 9, 2025

Respectfully submitted,

By:    */s/ Jamie Crooks*

Jamie Crooks (*pro hac vice*)
Michael Lieberman (*pro hac vice*)
Amanda R. Vaughn (*pro hac vice*)
Yinka Onayemi
FAIRMARK PARTNERS, LLP
400 7th Street, NW, Suite 304
Washington, DC 20004
Tel: 619.507.4182
jamie@fairmarklaw.com
michael@fairmarklaw.com
amanda@fairmarklaw.com
yinka@fairmarklaw.com
*Attorneys for Plaintiffs and the Proposed Classes*