**In the Matter Of:**

*The Authors Guild vs*

*National Endowment for the Humanities*

*NATHAN CAVANAUGH*

*January 23, 2026*



1

UNITED STATES DISTRICT COURT

for the

SOUTHERN DISTRICT OF NEW YORK

Civil Action No. 25-cv-3923

THE AUTHORS GUILD, et al.,

                    Plaintiff,

          vs.

NATIONAL ENDOWMENT FOR THE HUMANITIES,
et al.,

                    Defendant.


          T R A N S C R I P T of the deposition
of NATHAN CAVANAUGH taken stenographically before
Lisa Forlano, Registered Diplomate Reporter,
Certified Realtime Reporter, Certified Court
Reporter - NJ and Notary Public, held at the offices
of Schindler Cohen & Hochman LLP, 100 Wall Street,
Suite 1500, New York, New York 10005, on Friday,
January 23, 2026, commencing at 9:41 a.m.

Nathan Cavanaugh - January 23, 2026

2

A P P E A R A N C E S:


JACOBSON LAWYERS GROUP PLLC
BY:   JOHN ROBINSON, ESQUIRE
      KYLA SNOW, ESQUIRE
5100 Wisconsin Avenue, NW
Suite 301
Washington, DC  20016
(301) 823-1148
John@JacobsonLawyersGroup.com
Kyla@JacobsonLawyersGroup.com
ATTORNEYS FOR PLAINTIFF, ACLS


FAIRMARK PARTNERS, LLP
BY:   YINKA ONAYEMI, ESQUIRE
400 7th Street, NW #304
Washington, DC  20004
(617) 642-5569
yinka@fairmarklaw.com
ATTORNEYS FOR THE PLAINTIFF,
THE AUTHORS GUILD


US ATTORNEYS' OFFICE
BY:   RACHAEL DOUD, ESQUIRE
86 Chambers Street
New York, NY 10007
(212) 637-2699
rachael.doud@usdoj.gov
ATTORNEYS FOR THE DEFENDANT


ALSO PRESENT VIA ZOOM:

DANIEL JACOBSON, ESQUIRE - JACOBSON
LAWYERS

LYNN EISENBERG, ESQUIRE - JACOBSON LAWYERS

SARAH MARTIN, ESQUIRE - JACOBSON LAWYERS

ANNIE CLEAVER, ESQUIRE - FAIRMARK PARTNERS

JAMIE CROOKS, ESQUIRE - FAIRMARK PARTNERS

AMANDA VAUGHN, ESQUIRE - FAIRMARK PARTNERS

Nathan Cavanaugh - January 23, 2026

3

ALSO PRESENT:

DYLAN BORSOS, VIDEOGRAPHER

Nathan Cavanaugh - January 23, 2026

37

A    Steve was effectively my manager at DOGE.

Q    You said he was effectively your manager?

A    Yes.

Q    Did he oversee your work with the NEH project specifically?

A    No.

Q    Which projects did he oversee?

A    He assigned me to work and lead the small agencies team for DOGE.  Beyond assigning me that responsibility, he wasn't intimately involved in my day-to-day work.

Q    What was the small agencies team?

A    The small agencies team was the team at DOGE that was assigned and detailed from typically GSA to small Federal agencies in the Government, including NEH.

Q    Who was on that team?

A    Myself, Justin Fox, Ethan Shaotran.  And then later Marshall Wood, Jonathan Mendelson.  Initially Jacob Altik, although he wasn't after a couple of months. And then Justin Aimonetti took his place as the

Nathan Cavanaugh - January 23, 2026

38

new lawyer on our team.

Q    And what was the goal of the small agencies team?

A    It was to identify wasteful spend within the small agencies in the Federal Government.

Q    Which agencies were those?

A    There were about 100 small agencies on -- in our scope and purview, although we were mostly focused on agencies that were in executive orders, and those were the primary focus.

Q    How often did the small agencies team meet?

A    Daily.

Q    Was there a particular time of day?

A    No.  Most of the small agencies team, with the exception of Justin Aimonetti, were physically present at GSA as the home base.

Q    So you would meet at GSA every day, but the time varied?

A    Mostly business working hours.

Q    Okay.  And what would be

171

Q      You never communicated with anyone from the White House about that?

A      About grant terminations?

Q      Yeah.

A      No.

Q      And when I say "the White House," I mean the White House and all its components, Executive Office of the President, OMB.

A      I believe we -- Justin Aimonetti, who was a DOGE lawyer, who I believe was onboarded by EOP, the Executive Office of the President, he would have been involved in the course of our work, just basically making sure that it was -- that the work we were doing was approved.

Q      Did you discuss this specific e-mail with Mr. Fox where he says "We're getting pressure from the top"?

A      No, I did not.

Q      Didn't message with him about it on Signal that he was going to do it?

A      No.  We would have been working in the office together at GSA and verbally saying we need to get Mike to move quickly on

172

this plan.

Q     Okay.  And your strategy for doing that was just, like, making up this sense of pressure, e-mailing every hour or so until he responded?

MS. DOUD:  Objection.

THE WITNESS:  Well, as you can see from the e-mails, this has -- has not happened previously in the three weeks we'd been working with NEH.  So it wasn't used frequently.  But when it had been going on for three weeks and we had not heard an update from Mike, we were applying more pressure to get him to act on the plan.

BY MR. ROBINSON:

Q     Yeah.  Did -- you say, you know, "Let us know" -- or Fox says, excuse me, Fox says, "Let us know if you're no longer interested."

Did you have some sense that McDonald, you know, wasn't interested in -- in the terminations anymore?

A     I don't believe so, but the nature of their communications with us had

Nathan Cavanaugh - January 23, 2026

306

agency at the start of the Administration, January 20th, and then how many employees remained as of the latest scorecard.

Q    Other than those updates, did you have -- did you provide him other updates that related to NEH?

A    No.

Q    Did you ever have any substantive discussions with him about NEH via Signal?

A    No.

Q    And you testified a bit earlier about Jason Aimonetti.

Do you remember that?

A    Yes.

Q    Who is Jason Aimonetti?

A    Justin Aimonetti.

Q    Sorry, Justin Aimonetti.

A    Justin Aimonetti was an attorney at the US DOGE Service and provided us with legal counsel throughout all of our work with the small agencies, to the extent that he was on our team.

Q    Without going into detail about the substance of any particular communications,

Nathan Cavanaugh - January 23, 2026

307

what kinds of communications did you have with
Mr. Aimonetti?

A        Primarily around whether an
action we were about to take with the agency
head was appropriate, either by statute or form
or otherwise.  Anything that Justin and I felt
like we weren't equipped to perform on our own
and wanted a -- basically a lawyer's opinion on
our actions.

Q        Did you consult with anyone
other than Justin Fox, Michael McDonald and
others from NEH in determining which grants to
recommend for termination at NEH?

A        No.  It would have been myself,
Justin Fox, Mike McDonald and Adam.

Q        And you mentioned that there
were two criteria that you looked at in
flagging grants for termination; is that right?

A        Yes.

Q        And what were those?

A        The first bucket was any grants
that violated an outstanding executive order,
including those related to DEI.  And the other
bucket was our initial judgment of wasteful
spending in the context of trying to reduce the