IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| AMERICAN COUNCIL OF LEARNED SOCIETIES, *et al.*, <br><br> *Plaintiffs*, <br><br> v. <br><br> MICHAEL MCDONALD, in his official capacity as Acting Chairman of the National Endowment for the Humanities, *et al.*, <br><br> *Defendants*. | Case No. 25-cv-03657 |
| THE AUTHORS GUILD *et al.*, <br><br> *Plaintiffs*, <br><br> v. <br><br> NATIONAL ENDOWMENT FOR THE HUMANITIES, *et al.*, <br><br> *Defendants*. | Case No. 25-cv-3923 |

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SPOLIATION SANCTIONS AGAINST DEFENDANTS**

**TABLE OF CONTENTS**

INTRODUCTION ........................................................................................................................... 1

BACKGROUND ............................................................................................................................ 2

LEGAL STANDARD .................................................................................................................... 4

ARGUMENT ................................................................................................................................. 5

I.    DEFENDANTS SPOLIATED EVIDENCE ........................................................................ 5

    A.    Defendants Failed to Take Reasonable Steps to Preserve Evidence ................................. 5

    B.    Plaintiffs Have Been Prejudiced By Defendants' Spoliation ............................................ 8

    C.    Defendants Intended to Deprive Plaintiffs of Evidence .................................................. 11

II.    SANCTIONS ARE APPROPRIATE ................................................................................ 12

CONCLUSION ............................................................................................................................ 14

## **TABLE OF AUTHORITIES**

**Cases**

*Am. Friends Serv. Comm. v. Webster*,
　720 F.2d 29 (D.C. Cir. 1983) .................................................................................................. 7

*Byrnie v. Town of Cromwell, Bd. of Educ.*,
　243 F.3d 93 (2d Cir. 2001) ...................................................................................................... 7

*Charlestown Cap. Advisors, LLC v. Acero Junction, Inc.*,
　337 F.R.D. 47 (S.D.N.Y. 2020) ....................................................................................... 10, 13

*Europe v. Equinox Holdings, Inc.*,
　592 F. Supp. 3d 167 (S.D.N.Y. 2022) .................................................................................... 10

*Fujitsu Ltd. v. Fed. Exp. Corp.*,
　247 F.3d 423 (2d Cir. 2001) .................................................................................................... 5

*Gerlich v. DOJ*,
　828 F. Supp. 2d 284 (D.D.C. 2011) ........................................................................................ 7

*Harmon v. United States ex rel. Bureau of Indian Affs.*,
　No. 4:15-CV-00173, 2017 WL 1115158 (D. Idaho Mar. 24, 2017) ........................................ 7

*Michael v. Gen. Motors Co.*,
　No. 15-cv-03659, 2016 WL 3440551 (S.D.N.Y. June 14, 2016) ........................................ 4, 9

*Nurmagomedov v. Legionfarm, Inc.*, No. 23 CIV. 6683,
　2024 WL 4979235 (S.D.N.Y. Dec. 4, 2024) ............................................................. 8, 9, 10, 12

*Oakley v. MSG Networks, Inc.*,
　792 F. Supp. 3d 377 (S.D.N.Y. 2025) .................................................................. 4, 5, 11, 10, 12

*West v. Goodyear Tire & Rubber Co.*,
　167 F.3d 776 (2d Cir. 1999) ................................................................................................ 4, 5

*Zubulake v. UBS Warburg LLC*,
　220 F.R.D. 212 (S.D.N.Y. 2003) ............................................................................................ 5

**Statutes**

44 U.S.C. § 2911 ............................................................................................................................ 7

44 U.S.C. § 3101 ............................................................................................................................ 7

**Rules**

Federal Rule of Civil Procedure 37(e) ................................................................................... passim

## INTRODUCTION

At their depositions in this matter, the Government's three main witnesses—former NEH Chair Michael McDonald and DOGE members Nate Cavanaugh and Justin Fox—each testified that they used an unauthorized messaging app (Signal) to conduct official government business during the relevant time period related to this case. Defendant McDonald, specifically, testified that he likely sent and received Signal messages about work-related matters at NEH and about DOGE's involvement at NEH. McDonald, however, preserved none of his Signal or other text messages during the relevant time period, even though he knew at the time that litigation over DOGE's cuts at the agency was a virtual certainty. In fact, he affirmatively took steps to ensure that his messages were deleted in a matter of days. Defendants Cavanaugh and Fox likewise made no attempt to preserve their work-related Signal messages.

Defendants' clear violation of their preservation obligations warrants spoliation sanctions under Federal Rule of Civil Procedure 37(e). Each of the witnesses had a duty to preserve during the relevant time period, both because litigation was reasonably foreseeable and because the Federal Records Act independently imposed a preservation obligation on the witnesses as government employees. The loss of this evidence has prejudiced Plaintiffs, who have been deprived of relevant, contemporaneous communications among the witnesses. The deposition testimony also suggests that Defendants communicated on Signal precisely so that their messages would not be discoverable in litigation; indeed, McDonald admitted that he downloaded the app so that he could engage in what he called "protected" communications.

Accordingly, the Court should grant Plaintiffs' motion for spoliation sanctions and draw an adverse inference that McDonald, Cavanaugh, and Fox made admissions in their now-deleted Signal messages that would have corroborated Plaintiffs' core allegations in this case.[1]

**BACKGROUND**

McDonald, Cavanaugh, and Fox each testified that they downloaded and regularly used Signal to engage in government work during the relevant time period. McDonald testified that he started using Signal "around the time that [President Trump] was inaugurated." Jacobson Decl. Ex. 4 (McDonald Tr.) 367:19–23. He first learned about Signal "[t]hrough the Hillary Clinton case," *id.* at 367:24–68:9, and after downloading the app, he used it to message with NEH's Assistant Chair of Programs (Adam Wolfson), its Acting General Counsel (Lisette Voyatzis), and members of the National Humanities Council regarding matters at the agency. *Id.* at 150:18–23, 349:19–25. McDonald started using Signal after President Trump's inauguration because he believed that there was a "need to have . . . private communications where . . . we could discuss our opinions in a protected way." *Id.* at 368:13–19. He said that he "likely" used Signal to text with Mr. Wolfson and Ms. Voyatzis about work-related subjects, *id.* at 350:8–14, and that it was "likely" that he exchanged Signal messages with councilmembers regarding DOGE's involvement at NEH, *id.* at 151:22–52:5. He also testified that he "may have" texted with them about grant terminations at NEH specifically, though he could not be sure. *Id.* at 142:6–19.

McDonald testified that he set his Signal messages to ensure that the messages were deleted after "a matter of days." *Id.* at 369:6–12. He did this even though he believed there would "likely be litigation" over the mass termination of grants at NEH. *Id.* at 275:13–22 ("I also

---

[1] Undersigned counsel for the ACLS Plaintiffs has conferred with counsel for the Authors Guild Plaintiffs, who join this motion in all respects other than the request for attorneys' fees for the ACLS Plaintiffs, on which they take no position.

2

pointed out [to DOGE] the possibility that there would be litigation. . . . [T]here would likely be litigation."). McDonald also testified that he texted with others at NEH about work-related matters, *see, e.g.*, *id.* at 324:23–25:4, but that he has a longstanding practice of manually deleting *every* text message he receives on his cell phone "if not immediately after [he] receive[s] it, certainly by the next day." *Id.* at 82:14–19.

Defendant Cavanaugh, who was head of the "small agencies" team at DOGE and was closely involved with the termination of grants at NEH, also testified that he used Signal for government work during the relevant time period. *See, e.g.*, Jacobson Decl. Ex. 1 (Cavanaugh Tr.) 207:22–25. Cavanaugh prepared a weekly "deletions scorecard" that tracked how many grants or contracts he had terminated at federal agencies, and he shared that scorecard with the *de facto* head of DOGE, Steve Davis, over Signal. *Id.* at 80:6–81:9. Cavanaugh also communicated with Defendant Justin Fox over Signal during the relevant time period, as well as several other members of DOGE. *Id.* at 96:19–23. Cavanaugh used Signal to conduct government business "multiple times per week." *Id.* at 208:10–12. These messages no longer exist because they were auto-deleted. *Id.* at 97:6–11. Although Cavanaugh testified that he "[didn't] know for sure" why he was asked to use Signal, he acknowledged it was "probably" because of its auto-delete function. *Id.* at 249:21–250:3.

Defendant Fox, who was also associated with DOGE and worked with Cavanaugh to terminate grants at NEH, was also asked by senior leaders at DOGE to download Signal to conduct government business. Jacobson Decl. Ex. 2 (Fox Tr.) 32:2–23. Fox stated that a senior DOGE official, Anthony Armstrong, was "very focused on switching to Signal to talk about anything," and "all of" Fox's communications with Armstrong were on Signal. *Id.* at 32:14–33:10. Fox communicated with other DOGE associates, including Cavanaugh, over Signal as

3

well. *Id.* at 59:19–21. Although he testified that he did not remember having any "substantive" discussions about grant terminations at NEH over Signal, *id.* at 325:9–12, he acknowledged that the "small agencies" team at DOGE had a group chat on Signal and that no messages from that chat were preserved, *id.* at 76:24–77:3.

## LEGAL STANDARD

Sanctions for the spoliation of electronically stored information are governed by Federal Rule of Civil Procedure 37(e). *Oakley v. MSG Networks, Inc.*, 792 F. Supp. 3d 377, 383 (S.D.N.Y. 2025). Rule 37(e) provides that "[i]f electronically stored information that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery," the court:

> (1) upon finding prejudice to another party from loss of the information, may order measures no greater than necessary to cure the prejudice; or
>
> (2) only upon finding that the party acted with the intent to deprive another party of the information's use in the litigation may:
>
>> (A) presume that the lost information was unfavorable to the party;
>>
>> (B) instruct the jury that it may or must presume the information was unfavorable to the party; or
>>
>> (C) dismiss the action or enter a default judgment."

District courts have "broad discretion" in crafting a proper sanction for spoliation, and such sanctions should be "molded to serve the prophylactic, punitive, and remedial rationales underlying the spoliation doctrine." *West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776, 779 (2d Cir. 1999). "Any sanction imposed should reflect the tripartite policy aims of '(1) deterring parties from engaging in spoliation; (2) placing the risk of an erroneous judgment on the party who wrongfully created the risk; and (3) restoring the prejudiced party to the same position he or she would have been in absent the spoliation of evidence by the opposing party.'" *Michael v.*

*Gen. Motors Co.*, No. 15-cv-03659, 2016 WL 3440551, at *2 (S.D.N.Y. June 14, 2016) (McMahon, J.) (quoting *West*, 167 F. Supp. 3d at 779).

## ARGUMENT

### I. DEFENDANTS SPOLIATED EVIDENCE

Courts applying Rule 37(e) apply a "three-part inquiry." *Oakley*, 792 F. Supp. 3d at 383. First, the Court considers whether "a party failed to take reasonable steps to preserve electronically stored information that should have been preserved in the anticipation or conduct of litigation." *Id.* (quotations omitted). Second, the Court asks whether "there has been prejudice to another party from loss of the information." *Id.* (quotations omitted). Third, the Court considers whether the destroying party "acted with the intent to deprive another party of the information's use in the litigation." *Id.* (quotations omitted).

#### A. Defendants Failed to Take Reasonable Steps to Preserve Evidence

The first part of the spoliation inquiry "requires the moving party to demonstrate that the spoliating party had an obligation to preserve the evidence at the time it was destroyed." *Oakley*, 792 F. Supp. 3d at 384 (quotations omitted).

There can be no question that McDonald, Cavanaugh, and Fox had an obligation to preserve their Signal messages related to their work at NEH at the time those messages were destroyed. "The obligation to preserve evidence arises when the party has notice that the evidence is relevant to litigation *or when a party should have known that the evidence may be relevant to future litigation*." *Fujitsu Ltd. v. Fed. Exp. Corp.*, 247 F.3d 423, 436 (2d Cir. 2001) (emphasis added); *see also Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 216 (S.D.N.Y. 2003). "Once a party reasonably anticipates litigation, it must . . . ensure the preservation of relevant documents." *Zubulake*, 220 F.R.D. at 218; *see also West*, 167 F.3d at 779 (party has

5

obligation to preserve evidence when litigation is "reasonably foreseeable"). Parties cannot wait until litigation commences to preserve evidence; if such litigation is reasonably foreseeable, parties must take steps to preserve relevant evidence. *See, e.g.*, *Zubulake*, 220 F.R.D. at 217 (preservation obligation was triggered even before EEOC charge was filed, because "almost everyone associated" with employee expected her to sue).

Here, not only was litigation "reasonably foreseeable" to Defendants at the time that they were using Signal, but Defendants testified that they *actually* anticipated litigation at that time. Defendant McDonald testified that he told DOGE that there "would likely be litigation" over the grant terminations. McDonald Tr. 275:13–22. Adam Wolfson likewise testified that DOGE had discussed with him and McDonald the potential for legal challenges but that DOGE "didn't care if there were legal challenges." Jacobson Decl. Ex. 3 (Wolfson Tr. 265:21–66:1); *see also* McDonald Tr. 278:15–79:4 (DOGE said that "there was no need to follow the procedures, and if there was litigation, which has since occurred, this would be addressed . . . in the litigation").

Indeed, by March 2025, when DOGE, McDonald, and Wolfson were communicating regularly about the mass terminations, there were already multiple high-profile lawsuits challenging the mass termination or suspension of federal funding. *See, e.g.*, *Massachusetts v. NIH*, No. 25-cv-10338 (D. Mass. filed Feb. 10, 2025); *Global Health Council v. Trump*, No. 25-cv-402 (D.D.C. filed Feb. 11, 2025); *U.S. Institute of Peace v. Jackson*, No. 25-cv-804 (D.D.C. filed March 18, 2025). There was also extensive litigation related to DOGE and the actions it had taken to reduce or eliminate federal agencies. *See, e.g.*, *Doe 4 v. Musk*, No. 8:25-cv-462 (D. Md. filed Feb. 13, 2025); *CREW v. DOGE*, No. 25-cv-511 (D.D.C. filed Feb. 20, 2025). . Defendants thus knew or should have known that litigation over the mass terminations would ensue.

Defendants also had a duty to preserve their Signal messages for an additional, independent reason. Under the Federal Records Act, federal employees must preserve records sent "using a non-official electronic messaging account" by either "cop[ying] an official electronic messaging account of the . . . employee in the original creation or transmission of the record" or "forward[ing] a complete copy of the record to an official electronic messaging account" within 20 days. 44 U.S.C. § 2911(a). Under Second Circuit precedent, an independent obligation to preserve records such as the Federal Records Act "can create the requisite obligation to retain records, even if litigation involving the records is not reasonably foreseeable." *See Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d 93, 109 (2d Cir. 2001). A party moving for spoliation sanctions can rely on a record-retention law for the preservation obligation so long as the party is a "a member of the class of persons" that the law seeks to protect. *Id.*

Here, the text and legislative history of the Federal Records Act make clear that "Congress intended, expected, and positively desired . . . private parties whose rights may have been affected by government actions to have access to the documentary history of the federal government." *Am. Friends Serv. Comm. v. Webster*, 720 F.2d 29, 57 (D.C. Cir. 1983). Plaintiffs' interests are thus "directly covered by the language of the Act, which seeks to protect those 'directly affected by an agency's activities' and whose 'legal and financial rights' may be affected by the government's failure to preserve a documentary history of its undertakings." *Harmon v. United States ex rel. Bureau of Indian Affs.*, No. 4:15-CV-00173-BLW, 2017 WL 1115158, at *5 (D. Idaho Mar. 24, 2017) (quoting 44 U.S.C. § 3101) (holding that spoliation inference was warranted in light of Federal Records Act violation); *see also Gerlich v. DOJ*, 828 F. Supp. 2d 284, 300–01 (D.D.C. 2011) ("If a Department employee had destroyed agency

7

materials in violation of a [Federal Records Act] records disposition schedule, the destruction would likely warrant a spoliation inference."), *aff'd in part, rev'd in part*, 711 F.3d 161 (D.C. Cir. 2013).

In the face of these clear obligations to preserve their Signal messages, Defendants took *no* steps—let alone reasonable steps—to preserve their messages. To the contrary, Defendants continued to use Signal for their government work, including their work related to NEH, even though they knew that Signal's auto-delete feature meant that those communications would not be preserved. Defendant McDonald took affirmative steps to ensure that his messages would be deleted in a "matter of days," McDonald Tr. 369:6–12, so that he could have "private communications" where he could "discuss [his] opinions in a protected way," *id.* at 368:13–19.. There can thus be no dispute that Defendants "failed to take reasonable steps" to preserve information that should have been preserved.

### B.  Plaintiffs Have Been Prejudiced By Defendants' Spoliation

Plaintiffs have also been prejudiced by Defendants' spoliation. To show "prejudice" in this context, Plaintiffs need not establish what the Signal messages would have said had they not been destroyed. Rather, since the evidence is, by definition, "no longer available," courts do not "hold the prejudiced party to too strict a standard of proof regarding the likely contents of the destroyed or unavailable evidence." *Nurmagomedov v. Legionfarm, Inc.*, No. 23 CIV. 6683 (NRB), 2024 WL 4979235, at *5 (S.D.N.Y. Dec. 4, 2024). For example, in *Nurmagomedov*, the court held that Plaintiffs had established prejudice where the evidence showed that "WhatsApp was a main channel for discussing matters directly relevant to" the case and there was "no reason to doubt that [the messages were] similar in kind to the preserved messages and therefore impact the ability of the [party seeking sanctions] to substantiate its" claims." *Id.*

The same is true here. Defendants testified consistently that they were using Signal regularly to discuss their work during the critical time period. Cavanaugh communicated with others at DOGE, including Fox, "multiple times per week." Cavanaugh Tr. 208:10–12. McDonald likewise testified that he communicated with two key NEH staff members and members of the National Humanities Council over Signal during the relevant time period. McDonald Tr. 150:18–23, 349:19–25.

There is "no reason to doubt" that Defendants' Signal messages were similar in kind to the preserved messages that were produced, and would therefore help to substantiate Plaintiffs' claims. *Nurmagomedov*, 2024 WL 4979235, at *5. The messages that Defendants sent with their official government accounts already corroborate Plaintiffs' allegations, including that it was Defendants Fox and Cavanaugh, in their capacities as DOGE team members, who terminated the NEH grants. For example, in an April 1 email from McDonald to Fox, McDonald made clear that his "recommendation" was *not* to terminate certain grants that NEH staff had identified as having no "DEI" component. Jacobson Decl. Ex. 5 (US 9582). McDonald wrote that there was "no justification for canceling the project's funding and that DOGE "should allow it to continue." *Id.* But McDonald also made clear to Fox that it was "your [*i.e.*, DOGE's] decision on whether to discontinue funding any of the projects on th[e] list." *Id.* Cavanaugh and Fox then rejected McDonald's recommendation and terminated the grants anyway.

If this is what McDonald was saying on his official government email, there is no reason to doubt that he was sending similar messages to his NEH colleagues on Signal. If anything, the witnesses were likely less guarded when texting on Signal or their personal devices. Indeed, as the Court is already aware, one of the few text messages that wasn't deleted shows that McDonald and Wolfson were sending text messages directly relevant to both of Plaintiffs'

9

current legal claims. Jacobson Decl. Ex. 6 (US 62916). On April 13, after McDonald sent Wolfson an article about how the administration had terminated grants to Jewish individuals and organizations, Wolfson responded:

> [I]t is the case that DOGE cut grants having nothing to do with DEI. As they said it was a government wide effort to claw back money. But note the tendentious accusation that the administration is acting like all authoritarian (or even totalitarian!) governments to destroy the humanities. Their ultimate goal supposedly being to destroy independent thought. But the progressive version of the humanities accomplished that some time ago. Today it goes by the term wokeness and intersectionality.

*Id.* As the Court recognized in its recent decision rejecting the Government's attempt to keep this message secret, the message "bears directly on the disputed question of governmental intent" in this case. Dkt. 219 at 9. And there is every reason to believe that, had they not been deleted, Defendants would have produced other text and Signal messages like this one corroborating Plaintiffs' core contentions in this case.

To the extent Defendants argue that Plaintiffs cannot show prejudice because the contents of the deleted messages is unknown, that argument should be rejected. Endorsing such an argument would fly in the face of the main purpose of spoliation sanctions, which is to "deter[] parties from engaging in spoliation." *Michael*, 2016 WL 3440551, at *2. Accordingly, courts have rejected arguments that a party must show that the destroyed evidence "would necessarily have supported" the party's claims. *Id.* at *4. And "Second Circuit courts have held that evidence was relevant in cases where, as here, the prejudiced party was unable to inspect the evidence at all." *Id.*; *see also, e.g.*, *Nurmagomedov*, 2024 WL 4979235, at *5; *Europe v. Equinox Holdings, Inc.*, 592 F. Supp. 3d 167, 178 (S.D.N.Y. 2022) (holding that there was "no doubt' that a work schedule including the weeks leading up to the plaintiff's termination was relevant even though plaintiff did not know what the exact schedule would show).

### C. Defendants Intended to Deprive Plaintiffs of Evidence

The evidence also shows that Defendants communicated on Signal precisely so that their messages would not be discoverable in litigation. "A party seeking sanctions under Rule 37(e)(2) need only establish the requisite intent by a preponderance of the evidence, and such intent may be proven through circumstantial evidence." *Oakley*, 792 F. Supp.3d at 390. "For example, 'intent can be inferred when a party has significantly failed in its obligation to preserve and collect documents.'" *Id.* (quoting *Europe*, 592 F. Supp. 3d at 175). Likewise, courts have found that a party acted with the requisite intent where:

> (1) evidence once existed that could fairly be supposed to have been material to the proof or defense of a claim at issue in the case; (2) the spoliating party engaged in an affirmative act causing the evidence to be lost; (3) the spoliating party did so while it knew or should have known of its duty to preserve the evidence, and (4) the affirmative act causing the loss cannot be credibly explained as not involving bad faith by the reason proffered by the spoliator.

*Id.* (quoting *Charlestown Cap. Advisors, LLC v. Acero Junction, Inc.*, 337 F.R.D. 47, 67 (S.D.N.Y. 2020).

Here, Defendants' intent can be inferred from their failure to preserve any of their Signal messages. Defendants knew or should have known that they were required to conduct government business on government devices and comply with government recordkeeping requirements. Before serving as Acting Chair of NEH, Defendant McDonald was the agency's general counsel for many years, and certainly would have known through regular trainings and otherwise to preserve communications relating to his official work or that might be relevant to anticipated future litigation. Nonetheless, he deliberately chose to start using Signal after the President's inauguration, specifically out of a desire that his communications be "protected." McDonald Tr. 368:13–19.1. Defendant Cavanaugh likewise admitted that he was "probably" asked to use Signal because of its auto-delete function. *Id.* at 249:21–50:3. Indeed, there would

11

appear to be no reason for McDonald, Cavanaugh, and Fox to use Signal *other than* to deprive future litigants of damaging evidence. On this basis alone, the Court could infer the requisite intent. *See Oakley*, 792 F. Supp. 3d at 391 (finding requisite intent where party knew that he had a duty to preserve text messages but nevertheless failed to back up his messages when he upgraded his cell phone).

The Court could also infer the requisite intent by applying the four-step process set forth in *Oakley* and *Charlestown*. First, as explained above, the Signal messages "could fairly be supposed to have been material" because it is "plausible" that Defendants made admissions in those messages that would have corroborated Plaintiffs' core allegations in this case. *Oakley*, 792 F. Supp. 3d at 391. Second, each of the relevant witnesses—McDonald, Cavanaugh, and Fox—"engaged in an affirmative act" causing the evidence to be lost in that they affirmatively downloaded the Signal app and used it to communicate about their work. *Id.* Defendant McDonald went even further and affirmatively *changed* the auto-delete settings to ensure that messages were deleted in a "matter of days." McDonald Tr. 369:6–12. Third, Defendants knew or should have known of their duties to preserve under both as federal employees under the Federal Records Act and as potential parties and witnesses to reasonably anticipated litigation. Fourth, Defendants' use of Signal "cannot be credibly explained as not involving bad faith." *Oakley*, 702 F. Supp. 3d at 390. Government employees are required to use approved government devices and applications precisely so that relevant communications can be preserved. There is simply no reason to download and use an unapproved app for government business unless one is trying to flout their preservation obligations.

## II.  SANCTIONS ARE APPROPRIATE

In view of Defendants' clear spoliation, a number of remedies are warranted.

*First*, the Court should consider the evidence of Defendants' spoliation in evaluating the parties' forthcoming cross-motions for summary judgment and, if necessary, at trial. The "purpose of such a sanction"—which is "explicitly contemplated in the Advisory Committee's Note" to Rule 37(e)—is to "ensure that the finder of fact will have the full context for [any] evidentiary imbalance." *Oakley*, 792 F. Supp. 3d at 389; *see also Nurmagomedov*, 2024 WL 4979235, at *5 (granting party "permission to present evidence of plaintiff's spoliation" as a sanction). Accordingly, the Court should consider the evidence of Defendants' spoliation as important context for the record, including to the extent Defendants seek to argue that the record lacks evidence to support any of Plaintiffs allegations.

*Second*, the Court should draw an adverse inference that Defendants made admissions in their Signal messages that would have corroborated Plaintiffs' core allegations in this case. *See Oakley*, 792 F. Supp. 3d at 393 (granting adverse inference sanction). The Court should infer, for example, that Defendants Cavanaugh and Fox discussed on Signal how *they* would be the ones terminating NEH grants—including by selecting which grants would be terminated and by executing the terminations themselves. The Court should infer that Defendants discussed on Signal that they were selecting which grants to terminate based on their perceived viewpoints and associations, as Plaintiffs allege in connection with their First Amendment claim. And the Court should infer that Defendants discussed how they were selecting many grants for termination based on race, nationality, sex, gender, or sexual orientation, as Plaintiffs allege in connection with their Equal Protection claim. Such an adverse inference is necessary here to serve the "prophylactic, punitive, and remedial rationales" of spoliation sanctions. *Oakley*, 792 F. Supp. 3d at 393 (citation modified).

*Third*, the Court should order Defendants to pay Plaintiffs' attorneys' fees and costs in connection with pursuing this spoliation motion. *See id.* at 389–90. Rule 37(e)(1) "authorizes an award of attorneys' fees and costs to the moving party to the extent reasonably necessary to address any prejudice caused by the spoliation." *Id.* at 389 (quoting *Charlestown*, 337 F.R.D. at 69). The purpose of this remedy is to "ameliorate the economic prejudice imposed and also serve as a deterrent to future spoliation." *Id.* (citation modified). Accordingly, the Court should award Plaintiffs their attorneys' fees and costs incurred in connection with this motion.

## CONCLUSION

The Court should grant Plaintiffs' motion and issue the spoliation sanctions as set forth above.

Dated: February 13, 2026                    Respectfully submitted,

/s/ *Daniel F. Jacobson*
Daniel F. Jacobson
Lynn D. Eisenberg [+]
John Robinson
Kyla M. Snow [+]
JACOBSON LAWYERS GROUP PLLC
5100 Wisconsin Ave, Suite 301
Washington, DC 20016
Tel: (301) 823-1148
dan@jacobsonlawyersgroup.com

[+]Admitted *pro hac vice*

14