# Exhibit 1

**In the Matter Of:**

*The Authors Guild vs*

*National Endowment for the Humanities*

# NATHAN CAVANAUGH

# January 23, 2026



**Page 1**

```
 1              UNITED STATES DISTRICT COURT
 2                       for the
 3              SOUTHERN DISTRICT OF NEW YORK
 4              Civil Action No. 25-cv-3923
 5
 6   THE AUTHORS GUILD, et al.,
 7
                  Plaintiff,
 8
           vs.
 9
     NATIONAL ENDOWMENT FOR THE HUMANITIES,
10   et al.,
11
                  Defendant.
12
13
14        T R A N S C R I P T of the deposition
15   of NATHAN CAVANAUGH taken stenographically before
16   Lisa Forlano, Registered Diplomate Reporter,
17   Certified Realtime Reporter, Certified Court
18   Reporter - NJ and Notary Public, held at the offices
19   of Schindler Cohen & Hochman LLP, 100 Wall Street,
20   Suite 1500, New York, New York 10005, on Friday,
21   January 23, 2026, commencing at 9:41 a.m.
22
23
24
25
```

**Page 2**

```
 1   A P P E A R A N C E S:
 2
         JACOBSON LAWYERS GROUP PLLC
 3       BY:  JOHN ROBINSON, ESQUIRE
              KYLA SNOW, ESQUIRE
 4       5100 Wisconsin Avenue, NW
         Suite 301
 5       Washington, DC  20016
         (301) 823-1148
 6       John@JacobsonLawyersGroup.com
         Kyla@JacobsonLawyersGroup.com
 7       ATTORNEYS FOR PLAINTIFF, ACLS
 8
         FAIRMARK PARTNERS, LLP
 9       BY:  YINKA ONAYEMI, ESQUIRE
         400 7th Street, NW #304
10       Washington, DC  20004
         (617) 642-5569
11       yinka@fairmarklaw.com
         ATTORNEYS FOR THE PLAINTIFF,
12       THE AUTHORS GUILD
13
         US ATTORNEYS' OFFICE
14       BY:  RACHAEL DOUD, ESQUIRE
         86 Chambers Street
15       New York, NY 10007
         (212) 637-2699
16       rachael.doud@usdoj.gov
         ATTORNEYS FOR THE DEFENDANT
17
18   ALSO PRESENT VIA ZOOM:
19       DANIEL JACOBSON, ESQUIRE - JACOBSON
         LAWYERS
20
         LYNN EISENBERG, ESQUIRE - JACOBSON LAWYERS
21
         SARAH MARTIN, ESQUIRE - JACOBSON LAWYERS
22
         ANNIE CLEAVER, ESQUIRE - FAIRMARK PARTNERS
23
         JAMIE CROOKS, ESQUIRE - FAIRMARK PARTNERS
24
         AMANDA VAUGHN, ESQUIRE - FAIRMARK PARTNERS
25
```

**Page 3**

```
 1   ALSO PRESENT:
 2   DYLAN BORSOS, VIDEOGRAPHER
```

**Page 4**

```
 1              I N D E X
 2
 3   WITNESS                                      PAGE
 4   NATHAN CAVANAUGH
 5     By Mr. Robinson                              7
 6     By Mr. Onayemi                             215
 7     By Ms. Doud                                301
 8
 9
10
11              E X H I B I T S
12   P-1   Spreadsheet, US-6338                    40
13   P-2   E-mail chain, US-61501                  68
14   P-3   E-mail and attachment, US-9508          80
15   P-4   Spreadsheet, US-9509                    81
16   P-5   E-mail, US-9552                         83
17   P-6   Attachment, US-9553                     85
18   P-7   Exhibit C - Neeta Thakur, et al.        95
         vs. Donald J. Trump, et al.
19
     P-8   E-mail dated 2/7/25, AR1               100
20
     P-9   E-mail dated 3/12/25, AR3              105
21
     P-10  Spreadsheet, AR4                       111
22
     P-11  E-mail dated 3/13/25, AR5              126
23
     P-12  Spreadsheet, AR6                       127
24
25
```

77

1   Q   What did you do at the
2   Millennium Challenge Corporation?
3   A   We similarly met with the
4   management leadership of MCC to understand
5   their compacts, they call them, which is
6   effectively a grant for foreign spend. So was
7   trying to understand the, again, total number
8   of employees, contracts, grants.
9   Q   Did you terminate those
10  compacts?
11  A   Some of them were terminated at
12  the agency's discretion, not by -- DOGE did not
13  have the authority to individually cancel
14  contracts. It was always at the discretion of
15  the head of the agency.
16  Q   Earlier we were discussing some
17  agencies and I don't think you said that. Why
18  did you emphasize that just now?
19  A   I'm sorry?
20  Q   Why did you -- why did you
21  emphasize that just now?
22  A   Emphasize what exactly?
23  Q   That you had no discretion to
24  terminate contracts.
25  A   Because you asked if I

78

1   terminated compacts at MCC.
2   Q   Okay. Is that something you
3   discussed with counsel during the last break?
4   A   No.
5   Q   Okay. It just occurred to you
6   just now?
7   A   Yeah. Because you asked me --
8   Q   Okay.
9   A   -- if I terminated the compacts.
10  And I didn't.
11  Q   Okay. And what -- so contracts
12  were terminated at MCC?
13  A   I don't know if contracts were
14  terminated, but compacts -- there's a
15  distinction -- I believe certain compacts were
16  terminated by the head of MCC.
17  Q   Okay. What about at the DNI?
18  A   I did not terminate any
19  personnel, grants or contracts at ODNI. It was
20  done by Tulsi Gabbard, the Director of ODNI.
21  Q   Well, what was your -- what was
22  your work at DNI?
23  A   We had two or three meetings
24  with ODNI's team. One of my teammates,
25  Marshall Wood, was the lead at that agency, not

79

1   me personally. And the nature of these
2   meetings were effectively all the same in that
3   context.
4   Q   And what did -- what was the
5   result of your work at DNI?
6   A   There was no direct result
7   actually from our work. Because of the nature
8   of the intelligence community, there was a much
9   longer process to be fully onboarded, such as
10  security clearances. After we met with their
11  team two or three times, we realized that --
12  and also because of my timing at DOGE, we ended
13  up not terminating anything at ODNI. Later we
14  then realized that, at their own discretion,
15  they terminated, I think like 25 percent of
16  ODNI's head count. But it wasn't a result of
17  DOGE's actions.
18  Q   When you were working at these
19  agencies, were you working at multiple agencies
20  at the same time or would you take one agency
21  at a time?
22  A   There were generally multiple
23  agencies ongoing at the same time for me
24  personally.
25       MR. ROBINSON: All right. I'd

80

1   like to look at another document. We'll
2   mark this as Plaintiff's Exhibit 3.
3       (E-mail and attachment, US-9508,
4       was marked P-3 for identification.)
5   BY MR. ROBINSON:
6   Q   This is a document Bates-stamped
7   US-9508. This is an April 8, 2025 e-mail from
8   your GSA e-mail address to your special.co
9   e-mail address. And it's attaching a
10  spreadsheet called Deletions 330 Scorecard.
11      Do you recognize this?
12  A   Yes.
13  Q   So you said earlier that
14  special.co is a company that you are founding,
15  and also founding now. So would you sometimes
16  forward documents from your GSA account to your
17  special.co account?
18  A   In this case, yes. It wasn't a
19  regular occurrence. And this -- the reason
20  that this was forwarded was to provide the DOGE
21  leadership team, specifically Steve Davis, with
22  an update on the relevant savings at each
23  agency.
24  Q   Okay. Why did you do that?
25  A   To my knowledge, Steve didn't

93

1 with Mike, I think I reported back to Steve
2 that Mike was amenable to onboarding a DOGE
3 team. And I would update him on progress, as
4 there were meaningful updates.
5    Q   Okay. And then did you provide
6 those updates?
7    A   I believe so. I don't remember
8 exactly how frequently. It wasn't on a weekly
9 cadence outside of the scorecard that we looked
10 at together.
11   Q   How did you convey those
12 updates?
13   A   Either in person, because in
14 many cases Steve worked at GSA. Or on Signal.
15   Q   Okay. Those conversations you
16 had with Mr. Davis on Signal about NEH, do you
17 still have those?
18   A   I do not.
19   Q   Were they on your Government
20 phone or personal phone?
21   A   They were on my personal phone.
22   Q   And why don't you have them
23 anymore?
24   A   Messages automatically delete on
25 Signal.

94

1    Q   So when were these messages
2 deleted?
3    A   I don't know.
4    Q   Do you recall what the
5 auto-delete setting was for your conversations
6 with Mr. Davis? Was it 30 days? Was it seven
7 days?
8    A   I don't recall.
9    Q   Did anyone talk to you about
10 your use of Signal for Government work while
11 you were a DOGE employee?
12   A   Not explicitly, no.
13   Q   What about implicitly?
14   A   I don't believe so.
15   Q   Has anyone talked to you about
16 your use of Signal since you left Government
17 employment?
18   A   They've not.
19   Q   I'm going to show you a
20 declaration that Michael McDonald submitted in
21 another case, not our case, called Thakur v.
22 Trump.
23       MR. ROBINSON: We will mark this
24   as Plaintiff's Exhibit 7, I think this
25   is. We're going to be using it kind of

95

1 throughout the deposition.
2       (Exhibit C - Neeta Thakur, et
3   al. vs. Donald J. Trump, et al. was
4   marked P-7 for identification.)
5       THE WITNESS: Should I read
6   this?
7 BY MR. ROBINSON:
8    Q   Feel free to take a quick look.
9 I'm going to kind of guide you through it, so
10 no need to read it cover to cover. But feel
11 free to take a quick look just to get a sense
12 of what it is.
13      So as you see, this is a
14 declaration that Mr. McDonald submitted in the
15 Thakur case. You can see that on page 2 of the
16 document.
17      Before we get into it, you had
18 mentioned before that Mr. McDonald was amenable
19 to DOGE working at NEH. Is that something he
20 told you specifically?
21      MS. DOUD: Objection to form.
22      THE WITNESS: Yeah, I believe
23   so.
24 BY MR. ROBINSON:
25   Q   Do you recall specifically what

96

1 he said?
2    A   Specifically he said he welcomed
3 the DOGE team to be onboarded to NEH from GSA.
4    Q   Did he say why?
5    A   He did not, to my knowledge.
6    Q   This was in your first
7 conversation with him?
8    A   Yes.
9    Q   We were talking earlier about
10 Signal conversations you had with Mr. Davis.
11 Did you ever have Signal conversations with
12 Mr. McDonald?
13   A   Signal. I don't believe so, no.
14   Q   Okay. What about others on the
15 DOGE team side besides Mr. Davis, would you
16 talk about your work on Signal?
17   A   Can you repeat the question?
18 Sorry.
19   Q   Aside from Mr. Davis, who you
20 said you had discussions over Signal about your
21 work at NEH, did you have Signal conversations
22 with anyone else at DOGE?
23   A   Probably, yes, Justin Fox.
24   Q   Okay. What about Mr. Aimonetti?
25   A   I don't believe so, no.

**Page 97**

1  Q   Those conversations you had with
2  Fox, what were those?
3  A   General status update-related
4  topics around small agencies that we were
5  working with.
6  Q   Okay. And do you still have
7  them?
8  A   I don't.
9  Q   Those were also deleted?
10 A   They were auto-deleted by
11 Signal.
12 Q   Okay. Do you remember what the
13 auto-delete time frame was for your
14 conversations with Mr. Fox?
15 A   I don't.
16 Q   Do you still use Signal?
17 A   I do.
18 Q   Do you have a standard
19 auto-delete feature that you use with your
20 Signal -- for your Signal?
21 A   I don't know. I can look, if
22 you want me to...
23 Q   Yeah, if you don't mind. Please
24 do.
25 A   It is one week.

**Page 98**

1  Q   That's a schedule that you set?
2  A   I believe it's preset by the
3  app, but I could be wrong.
4  Q   You don't recall setting it
5  yourself --
6  A   I don't recall.
7  Q   -- changing it?
8  A   No.
9  Q   Okay. Do you have any messages
10 with Justin Fox on Signal now that you would
11 have had for the last -- in the last week?
12 A   No.
13 Q   What about Mr. Davis?
14 A   No.
15 Q   Anyone else from DOGE in the
16 last week?
17 A   Not related to anything with
18 DOGE specifically. It would be personal
19 conversations.
20 Q   Who was it?
21 A   It would have been Baris Akis.
22 Q   Okay. All right. Let's take a
23 look at this McDonald declaration. I turn your
24 attention to paragraph 6. And I'll just read
25 it to you.

**Page 99**

1  A   What page are you on?
2  Q   Page 2 of the PDF, which is, I
3  guess, the first page of the declaration.
4  Paragraph 6.
5  A   Okay.
6  Q   It says, "President Trump issued
7  Executive Order 14151, ending radical and
8  wasteful Government DEI programs and
9  preferencing a January 20, 2025, Executive
10 Order 14173, ending illegal discrimination and
11 restoring merits-based opportunity issued on
12 January 21, 2025, and Executive Order 14168,
13 defending women from gender ideology extremism
14 and restoring biological truth to the Federal
15 Government, on January 20, 2025, when Shelly C.
16 Lowe was still chair of NEH."
17     And then continuing on to
18 paragraph 7, it says, "Between January 20th and
19 February 7, 2025, Chair Lowe directed NEH
20 program staff to review open grants in light of
21 the new executive orders."
22     And my question is: Were you
23 involved with NEH during this time period, from
24 January 20th to February 7th?
25 A   No.

**Page 100**

1  Q   Did you talk to former Chair
2  Lowe about this review process ever?
3  A   No.
4  Q   Do you know if anyone at DOGE
5  talked to her about this review process?
6  A   No.
7  Q   So then continuing on to
8  paragraph 8, it says, "At the direction of then
9  Chair Lowe, on February 7th, NEH's Chief
10 Information Officer, Brett Bobley, e-mailed NEH
11 program directors asking them to identify
12 projects funded under the Biden Administration
13 that might be implicated by President Trump's
14 executive orders."
15     So I'm going to show you what we
16 will mark as Plaintiff's Exhibit 8.
17     (E-mail dated 2/7/25, AR1, was
18     marked P-8 for identification.)
19 BY MR. ROBINSON:
20 Q   This is Bates-labeled AR1. And
21 it's a February 7, 2025 e-mail from Brett
22 Bobley to -- it says Division Directors, and
23 there are some others copied. And it says,
24 "Dear Program Directors, Here are the review
25 criteria for reviewing all the awards from 2021

205

1  reduce, for political reasons, I assume. And
2  so I got transitioned to immigration after
3  that.
4     Q    Were you involved -- were you
5  privy at all to those tensions between Elon and
6  the White House about cutting spending?
7          MS. DOUD: Objection.
8          THE WITNESS: Can you be more
9     specific?
10 BY MR. ROBINSON:
11    Q    Well, you referenced it vaguely,
12 and it wasn't clear to me whether you had,
13 like, first-hand knowledge of meetings or
14 conversations about that issue or whether you
15 were just referring to things you read in the
16 press.
17    A    I had -- I had first-hand
18 knowledge of the tension between Elon and the
19 President.
20    Q    How so?
21    A    I was in a meeting with Elon,
22 Steve Davis, Howard Lutnick and David Sacks at
23 the -- in the West Wing of the White House
24 where there was a discussion about the growing
25 tension of not willing to -- not -- not -- not

206

1  being interested in cutting spending as
2  aggressively as we had originally hoped.
3     Q    And who communicated that from
4  the White House perspective?
5          MS. DOUD: Objection.
6          THE WITNESS: I don't recall.
7  BY MR. ROBINSON:
8     Q    Someone communicated it?
9          MS. DOUD: Objection.
10         THE WITNESS: I don't recall,
11    honestly, who said it. It might have
12    been Elon.
13 BY MR. ROBINSON:
14    Q    But it was said.
15         And did you say anything at that
16 meeting?
17    A    No.
18    Q    Why were you invited to that
19 meeting?
20    A    Because I was a senior official
21 within DOGE.
22    Q    You mentioned Elon Musk. Did
23 you ever talk to Elon Musk about NEH?
24    A    No.
25    Q    You weren't terminated from the

207

1  Government, you left on your own?
2     A    Yes.
3     Q    We might have covered some of
4  this earlier, but I want to make sure it's
5  covered.
6          So when you were working within
7  the Government, what e-mail addresses did you
8  use for work?
9     A    It would have been Nate -- my
10 GSA e-mail. In many of the agencies we were
11 assigned an agency e-mail address. In certain
12 cases we would use that, in others we wouldn't.
13 It would just be at the agency's discretion,
14 whatever -- whatever the agency had preferred.
15    Q    And you said you also used the
16 special.co e-mail at times?
17    A    In the case of forwarding a
18 scorecard to Steve Davis for weekly reporting.
19    Q    That was the only reason you
20 used it?
21    A    I believe so, yes.
22    Q    What other apps did you use to
23 do Government business? You already referenced
24 Signal, correct?
25    A    Yes.

208

1     Q    Anything else?
2     A    I don't believe so, no. It
3  would have been Signal, Gmail and GSA's Google
4  Workspace environment.
5     Q    What about just normal iPhone
6  messaging?
7     A    No.
8     Q    WhatsApp?
9     A    No.
10    Q    Did you use Signal daily?
11    A    Not daily, but multiple times
12 per week.
13    Q    So you never texted with Fox
14 about work?
15    A    No.
16    Q    You would Signal with him,
17 though?
18    A    You would either talk in person
19 at GSA, on Google Chat, which is GSA's approved
20 internal workspace communication tool, or it
21 would be on Signal. One of those three.
22    Q    I'm going to show you a document
23 subpoena that we issued to you in connection
24 with this case.
25         MR. ROBINSON: This will be

249

1 Do you remember that
2 conversation?
3   A   Yes, I do.
4   Q   Okay. Did you communicate with
5 anyone else at DOGE via Signal?
6   A   Yes.
7   Q   Who?
8   A   In the course of NEH or
9 generally?
10  Q   Generally.
11  A   It would be a pretty long list.
12 Justin Fox, Ethan Shaotran, occasionally James
13 Burnham, Steve Davis, Baris Akis. I don't --
14 beyond that -- I think that's the core scope.
15  Q   Okay. And how did you decide to
16 use Signal with all these people at DOGE?
17  A   That was the preferred
18 communication platform when I joined and that
19 was just -- when I joined that was where I was
20 told a lot of conversations were occurring.
21  Q   Okay. Did you have an
22 understanding of the reason that Signal, in
23 specific, was used?
24  A   I didn't.
25  Q   Do you think it was because of

250

1 its auto-delete function?
2   A   Probably, yes. But I don't know
3 for sure.
4   Q   Okay. And so what do you think
5 that would have -- what kind of benefit would
6 that have conferred on DOGE?
7       MS. DOUD: Objection.
8       THE WITNESS: What benefit would
9   that have conferred on for DOGE, I'm not
10  sure.
11 BY MR. ONAYEMI:
12  Q   Okay. But you were doing
13 Government work, right?
14  A   Yes.
15  Q   Okay. And you were using
16 another platform to do Government work?
17  A   That was not the only platform
18 we used to do Government work.
19  Q   But it was one of them?
20  A   It was one of them.
21  Q   Okay. Did you see that there
22 was an issue using an auto-delete service to do
23 Government work on?
24  A   No. I -- no, I didn't really
25 think much of it, because it was already used

251

1 when I joined.
2   Q   Did anyone discuss that being an
3 issue, potentially?
4   A   Not to me explicitly, no.
5   Q   Okay. Implicitly?
6   A   No, I don't believe so.
7   Q   Okay. What other services did
8 you use besides Signal?
9   A   I think we covered this already.
10 Google Workspace, which includes all of
11 Google's enterprise products, Drive, Gmail,
12 Calendar, et cetera, Docs.
13  Q   Yeah. And you said that no one
14 ever voiced a concern to you explicitly. Did
15 someone explicitly voice a concern to someone
16 else?
17      MS. DOUD: About what?
18 BY MR. ONAYEMI:
19  Q   About using an auto-delete
20 service for Government work.
21  A   Did somebody ever tell somebody
22 else that this could be -- I -- I wouldn't have
23 been privy to the conversation. I don't know.
24  Q   Fair enough.
25      When you said exp- -- you kind

252

1 of said explicitly. What did you mean by
2 explicitly?
3   A   Nobody told me that that would
4 have been an issue to use Signal.
5   Q   Okay. And you weren't privy to
6 any other conversations within the agency about
7 that being a concern?
8   A   No.
9   Q   Okay. And you noted that you
10 talked to Mr. Fox about this lawsuit at some
11 point; is that right?
12  A   That's right.
13  Q   Okay. When did you talk to
14 Mr. Fox about the lawsuit?
15  A   I don't recall the exact date,
16 actually. It would have been a few weeks ago.
17 And the context was basically that we're both
18 being -- having a deposition and that was the
19 extent of the conversation.
20  Q   Okay. How did you talk to him?
21  A   We were actually in person
22 together working in New York. We work in the
23 same office for the same company, so it was in
24 person, actually.
25  Q   Okay. I think I'll come back to