# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

AMERICAN COUNCIL OF LEARNED
SOCIETIES,
    633 Third Avenue, 8th Floor
    New York, NY 10017,

AMERICAN HISTORICAL ASSOCIATION,
    400 A Street SE
    Washington, DC 20003,

MODERN LANGUAGE ASSOCIATION,
    85 Broad Street,
    New York, NY 10004,

               *Plaintiffs*,

    v.

MICHAEL MCDONALD, in his official capacity as
Acting Chairman of the National Endowment for the
Humanities,
    400 7th St SW,
    Washington, DC 20506,

NATIONAL ENDOWMENT FOR THE
HUMANITIES,
    400 7th St SW,
    Washington, DC 20506,

UNITED STATES DOGE SERVICE,
736 Jackson Pl NW
Washington, DC 20503,

AMY GLEASON, in her official capacity as Acting
Administrator of the United States DOGE Service,
736 Jackson Pl NW
Washington, DC 20503,

NATE CAVANAUGH, in his official capacity as an
employee of the U.S. DOGE Service or the General
Services Administration,
1800 F St NW
Washington, DC 20006,

Case No. 1:25-cv-03657-CM

JUSTIN FOX, in his official capacity as an
employee of the U.S. DOGE Service or the General
Services Administration,
1800 F St NW
Washington, DC 20006,

        *Defendants.*

## [PROPOSED] AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1.      This lawsuit challenges the recent dismantling of the National Endowment for the Humanities ("NEH"), an agency created by Congress sixty years ago to foster the learning and advancement of humanities in this nation.

2.      In 1965, Congress declared that "the humanities belong to all the people of the United States." 20 U.S.C. § 951(1). "Democracy demands wisdom and vision in its citizens," Congress found, and therefore "national progress and scholarship in the humanities" are "appropriate matters of concern to the Federal government." *Id.* §§ 951(2), (4). Congress thus deemed it "necessary and appropriate for the Federal Government to complement, assist, and add to programs for the advancement of the humanities . . . by local, State, regional, and private agencies and their organizations." *Id.* § 951(5). In Congress's view, "it is essential to provide financial assistance to . . . organizations that support" the humanities." *Id.* § 951(10). Congress established NEH "to implement these findings and purposes." *Id.* § 951(12).

3.      Over the last six decades, with bipartisan support from Congress and administrations of both political parties, NEH has grown to become the largest and most prestigious funder of advanced humanities research in the United States. Since its founding, NEH has awarded over $6 billion in grants to museums, historic sites, colleges, universities, K-12 teaching, libraries, public television and radio stations, research institutions, and independent

scholars. Scores of organizations and individuals rely on NEH to fund important projects and research that could not be accomplished without NEH's support.

4.     Congress's funding of NEH and its programs has continued to this day. In March 2025, Congress appropriated an additional $207 million to NEH to fund its activities, the vast majority of which NEH must use on its grant programs.

5.     But NEH's 60-year history of fostering the humanities came to a crashing halt earlier this month, at the hands of the United States DOGE Service ("DOGE"). Two DOGE operatives who have been hopping from small agency to small agency to dismantle the agencies, Defendants Nate Cavanaugh and Justin Fox, arrived at NEH to do the same. According to accounts of former or current NEH staff, these operatives demanded lists of open NEH grants, used AI searches focused on race, sex, immigration status, and other characteristics to identify grants that must be terminated, and then terminated each of those grants, in addition to the majority of other open grants at the agency. According to former or current NEH staff, Cavanaugh and Fox did not even bother having NEH officials effectuate their work; Cavanaugh and Fox themselves emailed nearly 1,500 NEH grantees from a "Grant_Notifications@nehemail.onmicrosoft.com" email address, notifying the grantees that their awards had been terminated. NEH's Acting Chairman Michael McDonald actually admitted to staff a day after the grant terminations that "they"— DOGE—had written the termination letters and that he was not even aware of the full scope of the terminations. According to former or current NEH staff, Cavanaugh and Fox subsequently demanded that NEH mass terminate its staff, resulting in the abrupt issuance of reduction-in-force notices to roughly 75% of its workforce.

6.     NEH is now left as a shell of the agency that Congress established and has consistently funded. According to former or current NEH staff, NEH has eliminated or nearly

eliminated entire agency programs and divisions, including several programs and divisions from which Plaintiffs and their members have received grants and anticipated applying for new grants in the near future. NEH has publicly announced the cancellation of at least eighteen programs for which it has previously issued notices of funding opportunities, and the only substantial program that NEH seemingly will pursue going forward is a "Garden of Heroes" that NEH cannot lawfully fund. For all of the program and division eliminations, and the mass firing of staff, NEH has provided little to no explanation, let alone the type of reasoned explanation required under bedrock principles of administrative law. Further, NEH has provided no explanation of how, in its hollowed-out state, NEH intends to comply with its statutory duties and spend all the appropriations that Congress has mandated it spend.

7.     The Constitution grants Congress—not the President—the power to create and prescribe the duties of Federal agencies, and Congress maintains the exclusive power of the purse in directing how Federal funds must be spent. The President cannot unilaterally shut down an agency that Congress has created, nor may an agency refuse to spend funds that Congress has appropriated. Such unilateral Executive action not only violates the constitutional separation-of-powers, but it also violates the Impoundment Control Act of 1974 ("ICA"), which sets strict limits on the Executive Branch's ability to delay spending appropriated funds.

8.     Defendants' actions in eliminating programs and divisions, mass firing staff, and refusing to spend appropriations are also arbitrary and capricious under the Administrative Procedure Act. The actions are arbitrary and capricious in every way that agency action can be arbitrary and capricious: Defendants provided no reasoned explanations for their actions, they relied on factors that Congress did not permit them to rely on, they changed longstanding agency

positions without acknowledging the change, and they utterly failed to consider the reliance interests of thousands of NEH grantees that have long relied on NEH.

9.     Worse yet, all of these actions were taken or directed by DOGE, a body not created or authorized by statute. DOGE has no lawful authority to carry out the work of another agency, let alone to dismantle it. The Supreme Court has made clear that Federal agencies have no power to do anything unless given that power by Congress, and DOGE has been given none.

10.     Plaintiffs are three of the nation's preeminent humanities associations: the American Council of Learned Societies, the American Historical Association, and the Modern Language Association. Collectively, they have thousands of individual and organizational members who rely on NEH to fund and support their projects in the humanities. Plaintiffs and their members have suffered immense harm as a result of the Trump Administration's efforts to illegally dismantle the only Federal agency in the United States dedicated to funding the humanities. If those efforts are not enjoined, hundreds of millions of dollars in taxpayer-funded projects and research will not be completed and rendered useless, hundreds of millions more in Congressional appropriations will go unspent, and the fostering of the humanities that Congress mandated NEH carry out sixty years ago will disappear.

11.     To prevent these extraordinary harms, Plaintiffs bring this suit to enjoin and set aside Defendants' unlawful actions, and to require the Trump Administration to operate NEH as Congress intended, unless and until Congress says otherwise.

## PARTIES

12.     Plaintiff American Council of Learned Societies ("ACLS") is a nonprofit organization whose members include 81 scholarly organizations. ACLS was founded in 1919 and is headquartered in New York, NY. It is focused on supporting the creation and dissemination of

knowledge that advances understanding of humanity and human endeavors in an effort to improve the human experience. ACLS undertakes this mission through its work directly and through providing funding research and related activities. Both ACLS and its members receive awards directly from NEH. ACLS has received a total of 144 direct NEH awards since NEH's founding. As described in more detail below, ACLS and its members have been substantially injured by the recent actions of, or in the name of, NEH.

13.     Plaintiff American Historical Association ("AHA") is a nonprofit organization founded in 1884 and incorporated by Congress in 1889 for the promotion of historical studies. AHA's mission is to enhance the work of historians, including by promoting professional standards and ethics, innovative scholarship and teaching, academic freedom, and international collaboration. AHA is the largest membership association of historians in the world, with over 10,400 members. AHA serves historians in a wide variety of professions, and represents every historical era and geographical area. Both AHA and its members receive grant awards directly from NEH; AHA members have received over 300 such awards over the last five years, while AHA itself has received nearly 50 awards since NEH's founding. AHA is headquartered in Washington, D.C. As described in more detail below, AHA and its members have been substantially injured by the recent actions of, or in the name of, NEH.

14.     Plaintiff Modern Language Association of America ("MLA") is a nonprofit organization founded in 1883 that sustains one of the finest publishing programs in the humanities. MLA also serves as a leading advocate for the study and teaching of languages and literatures and serves as a clearinghouse for professional resources for teachers and scholars. MLA has over 20,000 members that it supports, including through the MLA Strategic Partnership Network ("SPN"), which brings together institutions with a proven commitment to the humanities to

develop critical resources for responding and building a sustainable foundation for the future. Both MLA and its members receive awards directly from NEH. MLA members have received over 180 such awards over the last three years, while MLA has received nearly 50 NEH grants since NEH's founding. The MLA is headquartered in New York, NY. As described in more detail below, MLA and its members have been substantially injured by the recent actions of, or in the name of, NEH.

15.     Defendant Michael McDonald is the Acting Chairman of the National Endowment for the Humanities. He is sued in his official capacity only.

16.     Defendant National Endowment for the Humanities is an agency of the United States government.

17.     Defendant United States DOGE Service ("DOGE") is a component of the Executive Office of the President established by Executive Order 14158 on January 20, 2025.

18.     Defendant Amy Gleason is the Acting Administrator of the United States DOGE Service and is the DOGE's highest ranking official. As such, she is responsible for activities of the organization.

19.     Defendant Nate Cavanaugh is reportedly a member of DOGE and an employee of the General Services Administration. Cavanaugh has reportedly operated on behalf of DOGE at multiple agencies to substantially eliminate agency programs and staff, including at NEH.

20.     Defendant Justin Fox is reportedly a member of DOGE and an employee of the General Services Administration. Fox has reportedly operated on behalf of DOGE at multiple agencies, including at NEH.

## JURISDICTION AND VENUE

21.     This court has subject-matter jurisdiction to adjudicate these claims because this action arises under the Constitution and laws of the United States, 28 U.S.C. § 1331; because

Defendants are United States officials, 28 U.S.C. § 1356(a)(2); and because this case arises under the judicial review provisions of the Administrative Procedure Act, 5 U.S.C. §§ 702, 704.

22.     This court may grant declaratory, injunctive, and other relief pursuant to 28 U.S.C. §§ 2201-2202, 5 U.S.C. §§ 705, 706, and the court's inherent authority to enjoin Federal officials from acting unlawfully.

23.     Venue is appropriate under 28 U.S.C. § 1391(e) in the Southern District of New York because Plaintiffs ACLS and MLA reside in this district.

## FACTUAL AND LEGAL BACKGROUND

***Congress Established the National Endowment for the Humanities to Broadly Fund Research, Scholarly Work, and the Advancement and Promotion of the Humanities***

24.     Finding that "[t]he arts and the humanities belong to all people of the United States," 20 U.S.C. § 951(1), Congress created the National Endowment for the Humanities ("NEH") and its sister agency, the National Endowment for the Arts ("NEA"), in 1965, as part of the National Foundation on the Arts and Humanities Act of 1965 ("NFAHA" or "the Act"). Pub. L. 89-209, 79 Stat. 845 (Sept. 29, 1965) (codified at 20 U.S.C. §§ 951-60).

25.     In establishing NEH, Congress found that "it is necessary and appropriate for the Federal Government to complement, assist, and add to programs for the advancement of the humanities and the arts by local, State, regional, and private agencies and their organizations." 20 U.S.C. § 951(5). Congress believed that the Federal government has a key role in "help[ing] create and sustain not only a climate encouraging freedom of thought, imagination, and inquiry but also the material conditions facilitating the release of this creative talent." *Id.* § 951(7).

26.     Accordingly, Congress established NEH to provide funding for organizations and individuals involved in research, publication of scholarly works, and promotion of the humanities. *See* 20 U.S.C. § 956.

27.     Congress viewed this directive as a broad one, meant to fund a wide range of projects and not to promote a singular viewpoint, and to fund traditionally underrepresented recipients. *See* 20 U.S.C. § 956(c).

28.     To that end, in creating NEH, Congress included several provisions aimed at protecting the agency from political influence. For example, Congress has prohibited Federal agencies and employees from "exercis[ing] any direction, supervision, or control over the policy determination, personnel, or curriculum" of any grantee organization. 20 U.S.C. § 953(c).

29.     Congress also provided for a process under which grant applications generally must be reviewed by NEH's National Council on the Humanities (the "Council") before being approved and issued by the agency. *Id.* § 957(f). The Council itself is made up of the Chairperson and 26 "private citizens…who are recognized for their broad knowledge of, expertise in, or commitment to the humanities" and who are appointed to staggered six-year terms, ensuring appointment across Presidential administrations. *Id.* § 957(c).

30.     The Chairperson "shall not approve or disapprove any [financial support] application until the Chairperson has received the recommendation of the Council on such application." *Id.* § 957(f).

31.     This statutory framework demonstrates Congress's intent to insulate NEH from political control. As a Senate committee report explained: "It is the intent of the committee that in the administration of this act there be given the fullest attention to freedom of artistic and humanistic expression. . . . [N]o undue preference should be given to any particular style or school of thought or expression." S. Rep. No. 80-300, at 3-4 (1965).

32.     With this broad purpose in mind, Congress provided that the Chairperson of NEH may "enter into arrangements," including "contracts, grants, loans, and other forms of assistance," to further a limited set of purposes. 20 U.S.C. § 956(c).[1] These purposes include to:

- develop and encourage the pursuit of a national policy for the promotion of progress and scholarship in the humanities;

- initiate and support research and programs to strengthen the research and teaching potential of the United States in the humanities by making arrangements with individuals or groups to support such activities;

- initiate and support training and workshops in the humanities by making arrangements with institutions or individuals;

- initiate and support programs and research which have substantial scholarly and cultural significance and that reach, or reflect the diversity and richness of our American cultural heritage, including the culture of, a minority, inner city, rural, or tribal community;

- foster international programs and exchanges;

- foster the interchange of information in the humanities;

- foster, with groups, education in, and public understanding and appreciation of the humanities;

- support the publication of scholarly works in the humanities;

- ensure that the benefit of its programs will also be available to our citizens where such programs would otherwise be unavailable due to geographic or economic reasons; and

- foster programs and projects that provide access to, and preserve materials important to research, education, and public understanding of, the humanities.

*Id.*

33.     Through these programs, NEH has played a significant role in both expanding access to the humanities and funding a wide range of research, training, and education. Indeed,

---

[1] In addition, Congress provided for three additional types of grant programs: grants in aid programs in each state; assisting public agencies and nonprofit organizations seeking to increase the levels of their support; and small annual awards for the Jefferson Lecture in the Humanities Award and the Charles Frankel Prize. 20 U.S.C. §§ 956(f),(h),(m).

"[a]s the largest federal funder of the humanities, NEH offers 47 grant programs to support museums, historic sites, colleges, universities, K-12 teachers, libraries, public television and radio stations, research institutions, independent scholars, and nonprofits nationwide." NEH Website, Grants, https://perma.cc/282U-ENAJ.

34.     NEH's programs have included a specialized grant program for community colleges aimed at "expand[ing] the humanities resources and educational opportunities available to historically underserved student populations." Press Release, *National Endowment for the Humanities Announces New Grant Program for Two-Year Institutions*, National Endowment for the Humanities (June 3, 2015), https://perma.cc/WGS5-GC67.

35.     NEH funding has supported video series such as a 20-hour series on the history of baseball; a 2.5-hour dramatic representation of *Brown v. Board of Education*; and a documentary on the American experience during World War II.

36.     And NEH funding has supported smaller projects including individualized research projects and college coursework.

37.     Both historically and over the last several years, Plaintiffs and their members have received hundreds of NEH grants for a range of work and funding a wide range of research and actions.

### *NEH Maintained a Robust Organizational Structure to Fulfill Its Mission*

38.     Until last month, NEH maintained a robust organizational structure to carry out its statutory functions.

39.     As of January 2025, NEH's organization and management were as depicted below:



Organizational Chart FY 2024

01/2025

40.     NEH thus had seven divisions under the Assistant Chair for Programs to carry out specific types of activities and grant programs, and NEH had three offices under the Assistant Chair for Partnerships and Strategic Initiatives, each focused on different types of community outreach or initiatives.

41.     As of April 1, 2025, NEH had more than 200 employees across the agency.

*NEH Awarded Grants Through a Rigorous, Staff-Intensive Advisory Process to Effectuate its Statutory Goals*

42.     The process of awarding NEH grants requires significant NEH staff resources.

43.     Each year, NEH recruits and organizes over 1,000 individual experts into more than 200 peer review panels to review each of the more than 5,500 grant applications NEH receives annually.

44.     Peer review panels are organized and overseen by NEH program officers—themselves experts from each of NEH's seven program divisions set forth above.

45.     Program officers place experts on review panels based on a variety of factors including broad knowledge of the humanities and specific expertise. Larger grant programs may have several peer-review panels.

46.     NEH does not permit any expert to serve on a review panel for the same grant program two years in a row and does not maintain any standing panels. As a result, NEH staff must go through this time-intensive process at the start of each grant competition.

47.     The panels are formal—announced in the Federal Register—and transparent, with names of panelists added to NEH's annual reports.

48.     After a grant application is submitted, a relevant program officer reviews it and, based on academic discipline, institutional type, project area, or project type, assigns it to a specific peer-review panel for the relevant program.

49.     The panel of three to six experts (called evaluators once placed on a panel) review each assigned application according to NEH's published review criteria and program-specific guidelines. While specific criteria will differ based on the program, this will generally include consideration of significance to the humanities, the applicant's abilities and qualifications, the proposal's clarity of expression, and the project's feasibility, design, cost, and work plan.

50.     Generally, each evaluator will grade each grant application individually before meeting as a group with other evaluators on their panels to discuss each of the applications. While panelists meet and may try to reach consensus, they are not required to do so; rather, each evaluator then provides individual final ratings on each application.

51.     As a result, program officers do not receive a uniform set of recommendations from peer review panels. Rather, program officers must then organize panel results both within each panel and across multiple review panels for each grant program.

52.     NEH program officers will then recommend applicants for each program, seeking to identify applications of similar quality across each panel. Program officers draft summaries of the ratings and comments from panel evaluators and submit recommendations to the National Council on the Humanities.

53.     The National Council on the Humanities meets three times each year, each for two days, to evaluate recommendations from NEH's divisions' program officers.

54.     While the Chair of NEH ultimately makes all final funding decisions, with the exception of certain lower-dollar discretionary Chairs Grants, the Chair cannot do so until the Council has submitted recommendations. In assessing applications for funding, the Chair takes into account the Council's recommendations, as well as the larger set of information available from program staff and evaluators.

***Congress Has Appropriated NEH Hundreds of Millions of Dollars Each Fiscal Year, Most of Which Is For Grantmaking***

55.     Each fiscal year, Congress appropriates funds for NEH to carry out its statutory functions, including to award grants.

56.     In the 2024 Appropriations Act, Congress appropriated $207,000,000 to NEH, of which $192,000,000 "shall be available for support of activities in the humanities, pursuant to

section 7(c) [20 U.S.C. § 956(c)] of the Act and for administering the functions of the Act." As such, $192,000,000 was designated for grants, loans, contracts, and other assistance to further the enumerated purposes set forth under 20 U.S.C. § 956(c). Pub. L. 118-42, 138 Stat. 25, 282 (Mar. 9, 2024) (the "2024 Act").

57.      On March 15, 2025, Congress enacted a continuing resolution that re-appropriated all of the funds appropriated to NEH under the 2024 Act, with the same breakdown on how the money must be spent. Pub. L. 119-4, §§ 1101-08, 139 Stat. 9, 10-12 (Mar. 15, 2025) (the "2025 Continuing Resolution"). NEH thus received an additional $207 million that it must spend, including an additional $192,000,000 that it must spend on grants and other assistance programs under 20 U.S.C. § 956(c).

***DOGE Sweeps Into NEH and Mass Terminates Grants and Staff***

58.      On March 13, 2025, NEH Chair Shelly Lowe was directed by the White House to resign her position. Shortly thereafter, teams from DOGE began appearing at NEH offices.[2]

59.      According to accounts of former and current NEH staff, in March 2025, Defendants Cavanaugh and Fox of DOGE met with NEH leadership to discuss DOGE's plans for NEH's future.

60.      Defendants Cavanaugh and Fox have reportedly been deployed to multiple small agencies, in most cases to swiftly carry out mass terminations of staff, programs, and grants. In addition to NEH, Defendants Cavanaugh and/or Fox reportedly have been deployed to the National

---

[2] Jennifer Schuessler, *DOGE Demands Deep Cuts at Humanities Endowment,* NYTIMES (Apr. 1, 2025), https://www.nytimes.com/2025/04/01/arts/trump-doge-federal-cuts-humanities.html.

Labor Relations Board,[3] the Inter American Foundation,[4] the Millennium Challenge Corporation,[5] the U.S. Institute for Peace,[6] and the African Development Foundation.[7]

61.     Defendant Cavanaugh has also been appointed the President of the U.S. Institute for Peace[8] and the Acting Director of the Interagency Council on Homelessness.[9] At each of these institutions, Cavanaugh has fired large numbers of staff and essentially shut down the institution.[10]

62.     On April 1, 2025, NEH staff members reportedly were informed that DOGE sought reductions in NEH staff by 70-80% and "what could amount to a cancellation of all grants made under the Biden administration that have not been fully paid out." *Id.* Indeed, Acting Chair Michael McDonald "told senior staff that [DOGE]…'wants to claw back $175 million' in grant money that has not yet been disbursed."[11]

63.     According to accounts of former or current NEH employees, while at NEH, Cavanaugh and Fox were provided one or more lists of open NEH grants, and Cavanaugh and Fox repeatedly asserted that cancelling at least $175 million in grant money was an imperative.

[3] Robert Iafolla, *Labor Board's DOGE Detailees Connected to Agency Take Downs*, BLOOMBERG LAW (Apr. 21, 2025), https://news.bloomberglaw.com/us-law-week/labor-boards-doge-detailees-connected-to-agency-take-downs.

[4] *Aviel v. Gor*, No. CV 25-778 (LLA), 2025 WL 1009035, at *2 (D.D.C. Apr. 4, 2025).

[5] Ben Johansen, *DOGE is Shutting Down Foreign Aid Agency Millenium Challenge Corporation*, POLITICO (Apr. 23, 2025), https://www.politico.com/news/2025/04/23/doge-millennium-challenge-foreign-aid-00306333.

[6] Compl., *U.S. Institute of Peace v. Jackson*, No. 25-cv-804 (Mar. 18, 2025) (describing involvement of Cavanaugh).

[7] Aishvarya Kavi, *Musk's Team Evicts Officials at the U.S. Institute of Peace*, NYTIMES (Mar. 17, 2025), https://www.nytimes.com/2025/03/17/us/politics/doge-musk-institute-of-peace.html.

[8] *Pippenger v. U.S. Doge Service*, No. 25-CV-1090 (BAH), 2025 WL 1148345, at *1 (D.D.C. Apr. 17, 2025).

[9] Kriston Capps, *DOGE Places Entire Staff of Federal Homelessness Agency on Leave*, BLOOMBERG (April 16, 2025), https://www.bloomberg.com/news/articles/2025-04-16/doge-places-entire-staff-of-federal-homelessness-agency-on-leave.

[10] *See* Gary Fields, A DOGE Employee is Put In Charge of the US Institute of Peace, a Court Filing Says, AP (March 31, 2025), https://apnews.com/article/doge-institute-peace-trump-musk-executive-order-be36e51ae6a59d08342920bf81f61698; Kriston Capps, *DOGE Places Entire Staff of Federal Homelessness Agency on Leave*, BLOOMBERG (Apr. 16, 2025), https://www.bloomberg.com/news/articles/2025-04-16/doge-places-entire-staff-of-federal-homelessness-agency-on-leave.

[11] Elizabeth Blair, *Cultural Groups Across U.S. Told That Federal Humanities Grants are Terminated*, NPR (Apr. 3, 2025), https://perma.cc/8GLD-CZS7.

64. According to accounts of former or current NEH employees, very shortly after receiving the list of open NEH grants, on April 2, Cavanaugh and Fox emailed nearly 1,500 grantees on the list informing the grantees that their grants were being terminated, including nearly all grants issued during the Biden Administration. According to former or current NEH employees, Cavanaugh and Fox did not process the grant terminations through NEH's grants management system as required by internal agency policies.

65. The emails received by NEH grantees did not come from an NEH server or email address, but from Grant_Notifications@nehemail.onmicrosoft.com, a non-governmental email account.

66. The emails attached a grant termination letter purportedly signed by Acting Director of NEH Michael McDonald. The termination letters were not hand-signed by McDonald or digitally signed with a verifiable digital signature. Instead, the signature on the termination letters was simply typed by someone as "/s/ *Michael McDonald*."

67. In a meeting with staff to answer questions about the terminations, McDonald appeared to acknowledge that he did not determine which grants to terminate nor did he draft the termination letters. First, he stated that he had explained NEH's traditional termination process but that "as *they* said in the notification letter…*they* would not be adhering to traditional notification processes" and "*they* did not feel those should be applied in this instance." Further, in response to a question about the rationale for grant terminations, he replied that the "rationale was simply because that's the way DOGE had operated at other agencies and they applied the same methodology here."[12] McDonald also said that any statement about the number of grants

---

[12] NEH SLT Meeting Recording - 04/03-2025,
https://www.rev.com/app/transcript/NjgxMTE2MjgzOGFiYWRjZGM5NTIxYjk5ZEpYN0hBcVNYY0xJ/o/VEMw
NDc3NTI1NjEz (last visited May 1, 2025).

terminated would be "conjecture" on his part, even though he purportedly signed each termination. He further told NEH he "did have some effect in saving a number of grants that had otherwise been targeted."

68.     On information and belief, the termination letters to all grantees sent on April 2 were nearly identical and lacked any individualized analysis or discussion of each terminated grant.

69.     The termination letters received by Plaintiffs and others contained the following explanation for the terminations:

> Your grant no longer effectuates the agency's needs and priorities and conditions of the Grant Agreement and is subject to termination due to several reasonable causes, as outlined in *2CFR§200.340.* NEH has reasonable cause to terminate your grant in light of the fact that the NEH is repurposing its funding allocations in a new direction in furtherance of the President's agenda. The President's February 19, 2025 executive order mandates that the NEH eliminate all non-statutorily required activities and functions. *See Commencing the Reduction of the Federal Bureaucracy*, E.O. 14217 (Feb. 19, 2025). Your grant's immediate termination is necessary to safeguard the interests of the federal government, including its fiscal priorities. The termination of your grant represents an urgent priority for the administration, and due to exceptional circumstances, adherence to the traditional notification process is not possible. Therefore, the NEH hereby terminates your grant in its entirety effective April 1, 2025.

70.     The termination letter to NEH grantees asserts that Executive Order 14216 "mandates that the NEH eliminate all non-statutorily required activities and functions." But NEH is not one of the agencies named in the Executive Order for eliminating non-statutorily required activities and functions. As described above, Cavanaugh and/or Fox were reportedly deployed to three of the agencies that were listed in Executive Order 1412: the Inter-American Foundation; the United States African Development Foundation; and the United States Institute of Peace. That

raises the question of whether Cavanaugh and/or Fox copied the termination letters used at those agencies for the NEH grant terminations.

71.     The termination notices included no reference to any method for appeal or to seek reconsideration, even though NEH's General Terms and Conditions require that grantees have the right to appeal a termination.

72.     Much less than having the opportunity to weigh-in on termination decisions, according to former or current NEH staff, relevant staff learned of the grant terminations at the same time that grant recipients received notifications. Indeed, according to former or current NEH staff, since the terminations were not done in NEH's grants management system, staff have had a difficult time figuring out which awards have been terminated and what small number has been left open, and NEH staff still are trying to make sense of what occurred.

73.     All of Plaintiffs' open grants were terminated as part of the mass grant termination, as were the vast majority of their members' open grants.[13]

74.     The criteria used for determining which grants to terminate blatantly discriminated on the basis of race, sex, gender, and other criteria.

75.     Initially, Defendants McDonald, Wolfson, and other NEH officials selected grants to terminate based on whether the grants, in their view, related to DEI, "gender ideology," or "environmental justice." That list of grants, as determined by NEH, was less than half the size of the grants that were ultimately terminated.

76.     Defendant Fox, an ultimate decisionmaker for which grants to terminate or keep, began selecting grants for termination by sorting them based on their relation to his conception of DEI. In so doing, Fox did not critically analyze the description or purpose of each grant. Instead,

---

[13] The Association for Computers and the Humanities maintains a database of terminated grants available at https://perma.cc/9FEK-9QML.

he used crude filtering techniques that created classifications on the basis of race, nationality, sex, gender, or other personal characteristics.

77. For instance, Fox searched each grant's description for the use of key words that appeared in a "Detection List" that he created. Those key words included terms such as "LGBTQ," "homosexual," "tribal," "immigrants," "gay," "BIPOC (Black, Indigenous, People of Color)," "native," and so on. Terms like "white," "caucasian," and "heterosexual" did not appear in the Detection List.

78. Fox also organized certain grants into a spreadsheet with lists that he labeled "Craziest Grants" and "Other Bad Grants." Among the grants on those lists were those Fox described as relating to "experiences of LGBTQ military service," "oral histories of LatinX in the mid-west," "social and cultural context of tribal linguistics," and a "book on the 'first gay black science fiction writer in history.'"

79. Fox also used the Artificial Intelligence (AI) tool ChatGTP to search grant descriptions that purportedly related to DEI. To flag grants for their DEI involvement, Fox entered the following command into ChatGPT: "Does the following relate at all to DEI? Respond factually in less than 120 characters. Begin with 'Yes.' or 'No.' followed by a brief explanation. Do not use 'this initiative' or 'this description' in your response." He then inserted short descriptions of each grant. Fox did not instruct ChatGPT to avoid classifying grants on the basis of race, ethnicity, national origin, gender, sexuality, and other characteristics. And Fox did nothing to understand ChatGPT's interpretation of "DEI" as used in the command or to ensure that ChatGPT's interpretation of "DEI" matched his own.

80. The AI searches classified grants for termination—for purportedly relating to "DEI"—based precisely on characteristics such as race, ethnicity, national origin, gender, and

sexuality. For example, the AI searches flagged a grant described as concerning "the Colfax massacre, the single greatest incidence of anti-Black violence during Reconstruction" as one that should be terminated. It identified another grant concerning "the untold story of Jewish women's slave labor during the Holocaust," another that funded a film examining how the game of baseball was "instrumental in healing wounds caused by World War I and the 1980s economic standoff between the US and Japan," another charting "the rise and reforms of the Native American boarding school systems in the U.S. between 1819 and 1934," and another about "the Women Airforce Service Pilots (WASP), the first female pilots to fly for the U.S. military during WWII" and the "Black female pilots who …were denied entry into the WASP because of their race."

81.    For grants that Fox identified in this way to be slated for termination, Fox and Cavanaugh generally did not permit staff at NEH, including the Acting Chair, to remove them from the termination list.

82.    Cavanaugh worked closely with Fox in selecting which grants to terminate using this selection criteria.

83.    Fox and Cavanaugh sorted grants in lists labeled "to cancel" or "to keep."

84.    Of the grants that Fox and Cavanaugh identified as purportedly involving DEI, or that Fox and Cavanaugh otherwise picked for terminations, McDonald was only allowed to recommend moving to the "to keep" list grants relating to the revolutionary period or the Garden of Heroes. McDonald could not recommending keeping grants relating to minority, female, or homosexual people or topics.

85.    On April 3, 2025, 145 NEH staff members—making up 80% of the staff—were reportedly placed on administrative leave.[14]

---

[14] Elizabeth Blair, *National Endowment for the Humanities Staff Put on Immediate Leave*, NPR (Apr. 3, 2025), https://perma.cc/7S9C-5P49.

86.     According to accounts of former or current NEH employees, this included 100% of the staff of the Office of Publications, the Office of Native and Indigenous Affairs Division, and the Office of Data and Evaluation. On information and belief, it included more than 75% of the staff of the Office of Digital Humanities Division, the Office of Communications, and the Division of Education Programs.

87.     According to accounts of former or current NEH employees, Cavanaugh and Fox pressured NEH employees to execute a reduction in force ("RIF") as quickly as possible.

88.     On April 9, 2025, NEH staff received a notice alerting them to an upcoming "multi-step approach to restructuring" that promised to include a RIF. The notice stated: "This restructuring will consolidate administrative and programmatic offices to enhance efficiency and streamline functions. As a result, the agency will be forced to reduce the total number of positions."

89.     The very next day, many NEH staff received RIF notifications that they would be terminated as of June 10, 2025. On information and belief, approximately 70-80% of NEH staff received a RIF notification.

90.     According to accounts of former or current NEH employees, as a result of the termination of staff and grants, NEH has effectively eliminated or nearly eliminated entire divisions and programs, including but not limited to the Office of Digital Humanities, the Office of Federal/State Partnerships, the Office of Data and Evaluation, the Office of Native and Indigenous Affairs, the Office of Outreach, and the Office of Partnerships and Strategic Initiatives.

91.     A number of NEH offices have announced that they are cancelling programs for which NEH had previously announced funding opportunities, including programs of the Office of Digital Humanities, the Division of Research Programs, the Division of Education Programs, the

Office of Data and Evaluation, the Division of Preservation and Access, the Division of Public Programs, the Office of Challenge Programs.

92.     NEH's website currently lists each of the following grant programs as having been ended:

- From the Division of Public Programs
  - Digital Projects for the Public
- From the Division of Research Programs
  - Awards for Faculty at Tribal Colleges and Universities
  - Awards for Faculty at Hispanic-Serving Institutions
  - Fellowship Programs at Independent Research Institutions
  - Dynamic Language Infrastructure–Documenting Endangered Languages Fellowships
  - Summer Stipends
  - Archaeological and Ethnographic Field Research
- From the Office of Data and Evaluation:
  - State and Impact of the Humanities
- From the Division of Education Programs:
  - Humanities Initiatives at Hispanic-Serving Institutions
  - Humanities Initiatives at Tribal Colleges and Universities
  - Humanities Connections
  - Spotlight on Humanities in Higher Education
- From the Division of Preservation and Access:
  - Cultural and Community Resilience

- ○ Research and Development

- From the Office of Digital Humanities:

  - ○ Digital Humanities Advancement Grants

  - ○ Fellowships Open Book Program

  - ○ Dangers and Opportunities of Technology: Perspectives from the Humanities

  - ○ Institutes for Advanced Topics in the Digital Humanities

93.     As a result of Defendants' actions, NEH is no longer able to effectuate its statutorily-required duties. It has terminated nearly all of its current grants and most of its future programs, despite having nearly $400 million in funding for programs over the last two years, including $192,000,000 it received for grant programs in March 2025.

94.     NEH has terminated the staff necessary to undertake the vigorous peer review process necessary to effectively award new grants.

95.     NEH has eliminated most of the staff required to oversee any grants it does award.

***NEH Seeks to Use Grant Funds to Build a "Garden of American Heroes"***

96.     Just days after terminating tens of millions of dollars in previously approved grants, NEH issued a Notice of Funding Opportunity to award up to $17 million in grants to build a "National Garden of American Heroes." The notice was unprecedented in several respects, some of which render the notice unlawful as well.

97.     First, the notice sought to use NEH funds—which Congress has appropriated to support "activities in the humanities"—to fund what is plainly the creation of "arts" within the meaning of 20 U.S.C. § 952(b). The notice states that recipients of grant funds will "create life-sized statues in marble, granite, bronze, copper, or brass depicting historical figures tied to the

accomplishments of the United States."[15] But the National Endowment for the Arts—not NEH—is statutorily charged with awarding grants for "the arts," which is defined to include "sculpture" and "the arts related to the presentation, performance, execution, and exhibition of such major art forms." *See* 20 U.S.C. §§ 952(b), 954. Congress charged NEH solely with promoting and fostering the "humanities," which Congress defined to be separate from "the arts." *See id.* §§ 952(c), 956. Indeed, NEA is also providing $17 million for the Garden, even though by statute NEH and NEA must fund different activities for different purposes.

98.　　Indeed, past NEH notices of funding opportunities made clear that, consistent with statutory requirements, no NEH funds could be used for projects "outside of the humanities," including the "creation . . . of art."[16] But this requirement is conspicuously absent from the notice of funding opportunity for the Garden. NEH has provided no explanation for its changes in policies, let alone its deviation from its statutory functions.

99.　　Second, nothing in the notice suggests that proposals for the Garden will undergo the rigorous, lengthy peer-review process that is typically required before NEH grants are awarded. As explained above, that process usually entails a multi-step review by experts in the relevant humanities discipline to ensure the intellectual quality of the project and its significance to the humanities. By contrast, the notice for the Garden provides that reviewers' primary focus will be on considerations that have nothing to do with the humanities, such as the "durab[ility]" of the sculpture and whether it "adhere[s] to building codes." NEH has provided no explanation for its change in processes and criteria for awarding funds.

---

[15] *See* Notice of Funding Opportunity, https://perma.cc/J5TF-YMP2.

[16] *See, e.g.*, Notice of Funding Opportunity: Fellowships, https://perma.cc/T8RB-DAYY; Notice of Funding Opportunity: Awards for Faculty, https://perma.cc/KWS9-6H9B.

100.     Third, the proposed amount that NEH intends to dedicate to the Garden—$17 million total, consisting of $200,000 per statue—is unprecedented, and contrary to Congress's intent that NEH issue grants to a wide array of deserving projects, including from scholars and cultural institutions that have traditionally been underrepresented. *See* 20 U.S.C. § 956(c). As explained above, most of NEH's grants are for less than $500,000, and only in rare circumstances were grants awarded that exceed that amount. To Plaintiffs' knowledge, no grant program has ever approached anywhere near the $34 million Garden proposal (consisting of $17 million from NEH and $17 million from NEA).

101.     Even if NEH were to go forward with providing grants for the Garden, it still would not come close to spending anywhere close to the over $400 million in funds that Congress appropriated to NEH in the most recent appropriations statutes, given the mass termination of nearly all of NEH's active grants and NEH staff.

***Plaintiffs, Their Members, and the Community at Large are Injured by NEH's Decisions***

102.     Plaintiffs, their members, and the broader public have long relied on NEH grants to fund deserving projects in the humanities. The Trump Administration's wholesale dismantling of the agency, termination of nearly all previously approved grants, and cancellation of numerous programs moving forward has caused and continues to cause Plaintiffs and their members serious, irreparable harm.

103.     Before the recent mass terminations, Plaintiff ACLS had two active NEH awards. The first was an award, funded by the Office of Challenge Programs in February 2025, for up to $500,000 in Federal matching funds to support a three-year cooperative agreement between ACLS and NEH. These funds were awarded to support a national convening to evaluate the current state of humanities graduate education, make recommendations for graduate programs to prepare students for humanities-related careers, and articulate a strategic vision for graduate education in

the humanities. The award included $270,000 in subawards to Plaintiff the American Historical Association, Plaintiff the Modern Language Association, and the Society of Biblical Literature (each receiving $90,000).

104. ACLS's second award consisted of a $207,000 grant, and up to $105,000 in Federal matching funds, issued by NEH's Division of Research Programs in June 2023. The award was to support three China Studies research fellowships from 2024 to 2027. The notice for this grant stated that the review process for this grant was "extremely competitive," and that the decision to award these grant funds was made on the basis of NEH's "long-standing peer review process," including by a panel of scholars and experts in the humanities and the Council on the Humanities. Because this award was terminated in April 2025, ACLS will no longer be able to fund these fellowships.

105. ACLS was also planning on applying for upcoming grant opportunities that have been abruptly cancelled. For example, ACLS was planning to apply to Fellowship Programs at Independent Research Institutions to support its program in China studies, but those programs have been discontinued. ACLS had also engaged with other organizations about applying for a grant from the Office of Data and Evaluation for a joint venture to conduct a data analysis regarding enrollment in humanities programs as well as faculty and graduate school numbers, but that Office has been shut down. ACLS had also planned to apply for grants from the Office of Digital Humanities before it was closed.

106. ACLS's members include organizations such as the American Academy of Arts and Sciences, the American Philosophical Society, and the American Musicological Society. Many of ACLS's members have also had their own NEH grants terminated. For example, the American Musicological Society recently received a $204,000 award to support "Music of the

United States," a longstanding project featuring American music of exceptional artistic quality and historical significance. This project had been supported by successive NEH grants since 1993, until its most recent grant was terminated.

107. Another member of ACLS and MLA, the University of Oregon, had multiple grants terminated. For example, the University received a $350,000 grant in September 2024 to develop the London Stage Database, an online resource that documents the history of British theater. The grant was approved to support the project for three years (through September 2027), until it was terminated in April 2025. The University also received a $149,827 grant in April 2023 to conduct research documenting the legacy of Indigenous foods and cultural practices in the Oregon Cascades. The grant was approved to support the project for two years, until it was recently terminated.

108. Another ACLS member, the University of Minnesota, had four direct grants from NEH terminated, including a $99,782 grant to digitize and display flap books, such as anatomy textbooks, so that their interactive nature is preserved for users.

109. Plaintiff AHA had two active NEH awards as of April 1, 2025. The first was an award of $194,261, issued by the Division of Education Programs in March 2025, to fund a three-week program for higher-education faculty on the history of U.S. environmental policy. The second was an award of $191,619, issued by the Division of Education Programs in September 2024, to fund a three-week virtual institute for 30 secondary school teachers on Africa in world history. Both of these grants were terminated in April 2025.

110. AHA had also applied and was planning on applying for upcoming grant opportunities that have been abruptly cancelled. For instance, AHA had recently submitted an application for an up to $250,000 grant from the Institute for Advanced Topics in the Digital

Humanities program when NEH cancelled the notice of funding opportunity as part of its broader elimination of the Office of Digital Humanities. AHA was also planning to apply for an up to $150,000 grant from the Office of Data and Evaluation's State and Impact of the Humanities program until that program was canceled.

111.     AHA's members have also had their own grants terminated. For example, Natalia Mehlman Petrzela is an AHA member who was awarded a $60,000 grant to research and write a book on the history of conflicts over public education and public-school policies in America. Receiving an NEH grant was an important milestone in her career that signified the importance of her work, helping her to achieve other funding and opportunities. Because the award's period of performance was set to begin on September 1, 2025, Dr. Petrzela will not receive any of the NEH funds that she had previously been awarded.

112.     Another AHA member, Laura Morreale, is an independent scholar who was a project director for two NEH grants that were terminated. One of those grants was for $100,000 to support preparation for digital publication of a critical edition and translation from Italian to English of *La Sfera* (The World), written by Gregorio Dati. As an independent scholar, receiving NEH grants is particularly important to Ms. Morreale. Without NEH funds to support the *La Sfera* Project, the project will not be able to be completed.

113.     A third AHA member, Dr. Karen Cook-Bell, received a $60,000 NEH grant to write a book on Black women's anti-slavery activities in South Carolina and how they informed the Denmark Vesey insurrection. As with AHA's other members whose grants were terminated, the NEH grant was an important signifier to her colleagues and others in her field that her work had been approved after undergoing NEH's rigorous peer-review process. Without NEH funding, Dr. Cook-Bell will not be able to devote the full time and resources she had intended to devote to

researching and writing the book for which NEH had awarded her a grant. Dr. Cook-Bell also applied in 2024 for a $300,000 NEH Research Collaborative Grant to produce a five-volume book series on Black Women in U.S. History, but NEH recently notified her that such grants will not be awarded in 2025.

114.    Plaintiff MLA had two active NEH awards as of April 1, 2025. The first was a $58,201 "Spotlight in the Humanities" grant, issued by NEH's Division of Education Programs in June 2023, to support a two-year development workshop series for college faculty to reimagine humanities coursework for career readiness. The second was a grant of $30,000, issued by the Office of Data and Evaluation in February 2025, to support a two-day convening of humanities stakeholders to assess the current field of data projects and practices related to the humanities in higher education.

115.    MLA was also planning on applying for upcoming grant opportunities that have been abruptly cancelled. For example, MLA was planning to apply for a $150,000 State and Impact of the Humanities program grant. NEH's Office of Digital Humanities reviewed MLA's pre-proposal for the grant and encouraged MLA to apply, but now MLA cannot apply for this opportunity because the program has been canceled.

116.    MLA's loss of these opportunities has prevented MLA from accomplishing its larger mission. MLA's Spotlight grant enabled it to help faculty members prepare their students for careers, and the State and Impact Grant would have enabled MLA to gather data that would have allowed it to develop a better understanding of the work and impact of the humanities across the nation.

117.    MLA's members have also been severely affected by the shuttering of entire NEH divisions and grant programs, especially programs in the Division of Education, Office of Digital

Humanities, and Office of Data and Evaluation. Many MLA members were preparing to apply for Humanities Connections programs as well as programs aimed at Hispanic-Serving Institutions. In addition, the Division of Research Programs sustains the research of many MLA members, who rely on NEH summer stipends and fellowships to conduct their research.

118.    MLA's members have also had their own grants terminated. For example, one of MLA's members, Kathleen Fitzpatrick, received a three-to-one matching grant from NEH to support capacity building for Knowledge Commons, an open platform to share and access research across disciplines. Despite raising enough money to obligate its full NEH award, the grant was terminated, and Knowledge Commons will soon have to terminate staff.

119.    Another MLA member, Professor Theodore B. Fernald, was the project director on a $442,752 grant to create accessible online language tools for understanding and teaching Navajo grammar. Although the grant was supposed to support the development of the project over the course of three summers at the Navajo Language Academy field school, NEH terminated the award midway through the project's second year, depriving the project of hundreds of thousands of dollars in NEH-approved funds on which it was relying.

120.    Another MLA member, Kathi Inman Behrens, was the principal investigator on a $149,951 NEH grant in 2023 to support a three-year project to develop a new humanities-focused minor in creative industries at Portland State University. As with many of the other grants described above, the directors of the project spent years developing it, applying for the grant, and then implementing the project using the awarded funds. Now that NEH has terminated the grant in year two of the three-year period of performance, the directors will not be able to complete the project, wasting years of effort and taxpayer funds.

121.     Another MLA member, Professor Rachel Sagner Buurma, received a $60,000 NEH grant to research and write a book on the history of free indirect discourse as it appears in literature, literary criticism, and commercial reviews of books from the early 19th to 21st centuries. The termination of her grant has caused significant disruption to her project, and she will no longer be able to devote her full time and attention to researching and writing the book as planned.

122.     If NEH restored the grant programs for which awards were recently terminated or the programs for which NEH was going to issue new awards but has now cancelled them, Plaintiffs and their members would apply and be very competitive for those awards.

123.     The recent actions at NEH harm Plaintiffs and their members in other ways beyond the loss of grants and future grant opportunities. Without a functioning NEH, there is no central body to fund the work that consortia, campuses, and individuals do to conduct research in the humanities, to improve teaching in the humanities, and to make humanities programming accessible to the public. NEH has played a role in countless advances in the humanities since it was founded, including thousands of books and articles made possible by research grants.

124.     Regular NEH-hosted convenings with project directors of similar grant programs have provided professional development and networking opportunities for Plaintiffs and their members, including AHA staff. Participants in these monthly meetings have built professional relationships with leaders in peer organizations in a variety of disciplines and shared resources and professional strategies that have improved and inspired one another's work.

125.     NEH staff have previously served on panels at meetings hosted by Plaintiffs or their members. For instance, NEH staff regularly appeared at AHA annual meeting sessions on funding for historians. These AHA sessions were well attended and extremely helpful to AHA's members. The mass firing of NEH staff will make it more difficult for AHA's members to learn about

funding opportunities and receive guidance on how to apply for Federal funding (not just for funding from the NEH).

126. NEH staff also regularly appear at MLA annual meeting sessions in humanities funding. The mass firing of NEH staff will make it more difficult for MLA's members to learn about funding opportunities and receive guidance on how to apply for Federal funding.

127. NEH staff have also regularly attended meetings co-hosted by ACLS. NEH have brought to these meetings a distinctive national perspective on the various sectors of humanistic activity on and off American campuses, including colleges, universities, public libraries, local history museums, and more. As no other foundation or organization does, NEH staff have knowledge of the many types of institutions of higher education in the United States where work in the humanities takes place: e.g. community colleges, regional comprehensive universities, liberal arts colleges, and research universities.

128. NEH seminars, institutes, and workshops for educators have been central to making new research available for curriculum development. These seminars are the only national structure designed to translate humanities research into humanities teaching in the classroom. Without NEH staff, there will be a massive void in the nation in facilitating the teaching of humanities. This void is the exact outcome Congress sought to address in establishing the NEH.

129. NEH has further served as a primary means by which researchers, scholars, and teachers, including Plaintiffs and their members, receive credentialing recognition for purposes of advancement, promotion, and tenure.

130. The loss of entire grant programs at NEH affects recognition, ranking, and competitiveness of scholars and institutions within the higher education marketplace, including for Plaintiffs and their members.

131. The elimination or near-elimination of entire NEH divisions significantly harms Plaintiffs and their members. For instance, the Office of Digital Humanities has been an important partner to the AHA and MLA. AHA and MLA will be materially harmed by losing the Office's expertise and the opportunities it offered for convening interdisciplinary conversations and workshops in the digital humanities.

132. The Office of Digital Humanities has likewise proven invaluable to ACLS. ACLS has benefited from regular contact with experts in the Office, who help keep ACLS up to date on new methods and content for research, such as newly digitized museum collections and archives. ACLS's meetings with the Office also led to ACLS obtaining a Chair's grant from NEH for the creation of a national commission of scholars, archivists, administrators, and funders to make a set of recommendations concerning how best to support and sustain digital scholarship. The Chair's grant was later supplemented by the Mellon Foundation with an expanded charge as the Commission for Fostering and Sustaining Diverse Digital Scholarship.

133. Similarly, the Office of Digital Humanities's Institutes for Advanced Topics in the Digital Humanities have provided training and professional development for MLA members, allowing them to bridge humanities and technical expertise that improved scholarship and training for undergraduate and graduate students. One MLA member's Institute brought humanities training to over 500 participants across at least 35 institutions across the country. Funding from the Office also supported key infrastructure for the prototype of Knowledge Commons, which until recent termination of the NEH contract, had become the official NEH repository of open access research, making the humanities broadly available to all.

134. NEH has more broadly supported key digital infrastructure projects that have benefited the public in various ways. NEH has been an influential source of funding for the

software and tools that support and facilitate high-quality research and public access work. NEH's funding investments have been central to the formation and implementation of descriptive practices that make research materials findable and useable, such as the World Historical Gazetteer, which is an index of historical place names, or PeriodO, which is a gazetteer of historical, art-historical, and archaeological time periods. These indexes are the building blocks of shared understanding. Similarly, NEH's support has been vital to the development and maintenance of tools to support transcription and translation of archival and audio-visual materials, such as the Oral History Metadata Synchronizer and High Performance Sound Technologies for Access and Scholarship, which make a wider range of cultural objects accessible and open to analysis. Additionally, a range of new developments in machine learning and computational analysis of a range of materials, both textual and audio visual, would not have been possible without initial funding from the NEH. All of these elements of the digital infrastructure are freely available both to scholars and the public so that they can be leveraged to forge new understandings of literature, history, art, and culture. NEH's investment in the development and sustainability of these tools and methods has created a digital infrastructure that serves as a springboard for new research and knowledge creation in the humanities and beyond.

135.    NEH staff in the Division of Research Programs and the Division of Education Research have played a key role in ensuring that a diverse range of institutions have access to funding, not only from the NEH but also from ACLS and its member societies and philanthropic foundations. The NEH's detailed knowledge of humanistic activity across all U.S. states and territories guides the development of ACLS's grant opportunities and the design of its competitions and evaluation criteria.

***Plaintiffs' Categories of Claims***

136.     Plaintiffs assert two categories of claim in this action.

137.     First, Plaintiffs challenge the institutional actions taken at NEH, including by DOGE, to eliminate or nearly eliminate entire divisions, to shut down entire programs, to mass fire staff, to fund the Garden of Heroes, and to delay spending or outright refuse to spend the funds that Congress appropriated to NEH (the "Institutional Claims"). Plaintiffs' Institutional Claims do not challenge the termination of any individual grant or seek to restore or compel payments under any individual grant. Plaintiffs assert their Institutional Claims under the Administrative Procedure Act ("APA") and through nonstatutory claims based on Defendants' unconstitutional and *ultra vires* actions.

138.     Second, Plaintiffs assert claims challenging the termination of grants, including the grants of Plaintiffs and their members (the "Grant Termination Claims"). Plaintiffs assert their Grant Termination claims only through nonstatutory claims based on Defendants' unconstitutional and *ultra vires* actions.

## CLAIMS FOR RELIEF

### COUNT ONE

**Institutional Claims: Violation of the Separation of Powers**
**APA Cause of Action**
**(Against All Defendants)**

139.     Plaintiffs hereby incorporate by reference the foregoing paragraphs of the Complaint as if set forth herein.

140.     The APA provides that a reviewing court shall hold unlawful and set aside agency action "not in accordance with law," "contrary to constitutional right, power, privilege, or immunity," or "in excess of statutory . . . authority." 5 U.S.C. §§ 706(2)(A)-(C).

141.     Defendants have made a final decision and taken final agency action to eliminate

or nearly eliminate entire divisions, to shut down entire programs, to mass fire staff, and to delay spending or outright refuse to spend the funds appropriated to NEH by Congress. These actions individually and collectively are part of an effort to effectively dismantle the agency.

142.    Defendants' final agency actions violate the constitutional separation of powers.

143.    The Constitution empowers Congress to make laws, U.S. Const. art. I, § 1, and requires the President to faithfully execute those laws, *id.* art. II, § 3. Congress's powers to set the policies of the nation are at their apex when it comes to spending money, as the Constitution "exclusively grants the power of the purse to Congress, not the President." *City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1238 (9th Cir. 2018)).

144.    The Executive Branch has no constitutional authority to refuse to carry out laws enacted by Congress, and it has no constitutional authority to block, amend, subvert, or delay spending appropriations based on the President's own policy preferences.

145.    Defendants' decisions to dismantle NEH, including to eliminate or nearly eliminate entire divisions, to shut down entire programs, and to mass fire staff, violates the separation of powers by precluding NEH from carrying out its statutory functions and purposes under 20 U.S.C. §§ 951 and 956.

146.    Defendants' decisions to delay spending and outright refusal to spend the amounts Congress appropriated violates Congress's power of the purse and the separation of powers.

147.    Accordingly, Defendants' actions are contrary to the Constitution, and must be vacated and set aside. 5 U.S.C. §§ 706(2)(A), (B).

## COUNT TWO

**Institutional and Grant Termination Claims: Violation of the Separation of Powers–
Implied Right of Action, Nonstatutory Review, and *Ultra Vires* Actions
(Against Defendants McDonald, Gleason, Cavanaugh, and Fox)**

148.    Plaintiffs hereby incorporate by reference the foregoing paragraphs of the Complaint as if set forth herein.

149.    Federal district courts have jurisdiction to enjoin Federal officials from violating the Constitution, including the separation of powers. *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 491 n.2 (2010).

150.    The Constitution empowers Congress to make laws, U.S. Const. art. I, § 1, and requires the President to faithfully execute those laws, *id.* art. II, § 3. Congress's powers to set the policies of the nation are at their apex when it comes to spending money, as the Constitution "exclusively grants the power of the purse to Congress, not the President." *City & Cnty. of San Francisco*, 897 F.3d at 1238.

151.    The Executive Branch has no constitutional authority to refuse to carry out laws enacted by Congress, and it has no constitutional authority to block, amend, subvert, or delay spending appropriations based on the President's own policy preferences.

152.    Defendants' decisions to dismantle NEH, including to eliminate or nearly eliminate entire divisions, to shut down entire programs, and to mass fire staff, violates the separation of powers by precluding NEH from carrying out its statutory functions and purposes under 20 U.S.C. §§ 951 and 956.

153.    Defendants' decisions to delay spending and outright refuse to spend the amounts Congress appropriated violates Congress's power of the purse and the separation of power

154.    Defendants' termination of grants, including the grants of Plaintiffs and their members, violates the separation of powers, because the mass and individual terminations of grants

are a primary means by which NEH is not carrying out its statutory functions and purposes, and by which Defendants are unlawfully deferring spending and outright refusing to spend appropriated funds.

155.    Because Defendants' actions violate the separation of powers and are *ultra vires*, they should be enjoined and declared unconstitutional.

## COUNT THREE

**Institutional Claims: Impoundment Control Act and Appropriations Acts Violations**
**APA Cause of Action**
**(Against All Defendants)**

156.    Plaintiffs hereby incorporate by reference the foregoing paragraphs of the Complaint as if set forth herein.

157.    By delaying spending or outright refusing to spend money that Congress appropriated, eliminating or nearly eliminating entire divisions, shutting down entire programs, and mass firing staff, Defendants are violating the Impoundment Control Act of 1974 (ICA). Under the ICA, a "deferral" includes any "withholding or delaying the obligation or expenditure of" appropriated funds, as well as "any other type of Executive action or inaction which effectively precludes the obligation or expenditure of" appropriated funds. 2 U.S.C. § 682(1). When the Executive Branch wishes to defer funds, it must send a special message to Congress detailing the money to be deferred and the reasons for deferral. There are only three permissible grounds for deferrals, none of which includes effort to ensure funds are spent consistent with the President's policy priorities. *Id.* § 684(b).

158.    Defendants' actions constitute a "deferral" because they reflect a "withholding or delaying [of] the obligation or expenditure of" funds that Congress appropriated for NEH. 2 U.S.C. § 682(1). Defendants did not notify Congress of the deferrals as the ICA requires, nor did Defendants undertake the deferrals for reasons permitted by the ICA.

159.     Defendants' actions also constitute an unlawful "rescission" of the funds appropriated for NEH. Where the President seeks to "rescind" appropriated funds, the ICA requires, among other things, that the President send a special message to Congress specifying the funds he seeks to have rescinded and the reasons for his proposal. 2 U.S.C. § 683(a). The President did not do so.

160.     Defendants are also violating the Further Consolidated Appropriations Act of 2024 and the March 2025 Continuing Resolution. Congress provided in the 2024 Appropriations that, of the $207 million lump-sum appropriated to NEH, "$192,000,000 shall be available for support of activities in the humanities, pursuant to section 7(c) of the" National Foundation on the Arts and the Humanities Act of 1965, 20 U.S.C. § 956(c). Congress further provided that "$15,000,0000 shall be available to carry out the matching grants program pursuant to" 20 U.S.C. § 959(a)(2), including "$13,000,000 for the purposes of" 20 U.S.C. § 956(h).

161.     Congress has carried forward these appropriations in continuing resolutions. Most recently, on March 15, 2025, Congress enacted a continuing resolution that re-appropriated all of the funds appropriated to NEH under the 2024 Act, with the same breakdown on how the money must be spent. Pub. L. 119-4, §§ 1101-08, 139 Stat. 9, 10-12 (Mar. 15, 2025).

162.     As a result of their actions, Defendants will not spend the hundreds of millions of dollars that Congress appropriated for NEH, including the hundreds of millions that Congress mandated NEH spend to support the humanities by issuing grants under 20 U.S.C. § 956(c).

163.     Accordingly, Defendants' actions are "not in accordance with law" and "in excess of statutory authority," in violation of the APA. 5 U.S.C. §§ 706(2)(A), (C).

## COUNT FOUR

**Institutional and Grant Termination Claims: Impoundment Control Act and Appropriations Acts Violations–Nonstatutory Review and *Ultra Vires* Actions (Against Defendants McDonald Gleason, Cavanaugh, and Fox)**

164.     Plaintiffs hereby incorporate by reference the foregoing paragraphs of the Complaint as if set forth herein.

165.     Plaintiffs may bring a nonstatutory claim to enjoin Defendants McDonald and Gleason, Cavanaugh, and Fox from acting *ultra vires* in violation of statutory commands.

166.     Defendants' delay in spending or outright refusal to spend money that Congress appropriated, elimination or near elimination of entire divisions, shutting down of entire programs, and mass firing of staff are without statutory authority and violate the Impoundment Control Act, the 2024 Appropriations Act, and subsequent Continuing Resolutions.

167.     Defendants' termination of grants, including the grants to Plaintiffs and their members, is without statutory authority and violates the Impoundment Control Act, the 2024 Act, and 2025 Continuing Resolutions, because the individual grant terminations were a primary means by which Defendants carried out their deferral of appropriated funds and outright refusals to spend appropriated funds.

168.     Because Defendants' actions violate statutory commands and are *ultra vires*, they should be enjoined and declared unlawful.

## COUNT FIVE

**Institutional Claims: Arbitrary and Capricious Agency Actions APA Cause of Action (Against All Defendants)**

169.     Plaintiffs hereby incorporate by reference the foregoing paragraphs of the Complaint as if set forth herein.

170.     A reviewing court must "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

171.     Defendants' decisions to eliminate or nearly eliminate entire divisions, to shut down entire programs, to mass fire staff, and to delay spending or outright refuse to spend the funds appropriated to NEH by Congress, are each final agency actions reviewable under 5 U.S.C. §§ 702 and 706.

172.     Defendants' actions are arbitrary and capricious. Defendants have provided little to no explanation, let alone reasoned explanations, for these decisions. They have failed to adequately justify their actions; have not considered or addressed key aspects of the problem, reasonable alternatives, and the substantial reliance interests at stake; have relied on factors that Congress did not authorize them to consider; and have not acknowledged or justified their change from prior agency positions.

173.     Defendants' abandonment of NEH's rigorous, staff-advisory process for issuing grants, including for the Garden of Heroes and other future awards, is also arbitrary and capricious because the agency has not adequately justified this action, has not considered or addressed key aspects of the problem, reasonable alternatives, and the substantial reliance interests at stake; has relied on factors that Congress did not authorize them to consider; and has not acknowledged or justified its change from prior agency practice and positions.

174.     Accordingly, Defendants' actions are "arbitrary" or "capricious," in violation of the APA. 5 U.S.C. § 706(2)(A).

## COUNT SIX

**Institutional Claims: Statutory Violations and Arbitrary and Capricious Agency Action in
Funding the "Garden of American Heroes"
APA Cause of Action
(Against All Defendants)**

175.     Plaintiffs hereby incorporate by reference the foregoing paragraphs of the
Complaint as if set forth herein.

176.     A reviewing court must "hold unlawful and set aside agency action" that is
"arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or "in
excess of statutory . . . authority." 5 U.S.C. §§ 706(2)(A), (C).

177.     Defendants' decision to use funds that Congress appropriated to NEH to support
activities in the humanities for the creation of statues in the proposed "Garden of American
Heroes" is a final agency action reviewable under 5 U.S.C. §§ 702 and 706.

178.     Defendants' decision to use NEH funds to create statues in the proposed "Garden
of American Heroes" is arbitrary and capricious and not in accordance with law.

179.     Defendants' decision to use NEH funds to create statues is contrary to law because
the National Foundation on the Arts and Humanities Act limited NEH's activities to promoting
the "humanities" and prohibits NEH from using appropriation to fund "the arts," including the
creation of statues. 20 U.S.C. §§ 951,952, 954, 956.

180.     Defendants' decision to use NEH funds to create statues is arbitrary and capricious
because Defendants have failed to adequately justify their actions; have failed to consider key
aspects of the problem, reasonable alternatives, and the substantial reliance interests at stake; have
relied on factors Congress did not authorize them to consider; and have failed to acknowledge or
justify their change of position from prior agency policy. In particular, Defendants have not

acknowledged or addressed NEH's change from longstanding agency policy not to spend grant funds on works of art.

181.     Accordingly, Defendants' actions are not in accordance with law, beyond statutory authority, and arbitrary and capricious, in violation of the APA. 5 U.S.C. §§ 706(2)(A), (C).

## COUNT SEVEN

### Institutional Claim: Violation of the First Amendment–APA Cause of Action
### (Against All Defendants)

182.     Plaintiffs hereby incorporate by reference the foregoing paragraphs as if set forth herein.

183.     The APA provides that a reviewing court shall hold unlawful and set aside agency action "not in accordance with law," or "contrary to constitutional right, power, privilege." 5 U.S.C. §§ 706(2)(A), (B).

184.     The First Amendment provides that the Federal government "shall make no law . . . abridging the freedom of speech." U.S. Const. amend. I.

185.     The First Amendment prohibits the government from "regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U.S. 819, 833 (1995). "Discrimination against speech because of its message is presumed to be unconstitutional." *Id.* at 828.

186.     "[E]ven in the provision of subsidies, the Government may not 'ai[m] at the suppression of dangerous ideas.'" *Finley*, 524 U.S. at 587 (quoting *Regan*, 461 U.S. at 55) (alteration in original). In the grant-making context, the government may not reject "a whole class of projects" based on "viewpoint alone," or use Federal funding to "impose a disproportionate burden calculated to drive certain ideas or viewpoints from the marketplace."

*Rhode Island Latino Arts v. Nat'l Endowment for the Arts*, No. CV 25-79 WES, 2025 WL
1009026, at *12 (D.R.I. Apr. 3, 2025) (quoting *Finley*, 524 U.S. at 587).

187.     Defendants' termination of nearly all NEH grants awarded during the prior
Administration, and leaving in place existing and future grants that align with particular political
and ideological viewpoints, is "the product of invidious viewpoint discrimination." *Finley*, 524
U.S. at 587. Defendants terminated the grants based on viewpoint, in an effort to drive such
views out of the marketplace of ideas. The First Amendment does not tolerate such viewpoint
discrimination.

188.     Accordingly, Defendants' actions are not in accordance with law, contrary to
constitutional right or power, and arbitrary and capricious, in violation of the APA. 5 U.S.C. §§
706(2)(A), (B).

## COUNT EIGHT

### Institutional and Grant Termination Claims: Violation of the First Amendment
### Implied Right of Action, Nonstatutory Review, and *Ultra Vires* Actions
### (Against Defendants McDonald, Gleason, Cavanaugh, and Fox)

189.     Plaintiffs hereby incorporate by reference the foregoing paragraphs as if set forth
herein.

190.     Federal district courts have jurisdiction to enjoin Federal officials from violating
the Constitution. *See Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327-28 (2015);
*Trump v. Hawaii*, 585 U.S. 667, 675 (2018) (considering First Amendment challenge to
presidential proclamation).

191.     As alleged in Count Seven, Defendants' termination of grants on the basis of
viewpoint violates the First Amendment. Because Defendants' actions violate the First
Amendment, those actions lack lawful authority. The Court should therefore declare them
unconstitutional and *ultra vires*.

192.    If Defendants' actions are not declared unlawful, set aside, and enjoined as unconstitutional and *ultra vires*, Plaintiffs will suffer substantial injury, including irreparable injury.

## COUNT NINE

**Institutional and Grant Termination Claims: DOGE Actions Without Authority**
**Implied Right of Action, Nonstatutory Review, and *Ultra Vires* Actions**
**(Against Defendants McDonald, Gleason, Cavanaugh, and Fox)**

193.    Plaintiffs hereby incorporate by reference the foregoing paragraphs of the Complaint as if set forth herein.

194.    Under the Constitution, Congress has the authority to set the powers and duties of Federal agencies. U.S. const. art. I, § 8, cl. 18.

195.    Federal agencies "possess only the authority that Congress has provided." *Nat'l Fed. of Indep. Bus. v. OSHA*, 595 U.S. 109, 117 (2022). "[A]n agency literally has no power to act . . . unless and until Congress confers power upon it." *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986).

196.    Congress did not create DOGE and has not vested DOGE with any powers. Rather, DOGE was created by the President via Executive Order.

197.    Congress has not authorized DOGE to conduct the business of another congressionally authorized agency such as NEH.

198.    According to former or current NEH staff, and a recording of McDonald's statements to NEH staff on April 3, 2025, Defendants Cavanaugh and Fox of DOGE directly carried out the termination of NEH grants, including the grants of Plaintiffs and their members, by selecting the grants to be terminated, drafting the termination letters, and emailing out the termination notice to grantees from a non-NEH email address and server.

199. According to former or current NEH staff, Cavanaugh and Fox were also the driving force behind the mass staff firings, which has resulted in the elimination or near elimination of entire NEH divisions and programs.

200. Because DOGE does not possess any congressionally conferred authority to terminate NEH grants or make other institutional decisions of NEH, the actions of McDonald, Gleason, Cavanaugh, and Fox, are *ultra vires* and should be enjoined and declared unlawful.

## COUNT TEN

### Institutional and Grant Termination Claims: Violation of the Fifth Amendment Implied Right of Action, Nonstatutory Review, and *Ultra Vires* Actions (Against Defendants McDonald, Gleason, Cavanaugh, and Fox)

201. Plaintiffs hereby incorporate by reference the foregoing paragraphs as if set forth herein.

202. Federal district courts have jurisdiction to enjoin Federal officials from violating the Constitution. *See Armstrong*, 575 U.S. at 327-28; *Hawaii*, 585 U.S. at 675.

203. The Fifth Amendment's Due Process Clause forbids discrimination by the federal government on the basis of classifications such as race or gender. *Bolling v. Sharpe*, 347 U.S. 497, 498 (1954); *Sessions v. Morales-Santana*, 582 U.S. 47, 48 (2017).

204. Federal actions that discriminate on the basis of race, ethnicity, or national origin are subject to strict scrutiny, *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 217 (1995), while those that discriminate on the basis of sex or gender are subject to heightened scrutiny, *Sessions*, 582 U.S. at 57.

205. Animus toward homosexuality is not a rational basis for differential treatment by the government. *Romer v. Evans*, 517 U.S. 620 (1996)

206. Defendants' actions terminating grants on the basis of perceived grant focus on

race, nationality, sex, gender, sexual orientation, or other characteristics lack any rational basis and cannot satisfy any applicable standard of review under the Fifth Amendment's Equal Protection component.

207.    Defendants' classification of grants on the basis of race, ethnicity, national origin, gender, sexuality, or other characteristics, and their termination of grants based on these classifications, violated the Equal Protection component of the Fifth Amendment's Due Process Clause. Because Defendants' actions violate the Fifth Amendment, those actions lack lawful authority. The Court should therefore declare them unconstitutional and *ultra vires*.

208.    If Defendants' actions are not declared unlawful, set aside, and enjoined and unconstitutional and *ultra vires*, Plaintiffs will suffer substantial injury, including irreparable injury.

### REQUEST FOR RELIEF

WHEREFORE, Plaintiffs request that this Court

A.    Declare as unlawful and set aside Defendants' decisions to eliminate or nearly eliminate entire divisions, to shut down entire programs, to mass fire staff, and to delay spending or outright refuse to spend the funds appropriated to NEH by Congress as not in accordance with law, 5 U.S.C. § 706(2)(A), arbitrary and capricious, *id.*, contrary to the Constitution, *id.* § 706(2)(B), in excess of statutory authority, *id.* § 706(2)(C), and unlawful and *ultra vires*;

B.    Declare as unlawful and *ultra vires* Defendants' terminations of grants, including the grants to Plaintiffs and their members;

C.    Enjoin Defendants from enforcing and giving effect to their decisions to eliminate or nearly eliminate entire divisions, to shut down entire programs, to mass fire staff, and to delay spending or outright refuse to spend the funds appropriated to NEH by Congress;

D.    Enjoin Defendants from enforcing and giving effect to the termination notices of Plaintiffs' grants and the grants of Plaintiffs' members;

E.    Enjoin Defendants to obligate and spend the full amount of funds that Congress has appropriated to NEH, including for NEH grants, without intentional delay;

F.    Award Plaintiffs reasonable costs and attorneys' fees; and

G.    Award such other relief as this Court may deem just and proper.


February 13, 2026                                Respectfully submitted,

                                                 */s/ Daniel F. Jacobson*
                                                 Daniel F. Jacobson
                                                 Lynn D. Eisenberg
                                                 John Robinson
                                                 Kyla M. Snow
                                                 JACOBSON LAWYERS GROUP PLLC
                                                 5100 Wisconsin Ave NW, Suite 301
                                                 Washington, D.C. 20016

                                                 (301) 823-1148
                                                 dan@jacobsonlawyersgroup.com


                                                 *Counsel for Plaintiffs*