# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| AMERICAN COUNCIL OF LEARNED SOCIETIES, *et al.*,<br><br>   *Plaintiffs*,<br><br>  v.<br><br>ADAM WOLFSON, in his official capacity as Acting Chairman of the National Endowment for the Humanities, *et al.*,<br><br>   *Defendants*. | Case No. 25-cv-03657 |

| | |
|---|---|
| THE AUTHORS GUILD *et al.*,<br><br>   *Plaintiffs*,<br><br>  v.<br><br>NATIONAL ENDOWMENT FOR THE HUMANITIES, *et al.*,<br><br>   *Defendants*. | Case No. 25-cv-3923 |

## MEMORANDUM IN SUPPORT OF PLAINTIFFS' <u>MOTION FOR SUMMARY JUDGMENT</u>

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

BACKGROUND ................................................................................................................. 3

   I.    Congress Created NEH to Promote Freedom of Humanistic Expression and Viewpoint
       Diversity ............................................................................................................... 3

   II.   DOGE Arrives at NEH With an Anti-DEI Mandate ........................................... 4

   III.  Fox and Cavanaugh Identify Over 1,400 Grants For Termination Based on DEI, Race,
       Gender, Political Affiliation, And Other Protected Characteristics ...................... 5

   IV.  DOGE Exercises Control Over NEH ................................................................ 9

   V.   DOGE Drafts and Sends Termination Notices to More Than 1,400 Grantees ................. 13

ARGUMENT ...................................................................................................................... 15

   I.    The Grant Terminations Violated the First Amendment ................................... 15

      A.   The First Amendment Prohibits Denying or Rescinding Grants Based on Viewpoint
           or Association. ............................................................................................. 15

      B.   Defendants Illegally Terminated "DEI" Grants Based on Viewpoint. ......................... 19

      C.   Defendants Illegally Terminated Biden-Era Grants Based on Viewpoint and
           Association ................................................................................................... 23

   II.   DOGE Terminated NEH Grants without Legal Authority ............................... 25

   III.  Many of the Grant Terminations Violated the Equal Protection Clause ........................ 33

   IV.  The Court Should Enter Multiple Forms of Relief to Fully Remedy the Harms to
       Plaintiffs and their Members ........................................................................... 38

      A.   The Tucker Act Does Not Preclude This Court's Jurisdiction to Issue the Requested
           Remedies ..................................................................................................... 38

      B.   The Court Should Enter Declaratory Relief, Vacate the Terminations, and Issue a
           Permanent Injunction ................................................................................... 41

CONCLUSION ................................................................................................................... 45

# TABLE OF AUTHORITIES

## Cases

*Alliance for Open Soc'y Int'l, Inc. v. USAID*,
   430 F.Supp.2d 222 (S.D.N.Y. 2006) ................................... 25

*Am. Acad. of Pediatrics v. U.S. Dep't of Health & Hum. Servs.*,
   2026 WL 80796, at *14–15 (D.D.C. Jan. 11, 2026) ........................ 38, 41

*Am. Ass'n of Univ. Professors v. Trump (AAUP)*,
   2025 WL 3187762 (N.D. Cal. Nov. 14, 2025) ........................... 26, 39, 40

*Amoco Prod. Co. v. Vill. of Gambell, AK*,
   480 U.S. 531 (1987) ................................................... 43

*Branti v. Finkel*,
   445 U.S. 507 (1980) ................................................... 23

*Brooklyn Inst. of Arts & Scis. v. City of New York*,
   64 F. Supp. 2d 184 (E.D.N.Y. 1999) ................................... 18

*Brown v. Plata*,
   563 U.S. 493 (2011) ................................................... 43

*Chamber of Com. of U.S. v. Reich*,
   74 F.3d 1322 (D.C. Cir. 1996) ......................................... 40

*Christa McAuliffe Intermediate Sch. PTO, Inc. v. de Blasio*,
   364 F. Supp. 3d 253 (S.D.N.Y.) ....................................... 43

*City of Saint Paul v. Wright*,
   2026 WL 88193 (D.D.C. Jan. 12, 2026) ................................. 38, 41, 42

*Climate United Fund v. Citibank, N.A.*,
   154 F.4th 809 (D.C. Cir. 2025) ........................................ 38

*Dalton v. Specter*,
   511 U.S. 462 (1994) ................................................... 26

*Deide v. Day*,
   676 F. Supp. 3d 196 (S.D.N.Y. 2023) ................................. 43, 44

*Dep't of Educ. v. California*,
   604 U.S. 650 (2025) ................................................... 38, 39

*eBay Inc. v. MercExchange, LLC*,
   547 U.S. 388 (2006) ................................................... 43

*EklecCo NewCo LLC v. Town of Clarkstown,*
    2019 WL 2210798 (S.D.N.Y. May 21, 2019) ....................................................... 16

*Elrod v. Burns,*
    427 U.S. 347 (1976) ................................................................................................ 23

*Esperanza Peace & Justice Center v. San Antonio,*
    316 F. Supp. 2d 433 (W.D. Tex. 2001) ................................................................. 19

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.,*
    561 U.S. 477 (2010) ................................................................................................ 26

*Free the Nipple-Fort Collins v. City of Fort Collins, Colorado,*
    916 F.3d 792 (10th Cir. 2019) ......................................................................... 43, 44

*Graham v. Richardson,*
    403 U.S. 365 (1971) ................................................................................................ 34

*Heffernan v. City of Paterson,*
    578 U.S. 266 (2016) ................................................................................................ 22

*Johnson v. California,*
    543 U.S. 499 (2005) ......................................................................................... 33, 37

*Kidder, Peabody & Co. v. Maxus Energy Corp.,*
    925 F.2d 556 (2d Cir. 1991) ................................................................................... 42

*Koala v. Khosla,*
    931 F.3d 887 (9th Cir. 2019) ................................................................................. 18

*La. Pub. Serv. Comm'n v. FCC,*
    476 U.S. 355 (1986) ................................................................................................ 26

*League of United Latin Am. Citizens v. Exec. Off. of the President,*
    2026 WL 252420 (D.D.C. Jan. 30, 2026) ............................................................. 26

*LeBlanc v. United States,*
    50 F.3d 1025 (Fed. Cir. 1995) ............................................................................... 39

*Legal Servs. Corp. v. Velazquez,*
    531 U.S. 533 (2001) ................................................................................................ 18

*Liffiton v. Keuker,*
    850 F.2d 73 (2d Cir. 1988) ..................................................................................... 40

*Make the Rd. New York v. Cuccinelli,*
    419 F. Supp. 3d 647 (S.D.N.Y. 2019) ................................................................... 45

iv

*N.Y. Magazine v. Metro. Transp. Auth.*,
  136 F.3d 123 (2d Cir. 1998)...........................................................................44

*Nat'l Endowment for the Arts v. Finley*,
  524 U.S. 569 (1998) ...............................................................................16, 17

*Nat'l Rifle Ass'n of Am. v. Vullo*,
  602 U.S. 175 (2024) .......................................................................................15

*Nat'l Insts. of Health v. Am. Public Health Ass'n*,
  145 S. Ct. 2658 (2025) ............................................................................38, 40

*Nevada Dep't of Hum. Res. v. Hibbs*,
  538 U.S. 721 (2003) .......................................................................................34

*New York C.L. Union v. New York City Transit Auth.*,
  684 F.3d 286 (2d Cir. 2012)..........................................................................43

*Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*,
  551 U.S. 701 (2007) .......................................................................................34

*Planned Parenthood of New York City, Inc. v. HHS*,
  337 F. Supp. 3d 308, 343 (S.D.N.Y. 2018)..................................................45

*Police Dep't of Chi. v. Mosley*,
  408 U.S. 92 (1972) ..................................................................................15, 18

*President & Fellows of Harvard Coll. v. HHS*,
  798 F. Supp. 3d 77 (D. Mass. 2025) ................................................40, 43, 45

*R.I. Latino Arts v. Nat'l Endowment for the Arts*,
  800 F. Supp. 3d 351 (D.R.I. 2025)..........................................................16, 17

*Rhode Island v. Trump*,
  2025 WL 3251113 (D.R.I. Nov. 21, 2025) ...............................27, 34, 40

*Rosenberger v. Rector & Visitors of the Univ. of Va.*,
  515 U.S. 819 (1995)..................................................................15, 18, 19, 34

*Shurtleff v. City of Bos.*,
  596 U.S. 243 (2022)..................................................................................16, 17

*Sustainability Inst. v. Trump*,
  165 F.4th 817 (4th Cir. 2026).......................................................................26

*Texas v. Johnson*,
  491 U.S. 397 (1989) .......................................................................................15

*Thakur v. Trump*,
    163 F.4th 1198 (9th Cir. 2025)...................................................................... 19, 20, 23

*United States v. Oliveras*,
    905 F.2d 623 (2d Cir. 1990)............................................................................ 16

*United States v. Brown*,
    352 F.3d 654 (2d Cir. 2003)............................................................................ 35

*We the Patriots USA, Inc. v. Hochul*,
    17 F.4th 266 (2d Cir. 2021)............................................................................ 47

*Webster v. Doe*,
    486 U.S. 592 (1988)...................................................................................... 41

*Windsor v. United States*,
    699 F.3d 169 (2d Cir.2012)............................................................................ 35

*Yale New Haven Hosp. v. Becerra*,
    56 F.4th 9 (2d Cir. 2022)............................................................................... 34

*Youngstown Sheet & Tube Co. v. Sawyer*,
    343 U.S. 579, 585 (1952).............................................................................. 27

**Statutes**

20 U.S.C. § 951(1)........................................................................................... 2, 16

20 U.S.C. § 953(c)................................................................................................ 2

20 U.S.C. § 956.................................................................................................... 2

**Rules**

Fed. R. Civ. P. 57............................................................................................... 41

**Executive Orders**

E.O. 14151, 90 Fed. Reg. 8339 (Jan. 20, 2025)...................................................... 3

E.O. 14168, 90 Fed. Reg. 8615 (Jan. 20, 2025)...................................................... 3

**Other Authorities**

*Hart & Wechsler's The Federal Courts and the Federal System* 462 (8th ed. 2025) ............... 39

## INTRODUCTION

For nearly six decades, the National Endowment for the Humanities ("NEH") has supported the full breadth of American intellectual life: funding scholars, universities, and humanities organizations to make the fruits of humanistic inquiry available to all, in furtherance of Congress' determination that "the humanities belong to all the people of the United States." 20 U.S.C. § 951(1). NEH has accomplished this mission through a rigorous, expert-led grant process that Congress designed to be insulated from political interference. As of April 1, 2025, over 1,400 grantees were actively funded through that process—their awards reflected months of applications, competitive peer review, and a final determination by the NEH Chair that each merited the financial support and imprimatur of a federal grant. On April 1, each grantee was furthering the NEH's humanistic mission. By April 3, 97% of those grants were gone.

Discovery has now established what happened. In March 2025, two members of the Department of Government Efficiency ("DOGE") swept into NEH intent on terminating grants purportedly associated with "DEI" or the Biden Administration. Working outside NEH's established processes, the two DOGE members used ChatGPT to identify grants associated with a disfavored and supposedly dangerous viewpoint: promoting "DEI." In so doing, they selected some grants for termination solely because they involved a specific race, national origin, ethnicity, religion, gender, or sexual orientation. The official "rationale" for terminating certain grants, for example, was that they were about a "Black lawyer," "Black children," a "woman writer," or "Jewish writers." After selecting more than 1,000 grants for termination because they purportedly involved DEI, they expanded the sweep to every remaining Biden-era grant promoting ideas not deemed aligned with the current Administration's priorities.

Members of NEH's leadership, including then-Acting Chair McDonald, were left as bystanders to DOGE's demolition of NEH's grant programs. Discovery has definitively refuted any notion that McDonald, and not DOGE, made the final determinations as to which grants to terminate, and it is undisputed that DOGE executed the terminations. The morning before the terminations began, McDonald emailed the DOGE agents making clear that he affirmatively opposed terminating many of the grants they had selected. McDonald wrote that for many grants "there is no justification for canceling the project's funding," and he therefore "recommended" that "you should allow it to continue," speaking to the DOGE agents. But, McDonald explained, "as you've made clear, it's your [*i.e.*, DOGE's] decision on whether to discontinue funding any of the projects." And indeed, the DOGE members rejected McDonald's "recommendation" and then carried out the terminations on their own, drafting the termination letters themselves and sending the notices to grantees from an unofficial Microsoft address. With that, DOGE had terminated nearly all of the agency's grants in a matter of 22 days.

The terminations are unconstitutional several times over. The record establishes, without genuine factual dispute, that the terminations violated the First Amendment by targeting grants for their viewpoints and perceived political associations; that they violated the equal protection guarantee by classifying grants based on race, sex, and other constitutionally protected characteristics; and that the two DOGE members made and executed the termination decision without any legal authority conferred by Congress. There is no jurisdictional barrier to vacating these unlawful terminations, and permanent relief is warranted.

**BACKGROUND**

I.    **Congress Created NEH to Promote Freedom of Humanistic Expression and Viewpoint Diversity.**

Congress established the National Endowment for the Humanities in 1965 as an independent federal agency dedicated to supporting scholarship, education, and public engagement in the humanities. 20 U.S.C. § 956. The NEH Act declares that "it is necessary and appropriate for the Federal Government to complement, assist, and add to programs for the advancement of the humanities." *Id.* § 951(5). Congress embedded viewpoint neutrality and support for a diversity of beliefs as mandates at the core of NEH's mission: the Act provides that the humanities "reflect the high place accorded by the American people to the nation's rich cultural heritage and to the fostering of mutual respect for the diverse beliefs and values of all persons and groups." *Id.* § 951(6). Congress further specified that no "department, agency, officer, or employee of the United States" shall "exercise any direction, supervision, or control over the policy determination, personnel, or curriculum, or the administration or operation of any [grantee]." *Id.* § 953(c). The Act was thus designed to ensure that government funding would enhance, rather than suppress, the diversity of humanistic inquiry.

Since its founding NEH has awarded over $6 billion in grants to support over 70,000 projects in all 50 states. NEH, https://www.neh.gov/. NEH grants to individual scholars include Public Scholar Awards, Fellowships, and Summer Stipends; grants to institutions fund archival preservation, curriculum development, documentary projects, and historic preservation programs. *See* ECF No. 116 ("PI Order"), at 15–16. Every grant terminated as part of the Mass Termination had navigated NEH's traditional award process, which involves multiple rounds of expert peer-review, administrative approvals, NEH Council review, and a final determination by the NEH Chair that the award is merited. *Id.* at 13–15.

## II.    DOGE Arrives at NEH With an Anti-DEI Mandate

On his first day in office, President Trump established the "Department of Government Efficiency," or DOGE, purportedly to "maximize governmental efficiency and productivity." The White House, *Establishing And Implementing The President's "Department Of Government Efficiency,"* https://tinyurl.com/3ak2kwrf. President Trump also issued Executive Order 14151, which instructed a number of agencies to end "radical and wasteful government DEI programs and preferencing." E.O. 14151, 90 Fed. Reg. 8339 (Jan. 20, 2025). The Executive Order required each agency to provide the Office of Management and Budget a list of all "grantees who received Federal funding to provide or advance DEI, DEIA, or 'environmental justice' programs, services, or activities." *Id.* § 2(b)(ii). On the same day, the President issued a different Executive Order on "Defending Women from Gender Ideology," which among other things directed agencies to "ensure grant funds do not promote gender ideology." E.O. 14168 § 3(g), 90 Fed. Reg. 8615 (Jan. 20, 2025). The Executive Orders did not define "DEI," "environmental justice," or "gender ideology." Around the same time, Defendants Justin Fox and Nathan Cavanaugh were contacted, interviewed, and hired by senior members of DOGE. Ex. 1, Deposition of Justin Fox ("Fox Dep.") at 56:25–57:11; Ex. 2, Deposition of Nathan Cavanaugh ("Cavanaugh Dep.") at 25:11–15.[1] They were hired officially as employees of the General Services Administration ("GSA"), but self–identified as members of the "DOGE Team" during the relevant period. Fox Dep. at 68:7–10; Cavanaugh Dep. at 18:19–19:5. Specifically, they belonged to what they referred to as DOGE's "Small Agencies Team." Cavanaugh Dep. at 37:9–13; Fox Dep. at 104:11–16. Defendant Cavanaugh led the Small Agencies Team, and Defendant Fox was its primary operative at NEH. Cavanaugh Dep. at 55:9–15, 91: 2–12 According to Cavanaugh, the Small Agencies Team's

---

[1] All citations are to exhibits to the Declaration of Yinka Onayemi, filed herewith.

overarching mission was to review "certain small agencies in the Federal Government, with the context of there would be certain executive orders signed to reduce certain useless small agencies in the Federal Government." *Id.* at 55:18–22. Fox similarly characterized his goal as "find[ing] efficiencies" and "terminating grants" while "ensuring that they were aligned with the executive orders." Fox Dep. at 88:6–17.

Neither Fox nor Cavanaugh had any relevant background in the humanities, public or private grant administration, peer review, or government service of any kind prior to joining the Administration. Cavanaugh Dep. at 51:1–4; Fox Dep. at 43:7–44:7 . Nevertheless, in the span of about three weeks in March of 2025, they marked over 1,400 Biden-era grants, which had obligated over $100 million in funds to humanities scholars and institutions, for termination. Fox and Cavanaugh entirely controlled the process of selecting grants to terminate and executing the terminations—their approach was top-down, viewpoint- and race-based, and indifferent to the views of NEH leadership or the ordinary processes of grant administration.

## III. Fox and Cavanaugh Identify Over 1,400 Grants For Termination Based on DEI, Race, Gender, Political Affiliation, And Other Protected Characteristics

Before DOGE's arrival at NEH, agency staff had begun the process of reviewing grants pursuant to Executive Orders 14151 and 14168, and specifically to identify for OMB grants that may conflict with the Executive Orders. *See* Ex. 3, Deposition of Michael McDonald ("McDonald Dep.") at 138:13–23. NEH's Chief Information Officer, Brett Bobley, directed NEH staff to identify grants issued "from 2021 to the present" based on whether they promoted "environmental justice," "diversity, equity, and inclusion," "diversity, equity, inclusion, and accessibility," or "gender ideology." Ex. 4, NEH_AR_000001. NEH staff followed that instruction; as Defendant McDonald confirmed, "[NEH] staff reviewed all the awards made over the past four years and rated them 'high, medium, or low' in terms of promoting DEI." Ex. 5, NEH_AR_000022; *see also*

Ex. 6, NEH_AR_000006, (spreadsheet with NEH staff annotations); McDonald Dep. at 101:7–11. Grants that NEH staff determined were no risk of promoting DEI, environmental justice, or gender ideology were marked as "N/A." Ex. 5, NEH_AR_000022.

DOGE then arrived at NEH and took control. Fox and Cavanaugh first met Acting NEH Chairman Michael McDonald and Assistant Chair for Programs Adam Wolfson on March 12, 2025. Fox Dep. at 127:20–25.

But days before his first meeting with McDonald and Wolfson on March 12, Fox had begun searching the public repository at www.grants.gov for all active NEH grant descriptions containing keywords like "gay," "BIPOC (Black, Indigenous, People of Color)," "indigenous," "tribal," "melting pot," "equality," and similar terms. Ex. 9, US-000016154 ("Detection List" tab); *see* Fox Dep. at 229:20–230:17; 236:22–237:10. The list conspicuously omitted analogous terms for majority or non-protected groups: "white," "heterosexual," and "Caucasian" did not appear. Fox Dep. at 241:21–243:14. In other words, Fox's initial search was a facially race-, ethnicity-, and sexuality-based screen—grants touching on the experiences of racial minorities, Indigenous peoples, or LGBTQ communities were flagged; and grants focused on white or heterosexual perspectives were not. Fox conceded at deposition that the "craziest grant" designations and the key words used to identify such grants were based entirely on his and Cavanaugh's subjective views—without reference to any standard developed by NEH program officers, peer reviewers, or agency attorneys. *Id.* at 232:18–233:14. He applied his own "subjective interpretation"—his words—across all the grants in the portfolio. *Id.* at 232:24–233:14. Fox claims he ultimately discarded this list and did not use it to identify grants for termination. Yet records show that he preserved the spreadsheet and emailed it to himself (from his NEH address to his GSA address)

on April 3, 2025—the same day he finished delivering notice of the Mass Termination to over 1,400 grantees. *See* Ex. 10, US-000016153.

After the March 12 meeting, Wolfson sent Fox and Cavanaugh the DEI and gender ideology ratings that NEH staff had prepared. *See* Ex. 8, NEH_AR_000005; Fox Dep. at 165:23–166:2. What followed was a three-week sprint in which Fox and Cavanaugh effectively took control of the agency and terminated nearly all of its grants. Fox then compiled a list of all Biden-era grants that purportedly promoted or involved DEI. That list would have two buckets of grants: (i) those which NEH staff had identified as "high" risk of conflicting with the Executive Orders (and also some identified as "medium" or "low" risk), and (ii) those that NEH staff had marked as "N/A" for DEI or gender ideology. For the latter, Fox used ChatGPT—submitting the description of 1,162 grants in the NEH database to ChatGPT with the following prompt: "Does the following relate at all to DEI? Respond factually in less than 120 characters. Begin with 'Yes.' or 'No.' followed by a brief explanation. Do not use 'this initiative' or 'this description' in your response." Ex. 11, US-000062485 (tab "Sheet3"), at C2–C1163; Fox Dep. at 205:5–206:5. Fox never instructed ChatGPT on what definition of "DEI" to apply. Nor did he verify what the model understood the term to mean. Fox Dep. at 206:6–8 ("Q. [W]hat's your understanding of how the model understood the word 'DEI'? A. I don't know"). And Fox did not do anything to ensure that ChatGPT would not discriminate on the basis of the grant writer's or grant subject's participation in a constitutionally protected class. *Id.* at 207:11–15 ("Q. Did you do anything to ensure that ChatGPT's conception of DEI as applied here wouldn't discriminate on the basis of race? A. No"), 209:11–17 ("Q. Did you do anything to ensure that ChatGPT's perception of DEI as applied here wouldn't discriminate on the basis of sex? A. It didn't matter. We didn't need to").

The predictable result was that ChatGPT tagged as DEI scores of grants that described engagement with subject matter touching on race, ethnicity, national origin, gender, or sexuality; irrespective of the scholarly purpose of that engagement. Indeed, in many cases it is clear that ChatGPT classified grants as DEI—and thus slated for termination—solely because the grant description referenced a particular race, ethnicity, national origin, religion, gender, or sexual orientation. For example, ChatGPT answered "Yes" for a grant awarded to fund a documentary about the 1873 Colfax Massacre, the single greatest incidence of anti-Black violence during Reconstruction, and its historical legacy for Black civil rights. ChatGPT classified that grant as DEI because "[t]he documentary explores a historical event that significantly impacted Black civil rights, making it relevant to the topic of DEI." Ex. 11, US-000062485 (tab "Sheet3"), at I4. ChatGPT similarly classified a grant to make a biography about Oscar Adams Jr. as DEI because "[t]his biography explores the life and accomplishments of . . . a Black lawyer and jurist." *Id.* at I707. As another example, ChatGPT answered "Yes" for a grant awarded to fund a project called "In the Shadow of the Holocaust: Short Fiction by Jewish Writers from the Soviet Union," which strove to provide "a critical, annotated translation into English of Yiddish and Russian works written in the aftermath of the most significant Jewish tragedy of the 20th century." ChatGPT classified this grant as DEI because "[t]his anthology explores Jewish writers' engagement with the Holocaust in the USSR [...]." *Id.* at I315.

For the grants that NEH staff flagged as at risk of promoting DEI or gender ideology, Fox simply designated them all as involving DEI, *see* Ex. 12, US-000000936 ("NEH Grant Detail" tab), even though there is no evidence that NEH leadership ever made a final determination whether those grants actually involved DEI or gender ideology.

Fox combined the ChatGPT designations with NEH's risk designations, producing a spreadsheet with 1,057 "DEI" grants. Ex. 12, US-000000936; *see also* Ex. 13, US-000041372 (Fox stating that he would "consolidate" the two lists); McDonald Dep. at 143:11–18. The "NEH Grant Summary" tab on this new spreadsheet catalogued these grants "by DEI involvement and Division" and marked them as "Yes" in the column titled "Yes / No DEI?" *Id.* A separate "NEH Grant Detail" tab listed details for each of these grants individually, including a "Yes / No DEI?" column, which was marked "Yes" for each grant, and a "DEI Rationale" column, which stated either that "NEH identified DEI involvement" for the grant, *e.g.*, Ex. 12, US-000000936 (tab "NEH Grant Detail"), at K21, or contained the identical "DEI rationale" that ChatGPT had provided to Fox, *e.g.*, *id.*, (tab "NEH Grant Detail"), at K256 (containing the same rationale for the Colfax Massacre grant that had been provided by ChatGPT) or at K660 (containing the same rationale for the "In the Shadow of the Holocaust: Short Fiction by Jewish writers from the Soviet Union" grant that had been provided by ChatGPT).

## IV.    DOGE Exercises Control Over NEH

Throughout this process, NEH leadership understood that Fox and Cavanaugh were in control and had final decisionmaking authority over which grants to terminate. In McDonald's own words, it was DOGE's "decision" whether to terminate any of the grants, and he was left to make only "recommendations" that DOGE largely rejected Ex. 14, NEH_AR_0000023 ("Therefore, our recommendation is that wherever the 'DEI Rationale' on the spreadsheet makes clear that there is no DEI component to the project, there is no justification for canceling the project's funding and you should allow it to continue"). Neither McDonald nor anyone else at NEH knew anything about how DOGE came up with its "DEI rationales" or that DOGE had used ChatGPT to generate them. McDonald Dep. at 117:1–6 ("Q. Do you know who drafted these DEI

rationales? A. No, I do not. Q. Do you know anything about the criteria that were used for drafting these DEI rationales? A. No"); *see also id.* at 126:9–19. When shown some of the rationales for termination during his deposition, McDonald agreed that the rationales often made no sense and that the grants should not have been terminated on the stated bases. *See id.* at 119:3–123:8.

This knowledge gap is hardly surprising; Fox and Cavanaugh reported to DOGE, not NEH. Senior DOGE official Steve Davis hired Cavanaugh into government. Cavanaugh Dep. at 22:19–25. Senior DOGE officials Anthony Armstrong and Joshua Gruenbaum recruited Fox into government. Fox Dep. at 32:10–23; 51:14–17. Davis was "effectively [Cavanaugh's] manager," Cavanaugh Dep. at 36:24–37:2; 49:5–8, appointing him to lead DOGE's Small Agencies Team, *id.* at 49:12–15; 55:9–22; 64:18–65:10, and instructing him to turn his attention to NEH, *id.* at 86:13–22. Cavanaugh testified that he gained an understanding of his mandate and responsibilities through some combination of Steve Davis and his own intuition. *See*, *e.g.*, *id.* at 63:14–5; 64:25–10; 66:6–17; 161:8–162:13; 239:22–240:11. While detailed to the "small agencies," Cavanaugh dutifully reported aggregate agency savings, *i.e.*, grant and contract terminations, to Davis and DOGE senior leadership on a weekly basis; including the supposed savings achieved at NEH. *See*, *e.g.*, US-00009509; Cavanaugh Dep. at 80:13–23; 81:24–82:13; 92:23–93:4; 272:20–273:13. Cavanaugh's understanding of his raison d'être during his short time in government was linked to DOGE, not NEH or any other (as he put it) "useless small agencies." Cavanaugh Dep. at 55:16–22; 56:4–14; 64:12–17. Fox likewise testified that he had no training and just "generally followed Nate." Fox Dep. at 103:14–23; *see also id.* at 58:20–59:5. Ultimately, Fox and Nate Cavanaugh were following DOGE's timelines and standards, not NEH's.

Fox and Cavanaugh testified that they needed to act "quickly" to terminate NEH grants because "[t]he general pacing of DOGE was to try and make decisions and act quickly to avoid

Government employees dragging their feet on cancellations." Cavanaugh Dep. at 134:24–135:4. To that end, Cavanaugh and Fox used "pressure tactics" at NEH to terminate the grants as quickly as possible. *Id.* at 170:3–8. For example, Fox represented to McDonald and Wolfson, falsely, that the White House was making demands from behind the scenes. *Id.* Fox emailed McDonald: "We're getting pressure from the top on this and we'd prefer that you remain on our side but let us know if you're no longer interested. Ex. 15, US-000050717; *see* Fox Dep. at 305:8–17. This email was the culmination of a series of increasingly urgent emails on March 31 in which Fox demanded that McDonald contact him as soon as possible. Ex. 16, NEH_AR_000010. In reality, there was no such extrinsic pressure; Fox and Cavanaugh had concocted this urgency as a "time pressure tactic" to effectuate the terminations. Cavanaugh Dep. at 169:10–171:5.

After Fox and McDonald spoke later that day, McDonald memorialized that Fox had made clear that DOGE and not NEH would be carrying out the terminations. Ex. 17, NEH_AR_000013. McDonald described two lists of grants to potentially terminate, the first being the grants NEH staff had identified as potentially conflicting with the Executive Orders, and the second being the grants Fox designated as DEI even though NEH staff had rated them as "N/A" for DEI. *Id.* McDonald indicated to Fox that NEH had been "getting ready to cancel" grants on the first, "but understand that you will do so." *Id.* On the second list containing the "N/As" as rated by NEH staff, McDonald wrote: "As you instructed, we have only excluded the ones that seem not to conflict with the Administration's priorities – such as the Papers of George Washington. *We understand that you will cancel this list of projects as well*." *Id.* (emphasis added).

The next morning, April 1, McDonald emailed Fox urging him not to terminate grants that NEH staff had marked as "N/A" for DEI. Ex. 5, NEH_AR_000022. McDonald explained that "we think these projects are harmless when it comes to promoting DEI," *see id.*, but then

11

acknowledged: "as you've made clear, it's your [*i.e.*, DOGE's] decision on whether to discontinue funding any of the projects on" DOGE's list. Ex. 5, NEH_AR_000023. McDonald therefore was left to offer only a "recommendation" that "wherever the 'DEI Rationale' on the spreadsheet makes clear that there is no DEI component to the project, there is no justification for canceling the project's funding and *you should allow it to continue*." *Id.* (emphasis added). Cavanaugh and Fox rejected McDonald's recommendation not to terminate grants that NEH staff had marked as "N/A." *See* McDonald Dep. at 214:2–6 ("Q: And did they take your recommendation? A: I don't believe they did, no."); Cavanaugh Dep. at 180:19–181:9 ("Q: Who rejected that recommendation? A: Justin and I both rejected that recommendation").

Fox and Cavanaugh then turned their focus to the roughly 400 Biden-era grants that had not been flagged (by NEH or ChatGPT) as DEI. As McDonald later explained to the NEH staff, "it became clear that [Fox and Cavanaugh] were looking at the totality of the awards that had been with [the] previous administration." McDonald Dep. at 302:21–25. Cavanaugh testified that the non-DEI Biden-era grants were treated as presumptively "wasteful" and thus marked for termination, unless Defendants' review determined that they "aligned with the [Trump] Administration." Cavanaugh Dep. at 155:11–13; *see also, e.g.*, Ex. 17, NEH_AR_000013 ("[W]e have only excluded [from termination] the ones that seem not to conflict with the Administration's priorities").

After Fox and Cavanaugh selected and compiled the grants to terminate, they allowed McDonald and Wolfson to make recommendations on grants to take off the list, but with strict limitations. For one, "if a grant related to DEI, it couldn't be on the 'keep' list." Cavanaugh Dep. at 202:14–20. In addition, McDonald's and Wolfson's remit was limited to saving grants relating to the American Revolution, *see* McDonald Dep. at 238:10–239:4, or those for which termination

"would not reflect well" on the Administration. Ex. 5, NEH_AR_000023. In total, McDonald and Wolfson recommended just a handful of grants for saving, *id.;* see also Ex. 14, US-000061492, and Defendants as a whole kept roughly only 40 Biden-era grants, Ex. 14, US-000061492. The rest on DOGE's list—1,477 grants in total—were all terminated. Ex. 25, NEH_AR_0000136.

Throughout the process, NEH employees—from its rank and file staff to its top officers—were kept largely in the dark. *See*, *e.g.*, Ex. 18, US-000064982 (Email from NEH Chief Information Officer, Brett Bobley, to Dartmouth-affiliated grantees: "I'm terribly sorry to tell you that DOGE did indeed cancel your award. NEH staff, like myself, didn't realize it was happening"); Ex. 19, US-000065114 (Email from NEH Director of the Division of Research Programs, Christopher Thornton: "[...] we have not been able to reinstate the five NEH-JUSFC fellowships terminated by DOGE (per Acting Chairman Michael McDonald). Michael sends his regrets but hopes you understand that *this was not an agency decision*") (emphasis added).

## V.    DOGE Drafts and Sends Termination Notices to More Than 1,400 Grantees

After DOGE decided on the final list of grants to terminate, Fox set out to work on executing the terminations. He worked with DOGE lawyer Justin Aimonetti to draft the termination notices. Fox Dep. at 288:5–15; McDonald Dep. at 257:12–13. The termination notice incorrectly stated as a basis for termination that an Executive Order mandated that NEH "eliminate all non-statutorily required activities and functions," even though the cited Executive Order said nothing at all about NEH. Ex. 20, US-000050608; McDonald Dep. at 257:14–25. And Fox—not McDonald—inserted the signature on the termination notices as: "/s/ Michael McDonald." Fox. Dep. at 282:20–21; McDonald Dep. at 262:8–263:2 ("Q. Did you type in /s/ Michael McDonald? A. No. Q. Okay. Who typed that in? A. Presumably the people at DOGE").

Fox obtained administrative access to a Microsoft email account that he then used to send the termination notices. Fox Dep. at 321:19–23; McDonald Dep. at 163:22–25; Ex. 16,

NEH_AR_000011. Rather than processing the terminations through NEH's Office of Grants Management, Fox himself sent the termination notices to the more than 1,400 organizations and individuals whose grants were terminated. Fox Dep. at 279:18–280:9. The termination notices did not come from an NEH email address, but were sent from the address grants_notifications@nehemail.onmicrosoft.com. McDonald Dep. at 260:16–261:14; *see*, *e.g.*, Ex. 35, NEH_AR_000091. McDonald could not recall any other time in his over twenty years at the agency where an official not part of NEH executed an NEH function in this manner. McDonald Dep. at 243:1–6.

Fox began sending the termination notices to grantees on April 2—one day short of his first full month in government. Ex. 22, US-000057526; Fox Dep. at 38:11–12; 279:18–280:9, 322:8–14. Every notice used substantially the same boilerplate language. Every notice was sent in the same window of time. Every notice was sent from the same unofficial email address. Ex. 23, US-000050461; Ex. 25, NEH_AR_0000136. *See also e.g.*, Ex. 37, NEH_AR_000092; Ex 38, NEH_AR_000094. No grantee received any individualized explanation of why their specific grant was selected for termination. No NEH program officer participated in the termination decision. No peer-review body was consulted. The NEH Act's procedural protections were entirely bypassed. The process replaced expert, individualized evaluation with a mass, automated dispatch.

The result of this process was the largest mass termination of grants in the history of NEH. McDonald Dep. at 66:13–67:12. In one fell swoop, more than 1,400 active grants—representing over $100 million in congressionally appropriated funds—were canceled. The terminated grants spanned every NEH program and encompassed a vast range of scholarly work: oral history projects documenting the experiences of racial and ethnic communities; archival preservation efforts relating to Indigenous languages and traditions; fellowships supporting scholarship on gender,

sexuality, and identity; documentary projects on immigration and diaspora; and hundreds of other projects engaging with the full breadth of human experience that is the province of the humanities.

Every one of these grants had been competitively awarded through NEH's rigorous multi-stage review process. The grantees—individual scholars, universities, libraries, museums, state humanities councils, and other institutions—had earned their awards on the merits. None received any individualized consideration as part of the Mass Termination process. Their grants were terminated not for any lack of humanistic merit, but because either the subject matter of their scholarship touched on the race, ethnicity, national origin, gender, or sexuality of the people and communities they studied; or because their grant was awarded during the term of a disfavored prior administration.

## ARGUMENT

## I.    The Grant Terminations Violated the First Amendment

### A.    The First Amendment Prohibits Denying or Rescinding Grants Based on Viewpoint or Association.

At its core, "the First Amendment means that the government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Police Dep't of Chi. v. Mosley*, 408 U.S. 92, 95 (1972). "At the heart of the First Amendment's Free Speech Clause is the recognition that viewpoint discrimination is uniquely harmful to a free and democratic society." *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 187 (2024). The government thus "must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 829 (1995). While this constitutional guarantee of course prohibits the government from banning speech outright, *see Texas v. Johnson*, 491 U.S. 397 (1989), it also prohibits the government "from doing indirectly what it

15

cannot do directly," *EklecCo NewCo LLC v. Town of Clarkstown*, 2019 WL 2210798, at *12 (S.D.N.Y. May 21, 2019) (citing *United States v. Oliveras*, 905 F.2d 623, 628 n.8 (2d Cir. 1990)). Accordingly, the government may not deny subsidies or other discretionary benefits because it disagrees with the recipient's viewpoint—*i.e.*, it may not "leverage its power to award subsidies on the basis of subjective criteria into a penalty on disfavored viewpoints." *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 587 (1998).

Key here, and as this Court concluded in its preliminary injunction decision, "there can be no question that the speech at issue is private and not governmental." PI Op. 62. McDonald himself agreed that NEH funds support grantees' private speech, and not speech of the government. McDonald Dep. 65:5–16 (agreeing that a book for which NEH provides grant funding "is still the author's speech"). That concession aside, "the history of the expression at issue; the public's likely perception as to who (the government or a private person) is speaking; and the extent to which the government has actively shaped or controlled the expression" all confirm that NEH grants fund private speech. *Shurtleff v. City of Bos.*, 596 U.S. 243, 252 (2022). A district court in Rhode Island recently came to this same conclusion in assessing the speech funded by the National Endowment for the Arts (NEA), which was created under the same organic statute as NEH (the National Foundation on the Arts and the Humanities Act). *See R.I. Latino Arts v. Nat'l Endowment for the Arts*, 800 F. Supp. 3d 351, 362 (D.R.I. 2025).

As with NEA, that Act makes easy work of the "history" and "control" prongs of the analysis. In founding NEH, Congress declared that "the humanities belong to all the people of the United States," and that federal funding was intended "to help create and sustain not only a climate encouraging freedom of thought, imagination, and inquiry, but also the material conditions facilitating the release of this creative talent." 20 U.S.C. §§ 951(1), (7); *see R.I. Latino Arts*, 800

F. Supp. 3d at 363–64. Congress sought, through NEH funding, to "foster[] . . . mutual respect for the diverse beliefs and values of all persons and entities," *id.* § 951(6)—not to have the party in power at any given moment promote only its own ideological views. And regarding "public perception," like NEA, NEH "does not take ownership of or designate a venue for the works that it funds," and grantees "retain the intellectual property rights in their [NEH]-funded works." *R.I. Latino Arts*, 800 F. Supp. 3d at 366; *see* Rhody Decl. ¶¶ 2–4 In short, NEH grants are "designed to . . . facilitate private expression" and not to "transmit the government's message." Id. at 362 (quoting *Shurtleff*, 596 U.S.at 271) (Alito, J., concurring)).

The Supreme Court has repeatedly reaffirmed that, when the government subsidizes private speech, it may not discriminate against disfavored viewpoints. In *Finley*, the Supreme Court upheld a provision requiring the National Endowment for the Arts to consider "general standards of decency and respect" in awarding grants, finding that the requirement was "merely hortatory." 524 U.S. at 580. But the Court made clear that it "would confront a different case" if an agency were to deny grants to projects because they expressed disfavored viewpoints. *Id.* at 587. Even "in the provision of subsidies," the Court explained, "the Government may not 'aim at the suppression'" of ideas it disfavors or impose "a disproportionate burden calculated to drive 'certain ideas or viewpoints from the marketplace.'" *Id.*

Similarly, in *Rosenberger v. Rector and Visitors of University of Virginia*, the University of Virginia offered funds to cover printing costs for student newspapers, but then denied a Christian newspaper's application for those funds because the newspaper "promot[ed] or manifest[ed] a particular belie[f] in or about a deity or an ultimate reality." 515 U.S. 819, 827, 843 (1995). The Supreme Court held that this denial violated the First Amendment. Even though the University had no obligation to cover printing costs in the first place, it could not selectively rescind the offer

17

once made based on the viewpoints expressed by a particular speaker: "Having offered to pay the third-party contractors on behalf of private speakers who convey their own messages, the [State] may not silence the expression of selected viewpoints." *Id.* at 835.

Likewise, as this Court highlighted in its PI Order, the Supreme Court held in *Perry v Sindermann* that even when "a person has no 'right' to a valuable governmental benefit," it may not deny that benefit "on a basis that infringes … his interest in freedom of speech." 408 U.S. 593, 597 (1972); *see* PI Op. 58. In *Perry*, a public school teacher was not offered a new teaching contract because he had expressed viewpoints that the government disfavored. The Court held that his lack of a contractual right to re-employment "is immaterial to" his First Amendment claim, as the government could not withhold an offer for reasons that violate the First Amendment. It explained that if the "government could deny a benefit to a person because of his constitutionally protected speech or associations, his exercise of those freedoms would in effect be penalized and inhibited," which would improperly "allow the government to 'produce a result which [it] could not command directly.'" 408 U.S. at 598; *see also Koala v. Khosla*, 931 F.3d 887, 898 (9th Cir. 2019) ("The *Speiser-Perry-Regan-Finley* line of cases reflects the Supreme Court's continued cautionary admonition that the First Amendment will not tolerate the administration of subsidy programs with a censorious purpose.").

Other decisions echo this rule. Congress may not condition its funding of the Legal Services Corporation on its attorneys' agreement not to express viewpoints the government disfavors. *Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 540-49 (2001). Congress may not impose viewpoint-based restrictions on granting the government benefit of a trademark. *Iancu v. Brunetti*, 588 U.S. 388, 392 (2019). Cities may not withdraw funding from a museum "because of the perceived viewpoint of the works." *Brooklyn Inst. of Arts & Scis. v. City of New York*, 64 F. Supp.

2d 184, 202 (E.D.N.Y. 1999). And cities may not discontinue an organization's arts funding because of the organization's viewpoints on social issues. *Esperanza Peace & Justice Center v. San Antonio*, 316 F. Supp. 2d 433, 447-56 (W.D. Tex. 2001).

These decisions all reflect the same "bedrock" First Amendment principle: "the government cannot leverage its power to award subsidies on the basis of subjective criteria into a penalty on disfavored viewpoints or aim at the suppression of dangerous ideas in the provision of subsidies." *Thakur v. Trump*, 163 F.4th 1198, 1206 (9th Cir. 2025). The First Amendment does not require the federal government to fund humanities scholarship or make grant funds available under the Public Scholars program, the Awards for Faculty at Historically Black Colleges and Universities program, or any other program. But once it has created those programs—and especially once it has confirmed that all class members' grants satisfy the subject-matter and merit-based requirements for those programs—it may not revoke those subsidies to "silence the expression of selected viewpoints." *Rosenberger*, 515 U.S. at 835.

**B.    Defendants Illegally Terminated "DEI" Grants Based on Viewpoint.**

In direct violation of those principles, the government withdrew funding from DEI grantees because it believed their projects promoted or were associated with disfavored viewpoints. The government's viewpoint discrimination is indisputable on this record: Defendants explicitly identified the viewpoints it wished to suppress, hunted down the grants that expressed them, and terminated those grants on that basis. That is the textbook definition of viewpoint discrimination. Indeed, the facts are so clear that in *Thakur*—which challenges some of the same grant terminations—the "government [did] not dispute that it terminated the subject grants because they promoted DEI, DEIA, or environmental justice." *Thakur*, 163 F.4th at 1206.

Defendants' two-pronged approach was explicitly aimed at identifying DEI grants and terminating them on that basis. First, NEH's Chief Information Officer directed NEH staff to identify grants issued "from 2021 to the present" regarding whether they promoted "environmental justice," "diversity, equity, and inclusion," "diversity, equity, inclusion, and accessibility," or "gender ideology." Ex. 4, NEH_AR_000001. NEH staff followed that instruction; as Defendant McDonald confirmed, "[NEH] staff reviewed all the awards made over the past four years and rated them 'high, medium, or low' in terms of promoting DEI." Ex. 5, NEH_AR_000022; *see also* Ex. 6, NEH_AR_000006 (spreadsheet with NEH staff annotations); McDonald Dep. at 101:7–11 ("Q. NEH staff went through and they rated every single active grant as low, medium, or high for these three categories; is that right? A. Yes.). If NEH staff believed a grant "promot[ed]" DEI, it was flagged for termination. *See, e.g.*, McDonald Dep. at 144:6–15 (McDonald agreeing that this process "was specifically to identify grants for potential termination").

For example, NEH staff rated a grant for a book about Black and indigenous farmers in the rural Midwest as "high" for DEI because it "discusses racial discrimination and land appropriation from Indigenous people, as well as environmental justice." Ex. 6, NEH_AR_000006 at R61. Similarly, NEH staff rated a grant to named (and Authors Guild member) Plaintiff Nicole Jenkins as "medium" for DEI because it "discusses white supremacy and Black women's experience of discrimination." *Id*. at R56. And NEH staff rated a grant to the American Historical Association as "high" for promoting environmental justice because it "violated the administration's views" on climate change. McDonald Dep. at 104:13–107:1. These DEI ratings were distributed internally at NEH, and then sent by Defendant Wolfson to Fox and Cavanaugh when they arrived at NEH. *See* Ex. 8, NEH_AR_000005; Fox Dep. at 165:23–166:2 ("A. Mike and Adam gave what their team

had done, reviewing every outstanding grant, tagging for DEI or not."). All three grants were later terminated. *See* Ex. 25, NEH_AR_0000136 at row 198, 1222.

Second, Fox conducted his own DEI review of the grants that NEH staff had *not* flagged as promoting DEI. He testified that he conducted this review to identify additional grants that should be placed "[o]n the road to termination." Fox Dep. at 159:2–11; *id.* at 193:20–23 (agreeing that his review was to "isolate [them] as grants to terminate"). Fox conducted this review by using ChatGPT. He sent each grant's description from the NEH database to ChatGPT, with the following prompt: "Does the following relate at all to DEI? Respond factually in less than 120 characters. Begin with 'Yes.' or 'No.' followed by a brief explanation." Ex. 11, US-000062485 (tab "Sheet3"), at C2–C1163. Fox testified that he used ChatGPT in this way "[t]o highlight why this grant may relate to DEI," Fox Dep. at 204:20–23, and "to pull out anything related to DEI," *id.* at 209:25–210:1. Fox's ChatGPT prompt is especially revealing in what it did not ask. Fox did not ask ChatGPT whether a grant advanced NEH's statutory mission or purposes, whether it reflected scholarly merit, or whether the grantee had complied with the grant terms. He asked only whether it "relate[d] at all to DEI"—a purely ideological filter with no programmatic function other than identifying viewpoints to suppress.

ChatGPT provided the output that Fox requested. For example, it answered "Yes" for the grant awarded to Authors Guild named Plaintiff Benjamin Holtzman, stating that "[t]his book project explores the grassroots activist network that challenged white power in the late 20th century US, highlighting diverse groups joining forces to challenge white supremacists and transform understandings of racism." Ex. 11, US-000062485 (tab "Sheet3"), at H592. Similarly, ChatGPT marked as "Yes" for DEI a book on deaths in the Native American boarding school system, because it "sheds light on the dark history of Native American boarding schools, revealing

their lethal impact" and "addressing the erasure of lives and the need for awareness in education systems. *Id.*, (tab "Sheet3"), at D638.

In total, 1,057 grants[2] were identified as DEI through either NEH's review or Fox's review, and then terminated on that basis. *See* Ex. 25, NEH_AR_0000136; Cavanaugh Dep. at 202:14–20 ("Q. [I]f a grant related to DEI, it couldn't be on the 'keep' list, right? A. That's correct."); McDonald Dep. at 144:6–15 (agreeing that the result of this process "was specifically to identify grants for potential termination"). Defendants have never claimed that these grants were reviewed for their humanistic merit or terminated for any reason other than their viewpoint (or perceived viewpoint, which is the same thing for First Amendment purposes, *see Heffernan v. City of Paterson*, 578 U.S. 266, 272 (2016)). Instead, they have openly admitted that these grants were targeted and terminated for promoting DEI. DOGE publicly characterized the terminations as such, posting from its official account on X (formerly Twitter) that "[d]uring the previous administration, the National Endowment for the Humanities (NEH) awarded the following grants to spend taxpayer dollars, all of which have been cancelled ($163M in overall savings)" before listing five grants explicitly related to LGBTQ+ topics. Post, DOGE (@DOGE), X (May 20, 2025, 3:45 PM) https://x.com/doge/status/1924944059153670530. Likewise, McDonald confirmed that "the policy for selecting grants for termination at NEH focused first on identifying open grants that focused on or promoted (in whole or in part) 'environmental justice,' 'diversity, equity, and inclusion' or 'diversity, equity, inclusion and accessibility,' and 'gender ideology.'" *Thakur* ECF 46 ¶ 20.

The record thus presents a termination process that made viewpoint, rather than humanistic merit, the criterion for defunding. Every aspect of the termination process—the internal DEI

---

[2] All of these grants, except for those held by ACLS Plaintiffs or their members, are part of the Authors Guild's proposed DEI Subclass.

ratings, the ChatGPT filter, and the spreadsheet sorting grants by DEI—reflects a single, unconstitutional purpose: to drive disfavored ideas from the marketplace of humanistic inquiry. *See Thakur*, 163 F.4th at 1207 ("[T]he current record suggests that the government aimed at the suppression of speech that views DEI, DEIA, and environmental justice favorably."). As this Court observed at the preliminary injunction stage: "[G]rants were terminated, not because the Plaintiffs' proposals were unworthy of NEH funding or reflected undistinguished scholarship, but because the matters they proposed to study ran afoul of the current Administration's beliefs or preferences." PI Op. 58.

### C. Defendants Illegally Terminated Biden-Era Grants Based on Viewpoint and Association.

The government likewise violated the First Amendment when it terminated other Biden-era grants. Just as the government may not deny benefits or rescind funding based on the recipient's viewpoint, it may not deny benefits or rescind funding "because of the recipient's association with a political party." PI Op. 60 (citing *Elrod v. Burns*, 427 U.S. 347 (1976); *Branti v. Finkel*, 445 U.S. 507 (1980)). Defendants did both with respect to the other Biden-era grants: they terminated grants because 1) they perceived the grantees' viewpoints to be aligned with the Biden Administration, and accordingly disfavored them; and 2) "because they were awarded by the Democratic administration – a reason that blatantly conflicts with First Amendment principles." *Id.* at 61. Both grounds are unlawful.

Defendants' targeting of "Biden-era" grants was clear from the start. When NEH's Chief Information Officer first directed NEH staff to start reviewing grants, he directed them to review only grants issued "from 2021 to the present." Ex. 4, NEH_AR_000001; *see also* Ex. 8, NEH_AR_000005 (Wolfson describing "historical review of NEH's grants since January 2021"); Ex. 26, Deposition of Adam Wolfson ("Wolfson Dep.") at 87:21–88:4 (describing "historical

review of all grants starting [at] the start of the Biden administration"). January 2021 was, of course, the month in which President Biden took office. Likewise, as soon as DOGE entered the picture, Cavanaugh sent McDonald "a list of grants that were awarded during President Biden's administration . . . at NEH" and suggested that all funds awarded during President Biden's administration that had yet to be distributed "can presumably be clawed back." Ex. 27, NEH_AR_000003. McDonald testified to his "understanding" from interactions with DOGE that "the presumption was that … open grants that were made under the Biden administration needed to be reviewed." McDonald Dep. at 372:19–23.

While Defendants' initial focus was on the subset of Biden-era grants they believed promoted DEI, Fox and Cavanaugh later deemed "wasteful" even those Biden-era grants that were not flagged for DEI. As McDonald explained DOGE's expanded focus to NEH staff, "it became clear that [Fox and Cavanaugh] were looking at the totality of the awards that had been with [the] previous administration." McDonald Dep. at 302:21–25. Given a specific example of a Biden-era grant that was not flagged for DEI but still terminated, McDonald explained: "Basically, we were looking at the last four years of open grants from the Biden administration. My understanding was we wanted to start afresh, a … clean slate … as much as possible." *Id.* at 226:12–227:1.

Defendants have never claimed—either contemporaneously or in this litigation—that any of these grants were terminated for a lack of humanistic merit or based on a re-evaluation of their contributions to the humanities. Instead, they were uniformly tagged as "Biden Grants," *see, e.g.*, Ex. 28, NEH_AR_000004, and—for the ones not terminated for promoting DEI—were deemed "wasteful" unless they advanced a message the Trump Administration favored. Specifically, Cavanaugh testified that the non-DEI Biden-era grants were presumptively wasteful unless Defendants' review determined that they "aligned with the [Trump] Administration." Cavanaugh

24

Dep. at 155:11–13; *see also, e.g.*, Ex. 17, NEH_AR_000013 ("[W]e have only excluded [from termination] the ones that seem not to conflict with the Administration's priorities."); Ex. 5, NEH_AR_000022 ("We've collected the grants you flagged to keep and a few of those pertaining to America 250th or within priorities of the administration"); Ex. 29, US-000064703 (McDonald's talking points stating that "the President does not like" the terminated grants). Defendants' "selections among recipients of public subsidies that favor and strengthen those friendly to the government's message while placing at a disadvantage and thus weakening the opponents and skeptics" is the kind of hand on the scale that is constitutionally verboten. *Alliance for Open Soc'y Int'l, Inc. v. USAID*, 430 F.Supp.2d 222, 258 (S.D.N.Y. 2006).

## II.    DOGE Terminated NEH Grants without Legal Authority

Plaintiffs are also entitled to judgment as a matter of law on their claim that DOGE terminated NEH grants without legal authority.

As an initial matter, it bears emphasis that there are two distinct types of "non-statutory review" claims, and Plaintiffs bring both here in the alternative. *See Sustainability Inst. v. Trump*, 165 F.4th 817, 829-30 (4th Cir. 2026). First, a plaintiff may allege that "a federal actor has violated a federal *statute.*" *Id.* at 830 (emphasis added). Such claims asserting statutory violations—"often called ultra vires claims"—have been described as a "Hail Mary pass," *id.*, but as this Court noted in its PI Order, that stringent standard would be satisfied here if the evidence shows that DOGE "effectively usurped the legal authority to terminate grants that Congress had expressly conferred on the NEH Chairperson." PI Op. at 68. Distinctly, a plaintiff may also assert "[n]onstatutory review claims alleging a constitutional violation," which, while sometimes also referred to as "ultra vires" claims, "are not subject to the same restrictions" as those challenging action merely in excess

of statutory authority. *Id.*; *see also Am. Ass'n of Univ. Professors v. Trump (AAUP)*, 2025 WL 3187762, at *22 (N.D. Cal. Nov. 14, 2025).

Here, Plaintiffs' DOGE claim is principally a constitutional one. In canceling the grants, DOGE did not merely exceed or violate some delegated statutory authority—it has absolutely no statutory authority at all. "[A]n agency literally has no power to act . . . unless and until Congress confers power upon it." *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 357 (1986). Here, it is undisputed that Congress conferred no statutory authority upon the U.S. DOGE Service or Fox and Cavanaugh, as members of the DOGE team at GSA, to take action on NEH grants. DOGE thus acted "in the absence of any statutory authority" from Congress," which the Supreme Court has recognized as an actionable separation of powers claim. *Rhode Island v. Trump*, 2025 WL 3251113, at *16 (D.R.I. Nov. 21, 2025) (quoting *Dalton v. Specter*, 511 U.S. 462, 473 (1994)); *see also, e.g.*, *League of United Latin Am. Citizens v. Exec. Off. of the President*, 2026 WL 252420, at *31 (D.D.C. Jan. 30, 2026).[3] Indeed, in *Dalton*, the Supreme Court described its seminal separation-of-powers decision—*Youngstown*—as involving a constitutional claim because there was a "conceded absence of any statutory authority." *Dalton*, 511 U.S. at 473 (citing *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585, 587 (1952)).

The same is true here: there is no dispute that DOGE lacked any statutory authority to terminate NEH grants. Accordingly, as this Court explained in its preliminary injunction opinion, this claim turns simply on whether "DOGE did the terminating," or whether "McDonald[] . . . made the final decision" to terminate the relevant grants. PI Op. 69. With the evidence now produced in discovery, there can be no genuine dispute that "DOGE did the dirty work here." *Id.*

---

[3] Plaintiffs are not relying on the Administrative Procedure Act's cause of action for this claim. Instead, they bring freestanding implied rights of action to seek equitable relief for violations of the Constitution. *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 491 n.2 (2010).

The evidence shows that Fox and Cavanaugh, as agents of DOGE: (i) selected which NEH grants to terminate, (ii) made the final decision to terminate those grants, and (iii) executed the terminations. As McDonald himself put it, he could make only "recommendation[s]," Ex. 5, NEH_AR_0000023, because (as he put it in an email to Fox imploring DOGE not to cancel certain grants) "you've made clear, it's your decision on whether to discontinue funding any of the projects on this list." Ex. 14, NEH_AR_0000023.

Fox and Cavanaugh took over the termination selection process as soon as they were sent to NEH by Steve Davis, DOGE's *de facto* head. Fox quickly compiled a list of 1,057 grants to terminate because they purportedly involved DEI. Ex. 30, US-000000839; Ex. 12, US-000000936. Fox and Cavanaugh unilaterally decided to include not only grants that NEH staff had identified as "high" risk for DEI or gender ideology, but also grants that NEH staff had identified as "medium" or "low" risk. *See, e.g.*, Ex. 6, NEH_AR_000006 at R55. Fox then identified roughly 440 more grants as purportedly DEI by using ChatGPT. When Fox emailed the combined list to McDonald and Wolfson on March 16, 2025, he stated: "We [i.e., DOGE] reviewed all active grants for DEI involvement and marked them accordingly." Ex. 30, US-000000839; Ex. 12, US-000000936. On March 19, Fox sent McDonald a list of the approximately 440 grants that were "flagged as NA for DEI by NEH personnel, but *we* flagged for DEI involvement." Ex. 13, US-000041372 (emphasis added). DOGE and McDonald referred to this as the "N/A spreadsheet." Ex. 5, NEH_AR_000022.

No one at NEH knew anything about how DOGE came up with the "DEI rationales" that it used to flag grants for termination. McDonald Dep. at 117:4–6. McDonald did not know the criteria used for drafting these DEI rationales, and he had no idea that DOGE had used ChatGPT

to generate them. McDonald Dep. at 117:4–6, 126:9–19. When shown some of the rationales, McDonald agreed that the rationales often made no sense. For example:

- ChatGPT flagged a grant to the Modern Language Association as DEI on the ground that it "aims to align humanities courses with career outcomes for under-served students." McDonald Dep. at 127:16–20; Ex. 31, US-000061583. McDonald did not agree that this grant implicated DEI. McDonald Dep. at 119:3–8.

- ChatGPT flagged as DEI a grant to an ACLS member to digitize mid 20th century African American newspapers, on the ground that it "contributes to inclusivity by preserving and sharing underrepresented voices." McDonald Dep. at 121:9–14; Ex. 31, US-000061583. McDonald did not agree that this grant implicated DEI. McDonald Dep. at 121:15–17.

- ChatGPT flagged as DEI a grant to an ACLS member to digitize and display anatomical flap books, on the ground that it "promot[ed] inclusivity in digitization efforts." McDonald Dep. at 122:19–25. McDonald did not agree that this grant implicated DEI and believed that ChatGPT "mischaracterize[d] the grant." McDonald Dep. at 123:1–8.

McDonald further agreed that if the grants were terminated on the basis of these rationales (they were), that would not be "an appropriate basis for termination." McDonald Dep. at 119:9–23, 121:18–24, 123:10–18; *see also id.* at 128:21–129:15 (agreeing that ChatGPT incorrectly designated a grant about the history of an anti-Black massacre as DEI); *id.* at 130:1–131:11 (same for a grant for a film called "Diamond Diplomacy" about baseball). Overall, after learning for the first time at his deposition that Fox had deployed ChatGPT to identify grants as DEI, McDonald testified that he did not believe this was an appropriate methodology to identify which grants should be terminated. *Id.* at 131:12–25.

On March 28, 2025, Cavanaugh and Fox met with McDonald and Wolfson and told them that DOGE had decided to "expand" its termination efforts "beyond DEI," to include wasteful spending. *Id.* at 155:10–19, 156:10–13 (the "idea" to terminate based on wasteful spend "came from Nate and Justin"). In the final days leading to the Mass Termination, Fox ran out of patience with McDonald and dispensed with any fig leaf that McDonald or others at NEH had control over the final termination decisions and the execution of them. Fox sent McDonald a series of frantic

emails on March 31, 2025, culminating in Fox emailing McDonald: "Call me when you get the chance . . . We're getting pressure from the top on this and we'd prefer that you remain on our side but let us know if you're no longer interested." Ex. 16, NEH_AR_000010. After Fox and McDonald spoke later that day, McDonald Dep. at 189:18–21, McDonald emailed Fox and Cavanaugh regarding the termination process. Ex. 17, NEH_AR_000013. McDonald stated that NEH had been "getting ready to cancel" the grants that NEH staff had determined were "implicated by the [Executive Orders]," but that he now "understand[s] that you [*i.e.*, DOGE] will do so." Ex. 17, NEH_AR_000013. McDonald also told Fox that he had reviewed DOGE's "N/A spreadsheet" and that, "[a]s you instructed, we have only excluded the ones that seem not to conflict with the Administration's priorities—such as the Papers of George Washington." *Id.* McDonald added: "We understand that you will cancel this list of projects as well." *Id.*

The next morning, on April 1, McDonald explicitly stated his disagreement with DOGE's decision to terminate grants on the N/A list. Ex. 5, NEH_AR_000022. With respect to those grants, McDonald stated: "[w]e think these projects are harmless when it comes to promoting DEI." *Id.*; *see* McDonald Dep. at 203:12—212:9. McDonald then wrote:

> [O]ur *recommendation* is that wherever the "DEI Rationale" on the spreadsheet makes clear that there is no DEI component to the project, there is no justification for canceling the project's funding[,] and *you should allow it to continue*.

Ex. 5, NEH_AR_000023 (emphasis added); *see also* McDonald Dep. at 212:11–215:19. But, he added, "as you've made clear, it's *your decision on whether to discontinue funding any of the projects on this list*." Ex. 5, NEH_AR_000023 (emphasis added). McDonald testified that his recommendation not to terminate included all projects for which there was no clear DEI component of the project, including grants that ChatGPT erroneously labeled as DEI, such as the three grants described above to ACLS Plaintiffs and their members. McDonald Dep. at 218:15–220:14.

Accordingly, in McDonald's own words, it was DOGE's "decision" whether to terminate any of the grants, and he was left to only "recommend[]" which grants should be spared. *Id.* He pleaded with DOGE to save grants—stating "you should allow it to continue"—but DOGE said no, swiftly rejecting his "recommendation." *See* McDonald Dep. at 214:2–6 ("Q: And did they take your recommendation? A: I don't believe they did, no."); Cavanaugh Dep. at 181:3–9 ("Q: Who rejected that recommendation? A: Justin and I both rejected that recommendation.").

Not only did DOGE reject McDonald's recommendations, but DOGE then at the last minute—on April 1, 2025—added the non-DEI, Biden-era grants for termination, Ex. 32, US-000041206. McDonald Dep. at 225:2–6. These included, for example, a grant to advance the National Catholic Center for Holocaust Education at Seton Hill University. McDonald Dep. at 225:12–20. As with the prior lists that DOGE compiled, McDonald did not select these grants for termination, and he disagreed that many of the grants on this list implicated DEI or were wasteful. *See, e.g.*, McDonald Dep. at 226:6–11 ("Q: [I]n your view, does this grant relate to DEI? A: No. Q: Would you consider this to be wasteful spend? A: I would not, no."); *see also id.* at 229:5–10; 231:21–24.

Fox ultimately sent McDonald and Wolfson an Excel file containing a compiled list of all grants "to cancel" and all grants "to keep." Ex. 5, NEH_AR_000022; Ex. 32, US-000041206. McDonald testified that "Justin [Fox] prepared the list" of all grants "to cancel," and it was Fox "who put [] particular grant[s] on the list for termination." McDonald Dep. at 229:9, 231:21–24. McDonald further testified that he did "not recall approving the termination of [] specific grant[s]" on the list, *id.* at 231:7–12, including the three grants previously discussed held by ACLS Plaintiffs and their members, *id.* at 231:13–232:11. McDonald testified that the termination of some of the awards "did not reflect well on" NEH. *Id.* at 227:2–7. And even today, McDonald has no idea

whether a grant was included on this list because it supposedly implicated DEI or because it constituted "wasteful spend." McDonald Dep. at 179:1–17. That determination, like the decision ultimately to terminate, was made solely by DOGE. McDonald Dep. at 179:18–80:3.

In addition to not choosing grants to terminate or even knowing why they were terminated, McDonald testified that he had no idea why particular grants were placed on the "to keep" list. *See, e.g.*, McDonald Dep. at 248:5–19 (McDonald did not know why a project to arrange and describe "475 linear feet of Jewish Federation records dating 1916 to 1999" was kept); *id.* at 253:23–55:11 (McDonald had "no idea" why a grant to add 200 entries to Encyclopedia Virginia about the Revolutionary Era was kept). Although McDonald initially testified that he believed projects were saved because they related to the American Revolution or American "civilization and culture," *see id.* at 238:2–239:4, he ultimately admitted that DOGE kept some projects that had no apparent connection to those topics, such as projects focus on English, Spanish, and German philosophers, *id.* at 249:9–253:11.

After DOGE decided on the final list of grants to terminate, Cavanaugh and Fox executed the terminations. As noted above, Fox drafted the termination notices and then gained administrative access to a Microsoft email account that he then used to send the termination notices. Fox Dep. at 321:19–23; McDonald Dep. at 163:22–25; Ex. 16, NEH_AR_000011. Fox typed Michael McDonald's signature on the termination notices; McDonald did not sign the notices himself. Ex. 33, Defs.' Responses to Pls.' Requests for Admission No. 36; McDonald Dep. at 262:17–21.

In the days following the terminations, McDonald made clear in conversations with NEH staff that DOGE terminated the grants at issue. In a meeting with staff on April 3 (the day after the terminations), McDonald described DOGE as having written and transmitted the terminations,

saying that "*they* said in the notification letter . . . [that] *they* would not be adhering to the traditional notification processes." McDonald Dep. at 303:14–18; McDonald Dep. at Ex. 30 (transcript). McDonald described the rationale for the terminations as "because that's the way DOGE had operated at other agencies and they applied the same methodology here." McDonald Dep. at 315:23–316:1; McDonald Dep. at Ex. 30 (transcript). McDonald could not even answer a question about the number of grants terminated, stating that it would be "conjecture" on his part. McDonald Dep. at 312:20–23.

Similarly, NEH staff understood that DOGE—and not NEH—had been responsible for the terminations. NEH's Director of the Division of Research Programs wrote to a grantee that "this was not an agency decision." Ex. 19, US-000065114. NEH's Chief Information Officer likewise wrote to a grantee that "DOGE did indeed cancel your award." Ex. 18, US-000064982. And Wolfson wrote in a text to McDonald shortly after the terminations that "it is the case that DOGE cut grants having nothing to do with DEI." Ex. 34, US-000062916. McDonald responded with a "thumbs up" to Wolfson's message, which he testified meant that he agreed with Wolfson's statements. McDonald Dep. at 326:15–19.

In short, Fox and Cavanaugh selected the grants to terminate using their own methodologies, overruled McDonald's expressed objection to terminating many grants, drafted and signed the termination letters, and then sent the termination letters directly to grantees. McDonald was largely an observer to the process, with the one exception being when he recommended not to terminate a large number of the grants, which Fox and Cavanaugh swiftly rejected. There can be no genuine dispute that DOGE, and not McDonald or anyone else at NEH, terminated the grants.

Because Congress conferred no power upon DOGE to terminate or administer NEH grants, Fox and Cavanaugh acted in the complete "absence of any statutory authority," violating the separation of powers. *Rhode Island*, 2025 WL 3251113, at *16. In the alternative, should the Court conclude that this claim is properly considered as an *ultra vires* claim based on a statutory violation, *supra* at 25, the claim would still succeed. The record makes clear that "DOGE did the terminating." PI Order at 68. In doing so, Fox and Cavanaugh "plainly act[ed] in excess of" any "delegated powers" they had as members of the DOGE team at GSA. PI Op. 68 (quoting *Yale New Haven Hosp. v. Becerra*, 56 F.4th 9, 27 (2d Cir. 2022)).

## III. Many of the Grant Terminations Violated the Equal Protection Clause

Defendants violated the equal protection guarantee of the Fifth Amendment in terminating grants through classifications based on race, ethnicity, national origin, religion, sex, and sexual orientation.

Where the government uses race to create a classification for purposes of official action, the government must satisfy strict scrutiny. The Supreme Court has made clear that "*all* racial classifications, imposed by whatever federal, state, or local governmental actor, must be analyzed by a reviewing court under strict scrutiny." *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 227 (1995) (emphasis added). The government's "motives" for using race to create a classification does not "affect the strict scrutiny analysis." *Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 741-42 (2007). Rather, courts must "apply strict scrutiny to all racial classifications to smoke out illegitimate uses of race by assuring that government is pursuing a goal important enough to warrant use of a highly suspect tool." *Johnson v. California*, 543 U.S. 499, 505–06 (2005) (quotations omitted). Moreover, a "racial classification itself" is a "relevant harm." *Alexander v. S.C. State Conf. of the NAACP*, 602 U.S. 1, 38 (2024).

The above applies equally to classifications based on ethnicity, national origin, and religion, for which strict scrutiny always applies. *See Graham v. Richardson*, 403 U.S. 365 (1971) (alienage, nationality, and race); *United States v. Brown*, 352 F.3d 654, 668, n.16 (2d Cir. 2003) (religion). The Court must apply "heightened scrutiny" for any "gender-based classification," under which the classification "must serve important governmental objectives, and the discriminatory means employed must be substantially related to the achievement of those objectives." *Nevada Dep't of Hum. Res. v. Hibbs*, 538 U.S. 721, 728-20 (2003) (cleaned up). The Second Circuit has held that heightened scrutiny likewise applies to classification based on sexual orientation. *Windsor v. United States*, 699 F.3d 169, 185 (2d Cir. 2012) *aff'd on other grounds*, 570 U.S. 744 (2013).

Defendants unambiguously employed all of the above suspect classifications to identify grants for placement on the termination list. For instance, after being deployed to NEH, Justin Fox used search terms—which he labeled as "Detection Codes"—to identify grants that he dubbed the "Craziest Grants" and "Other Bad Grants." Ex. 9, US-000016154 ("Detection List" tab); Fox Dep. at 276:16–277:2. The search terms included, among other terms, "BIPOC (Black, Indigenous, People of Color)," "Minorities," "Native," "Tribal," "Indigenous," "Immigrant," "LGBTQ," "Homosexual," and "Gay." Fox. Dep. at 236:22–237:10. Fox did not include corresponding terms such as "White" or "Heterosexual." *Id.* at 242:2–243:19. Fox thus explicitly created classifications based on specific races, ethnicities, and sexual orientations.

Fox also created classifications based on these protected characteristics through his use of ChatGPT. Fox directed ChatGPT to identify grants purportedly involving DEI, but Fox never instructed ChatGPT not to identify grants solely on the basis of race or other protected characteristics. Fox. Dep. at 207:11–214:21. And it is clear that ChatGPT did exactly that. As

described, ChatGPT provided a "DEI Rationale" that explained why it answered "Yes" for each particular grant involving DEI. In hundreds of cases, that DEI Rationale is explicit that ChatGPT made the classification solely because a grant involved a particular race or other protected trait. As just one example, the grant description given to ChatGPT for one grant was: "The documentary tells the story of the Colfax Massacre, the single greatest incidence of anti-Black violence during Reconstruction, and its historical legacy for Black civil rights." Ex. 11, US 000062485 (tab "Sheet3"), at D3. ChatGPT classified that grant as DEI because "The documentary explores a historical event that significantly impacted Black civil rights." *Id.*

Fox testified that he agreed with ChatGPT's methodology of classifying grants because they involved specific races, religions, genders, and—so on. In the aforementioned grant about the Colfax Massacre, Fox testified that the grant was properly labeled as DEI—and thus ultimately terminated—because "[i]t focuses on . . . a specific race, here being Black." Fox Dep. at 220:16–18. For a different grant about violence against women during the Holocaust, Fox testified that ChatGPT properly classified the grants as involving DEI, and thus slated it for termination, because it was "specifically focused on Jewish cultures" (as in, it was about the Holocaust) and the "voices of the females in that culture." *Id.* at 191:5–9. More generally, Fox stated that he identified as DEI any grant about a specific "minority group," meaning any particular "ethnicity, culture . . . race or gender or religion." *Id.* at 183:14–16, 191:19–25 ("Q. So how do you go about determining what was a minority [...]? A. Inherently focused on any ethnicity, culture, gender, no matter the, sort of, race or gender or religion or – yeah").

Defendants included at least 110 grants of ACLS Plaintiffs, their members, and members of the DEI Subclass in their racial and other unlawful classifications used to terminate grants. By

way of example, in reliance on ChatGPT, Defendants gave the following "Rationales" for slating

some of the grants for termination:

- "This biography explores the life and accomplishments of . . . a Black lawyer and jurist."

- "The documentary explores a historical event that significantly impacted Black civil rights."

- "This project analyzes the experiences and contributions of Black children in the Atlantic world, shedding light on their perspectives and resistance to slavery."

- "The Kansas City workshop highlights diverse histories, including Black and Latinx communities, in the Jazz Age and Great Depression."

- "This proposal aims to expand understanding of Black life and geography during slavery."

- "This project focuses on the history and experiences of a Black community."

- "The book explores a Black-led project."

- "The SNCC discussion series engages historically marginalized communities and highlights Black history and activism."

- "The project uses historical research and Augmented Reality to showcase a demolished Chinatown, inviting reflection on the Asian American experience."

- "This anthology explores Jewish writers' engagement with the Holocaust in the USSR."

- "This project aims to restore the legacy of a marginalized woman writer."

Ex. 21, NEH_AR_000024 (Rows, 346, 239, 298, 205, 417, 267, 255, 156, 158, 258, 260,

respectively). Another ACLS member had a grant listed on Fox's list of "craziest" or "other bad

grants" generated using search terms; this grant was deemed "crazy" because it included the term

"LGBTQ" in its description. Ex. 9, US-000016154, "NEH Grants (JF)" tab, row 11). The full list

of grants of ACLS Plaintiffs and their members that were subject to improper classifications, and

for which ACLS Plaintiffs assert equal protection violations, is provided in Exhibit 24.

It does not matter for the equal protection analysis if Defendants argue that they purportedly terminated grants that were about any specific race, ethnic group, gender, or so on regardless of which group was involved. The Supreme Court has rejected the argument that racial classifications do not trigger strict scrutiny where they "neither benefit[] nor burden[] one group or individual more than any other group or individual." *Johnson*, 543 U.S. at 506 (quotations omitted); *id.* ("[I]t is axiomatic that racial classifications do not become legitimate on the assumption that all persons suffer them in equal degree.").

Moreover, any such argument would not even be true as a factual matter. As mentioned, Fox did not search for grants involving "white" or "heterosexual" subjects, despite searching for grants about "BIPOC (Black, Indigenous, People of Color)," "gay", and "homosexual" ones. Fox Dep. at 242:20–243:19. There is not a single instance where ChatGPT classified a grant as DEI because it involved, white, male, heterosexual, or another majority group.

The list of grants that Defendants did not terminate is further illuminating. Of the 42 grants that were not terminated, just one grant was related at all to a racial or ethnic minority, being about emancipation. Ex. 14, US-000061492. Every retained grant about a particular individual was about a white person. *See id.* Whereas Defendants terminated grants because they focused on people from particular countries in Asia, Africa, or South America, Defendants retained grants where the official grant descriptions mentioned a national origin in Western Europe, such as grants about "Victorian poets," a "German theologian," a "German philosopher," "British philosophers," an "English philosopher and mathematician," and an "Italian composer." Ex. 14, US-000061492. And Defendants clearly targeted all grants about Native Americans and Indigenous people for termination; Defendants terminated *every* such grant—dozens in total. *See id.*

Defendants cannot satisfy strict scrutiny—or any level of scrutiny—for these terminations. *See, e.g.*, *City of Saint Paul v. Wright*, 2026 WL 88193, at *5–7 (D.D.C. Jan. 12, 2026) (holding grant terminations unconstitutional under rational-basis review). They cannot point to any compelling state interest served by, or even a rational basis for, terminating grants solely because they involve a specific race, national origin, ethnicity, religion, gender, or sexual orientation. Defendants certainly cannot demonstrate that the manner in which they carried out these terminations was narrowly tailored to any compelling state interest. Thus, the terminations violated the Fifth Amendment's equal protection guarantee.

## IV. The Court Should Enter Multiple Forms of Relief to Fully Remedy the Harms to Plaintiffs and their Members

### A. The Tucker Act Does Not Preclude This Court's Jurisdiction to Issue the Requested Remedies

The Tucker Act does not strip this Court's jurisdiction to remedy Defendants' constitutional violations. Constitutional and *ultra vires* challenges to grant terminations are fundamentally different from the arbitrary-and-capricious claims the Supreme Court addressed in *National Institutes of Health v. American Public Health Association*, 145 S. Ct. 2658 (2025) and *Department of Education v. California*, 604 U.S. 650 (2025). There has been a growing judicial consensus on this point since this Court's preliminary injunction decision, with various courts holding that district courts necessarily have jurisdiction over constitutional challenges to grant terminations. *See, e.g.*, *Climate United Fund v. Citibank, N.A.*, 154 F.4th 809, 817, 826 (D.C. Cir. 2025) (holding that district court had jurisdiction over separation of powers grant termination claim); *Rhode Island*, 2025 WL 3251113, at *4 (same); *City of Saint Paul*, 2026 WL 88193, at *4 (same for equal protection and First Amendment claims); *Am. Acad. of Pediatrics v. U.S. Dep't of Health & Hum. Servs.*, 2026 WL 80796, at *14–15 (D.D.C. Jan. 11, 2026) (same for First

Amendment claim); *President & Fellows of Harvard Coll. v. Dep't of Health & Hum. Servs.*, 798 F. Supp. 3d 77, 107 (D. Mass. 2025) (same); *AAUP*, 2025 WL 3187762, at *22 (same).

There are two principal reasons why this Court must have jurisdiction over Plaintiffs' claims, notwithstanding *California* and *NIH*. First, as this Court recognized in its preliminary injunction opinion, if the Court lacked jurisdiction to hear Plaintiffs' constitutional claims, Plaintiffs would have *no judicial forum* to present their constitutional challenges and "obtain any remedy for the violation of their constitutional . . . rights." PI Op. 50. It is firmly established that contractors may not bring First Amendment, equal protection, or separation of powers claims in the Court of Federal Claims, because none of those constitutional provisions "mandate payment of money by the government." *LeBlanc v. United States*, 50 F.3d 1025, 1028 (Fed. Cir. 1995). The Supreme Court held in *Webster v. Doe*, 486 U.S. 592 (1988), that where a jurisdiction-stripping statute would leave a plaintiff with no forum to bring a constitutional claim, Congress' "intent" to produce this outcome "must be clear." *Id.* at 603. The Court "require[s] this heightened showing in part to avoid the serious constitutional question that would arise if a federal statute were construed to deny any judicial forum for a colorable constitutional claim." *Id.* (quotations omitted). Applying this rule, the Supreme Court has *never* read a federal statute to preclude a party from having any forum to challenge the constitutionality of government action, to "avoid squarely facing" the "serious constitutional question" that would present. William Baude et al., *Hart & Wechsler's The Federal Courts and the Federal System* 462 (8th ed. 2025).

This Court should decline to go where the Supreme Court has never gone. The Tucker Act contains no clear statement that Congress intended to strip district courts of jurisdiction over constitutional challenges to grant terminations, and that is dispositive under *Webster*. *See AAUP*, 2025 WL 3187762, at *22 ("Defendants have pointed to no evidence that Congress intended the

Tucker Act to deprive parties of recourse for First Amendment claims that cannot be heard in the Court of Federal Claims.").

A second, independent reason why the Tucker Act does not preclude jurisdiction here is that Plaintiffs need not rely on any sovereign immunity waiver. It is well-settled that where a "complaint alleges that the federal defendants acted outside of the scope of their statutory authority and outside constitutional limits, the claims for injunctive relief are not barred by sovereign immunity." *Liffiton v. Keuker*, 850 F.2d 73, 78 (2d Cir. 1988). Because "[t]he officer is not doing the business which the sovereign has empowered him to do," "there is no sovereign immunity to waive—it never attached in the first place." *Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322, 1329 (D.C. Cir. 1996) (quotations omitted). That applies equally to non-statutory constitutional claims and ultra vires claims alleging a violation of a statute.

The decisions in *California* and *NIH* were based solely on the "Administrative Procedure Act's limited waiver of sovereign immunity," *NIH*, 145 S. Ct. at 2559 (cleaned up), providing another reason they do not control here. As one court recently put it, "the Tucker Act's limitation on the APA's sovereign immunity waiver is irrelevant" to constitutional claims against agency officials for grant terminations *AAUP*, 2025 WL 3187762, at *22. And without sovereign immunity, the government can point to no doctrinal basis upon which this Court would lack jurisdiction over Plaintiffs' claims.

And just as the Tucker Act does not deprive this Court of jurisdiction to *hear* Plaintiffs' claims, it does not deprive this Court of authority to remedy Defendants' constitutional violations. In declining to grant this relief previously, the Court reasoned that the Supreme Court's decision in *California* suggested that the Court could not enter an order directing NEH to pay Plaintiffs' their grant funds. *See* PI Op. 49. But in the instant motion, Plaintiffs are not seeking such an order;

they seek only an order that the Court vacate the terminations and enjoin Defendants from terminating again on the same unlawful bases. *Cf. id.* (holding that court likely lacked authority to order NEH to "take all steps necessary [to] disburse funds on covered grants in the customary manner and in customary timeframes").

Since the Court's preliminary injunction decision, numerous courts have issued such relief to remedy constitutional violations in grant termination cases. *See, e.g.*, *City of Saint Paul*, 2026 WL 88193, at *8 (vacating DOE terminations for violating Equal Protection); *American Academy of Pediatrics*, 2026 WL 80796, at *14 (enjoining HHS terminations for violating First Amendment); *President and Fellows of Harvard College*, 798 F. Supp. 3d at 108, 138 (vacating terminations and issuing injunctive relief to remedy First Amendment violations). Nothing in *California* or *NIH* suggests that, once jurisdiction over constitutional claims is established (as it is here), the Tucker Act somehow limits the court's remedial power in equity. *See Brown v. Plata*, 563 U.S. 493, 438 (2011) ("Once invoked, the scope of a district court's equitable powers is broad, for breadth and flexibility are inherent in equitable remedies." (citation modified)). The Court accordingly has equitable jurisdiction to issue the requested relief' constitutional violations.

### B.    The Court Should Enter Declaratory Relief, Vacate the Terminations, and Issue a Permanent Injunction

The Court should enter three forms of relief to remedy the harms to Plaintiffs, their members, and members of the Proposed Class caused by the unlawful grant terminations: a declaration that the terminations were unlawful, vacatur of the grant terminations, and a permanent injunction prohibiting Defendants from terminating the grants on the same unlawful bases and by the same unlawful means in the future. [4]

---

[4] A list of ACLS Plaintiffs' and their members' grants that were terminated is attached as Ex. 7.

First, the Court should enter a declaratory judgment that Defendants' termination of the grants held by Plaintiffs, their members, and members of the Proposed Class violated the Constitution and was *ultra vires*. "The existence of another adequate remedy does not preclude a declaratory judgment that is otherwise appropriate." Fed. R. Civ. P. 57. A declaratory judgment is appropriate when the declaration would "serve a useful purpose in clarifying and settling the legal relations in issue, and when it w[ould] terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceedings." *Kidder, Peabody & Co. v. Maxus Energy Corp.*, 925 F.2d 556, 562 (2d Cir. 1991) (citation omitted). A declaration would serve a useful purpose here: it would clarify whether Defendants' past conduct in terminating the grants violated the Constitution and thereby give relief from uncertainty about whether Defendants may take similar actions in the future.

Second, the Court should vacate Defendants' termination of the grants. Vacatur is necessary to restore Plaintiffs to the status quo before the terminations. *See City of Saint Paul*, 2026 WL 88193, at *8 (vacating grant terminations that violated equal protection). Indeed, in *Saint Paul*, the government acknowledged that because the Court had "determined that DOE's grant-termination decisions . . . were unlawful," the "appropriate remedy" was to "vacate th[o]se decisions." *See* Dkt. 31 at 3 in No. 25-cv-03899 (D.D.C. Feb. 13, 2026). As in *City of Saint Paul* and *President and Fellows of Harvard College*, the Court should vacate the terminations at issue. 2026 WL 88193, at *8; 798 F. Supp. 3d at 138.

Third, the Court should enter a permanent injunction precluding Defendants from terminating the grants in the future on the same unlawful bases and in the same unlawful manner as they did in this case. Vacatur alone is not enough. Although vacatur necessarily entails the reinstatement of the grants, it does not preclude Defendants from terminating the grants again,

even immediately after reinstatement. Without a permanent injunction precluding that future unlawful conduct, Plaintiffs, their members, and members of the Proposed Class face a substantial risk that Defendants will re-terminate their awards. A permanent injunction is therefore necessary to afford complete relief from the constitutional violations established here.

Plaintiffs satisfy each of the factors supporting a permanent injunction, as the Court's ruling on their preliminary injunction motion affirms. *See* PI Op. 116. "The requirements for a permanent injunction are 'essentially the same' as for a preliminary injunction, except that the moving party must demonstrate 'actual success' on the merits." *New York C.L. Union v. New York City Transit Auth.*, 684 F.3d 286, 294 (2d Cir. 2012) (quoting *Amoco Prod. Co. v. Vill. of Gambell, AK*, 480 U.S. 531, 546 n.12 (1987)). After establishing success on the merits, "a plaintiff must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006).

Without question, Plaintiffs are suffering irreparable injury. "In the Second Circuit, it is well-settled that an alleged constitutional violation constitutes irreparable harm." *Deide v. Day*, 676 F. Supp. 3d 196, 232 (S.D.N.Y. 2023) (citing cases); *see also Christa McAuliffe Intermediate Sch. PTO, Inc. v. de Blasio*, 364 F. Supp. 3d 253, 276 (S.D.N.Y.), *aff'd*, 788 F. App'x 85 (2d Cir. 2019) ("When a plaintiff alleges a deprivation of a constitutional right, the Court presumes the existence of irreparable harm"). Other circuits have concluded the same. *See Free the Nipple-Fort Collins v. City of Fort Collins, Colorado*, 916 F.3d 792, 806 (10th Cir. 2019) ("What makes an

injury 'irreparable' is the inadequacy of, and the difficulty of calculating, a monetary remedy after a full trial. … Any deprivation of any constitutional right fits that bill.").

This Court already concluded at the preliminary injunction stage that Plaintiffs' First Amendment claim sufficed to show irreparable injury, noting that courts "presume irreparable harm" in the First Amendment context, because "the 'loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.'" *See* PI. Op. 70 (quoting *N.Y. Magazine v. Metro. Transp. Auth.*, 136 F.3d 123, 127 (2d Cir. 1998)). Defendants' equal protection violations likewise definitionally cause irreparable harm. *See Deide*, 676 F. Supp. 3d at 232 ("[B]ecause Plaintiffs' have established a substantial likelihood of success on the merits with respect to their Equal Protection and Fourteenth Amendment due process right to intrastate travel claims, a presumption of irreparable harm follows."); *Free the Nipple-Fort Collins*, 916 F.3d at 806 (similar).

Even if Plaintiffs were required to show more than constitutional harms, they have done so. As the Court previously found, the record is "replete" with evidence of irreparable harm. PI. Op. 71. Those harms are ongoing, as Plaintiffs and their members have had to cancel or delay projects that were funded by the grants and lay off staff working on the projects. *See, e.g.*, Krebs Decl. ¶¶ 26; Connolly Decl. ¶¶ 17–22; Weicksel Decl. ¶¶ 13–18; Burckert Decl. ¶¶ 7–14; Morreale Decl. ¶¶ 13–17; Schnell Decl. ¶¶ 7–10; Walsh Decl. ¶¶ 12–18 ; Weise Decl. ¶¶ 7–9; *see also* Dkts. 27–51. Nor are legal remedies, such as damages, adequate to remedy Plaintiffs' harms. *See* PI Op. 71. Damages, of course, are unavailable to Plaintiffs on their claims here. *Supra* Section IV.A.

The balance of the equities and public interest likewise favor a permanent injunction. *See We the Patriots USA, Inc. v. Hochul*, 17 F.4th 266, 295 (2d Cir. 2021). Many terminated grants concern topics in which the broader public has a strong interest, particularly at this moment in

time. *See* PI Op. 26–30. As the Court emphasized when granting a preliminary injunction, NEH itself had concluded that the works the grants supported were among "our nation's most significant humanities projects," PI Op. 71, and they contributed in important ways "to our understanding of history, sociology, and literature," *id.* at 72–73. An injunction ensuring these grants are not terminated after reinstatement on the same unlawful bases would certainly "provide[] a significant public benefit." *See Make the Rd. New York v. Cuccinelli*, 419 F. Supp. 3d 647, 665–66 (S.D.N.Y. 2019), *aff'd*, 969 F.3d 42 (2d Cir. 2020). In contrast, a permanent injunction would not impose any cost on the federal government, as it would require only that the government refrain from taking unlawful action. The public interest is always served by requiring the government to comply with the law. *See Planned Parenthood of New York City, Inc. v. U.S. Dep't of Health and Human Servs.*, 337 F. Supp. 3d 308, 343 (S.D.N.Y. 2018).

## CONCLUSION

For the foregoing reasons, the Court should grant Plaintiffs' Motion for Summary Judgment, enter judgment in Plaintiffs' favor on each of their claims, and enter the relief requested herein.

March 6, 2026                    Respectfully submitted,

                                */s/ Daniel F. Jacobson*
                                Daniel F. Jacobson
                                Lynn D. Eisenberg
                                John Robinson
                                Kyla M. Snow
                                JACOBSON LAWYERS GROUP PLLC
                                5100 Wisconsin Ave NW, Suite 301
                                Washington, D.C. 20016
                                (301) 823-1148
                                dan@jacobsonlawyersgroup.com

                                *Counsel for ACLS Plaintiffs*

*/s/ Jamie Crooks*

Jamie Crooks
Amanda R. Vaughn
Michael Lieberman
Yinka Onayemi

FAIRMARK PARTNERS, LLP
400 7th Street, NW, Suite 304
Washington, DC 20004
Ph: (619) 507-4182
Email: jamie@fairmarklaw.com
amanda@fairmarklaw.com
michael@fairmarklaw.com
yinka@fairmarklaw.com

*Counsel for Authors Guild Plaintiffs and the
Proposed Class*