**In the Matter Of:**

*The Authors Guild vs*

*National Endowment for the Humanities*

---

*NATHAN CAVANAUGH*

*January 23, 2026*

---



## 1

```
1              UNITED STATES DISTRICT COURT
2                        for the
3              SOUTHERN DISTRICT OF NEW YORK
4              Civil Action No. 25-cv-3923
5
6    THE AUTHORS GUILD, et al.,
7
                    Plaintiff,
8
              vs.
9
     NATIONAL ENDOWMENT FOR THE HUMANITIES,
10   et al.,
11
                    Defendant.
12
13
14         T R A N S C R I P T of the deposition
15   of NATHAN CAVANAUGH taken stenographically before
16   Lisa Forlano, Registered Diplomate Reporter,
17   Certified Realtime Reporter, Certified Court
18   Reporter - NJ and Notary Public, held at the offices
19   of Schindler Cohen & Hochman LLP, 100 Wall Street,
20   Suite 1500, New York, New York 10005, on Friday,
21   January 23, 2026, commencing at 9:41 a.m.
22
23
24
25
```

## 2

```
1    A P P E A R A N C E S :
2
3          JACOBSON LAWYERS GROUP PLLC
           BY:  JOHN ROBINSON, ESQUIRE
4               KYLA SNOW, ESQUIRE
           5100 Wisconsin Avenue, NW
5          Suite 301
           Washington, DC  20016
6          (301) 823-1148
           John@JacobsonLawyersGroup.com
7          Kyla@JacobsonLawyersGroup.com
           ATTORNEYS FOR PLAINTIFF, ACLS
8
9          FAIRMARK PARTNERS, LLP
           BY:  YINKA ONAYEMI, ESQUIRE
10         400 7th Street, NW #304
           Washington, DC  20004
11         (617) 642-5569
           yinka@fairmarklaw.com
12         ATTORNEYS FOR THE PLAINTIFF,
           THE AUTHORS GUILD
13
           US ATTORNEYS' OFFICE
14         BY:  RACHAEL DOUD, ESQUIRE
           86 Chambers Street
15         New York, NY 10007
           (212) 637-2699
16         rachael.doud@usdoj.gov
           ATTORNEYS FOR THE DEFENDANT
17
18   ALSO PRESENT VIA ZOOM:
19   DANIEL JACOBSON, ESQUIRE - JACOBSON
     LAWYERS
20
     LYNN EISENBERG, ESQUIRE - JACOBSON LAWYERS
21
     SARAH MARTIN, ESQUIRE - JACOBSON LAWYERS
22
     ANNIE CLEAVER, ESQUIRE - FAIRMARK PARTNERS
23
     JAMIE CROOKS, ESQUIRE - FAIRMARK PARTNERS
24
     AMANDA VAUGHN, ESQUIRE - FAIRMARK PARTNERS
25
```

## 3

```
1    ALSO PRESENT:
2    DYLAN BORSOS, VIDEOGRAPHER
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

## 4

```
1                     I N D E X
2
3    WITNESS                              PAGE
4    NATHAN CAVANAUGH
5      By Mr. Robinson                     7
6      By Mr. Onayemi                    215
7      By Ms. Doud                       301
8
9
10
11           E X H I B I T S
12   P-1   Spreadsheet, US-6338            40
13   P-2   E-mail chain, US-61501          68
14   P-3   E-mail and attachment, US-9508  80
15   P-4   Spreadsheet, US-9509            81
16   P-5   E-mail, US-9552                 83
17   P-6   Attachment, US-9553            85
18   P-7   Exhibit C - Neeta Thakur, et al.  95
           vs. Donald J. Trump, et al.
19
     P-8   E-mail dated 2/7/25, AR1       100
20
     P-9   E-mail dated 3/12/25, AR3      105
21
     P-10  Spreadsheet, AR4              111
22
     P-11  E-mail dated 3/13/25, AR5     126
23
     P-12  Spreadsheet, AR6              127
24
25
```

**5**

1                 E X H I B I T S  (CONTINUED)
2    P-13  E-mail dated 3/13/25, US-37960        131
3    P-14  E-mail dated 3/17/25, US-50669        132
4    P-15  E-mail dated 3/17/25, US-839          135
5    P-16  Spreadsheet, US-847                   138
6    P-17  E-mail chain, US-753                  142
7    P-18  E-mail chain, US-826                  149
8    P-19  E-mail chain, NEH_AR_10 - NEH_AR_12   158
9    P-20  E-mail chain, NEH_AR_17 - NEH_AR_19   173
10   P-21  E-mail chain, NEH_AR_21 - NEH_AR_23   178
11   P-22  E-mail chain, US-0562                 184
12   P-23  Spreadsheet, US-61429                 189
13   P-24  E-mail, US-61427                      189
14   P-25  E-mail dated 4/2/25, NEH_AR_91        191
15   P-26  Subpoena                              209
16
17   DIRECTION NOT TO ANSWER                     13
18
19
20
21
22
23
24
25

**6**

1       VIDEO OPERATOR:  We are now on
2   the record.  This begins videotape number
3   one in the deposition of Nate Cavanaugh,
4   in the matter of The Authors Guild versus
5   National Endowment for the Humanities.
6       This deposition is being held at
7   100 Wall Street, Suite 1500, New York,
8   New York 10005.
9       Today's date is January 23,
10  2026, and the time is approximately
11  9:41 a.m. Eastern Time.
12       The videographer is Dylan
13  Borsos, representing Lexitas.  And the
14  court reporter is Lisa Forlano, also
15  representing Lexitas.
16       Will counsel and all parties
17  present please state their appearances
18  and whom they represent.
19       MR. ROBINSON:  John Robinson
20  from Jacobson Lawyers Group on behalf of
21  the American Council of Learned
22  Societies, Plaintiffs.
23       With me at counsel table is Kyla
24  Snow.  And I'll let my colleague from the
25  Authors Guild introduce himself.

**7**

1       MR. ONAYEMI:  Yinka Onayemi from
2   Fairmark Partners on behalf of The
3   Authors Guild, Plaintiffs.
4       MS. DOUD:  Rachael Doud from the
5   US Attorney's Office for the Defendants.
6       MR. ROBINSON:  Good morning,
7   Mr. Cavanaugh.
8       STENOGRAPHER:  Wait a second.
9       NATHAN CAVANUAGH, having been
10  duly sworn, was examined and testified as
11  follows:
12  BY MR. ROBINSON:
13  Q       Good morning, Mr. Cavanaugh.
14  Could you please state your full name for the
15  record?
16  A       Nathan Cavanaugh.
17  Q       And I will start the questioning
18  today.  We'll go for a few hours.  When I'm
19  done, my colleague from the Authors Guild
20  Plaintiffs will ask some questions at the end.
21

**8**



10  Q       I was going to ask about this
11  later, but what is special.co?
12  A       It's a technology company that
13  I'm starting.
14  Q       Oh, okay.  Do you have any other
15  e-mail address?
16  A       I do.
17  Q       Is the best one to reach you
18  that special.co?
19  A       Yes.
20  Q       Okay.  Where are you currently
21  employed?
22  A       I'm the founder and CEO of
23  Special.
24  Q       Any other employment?
25  A       No.

17

1    A    Yes.
2    Q    What did you do after that one
3 year?
4    **A    I started my first company in**
5 **California.**
6    Q    And what company was that?
7    **A    It was called Brainbase.**
8    Q    What was Brainbase?
9    **A    An enterprise software company.**
10    Q    How long were you working at
11 Brainbase?
12    **A    About six years.**
13    Q    Can you say a little bit more
14 about what the company did?  You said
15 enterprise.
16    **A    We helped Fortune 500 brands**
17 **manage their intellectual property on our**
18 **software.  We had about 80 employees.  It was**
19 **acquired by a large public company in Canada in**
20 **2022.**
21    Q    And what did you do after that?
22    **A    I took a break from working in**
23 **the tech industry for about six months and then**
24 **helped cofound another business in the**
25 **technology industry.**

18

1    Q    What was that business?
2    **A    It was called FlowFinance.  It**
3 **was a technology-enabled accounting and finance**
4 **product for small businesses.**
5    Q    How long were you there?
6    **A    About three years.**
7    Q    How large was that company, how
8 many employees?
9    **A    About 40.**
10    Q    And what did you do after that?
11    **A    I moved from California to**
12 **Florida, took another small break in working,**
13 **and then joined the Department of Government**
14 **Efficiency in January of 2025.**
15    Q    Okay.  It's a good segue.  So I
16 did want to ask you how you first got involved
17 with the Department of Government Efficiency,
18 which you might call DOGE today.  That's okay.
19    How did you first get involved?
20    **A    I was introduced to one of the**
21 **recruiters at DOGE through a mutual investor**
22 **connection.  We had a few phone calls about my**
23 **background and my interest in joining DOGE, and**
24 **was subsequently offered a position informally**
25 **to join in D.C.**

19

1    Q    Who was the recruiter?
2    **A    Steve Davis.**
3    Q    Who is Steve Davis?
4    **A    He was a member of the DOGE**
5 **team.**
6    Q    And what's his background?
7    **A    He's the CEO of The Boring**
8 **Company.**
9    Q    Okay.
10    STENOGRAPHER:  Of the what
11 company?
12    **THE WITNESS:  The Boring**
13    **Company.**
14 BY MR. ROBINSON:
15    Q    And approximately when did
16 Mr. Davis contact you?
17    **A    I was introduced to Steve**
18 **January 2nd of 2025, approximately.**
19    Q    Who introduced you to him?
20    **A    A gentleman named Baris Akis.**
21    Q    Do you know how to spell that?
22    **A    B-A-R-I-S  A-K-I-S.**
23    Q    What's his background?
24    **A    He runs a venture capital fund**
25 **in Silicon Valley called Human Capital.**

20

1    Q    And how did you know him?
2    **A    I was introduced to him through**
3 **a mutual investor connection in Silicon Valley.**
4    Q    Who was that?
5    **A    Vinay Hiremath.**
6    Q    Could you spell that, please?
7    **A    V-I-N-A-Y  H-I-R-E-M-A-T-H.**
8    Q    And did I hear you correctly
9 that Mr. Davis was the recruiter, the DOGE
10 recruiter who contacted --
11    **A    His -- he was not a recruiter**
12 **for the DOGE team.  I was introduced to him**
13 **because he was a senior DOGE official and he**
14 **was the one that offered me a position on the**
15 **team.**
16    Q    Okay.  Was there a recruiter?
17    **A    Baris would have been the --**
18 **informally the recruiter.**
19    Q    Got it.  So when Baris called
20 you, what did he -- what did he say?
21    **A    We discussed my background, my**
22 **interest for wanting to join DOGE, standard**
23 **interview questions around my background in**
24 **technology, finance, et cetera.  And then**
25 **subsequently introduced me to Steve, as a**

21

1  second interview.
2      Q    Had you expressed some interest
3  before then to anyone about wanting to join the
4  Administration or DOGE?
5      A    Not the Administration
6  specifically, but DOGE generally, yes.
7      Q    Okay.  How did -- when did you
8  do that?
9      A    I don't recall, frankly.  I've
10  always had an interest in government and
11  politics, so this was a natural time to join,
12  given the focus on technology and finance.
13      Q    Okay.  You said that you
14  expressed, though, that you had some interest
15  in joining DOGE --
16      A    I expressed to the DOGE team
17  that I had interest in joining.
18      Q    But how did -- how did Baris
19  know to contact you that you might be
20  interested in this?
21      A    Because Vinay and I had a
22  relationship and we were talking about the DOGE
23  opportunity and that it was being formed.  He
24  recommended that I speak to Baris about
25  potentially joining.

22

1      Q    Got it.  So did you and Vinay
2  like meet after the election and talk about
3  this or --
4      A    We did meet after the election
5  virtually and had one phone call about my
6  background, spoke a little bit more about why
7  I'd be a good fit for DOGE.  And then he
8  subsequently introduced me to Baris.
9      Q    Do you remember what you told
10  him in that conversation about why you were
11  interested?
12      A    No.
13      Q    Why were you interested?  Let me
14  just ask you that.
15      A    I was interested because I
16  wanted to help reduce the federal deficit.
17      Q    Any other reasons?
18      A    No.
19      Q    You said that Mr. Davis offered
20  you the job?
21      A    It was an informal offer.  It
22  was basically, if you're interested in joining
23  we will assign you a first project on the DOGE
24  team.  And I said yes.  And subsequently
25  started working on a project for the DOGE team.

23

1      Q    Did he interview you?  Did
2  anyone interview you?
3      A    Baris interviewed me twice.
4  Steve and I had a conversation, which would
5  have been the final interview in the process.
6  And then I subsequently joined.
7      Q    What was Baris' view -- role
8  with DOGE, if you didn't already say?
9      A    He had an informal role as a
10  recruiter of folks from the technology
11  industry, just given his background.
12      Q    Do you know if he was employed
13  by the Government?
14      A    I don't believe so.
15      Q    So aside from the individuals
16  we've talked about so far, Mr. Davis, Baris,
17  Vinay, is there anyone else you spoke with, in
18  or out of the Government, before you joined the
19  DOGE team, about joining the team?
20      A    It would have been casual
21  conversations with family, my dad, for example.
22  Outside of that, no.
23      Q    No.
24          Did Mr. Davis or Baris tell you
25  what you would be doing at DOGE?

24

1      A    No.
2      Q    What did they tell you about
3  what your responsibilities would be, generally?
4      A    They did not tell me.
5      Q    So you just knew -- what did you
6  know about DOGE at this point?
7      A    I knew that the effort of DOGE
8  was to reduce the federal deficit from
9  $2 trillion annually to as close to zero as
10  possible.  And that was really all I was told.
11      Q    Did you know anything before you
12  started about the mechanics, about how the
13  Administration wanted to accomplish that goal?
14      A    No.
15      Q    And you mentioned earlier that
16  they assigned you -- they said that they would
17  assign you to a project.  Did they tell you
18  what that project was going to be before you
19  joined DOGE?
20      A    No.
21      Q    Did they mention anything
22  specific about the National Endowment for the
23  Humanities?
24      A    No.
25      Q    Anything specific about any of

25

1  the other agencies that you eventually worked
2  at?
3       A     No.
4       Q     Did you speak with Elon Musk
5  before you joined DOGE?
6       A     No.
7       Q     Did you speak with Amy Gleason?
8       A     No.
9       Q     And do you recall the date that
10 you first formally joined the DOGE team?
11      A     I started working on my first
12 DOGE-related project in early January.  I moved
13 to Washington, D.C. around Inauguration Day,
14 January 20th, and formally started working in
15 person a few days after that.
16      Q     What was that first project?
17      A     We were building an
18 organizational chart of the Federal Government
19 to try and understand the relationship between
20 the different agencies and the associated
21 hierarchy.
22      Q     What was the goal of that
23 project?
24      A     Just to help the team get a
25 better understanding of how the Federal

26

1  Government is set up structurally.
2       Q     How long did that project take?
3       A     A few days.
4       Q     And did you create that
5  organizational chart?
6       A     I was a part of helping create
7  it.  There were multiple folks on the team.
8       Q     And it was created eventually?
9       A     It was.
10      Q     Is that a public document, do
11 you know?
12      A     I believe it is -- it was public
13 on the DOGE website, on doge.gov.
14      Q     Okay.  What was your title?
15      A     I didn't have a title.
16      Q     Were you technically an employee
17 of the General Services Administration?
18      A     I was a political appointee at
19 GSA as a Schedule C employee.
20      Q     Do you know why you were placed
21 in the General Services Administration as
22 opposed to somewhere else?
23      A     I don't.
24      Q     But you would agree you were
25 associated with the DOGE team more broadly?

27

1       A     Yes.
2       Q     Part of the DOGE effort?
3       A     Yes.
4       Q     There was also a US DOGE
5  Service.  What was that?
6       A     There -- it was another
7  organization within the Federal Government that
8  I think was originally created under the Obama
9  administration.  And it was subsequently
10 retooled, rebranded to onboard some of the DOGE
11 engineers to the DOGE team.
12      Q     So there was like a US Digital
13 Service and that became the US DOGE Service?
14      A     I believe so.
15      Q     Okay.  Did you have an
16 understanding as to how that was different from
17 individuals at GSA elsewhere who might be
18 helping with the DOGE effort but weren't
19 employed by the US DOGE Service?
20      A     My understanding is that the
21 general philosophy was to put engineers under
22 the US DOGE Service and then non-engineers
23 under GSA, or whichever agency they would have
24 been the best fit for.
25      Q     What about lawyers, people

28

1  providing legal advice to you and others, do
2  you know where they were placed?
3       A     I don't.
4       Q     Okay.  You mentioned earlier
5  that Justin Fox was part of the DOGE team and
6  that you worked with him.  Who else from the US
7  DOGE Service do you recall working with while
8  you were in the Government?
9       A     Can you repeat the question?
10 Sorry.
11      Q     Who else from -- who from the US
12 DOGE Service do you recall working with while
13 you were at the Government?
14      A     There were -- there were several
15 employees, engineers.  Frankly, it was hard to
16 tell which agency people were onboarded with,
17 so you wouldn't know in conversations whether
18 they were onboarded with GSA, for example, or
19 the US DOGE Service.
20      Q     Got it.
21      A     But pursuantly there were many.
22      Q     Let's just go through some names
23 of individuals.
24            So you said Justin Fox earlier
25 was one?

Nathan Cavanaugh - January 23, 2026

33

1  working?
2      A    I was physically working at GSA.
3      Q    Okay.  On this list, who else
4  was physically at GSA?
5      A    Ethan Shaotran.  Initially Kyle
6  Schutt.  Occasionally Luke Farritor and Akash
7  Bobba.  And I believe that's it.
8      Q    Where was Justin Aimonetti
9  physically located?
10     A    The Eisenhower Building at EEOB.
11     Q    Okay.  This is a list of, it
12  says detailees.  Do you know what that means?
13     A    I do know what a detailee is,
14  yes.
15     Q    What does it mean?
16     A    It generally means you are
17  assigned from your home base agency, in my case
18  GSA, to another agency within the Federal
19  Government.
20     Q    So how would that apply to
21  someone like Justin Aimonetti, if you know?
22     A    I don't know how it would apply
23  to Justin Aimonetti because he was a lawyer
24  with the US DOGE Service.  For non-lawyers, it
25  would be you were assigned from, for example,

34

1  GSA to NEH.
2      Q    Okay.  And let's look at the
3  Contractor tab.  What does this appear to be?
4          If we could scroll up maybe to
5  see the first row.
6      A    I don't know.
7      Q    There are more names on this
8  list.  Just looking at them, did you work with
9  any of them?
10     A    No.
11     Q    Scroll down a little bit.
12         Did you work with anyone on this
13  list?
14     A    No.
15     Q    Let's go to the Other tab.
16         Do you know any of these
17  individuals?
18     A    Yes.
19     Q    Which ones?
20     A    Anthony Armstrong, Jehn
21  Balajadia, James Burnham, Ed Coristine, Steve
22  Davis, Marko Elez, Cole -- Gautier, Adam
23  Ramada, Brad Smith and Christopher Stanley.
24     Q    Do you know why these
25  individuals are listed as "Other" as opposed to

35

1  detailees or contractors?
2      A    No.
3      Q    What work did you do with
4  Anthony Armstrong?
5      A    I didn't do any work with
6  Anthony Armstrong.
7      Q    But you knew of him?
8      A    Yes.
9      Q    You spoke with him?
10     A    Yes.
11     Q    What was his role?
12     A    Initially he was a senior
13  official at OPM, Office of Personnel
14  Management, for DOGE.
15     Q    And what about Jennifer
16  Balajadia?
17     A    She was an assistant to Elon
18  Musk.
19     Q    Did you work with her?
20     A    No.
21     Q    Who was the next individual on
22  this list that you worked with?
23     A    James Burnham.
24     Q    And what did you work with him
25  on?

36

1      A    I didn't work with James on any
2  specific project, but he was a senior lawyer
3  for the DOGE team.
4      Q    Did you work with him in
5  connection with the NEH?
6      A    No.
7      Q    What did you work with him in
8  connection with?
9      A    James served as an escalatory
10  legal figure for the DOGE team.  He would
11  generally get involved in projects, to the
12  extent that one of the other mid-level
13  attorneys could not answer a question.
14     Q    How often did that happen?
15     A    Infrequently.
16     Q    Would you go to him, then, or
17  would someone -- one of the more junior lawyers
18  escalate it to him?
19     A    It would mostly be a more junior
20  lawyer would escalate to James.
21     Q    Okay.  Who's the next individual
22  on this list that you worked with?
23     A    Steve Davis.
24     Q    And what did you do with
25  Mr. Davis?

49

1  for DOGE.
2      Q    Were there any other teams that
3  you were part of?
4      A    No.
5      Q    Did you report to anyone?
6      A    Not in a formal capacity. In an
7  informal capacity, it would have been Steve
8  Davis.
9      Q    Did the other agency leads
10  report to Mr. Davis?
11      A    I'm not sure.
12      Q    And who reported to you?
13      A    Justin Fox, Ethan Shaotran. And
14  then eventually Marshall Wood and Jonathan
15  Mendelson.
16      Q    What was Amy Gleason's role in
17  DOGE?
18      A    I believe she was the head of
19  the US DOGE Service.
20      Q    And how did that relate with
21  Mr. Davis' role?
22      A    I'm not sure if Steve had a
23  title, so I don't know.
24      Q    You understood that as a
25  practical matter Mr. Davis was the head, but

50

1  she was the legal head of the US DOGE Service?
2          MS. DOUD:  Objection.
3          You can answer.
4          THE WITNESS:  Amy Gleason was
5      the head of the US DOGE Service. I don't
6      know what Steve's title was formally.
7  BY MR. ROBINSON:
8      Q    Did she ever lead the weekly
9  DOGE meetings?
10      A    Not the ones where I was
11  present, no.
12      Q    Did you ever see her at the
13  meetings?
14      A    A few times.
15      Q    Do you know what her role was?
16  Aside from her title, what her actual
17  responsibilities were.
18      A    I don't.
19      Q    Did you get the sense that she
20  had significant responsibilities of DOGE?
21      A    I'm not sure. I didn't
22  interface with her very much.
23      Q    What was your salary at GSA?
24      A    I believe it was about $120,000
25  annually.

51

1      Q    And prior to working at DOGE for
2  this administration, you had no prior
3  Government experience, right?
4      A    No.
5      Q    But you said you were interested
6  in Government since a young age?
7      A    Yes.
8      Q    Can you tell me a little bit
9  more about that?  What prompted that interest?
10      A    I'm not sure what prompted the
11  interest.
12      Q    Did you go to any summer
13  programs or take any classes that aligned with
14  that interest in Government service?
15      A    No.
16      Q    But you just had an interest in
17  Government generally?
18      A    Just specific policy, topics
19  that were topical in each election. And
20  reading just casual information that's publicly
21  available.
22      Q    Which -- which topics?
23      A    Foreign policy, economic policy,
24  social issues are some of them.
25          STENOGRAPHER:  What was that?

52

1          THE WITNESS:  Social issues.
2      Those are just some of the topics of
3      which I was interested in.
4  BY MR. ROBINSON:
5      Q    Did you work on any, like,
6  political campaigns before you worked in this
7  administration?
8      A    No.
9      Q    Did you ever go on, like, a
10  podcast and talk about your views on these
11  issues before joining the Administration?
12      A    No.
13      Q    Part of any, like, social groups
14  in -- where did you live, by the way, after
15  college?
16      A    Los Angeles.
17      Q    Los Angeles.  Okay.
18          Were you part of any, like,
19  social groups in Los Angeles where you
20  discussed these issues --
21      A    No.
22      Q    -- with others?
23          Did you grow up in Indiana?
24      A    I grew up in Pittsburgh.
25      Q    Let's do a few more and then

49

1  for DOGE.
2      Q      Were there any other teams that
3  you were part of?
4      A      No.
5      Q      Did you report to anyone?
6      A      Not in a formal capacity.  In an
7  informal capacity, it would have been Steve
8  Davis.
9      Q      Did the other agency leads
10 report to Mr. Davis?
11     A      I'm not sure.
12     Q      And who reported to you?
13     A      Justin Fox, Ethan Shaotran.  And
14 then eventually Marshall Wood and Jonathan
15 Mendelson.
16     Q      What was Amy Gleason's role in
17 DOGE?
18     A      I believe she was the head of
19 the US DOGE Service.
20     Q      And how did that relate with
21 Mr. Davis' role?
22     A      I'm not sure if Steve had a
23 title, so I don't know.
24     Q      You understood that as a
25 practical matter Mr. Davis was the head, but

50

1  she was the legal head of the US DOGE Service?
2          MS. DOUD:  Objection.
3          You can answer.
4          THE WITNESS:  Amy Gleason was
5      the head of the US DOGE Service.  I don't
6      know what Steve's title was formally.
7  BY MR. ROBINSON:
8      Q      Did she ever lead the weekly
9  DOGE meetings?
10     A      Not the ones where I was
11 present, no.
12     Q      Did you ever see her at the
13 meetings?
14     A      A few times.
15     Q      Do you know what her role was?
16 Aside from her title, what her actual
17 responsibilities were.
18     A      I don't.
19     Q      Did you get the sense that she
20 had significant responsibilities of DOGE?
21     A      I'm not sure.  I didn't
22 interface with her very much.
23     Q      What was your salary at GSA?
24     A      I believe it was about $120,000
25 annually.

51

1      Q      And prior to working at DOGE for
2  this administration, you had no prior
3  Government experience, right?
4      A      No.
5      Q      But you said you were interested
6  in Government since a young age?
7      A      Yes.
8      Q      Can you tell me a little bit
9  more about that?  What prompted that interest?
10     A      I'm not sure what prompted the
11 interest.
12     Q      Did you go to any summer
13 programs or take any classes that aligned with
14 that interest in Government service?
15     A      No.
16     Q      But you just had an interest in
17 Government generally?
18     A      Just specific policy, topics
19 that were topical in each election.  And
20 reading just casual information that's publicly
21 available.
22     Q      Which -- which topics?
23     A      Foreign policy, economic policy,
24 social issues are some of them.
25          STENOGRAPHER:  What was that?

52

1          THE WITNESS:  Social issues.
2      Those are just some of the topics of
3      which I was interested in.
4  BY MR. ROBINSON:
5      Q      Did you work on any, like,
6  political campaigns before you worked in this
7  administration?
8      A      No.
9      Q      Did you ever go on, like, a
10 podcast and talk about your views on these
11 issues before joining the Administration?
12     A      No.
13     Q      Part of any, like, social groups
14 in -- where did you live, by the way, after
15 college?
16     A      Los Angeles.
17     Q      Los Angeles.  Okay.
18          Were you part of any, like,
19 social groups in Los Angeles where you
20 discussed these issues --
21     A      No.
22     Q      -- with others?
23          Did you grow up in Indiana?
24     A      I grew up in Pittsburgh.
25     Q      Let's do a few more and then

61

1  Foundation.
2        What was the next agency that
3  you worked at?
4     A    The United States Institute of
5  Peace.
6     Q    Approximately when was that?
7     A    March of 2025.
8     Q    What did you do at the US
9  Institute of Peace?
10    A    We reduced the Institute of
11 Peace to its statutory minimum.
12    Q    What did that involve?
13    A    It involved terminating all of
14 the existing contracts, grants, and firing all
15 the employees.
16    Q    Okay.  So you terminated all the
17 existing contracts, grants, and fired all the
18 employees at the Institute of Peace?
19        MS. DOUD:  Objection.
20        You can answer.
21        THE WITNESS:  Effectively, yes.
22        MR. ROBINSON:  What's the
23 objection?
24        MS. DOUD:  Form.
25        STENOGRAPHER:  What's the

62

1  objection?
2        MS. DOUD:  Form.
3        MR. ROBINSON:  I see.  Form in
4  what sense?
5        MS. DOUD:  Well, you know, I
6  mean, you know, partially just repeating
7  what he said but -- in -- in a slightly
8  different way.
9        MR. ROBINSON:  Okay.
10 BY MR. ROBINSON:
11    Q    What did you do after the --
12 which agency did you work at after the US
13 Institute of Peace?
14    A    I don't recall.
15    Q    So it sounds like essentially
16 you were tasked with going to each of these
17 agencies, terminating all grants, contracts,
18 employees that weren't statutorily necessary?
19        MS. DOUD:  Objection.
20        THE WITNESS:  That was the case
21    for agencies that were listed in an
22    executive order where the White House
23    stated through EO that they would be
24    reduced to statutory minimum, yes.
25

63

1  BY MR. ROBINSON:
2     Q    And which agencies do you recall
3  that applied to?
4     A    I don't recall.  It's the ones I
5  gave you, plus there was a second executive
6  order in March, I believe, which had another
7  set of agencies.
8     Q    But you also worked at agencies
9  that weren't specifically referenced in an
10 executive order --
11    A    That's right.
12    Q    -- right?
13        And what was your task there?
14    A    That was not the same task.  It
15 was to meet with the heads of the agencies to
16 evaluate personnel, contracts and grants, but
17 the mandate was not to reduce those agencies to
18 statutory minimum.  It was just to conduct a
19 thorough review to make sure that all spending
20 was appropriate, given the broader mission of
21 DOGE.
22    Q    And how was that mandate
23 conveyed to you?
24    A    It wasn't explicitly conveyed to
25 me.

64

1     Q    How did you understand that that
2  was your mandate?
3     A    Because when I was attasked by
4  Steve Davis to go meet with small agencies,
5  that was the implication.
6     Q    The implication, presumably that
7  was something he said?
8        MS. DOUD:  Objection.
9        THE WITNESS:  No, he did not say
10    that explicitly.
11 BY MR. ROBINSON:
12    Q    So what did he say explicitly?
13    A    Explicitly he said there would
14 be an executive order stating that certain
15 useless agencies be reduced to statutory
16 minimum, starting with the ones in February.
17 And that's what I worked on.
18    Q    But then we were talking about
19 other agencies that weren't specifically
20 referenced in that executive order.  If I
21 understood your testimony correctly, you said
22 that for those agencies your mandate was to
23 meet with the head of the agency and to clarify
24 and identify wasteful spending.
25        How did you understand that was

77

1    Q    What did you do at the
2  Millennium Challenge Corporation?
3    A    We similarly met with the
4  management leadership of MCC to understand
5  their compacts, they call them, which is
6  effectively a grant for foreign spend.  So was
7  trying to understand the, again, total number
8  of employees, contracts, grants.
9    Q    Did you terminate those
10  compacts?
11    A    Some of them were terminated at
12  the agency's discretion, not by -- DOGE did not
13  have the authority to individually cancel
14  contracts.  It was always at the discretion of
15  the head of the agency.
16    Q    Earlier we were discussing some
17  agencies and I don't think you said that.  Why
18  did you emphasize that just now?
19    A    I'm sorry?
20    Q    Why did you -- why did you
21  emphasize that just now?
22    A    Emphasize what exactly?
23    Q    That you had no discretion to
24  terminate contracts.
25    A    Because you asked if I

78

1  terminated compacts at MCC.
2    Q    Okay.  Is that something you
3  discussed with counsel during the last break?
4    A    No.
5    Q    Okay.  It just occurred to you
6  just now?
7    A    Yeah.  Because you asked me --
8    Q    Okay.
9    A    -- if I terminated the compacts.
10  And I didn't.
11    Q    Okay.  And what -- so contracts
12  were terminated at MCC?
13    A    I don't know if contracts were
14  terminated, but compacts -- there's a
15  distinction -- I believe certain compacts were
16  terminated by the head of MCC.
17    Q    Okay.  What about at the DNI?
18    A    I did not terminate any
19  personnel, grants or contracts at ODNI.  It was
20  done by Tulsi Gabbard, the Director of ODNI.
21    Q    Well, what was your -- what was
22  your work at DNI?
23    A    We had two or three meetings
24  with ODNI's team.  One of my teammates,
25  Marshall Wood, was the lead at that agency, not

79

1  me personally.  And the nature of these
2  meetings were effectively all the same in that
3  context.
4    Q    And what did -- what was the
5  result of your work at DNI?
6    A    There was no direct result
7  actually from our work.  Because of the nature
8  of the intelligence community, there was a much
9  longer process to be fully onboarded, such as
10  security clearances.  After we met with their
11  team two or three times, we realized that --
12  and also because of my timing at DOGE, we ended
13  up not terminating anything at ODNI.  Later we
14  then realized that, at their own discretion,
15  they terminated, I think like 25 percent of
16  ODNI's head count.  But it wasn't a result of
17  DOGE's actions.
18    Q    When you were working at these
19  agencies, were you working at multiple agencies
20  at the same time or would you take one agency
21  at a time?
22    A    There were generally multiple
23  agencies ongoing at the same time for me
24  personally.
25    MR. ROBINSON:  All right.  I'd

80

1  like to look at another document.  We'll
2  mark this as Plaintiff's Exhibit 3.
3    (E-mail and attachment, US-9508,
4  was marked P-3 for identification.)
5  BY MR. ROBINSON:
6    Q    This is a document Bates-stamped
7  US-9508.  This is an April 8, 2025 e-mail from
8  your GSA e-mail address to your special.co
9  e-mail address.  And it's attaching a
10  spreadsheet called Deletions 330 Scorecard.
11    Do you recognize this?
12    A    Yes.
13    Q    So you said earlier that
14  special.co is a company that you are founding,
15  and also founding now.  So would you sometimes
16  forward documents from your GSA account to your
17  special.co account?
18    A    In this case, yes.  It wasn't a
19  regular occurrence.  And this -- the reason
20  that this was forwarded was to provide the DOGE
21  leadership team, specifically Steve Davis, with
22  an update on the relevant savings at each
23  agency.
24    Q    Okay.  Why did you do that?
25    A    To my knowledge, Steve didn't

85

1    Exhibit 6.
2         (Attachment, US-9553, was marked
3    P-6 for identification.)
4  BY MR. ROBINSON:
5    Q    Is this the same spreadsheet we
6  were looking at before or is it slightly
7  different?
8    A    **The template is the same.  The**
9  **agencies listed seems to have changed, as well**
10 **as the associated savings.**
11   Q    Do you know why it's different?
12   A    **The list would dynamically**
13 **change depending on week to week what the**
14 **latest savings were for each agency.**
15   Q    So I think the prior spreadsheet
16 was called Deletion Scorecard and this is
17 called Master Reporting.  Were those the
18 same -- just different words for the same
19 thing?
20   A    **Correct.**
21   Q    Okay.  We can take this down.
22        Do you recall offhand when you
23 first got involved with the National Endowment
24 for the Humanities?
25   A    **I believe it was March of 2025.**

87

1    Q    And was this a phone call or an
2  in-person meeting?
3    A    **This was an in-person meeting.**
4    Q    Was anyone else there?
5    A    **No.**
6    Q    Okay.  What specifically do you
7  remember Mr. Davis saying besides the chair has
8  been replaced, I want you to go meet with
9  Mr. McDonald?
10   A    **He introduced me to Mike.  I**
11 **believe he gave me his phone number, and I**
12 **called Mike, and that was it.**
13   Q    What did he tell you about
14 Mr. McDonald?
15   A    **That he was previously the**
16 **general counsel for the agency.  And that he**
17 **was newly appointed in the role as acting**
18 **chairman.**
19   Q    Did he tell you anything else?
20   A    **I don't believe so.**
21   Q    Did he tell you that he might be
22 amenable to DOGE coming in and looking at the
23 agency?
24        MS. DOUD:  Objection.
25        THE WITNESS:  I don't recall.

86

1  I don't recall the exact date.
2    Q    Okay.  And do you recall, like,
3  the first conversation you had about the
4  agency?
5    A    **About the agency or with the**
6  **agency?**
7    Q    About the agency.
8    A    **About the agency would have been**
9  **around the same time frame.**
10   Q    And what was that conversation?
11   A    **It was the short conversation**
12 **with Steve Davis that I referenced previously.**
13   Q    And it was your idea to go look
14 at spending at the National Endowment for the
15 Humanities?
16   A    **It was not.**
17   Q    Whose idea was it?
18   A    **It was Steve's idea, with the**
19 **context being that the prior head of the**
20 **National Endowment for the Humanities was**
21 **recently terminated and I was to go meet with**
22 **Mike McDonald, the new acting chair of NEH.**
23   Q    So he approached you about going
24 to speak with Mr. McDonald at NEH?
25   A    **That's right.**

88

1  BY MR. ROBINSON:
2    Q    About how long did this
3  conversation last?
4    A    **A minute.**
5    Q    So you had a one-minute
6  conversation with Mr. Davis, when he told you
7  go look at NEH, talk to Mr. McDonald.
8        Do you recall anything else from
9  the conversation?
10   A    **Substantively, no.  That was the**
11 **extent of the conversation.**
12   Q    Did you take notes during the
13 conversation?
14   A    **No.**
15   Q    And after you had that
16 conversation with Mr. Davis, did you go talk to
17 anyone else about this assignment?
18   A    **I believe initially, no.  And**
19 **then when we first scheduled our meeting with**
20 **Mike McDonald, Justin Fox was with me as a**
21 **member of the small agencies team.  So he and I**
22 **were in all of the meetings with Mike.**
23   Q    Did you talk to Mr. Fox about
24 the meeting with Mr. McDonald before you
25 actually met?

89

1    A    I don't recall exactly what the
2  conversation was, but it would have been
3  something to the effect of we're going to go
4  meet with the new acting chairman of NEH and
5  evaluate what's going on at the agency.
6    Q    Did you speak with -- aside from
7  that possible conversation with Mr. Fox, did
8  you speak with anyone about NEH before you met
9  with Mr. McDonald?
10    A    No.
11    Q    What did you know about the
12  National Endowment for the Humanities at this
13  point?
14    A    Very little.
15    Q    You had no prior experience with
16  the agency?
17    A    Outside of research that I did
18  prior to the first meeting with Mike, no.
19    Q    What was that research?
20    A    Just browsing the NEH website,
21  understanding the key personnel, the size of
22  the agency, et cetera.
23    Q    But that was after Mr. Davis had
24  that conversation with you?
25    A    That's right.

90

1    Q    Okay.  You didn't do any work in
2  the humanities in college or anything?
3    A    No.
4    Q    Okay.  Never applied for an NEH
5  grant, I'm sure?
6    A    No.
7    Q    Never applied for any Federal
8  grant, I take it?
9    A    No.
10    Q    Okay.  So then you started
11  working at NEH.  You said that Mr. Fox was
12  working there with you.  Was anyone else
13  working at NEH with you and Mr. Fox?
14    A    I don't believe so, no.
15    Q    What about Ethan Shaotran?
16    A    He may have been detailed to the
17  agency from GSA to NEH, but he wasn't
18  physically present in any of our meetings with
19  the NEH team.
20    Q    Was he involved at all in the
21  termination of grants at NEH?
22    A    I don't believe so, no.
23    Q    As between you and Mr. Fox, did
24  you each have like a particular role in how you
25  were conducting your work at NEH?

91

1    A    No.  There's no predefined role.
2    Q    You were the lead, though,
3  right?
4    A    In the first meeting with Mike
5  and his colleague, Adam, I believe is his name,
6  we had a first meeting where I primarily led
7  the conversation, introduced ourselves as
8  members of the DOGE team from GSA.  I led the
9  majority of that first meeting.  Thereafter,
10  Justin took the lead role at NEH, in terms of
11  working with Mike and Adam on reviewing their
12  contracts and grants and personnel.
13    Q    So after that first meeting
14  Justin played more of a hands-on role --
15    A    That's right.
16    Q    -- at NEH than you did?
17    A    Yeah.
18    Q    But Justin still reported to
19  you?
20    A    In an informal capacity, yes.
21    Q    So after you started working at
22  NEH, did you and Mr. Fox have, like, regular
23  meetings to talk about your work at the agency?
24    A    We did not have regular
25  meetings, no.

92

1    Q    Did you have irregular meetings?
2    A    Not solely focused on NEH; so
3  no.
4    Q    So say more about that.  You
5  have meetings to talk about, what, a variety of
6  small agencies and NEH would be one of them?
7    A    That's right.
8    Q    How often did you have those
9  meetings?
10    A    Well, we were in the office
11  together every day at GSA.  So in the casual
12  course of working, you would talk about the
13  status of each agency and what you were working
14  on.  And NEH was one of them.
15    Q    Okay.  But you didn't have
16  designated NEH --
17    A    No.
18    Q    -- meetings?
19    Did you meet with Mr. Davis to
20  talk about your progress at NEH while you were
21  working there?
22    A    No.
23    Q    Did you ever update him on
24  the -- what you had done at NEH?
25    A    We did.  After the first meeting

133

1  BY MR. ROBINSON:
2      Q      This is an e-mail chain between
3  you, Justin Fox and Ethan Shaotran titled "NEH
4  Review," correct?
5      A      Correct.
6      Q      Dated March 17th at 10:47 a.m.
7  At the bottom of the page, there's an earlier
8  e-mail, just a few rows down, March -- Sunday,
9  March 16, 2025 at 7:28 p.m. from Justin Fox
10  where Justin Fox says, "Nate - See attached PDF
11  and Excels to share with Mike/Adam tonight for
12  them to review."  Correct?
13      A      "For them to review tomorrow."
14      Q      "For them to review tomorrow
15  a.m."
16            And then you respond on
17  March 17th at the top saying, "Nice job - this
18  looks great.  We just need to follow up with
19  them today to make sure they are aligned on
20  executing the plan quickly."
21            That's what it says, right?
22      A      Right.
23      Q      So what's "the plan" referring
24  to here?
25      A      The plan is canceling the grants

134

1  that were flagged in the review files that
2  we've -- that Justin is referencing in his
3  previous e-mail.
4      Q      Okay.  And these were the grants
5  that you had identified before you reviewed the
6  list from NEH?
7      A      These were the list -- no,
8  this -- can you repeat the question?  Sorry.
9      Q      These were grants that you had
10  identified before reviewing the list of grants
11  that NEH had supplied, that NEH staff had
12  identified as potentially being related to
13  diversity, equity, inclusion?
14      A      The final list that we ended up
15  recommending to Mike and Adam were a
16  combination of both our original list and their
17  employee reviewed list.  And we created a
18  synthesis of both of those to make a
19  recommendation to Mike.
20      Q      Okay.  And this is what you were
21  conveying in -- or this is what Mr. Fox was
22  sending you in this March 16th e-mail?
23      A      Yes.
24      Q      Okay.  Why was there a need to
25  execute the plan quickly?

135

1      A      The general pacing of DOGE was
2  to try and make decisions and act quickly to
3  avoid Government employees dragging their feet
4  on cancellations.
5      Q      Aside from that general goal,
6  did you receive any specific instruction to --
7      A      No.
8      Q      -- execute this plan quickly?
9      A      No.
10      Q      No.
11            MR. ROBINSON:  I'm marking
12  Plaintiff's Exhibit 15.
13            (E-mail dated 3/17/25, US-839,
14  was marked P-15 for identification.)
15            MR. ROBINSON:  I'm handing it to
16  the witness.
17  BY MR. ROBINSON:
18      Q      This is a document Bates-stamped
19  US-839.  This is an e-mail from Justin Fox to
20  Mr. McDonald, Mr. Wolfson; and you're copied.
21  And it says, "Michael, Adam, I hope you both
22  had a good weekend.  See attached for our
23  review of NEH grants, census and contracts."
24            And then he has the same bullets
25  from the prior e-mail.  And under "Grants" it

136

1  says, "We reviewed all active grants for DEI
2  involvement and marked them accordingly."
3            Did I read that correctly?
4      A      Yes.
5      Q      And I know we talked about it
6  somewhat already, but what is DEI referring to
7  here?
8      A      It stands for diversity, equity
9  and inclusion.
10      Q      And what is your opinion of
11  diversity, equity and inclusion?
12      A      My personal opinion?
13      Q      Well, let's start with what does
14  it mean to you?
15      A      It means diversity, equity and
16  inclusion.
17      Q      Well, those -- that's the label,
18  but what does -- what do those words mean to
19  you?
20      A      It means -- it means making
21  decisions on a basis of something other than
22  merit.
23      Q      Okay.  How does diversity differ
24  from equity in that term, if you know?
25      A      I don't know.  I don't

Nathan Cavanaugh - January 23, 2026

153

1    Q    Here McDonald says, "On
2  March 17th to 18th, I worked with NEH Assistant
3  Chairman for Programs, Adam Wolfson, to conduct
4  a further individualized review of the
5  spreadsheets of open grants created by program
6  staff."
7          So is that something that you
8  and Fox told McDonald and Wolfson to do on
9  March 17th and 18th?
10   **A    I don't recall explicitly**
11 **telling them to -- to review those.  They were**
12 **reviewing the grants that we had recommended**
13 **for termination.**
14   Q    And what did you tell him when
15 you asked him to take a look at those grants?
16   **A    I think this was Justin telling**
17 **him, because he was running point on NEH for**
18 **our team.  But it was something to the effect**
19 **of review our recommendations and let us know**
20 **which you agree with.**
21   Q    And I know we talked about some,
22 but can you just say again what the goal was or
23 the guiding principle or the criteria that you
24 were asking them to apply?
25   **A    There were two guiding**

154

1  **principles.**
2          **One was through the lens of the**
3  **executive orders that were signed with respect**
4  **to DEI, preference, et cetera, on the pages we**
5  **have not referenced.**
6          **The other was a list that we**
7  **came up with, which, at our discretion, fell in**
8  **the category of wasteful spending in the**
9  **context of the broader deficit.  And ones we**
10 **felt did not align with the America250**
11 **initiative and the Garden of Heroes initiative.**
12 **And here is the master list, review it, and let**
13 **us know if there are any that you'd like to**
14 **keep.**
15   Q    Did you provide any further
16 gloss or instruction on what was meant by
17 "wasteful spending"?
18   **A    No.**
19   Q    What would you have expected
20 them to do to determine whether something was
21 wasteful?
22   **A    The two priorities that we know**
23 **were to be kept were anything around grants**
24 **related to the founding of the country, related**
25 **to this America250 initiative in 2026 and this**

155

1  **Garden of Heroes museum that the White House**
2  **was interested in building with NEH funds.**
3          **So those were the cornerstones**
4  **of what we knew to keep.  Otherwise, everything**
5  **was up to be evaluated for potential**
6  **termination.**
7    Q    Okay.
8    **A    We didn't recommend that, but**
9  **that was the lens by which we were evaluating**
10 **things through.**
11   Q    Okay.  Because those ideas,
12 America250, Garden of Heroes, those were things
13 aligned with the Administration, in your view?
14   **A    Yes.**
15   Q    Okay.  Anything else would fall
16 into the category of wasteful?
17   **A    Not -- not explicitly, but**
18 **potentially and subject to be reviewed.**
19   Q    Okay.  What would be a reason
20 why something would be saved if it didn't align
21 with those two viewpoints?
22   **A    Can we pull up the list of**
23 **grants that were kept versus cut and we can go**
24 **through each one?**
25   Q    I don't know if that's a great

156

1  use of time, but we can.  But does any one come
2  to mind right now, sitting here?
3    **A    No.  There were 1,200 grants,**
4  **roughly.**
5    Q    Do you remember, roughly, how
6  many were saved?
7    **A    I don't.**
8    Q    Okay.
9    **A    A large percentage of**
10 **outstanding grants were cut.**
11   Q    Okay.  We might come back to
12 that later, but I'll just -- we'll leave it
13 there for now.
14         Okay.  Back to the Thakur
15 declaration, which I think you have in front of
16 you, paragraph 14.  He says, "On March 19,
17 2025, NEH CIO Bobley sent NEH Assistant Chair
18 for Planning and Operations, Pranita,"
19 P-R-A-N-I-T-A, "Raghavan," R-A-G-H-A-V-A-N, "a
20 final spreadsheet containing only those
21 projects that I and Mr. Wolfson deemed to
22 conflict with President Trump's executive
23 orders."
24         And then in the following
25 paragraph it says, "On March 20, 2025, Miss

161

1   DEI category for potential termination.
2       Q     And he says, "Let us know on
3   these.  I'll circle back on the total proposed
4   cut based on the list Brett gave me."
5           That's Brett Bobley there, I
6   take it?
7       A     Yes.
8       Q     He says, "For your benefit, I've
9   also attached the attached RIF plan."  And then
10  he says, "Could you put us in touch with
11  someone who could help us gain admin access to
12  Microsoft?"
13          Why did you and Fox want access
14  to Microsoft?
15      A     Part of our operating procedure
16  with DOGE was to get system administrator
17  access, we called it "sys admin," which allowed
18  us to operate as if we were an administrator
19  within the agency for provisioning e-mail
20  accounts, access to critical systems, et
21  cetera.
22      Q     Was this operating procedure set
23  forth in any document?
24      A     No.
25      Q     How did you know it was

162

1   operating procedure?
2       A     It was discussed openly during
3   all-hands meetings.
4       Q     By whom?
5       A     Multiple members of the DOGE
6   team.
7       Q     Was it discussed by Mr. Davis as
8   something you should do?
9       A     Yes.
10      Q     And you did it at other
11  agencies?
12      A     Yes.  To the maximum extent that
13  we could.
14      Q     Which other agencies do you
15  recall?
16      A     The vast maj- -- I mean, the
17  vast majority of agencies in which we were
18  onboarded.
19      Q     Okay.  So then in the next
20  e-mail McDonald says, "My understanding from
21  our Friday meeting was that the idea was to
22  check on whether employees were logging in to
23  their e-mail accounts on a regular basis.  But
24  if I misunderstood what you needed, please let
25  me know."

163

1           So it sounds like McDonald did
2   misunderstand the purpose of logging in, right?
3       A     I don't think he misunder- -- I
4   guess. I don't know.
5       Q     Well, you had -- you said that
6   the reason you were asking for control -- could
7   you say it again, why you were asking for
8   control of the Microsoft account.
9       A     Yeah.  It was mostly in the
10  context of conducting RIF plans.  We needed to
11  see which employees were actually logging into
12  their accounts for usage, which employees were
13  engaged, which weren't.  It was also important
14  if we needed to make changes to anything within
15  the agency with respect to user accounts that
16  we could do so without having to rely on a CIO
17  figure like Brett.
18      Q     Okay.  Was it also for purposes
19  of terminating grants and contracts,
20  potentially?
21      A     No.
22      Q     So it was unrelated to that?
23      A     Yes.
24      Q     Okay.  It was more focused on
25  RIFs?

164

1       A     Yes.
2       Q     Okay.
3       A     In NEH's case, they had a
4   completely separate system for provisioning
5   grants.
6       Q     What was that system called?
7       A     I don't remember.
8       Q     Okay.
9       A     Brett Bobley was the
10  administrator of it.
11      Q     Yeah.  Okay.  Then if you look
12  on the first page, on March 31st at 11:35, Fox
13  sends an e-mail to McDonald saying, "Mike,
14  could you pass along your cell #?  Sorry, don't
15  have it saved and need to catch up with you on
16  something time sensitive."
17          Do you see that?
18      A     I do, yes.
19      Q     Do you know what he's referring
20  to there?
21      A     I don't.
22      Q     No idea?
23      A     No, no idea.  I assume it was
24  related to the status of the cancellations that
25  were being discussed.

Nathan Cavanaugh - January 23, 2026

165

1    Q    A couple hours later,
2  12:29 p.m., Fox says, "Mike, please call me as
3  soon as you can."
4        Do you know what that's
5  referring to?
6    A    The same topic.
7    Q    But you said -- you said you
8  don't know, but you assume it -- the status --
9    A    I assume that that's the case,
10  is he was trying to get a status update for
11  Mike and Adam on their review of our proposed
12  cuts across people, contracts and grants.
13    Q    But why would he have needed a
14  status update on a time-sensitive basis on
15  March 31st?
16    A    Because our general operating
17  procedure at DOGE was to try and get this work
18  done quickly.  And this had now been dragging
19  out for two or three weeks with NEH.  And so we
20  were trying to push Michael on to move faster
21  with agreeing on a plan.
22    Q    Is that something that you and
23  Fox discussed?
24    A    It wasn't explicitly discussed,
25  but the -- it was implicitly discussed that we

166

1  wanted to try and get the agency heads to act
2  quickly on their proposed plans.
3    Q    Did you -- but at NEH
4  specifically with McDonald, did you discuss
5  with Fox, okay, we need to, like, apply
6  pressure now because it's been two to three
7  weeks?
8    A    That was, like, not explicitly
9  discussed, but that was the implication of --
10  the culture of DOGE was to try and get these
11  folks to move fast.
12    Q    Yeah.
13    A    So we were comfortable applying
14  pressure to the extent that we needed to.
15    Q    Understood.
16        But I'm just trying to
17  understand why, on March 31st, all of a sudden
18  Fox is saying I need to talk about something
19  time sensitive.  It seems to suggest there's
20  something specific.
21    A    There wasn't something specific.
22  It was just --
23        MS. DOUD:  Objection.  Sorry.
24        THE WITNESS:  Please.
25        MS. DOUD:  Go ahead.

167

1        THE WITNESS:  There wasn't
2  something specific other than us applying
3  pressure to get Mike to act on this plan.
4  BY MR. ROBINSON:
5    Q    Is that something you and Fox
6  discussed before he sent the e-mail?
7    A    I don't believe Justin discussed
8  it.
9    Q    So your best understanding is
10  that Fox just all of a sudden, at 11:35 on
11  March 31st, thought, I'm going to call Mike --
12  I'm going to e-mail Mike and say I need to talk
13  to you about something time sensitive, but it
14  was just to apply pressure to make him move
15  more quickly?
16    A    Yes.
17        MS. DOUD:  Objection.
18  BY MR. ROBINSON:
19    Q    And what's that understanding
20  based on?
21    A    The broad operating procedures
22  of DOGE, of which I've done the same thing in
23  other agencies.
24    Q    Could you provide an example?
25    A    Not off the top of my head, no.

168

1    Q    And then an hour later, at
2  12:29, when he says, "Please call me as soon as
3  you can," you don't know why he sent that an
4  hour later?
5        MS. DOUD:  Objection.
6        THE WITNESS:  No, I don't.
7  BY MR. ROBINSON:
8    Q    You think it was just the same,
9  that he was just trying to get McDonald to move
10  quickly?  I mean, this is just -- less than an
11  hour later.
12    A    Right.
13        MS. DOUD:  Objection.
14        THE WITNESS:  But our initial
15  meeting with Mike was on Wednesday,
16  March 12th.  So 19 days later, in the
17  context of DOGE, would have been almost
18  three weeks of trying to align on a list
19  of grants to terminate that effectively
20  had not changed materially over the
21  course of the beginning to the end.  And
22  so we were trying to push Mike to move
23  faster on the plan because it had been
24  almost three weeks.
25

169

1  BY MR. ROBINSON:
2      Q    So nothing happened, though,
3  from March 30th to March 31st from 11:35 to
4  12:29 p.m., nothing happened besides the
5  passage of time is what you're saying to lead
6  to this e-mail?
7          MS. DOUD:  Objection.
8          THE WITNESS:  Yes.
9  BY MR. ROBINSON:
10     Q    All right.  So then Fox e-mails
11  again at 12:52 p.m., this is less than half an
12  hour from the prior e-mail.  I'll just read it.
13  "Mike, call me when you get the chance.  We
14  need a game plan for effectuating RIFs, final
15  grant terminations and contract cancellations
16  by tomorrow a.m.  We will carry these plans out
17  before the end of the week.  We're getting
18  pressure from the top on this and would prefer
19  that you remain on our side but let us know if
20  you're no longer interested."
21         So who from the top was
22  pressuring you on this?
23     A    Nobody explicitly.  Again,
24  Mike's perception of where DOGE sat within the
25  Federal Government was we had a direct line of

170

1  communication with the White House and so we
2  were there to help enforce the executive orders
3  that were signed.  So as a pressure tactic we
4  would tell Mike that we were getting pressure
5  from basically the White House to effectuate
6  these contract and grant terminations that are
7  aligned with the EO.  So it was a time pressure
8  tactic.  There was no person explicitly putting
9  pressure on Justin to send this e-mail.
10     Q    What about implicitly?
11     A    No.
12     Q    So it was just untrue?
13     A    It -- I don't know if it -- I
14  don't think it's untrue.
15     Q    Was someone applying pressure
16  from the top to terminate grants quickly?
17     A    No.  The top pressure in the
18  backdrop of our work at NEH was there were EOs
19  signed relating to the terminating grants
20  related to DEI initially.  So we could use that
21  as a backstop to apply pressure to Mike to move
22  quickly on a contract and grant cutting plan.
23     Q    Was anyone at the White House
24  involved in grant terminations at NEH?
25     A    No.

171

1      Q    You never communicated with
2  anyone from the White House about that?
3      A    About grant terminations?
4      Q    Yeah.
5      A    No.
6      Q    And when I say "the White
7  House," I mean the White House and all its
8  components, Executive Office of the President,
9  OMB.
10     A    I believe we -- Justin
11  Aimonetti, who was a DOGE lawyer, who I believe
12  was onboarded by EOP, the Executive Office of
13  the President, he would have been involved in
14  the course of our work, just basically making
15  sure that it was -- that the work we were doing
16  was approved.
17     Q    Did you discuss this specific
18  e-mail with Mr. Fox where he says "We're
19  getting pressure from the top"?
20     A    No, I did not.
21     Q    Didn't message with him about it
22  on Signal that he was going to do it?
23     A    No.  We would have been working
24  in the office together at GSA and verbally
25  saying we need to get Mike to move quickly on

172

1  this plan.
2      Q    Okay.  And your strategy for
3  doing that was just, like, making up this sense
4  of pressure, e-mailing every hour or so until
5  he responded?
6          MS. DOUD:  Objection.
7          THE WITNESS:  Well, as you can
8      see from the e-mails, this has -- has not
9      happened previously in the three weeks
10     we'd been working with NEH.  So it wasn't
11     used frequently.  But when it had been
12     going on for three weeks and we had not
13     heard an update from Mike, we were
14     applying more pressure to get him to act
15     on the plan.
16  BY MR. ROBINSON:
17     Q    Yeah.  Did -- you say, you know,
18  "Let us know" -- or Fox says, excuse me, Fox
19  says, "Let us know if you're no longer
20  interested."
21         Did you have some sense that
22  McDonald, you know, wasn't interested in -- in
23  the terminations anymore?
24     A    I don't believe so, but the
25  nature of their communications with us had

177

1       THE WITNESS:  Sure.
2           STENOGRAPHER:  Common?  You'll
3   notice there are?
4       THE WITNESS:  The e-mail says,
5   "It is common to have small differences
6   between eGMS and those records found in
7   USAspending."
8       So he was cross-referencing the
9   list to ensure just thoroughness in our
10   work before we had a final list of grants
11   for termination.
12  BY MR. ROBINSON:
13      Q    And to generate that final list
14  of grants for termination, did you use this
15  list that Beth had sent you, or some other
16  list?
17      A    You'll have to ask Justin, but
18  my sense is that we had a master Excel file
19  which concluded -- which included both the data
20  from USAspending and the data from eGMS.  There
21  was likely -- you'll have to ask Justin -- a
22  very small discrepancy in what was in those two
23  systems.  And to the extent that we were
24  missing one, we evaluated those through the
25  same criteria and then put it into a master

178

1   file for them to sign off on the termination.
2       Q    So Mr. Fox generated the final
3   list?
4       A    Yes.
5           MR. ROBINSON:  I'm going to mark
6   a document as P-21.
7           (E-mail chain, NEH_AR_21 -
8   NEH_AR_23, was marked P-21 for
9   identification.)
10  BY MR. ROBINSON:
11      Q    This is labeled as AR_21.  This
12  is an e-mail chain that starts off April 1st,
13  8:06 p.m. from McDonald to Fox, Wolfson.
14  You're copied.  I direct your attention to the
15  first in time e-mail in this chain sent from
16  McDonald to Fox at 10:07 a.m.  I'm going to
17  read a good portion of this, just as a
18  background for questions.  So if you'll indulge
19  me.
20          I'll start with the second
21  paragraph.  "As you know, after our staff
22  reviewed all the awards made over the past four
23  years and rated them high, medium or low in
24  terms of promoting DEI.  Adam and I carefully
25  reviewed the staff's work over two full days

179

1   and sent you that first spreadsheet, which we
2   feel very confident about.  It's also the list
3   that we sent to OMB.  The attached list
4   concerns, as you know, applications that staff
5   rated N/A.  That is involving products that
6   seemed to have no applicability to promoting
7   DEI.  We feel much less confident about it.
8   This is because many of the DEI rationale
9   comments relating to products on the attached
10   spreadsheet say things such as, does not relate
11   directly to DEI topics.  Or more emphatically,
12   there is no direct connection to DEI.  We think
13   these products are harmless when it comes to
14   promoting DEI."
15          "The initial time, because we
16   know you want to move quickly," I assume he
17   meant, "we didn't give these applications the
18   individualized consideration that we did to
19   those on the first spreadsheet.  Accordingly,
20   we only explicitly initialed a few important
21   products, such as the papers of George
22   Washington whose cancellation would not reflect
23   well on any of us.  And the same could be said
24   for many other listed projects.  It would take
25   too long at this point to review the N/A list

180

1   appropriately.  Therefore, our recommendation
2   is that wherever the DEI rationale on the
3   spreadsheet makes clear that there is no DEI
4   component to the project, there is no
5   justification for canceling the product's
6   funding and you should allow it to continue."
7           Who decided to reject that
8   recommendation from Mr. McDonald?
9           MS. DOUD:  Objection.
10          THE WITNESS:  Who decided to
11      reject what recommendation?
12  BY MR. ROBINSON:
13      Q    The recommendation to save
14  projects listed as NEA -- N/A for which he says
15  there is no justification for canceling the
16  product's funding?
17      A    I -- I don't understand the
18  question.
19      Q    So Mr. McDonald here is saying
20  in this e-mail that there are projects that NEH
21  staff have flagged as N/A, meaning not
22  applicable for DEI.  And he says, "Our
23  recommendation is that wherever the DEI
24  rationale on the spreadsheet makes clear that
25  there is no DEI component, there is no

201

1    Q    What were you spending most of
2 your time on?
3    A    Other small agencies in the
4 government.
5    Q    Can you provide some examples?
6    A    The Institute of Museum and
7 Library Services, AmeriCorps, the Office of the
8 Director of National Intelligence; three.
9    Q    Was there a sense in which
10 NEH -- your work on NEH was paired in
11 connection with work at NEA or the Institute of
12 Museum and Library Services, were you, like,
13 working on those at the same time and applying
14 the same method at those three agencies or --
15 or no?
16        MS. DOUD:  Objection.
17        THE WITNESS:  The short answer
18    is no.  Another person on our team,
19    Marshall Wood, was the lead for NEA.  We
20    worked on that agency completely
21    separately from NEH.  We didn't have a
22    relationship with the head of NEA at the
23    time.
24        IMLS I believe was listed in an
25    executive order.  And Keith Sonderling

202

1    was appointed acting chairman of IMLS,
2    and so we had a close relationship with
3    Keith.  And so the circumstances at that
4    agency were different as well.
5        STENOGRAPHER:  You said the
6    circumstances of that were?
7        THE WITNESS:  Different from
8    that of NEH.  Each agency had its own
9    unique situation and circumstance.
10 BY MR. ROBINSON:
11    Q    Was there a proposal at one
12 point to merge NEH and NEA?
13    A    Not to my knowledge.
14    Q    Just to go back to something
15 briefly, that list we were looking at before of
16 grants that were to be kept and we went through
17 some examples.  Just to make sure I understand
18 your testimony, if a grant related to DEI, it
19 couldn't be on the keep list, right?
20    A    That's correct.
21    Q    After NEH, what did you do in
22 Government?
23    A    After NEH, I continued my work
24 as the leader of the small agencies team and
25 proceeded to work on the three agencies I

203

1 mentioned, but there were also others.  I don't
2 have the full list in front of me, but there
3 were about a dozen.
4    Q    Aside from your work with the
5 small -- sorry -- from the small agencies team,
6 did you do anything else for DOGE?
7    A    At the -- at the end of my time
8 at DOGE I worked at the Department of Homeland
9 Security on the immigration team with ICE for
10 about a month.  And that was it.
11    Q    What did you do with ICE?
12    A    We were designing a voluntary
13 departure program to encourage illegal
14 immigrants to self-deport from the country.
15    Q    Anything else besides that time
16 at ICE?
17    A    No.
18    Q    You left around August 2025; is
19 that right?
20    A    Yes.
21    Q    Why did you leave?
22    A    I was not enjoying the work on
23 immigration and I was ready to go start my next
24 company.
25    Q    Why were you not enjoying it?

204

1    A    I was not drawn to the
2 immigration program personally.  Wasn't -- I
3 didn't agree with all of it.
4    Q    What didn't you agree with?
5    A    I had found the small agencies
6 work more fulfilling, because I originally
7 joined DOGE to help reduce the Federal deficit,
8 and immigration was not directly related to
9 that, so I wasn't interested in it.
10    Q    Did you feel like the ICE work
11 was too aggressively getting people deported or
12 not aggressively enough?
13        MS. DOUD:  Objection.
14        THE WITNESS:  I didn't think it
15    was aggressive enough, but I -- at the
16    same time, I didn't enjoy working on that
17    project.
18 BY MR. ROBINSON:
19    Q    So why did you go there in the
20 first place?
21    A    The small agencies work
22 ultimately was winding down in around July
23 because there was growing tension between Elon
24 and the White House, and the desire to cut
25 spending from the White House started to

Nathan Cavanaugh - January 23, 2026

237

1  BY MR. ONAYEMI:
2      Q    Okay.  So DEI, it sounds like to
3  you, has something to do with hiring; is
4  that --
5      A    That's one component under which
6  DEI can be applied.
7      Q    And I'm asking you for the
8  others.  So what are the others?
9      A    In the context of the NEH
10  grants?
11     Q    Sure.
12     A    Can you pull up some of the NEH
13  grants?  There were 1500 of them.
14     Q    Right.
15     A    Presumably, you can pull up one
16  or two that were canceled.
17     Q    I don't think we need to pull it
18  up to get your understanding of DEI.
19          So you played a role in
20  determining what grants would be canceled based
21  on DEI, right?
22     A    Yes.
23     Q    Okay.  And sitting here today,
24  you can't give a definition of DEI without
25  looking at the grants?

238

1          MS. DOUD:  Objection.
2          THE WITNESS:  Many of the grants
3      that we canceled explicitly said DEI in
4      the description.
5  BY MR. ONAYEMI:
6      Q    Okay.  So is that the only basis
7  through which you canceled grants, if they said
8  DEI in the description?
9      A    No, that's not the only basis.
10     Q    Okay.  So what other bases did
11  you use?
12     A    As we discussed before, it was
13  also -- could have been wasteful spending.  It
14  wasn't just on the basis of DEI.
15     Q    So wasteful spending or if DEI
16  was explicitly noted in the grant description?
17     A    Those were two of the driving
18  primary criteria, yes.
19     Q    I think we looked at some grants
20  earlier that didn't explicitly say DEI in the
21  description.
22     A    Okay.  Maybe those fell in the
23  wasteful spending bucket, then.
24     Q    So I want to go back to
25  something you said earlier in testifying.  You

239

1  noted that during the process of terminating
2  grants "it is well understood that you were
3  required to read the actual grant description
4  before requesting that it be terminated."
5          Do you remember testifying to
6  that?
7      A    Yeah.  We would read the full
8  description on the list of grants that were
9  exported from the grant management system or in
10  the USAspending data export.
11     Q    Okay.  And you said this was
12  well understood.  What did you base that on?
13     A    It was well understood by myself
14  and my team, the small agencies team.  And it
15  was well understood among the DOGE team and
16  culture, that you couldn't just randomly
17  recommend to an agency head to terminate a
18  grant or contract unless you thoroughly
19  understood what it said and had a basis for
20  doing so, either based on an executive order or
21  through the lens of wasteful spending.
22     Q    Okay.  When you talk about this
23  culture, like, what exactly did you perceive
24  that gave you that idea?
25     A    What did I perceive that gave me

240

1  the idea that what?
2      Q    That that was part of the
3  culture.
4      A    Because it was spoken about
5  explicitly that you need to be precise in your
6  cutting efforts.  It wasn't -- it wasn't a
7  random exercise.
8      Q    Who told you that?
9      A    Steve Davis made that very clear
10  to the DOGE team, that that was the principle
11  by which you should operate.
12     Q    And he said explicitly you
13  should read every grant before canceling?
14         MS. DOUD:  Objection.
15         THE WITNESS:  Yes.  Yes.
16         MS. DOUD:  He didn't say grant.
17     He didn't say you should read the grant.
18         THE WITNESS:  Grant description,
19     contract, et cetera, yes.
20  BY MR. ONAYEMI:
21     Q    Okay.  And do you understand
22  that each grant application at any age comes
23  with an entire file beyond just the grant
24  description?
25     A    I do, yes.

Nathan Cavanaugh - January 23, 2026

269

1      description of the actual grant.
2  BY MR. ONAYEMI:
3      Q    Okay.  You just -- I'm sorry.
4  I'm saying books because you said books.
5          What books would you have read
6  that would have informed your opinion on what
7  grants to cancel based on DEI or not DEI?
8      A    There -- there were no books.
9      Q    Okay.  So there are no books.
10  Anything else that would have informed you on
11  how to stop this?
12     A    No.
13     Q    Okay.  Just kind of your whims,
14  I guess, is that what you're saying?
15         MS. DOUD:  Objection.
16         THE WITNESS:  They're not my
17     whims.  They're -- it's my judgment of
18     how to interpret a grant that includes
19     DEI characteristics or are wasteful
20     spend.
21  BY MR. ONAYEMI:
22     Q    Right.  And there was no one
23  that you were consulting to make that call?
24     A    No.
25     Q    Okay.  Did you ever talk to

270

1  Justin about edge cases --
2         STENOGRAPHER:  About what cases?
3         MR. ONAYEMI:  Edge cases.  Cases
4     on the edge.
5         THE WITNESS:  Yeah.  If there
6     was an edge -- again, the lens by which
7     we were making decisions was -- I know
8     you're very focused on DEI.  There was
9     not -- the only lens was not DEI.  It was
10    also wasteful spending.
11        The priorities for NEH's grants
12    were related to the founding of the
13    country or America250 initiative this
14    year, or the Garden of Heroes.  If the
15    grants didn't fall in those three buckets
16    and met a DEI criteria or, in our view,
17    were wasteful spending, we would flag
18    those grants for review for Mike and Adam
19    to agree with.  If there was an edge
20    case, we lean on the side of cutting it
21    because DOGE's mission was to reduce
22    Federal spending.  We erred on the side
23    of the cut versus keep, generally.
24  BY MR. ONAYEMI:
25     Q    Okay.  Did you go through any

271

1  type of HR onboarding when you joined GSA?
2      A    Yes.
3      Q    Can you walk me through what
4  that was?
5      A    I don't remember the specific
6  courses we took.  It was like a multi-hour
7  video series where you went through traditional
8  corporate HR policies.
9      Q    Okay.  Was it one day of
10  onboarding, two days, a week?
11     A    It was about -- it was a day or
12  two of onboarding, including going through
13  training, get our PIV card, et cetera.
14     Q    Okay.  Did you go through that
15  onboarding with anyone else or by yourself?
16     A    Someone from GSA HR, but there
17  were no other teammates with me at -- during
18  that time.
19     Q    Okay.  Did you fill out any
20  paperwork as part of that process?
21     A    Did I fill out any paperwork
22  after completing the HR training?
23     Q    Or as part of the HR training.
24     A    I didn't fill out any paperwork
25  regarding the HR training, no.

272

1      Q    Did you have a background check
2  run on you?
3      A    I did.
4      Q    Okay.  Did you go through any
5  training on how to maintain Government records?
6      A    I believe so, yes.  Yes.  I
7  don't recall exactly what was in there, but
8  yes.
9      Q    Okay.  Did it touch at all on
10  using auto-delete services?
11     A    I honestly don't recall.
12     Q    Did the onboarding -- did you
13  receive, as part of the onboarding process, a
14  Government laptop and phone?
15     A    Yes.
16     Q    Okay.  And did you -- have you
17  since returned those after leaving the
18  Government?
19     A    Yes.
20     Q    Okay.  So earlier we talked
21  about some of your communications with
22  Mr. Davis, including the context of you
23  e-mailing yourself, I think you were saying,
24  and then using that e-mail on Signal to send to
25  Mr. Davis.