# <u>EXHIBIT 3</u>

UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF NEW YORK

AMERICAN COUNCIL OF LEARNED SOCIETIES, et al.,

      Plaintiffs,      Case No. 1:25-cv-03657

vs.       Consolidated with No: 1:25-cv-03923

MICHAEL McDONALD, in his official capacity as

Acting Chairman of the National Endowment of

the Humanities, et al.,

      Defendants.

_____


VIDEOTAPED DEPOSITION OF

MICHAEL P. McDONALD


TAKEN ON

FRIDAY, JANUARY 30, 2026

9:33 A.M.


NATIONAL ENDOWMENT FOR THE HUMANITIES

400 SEVENTH STREET SOUTHWEST

WASHINGTON, DC 20004

MICHAEL MCDONALD                    January 30, 2026                    2 to 5
93097

Page 2
```
1          APPEARANCES
2
3  Appearing on behalf of the Plaintiffs:
4  DANIEL F. JACOBSON, ESQUIRE
5  NINA CAHILL, ESQUIRE
6  KYLA M. SNOW, ESQUIRE (Via Zoom)
7  LYNN D. EISENBERG, ESQUIRE (Via Zoom)
8  JOHN ROBINSON, ESQUIRE (Via Zoom)
9  Jacobson Lawyers Group, PLLC
10 5100 Wisconsin Avenue Northwest, Suite 301
11 Washington, DC 20016
12 (301) 823-1148
13 daniel@jacobsonlawyersgroup.com
14 nina@jacobsonlawyersgroup.com
15 kyla@jacobsonlawyersgroup.com
16 lynn@jacobsonlawyersgroup.com
17 john@jacobsonlawyersgroup.com
18
19
20
21
22
23
24
25
```

Page 4
```
1          APPEARANCS CONTINUED
2
3  Appearing on behalf of the Defendants:
4  JONAKI SINGH, ESQUIRE
5  MARY ELLEN BRENNAN, ESQUIRE
6  RACHEL DOUD, ESQUIRE
7  U.S. Attorney's Office Southern District of New York
8  1 Saint Andrews Plaza
9  New York, New York 10007
10 (212) 637-2200
11 jonaki.singh@usdoj.gov
12 maryellen.brennan@usdoj.gov
13 rachel.doud@usdoj.gov
14
15 Also Present:
16 Annie Cleaver, Head of Research, Fairmark Partners
17 Kimberly Hylan, Attorney-Advisor, NEH
18 Elizabeth "Lisette" Voyatzis,
19     Deputy General Counsel, NEH
20 Vincent Guerrera, Naegeli Technician
21
22
23
24
25
```

Page 3
```
1          APPEARANCES CONTINUED
2
3  Appearing on behalf of the Authors Guild Plaintiffs:
4  AMANDA VAUGHN, ESQUIRE
5  YINKA ONAYEMI, ESQUIRE (Via Zoom)
6  SARAH MARTIN, ESQUIRE (Via Zoom)
7  JAMIE CROOKS, ESQUIRE (Via Zoom)
8  Fairmark Partners, LLP
9  400 7th Street NW, Suite 304
10 Washington, DC 20004
11 (202) 417-7111
12 amanda@fairmarklaw.com
13 yinka@fairmarklaw.com
14 sarah@fairmarklaw.com
15 jamie@fairmarklaw.com
16
17
18
19
20
21
22
23
24
25
```

Page 5
```
1          EXAMINATION INDEX
2                    PAGE
3
4  EXAMINATION BY MR. JACOBSON           9
5  EXAMINATION BY MS. VAUGHN           353
6  EXAMINATION BY MS. BRENNAN          375
7  FURTHER EXAMINATION BY MR. JACOBSON      376
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

MICHAEL MCDONALD                    January 30, 2026                                6 to 9
93097

Page 6

```
1          EXHIBIT INDEX
2  EXHIBIT                    PAGE
3
4    1 CV                      24
5    2 EMAIL MAR 12 2025           93
6    3 EMAIL MAR 13 2025           97
7    4 COPY OF USB           103
8    5 EMAIL MAR 17 2025       110
9    6 GRANT SUMMARY          113
10   7 COPY OF USB            125
11   8 EMAIL MAR 19 2025      133
12   9 EMAIL MAR 19 2025      137
13   10 EMAIL MAR 19 2025     140
14   11 ACTIVE GRANTS FLAGGED      144
15   12 EMAIL MAR 28 2025     146
16   13 MAR 31 2025           153
17   14 ACTIVE GRANTS FLAGGED      164
18   15 EMAIL MAR 31 2025     180
19   16 EMAIL MAR 31 2025     185
20   17 MAR 31 2025           199
21   18 EMAIL APR 1 2025      200
22   19 EMAIL APR 1 2025      220
23   20 NEH GRANTS TO KEEP        223
24   21 NEH GRANTS TO KEEP        236
25   22 NEH GRANT TERMINATION SUMMARY    244
```

Page 7

```
1       EXHIBIT INDEX CONTINUED
2  EXHIBIT                    PAGE
3
4    23 GRANT TERMINATION LETTER        256
5    24 GRANT TERMINATION LETTER        260
6    25 EMAIL APR 2 2025      264
7    26 EMAIL APR 2 2025      267
8    27 EMAIL APR 3 2025      279
9    28 EMAIL APR 4 2025      282
10   29 EMAIL APR 5 2025      288
11   30 TRANSCRIPT            297
12   31 TEXTS                323
13   32 SIGMA CHI FRATERNITY VS        332
14      GEORGE MASON UNIVERSITY
15
16
17
18
19
20
21
22
23
24
25
```

Page 8

```
1          VIDEOTAPED DEPOSITION OF
2              MICHAEL P. McDONALD
3                 TAKEN ON
4          FRIDAY, JANUARY 30, 2026
5                9:33 A.M.
6
7      THE VIDEOGRAPHER:  All right.  We are on
8  the record.  The time is 9:33, and the date is
9  January 30th, 2026.
10      This is the beginning of the deposition of
11 Michael McDonald.  The case caption is American
12 Council of Learned Societies versus McDonald.
13      Will Counsel introduce yourselves and
14 state whom you represent.
15      MR. JACOBSON:  Daniel Jacobson for
16 American Council of Learned Societies, et al.
17      MS. VAUGHN:  Amanda Vaughn, from Fairmark
18 Partners, here representing the Authors Guild
19 Plaintiffs.
20      MS. CAHILL:  Nina Cahill, American --
21 American Council of Learned Societies.
22      MS. BRENNAN:  Mary Ellen Brennan, from the
23 US Attorney's Office, for the Defendants.
24      MS. DOUD:  Rachael Doud, from the US
25 Attorney's Office, for the Defendants.
```

Page 9

```
1      MS. SINGH:  Jonaki Singh, from the US
2  Attorney's Office, for the Defendants.
3      THE VIDEOGRAPHER:  The court reporter will
4  now swear in the witness.
5      THE REPORTER:  Mr. McDonald, would you
6  please raise your right hand.
7      Do you affirm under penalty of perjury
8  that the testimony you're about to give will be the
9  truth, the whole truth, and nothing but the truth?
10      THE DEPONENT:  Yes.
11      THE REPORTER:  All right.  You may
12 proceed.
13 MICHAEL PATRICK McDONALD, having been first duly
14 affirmed to tell the truth, was examined and
15 testified as follows:
16 EXAMINATION
17 BY MR. JACOBSON:
18   Q.  Good morning, Mr. McDonald.
19   A.  Good morning.
20   Q.  Could you please state your full name for
21 the record.
22   A.  Michael Patrick McDonald.
23   Q.  Mr. McDonald, I represent -- you
24 understand that there's two lawsuits in this matter
25 that have been consolidated?
```

MICHAEL MCDONALD                    January 30, 2026                    62 to 65
93097

Page 62

1 that space, right?
2        MS. BRENNAN: Objection.
3        THE DEPONENT: My job as a civil servant
4 in occupying the office is not to question the
5 directives, but to do my best to give advice, to
6 help them help them be carried out. My personal
7 opinions, if you're asking what my personal opinions
8 were, no, I wasn't -- I wasn't a fan, but I
9 certainly didn't do anything to put a stick in the
10 wheel --
11 BY MR. JACOBSON:
12    Q. Sure.
13    A. -- of what -- what the administration
14 wanted to do.
15    Q. But as in -- a matter of your personal
16 opinion, you thought it was kind of ridiculous,
17 right?
18        MS. BRENNAN: Objection.
19        THE DEPONENT: I thought it was certainly
20 economically baneful for the country to -- to engage
21 in those practices.
22 BY MR. JACOBSON:
23    Q. And across your 23 years, this is -- this
24 is a unanswerable question, probably, but --
25    A. You'll ask it anyway.

Page 63

1    Q. -- I'll ask it anyway. Ballpark, how many
2 grants do you think have gone out of the door from
3 here across your 23 years from NEH? Thousands?
4    A. Yeah. Certainly thousands.
5    Q. Maybe even tens of thousands?
6    A. Possibly.
7    Q. And it's -- you'd agree that those grants,
8 to the recipients of those grants, the grants are
9 really valuable, right?
10        MS. BRENNAN: Objection.
11        THE DEPONENT: Yes.
12 BY MR. JACOBSON:
13    Q. And why is that?
14    A. Because for reasons that I don't quite
15 understand, notwithstanding the fact that
16 universities have billion-dollar endowments,
17 scholars at the universities rely on government
18 funding to help them in their research. And
19 oftentimes the research that they're doing in
20 humanities is very valuable and --
21    Q. Valuable in a non-monetary sense, you
22 mean?
23    A. Yes. Valuable for -- for the good of the
24 field, for the good of people, generally, for -- for
25 a greater appreciation of the value of the liberal

Page 64

1 arts.
2    Q. And they're also valuable to a person's
3 career trajectory, fair to say, or can be?
4    A. Yes.
5    Q. Prestigious?
6    A. Yes.
7    Q. Do they help universities recruit faculty?
8        MS. BRENNAN: Objection.
9        THE DEPONENT: Do they -- do -- do NEH
10 grants help universities recruit faculties? Could
11 you rephrase that? What do you mean?
12 BY MR. JACOBSON:
13    Q. I'll withdraw the question. It was a bad
14 question. When NEH funds a grant, let's say for
15 someone to write a book, NEH is funding that
16 grantees speech, right?
17        MS. BRENNAN: Objection.
18        THE DEPONENT: NEH establishes programs
19 and sets out criteria, the types of project --
20 projects, and in that sense, speech it wishes to
21 fund. When the government is going to invest its
22 money in that, it wants to be confident of, you
23 know, that the -- the money is going to be used for
24 the purposes that the government, or in this case,
25 the agency wants, not the individual. So yes, we

Page 65

1 want to make sure that the project doesn't -- that
2 it doesn't metamorphize into something that it
3 shouldn't be, such as political advocacy.
4 BY MR. JACOBSON:
5    Q. But when somebody files a grant
6 application and they say, I'm writing a book on, you
7 know, 19th Century Italian Architecture, I don't
8 know if any -- I'm guessing someone's written a book
9 about that.
10    A. I'm sure they have.
11    Q. And they -- they ask -- they submit a
12 grant application for funds to support that book,
13 and they get the grant.
14    A. Yeah.
15    Q. The book itself is still the author's
16 speech, right?
17    A. That's correct.
18        MS. BRENNAN: Objection.
19        MR. JACOBSON: Okay.
20        MS. BRENNAN: And, Dan, I mean, we've let
21 this go on for a while, but I don't see how some of
22 these questions are -- are designed to elicit
23 discovery of admissible facts. It -- it seems like
24 you're just engaging in legal discussions with the
25 witness.

MICHAEL MCDONALD                    January 30, 2026                                   66 to 69
93097

Page 66

1      MR. JACOBSON: Okay. I understand your
2  objection.
3  BY MR. JACOBSON:
4      Q.  You spent about you said 20 sorry, 22
5  years at NEH prior to becoming the acting chair in
6  2025; is that right?
7      A.  Yeah.
8      Q.  And that covered three presidential
9  transitions; is that right?
10     A.  Let's see.  George W. Bush, there was
11 Barack Obama, then who did we have?  Donald Trump,
12 and then we had President Biden.  Yeah, four.
13     Q.  And during your 22 -- those 22 years, did
14 NEH ever terminate a grant or cooperative agreement
15 during your time here?
16     A.  Well, I think there were very few
17 instances that I recall when we may have a couple.
18 Generally, we terminated grants, as I was about to
19 say, I was continuing what I was saying before, when
20 this -- there could be a change, for example, in the
21 direction the project is going in that we didn't
22 like.
23     Q.  Can you give me a ballpark of how many
24 grants NEH terminated in those 22 years?
25     A.  I'd say very few, probably under half a

Page 67

1  dozen.
2      Q.  Less than six?
3      A.  Possibly.
4      Q.  So that's, you know, 0.2 grants a year or
5  something like that.  I'll didn't the math.  It's
6  probably wrong, but less than one grant a year?
7      A.  Correct.
8      Q.  And did NEH ever terminate a grant solely
9  because NEH disagreed sorry, withdraw that.  Did NEH
10 ever terminate a grant before 2025 based on agency
11 policies or priorities?
12     A.  Grant.  No, to the best of my knowledge.
13     Q.  And with those prior grant terminations,
14 did the Office of General Counsel typically review
15 the grant termination notices?
16     A.  It would depend.  It would depend.
17     Q.  What would it depend on?
18     A.  It would depend on the circumstances on
19 which we were terminating the grant.
20     Q.  So which would be -- what would be a
21 circumstance when you -- the OGC would not review a
22 grant termination notice?
23     A.  I would say in most instances, we probably
24 would, but there are some instances that may have
25 been so clear cut that it was simply left up to the

Page 68

1  -- to the directors to propose a memo to the admin
2  to the -- to the office of the chairman or
3  chairwoman or chairperson to -- requesting the
4  termination of the grant.  And it would be done on
5  that basis with minimal or perhaps even no NEH
6  general counsel involvement.
7      Q.  And you mentioned you've been at NEH, I
8  think, for three prior transitions, presidential
9  transitions.  Did NEH ever terminate a whole host of
10 grants following a transition?
11     A.  No.
12     MR. JACOBSON: Okay.  I think this would
13 be a good point for, like, a five-minute break, if
14 that makes sense.  Go off the record.
15     THE DEPONENT: Yes.
16     THE VIDEOGRAPHER: All right.  Stand by.
17 The time is 10:37 and we are off the record.
18     (WHEREUPON, a recess was taken.)
19     THE VIDEOGRAPHER: The time is 10:46, and
20 we are on the record.
21 BY MR. JACOBSON:
22     Q.  Mr. McDonald, I'm going to turn now to
23 starting after the -- the second Trump
24 administration took office in 2025.  As of February
25 2025, was Shelly Lowe still chair at NEH?

Page 69

1      A.  Yes.
2      Q.  And at some point in February, did Chair
3  Lowe decide to fund all awards approved up to 20 --
4  January 20th, 2025, even those that were deemed to
5  be in conflict with the new executive orders?
6      A.  I'm inclined to say yes, but I'm not sure.
7  Because my recollection is there may have been
8  awards that came in, these discretionary chairman's
9  grants.  I don't know if she's -- she's funding
10 some.  I don't know all.
11     Q.  She decided to fund some awards.
12     A.  Yeah.
13     Q.  Even though they were in conflict with the
14 new executive orders?
15     A.  I'm not sure.
16     Q.  A moment ago, you said you were inclined
17 to say yes.
18     MS. BRENNAN: Objection.
19     THE DEPONENT: I -- I don't have a clear
20 recollection that she was.  Certainly knowing --
21 knowing that Shelly was a very careful person,
22 thinking about it, it would surprise me that she
23 would fund a -- fund a project in direct violation
24 of an executive order unless the -- unless somehow
25 it had been pending, and I -- I just don't know

MICHAEL MCDONALD                    January 30, 2026                    98 to 101
93097

1  nine or ten months ago.  But I imagine that what we
2  told them was that we had already begun the process
3  of scrutinizing awards in line with the president's
4  executive order, and that we would -- we would
5  provide them with that so they could use it as they
6  saw fit -- fit for the work that they were doing.
7      Q.  And the three categories you mentioned,
8  one was DEI/DEIA, the second was gender ideology,
9  and the third was environmental justice; is that
10 right?
11     A.  Yes.
12     Q.  I believe you've already given a
13 definition for DEI.  How do you define gender
14 ideology?
15     MS. BRENNAN:  Objection.
16     THE DEPONENT:  Well, that was defined for
17 us in the president's executive order, which I don't
18 have here before me, but we were working off of that
19 definition.
20 BY MR. JACOBSON:
21     Q.  So -- so your definition for these
22 purposes was solely the definition of the executive
23 order?
24     MS. BRENNAN:  Objection.
25     THE DEPONENT:  I was trying to get in --

1  in my role, I was adhering to the definition and the
2  guidance provided in the executive order, yes.
3  BY MR. JACOBSON:
4      Q.  And how about environmental justice?  How
5  do you define environmental justice?
6      MS. BRENNAN:  Objection.
7      THE DEPONENT:  I -- just the same way.  I
8  was -- I was working off of the executive orders
9  that the president promulgated.
10 BY MR. JACOBSON:
11     Q.  And was there a specific definition of
12 environmental justice in that executive order?
13     A.  I don't recall the wording of the order,
14 but whatever it was, that was -- that was the road-
15 map we were -- we were attempting to follow.
16     Q.  Well, how would you in your personal
17 capacity, define environmental justice?
18     MS. BRENNAN:  Objection.
19     THE DEPONENT:  I would define it as
20 crossing the line into advocacy and violating the
21 agency's longstanding prohibitions against funding
22 projects that are politically tendentious in nature.
23 In this instance, you know, we have received -- we
24 have received grant applications.  For example, I
25 recall we received a grant application entitled

1  Hunger Studies.
2      And you took a look at the application,
3  and it had a very activist component.  It was going
4  to have university students engage in lobbying and
5  letter writing campaigns to their state, local, and
6  federal representatives, things of that nature.
7      A.  And you -- you've used several times the
8  phrase politically tendentious; is that right?
9  BY MR. JACOBSON:
10     Q.  Yes.
11     A.  Can you explain what you mean by that?
12     Q.  Sure.  Scholarship -- a scholarship can
13 have a -- can have a -- a scholarship can have a
14 point of view.  But when we, for example, fund
15 educational programs, teaching programs, we take a
16 look at such things as who the participants are
17 going to be, what the reading lists are going to be,
18 is there a diversity of opinion, or is it all going
19 to be a one-way street?  So I think we were looking
20 for environmental justice programs that -- that's
21 that -- well, that's what I mean by tendentious,
22 that they don't allow for a divergent point of view.
23     That, you know, there -- there continue to
24 be divergences among scientists about the climate.
25 There continue to be divergences about matters that

1  are unresolved.  And we try in the funding because
2  we're -- one of our -- one of our statutory
3  requirements is to promote taxpayer confidence in
4  the wise use of federal funds, that the agency is
5  not becoming or funding or rather expending funds in
6  a tendentious fashion, politically tendentious way.
7      Q.  And so if I understand this exercise, NEH
8  staff went through and they rated every single
9  active grant as low, medium, or high for these three
10 categories; is that right?
11     A.  Yes.
12     Q.  With the idea being that under the
13 president's executive orders, anything rated as high
14 would be terminated?
15     MS. BRENNAN:  Objection.
16     THE DEPONENT:  I would say that if
17 anything with -- if -- if the NEH staff thought that
18 something -- it's -- it's not as simple as that
19 because -- but I would say, generally speaking, yes.
20 I would -- I would agree with that.  If it was rated
21 high by the staff, more than likely, it would -- it
22 would be -- we -- we'd review it -- we -- we would
23 want to terminate it, yes.
24 BY MR. JACOBSON:
25     Q.  In your view, was that -- it was

1 appropriate to terminate those under the executive
2 order?
3    A.  Yes.
4    Q.  What about medium?
5    A.  Well, this is why I took a second -- I had
6 to take a second look at the -- the applications
7 themselves or the -- the grants that had been
8 designated, medium or low.
9    Q.  Got it.  And so the last sentence of this
10 email says, "We've set aside a block of time Monday
11 morning to finalize the list for OMB;" is that
12 right?
13    A.  Yes.
14    Q.  And who told you that you had to send the
15 list to OMB?
16    A.  Well, that was a requirement from OMB.
17 OMB also issued guidance on the executive orders, as
18 I recall, to all the federal agencies, and they gave
19 us a -- a deadline for conducting the reviews and
20 submitting the information to them.
21    Q.  So Fox and Cavanaugh never said anything
22 about sending it to OMB?
23    A.  That's correct.
24    Q.  Did you speak with anyone at OMB about
25 this project?

1    A.  No.
2       MR. JACOBSON:  Okay.  I'm going to ask
3 that we now, Nina, on the spreadsheet, pull up the
4 spreadsheet -- the spreadsheet that was attached to
5 the email we just looked at, which is produced as
6 Administrative Record 6.  And we'll mark this as
7 Exhibit 4.
8       THE REPORTER:  Exhibit 4 marked.
9       (WHEREUPON, Exhibit 4 was marked for
10 identification.)
11 BY MR. JACOBSON:
12    Q.  I won't to ask you about the upcoming UFC
13 fight.
14    A.  Coming to the White House soon.
15    Q.  Okay.  Mr. McDonald, can you see the
16 spreadsheet that's on the screen?
17    A.  Let me take a look.  Yes.
18    Q.  Do you recognize this spreadsheet?
19    A.  I recognize -- there are so many
20 spreadsheets. I don't -- I don't -- I -- I couldn't
21 tell you which one or which date this was, but it
22 looks like one of the spreadsheets that -- that was
23 in play to identify grants.
24    Q.  If I represent to you that this is the
25 spreadsheet that was attached to Mr. Wolfson's email

1 that we just read, will -- any reason to --
2    A.  I would accept that, yes.
3    Q.  Okay.
4    A.  Thank you.
5    Q.  And that means this would be a spreadsheet
6 that was prepared by NEH staff to send to OMB; is
7 that right?
8    A.  NEH staff, yes.
9       MR. JACOBSON:  Okay.  And we're in the
10 Education tab now.  Nina, could you scroll to Row
11 71?
12 BY MR. JACOBSON:
13    Q.  Do you see in bold, there's a -- and we
14 can expand any of the columns if you need.  There's
15 a grant to the American Historical Association there
16 highlighted in bold?
17    A.  Yes.  It's difficult to read.  No.  It's a
18 little bit better.
19    Q.  And can you read the project description
20 over in Column O there, if you're able, into the
21 record.
22    A.  This is like at the optometrist.  Let me
23 see if I can manage it.  The American Historical --
24 that's what you wanted me to read?
25    Q.  Yes, please.

1    A.  Yes.  "The American Historical Association
2 proposes a three-week combined format summer
3 institute for 25 higher education faculty on US
4 Environmental Policy in responses to environmental
5 changes from the early 19th century through the 20th
6 century."
7    Q.  That's fine right there.  I won't make you
8 read the whole thing.
9    A.  Thank you.
10    Q.  And you see in the column -- over in
11 Column U, it's rated as high-primary aspect of the
12 project and/or its activities.
13    A.  Mm-hmm.
14    Q.  Do you see that, Mr. McDonald?
15    A.  I do, yes.
16    Q.  And what does high mean there?
17    A.  It means that the staff identified it as
18 something that would almost certainly be in conflict
19 with the presidential executive order.
20    Q.  And why would it be in conflict with the
21 executive order?
22    A.  Well, the -- the staff would have made
23 that determination.  I can't speak for the staff,
24 but I can speculate if you'd like.
25    Q.  Well, Mr. McDonald, you were the acting

Page 106

1 chair at the time that --
2    A.  Correct.
3    Q.  -- this was sent to OMB?
4    A.  Yeah.
5       MS. BRENNAN:  Objection.
6 BY MR. JACOBSON:
7    Q.  So it's fair to say you stood by the
8 ratings in something that was sent to the White
9 House like this?
10      MS. BRENNAN:  Objection.
11      THE DEPONENT:  Was sent to OMB?  Yes.
12 BY MR. JACOBSON:
13   Q.  Okay.  So why do you think it was
14 appropriate that this was tagged as high?
15      MS. BRENNAN:  Objection.
16      THE DEPONENT:  Well, the -- the part that
17 I didn't read talks about emissions-driven climate
18 change.  And as I say, there is still discussion in
19 the scientific community about the effects of
20 emission-driven climate change.  And I think the
21 executive order, that the administration's position
22 was that -- particularly given that this was funded
23 under the previous -- by the Biden administration,
24 was that the funding -- the funding should not
25 continue because it violated the administration's

Page 107

1 views on this very controversial issue.
2 BY MR. JACOBSON:
3    Q.  Well, these were tagged specifically with
4 respect to violating three executive orders, right?
5    A.  Yeah.
6    Q.  So which executive order did this violate?
7    A.  I would say most likely on the
8 environmental justice.
9    Q.  Okay.  So can you explain to me how this
10 related to, "environmental justice?"
11      MS. BRENNAN:  Objection.
12      THE DEPONENT:  I think the -- I think it
13 appeared -- it would have appeared that it was
14 continuing a priority of the previous
15 administration, which was not the priority of the
16 Trump administration in the area of devoting --
17 devoting limited NEH funds to topics such as climate
18 change, which up until the advent of the Biden
19 administration, the agency had never paid attention
20 to.
21 BY MR. JACOBSON:
22   Q.  Mr. McDonald, the executive order was
23 specific to environmental justice, right?
24   A.  Right.
25   Q.  So can you give me an answer as to why

Page 108

1 this related to environmental justice?
2       MS. BRENNAN:  Objection.
3       THE DEPONENT:  It depends on the
4 definition of environmental justice.  If this --
5 this is -- this could be identified as a project
6 which would lend humanities research to the support
7 of environmental justice causes.
8 BY MR. JACOBSON:
9    Q.  And that -- when you say environmental
10 justice causes, you're referring to climate change?
11   A.  Yes.
12   Q.  And so your testimony a moment ago was
13 that you didn't think it was appropriate for NEH to
14 be funding a topic that treats climate change as
15 sort of a -- a fact because it's still under
16 dispute.
17      MS. BRENNAN:  Objection.
18 BY MR. JACOBSON:
19   Q.  Did I get that right?
20   A.  Yes.
21      MS. BRENNAN:  Objection.
22 BY MR. JACOBSON:
23   Q.  And so any -- any topic -- any grant that
24 took a view that climate change is -- is factually
25 happening, not appropriate to fund?

Page 109

1       MS. BRENNAN:  Objection.
2       THE DEPONENT:  It was a change in
3 administration priorities.  It was not appropriate
4 to fund under the Trump administration, no.
5 BY MR. JACOBSON:
6    Q.  Because it was taking a view that climate
7 change is a fact that is happening when that is
8 actively under debate in your view?
9       MS. BRENNAN:  Objection.
10      THE DEPONENT:  Could you rephrase the
11 question?
12 BY MR. JACOBSON:
13   Q.  Your view is that it was not appropriate
14 for NEH to be funding this because climate change --
15 whether climate change and how it's happening is a
16 debated question, and this is taking a view that
17 climate change is in fact happening?
18      MS. BRENNAN:  Objection.
19      THE DEPONENT:  I don't know if it's like
20 -- it -- without going into the application, I can't
21 say what it's going to be doing.  I'm just saying on
22 -- on -- just from that -- that little part that
23 we've read, I can see how one -- one can come to
24 that conclusion.
25 BY MR. JACOBSON:

MICHAEL MCDONALD                    January 30, 2026                    114 to 117
93097

Page 114

1    Q.  Okay.  Thank you.
2        THE REPORTER:  Just to clarify, are we --
3    this is going to be Exhibit 6, every page of the
4    entire workbook?
5        MR. JACOBSON:  We're only going to be
6    showing the grant detail tab.
7        THE REPORTER:  Okay.
8        MR. JACOBSON:  So just -- but I -- can we
9    just mark the whole file as Exhibit 6 or no?
10       THE REPORTER:  Yeah, that's what I was
11   asking.  If you want to mark the entire file or it's
12   just --
13       MR. JACOBSON:  Let's just mark the entire
14   file as Exhibit 6.  Thank you.
15       THE REPORTER:  Thank you.
16   BY MR. JACOBSON:
17   Q.  So -- I'm sorry.  Do you see the tab at
18   the bottom there that says, NEH grant detail?
19   A.  Yes.
20   Q.  And your understanding is it was Mr. Fox
21   and/or Mr. Cavanaugh who put this spreadsheet
22   together?
23   A.  Yeah.  This is their spreadsheet.  You
24   just --
25   Q.  Right.

Page 115

1    A.  Yeah.
2    Q.  The one that Mr. Fox attached?
3    A.  Yeah.
4    Q.  Nobody at NEH put this together?
5    A.  That's correct.
6    Q.  Okay.  Looking at the first column, do you
7    see where it says, "Yes/No DEI?"
8    A.  Yes.
9    Q.  And what do you take that to indicate
10   where then it says yes underneath that for some
11   grants?
12   A.  It means that they had identified that
13   there was a DEI component to the open award.
14   Q.  And it was Mr. Fox or Mr. Cavanaugh who
15   wrote yes there, is your understanding?
16   A.  Yes.
17   Q.  Okay.  And then do you see the column, I
18   believe it's Column K that says DEI rationale?
19   A.  Yes.
20   Q.  Do you see that the first row, it says,
21   "NEH identified DEI involvement?".
22   A.  Yes.
23   Q.  And do you take that to mean that on the
24   other spreadsheet we were just looking at, the one
25   sent to OMB, NEH staff had identified this grant as

Page 116

1    having DEI involvement?
2    A.  Yes.
3        MS. BRENNAN:  Objection.
4    BY MR. JACOBSON:
5    Q.  And so the rows that don't say NEH
6    identified DEI involvement, is it a fair inference
7    that those are ones that NEH staff did not mark in
8    that separate spreadsheet as having DEI involvement?
9        MS. BRENNAN:  Objection.
10       THE DEPONENT:  I'm sorry, can you repeat
11   the question?
12       MR. JACOBSON:  So if we scroll down, Nina,
13   just a little bit.
14   BY MR. JACOBSON:
15   Q.  You'll see -- there's a handful.
16   A.  Oh, yes.
17   Q.  There's another one.
18   A.  I see what you're saying, yes.
19   Q.  So anyone that doesn't say NE -- NEH
20   identified DA involvement, it's a fair inference
21   that those are ones that were not marked in that
22   high, medium, low spreadsheet?
23       MS. BRENNAN:  Objection.
24       THE DEPONENT:  Yes, I agree with that.
25   BY MR. JACOBSON:

Page 117

1    Q.  Okay.  Thank you.  Do you know who drafted
2    these DEI rationales?
3    A.  No, I do not.
4    Q.  Do you know anything about the criteria
5    that were used for drafting these DEI rationales?
6    A.  No.
7        MR. JACOBSON:  Okay.  Can we scroll to Row
8    561, please, which should be highlighted in yellow.
9    BY MR. JACOBSON:
10   Q.  Do you see the row highlighted in yellow
11   there, involving a grant involving the Modern
12   Language
13   Association?
14   A.  Yes, I do.
15   Q.  Okay.  And because the -- the DEI
16   rationale there is not, you know, NEH identified,
17   it's a fair inference that NEH staff did not
18   identify this grant as having DEI involvement?
19       MS. BRENNAN:  Objection.
20   BY MR. JACOBSON:
21   Q.  In that other spreadsheet we were just
22   looking at?
23   A.  Yes.
24   Q.  Okay.  And you see in the first column,
25   though, it says, yes for yes/no, DEI?

MICHAEL MCDONALD                    January 30, 2026                    118 to 121
93097

Page 118

1    A. I see that, yes.
2    Q. Okay. Can you read into the record, Mr.
3 McDonald, the DEI rationale for this grant in Column
4 K?
5    A. Column K.
6    Q. The one that says DEI rationale.
7    A. Thank you. "The Modern Language
8 Associations initiative aims to align humanities
9 courses with career outcomes for under-served
10 students, thus relating to DEI."
11    Q. And can you -- you don't have to read into
12 the record, but can you take a moment to read the
13 grant description in Column M there?
14    A. Yes. "The Modern Language Association
15 (MLA) requests $60,000 over two years to support the
16 creation of a virtual professional development
17 workshop series to prepare humanities instructors at
18 small and mid-sized institutions to align humanities
19 courses in language and literature with career-
20 minded outcomes that benefit under-served students."
21    Q. Mr. McDonald, you don't have to read the
22 rest into the record. You're welcome to take a
23 moment to read the rest to yourself if you would
24 like to before answering the next question.
25    A. Yes. Let me do that.

Page 119

1    Q. Just let me know when you're ready.
2    A. I will. I'm ready.
3    Q. Do you agree, based on that grant
4 description with the -- if Nina could go back over
5 to the DEI rationale. Do you agree that this grant
6 involved DEI based on that grant description you
7 just read?
8    A. No.
9    Q. And so if this grant was terminated on the
10 ground that it did involve DEI, that's not something
11 you would agree was an appropriate basis for
12 termination?
13    MS. BRENNAN: Objection.
14    THE DEPONENT: If it were terminated on
15 that grounds, again, without knowing more about we
16 -- we have to pull -- the poll description there.
17 You might have to drill down into the application to
18 see how they defined under-served students, whether
19 or not there were any preferences involved. So I
20 have to -- yeah, I wouldn't have to ask to caveat
21 it, but just on the facial -- the information there,
22 it's not enough. And so, yes, I would say it should
23 not be terminated DEI.
24 BY MR. JACOBSON:
25    Q. Thank `you.

Page 120

1    A. You're welcome.
2    MR. JACOBSON: Can we go to Row 169,
3 please? I'm sorry, Row 100.
4 BY MR. JACOBSON:
5    Q. Do you see highlighted in bold, there's a
6 grant --
7    MR. JACOBSON: Nina, if you could scroll
8 over to the University of California at Riverside?
9    THE DEPONENT: Yes.
10 BY MR. JACOBSON:
11    Q. And you see that that was a grant for it
12 appears to be --
13    MR. JACOBSON: Nina, if you could scroll
14 over a little bit more until we get to some dollar
15 amounts. Oh, they're not in there. Oh, sorry. It's
16 in the grant. My -- my mistake.
17 BY MR. JACOBSON:
18    Q. You see in the grant description, it's a
19 grant for around $321,000.
20    A. Yes, I see that.
21    Q. And do you see that the grant was to,
22 quote, digitize mid 20th century African American
23 newspapers from Los Angeles and the Bay area and
24 contribute them to the national digital newspaper
25 program?

Page 121

1    A. Yes.
2    Q. Okay. Mr. -- Mr. McDonald, I'll give you
3 another moment to -- to read the full description
4 there, if you'd like.
5    A. Thank you. I'm ready.
6    MR. JACOBSON: Okay. Nina, if we can go
7 back over to the DEI rationale.
8 BY MR. JACOBSON:
9    Q. Mr. McDonald, can I ask you to read into
10 the record the DEI rationale?
11    A. " The request for funding to digitize mid
12 20th century African American newspapers contributes
13 to inclusivity by preserving and sharing
14 underrepresented voices."
15    Q. Mr. McDonald, do you agree that this grant
16 involved DEI?
17    A. I do not agree.
18    Q. Okay. So if this grant was terminated on
19 the ground that involved DEI, you would agree that
20 that's not something that was an appropriate basis
21 for termination?
22    MS. BRENNAN: Objection.
23    THE DEPONENT: If the grant had been
24 terminated on that basis, I would agree.
25    MR. JACOBSON: Okay. Nina, now, can we go

Page 122

1 to Row 169? And if we could scroll over.
2 BY MR. JACOBSON:
3    Q.  Mr. McDonald, do you see there's a grant
4 highlighted in bold to the University of Minnesota?
5    A.  Yes.
6    Q.  And you see that this grant and I'll just
7 read it. The grant description, you see it says,
8 "This project will pilot – pilot a process to
9 digitize and display flat books such that their
10 interactive nature is preserved for years." Do you
11 see that?
12    A.  I do.
13    Q.  And I'll give you another moment if you
14 want to read the full grant description.
15    A.  All right.
16       MR. JACOBSON: Okay. Nina, can we go over
17 to the DEI rationale.
18 BY MR. JACOBSON:
19    Q.  Can I ask you to read that into the
20 record, Mr. McDonald.
21    A.  "This initiative aims to address a gap in
22 current digitization practices by prioritizing the
23 preservation of interactive nature in historical
24 materials, promoting inclusivity in digitization
25 efforts."

Page 123

1    Q.  Mr. McDonald, do you agree with that DEI
2 rationale for this grant?
3    A.  No, I do not.
4    Q.  Do you agree that it's fairly ludicrous to
5 say that this grant involved DEI?
6       MS. BRENNAN: Objection.
7       THE DEPONENT: I would agree that it
8 mischaracterizes the grant.
9 BY MR. JACOBSON:
10    Q.  Mr. McDonald, so if this grant were
11 terminated on the ground that involved DEI, that's
12 not something you would agree was an appropriate
13 basis for termination?
14       MS. BRENNAN: Objection.
15       THE DEPONENT: If the grant were
16 terminated solely on the basis that it had violated
17 the -- the executive order on DEI, yes, I would
18 agree that that was not appropriate.
19 BY MR. JACOBSON:
20    Q.  And -- and stepping back, do you agree
21 that Mr. Fox and Mr. Cavanaugh identified a lot more
22 grants as involving DEI than NEH staff had?
23    A.  Yes.
24       MR. JACOBSON: Okay. And Nina, if you
25 could just scroll to the very bottom of this list.

Page 124

1 And then just scroll over to the left once you get
2 there.
3 BY MR. JACOBSON:
4    Q.  Do you see that number, 1057?
5    A.  Yes, I see it.
6    Q.  So that – do – do you agree that that
7 indicates that Mr. Fox and Mr. Cavanaugh identified
8 1057 grants as involving DEI, active grants?
9    A.  That appears to be the case, yes.
10    Q.  Okay. And that's a pretty high percentage
11 of the total 1440 that ended up being terminated,
12 give or take?
13    A.  That's correct.
14    Q.  Okay. Mr. McDonald, do you know what
15 process Mr. Fox used to identify grants as involving
16 DEI?
17    A.  No.
18    Q.  Okay. It's another spreadsheet.
19       MR. JACOBSON: Nina, can we pull up 61583,
20 the spreadsheet? Okay. And then go to Sheet 1, if
21 you're clear. And we'll mark this as -- what's
22 next?
23       THE REPORTER: Exhibit 7.
24       MR. JACOBSON: We'll mark this as Exhibit
25 7.

Page 125

1       (WHEREUPON, Exhibit 7 was marked for
2 identification.)
3 BY MR. JACOBSON:
4    Q.  Mr. McDonald, have you ever seen this
5 before?
6    A.  I don't believe I have, no.
7    Q.  And if I represented to you that this is a
8 document produced in discovery that reflected
9 ChatGPT inquiries or queries that Mr. Fox did, would
10 you have any basis to question that representation?
11       MS. BRENNAN: Objection.
12       THE DEPONENT: No, I would not.
13 BY MR. JACOBSON:
14    Q.  Okay. So for the – for the sake of the
15 – the rest of my questions on the spreadsheet, I'll
16 ask you just to assume that representation, and if
17 it's wrong, then that's on me and your answers won't
18 mean much if it's wrong. Pardon me. Starting with
19 Sheet 1, do you see where it says, in every row,
20 really, "From the perspective of someone looking to
21 identify DEI grants, does this involve DEI question
22 mark?"
23    A.  I do.
24    Q.  And do you see that it says, "Respond
25 factually in less than 120 characters?"

MICHAEL MCDONALD                January 30, 2026                126 to 129
93097

Page 126

1   A.  Yes, I see that.
2   Q.  And then it says, begin with yes or no,
3 followed by a brief explanation.
4   A.  Yes, I see that.
5   Q.  And then do you see in Column X there or
6 right under Column X, there's a description of
7 various grants?
8   A.  Yes.
9   Q.  And so does it appear to you, based on
10 this, that Mr. Cavanaugh was or Mr. Fox, I should
11 say, was asking ChatGPT -- was giving ChatGPT each
12 project description and asking it to answer yes or
13 no, whether it involved DEI?
14   A.  You know, I -- I have no basis saying what
15 information he was feeding it to ChatGPT.  He was --
16 where he was getting his descriptions from, what
17 aspects of the -- yeah, I just don't know.  But if
18 you repeat the question, I'll try and answer it
19 again.
20   Q.  I'll -- I'll move on, Mr. -- Mr. McDonald.
21   MR. JACOBSON:  Can we go over to -- is it
22 Sheet 2, I think, or Sheet 3, maybe?  And then Row
23 802, if we could.  Okay.  And then if we can scroll
24 over, do you see the -- the row that's highlighted
25 there?

Page 127

1   A.  Yes, I do.
2 BY MR. JACOBSON:
3   Q.  And you see that this involves the -- a
4 grant to the Modern Language Association?
5   A.  Yes.
6   Q.  And I'll represent to you that this is the
7 same grant that we just identified on that prior
8 spreadsheet.
9   A.  Very good.
10   Q.  Okay.  And then do you see where it says,
11 yes -- the column starting with yes?
12   A.  Yes.
13   MR. JACOBSON:  Sorry.  Nina, do you mind
14 scrolling?
15 BY MR. JACOBSON:
16   Q.  And then do you see that it says, "Yes,
17 the Modern Language Association's initiative aims to
18 align humanities courses with career outcomes for
19 under-served students, thus relating to DEI?"
20   A.  I see that, yes.
21   Q.  And is that the same -- is -- is that the
22 same explanation that we saw in the DEI rationale
23 column before for this grant?
24   A.  Appears to be the same, yes.
25   Q.  Okay.  And so you would agree based on

Page 128

1 that, that it appears to be the case that Mr. Fox
2 copied the results produced in this spreadsheet over
3 to that spreadsheet that he then sent to you,
4 stating that those are the ones that were flagged
5 for DEI involvement?
6   A.  Yes.
7   Q.  Okay.  If -- if I represent to you, Mr.
8 McDonald, that the same will be true for the
9 University of Minnesota and University of UC
10 Riverside grants, do you accept that representation?
11   A.  Yes.
12   Q.  Okay.
13   MR. JACOBSON:  Nina, can we go to Row 767?
14 BY MR. JACOBSON:
15   Q.  Okay.  This will be a grant we haven't
16 looked at yet.
17   MR. JACOBSON:  Nina, can you scroll over?
18 And can you open that box that says the documentary
19 tells the story.
20 BY MR. JACOBSON:
21   Q.  Mr. McDonald, do you see where in
22 describing this grant, it says, "The documentary
23 tells the story of the Colfax Massacre, the single
24 greatest incident of anti-Black violence during
25 reconstruction, and its historical and legacy for

Page 129

1 Black civil rights in Louisiana, the south, and in
2 the nation as a whole"?
3   A.  Yes.
4   Q.  And then do you look at the next column
5 over, you know, if we could pull out.  Does that
6 indicate that this was marked as yes or no for DEI?
7   A.  It indicates that it was marked yes for
8 DEI.
9   Q.  And can you read into the record the --
10 the rationale given?
11   A.  "The documentary explores a historical
12 event that significantly impacted lack civil rights,
13 making it relevant to the topic of DEI."
14   Q.  Do you agree that this grant involved DEI?
15   A.  No, I do not.
16   Q.  And why don't you agree with that?
17   A.  Because a historical examination of such
18 an event of anti-Black violence is not pushing an
19 agenda of DEI, as I understand the meaning of -- of
20 that acronym.
21   MR. JACOBSON:  Nina, can you pull up Row
22 779?  And if you can go over to the description
23 again and open it up where it says, the feature
24 documentary.
25 BY MR. JACOBSON:

MICHAEL MCDONALD                January 30, 2026                130 to 133
93097

Page 130

1    Q.  Mr. McDonald, this is describing another
2  grant, and you can see it says, The Feature
3  Documentary film, Diamond Diplomacy, examines how
4  two vastly different cultures came to embrace
5  baseball with different styles but equal passion,
6  arguing that the nation's shared obsession with the
7  game has been instrumental in healing wounds caused
8  by World War I and the 1980s economic standoff
9  between the US and Japan." Do you see that, Mr.
10  McDonald?
11    A.  Yes.
12    Q.  Okay.
13      MR. JACOBSON:  And then if -- Nina, if we
14  could just look one more row over.
15  BY MR. JACOBSON:
16    Q.  And do you see whether this was marked as
17  yes for DEI?
18    A.  It was marked as yes.
19    Q.  And can you read into the record the
20  rationale given?
21    A.  "The film explores the role of baseball in
22  strengthening national identities and healing
23  wounds, which can be related to diversity, equity,
24  and inclusion efforts."
25    Q.  Do you agree that this grant involved DEI?

Page 131

1    A.  I do not agree.
2    Q.  And why don't you agree?
3    A.  Based on this description, I have no basis
4  on which to conclude that the -- grant money
5  would have been used to advance a particular social
6  or political point of view that I would normally
7  associate with DEI as it was practiced under the
8  Biden administration.
9    Q.  You would agree that a love of baseball is
10  not DEI?
11    A.  I would agree.
12    Q.  Okay.  Mr. McDonald, taking a step back,
13  do you believe that the methodology that we see on
14  the screen is an appropriate methodology to identify
15  which NEH grant should be terminated?
16      MS. BRENNAN:  Objection.
17      THE DEPONENT:  No, I do not agree.  I
18  mean, I'm sorry, could you rephrase it?
19  BY MR. JACOBSON:
20    Q.  Sure.  Do you agree that the methodology
21  we were just looking at on the screen is not an
22  appropriate methodology to identify which NEH grants
23  should be terminated?
24    A.  I agree that it is not an appropriate
25  methodology --

Page 132

1    Q.  And why is it not?
2    A.  -- to -- to terminate grants on the basis
3  of DEI.
4    Q.  Okay.  And so if this was the basis,
5  hypothetically, upon which grants were terminated,
6  this methodology, that's not something you would
7  have signed off on?
8      MS. BRENNAN:  Objection.
9      THE DEPONENT:  Yes.  It is a hypothetical
10  question since it -- it was not the basis.  But if
11  it had been the only basis, it's not something that
12  I would have signed off.
13  BY MR. JACOBSON:
14    Q.  Okay.  And you would have been very much
15  opposed to terminating grants based on this
16  methodology?
17      MS. BRENNAN:  Objection.
18      THE DEPONENT:  Again, it's hypothetical.
19  If that were the case, I would have been opposed,
20  yes.
21  BY MR. JACOBSON:
22    Q.  Okay.  Let's now go to -- I'm going to
23  hand you an email this time.
24      MR. JACOBSON:  We'll mark this as Exhibit
25  8; is that right?

Page 133

1      THE REPORTER:  Yes.
2      MR. JACOBSON:  Okay.
3      THE REPORTER:  Exhibit 8 marked.
4      (WHEREUPON, Exhibit 8 was marked for
5  identification.)
6      THE DEPONENT:  Thank you.
7  BY MR. JACOBSON:
8    Q.  Mr. McDonald, I'll direct your attention
9  first to the email at the very bottom of this
10  exhibit.  So I think three pages in.  Do you see
11  that?
12    A.  So beginning Page 3?
13    Q.  I'm sorry.  Bear with me a moment.  Yeah.
14  Sorry.  Page 2, the email at the bottom of Page 2.
15    A.  Page 2.  Okay.  I'm there.
16    Q.  And you see this is an email from Justin
17  Fox to himself and copying you and Mr. Wolfson and
18  Mr. Cavanaugh on March 18th?
19    A.  Yes.
20    Q.  In this email, Mr. Fox says, "Let us know
21  when works best for a meeting, tomorrow or Thursday,
22  to walk through this." Do you see that?
23    A.  I do.
24    Q.  And by this, is he referring to the
25  spreadsheet we were reviewing a few minutes ago

Page 138

1    A.  Yes.
2    Q.  And is my understanding right that you
3  went through that high, medium, low spreadsheet that
4  NEH staff prepared and -- and you personally
5  reviewed it to assess whether you agreed with the
6  assessments in there?
7    A.  Yes.  As I recall, we -- we reviewed it
8  over -- devoted a significant amount of time over
9  two days to review of that spreadsheet.
10    Q.  And when you say over two days, was that
11  immediately before this March 19th email?
12    A.  I imagine it would have been, yes.
13    Q.  So help me understand, at the same time
14  you're reviewing this NEH staff spreadsheet, Mr. Fox
15  had sent you a different, much broader spreadsheet
16  three days earlier.  So why were you working off of
17  this spreadsheet when Mr. Fox was sending you a much
18  broader spreadsheet at the same time?
19    A.  Well, first of all, we were under an
20  obligation to provide something to OMB.  Suppose
21  that was the chief rationale.  We had already begun
22  the work, and we -- we wanted to complete it and
23  comply with the OMB directive.
24    Q.  Any other reason?
25    A.  No.

Page 139

1    Q.  Did you believe this spreadsheet reflected
2  a fair and accurate assessment of which brands
3  involved DEI and environmental justice and gender
4  ideology?
5    A.  As fair as we could -- we could make it,
6  yes.
7    Q.  And you believe that your -- in submitting
8  that to OMB, you believe you were submitting to them
9  what would be an appropriate list of brands to
10  terminate?
11    A.  That's correct.
12    Q.  Okay.  And if I represent to you that this
13  spreadsheet had 647 grants that NEH staff, as
14  reviewed by you and Mr. Wolfson, marked as
15  appropriate for termination, any reason to doubt
16  that number?
17    A.  No.
18    Q.  Okay.  And 647 is less than half of the
19  1440 that were ultimately terminated?
20    A.  The 1440, which were terminated not solely
21  for DEI, but for other reasons.  Yes.
22    Q.  Okay.  I'm going to now hand you -- oh
23  confusing myself -- a document marked US 1 -- 41372,
24  which will be Exhibit 10, I believe.
25    THE REPORTER:  Exhibit 10 marked.

Page 140

1    (WHEREUPON, Exhibit 10 was marked for
2  identification.)
3    THE DEPONENT:  Sorry, before -- would --
4  would it be possible to take a break maybe in five
5  minutes?
6    MR. JACOBSON:  You know what?  This would
7  probably -- this would probably be a better time to
8  break right now.
9    THE DEPONENT:  Right now?
10    MR. JACOBSON:  Yeah.
11    THE DEPONENT:  All right.  That's fine.
12  Sure.  Thank you.
13    MR. JACOBSON:  Okay.  We can go off the
14  record.
15    THE VIDEOGRAPHER:  All right.  Stand by.
16  The time is 12:10, and we are off the record.
17    (WHEREUPON, a recess was taken.)
18    THE VIDEOGRAPHER:  The time is the time is
19  12:54, and we are on the record.
20  BY MR. JACOBSON:
21    Q.  Okay.  Mr. McDonald, oh, can we get the
22  screen back on, too?  Before the break, you'll
23  recall we were going through a series of email from
24  mid to late March related to the back and forth
25  between you and Mr. Fox?

Page 141

1    A.  Yes.
2    Q.  Sound familiar?
3    A.  Yes.
4    Q.  Okay.  So now we -- what we've marked as
5  Exhibit 10 is an email with the Bates stamp 41372.
6  Do you have that in front of you?
7    A.  Yes, I do.
8    Q.  Okay.  And you'll see this is an email
9  from Justin Fox to you, Mr. Wolfson, to Mr.
10  Cavanaugh, and to Mr. Fox himself on March 19th,
11  2025?  Do you see that?
12    A.  Yes.
13    Q.  Okay.  And he writes in his email,
14  Mike/Adam, that's referring to you and Mr. Wolfson?
15    A.  Yes.
16    Q.  Okay.  See attached updated spreadsheets
17  and their descriptions below.  And so he was -- he
18  was sending you a spreadsheet here, right?
19    A.  Yes.
20    Q.  An attached spreadsheet?  And you see he
21  says, under NEH, "Active grants marked as NA, shows
22  all active grants, i.e. not expired, which are
23  flagged as NA for DEI by NEH personnel, but we
24  flagged for DEI involvement."
25    A.  Yes.

MICHAEL MCDONALD                    January 30, 2026                    142 to 145
93097

Page 142

1    Q.  And who is the we there?
2    A.  I believe that would be Mr. Fox and Mr.
3  Cavanaugh.
4    Q.  Okay.  And then he similarly repeats,
5  below, "Flagging all grants in the attach were
6  flagged as NA by employees, and we flagged for DEI
7  involvement upon review." So that's again, we as Mr.
8  Fox and Mr. Cavanaugh?
9    A.  Correct.
10    Q.  Okay.  And then he says, "So to clarify,
11  you have not reviewed any of these grants." What
12  does he mean by that?
13    A.  It means that neither Adam nor I looked at
14  the these NA, non applicable grants in the
15  spreadsheet because we -- we were only looking for
16  ones that may have violated the executive orders,
17  particularly with respect to DEI.
18    Q.  Right.  But these were ones that they also
19  thought violated the executive order for DEI, but
20  you hadn't reviewed them yet; is that right?
21    A.  Yeah.  I'm sorry.  I was addressing the
22  second part of your question.  We hadn't reviewed
23  them.  That's correct.
24    Q.  Okay.  And he says, "Once we receive your
25  input, we can consolidate to one list of grants

Page 143

1  using the Excel from Brett and make appropriate next
2  steps." Who's the Brett there for the record?
3    A.  He -- our chief intelligence official at
4  the time, Brett Bobley.
5    Q.  Do you mean chief information official?
6    A.  I'm sorry, chief information.  What did I
7  say?
8    Q.  You guys are doing what he said --
9  intelligence, you said.
10    A.  Sorry.
11    Q.  And when he says, "we can consolidate to
12  one list of grants," am I correct in taking that to
13  mean that they would take this list of NA grants,
14  let's call them the NA list, consolidate that with
15  the list that you all had put together and that was
16  sent to OMB to produce one list of grants; is that
17  right?
18    A.  That seems to be what he's saying, yeah.
19    Q.  And do you know what he meant when he
20  said, "and make appropriate next steps?"
21    A.  Just continuing on with the process.
22    Q.  And was it your understanding that this
23  one consolidated list of grants would be the grant
24  -- the grants slated for termination?
25    A.  I don't think on March 19th, I was

Page 144

1  thinking about final list for -- I had no idea how
2  many iterations there would be or what -- what would
3  come next.  I was focused at that point on the two-
4  day council meeting that was going to be the next
5  day.
6    Q.  But -- but you understood that the process
7  you were undertaking here was specifically to
8  identify grants for potential termination?
9    A.  Right.  There would be an end -- there
10  would be an end point at which, you know, we would
11  do that.
12    Q.  But the -- the list that would be
13  produced, you understood was a list of grants to
14  consider to terminate?
15    A.  Yes.
16      MR. JACOBSON:  Okay.  Let's pull up the
17  spreadsheet that was attached to this, which is US
18  41427, which we'll make Exhibit 11.  And sorry, when
19  I say spreadsheet, I mean the whole Excel file we'll
20  make Exhibit 11.  And we're in the active grants
21  tab.  Do you see that, Mr. McDonald?
22      (WHEREUPON, Exhibit 11 was marked for
23  identification.)
24      THE DEPONENT:  Yes, I see it.
25  BY MR. JACOBSON:

Page 145

1    Q.  And if we look at the top left corner, you
2  see it says, active grants flagged as NA?
3    A.  Mm-hmm.
4    Q.  And so did you understand that -- is this
5  what you would come to later refer to as the quote,
6  the NA list?
7    A.  Yes.
8    Q.  Okay.  And if we could go to Row 2 -- 223.
9  And do you see there the same Modern Language
10  Association grant that we've been talking about, you
11  know, on other spreadsheets today?
12    A.  Yes.
13    Q.  Okay.  And if we go back over to the left,
14  do you see there's a column that says DEI rationale?
15    A.  Yes.
16    Q.  And does that appear to be the same DEI
17  rationale that we saw on the prior spreadsheets that
18  we looked at?
19    A.  Yes.
20    Q.  Okay.  And if I represent to you that if
21  we did the same thing with the University of
22  Minnesota grants and the UC Riverside grants, that
23  the same thing would show up.  Any basis to question
24  that?
25    A.  I would have no basis to question it, no.

MICHAEL MCDONALD
93097

January 30, 2026

154 to 157

---

Page 154

1    Q. Okay. If we could go to the second page
2  here, do you see there an email from Mr. Fox to you
3  at 11:57 a.m. on March 28th?
4    A. Yes.
5    Q. And the email starts with saying, "Mike,
6  Adam, thanks for the productive time today." Do you
7  see that?
8    A. Yes.
9    Q. So that indicates that you met with him
10  that day?
11    A. Yes.
12    Q. Do you recall that meeting?
13    A. Yes.
14    Q. And was that in person or was that remote?
15    A. If my recollection is correct, that was an
16  in-person meeting here in the chairman's office.
17    Q. And was Mr. Cavanaugh there or just Mr.
18  Fox?
19    A. I believe, Mr. Cavanaugh, was there as
20  well.
21    Q. Anyone else from DOGE there?
22    A. Justin, Nate, that was it.
23    Q. And anyone else from NEH besides you and
24  Mr. Wolfson who was in the room?
25    A. I don't believe so, no.

---

Page 155

1    Q. And was the topic of that meeting the
2  grant termination process that you were undertaking?
3    A. Yes.
4    Q. And what did Mr. Fox say at that meeting?
5    A. But that wasn't the exclusive topic. I
6  just add that -- I believe at that meeting, there
7  were also discussions about the reduction in force.
8    Q. So focusing just on the grant --
9    A. Yeah.
10    Q. -- terminations, do you recall what Mr.
11  Fox said to you and Mr. Wolfson at that meeting?
12    A. If I'm correct, I believe this was a
13  meeting at which the rationale for terminating
14  grants expanded beyond DEI to consider
15  administration -- Trump administration priorities,
16  funding priorities, and also grants that could be
17  terminated because they appeared to be too niche or
18  too recondite or and -- so could -- could be
19  seen as constituting a waste.
20    Q. And where it says here on the email from
21  Mr. Fox, see attached active grants for your review
22  for DEI or wasteful spend.
23    A. Yeah.
24    Q. About 440 grants.
25    A. Yeah.

---

Page 156

1    Q. And what does wasteful spend mean there?
2    A. Well, as I say, these -- these are
3  subjective -- subjective determinations about the
4  value of expending federal funds on -- on a grant
5  project. This is one -- one man's meat is another
6  man's poison. One man's serious humanities project
7  strikes another person as ridiculous. And so this
8  all -- these were determinations that in my capacity
9  as acting chairman, I'd have to -- I'd have to make.
10    Q. But -- but terminating on the basis of
11  wasteful spend, whose idea was that?
12    A. That -- that was -- that came from Nate
13  and Justin.
14    Q. And did they tell you why this -- the
15  rationales for terminations were expanding at that
16  point?
17    A. I don't believe that they provided an
18  explanation other than the fact that the whole --
19  the whole reason for the existence -- the whole
20  reason for the President authorizing the existence
21  of the -- of DOGE was in order to reduce wasteful
22  spending.
23    Q. And -- and even though that was -- that
24  was the case since the founding of DOGE, right? On
25  January 20th, that that was the purpose of DOGE?

---

Page 157

1    A. That appeared to me to be the purpose of
2  DOGE, yes.
3    Q. But up until this point, from when they
4  first contacted you to this point, that was not the
5  focus of the grant terminations, right? It was just
6  the DEI?
7    A. The President's executive orders, as I
8  recall, came out in January. So -- and DOGE got
9  underway as whenever -- I believe you said in
10  February or whenever they -- there was an executive
11  order, then they started gearing up, and they were
12  at -- visiting other agencies. We were already in
13  the middle of the DEI termination process. Go back
14  to your question, if I'm remembering it correctly,
15  this -- this was -- so no, the wasteful spend did
16  not come up before this meeting.
17    Q. And do you remember anything else that
18  either Mr. Fox or Mr. Cavanaugh said about why
19  wasteful spend -- wasteful spend was being added as
20  a rationale for terminations?
21    A. Just because I think -- I don't recall
22  anything in particular that they said, period. My
23  overall impression was that, again, they looked at
24  some of the grants that we -- we had been investing
25  a significant amount of money in and viewed them as

MICHAEL MCDONALD        January 30, 2026        162 to 165
93097

Page 162

1 they were adding wasteful spend. So -- so --
2    A.   No, they -- they didn't, I'm -- I'm just
3 giving you my overall impression.
4    Q.   -- so you -- at that meeting, you were
5 kind of just surmising for yourself why?
6    A.   They always talk -- they did bring up the
7 administration's priority. That was a leitmotif on
8 -- on -- in these conversations.
9    Q.   Okay. You weren't curious, though, why
10 the scope was suddenly being changed?
11      MS. BRENNAN: Objection.
12      THE DEPONENT: I didn't see -- I wasn't
13 curious because, as I said, having worked at the
14 agency for over 20 years, seeing how different
15 people, we get letters from the public, from
16 senators, from congressmen, newspapers write
17 articles about how silly and wasteful some of the
18 things we are funding. I understand that -- that
19 people can reasonably hold that point of view.
20 BY MR. JACOBSON:
21    Q.   You were the head of the agency at this
22 point?
23    A.   Mm-hmm.
24    Q.   Acting head?
25    A.   That's correct.

Page 163

1    Q.   And somebody who's not at the agency comes
2 in and says, you know, we're going to terminate a
3 bunch of your agency's grants for a new reason we
4 haven't given before.
5    A.   Mm-hmm.
6    Q.   You weren't at all curious as to why?
7      MS. BRENNAN: Objection.
8      THE DEPONENT: I think I've answered that
9 not two times. I was not curious. I understand
10 where they were coming from.
11 BY MR. JACOBSON:
12    Q.   Okay. And so let's now pull up -- well,
13 I'm sorry. Back on that email. You see Mr. Fox
14 says, "Flagging, these are the ones NEH staff has
15 marked as NA for DEI."
16    A.   Yes.
17    Q.   Okay. And then at the bottom there, you
18 see Mr. Fox wrote, could you put us in touch with
19 someone who could help us gain admin access to
20 Microsoft?
21    A.   Yes.
22    Q.   Did you have an understanding of why Mr.
23 Fox was asking for admin access?
24    A.   That would have been in connection with
25 the -- sending out the termination notices.

Page 164

1    Q.   And at what point did Mr. Fox tell you
2 that he was going to be the one sending out the
3 termination notices?
4    A.   I don't recall exactly.
5      MS. BRENNAN: Objection.
6 BY MR. JACOBSON:
7    Q.   Okay.
8    A.   It was probably at this meeting.
9    Q.   Okay. Well -- we'll come back to that
10 one. So let's pull up the spreadsheet that Mr. Fox
11 attached to this, which is marked as US 41 -- wait,
12 did I just do the wrong one? I just did the wrong
13 one. Sorry. It's marked US 9583.
14      MR. JACOBSON: And if we could go up to
15 the top left, we'll mark this as Exhibit 14.
16      (WHEREUPON, Exhibit 14 was marked for
17 identification.)
18 BY MR. JACOBSON:
19    Q.   And just like the spreadsheet that we
20 looked at prior to this, you see on the top left
21 corner, it says, Active grants flagged as NA for
22 DEI?
23    A.   Yes.
24      MR. JACOBSON: And if you scroll down to
25 the Row 440 or so, Nina. A little bit lower.

Page 165

1 Sorry, just to, like, the yeses end. There we go.
2 And go up a little bit.
3 BY MR. JACOBSON:
4    Q.   And you see the columns all look the same
5 as the prior spreadsheet did?
6    A.   Yes.
7    Q.   And you see at the bottom there, it says,
8 total 47,409,330?
9    A.   Yes.
10    Q.   And that's the exact same total as in the
11 prior spreadsheet we looked at, right?
12    A.   If you --
13      MR. JACOBSON: Nina, do you want to pull
14 up the prior spreadsheet, if you have that one?
15 BY MR. JACOBSON:
16    Q.   This is the prior one. It looks to be the
17 same?
18    A.   It's the same figure, yeah.
19    Q.   And is that the same row, Row 451? Go
20 back to the other one.
21    A.   It appears to be, yeah.
22    Q.   And the prior spreadsheet we looked at,
23 that was at a point where Mr. Fox said he was just
24 flagging items that NEH staff had marked as not DEI,
25 but that DOGE had identified as being DEI, right?

Page 178

1 said earlier, you disagreed with the DEI rationale?
2      MS. BRENNAN: Objection.
3      THE DEPONENT: That's correct.
4 BY MR. JACOBSON:
5      Q. And it was -- as with the prior grant, it
6 was Mr. Fox who included this grant on the
7 spreadsheet?
8      MS. BRENNAN: Objection.
9      THE DEPONENT: Yes.
10 BY MR. JACOBSON:
11     Q. Okay. And one more, if we go with Row 85.
12 And this is the grant involving the flat books for
13 the University of Minnesota that we looked at
14 before?
15     A. Yes.
16     Q. And this is the grant also for which you
17 disagreed with the DEI rationale?
18     MS. BRENNAN: Objection.
19     THE DEPONENT: Yes.
20 BY MR. JACOBSON:
21     Q. And it was, again, Mr. Fox who included
22 this grant on this spreadsheet?
23     MS. BRENNAN: Objection.
24     THE DEPONENT: Yes.
25 BY MR. JACOBSON:

Page 179

1      Q. Okay. Do you know, sitting here today,
2 was this -- was this grant included on the
3 spreadsheet, because it was DEI or because it was
4 wasteful spend?
5      MS. BRENNAN: Objection.
6      THE DEPONENT: I don't know.
7 BY MR. JACOBSON:
8      Q. Okay. Same question for the Modern
9 Language Association grants. Was it included
10 because it was DEI or wasteful spend?
11     MS. BRENNAN: Objection.
12     THE DEPONENT: I don't know.
13 BY MR. JACOBSON:
14     Q. And same question, again, for the UC
15 Riverside grants.
16     A. I'm sorry. You're asking me to speculate
17 as to why Nate put them on the list. I don't know.
18     Q. Right. And so to the extent the Modern
19 Language Association grant was on this list, because
20 it was designated wasteful spend, that was not your
21 designation, right?
22     MS. BRENNAN: Objection.
23     THE DEPONENT: No.
24 BY MR. JACOBSON:
25     Q. Okay. Same for the other two we've been

Page 180

1 talking about?
2      MS. BRENNAN: Objection.
3      THE DEPONENT: Yes.
4 BY MR. JACOBSON:
5      Q. Okay. I'd like to pull up now what's
6 marked as US 2796. And this will be -- I'm sorry, I
7 lost track, again. Exhibit 15. Oh, there.
8      THE REPORTER: Exhibit 15 marked.
9      (WHEREUPON, Exhibit 15 was marked for
10 identification.)
11 BY MR. JACOBSON:
12     Q. Okay. And you see at the bottom here is
13 an email from you to Mr. Wolfson copying Ms. -- I'm
14 sorry, I'm going to mispronounce it, Voyatzis; is
15 that right?
16     A. Yes.
17     Q. And that's dated Sunday, March 30th, 3:20
18 -- 3:32 p.m.
19     A. Yes.
20     Q. And could you read that email into the
21 record?
22     A. "This is another agreement that will have
23 to go by the wayside. Maybe we should have Richard
24 at least give AAAS and ACLS 30 days' notice."
25     Q. And why did this agreement have to go by

Page 181

1 the wayside?
2      A. The Biden administration had created an
3 office of data evaluation and hired people to staff
4 that office. The person who was heading the office
5 had negotiated this cooperative agreement with the
6 AAAS, and that office was going to be eliminated.
7 And I think that was the primary reason. We were --
8 we -- simply it was going to be discontinued as a
9 result of the determination of staff.
10     Q. Okay. And you're testifying that the
11 reason that this AAAS grant would have to go by the
12 "wayside" was solely because that office was being
13 eliminated?
14     MS. BRENNAN: Objection.
15     THE DEPONENT: I'm not sure if there were
16 not other contributing factors to the decision. I
17 think that was the main factor. The subsidiary
18 consideration, which has always been a debate at the
19 agency, has to do with data collection and our
20 ability to conduct data collection in any case.
21 Different administrations have gone back and forth
22 on that issue.
23     There is a provision in our statute that
24 talks about data collection, but there have been at
25 the times for a reason of personnel or for other

MICHAEL MCDONALD                    January 30, 2026                    186 to 189
93097

Page 186

1   A.  The first page.
2   Q.  The second email from the bottom.
3   A.  Yeah, yeah.
4   Q.  And he says, "Mike, could you pass along
5   your cell number?  Sorry, don't have it saved and
6   need to catch up with you on something time
7   sensitive." Do you see that on the first page there?
8   A.  On the first page.  Yes, I see it.
9   Q.  Okay.  And then you could see about less
10  than an hour later, he emails you, Mike, please call
11  me as soon as you can.
12  A.  Yes.
13  Q.  And you would agree he was expressing some
14  urgency in these two emails?
15  A.  Yes.
16  Q.  Okay.  And then you see just a mere 23
17  minutes, 24 minutes later, the first email on the
18  top of the page.
19  A.  Mm-hmm.
20  Q.  Mr. Fox writes you, "Mike, call me when
21  you get a chance.  We need a game plan for
22  effectuating RIFs, final grant terminations, and
23  contract cancellations by tomorrow 8:00 a.m.  We
24  will carry out these plans before the end of the
25  week." Do you see that?

Page 187

1   A.  I do.
2   Q.  And then you see he writes, "We're getting
3   pressure from the top on this, and we'd prefer that
4   you remain on our side, but let us know if you're no
5   longer interested."
6   A.  Mm-hmm.  Yes.
7   Q.  And who was he referring to when he said
8   our side?
9       MS. BRENNAN:  Objection.
10      THE DEPONENT:  I could only speculate.  I
11  do not know.
12  BY MR. JACOBSON:
13  Q.  Who do you think he was referring to?
14  A.  I believe he was --
15      MS. BRENNAN:  Objection.  You can answer,
16  sir.
17      THE DEPONENT:  He was most likely
18  referring to whoever he responded to above the chain
19  of command at DOGE.
20  BY MR. JACOBSON:
21  Q.  So the -- the DOGE side, sort of, broadly
22  speaking?
23  A.  Yes.
24  Q.  Okay.  And then he said -- when he says,
25  "but let us know if you're no longer interested,"

Page 188

1   what do you think he meant by that?
2       MS. BRENNAN:  Objection.
3       THE DEPONENT:  Again, I can only
4   speculate.
5   BY MR. JACOBSON:
6   Q.  And what would that speculation be?
7       MS. BRENNAN:  Objection.
8       THE DEPONENT:  Speculation would be that
9   -- you recall I mentioned patience earlier, in an
10  earlier response, that he wanted to know if I was
11  interested in continuing to work with DOGE to
12  implement the -- to help them with their work.  I
13  think Justin always had a concern.  It's again, more
14  speculation, based upon his involvement in work at
15  previous federal agencies, that career federal
16  bureaucrats, such as myself, might be slow walking
17  the process to disadvantage them in the goals that
18  they were attempting to achieve.
19  BY MR. JACOBSON:
20  Q.  And did you think there was any basis for
21  him to think that?  Factual basis?
22  A.  No.  I did not think that there was a
23  factual basis for him to believe that.  I thought it
24  was cooperating because I -- I believe that I had a
25  responsibility, having accepted the position in

Page 189

1   directing the agency, which in my view is part of
2   the executive branch of government.  We were given
3   instructions by the President to cooperate with DOGE
4   in its work.  And no, I didn't feel that there were
5   any reasons for obstruction, certainly on my part.
6       But I know that -- I believe, again,
7   speculation, that Justin thought, given his previous
8   work or perhaps talking with Nate, that career
9   federal bureaucrats such as myself could try and put
10  sticks in wheels and slow walk things.
11  Q.  I understand.  Go back to this.  And where
12  he says here, we're getting pressure from the top
13  office, who was he referring to?
14      MS. BRENNAN:  Objection.
15      THE DEPONENT:  I think I just answered
16  that.  I don't know who -- who he was referring to.
17  BY MR. JACOBSON:
18  Q.  At some point during this day, March 31st,
19  did you connect with him on the phone?
20  A.  That's likely.  It's more than likely.
21  I'm sure I did.
22  Q.  Okay.  And when he called you or when you
23  call -- when you connected on the phone, did he say
24  anything about the urgency -- the sudden urgency,
25  that was behind these three emails?

MICHAEL MCDONALD                    January 30, 2026                    202 to 205
93097

Page 202

1    A.  Well, because the DOGE team was waiting
2 for our evaluation of the grants listed on the NA
3 sheet for potential termination.
4    Q.  Okay.  And what emotions were you feeling
5 when you sent this email?
6       MS. BRENNAN:  Objection.
7       THE DEPONENT:  Mainly, frustration at my
8 own technological ignorance.  Adam and I had looked
9 at the NA spreadsheet the -- the previous day, or
10 afternoon or evening, I forget the time frame.  And
11 we went through it, and we annotated certain grants
12 and lacking the tech technological noose to
13 understand how to save the grants that we had marked
14 to -- not to terminate, I ended up sending him a
15 spreadsheet that he had sent us. So at this point,
16 my main emotion was one of frustration with myself
17 at having to duplicate the work.
18 BY MR. JACOBSON:
19    Q.  So you weren't frustrated with Justin Fox
20 when you sent this email?
21    A.  I don't think I was personally frustrated
22 with Justin Fox, no.
23    Q.  Were you frustrated with him in some way
24 that wasn't personally frustrated?
25    A.  I think the -- well, you know, of course,

Page 203

1 again, I go back to the situation with the RIFs, the
2 contract cancellations, the council meeting.  It was
3 a rather stressful period, and we were all under a
4 lot of pressure.  And there was this time pressure
5 component, which we just saw in the previous email
6 that Mr. Fox had sent me.
7    Q.  Yeah.
8    A.  About so yeah, there was frustration over
9 the overall process that it would -- the time
10 constraints that were put -- that were placed upon
11 us, or me in particular.
12    Q.  Okay.  Let's just start going through the
13 email.  So could you read into the record the last
14 sentence of the first paragraph?  Starting with and
15 even.
16    A.  Yeah.  "And even though I'm getting it to
17 you late, I'm glad we had the opportunity to go over
18 -- go over it again, if only to clarify our thoughts
19 about the process."
20    Q.  And is what then follows in the remainder
21 of the email, fair to say that those are your
22 thoughts about the process?
23    A.  Yes.
24    Q.  Okay.  And then the second paragraph that
25 starts with, as you know, in that paragraph, are you

Page 204

1 describing the list of awards we've discussed that
2 NEH staff identified as involving DEI?
3    A.  That's correct.
4    Q.  The one that was sent to OMB?
5    A.  Yes.
6    Q.  Okay.  And can I ask you to read into the
7 record the third paragraph?
8    A.  "The attached list concerns, as you know,
9 applications that staff rated NA, that is, involving
10 projects that seemed to have no applicability to
11 promoting DEI, and we feel much less confident about
12 it."
13    Q.  Okay.  And this is the -- the attached
14 list, that's referring to the -- the NA list to
15 which you were attaching your annotations; is that
16 right?
17    A.  Correct.
18    Q.  Okay.  And when you say, we felt much less
19 confident about that, you felt much less confident
20 about the DEI rationales that were being provided?
21    A.  Well, certainly about -- yes, about the
22 DEI rationales.
23    Q.  And you also felt much less confident
24 about the basis overall for terminating them?
25       MS. BRENNAN:  Objection.

Page 205

1       THE DEPONENT:  As I was saying, the
2 question -- the question of a wasteful grant is,
3 again, highly subjective.  So yes, having worked at
4 the agency for over 20 years and seen the types of
5 grants, in my perspective, is different from
6 somebody that is just encountering the grants for
7 the first -- for the first time.  Having -- having
8 studied Latin and Ancient Greek, I could see a value
9 in a 4th-century Greek -- obscure Greek poet.
10 That's not to say that everybody would.
11 BY MR. JACOBSON:
12    Q.  But when you say confident about it, it
13 being the placement on this list, is what that
14 means, right?
15    A.  It being the list, the -- the
16 notifications of the DEI rationales, principally,
17 yeah.
18    Q.  Okay.  Understood.  And then you say, just
19 -- just skipping ahead a paragraph, although you're
20 welcome to read the paragraph in between.  You say,
21 "We think these projects are harmless when it comes
22 to promoting DEI."
23    A.  Yes.
24    Q.  And when you say "we," who are you
25 referring to?

MICHAEL MCDONALD                January 30, 2026                206 to 209
93097

Page 206

1    A.  I was reviewing the -- at that time with
2  Adam Wolfson, we had just, again, gone over the
3  spreadsheet a second time.  So when I was saying we,
4  it was -- I was referring to myself and to Adam
5  Wolfson.
6    Q.  Okay.  And these projects, for the record,
7  that's referring to the projects in the -- in the NA
8  spreadsheet you were sending back to him; is that
9  right?
10    A.  Correct.
11    Q.  Okay.  And then you wrote, "But in the
12  interest of time, because we now -- we know you want
13  to move quickly, we didn't give these applications
14  the individualized consideration that we did to
15  those in the first spreadsheet." Do you see that?
16    A.  I do.
17    Q.  And when you say, "because we know you
18  want to," I think you meant to say move it maybe you
19  wrote more quickly?
20    A.  That's correct, typo.
21    Q.  Okay.  And when did he tell you he wanted
22  to move quickly?
23    A.  Well, we just saw the email exchanges.
24    Q.  Okay.  And so when you say, "we didn't
25  give these applications the individualized

Page 207

1  consideration," the we there is you and Mr. Wolfson;
2  is that correct?
3    A.  That's correct.
4    Q.  And when you said individualized
5  consideration, I take that to mean you didn't go one
6  by one individually through those grants and do an
7  assessment of each one of those?
8      MS. BRENNAN:  Objection.
9      THE DEPONENT:  What I meant there was
10  that, in contradistinction to what we did with the
11  DEI list that the staff generated, where, as I
12  mentioned earlier, Adam Wolfson and I spent a
13  significant amount of time over two days, drilling
14  down into the actual applications to see what was at
15  stake.  Given the time constraints, we only had time
16  to review the -- the spreadsheet, the information
17  that was on the spreadsheet, and make -- and make
18  judgments on that basis.
19  BY MR. JACOBSON:
20    Q.  And your -- is your testimony you gave
21  individualized consideration to every grant on that
22  spreadsheet one by one?
23    A.  I -- my testimony is we certainly looked
24  at the information in -- on the spreadsheets.  We
25  went through each one, but we were circumscribed by

Page 208

1  the spreadsheets.  We didn't take the time as we --
2  as we had done in the earlier process of going into
3  our grant management base, pulling up the
4  application, or doing other types of searches to
5  understand precisely what was at work in this -- in
6  -- in the grant.
7    Q.  And if you had had your druthers, you
8  would have taken the time to do that before
9  terminating these grants?
10    A.  That's correct.
11    Q.  Okay.  But DOGE said you couldn't have the
12  time?
13      MS. BRENNAN:  Objection.
14      THE DEPONENT:  Again, I -- forgive me for
15  repeating myself.  My understanding was that we were
16  to cooperate with DOGE.  NEH is part of the
17  executive branch.  The president instructed me, as
18  the acting, to cooperate with DOGE.  DOGE had its
19  own timetable for the -- for this process.  I felt
20  that it was my duty to work with them on their
21  timetable, their -- their process, not mine.
22  BY MR. JACOBSON:
23    Q.  Got it.  But it's your testimony still
24  that they were consultants?
25      MS. BRENNAN:  Objection.

Page 209

1      THE DEPONENT:  Testimony is -- they --
2  yes, they were consultants --
3  BY MR. JACOBSON:
4    Q.  And you think --
5    A.  -- because the ultimate decisions were
6  mine, not theirs.
7    Q.  Sure.  And you think consultants typically
8  tell the person they're consulting how much time
9  they have to make a decision?
10      MS. BRENNAN:  Objection.
11      THE DEPONENT:  Again, this was a
12  collaborative process.  Under the direction of an
13  executive order signed by the President, I wouldn't
14  have taken the job of acting chairman if I was going
15  to disobey and not cooperate or seek to prolong the
16  process that the President had -- had entrusted to
17  DOGE.
18  BY MR. JACOBSON:
19    Q.  And you used the word -- you used the word
20  disobey.  Did I get that right?
21    A.  I wasn't going to disobey the directive of
22  the president to -- to cooperate with -- with DOGE.
23    Q.  As -- and then that would mean if you were
24  not following the advice that Justin and Nate were
25  giving, you'd be disobeying the president because

MICHAEL MCDONALD                    January 30, 2026                    210 to 213
93097

Page 210

1 they were acting sort of on his behalf; is that your
2 -- is what -- is that your testimony?
3        MR. JACOBSON:  Objection.
4        THE DEPONENT:  They were all -- my
5 testimony is that NEH, DOGE, we're all part of the
6 executive branch, and we answer ultimately to the
7 president.  The president was just -- had just won
8 an election in which he campaigned specifically on
9 issues like DOGE and the elimination of wasteful
10 spending.  My job was not to impede that process.
11 BY MR. JACOBSON:
12    Q.  Okay.  And so you say here, we only --
13 accordingly, we only explicitly initialed a few
14 important profit -- projects such as the papers of
15 George Washington, whose cancellation would not
16 reflect well on any of us.  And the same could be
17 said for many other listed projects.  So canceling
18 the papers of George Washington, that would not
19 reflect well on anyone involved in this process,
20 right?
21    A.  That was my view at the time, yes.
22    Q.  And when you say, the same could be said
23 for many other listed projects, you're referring to
24 other projects that still were slated for
25 termination?

Page 211

1    A.  Correct.
2        MS. BRENNAN:  Objection.
3 BY MR. JACOBSON:
4    Q.  That the cancellation of those would not
5 well -- reflect well on any of us?
6        MS. BRENNAN:  Objection.
7        THE DEPONENT:  I saw -- I saw humanities
8 values in a number of projects that were slated for
9 termination, that I thought, yes, would not reflect
10 well.
11 BY MR. JACOBSON:
12    Q.  Okay.  But your testimony is you decided
13 to terminate grants for which the termination would
14 not reflect well on any of us?
15        MS. BRENNAN:  Objection.
16        THE DEPONENT:  There was a larger -- yes,
17 because there was a larger matter at stake, and that
18 was the question of the reordering of NEH
19 priorities, and sort of, in -- in a sense -- well,
20 I'll leave it at that.
21 BY MR. JACOBSON:
22    Q.  And then you write, "It would take too
23 long at this point to review the NA list
24 appropriately."  So that gets back to what we were
25 talking about before, that if you had your druthers,

Page 212

1 you would have dug into each grant application; is
2 that right?
3    A.  Yes.
4    Q.  So you didn't feel the -- the review you
5 did was an appropriate amount of review of this
6 list?
7        MS. BRENNAN:  Objection.
8        THE DEPONENT:  I felt the review process
9 was inadequate.
10 BY MR. JACOBSON:
11    Q.  Okay.  And then you say, "Therefore, our
12 recommendation is that wherever the 'DEI rationale'
13 on the spreadsheet makes clear that there is no DEI
14 component to the project, there is no justification
15 for canceling the project's funding, and you should
16 allow it to continue."  Do you see that?
17    A.  I do.
18    Q.  And when you say "our recommendation," who
19 are you referring to?
20    A.  Adam Wolfson and myself.
21    Q.  And you were making a recommendation to
22 whom?
23    A.  To the DOGE team.
24    Q.  Okay.  And when you say "you should allow
25 it to continue," who is the you there?

Page 213

1    A.  That would be the -- the DOGE people.
2    Q.  Okay.  So you were -- if I'm understanding
3 this right, you went through the NA list.  There's
4 about 404 on the list.
5    A.  Mm-hmm.
6    Q.  We'll go through it.  You marked a couple
7 for saving.
8    A.  Mm-hmm.
9    Q.  But the rest, your recommendation is that
10 wherever the DI rationale in the spreadsheet makes
11 clear that there is no DI component to the project,
12 you were recommending that Mr. Fox and Mr. Cavanaugh
13 should allow that grant to continue?
14    A.  Where there was no DEI rationale on the
15 spreadsheet, yes.  They should allowed it to
16 continue.
17    Q.  Sorry.  Your -- your email, it's not that
18 when there was no DEI rationale on the spreadsheet.
19 It was that whenever the DEI rationale on the
20 spreadsheet makes it clear that there was no DEI
21 component to the project.
22    A.  Correct.  Yes.  That's right.
23    Q.  Right.  So if that was the case, then your
24 recommendation was, Mr. Fox, Mr. Cavanaugh, you
25 should allow this grant to continue?

Page 214

1    A.  It should not be terminated, correct.
2    Q.  Right.  And did they take your
3  recommendation?
4        MS. BRENNAN:  Objection.
5        THE DEPONENT:  I don't believe they did,
6  no.
7  BY MR. JACOBSON:
8    Q.  Okay.  And then you write, final
9  paragraph, "But you have also told us that in
10  addition to canceling projects because they may
11  promote DEI ideology, the DOGE team also wishes to
12  cancel funding to assist in deficit reduction."
13    A.  Yes.
14    Q.  "Either way, as you've made clear, it's
15  your decision on whether to discontinue funding on
16  any of the projects on this list." Do you see that?
17    A.  I do.
18    Q.  And when you sent this email, you - you
19  meant what you wrote?
20    A.  Yes.
21    Q.  Okay.  Everything you wrote in here was
22  accurate at the time you wrote it?
23    A.  It – it accurately expressed my state of
24  mind at the time, yes.
25    Q.  Okay.  And when you say, "as you've made

Page 215

1  clear," the you is referring again to Nate and
2  Justin.
3    A.  In that paragraph?
4    Q.  Yeah.
5    A.  Yes.
6    Q.  And – and not asking for the substance of
7  what they said, but do you remember when they made
8  that clear?
9    A.  Made what clear?
10    Q.  Well, you say, "As you've made clear, it's
11  your decision on whether to discontinue funding on
12  any of the projects on this list." So do you recall
13  when they made that clear?
14        MS. BRENNAN:  Objection.
15        THE DEPONENT:  It may have been at the
16  March 28th in-person meeting that we had here.
17  BY MR. JACOBSON:
18    Q.  And do you recall what words they used
19  that made it clear?
20    A.  No, I do not.
21    Q.  Okay.  I'm going to now go up to the next
22  email on that chain, which is an email from Mr. Fox
23  responding to you about two hours later at 11:57
24  a.m. Do you see that?  It's –
25    A.  Yes.

Page 216

1    Q.  I'm sorry.  I'm on the wrong – there's
2  two different chains that have this, and so bear
3  with me while I pull up the right one.  I'm sorry.
4  It is on this one.  I'm all out of sorts.  Okay.
5  You see that email from Mr. Fox at 11:57 a.m.?
6    A.  Yes.
7    Q.  And he said, "Received.  Thanks, Mike.  We
8  need to execute on these today, but need Brett/Beth
9  to send us the information I requested last night."
10  Do you see that?
11    A.  Yes.
12    Q.  And when he said, "we need to execute on
13  these today," is these referring to the grants on
14  the NEH spreadsheet?
15    A.  I believe so.
16    Q.  So this reflects that he was not taking
17  your recommendation to allow the funding to
18  continue?
19        MS. BRENNAN:  Objection.
20        THE DEPONENT:  It's unclear from – from
21  just this email.  He's talking about executing, but
22  he doesn't – he doesn't add any information to say
23  what, you know, how specifically he is going to
24  proceed.
25  BY MR. JACOBSON:

Page 217

1    Q.  No – at no point either in this email or
2  subsequent, did he say, Mike, we're accepting your
3  recommendation?
4    A.  That's correct.  He did not say that.
5    Q.  Okay.  Between the email you sent at 10:07
6  and this email from 11:57 a.m., did you speak with
7  Mr. Fox?
8    A.  I have no recollection.
9    Q.  Mr. Cavanaugh, did you speak with him?
10    A.  Again, I have no recollection.
11    Q.  At any point after you sent that 10:07
12  a.m. email, did somebody from either Mr. Fox, Mr.
13  Cavanaugh, or someone else affiliated with DOGE call
14  you to talk to you about that email?
15    A.  No.  No one called me to – to discuss the
16  email.
17    Q.  Email, did you discuss it?
18    A.  My -- I have no recollection of anybody
19  telephoning me after 10:07 to talk about the
20  substance of the email that I had sent.
21    Q.  No recollection of anyone reaching out in
22  any way about it through any medium?
23    A.  No.
24    Q.  Okay.  I'm going to now pull up again the
25  spreadsheet, which we were looking at before, which

MICHAEL MCDONALD                    January 30, 2026                    218 to 221
93097

Page 218

1 as I mentioned, is marked 9583. So we've already --
2 US 9583. So we've already marked this as an
3 exhibit. And this is the -- I'll represent to you
4 that this is the spreadsheet that was attached to
5 your 10:07 a.m. email. It's the same spreadsheet we
6 were looking at before that has the -- what we've
7 been calling the NA list of 400 or 40 or 440 or so
8 grants. Do you accept that representation?
9    A. I do, yes.
10   Q. Okay. And so Column L here, the one MM/AW
11  --
12   A. Yes.
13   Q. -- can you tell me what that column was
14 for?
15   A. That was when we conducted our review of
16 the NAs. That column existed for us to mark grants
17 on the list to -- not to terminate.
18   Q. And can we go to row 235? I'm sorry.
19 Before we do this, can we go to row 223? This is,
20 again, the same Modern Language Association grant
21 we've been talking about?
22   A. Yes.
23   Q. And you can correct me. I believe your
24 testimony earlier was that you did not think the DEI
25 rationale here showed an actual connection between

Page 219

1 DEI and this grant; is that right?
2    A. Well, I believe, as I said before, just on
3 the basis of the information provided there, no, I
4 did not.
5    Q. Okay. So going back then to the email we
6 just read from April 1st, the email you sent, where
7 you said, for those where the rationale -- I can't
8 remember the exact wording. You said, our
9 recommendation is that those should be allowed to
10 continue. This would be among those grants that you
11 were recommending be allowed to continue.
12   A. If -- if it says on the spreadsheet that
13 there was -- I'm sorry, I'm a bit confused.
14   Q. Sure. So if we go back to your April 1st
15 email, right?
16   A. Right -- right.
17   Q. You said, our recommend -- I'm in the
18 second to last paragraph.
19   A. Yeah -- yeah.
20   Q. Our recommendation is that wherever the
21 "DEI rationale" on the spreadsheet makes clear that
22 there is no DEI component to the project, there's no
23 justification for canceling the project's funding,
24 and you should allow it to continue. So we said
25 before this was one where you -- the DEI -- is it

Page 220

1 fair to say that this is an example where the DEI
2 rationale on the spreadsheet makes clear that there
3 is no actual DEI component to the project?
4    A. Correct. That's correct.
5    Q. So this would be covered by that sentence
6 I just read into --
7    A. Yes.
8    Q. -- your recommendation.
9    A. Yeah.
10   Q. And would the same be true of the
11 University of Minnesota flat book grants and the UC
12 Riverside grants that we talked about before, or do
13 you want to pull them up individually?
14   A. No need to pull it up. Yeah.
15   Q. Same? Okay. Let's go to -- sorry. I'm
16 going to hand you an email chain, another email
17 chain that starts with US 50604. Sorry. Two
18 copies. And we'll mark this as Exhibit 19.
19   A. Thank you.
20      THE REPORTER: Exhibit 19 marked.
21      (WHEREUPON, Exhibit 19 was marked for
22 identification.)
23 BY MR. JACOBSON:
24   Q. Okay. And if we go to the second page
25 here.

Page 221

1    A. Yes.
2    Q. And do you see Mr. Fox emailed you at
3 around 3:50 p.m. on April 1st?
4    A. Yes.
5    Q. And he wrote, "Mike, as we discussed,
6 we've collected the grants you flagged to keep and a
7 few of those pertaining to America 250th or within
8 priorities of the administration."
9    A. Yes.
10   Q. And where he said that you flagged to keep
11 and a few of those pertaining to America 250th or
12 within the priorities, does that mean those were two
13 separate groups of grants?
14   A. I'm not sure. Two separate grants. I
15 think there were -- I think at that point, I don't
16 recall clearly. Like, you want to restate the
17 question?
18   Q. Yeah. Let me ask the question in a better
19 way.
20   A. Yeah. Thank you.
21   Q. It says, we've collected the grants you
22 keep -- you flagged to keep.
23   A. Yeah.
24   Q. Right. So there's one set of grants that
25 we just --

MICHAEL MCDONALD                    January 30, 2026                              222 to 225
93097

Page 222

1    A.  The ones with our initials.
2    Q.  In the initials that you'd like to keep.
3  And am I right that that was just a couple on that
4  spreadsheet that you --
5    A.  That's correct.
6    Q.  And then he says, when he's talking about
7  what they've collected and a few of those pertaining
8  to America 250, or within the priorities of the
9  administration?
10   A.  Correct.
11   Q.  So when you say "we've collected the
12  grants," Mr. Fox is referring to him and Mr.
13  Cavanaugh?
14   A.  Yes.
15   Q.  So to the extent there were grants
16  collected to put on what we'll look at, what's
17  called a keep list, I think, there are some that
18  you flag to keep, and then there's ones that they
19  identified to keep based on that criteria that we
20  described.
21   A.  That is correct.
22   Q.  Okay.  And when he says, we need your
23  final approval, and then skipping ahead, he says,
24  I'll call you in about an hour to check on progress.
25  What progress was he referring to?

Page 223

1        MS. BRENNAN:  Objection.
2        THE DEPONENT:  It's difficult for me to
3  recall.  I could speculate again that he was asking
4  us to confirm the 250 grants that they had
5  identified to keep because he wanted my sign off on
6  those as well.
7  BY MR. JACOBSON:
8    Q.  Okay.  All right.  I'm going to -- pardon
9  me.  We're going to pull up another spreadsheet now
10  that's US 41206, which we'll mark as Exhibit 20.
11       THE REPORTER:  Exhibit 20 marked.
12       (WHEREUPON, Exhibit 20 was marked for
13  identification.)
14  BY MR. JACOBSON:
15   Q.  And I'll represent to you, Mr. McDonald,
16  that this is the spreadsheet that Mr. Fox attached
17  to that email we just read where he said, we've
18  collected, you know, the ones you flagged and ones
19  pertaining to America 250th and the administration.
20  Do you accept that representation?
21   A.  Yes.
22   Q.  Okay.  And you see here there's two tabs.
23  One is titled to keep and the other is titled to
24  cancel?
25   A.  I see to cancel and I see to keep, yes.

Page 224

1    Q.  And do you recall seeing this spreadsheet,
2  this Excel file, I should say?
3    A.  I have no recollection.
4    Q.  Do you recall seeing an Excel file that
5  had tabs for to keep and to cancel?
6    A.  I have no definite recollection, but I'm
7  sure I probably did.  That makes sense.
8    Q.  So I can tell you when we looked through
9  the discovery produced, this was the first iteration
10  that we found of this spreadsheet with those two
11  tabs being sent.  You have no basis to say, no, it
12  was an earlier time?
13   A.  No, I do not.
14       MS. BRENNAN:  Objection.
15  BY MR. JACOBSON:
16   Q.  Okay.  And what did to keep mean here, do
17  you think?
18   A.  To keep, I understood not to terminate.
19   Q.  And to cancel?
20   A.  To terminate.
21   Q.  And from the fact that you just said, you
22  don't have a specific recollection, I take it, that
23  you didn't personally put together this -- these
24  spreadsheets?
25   A.  No.  As I mentioned earlier, I'm -- I am

Page 225

1  not -- don't deal with spreadsheets.
2    Q.  Okay.  And is it your understanding that
3  Mr. Fox compiled these spreadsheets?
4    A.  More than likely, yes.
5    Q.  Or Mr. Cavanaugh?
6    A.  More likely, Justin, yes.
7    Q.  Okay.  And so if we go to the cancel
8  list and then go to Row 1355.  And you'll see a
9  grant here highlighted in bold.  Do you see that,
10  Mr. McDonald?
11   A.  Yes.
12   Q.  And do you see that this is a grant in
13  Column I, it says, this is a grant to advancing the
14  National Catholic Center for Holocaust Education at
15  Seton Hill?
16   A.  Yes.
17   Q.  And do you know, is that a typo, should
18  that be Seton Hall?
19   A.  Should that be what?
20   Q.  Seton Hall University.
21   A.  Yeah, probably Seton Hall.
22       MR. JACOBSON:  And if we go over Nina to
23  Column J.
24  BY MR. JACOBSON:
25   Q.  Can you read into the record a description

MICHAEL MCDONALD                January 30, 2026                            226 to 229
93097

Page 226

1 of that project?
2    A. Oh, I'm sorry. "Development of a
3 strategic plan for delivering interpretive
4 programming of the Holocaust to the local
5 community."
6    Q. Okay. And in your view, does this grant
7 relate to DEI?
8    A. No.
9    Q. Would you consider this to be wasteful
10 spend?
11    A. I would not, no.
12    Q. Okay. So you didn't consider it to be a
13 DEI, and you didn't consider it to be wasteful
14 spend? So why was the grant terminated?
15    A. The grant was terminated on the basis of
16 the resetting of priorities. Basically, we were
17 looking at the last four years of open grants from
18 the Biden administration. My understanding was we
19 wanted to start afresh, a clean -- clean slate --
20    Q. Right.
21    A. -- as much as possible, not canceling
22 grants that we deemed to be in accordance with the
23 chief administration, Trump administration
24 priorities, and that therefore, this grant was
25 canceled on that basis, that there were higher

Page 227

1 priorities involved.
2    Q. We talked before about grants that you
3 thought the cancellation did not reflect well on any
4 of us, you wrote.
5    A. Mm-hmm.
6    Q. Would this be one of those grants?
7    A. Yes.
8    Q. But just to clarify, notwithstanding your
9 answer a moment ago, it was Justin Fox who placed
10 this grant on this list to terminate it, right?
11    MS. BRENNAN: Objection.
12    THE DEPONENT: I'd say it's likely that
13 Justin developed the list, so yes.
14 BY MR. JACOBSON:
15    Q. Okay. You don't recall ever saying, I'd
16 like to terminate the grant about delivering
17 interpretive programming about the Holocaust to
18 local communities?
19    A. No. That was probably on the NA list.
20    Q. Right.
21    A. It was carried over. So no.
22    Q. Okay.
23    MR. JACOBSON: Can we go to row 116. And
24 can you maybe expand the row? Yeah.
25 BY MR. JACOBSON:

Page 228

1    Q. Do you see this is a grant -- this is
2 again on the to cancel list titled, "My Underground
3 Mother, a -- a feature length documentary that
4 explores the lives and legacies of survivors of
5 Jewish women slave labor during the Holocaust?"
6    A. Yes.
7    Q. And then could you read into the record
8 the project description?
9    A. "Production of a feature length
10 documentary about Jewish female slave labor during
11 the Holocaust, using as a lens, one daughter's
12 journey to uncover her mother's past."
13    Q. And do you believe -- scratch that. Do
14 you believe this grant involves DEI?
15    A. No.
16    Q. So the fact that it's specific to Jewish
17 people doesn't make it involve DEI?
18    A. That's not how I understand DEI.
19    Q. Okay. And the fact that it's specific to
20 -- to women doesn't make it involve DEI?
21    A. No.
22    Q. What would you think if somebody said,
23 yes, that did involve DEI?
24    MS. BRENNAN: Objection.
25    THE DEPONENT: Yes. Hypothetically, if

Page 229

1 somebody were to say that they thought it involved
2 DEI, I would think that they didn't -- their
3 understanding of DEI was not the same as mine.
4 BY MR. JACOBSON:
5    Q. Okay. And it was Justin Fox who, again,
6 he was the one who placed this grant on this list
7 for termination?
8    MS. BRENNAN: Objection.
9    THE DEPONENT: Justin prepared the list,
10 yes.
11 BY MR. JACOBSON:
12    Q. Michael McDonald never said, I -- I'd
13 really like to terminate the grant about Jewish
14 female slave labor during the Holocaust.
15    A. That's correct.
16    Q. Okay. And so it's Justin Fox who's
17 responsible for this grant being terminated?
18    MS. BRENNAN: Objection.
19    THE DEPONENT: No.
20 BY MR. JACOBSON:
21    Q. It's not -- he placed it on the list.
22    A. I was the final decider. I made that
23 decision.
24    MS. BRENNAN: Objection.
25    A. You are the final decider for this

MICHAEL MCDONALD                    January 30, 2026                    230 to 233
93097

Page 230

1 specific grant being terminated?
2 BY MR. JACOBSON:
3    Q.  In the end, yes.
4    A.  So do you recall reviewing this grant and
5 thinking to yourself, I, Michael McDonald, decide to
6 terminate the grant about Jewish female slave labor
7 during the Holocaust?
8        MS. BRENNAN:  Objection.
9        THE DEPONENT:  Do I recall?
10 BY MR. JACOBSON:
11    Q.  Yeah.
12    A.  No.
13    Q.  So then how do you know you were the
14 decider?
15    A.  The grant was terminated.  I approved all
16 the grant terminations.
17    Q.  But you don't recall approving this one
18 specifically?
19    A.  There are over 1,400 grants.  I don't
20 recall the vast majority of them.
21    Q.  You don't -- just to make sure I
22 understand, you don't recall approving the vast
23 majority of them?
24        MS. BRENNAN:  Objection.
25        THE DEPONENT:  I'm not sure I understand

Page 231

1 the question.
2 BY MR. JACOBSON:
3    Q.  So on this one, on an individualized
4 basis, you don't recall approving the termination of
5 this grant about Jewish female slave labor during
6 the Holocaust?
7    A.  I do not recall approving the termination
8 of this specific grant.
9    Q.  And if we went through a lot of other
10 grants on this list, is it fair to say the same
11 would be true?
12    A.  Yes.
13    Q.  Okay.  And just because you know I have to
14 do it, I'll go through my three favorite grants
15 again.
16        MR. JACOBSON:  Can we pull up 1144?
17 BY MR. JACOBSON:
18    Q.  And this was -- this, again, the grant is
19 this one to the Modern Language Association?
20    A.  Yeah.
21    Q.  Again, you did not.  It was Justin Fox who
22 put this grant on the list for termination?
23        MS. BRENNAN:  Objection.
24        THE DEPONENT:  Yes.
25 BY MR. JACOBSON:

Page 232

1    Q.  Okay.  And is it the same answer that I
2 just gave that you just gave before, that you don't
3 recall specifically approving this grant for
4 termination?
5    A.  That's correct.  I do not recall
6 specifically approving this grant for termination.
7    Q.  And would the same be true of the the
8 University of Minnesota flat book grant and the
9 University of Riverside -- California Riverside
10 grant that we've talked about today?
11    A.  Yes.
12        MS. BRENNAN:  Objection.
13    A.  Okay.  I'm now going to hand you -- I'm
14 now going to go back.
15        MS. BRENNAN:  Can we also take a break at
16 some point whenever you get --
17        MR. JACOBSON:  To a good spot.  Yeah.
18        MS. BRENNAN:  Yeah.
19        MR. JACOBSON:  What time is it?  2:43.
20 I'm just figure out if we're at a good spot now.
21 Give me another, like, 5, 10 minutes.  We'll take a
22 break.
23        MS. BRENNAN:  Sure.
24        MR. JACOBSON:  Okay.  Thank you.
25 BY MR. JACOBSON:

Page 233

1    Q.  So going back to Exhibit 19, this is the
2 email chain that started with 5064.
3    A.  5064.  Got it.
4    Q.  Okay.  And you see --- and then if you go
5 to the next page, 50605?
6    A.  Yes.
7    Q.  You see Mr. Fox emailed you at 4:17 p.m.
8 saying, "Mike, update attached, call me once you
9 receive."
10    A.  Yes.
11    Q.  And do you remember calling Mr. Fox then?
12    A.  No.  I don't remember, but I most likely
13 did call.
14    Q.  Okay.  But you don't have any recollection
15 of the conversation?
16    A.  No.
17    Q.  Okay.  And then do you see going up the
18 chain that you emailed him back at 5:05 p.m. saying,
19 "Hi, Justin, we've completed our review.  Our
20 initial version is attached."
21    A.  All right.  Yes.
22    Q.  And so that was about, I'm getting my math
23 right, 48 minutes later?
24    A.  I'll take you -- I take your word for
25 that, yeah.

MICHAEL MCDONALD                    January 30, 2026                    238 to 241
93097

Page 238

1   A.  Yes.
2   Q.  And we have in Column J, again, that's
3  where you would have you or Mr. Wolfson would have
4  put your initials.  And I looked through this and I
5  saw that I think there were seven grants for you --
6  for which you put your initials.  Does that sound
7  about right?
8   A.  Yes.
9       MS. BRENNAN:  Objection.
10      THE DEPONENT:  And five of the seven seem
11 to relate in some way to the American Revolution.
12 Does that sound about right?
13      MS. BRENNAN:  Objection.
14      THE DEPONENT:  Yes.
15 BY MR. JACOBSON:
16   Q.  Okay.  So here on 1386, you marked to save
17 one.
18      MR. JACOBSON:  And if you could just go
19 over Nina to the description.
20 BY MR. JACOBSON:
21   Q.  Where it's described as materials and
22 equipment, including exhibition cases, benches, and
23 chairs for the new US Constitution Museum in Boston,
24 Massachusetts, for $333,000; is that right?
25   A.  Yes.

Page 239

1   Q.  Do you recall why you marked to keep that
2  one?
3   A.  Because of its connection to the
4  Revolution.
5   Q.  So you marked to keep that one because of
6  its connection to the Revolution, to building a
7  museum, to the USS Constitution?
8   A.  Sorry, I'm saying that -- I'm not sure why,
9  at this point, I can't recall.
10   Q.  Okay.
11      MR. JACOBSON:  Can we go down to Row 1465?
12 Okay.
13 BY MR. JACOBSON:
14   Q.  And here's another one that you marked to
15 keep that also related to the US Constitution.
16      MR. JACOBSON:  Nina, if you could go over.
17 BY MR. JACOBSON:
18   Q.  Planning of a permanent exhibition about
19 the USS Constitution's 1844-'46 International crews
20 to expand United States diplomatic and trade
21 relations. Do you see that?
22   A.  I do.
23   Q.  Do you recall why you marked that one to
24 keep?
25   A.  I do not.

Page 240

1   Q.  Okay.  So nothing jumped out at you about
2  these ones as somehow uniquely within the
3  administration's priorities?
4       MS. BRENNAN:  Objection.
5       THE DEPONENT:  I can't say what I was
6  thinking in my discussions with Adam at that time.
7  BY MR. JACOBSON:
8    Q.  Sure.  I'd like to now go back to Exhibit
9  19, and this was the one with 50604.
10   A.  Yes.
11   Q.  And do you see at the bottom of the first
12 page, there's an email from Justin Fox to you at
13 7:55 p.m.
14   A.  Yes.
15   Q.  To you and Mr. Wolfson?
16   A.  Yes.
17   Q.  Okay.  And he writes, "Thank you, Mike.
18 As discussed, please see attached for your review."
19 Do you see that?
20   A.  Yes.
21   Q.  Do you remember discussing this with him
22 at all?
23   A.  I do not remember -- recall discussing
24 this with Mr. Fox.
25   Q.  Okay.  And then he says, "In accordance

Page 241

1  with the President's February 19th, 2025, EO, to
2  eliminate all non-statutorily required activities
3  and functions."
4       And then parentheses, "citation, we will
5  begin to execute the attach with your permission."
6    A.  Mm-hmm.  Yes.
7    Q.  Do you know why he was referencing an
8  executive order about eliminating all non-
9  statutorily required activities and functions?
10   A.  No.
11   Q.  There was no executive order to eliminate
12 all of NEH's non-statutorily required activities and
13 functions, right?
14   A.  That's correct.
15   Q.  Do you know that there was for other
16 agencies, small agencies?
17   A.  I believe they were, yes.
18   Q.  Including agencies that Mr. Cox and Mr.
19 Cavanaugh had been deployed to?
20   A.  Yes.
21   Q.  Okay.  And then he says, We will begin to
22 execute the attached with your permission.  And
23 who's the we there?
24   A.  I don't know.
25   Q.  Well, it's coming from Mr. Fox, so it's

MICHAEL MCDONALD                    January 30, 2026                    242 to 245
93097

Page 242

1 fair to say that he's part of the --
2    A.  The DOGE -- the DOGE team, yes.
3    Q.  Yeah.  And what did he mean by execute, to
4 your understanding?
5    A.  Well, in this context, begin the
6 termination process.
7    Q.  Okay.  So they were going to carry out the
8 termination process?
9       MS. BRENNAN:  Objection.
10      THE DEPONENT:  They were doing -- yes.
11 They were doing what I would consider to be a
12 ministerial act in carrying out the terminations.
13 BY MR. JACOBSON:
14   Q.  And you -- the ministerial act encompasses
15 what exactly?
16   A.  The actual mechanics of sending out the
17 termination notices.
18   Q.  What about drafting the termination
19 letters?  Is that ministerial?
20   A.  In -- in certain instances, it can be.
21   Q.  Was it here?
22      MS. BRENNAN:  Objection.
23      THE DEPONENT:  I believe so.
24 BY MR. JACOBSON:
25   Q.  Okay.  And they say, we'll begin to

Page 243

1 execute. Can you think of any other context where
2 you've had at -- at your entire time at NEH, where
3 officials from the federal government who are not
4 part of NEH have executed on NEH functions?
5       MS. BRENNAN:  Objection.
6       THE DEPONENT:  No.
7 BY MR. JACOBSON:
8    Q.  Okay.  And then Mr. Fox says, "I'll follow
9 up with the documents and language for the
10 termination notices." Do you see that?
11   A.  Yes.
12   Q.  And when he says, "I'll follow up," that
13 means he's going to be drafting and sending you the
14 documents and language for the termination notices?
15      MS. BRENNAN:  Objection.
16      THE DEPONENT:  It's a -- yeah, I believe
17 that's what he's saying, yes.
18 BY MR. JACOBSON:
19   Q.  Okay.  And did you ask him to do that?
20   A.  I don't -- I don't recall asking him to do
21 it.
22      As I said earlier, I know they had a
23 process for doing this.  So I delegated that to him.
24   Q.  When you say delegated, can you
25 clarify what you mean by that?  Did you actively

Page 244

1 say, I would like you to draft up the termination
2 notices?
3    A.  He -- they -- they offered their services,
4 so to speak, to do that, and I agreed.
5    Q.  Okay.  And let's now pull up the other
6 spreadsheet that I think it's confusingly numbered
7 almost the same, which is the one that is 61492.
8 And I'll represent to you that this is the
9 spreadsheet that Mr. Fox sent back to you with the
10 email we just read where he said, you know, with
11 your permission, we'll execute.  Do you accept that
12 representation?
13   A.  I tend to get blurry eyed over all these
14 spreadsheets, but sure, I will accept your
15 representation.
16   Q.  Okay.
17      MS. BRENNAN:  Is this --
18      MR. JACOBSON:  Let's mark this as a new
19 exhibit.  So this will be 22.  It's an Excel sheet.
20      (WHEREUPON, Exhibit 22 was marked for
21 identification.)
22 BY MR. JACOBSON:
23   Q.  Okay.  And so this is the one where I had
24 a false start earlier, where it seems to be the same
25 as the prior one in terms of the -- the tabs, at

Page 245

1 least at the bottom, but now the two cancel has been
2 broken out into orgs and individ.  Do you see that?
3 Indiv?
4    A.  Broken out into what?
5    Q.  It says organizations and individuals, it
6 seems to be the breakdown.  Does that seem accurate
7 in the two tabs there at the bottom?
8    A.  Two tabs at the bottom.
9    Q.  Do you see where the cursor is?
10   A.  Yes.
11   Q.  And do you see it says to cancel,
12 parentheses, orgs --
13   A.  Orgs.  Yes.
14   Q.  -- and then you see to cancel.
15   A.  Yes.
16   Q.  Okay.  And again, the to keep tab here
17 represents the grants that were going to be kept,
18 right?
19   A.  Yes.
20   Q.  Okay.
21      MR. JACOBSON:  So can we click on that?
22 BY MR. JACOBSON:
23   Q.  And let's go to -- or just look at the
24 first one there.  These are the papers of George
25 Washington -- I'm sorry, of Albert Einstein.  That

MICHAEL MCDONALD                    January 30, 2026                    246 to 249
93097

Page 246

1 grant was not terminated; is that correct?
2    A.  I don't recall.
3    Q.  Okay.  Sitting here today, you're not sure
4 whether or not that grant was terminated?
5    A.  No, I'm not sure.
6    Q.  Okay.  And do you then recall who put that
7 grant on this list of ones to keep?
8    A.  Well, then we must have put it on.  Adam
9 and I must have put it on the list to keep.  I just
10 don't call.
11    Q.  Okay.  And then the next one with the
12 Adams papers, is that the same answer?
13    A.  The Adams paper, I don't know.  That I
14 would -- I'm pretty sure we, yeah, we -- we both put
15 that on this to save list, to keep list.
16        MR. JACOBSON:  Okay.  Nina, can we go to
17 the one that's the letters of Ernest Hemingway?
18 BY MR. JACOBSON:
19    Q.  All right.  Do you recall that one being
20 on the to keep to list?
21    A.  I have no clear recollection, but classic
22 American author, that was probably the rationale, so
23 yes.
24    Q.  When you say "classic American author,"
25 that's the first time today you've mentioned that as

Page 247

1 a -- as a rationale.  I thought you had mentioned
2 the Revolution we talked about, right?
3    A.  Mm-hmm.
4    Q.  The 250th.
5    A.  Mm-hmm.
6    Q.  Are you saying that Classic American
7 author was another category of ones to keep?
8        MS. BRENNAN:  Objection.
9        THE DEPONENT:  Well, the NEH had been
10 funding -- these are the letters of Ernest Hemingway
11 for a significant period of time.  That was more
12 than likely another consideration.  But overall, the
13 design as to the administration's priorities, it
14 also had to do with American civilization and
15 culture.  And again, these were decisions that I was
16 making as the acting chairman.
17 BY MR. JACOBSON:
18    Q.  So can you tell me specifically why was
19 this one put on to the keep list as the acting
20 chairman?
21    A.  Why it was specifically put on the keep --
22 to keep list?
23    Q.  Because?
24    A.  Because I thought it was in the interest
25 and -- and accorded with the administration's

Page 248

1 priorities.
2    Q.  Of focusing on American civilization, is
3 that what you said?
4    A.  And culture, correct.
5    Q.  Okay.  And can we go down -- there's one
6 titled, Connection and Community.  Do you see that
7 email?  And this is a grant for, "The arrangement
8 and description of 475 linear feet of Council of
9 Jewish Federation records dating 1916 to 1999."  Do
10 you recall who put this on the to keep list?
11    A.  No, I don't.
12    Q.  Do you know why this was put on the to
13 keep list?
14    A.  No.  Sitting here today, I don't recall
15 the reasons for putting it on the to keep list.
16    Q.  Do you have any speculation as to why this
17 was put on the to keep list?
18    A.  It would only be speculation, and I would
19 prefer not to speculate.
20    Q.  But it is your testimony that it was your
21 decision to put this on the to keep list?
22    A.  It ended up on the --
23        MS. BRENNAN:  Objection.
24        THE DEPONENT:  It ended up on the keep
25 list.  Ultimately, yes, it was my decision.

Page 249

1 BY MR. JACOBSON:
2    Q.  So it was your decision, but you don't
3 know why you made that decision?
4        MR. JACOBSON:  Objection.
5        THE DEPONENT:  I can't go back in time and
6 review my discussions with Adam as we would go
7 through them and come up with the exact reason why.
8 BY MR. JACOBSON:
9    Q.  Okay.  Can we go down to the Edinburgh
10 Critical Edition of the complete works of Alfred
11 North Whitehead?  Do you see that one, Mr. McDonald?
12 It's -- it's described as preparation for
13 publication of two volumes of the Harvard lectures
14 and one volume of collected monographs of English
15 philosopher and mathematician, Alfred North
16 Whitehead, who lived from 1861 to 1947.
17    A.  Mm-hmm.  Yes.
18    Q.  Do you recall who put that on the to keep
19 list?
20    A.  Yeah.  Presumably, I did in consultation
21 with Adam Wolfson.
22    Q.  When you say "presumably," do you have a
23 specific recollection?
24    A.  I don't have a specific recollection.  No.
25    Q.  Okay.  Do you know why that was put on the

MICHAEL MCDONALD                    January 30, 2026                          250 to 253
93097

Page 250

1 to keep list?
2    A.  Again, I would -- I -- as with my previous
3 answer, it would be speculation.
4    Q.  Okay.  And well, you previously talked
5 about American civilization --
6    A.  Mm-hmm.
7    Q.  -- American history.  Would that -- would
8 this grant fit within that paradigm?
9    A.  Possibly.
10   Q.  About an English mathematician?
11   A.  I'm -- I'm not a philosopher, and I don't
12 know his influence in the United States.  It's
13 possible.
14   Q.  So you don't know anything about Alfred
15 North Whitehead?
16      MS. BRENNAN:  Objection.
17      THE DEPONENT:  I -- I suppose I know what
18 the average educated person knows about Alfred North
19 Whitehead, which is not a lot.
20 BY MR. JACOBSON:
21   Q.  Okay.  But it's your testimony that was
22 your decision to keep this one?
23   A.  Yes.
24   Q.  Okay.
25      MR. JACOBSON:  Can we go down to the works

Page 251

1 of George Santayana?
2 BY MR. JACOBSON:
3    Q.  I might be mispronouncing that.  Do you
4 know who that Spanish American Philosopher is?
5    A.  Yes.  I'm familiar with Santayana.
6    Q.  Okay.  So why was this one on the to keep
7 list?
8    A.  Again, I have to go with my previous
9 answer. I can't recall specifically what were the
10 reasons that we talked about to put it on the keep
11 list as I sit here today.
12   Q.  Okay.  Was it you who specifically put
13 this on the to keep list?
14   A.  I don't recall if it was me specifically
15 put it on the keep list.
16   Q.  And did this fit within American
17 Revolution, American civilization, and that's why it
18 was put on that list?
19      MS. BRENNAN:  Objection.
20      THE DEPONENT:  Again, I can't -- I can't
21 go back in time.
22 BY MR. JACOBSON:
23   Q.  Okay.
24      MR. JACOBSON:  Let's go down to Karl
25 Barth's Lectures and Shorter Works.

Page 252

1 BY MR. JACOBSON:
2    Q.  Do you know who Karl Barth is?  Sorry,
3 Barth.
4    A.  Yes.
5    Q.  And who's Karl Barth?
6    A.  Well, he's an important religious
7 philosopher and thinker.
8    Q.  Okay.  And he was a German philosopher; is
9 that right?
10   A.  That's correct.
11   Q.  And are German philosophers' work related
12 to the American Revolution?
13      MS. BRENNAN:  Objection.
14      THE DEPONENT:  No.  I don't think Karl
15 Barth's work had an effect on the Revolution or
16 related to it.
17 BY MR. JACOBSON:
18   Q.  Okay.  What about American civilization?
19   A.  Again, it's -- in general, if you're
20 asking me, I know Barth had a tremendous influence
21 on religious thinkers and theologians in the United
22 States.
23   Q.  Okay.  But he was German?
24   A.  Yes.
25   Q.  Never lived in America?

Page 253

1      MS. BRENNAN:  Objection.
2      THE DEPONENT:  I have no -- I have no idea
3 if he did or didn't.
4 BY MR. JACOBSON:
5    Q.  Okay.  So can you tell me why this was put
6 on the to keep list?
7    A.  I have --
8      MS. BRENNAN:  Objection.
9      THE DEPONENT:  Revert to my previous
10 answer, I cannot recall at this date the reason why
11 he was put on the to keep list.
12 BY MR. JACOBSON:
13   Q.  Okay.  And you -- you don't recall whether
14 you were the one who put this on to keep list?
15   A.  I -- I was having discussions at --
16 simultaneous discussions with Mr. Wolfson.  I'm not
17 sure what were the reasons that ultimately ended up
18 having this placed on the keep -- to keep list.
19   Q.  Okay.
20      MR. JACOBSON:  Nina, can we scroll or
21 search for one called By the People: The Inclusive
22 Story of Revolution in Virginia?
23 BY MR. JACOBSON:
24   Q.  Okay.  Do you see this grant, Mr.
25 McDonald, title -- titled, By the People: The

MICHAEL MCDONALD                    January 30, 2026                    254 to 257
93097

Page 254

1 Inclusive Story of Revolution in Virginia, 1763
2 through 1800?
3   A.  Yes.
4   Q.  And do you see the description is, the
5 addition of 200 entries to Encyclopedia Virginia to
6 make more inclusive its coverage of the
7 Revolutionary Era, and the addition of primary
8 sources, artifacts, lesson plans, and digital public
9 history experiences, all in preparation for the
10 250th anniversary?
11   A.  Yes.
12   Q.  Okay.  Would you consider this grant to be
13 DEI?
14   A.  Possibly.
15   Q.  Is that a yes?
16      MS. BRENNAN:  Objection.
17      THE DEPONENT:  I said possibly.
18 BY MR. JACOBSON:
19   Q.  It says inclusive?
20   A.  One has to know more about the -- the
21 applicant and what the applicant means by inclusive.
22   Q.  Sitting here today, do you know about the
23 applicant and what the applicant meant?
24   A.  Who is the applicant?
25      MR. JACOBSON:  I think it's over to the

Page 255

1 right, Nina, if you scroll.
2 BY MR. JACOBSON:
3   Q.  Someone at the University of Virginia,
4 Emily Wall, something that we can't see right now.
5 Do you know --
6   A.  No.  As I sit here today, I don't know
7 anything about that person.
8   Q.  So sitting here today, you have no idea
9 why this grant was kept while others that related to
10 inclusiveness were terminated?
11   A.  No.
12   Q.  Okay.  I'd like to pull up now -- sorry,
13 at the top of the email chain we've been looking at,
14 which is an email -- this is Exhibit 19 again.  And
15 this is an email from Mr. Fox to you and Mr. Wolfson
16 on April 1st at 11:25 p.m.  Do you see that?
17   A.  Sorry.  Which document?  What's the
18 number?
19   Q.  It's 50604.
20   A.  Yes.
21   Q.  The first email at the top.
22   A.  Yes.
23   Q.  Okay.  Do you see this email?
24   A.  Yes, I do.
25   Q.  Okay.  And can you -- do you see where Mr.

Page 256

1 Fox says, "Mike, please see attached grant
2 termination letter, which we plan to use for
3 organizations and state and jurisdictional
4 humanities councils." Do you see that?
5   A.  I do.
6   Q.  Okay.  And when he says, "we plan to use,"
7 who is he referring to?
8   A.  The DOGE team.
9   Q.  Okay.  And when he says, "Please see
10 attached grant termination letter," that means he
11 drafted the letter, right?
12   A.  I don't know that he drafted the letter.
13 Somebody at DOGE.
14   Q.  Okay.  Let's pull up that letter itself,
15 which is -- we'll mark this as a new exhibit, and
16 it's 50608.  This will be Exhibit 23.
17      THE REPORTER:  Exhibit 23 marked.
18      (WHEREUPON, Exhibit 23 was marked for
19 identification.)
20      MR. JACOBSON:  This one.  I'm going to
21 take this one.  Okay.
22 BY MR. JACOBSON:
23   Q.  Do you recall seeing something of this
24 nature that Mr. Fox sent you that evening, a draft
25 termination letter?

Page 257

1   A.  Yes.
2   Q.  Okay.  And well, let me ask you, did you
3 draft this?
4   A.  No.
5   Q.  Did anyone else who works at NEH draft
6 this?
7   A.  No.
8   Q.  Okay.  Mr. Fox drafted it to the best of
9 your knowledge?
10   A.  I have no knowledge who drafted it at
11 DOGE.
12   Q.  Somebody at DOGE drafted this?
13   A.  That was my understanding, yes.
14   Q.  Okay.  And if you look in the middle of
15 the second paragraph, it says, "The president's
16 February 19th executive order mandates that the NEH
17 eliminate all non-statutorily required activities
18 and functions."
19   A.  Yes, I see that.
20   Q.  And is that accurate?
21   A.  Is what accurate?
22   Q.  That there was an executive order that
23 mandates that the NEH eliminate all non-statutorily
24 required activities and functions?
25   A.  No, that was not accurate.

MICHAEL MCDONALD                    January 30, 2026                          258 to 261
93097

Page 258

1    Q.  So the person who drafted this wasn't that
2  intimately familiar with what was going on at NEH at
3  the time?
4        MS. BRENNAN:  Objection.
5        THE DEPONENT:  I have no knowledge how
6  intimately or not the person was.
7  BY MR. JACOBSON:
8    Q.  The person who drafted this thought there
9  was an executive order to basically eliminate most
10  of the agency?
11        MS. BRENNAN:  Objection.
12        THE DEPONENT:  I -- I have no way of
13  knowing that.
14  BY MR. JACOBSON:
15    Q.  Okay.  That's what it would mean to
16  eliminate all non-statutorily required activities
17  and functions?
18        MS. BRENNAN:  Objection.
19        THE DEPONENT:  It's just speculation on my
20  part.
21  BY MR. JACOBSON:
22    Q.  Okay.  It would be a pretty big deal to
23  you as the acting chair if there was an executive
24  order to eliminate all of your non-statutorily
25  required activities and functions?

Page 259

1        MS. BRENNAN:  Objection.
2        THE DEPONENT:  If there were such an
3  executive order, a big deal, yes.
4  BY MR. JACOBSON:
5    Q.  Okay.  And did you review this letter when
6  Mr. Fox sent it to you?
7    A.  Yes.
8    Q.  Did you review it closely?
9    A.  In retrospect, not as closely as perhaps I
10  should have.
11    Q.  Right.  Because certainly, if you had
12  noticed this, you would have said, hey, there's no
13  executive order eliminating our agency?
14        MS. BRENNAN:  Objection.
15        THE DEPONENT:  If -- if I had reviewed it
16  more carefully, yes, that is correct.
17  BY MR. JACOBSON:
18    Q.  Okay.  And at the -- in the last sentence,
19  it says, "Please contact," and then it lists your
20  email address with urgent questions only -- or
21  sorry, with -- with only urgent questions.  Do you
22  see that?
23    A.  I do.
24    Q.  Okay.  And did your email address stay in
25  the final version of this letter that went out?

Page 260

1    A.  I am not sure what was in the final
2  letter.
3    Q.  I'll hand you now what is US 03375, and
4  I'll represent to you that this is a final version
5  of the letter, one of the letters that went out.
6  This will be Exhibit 24.
7        THE REPORTER:  Exhibit 24 marked.
8        (WHEREUPON, Exhibit 24 was marked for
9  identification.)
10  BY MR. JACOBSON:
11    Q.  Looking at this letter, do you see whether
12  it was your email address listed in that last line?
13    A.  In the -- the exhibit you just handed?
14    Q.  Correct.
15    A.  I do not see my email on this document.
16    Q.  Do you see it says, "Please contact
17  grants_notifications@nehemail.onmicrosoft.com"?
18    A.  Yes.
19    Q.  And is that an email address you've ever
20  seen before?
21    A.  Maybe not.
22    Q.  Before this -- before April 1st, 2025, had
23  you ever seen that email address before?
24    A.  No.
25    Q.  Okay.  Is that a typical email address for

Page 261

1  a government email address, @microsoft.com?
2    A.  No.
3        MS. BRENNAN:  Objection.
4  BY MR. JACOBSON:
5    Q.  Okay.  And your email addresses all end
6  with @neh.gov; is that right?
7    A.  That's correct.
8    Q.  Okay.  So at some point between the draft
9  letter that Mr. Fox sent you that we looked at and
10  this final version, your email address was swapped
11  out for this email address; is that right?
12    A.  Yes.
13    Q.  Do you recall why?
14    A.  I don't recall.  No.
15    Q.  Did you --
16    A.  Other than the fact that the email address
17  on the previous document was incorrect.
18    Q.  The one for you, that is?
19    A.  Yes.
20    Q.  Okay.  Do you recall ever asking that your
21  email address not be listed on these termination
22  letters?
23    A.  No.  I don't recall asking.  But normally,
24  terminations would be handled through the Office of
25  Grant Management.  And that would -- so in that --

MICHAEL MCDONALD                    January 30, 2026                         262 to 265
93097

Page 262

1 in that instance, emails on grant terminations
2 wouldn't be sent to the chairman.
3    Q.  Okay.
4    A.  Toward the chairman's office.
5    Q.  So that's a no.  You don't recall saying,
6 "Please take out my email address"?
7    A.  I don't recall.
8    Q.  Okay.  And your -- the signature that's
9 typed at the bottom, /s/Michael McDonald, do you see
10 that?
11   A.  Yes.
12   Q.  Did you write that there?
13   A.  I approved the use of it.
14   Q.  Did you write that there?
15   A.  Did I write /s/McDonald?  I don't -- I
16 don't understand the question.
17   Q.  Yeah.  Did you type in /s/Michael
18 McDonald?
19   A.  No.
20   Q.  Okay.  Who typed that in?
21   A.  Presumably the people at DOGE.
22   Q.  Justin Fox?
23   A.  I don't know.
24   Q.  Can you think of a single government
25 document in your entire government career where

Page 263

1 you've ever signed an official document that way?
2    A.  No.
3    Q.  Okay.  Because you normally -- you have a
4 specific way you like to sign your signatures and
5 documents?
6    A.  Well, we have electronic signatures now.
7 I don't know that it's specific -- I have a favorite
8 or a specific way.
9    Q.  Okay.  But this is -- this is not
10 something that -- this is --
11   A.  No, that's --
12   Q.  Is it an anomaly, fair to say?
13   A.  It would be an anomaly, yes.
14   Q.  Okay.  Do you think it's appropriate for a
15 document notifying someone that they're going to --
16 their grant is being terminated to write, you know,
17 /Michael McDonald --
18       MS. BRENNAN:  Objection.
19 BY MR. JACOBSON:
20   Q.  -- as a signature?
21   A.  I don't see why it would be considered
22 inappropriate.
23   Q.  Okay.  I'm going to hand you these.  Now
24 going to hand you a document produced as US 9562.
25 There you go.  This will be Exhibit 25.

Page 264

1       THE REPORTER:  Exhibit 25 marked.
2       (WHEREUPON, Exhibit 25 was marked for
3 identification.)
4 BY MR. JACOBSON:
5    Q.  And do you see at the bottom there,
6 there's an email from Justin Fox to you dated April
7 2nd, 2025, 12:23 a.m.
8    A.  Yes.
9    Q.  And you see in the first sentence, he's
10 asking for an email -- a meeting with you or
11 confirming a meeting with you the next day?
12   A.  Yes.
13   Q.  And you say -- he writes, "Please be
14 prepared with your view of the core, capable, and
15 mission aligned folks needed to execute under
16 renewed direction prioritizing America first
17 grants." Do you see that?
18   A.  I do.
19   Q.  Okay.  And when he says your renewed
20 direction, that's referring to you as the acting
21 chair?
22   A.  Yes.
23   Q.  Okay.  And who gave you that direction?
24   A.  I'm not sure he's suggesting that anybody
25 gave me any direction.  I'm not -- I'm not following

Page 265

1 the question.
2    Q.  Sure.  So somebody writes, you know, they
3 reference your renewed direction in prioritizing a
4 certain type of grant, right?  Did you know what he
5 was referring to when he said that?
6    A.  Well, just that -- I'm not sure what -- I
7 -- I don't have a clear recollection.  I could
8 speculate that -- "Please be prepared with your view
9 on the core, capable, and mission aligned folks
10 needed to execute on your renewed direction,
11 prioritizing America First Grants.  We're canceling
12 -- given we're canceling many of the small wasteful
13 grants, our sense is that this will be a tight
14 group, which we can walk through."
15       Again, I think it was -- again, I can't
16 recall something clearly from April 2nd of 2025 as I
17 sit here on January 30th, 2026.
18   Q.  Okay.
19   A.  My sense, though, is that again, given
20 their prior experience at other agencies, they
21 wanted a group of people at NEH that they could
22 trust to execute without slow walking.
23   Q.  Understood.  And what does America First
24 mean to you?  How would you define that?
25   A.  As -- as you probably know, there's a good

Page 302

1 BY MR. JACOBSON:
2    Q.  The person who just started talking, is
3 that -- can you authenticate that's your voice?
4    A.  Who just started talking?
5    Q.  Yes.
6    A.  It appears to be my voice, yes.
7    Q.  Okay.  If at any point you don't think
8 it's your voice, will you let me know?
9    A.  I will.
10    Q.  Okay.
11    MR. JACOBSON:  Nina, can you hit play?
12       (WHEREUPON, an audio recording was played
13 and transcribed as heard:)
14    MICHAEL McDONALD:  "It was broader than
15 the executive orders.  The initial reviews that we
16 were asked to conduct were to be conducted, and you
17 know because you all participated in the process,
18 has to do with funding that could be viewed as being
19 contrary to the directives in the executive orders.
20 So that -- that's not a perfect example.  That is,
21 that by the end of that process the grounds had
22 shifted, one meeting that we had with another, and
23 it became clear that they were looking at the
24 totality of the awards that had been with  previous
25 administration, not simply (inaudible) contravening

Page 303

1 the executive board. (Inaudible) could be viewed as
2 wasteful or trivial or just plain silly.  And Adam
3 and I spent a lot of time, a couple of days, going
4 over lists and talking with them and making cases
5 left and right.  The final termination note is just
6 we did have some effort in saving a number of grants
7 that had otherwise been targeted, but the
8 determinations of, you know,  a large -- the
9 overwhelming majority, unfortunately, and the views
10 of the administration, did not accord with the --
11 with the -- with the direction that the president
12 wanted this agency to take, and therefore, the
13 termination went -- went out and they also felt this
14 great urgency there.  So as they said in the
15 notification letter, that it was exceptional
16 circumstances, and they would not be adhering to
17 traditional notification processes, even though I
18 certainly pointed out to them what our traditional
19 notification processes were.  But as I said in the
20 termination notice, they did not feel this should be
21 applied in this instance.  So that -- that is the
22 second part of your question.  Remind me what the
23 first part of it was."
24       (WHEREUPON, the audio recording
25 concluded.)

Page 304

1    MR. JACOBSON:  Okay.  We can pause it
2 there.
3 BY MR. JACOBSON:
4    Q.  So that was you speaking that we just
5 heard again?
6    A.  Yes.
7    Q.  Okay.  And if you look at the transcript,
8 right under where it says 6:25, you say,"The final
9 termination note is just we did have some effect in
10 saving the number of grants that had otherwise been
11 targeted"?
12    A.  Mm-hmm.
13    Q.  And does the "we" there refer to you and
14 Mr. Wolfson?
15    A.  Yes.
16    Q.  And when it says "targeted," does that
17 mean targeted by DOGE?
18    A.  Yes.
19    Q.  And when you say "saving a number of
20 grants," that means DOGE had put some grants on a
21 list to terminate, and you and Mr. Wolfson were able
22 to save them, meaning pull them off that list, is
23 that fair?
24    A.  That's fair.
25    Q.  Okay.  And then the next sentence, you

Page 305

1 say, "Unfortunately" -- sorry.  "The determinations
2 of the overwhelming majority, unfortunately, and the
3 views of the administration, did not accord with the
4 direction that the president wanted this agency to
5 take, and therefore, the termination went out." So
6 you used the word "unfortunately" there.
7    A.  Yes.
8    Q.  And when you say "unfortunately," that
9 means you thought it was unfortunate?
10    A.  No.  What I meant in that instance, and I
11 believe I've addressed this earlier, is that having
12 worked at the agency for over 20 years, I'm familiar
13 with a lot of humanities projects that I think may
14 have value, but that people on the outside, whether
15 they be on Capitol Hill or in the White House, think
16 do not and think that should be eliminated.
17    Q.  Right.  But when you say -- I'm focusing
18 on the word "unfortunately."
19    A.  Yes.
20    Q.  That just means that you thought it was
21 unfortunate, right?
22    MS. BRENNAN:  Objection.
23    THE DEPONENT:  I thought it was
24 unfortunate that certain grants that were in the
25 traditional realm --

MICHAEL MCDONALD                January 30, 2026                310 to 313
93097

Page 310

1    A. It didn't seem appropriate, no.
2    Q. Okay. So when you say you provided input,
3 what you're referring to is the -- solely the
4 addition of as outlined in two CFR 200.340?
5    MS. BRENNAN: Objection.
6    THE DEPONENT: Well, it wasn't -- there
7 were these other -- these other changes as well. So
8 it wasn't simply that.
9 BY MR. JACOBSON:
10   Q. Okay. So it was that addition plus
11 changing the email address and not wishing people
12 well?
13   MS. BRENNAN: Objection.
14   THE DEPONENT: Yeah. Those appear to be
15 the changes.
16 BY MR. JACOBSON:
17   Q. Okay. Thank you.
18   A. You're welcome.
19   Q. And then just going back to that same
20 portion of the transcript, you write, "So as they
21 said in the notification letter, that it was
22 exceptional circumstances, and they would not be
23 adhering to the traditional notification processes,
24 even though I certainly pointed out to them that
25 what our traditional notification processes were."

Page 311

1 Do you see that?
2    A. Yes.
3    Q. And again, that they, there is Mr. Fox and
4 Mr. Cavanaugh?
5    A. DOGE.
6    Q. And -- and so that meant they would not be
7 adhering, meaning Mr. Fox and Mr. Cavanaugh, would
8 not be adhering to traditional notification
9 processes, even though I, meaning you, Mr. McDonald,
10 pointed out to them what they were?
11   A. That's correct.
12   Q. Okay. So it was their decision not to
13 adhere to the traditional notification processes?
14   MS. BRENNAN: Objection.
15   THE DEPONENT: They recommended that we
16 not adhere to the traditional notification processes
17 in the interest of time, and I accepted their
18 recommendation.
19 BY MR. JACOBSON:
20   Q. Okay. Did you -- did you say that here to
21 your staff, that they recommended it and you
22 accepted their recommendation?
23   A. In this -- no, I did not.
24   Q. Okay.
25   MR. JACOBSON: All right. Nina, can we

Page 312

1 play the clip starting with 7:37, please?
2    (WHEREUPON, an audio recording was played
3 and transcribed as heard:)
4    SPEAKER TWO: "Sure. It's -- and
5 actually, if I can just follow-up on that first --
6 what you just responded to. It -- I -- I have been
7 surprised just about what awards -- I've received
8 reports have been terminated some from say our
9 national digital newspaper program that were
10 digitizing newspapers for, you know, Revolutionary
11 War period newspapers seem very 250th. So I do -- so
12 what you're saying is there are some grants, we just
13 don't know which, which were able to be seen by the
14 administration as -- as appropriate. Are we
15 thinking of, you know, do you have a sense of what
16 percent of our awards might have been able to meet
17 that -- that high bar? And I certainly appreciate
18 you making the case for as many awards as -- as you
19 did.
20   MICHAEL McDONALD: "It would be conjecture
21 on my part, but I would say that upwards of 80 to 90
22 percent of previously-approved awards went by the
23 wayside."
24   (WHEREUPON, the audio recording
25 concluded.)

Page 313

1    MR. JACOBSON: Okay. We can pause it
2 there.
3 BY MR. JACOBSON:
4    Q. So the -- the speaker we just heard who
5 said under the 8:36 mark, "It would be conjecture on
6 my part, but I would say the upwards of 80-90
7 percent of approved awards went by the wayside."
8 That was -- that was you speaking?
9    A. Correct.
10   Q. Okay. And you -- when you said it would
11 be conjecture on my part, you were referring to the
12 scope of the grant terminations?
13   A. Yes.
14   MS. BRENNAN: Objection.
15 BY MR. JACOBSON:
16   Q. Okay. So as of April 3rd, you had no idea
17 what the scope of the grant terminations were?
18   MS. BRENNAN: Objection.
19   THE DEPONENT: No. I did have an idea of
20 what the scope was. I just didn't have an idea of
21 price percentage or number. I knew that the -- it
22 was a significant cull of open awards.
23 BY MR. JACOBSON:
24   Q. Okay. But you just testified a moment ago
25 that you didn't know what the scope was, that that's

Page 314

1  what conjecture was?
2      MS. BRENNAN: Objection.
3      THE DEPONENT: I was aware that a
4  significant portion of grants had been terminated.
5  I was not aware of the exact number.
6  BY MR. JACOBSON:
7   Q. Okay.
8   A. At least at this time. And since then, I
9  think the number was 1,478, or something like that.
10   Q. Sure. But this was April 3rd, so this was
11  the day after the termination.
12   A. Right. And also on April 3rd, we were
13  dealing with staff on administrative notice, the
14  RIFs, there were — and — all of the agitation
15  that goes along with that.
16   Q. Right.
17   A. So there were a number of considerations.
18  And of course, I don't know about you. I'm an early
19  riser. I normally get up at 4:00 in the morning.
20  When it's late in the day, I'm not functioning at my
21  best.
22   Q. But — but as of April 3rd, the day after
23  the termination, you didn't know how many awards you
24  had decided to terminate?
25      MS. BRENNAN: Objection.

Page 315

1      THE DEPONENT: It didn't occur to me to
2  inquire about the exact number of awards.
3  BY MR. JACOBSON:
4   Q. Okay. You'd have to engage in conjecture
5  to know how many awards you terminated?
6      MS. BRENNAN: Objection.
7      THE DEPONENT: To — to arrive at the
8  final number, yes.
9  BY MR. JACOBSON:
10   Q. Okay.
11      MR. JACOBSON: If we could go to the 10:01
12  mark.
13      (WHEREUPON, an audio recording was played
14  and transcribed as heard:)
15      SPEAKER THREE: "Mike, since those
16  letters have gone out, so (inaudible). We're
17  supposed to have (inaudible) correspondence saved
18  there, but we actually have no record of them
19  (inaudible) in our accounting system. How do we
20  actually cancel these grants? Simply what we
21  (inaudible). They will slash their (inaudible) upon
22  that budget."
23      MICHAEL McDONALD: "But there is now with
24  (inaudible) because that's the way DOGE — DOGE
25  operated at other agencies and they applied the same

Page 316

1  — the same methodology here."
2      (WHEREUPON, the audio recording was
3  concluded.)
4      MR. JACOBSON: So if you could pause it
5  there.
6  BY MR. JACOBSON:
7   Q. Again, that was your voice who was
8  speaking just now?
9   A. Yes.
10   Q. Okay. After the 10:31 mark?
11   A. Yes.
12   Q. Okay. And so you're saying when the —
13  when the staff member asked you what was the
14  rationale behind that, referring to, I believe,
15  referring to not using the EMS system, your — you
16  say the rationale was because DOGE just said that's
17  the way it was going to be?
18      MS. BRENNAN: Objection.
19      THE DEPONENT: That's not what I said.
20  BY MR. JACOBSON:
21   Q. Okay. What did I get wrong?
22   A. Rationale was because — what I said at
23  the meeting was that was the way that DOGE had
24  operated at other agencies, and they wanted to apply
25  the same methodologies, perhaps not the exact word,

Page 317

1  but the same process in this instance.
2   Q. And so your testimony is that other
3  agencies, DOGE sent out grant termination notices
4  themselves?
5   A. I'm not —
6      MS. BRENNAN: Objection.
7      THE DEPONENT: I have no knowledge of what
8  they did or didn't do at other agencies. I was
9  speculating that they had operated that way on the
10  basis of what they had told me in meetings about
11  they knew what they were doing. They had done this
12  at other agencies.
13  BY MR. JACOBSON:
14   Q. Sure. Did they tell you we've — we've
15  sent out grant termination notices ourselves at
16  other agencies?
17   A. I'm pretty sure that they did.
18   Q. Do you know which agencies those were?
19   A. I think it might have been IMLS.
20   Q. Any others?
21   A. I'm just speculating.
22   Q. Yeah. And they said that they had — at
23  those other agencies, they had created a Microsoft
24  email account and sent out the grant terminations
25  from there?

MICHAEL MCDONALD                    January 30, 2026                    326 to 329
93097

Page 326

1   A.  Yes, I see that.
2   Q.  And then he writes, "As they said, it was
3  a government wide effort to claw back money.  But
4  note the tendentious accusation that the
5  administration is acting like an authoritarian (or
6  even totalitarian) government to destroy the
7  humanities.  The ultimate goal supposedly being to
8  destroy independent thought. But the progressive
9  version of the humanities accomplished that some
10  time ago.  Today, it goes by the term wokeness and
11  intersectionality.".
12      So that was Mr. Wolfson's text to you,
13  right?
14   A.  Yes.
15   Q.  And you responded with a thumbs up?
16   A.  Yes.
17   Q.  And a thumbs up meant that you agreed with
18  this text?
19   A.  Yes.
20   Q.  Okay.  And so you agreed -- you agreed
21  that the ultimate -- well, let me -- let me take a
22  step back.  When he references the progressive
23  version of the humanities, do you know what he's
24  referring to there?
25      MS. BRENNAN:  I'm just -- I'm just going

Page 327

1  to note that the questions themselves contain
2  confidential information and may call for responses
3  containing confidential information.  So we'll --
4  we'll be contacting the reporter pursuant to the
5  protective order to designate the deposition.
6      MR. JACOBSON:  Okay.  And what
7  specifically is the confidential information here?
8      MS. BRENNAN:  The -- we would -- the
9  confidential information starts with "but note" and
10  goes to the end.
11      MR. JACOBSON:  So just to understand for
12  the record, you're saying all three sentences,
13  sorry, four sentences starting with but note, is
14  confidential?
15      MS. BRENNAN:  Yes.
16      MR. JACOBSON:  And can you state the basis
17  on which that -- that's confidential?
18      MS. BRENNAN:  We've already discussed
19  this, but it's -- that it's a personal text message
20  on someone's personal phone about their personal
21  views that -- and so that is the basis for
22  designating them confidential.
23      The person would have had a reasonable
24  expectation of privacy that his personal views --
25  that about -- that his personal views would remain

Page 328

1  confidential and wouldn't be part of the public
2  record.
3      MR. JACOBSON:  Okay.
4  BY MR. JACOBSON:
5   Q.  So do you know what he's referring to when
6  he says the progressive version of the humanities?
7      MS. BRENNAN:  Objection.
8      THE DEPONENT:  I believe he would be
9  talking about the politicization of the humanities
10  on American college and university campuses.
11  BY MR. JACOBSON:
12   Q.  And the politicization, you mean
13  politicization towards a left-leaning view of the
14  humanities; is that fair?
15      MS. BRENNAN:  Objection.
16      THE DEPONENT:  Not merely that.  I mean,
17  it's -- it's a whole series of things.
18  BY MR. JACOBSON:
19   Q.  Can you give me a couple of the things in
20  the series?
21   A.  Sure.  The -- the suppression of
22  conservative speech on campuses.  For example, the
23  fact that when a conservative speaker wants to show
24  up to give a talk to a student organization, the
25  university will cancel it because of the protests.

Page 329

1  They don't allow -- there's a uniformity of -- of
2  progressive ideology that -- that courses throughout
3  the veins of of -- of the humanities these days in
4  that direction.
5   Q.  Anything else?  You said it was a series
6  of things?
7   A.  Well, we're still living in -- where
8  the humanities have become a --
9      MS. BRENNAN:  Objection.
10      THE DEPONENT:  -- they're -- they're not
11  -- they're -- they're still largely theory-driven in
12  a progressive sense and not dealing with basic
13  texts, substituting theory for text, and
14  deconstructing the Western canon when not ignoring
15  the Western canon and things of that nature.  But as
16  I say, it's -- it's a topic that could exhaust one
17  to go into in detail.  So when he said this, again,
18  back -- to get back to your question.  Having worked
19  with Adam for a number of years, I have a general
20  understanding of what he meant.
21  BY MR. JACOBSON:
22   Q.  But you agreed with it by virtue of doing
23  it a thumbs up, you said, right?
24   A.  Oh, yes.
25   Q.  Okay.  And when you said it goes by the

MICHAEL MCDONALD                 January 30, 2026                      370 to 373
93097

Page 370

1 Wolfson over Signal?
2     A.  Occasionally.
3     Q.  And also over regular text?
4     A.  Occasionally, yes.
5     Q.  What kind of message did you send over
6 Signal to Mr. Wolfson versus over regular text?
7         MS. BRENNAN:  Objection.
8         THE DEPONENT:  Well, we had one example
9 here, articles, I see.  I might be expressing my
10 opinions on certain individuals or certain
11 activities that had taken place, or it could just be
12 about something that was in the news.
13 BY MS. VAUGHN:
14    Q.  How long have you had the practice of
15 deleting every text message on your phone?
16    A.  For a long time.
17    Q.  When you say "a long time," is that more
18 than a year, more than five years?
19    A.  I regularly -- I've never allowed -- I've
20 never -- I never allowed any -- any text messages to
21 remain on my phone beyond -- they're normally --
22 they're normally be deleted within 30 days.  My
23 practice has been to delete them sooner than that.
24 And a limit would be 30 days.  The reason for
25 leaving them on there would simply be that they had

Page 371

1 some type of, for example, sentimental reason for me
2 or that they contained dates about meetings where
3 I'd be meeting a friend or a family member or
4 something of that.  So I would -- I would remember
5 to keep them to put them on my calendar.
6     Q.  Did someone tell you to start using Signal
7 or did you decide that on your own?
8         MS. BRENNAN:  Objection.
9         THE DEPONENT:  So I was saying, I believe
10 it -- I had a conversation with Council member
11 Keegan Callahan, and he recommended to using Signal.
12 BY MS. VAUGHN:
13    Q.  At the time that you were -- at the time
14 that -- that grants were being reviewed for
15 termination in spring of 2025, there were still
16 active grants from the -- the first Trump
17 administration; is that right?
18    A.  I don't -- I couldn't say offhand.  My --
19 my speculation would be that most of those had
20 terminated.  The grants don't -- typically,
21 individual grants don't extend beyond a year or two.
22 Depending on the type of arrangement with an
23 institution, it's possible there may have been still
24 outstanding Trump awards, but I can't say.
25    Q.  Did you ever review outstanding Trump

Page 372

1 awards for potential termination?
2     A.  I don't recall ever inquiring into
3 outstanding Trump awards for termination.
4     Q.  Did you tell Mr. Fox and Mr. Cavanaugh
5 that they should only focus on reviewing Biden
6 grants for termination because there was a lot of
7 DEI, gender ideology, and environmental justice
8 material in those projects?
9     A.  No.
10    Q.  You did not tell them that?
11    A.  No.
12    Q.  You're aware that we've deposed Nate
13 Cavanaugh?
14    A.  Yes.
15    Q.  So if he told us that you said they should
16 focus on Biden grants because they had a lot of DEI
17 in them, that was not true?
18        MS. BRENNAN:  Objection.
19        THE DEPONENT:  I'd have to know the
20 context.  My -- my understanding was that there was
21 going to be a reset.  That the presumption was that
22 grants, open grants that were made under the Biden
23 administration needed to be reviewed.  I don't
24 recall that that idea originated with me, so I -- I
25 might have to disagree with Mr. Cavanaugh if that --

Page 373

1 if that was his testimony.  It was certainly the
2 case that I -- if you -- I'm not even sure when I --
3 how that first came up.
4         But there was going to be a general reset,
5 and I believe that that occurred at the time that
6 the DOGE people arrived here.  And it could have
7 been the case that I also added, yes, it's -- it's
8 good that we -- we look at all the DEI grants that
9 were made under the previous administration.  So
10 again, I -- without knowing, you know, the context
11 of what you're saying, he said, I can't -- I can't
12 say.
13 BY MS. VAUGHN:
14    Q.  Now, we've been talking about grants that
15 were canceled approximately ten months ago; is that
16 correct?
17    A.  Yes.
18    Q.  In your experience, would your perception
19 of events be more accurate at the time those events
20 were happening or today ten months later?
21        MS. BRENNAN:  Objection.
22        THE DEPONENT:  It's difficult to say.  It
23 depends on the -- on the events and in my
24 recollection today.  Certain things one has a better
25 recollection of.  I would probably say in general,