**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| THE AUTHORS GUILD, WILLIAM GOLDSTEIN, ELIZABETH KADETSKY, VALERIE ORLANDO, KATALIN BALOG, BENJAMIN HOLTZMAN, LEE JASPERSE, and NICOLE JENKINS, on behalf of themselves and all others similarly situated,<br><br>       Plaintiffs,<br><br>       v.<br><br>NATIONAL ENDOWMENT FOR THE HUMANITIES, et al.,<br><br>       Defendants. | Case No. 1:25-cv-03923<br><br>Consolidated with No. 1:25-cv-03657 |

**PLAINTIFFS' REPLY BRIEF IN SUPPORT OF**
**MOTION FOR CLASS CERTIFICATION**

**TABLE OF CONTENTS**

INTRODUCTION ............................................................................................................... 1

I.    The Mass Termination Was a Uniform Process That Led to a Uniform Result for the
      Proposed Class .................................................................................................... 1

II.   Underinclusiveness Is Not a Rule 23 Defect .................................................... 4

III.  The Proposed Class and Subclasses Satisfy Commonality and Typicality ........ 5

IV.   Certification Under Rule 23(b)(2) Is Appropriate ............................................. 8

CONCLUSION.................................................................................................................. 9

## TABLE OF AUTHORITIES

**Cases**

*Augustin v. Jablonsky (In re Nassau County Strip Search Cases),*
    461 F.3d 219 (2d Cir. 2006)........................................................................................ 9

*Denney v. Deutsche Bank AG,*
    443 F.3d 253 (2d Cir. 2006)........................................................................................ 4

*Gooch v. Life Investors Ins. Co. of Am.,*
    672 F.3d 402 (6th Cir. 2012) ...................................................................................... 9

*Heffernan v. City of Paterson,*
    578 U.S. 266 (2016)..................................................................................................... 6

*Marisol A. by Forbes v. Giuliani,*
    126 F.3d 372 (2d Cir. 1997)............................................................................... 6, 7, 8

*Neal v. Casey,*
    43 F.3d 48 (3d. Cir. 1994) ........................................................................................... 8

*Robidoux v. Celani,*
    987 F.2d 931 (2d Cir. 1993)........................................................................................ 7

*Thakur v. Trump,*
    No. 25 Civ. 4737 (N.D. Cal. 2025)............................................................................. 8

*Wal-Mart Stores, Inc. v. Dukes,*
    564 U.S. 338 (2011).......................................................................................... 1, 3, 4, 6, 8

**Rules**

Fed. R. Civ. P. 23(b)(2)..................................................................................................... 8

Fed. R. Civ. P. 23(c)(5)..................................................................................................... 7

**INTRODUCTION**

Justin Fox and Nathan Cavanaugh—two former DOGE members with no prior government experience, no background in humanities scholarship, and no grant administration experience of any kind—arrived at NEH in March 2025 and, within three weeks, terminated more than 1,400 grants through a single, centralized process and a single, centralized decision.  Every class member received the same boilerplate termination notice, drafted by Fox, sent from an email address Fox created for that purpose. The decision to cancel the grants was made by two people: Justin Fox and Nathan Cavanaugh. As this Court previously noted, "all putative class members had their grants terminated in the same way, at the same time, and for the same unconstitutional reasons," and that "[t]here is no need for any individualized assessment of whether each class member suffered the same First Amendment injury […]." ECF No. 116 ("PI Order"), at 78.[1]

The Government's opposition, ECF No. 268 ("Opp."), does not grapple with these facts. Instead, it offers three arguments: that the class definition is underinclusive, that the proposed class lacks commonality and typicality, and that Rule 23(b)(2) certification is improper. None of these arguments address the dispositive reality that the Mass Termination was a single uniform government action susceptible to a single uniform legal answer. The Court should certify the class.

I.    **The Mass Termination Was a Uniform Process That Led to a Uniform Result for the Proposed Class.**

The Government invokes *Wal-Mart's* "rigorous analysis" standard but fails to apply it rigorously. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 351 (2011). Any rigorous analysis applied to these archetypal facts compels certification. Two individuals effectuated the Mass Termination. One of them, Justin Fox, drafted a ChatGPT prompt that he ran more than 1,000

---

[1] Unless otherwise noted, all docket citations are to the ACLS docket, No. 25-cv-3657.

grants through to spit out a "Yes/No" answer to whether they were "DEI." Fox also drafted the model Mass Termination notice and duplicated it for each grantee, changing only ministerial details like the recipient's name. He created a single email address that delivered the Mass Termination notice to every class member in the same two-day span. This same boilerplate language, citing the same executive orders, invoking the same "exceptional circumstances," reached the entire putative class.

There was nothing individualized about any of this process. The legal questions that follow—*i.e.*, whether the Mass Termination violated the First Amendment, Equal Protection, or exceeded DOGE's statutory authority—have answers that apply to every class and subclass member in one stroke.

Indeed, when this Court conducted its analysis of the record at the preliminary injunction stage, it found precisely that: "all putative class members had their grants terminated in the same way, at the same time, and for the same unconstitutional reasons," and thus that Plaintiffs' argument "appears sufficient, on its own, to provide a common legal question to all purported class-members, on which the named plaintiffs' claims are typical," and that "[t]he individual impacts described above are not atypical of the injuries suffered by other members of the proposed class." PI Order at 78, 79, 29.

The Government does not identify a single development in the record since that ruling that would justify a different conclusion now—no evidence that any grant *actually received* the kind of "individualized deliberation" the Government suggests would defeat certification. Opp. 7. To the contrary, discovery has confirmed what the Court observed at the PI stage. Fox compiled a list of over 1,000 grants that promoted "DEI" and then terminated them on that basis. As Cavanaugh testified, any grant "related to DEI" could not be on the "keep" list. Ex. 1 (Cavanaugh Dep.) at

202:14-20.[2] Fox then compiled a list of "Biden-era" grants that were not on the DEI list and then terminated them on that basis. McDonald described this latter process as terminating "the last four years of open grants from the Biden administration" to achieve "a clean slate." Ex. 2 (McDonald Dep.) at 226:12-227:1. Fox then sent the identical boilerplate notice to every class member on the same day from an email address he created for that purpose. Ex. 3 (Fox Dep.) at 279:14-279. McDonald described the Mass Termination to other NEH employees as follows: "[a]t the discretion of the White House, as communicated to us through DOGE, and as conveyed to grantees through DOGE on April 2, we have terminated roughly 1400 grants to individuals, institutions, and the State Humanities Councils." Ex. 4, US-000064703.

The Government is right that, under *Wal-Mart*, it is not enough that all class members allege violation of the same provision of law, Opp. at 9; instead, the Court held that a proposed class's "claims must depend upon a common contention—for example, the assertion of discriminatory bias on the part of the same supervisor." *Wal-Mart*, 564 U.S. at 350. Plaintiffs here easily meet that standard: they allege, and the evidence shows, that two DOGE officials planned and executed the Mass Termination with respect to all class members, and in doing so, were motivated by discriminatory animus against viewpoints, political associations, and race, gender, and sexual orientation classifications that they disfavored. Plaintiffs further allege that those same two DOGE officials lacked authority to carry out those actions. Those allegations can be resolved uniformly across the class.

---

[2] All "Ex." citations refer to exhibits to the Declaration of Yinka Onayemi.

That there may be hypothetical disagreements about what does or does not actually constitute "DEI," *see* Opp. at 8 (arguing DEI has distinct subcategories),[3] cannot change the fact that these two individuals used that moniker, alongside grants' associations with the Biden Administration, as their bases for canceling the grants awarded to the Proposed Class.  This case thus readily satisfies *Wal-Mart*'s requirement that there be "some glue holding the alleged *reasons* for all those [terminations] together."  564 U.S. at 352.

## II.    Underinclusiveness Is Not a Rule 23 Defect.

The Government suggests that the Proposed Class is defective because approximately 46 terminated grants were awarded before January 20, 2021 and are excluded from the class as defined by Plaintiffs. ECF No. 268 at 6 ("In fact, a subset of the terminated grants were awarded prior to January 20, 2021 (during the prior Trump administration), and therefore are not included in the Proposed Class"). This is not a Rule 23 argument. The question at class certification is whether the class is *over*inclusive, *i.e.*, whether it sweeps in people who were not injured by the challenged conduct. *See Denney v. Deutsche Bank AG*, 443 F.3d 253, 264 (2d Cir. 2006) ("no class may be certified that contains members lacking Article III standing" and "[t]he class must therefore be defined in such a way that anyone within it would have standing"). The Government's argument runs in the completely wrong direction. It faults Plaintiffs for excluding approximately 46 grantees from the class definition. But *under*inclusiveness is not a Rule 23 defect. Plaintiffs are entitled to define a class narrower than the full universe of potentially injured persons, and nothing in Rule 23 requires otherwise.

---

[3] To be clear, there is no evidence in the record that Justin Fox, Nate Cavanaugh, or ChatGPT understood or were motivated in any way by nuanced distinctions about different types of "DEI."

Moreover, the class definition as defined by Plaintiffs is deliberate: It tracks the grants Fox and Cavanaugh *actually* targeted: (i) Biden-era grants, which McDonald described as the intended scope of the termination and (ii) grants terminated for being "DEI," whether that label was applied by ChatGPT, Fox, or someone else. That Cavanaugh and Fox may have terminated 46 grants from an earlier period that Plaintiffs have not included in the proposed class does not make the class definition improper. If anything, it confirms that Plaintiffs' definition errs on the side of precision.

### III.    The Proposed Class and Subclasses Satisfy Commonality and Typicality.

The Government's commonality and typicality arguments are not that individual factual differences between grants generate different legal questions. It is that the legal theories Plaintiffs assert—*i.e.*, First Amendment viewpoint discrimination, Equal Protection, and ultra vires conduct—may apply differently to different grants depending on the circumstances of each termination. Opp. at 9-11.

The Government's position ignores the facts. Determining "whether particular grants were terminated on the basis of 'DEI' affiliation" does not "require analysis of the individual grants." Opp. at 7. It doesn't really require any "analysis" at all. It requires looking at a single spreadsheet, where all 1,046 such grants are listed and marked with "Yes" in a column titled "Yes/No DEI?" Ex. 14 to Mot. for Class Cert. The Government seems to want this Court to sift grant-by-grant to decide whether each one is *in fact* DEI or a Biden-era grant. But such an individualized review is not necessary, in large part because it is not—and, indeed, would go far beyond—what Defendants themselves did when they canceled the grants. Instead, Defendants (primarily Fox) labelled class members' grants as DEI and then canceled them on that basis. Even if Fox and Cavanaugh were mistaken in their belief that anything about Black civil rights or the Holocaust was "DEI," for example, their blanket designation of all such grants for cancelation because they believed it was

5

"DEI" at the time is all that matters for the First Amendment analysis. *See Heffernan v. City of Paterson*, 578 U.S. 266, 272 (2016). The relevant factual question is whether Defendants terminated the grants because they were "DEI," and the relevant legal question is whether terminating them on that basis violated the First Amendment. Those questions are common to the class.

More broadly, the Government cannot selectively atomize a policy it centrally designed and uniformly executed for 1,400 individual termination decisions just for purposes of defeating class certification. *Wal-Mart* itself helps to illustrate why. The Supreme Court found no commonality in *Wal-Mart* in part because the challenged employment decisions were made by individual store managers exercising independent discretion; put differently, the Supreme Court found that there was no "glue" holding the class members' claims together. *Id*. at 355 ("Without some glue holding the alleged *reasons* for all those decisions together, it will be impossible to say that examination of all the class members' claims for relief will produce a common answer to the crucial question *why was I disfavored.*"). The opposite is true here. Two individuals made all of the Mass Termination decisions. The same processes were followed. One person drafted each notice. One email address delivered them. The "glue" here is the Mass Termination process itself, exercised primarily by Fox, with the help of Cavanaugh, McDonald, and Wolfson.

To the extent different legal theories bear differently on different subsets of the class, the subclass structure Plaintiffs proposed addresses exactly that. *See* Plaintiffs' Motion for Class Certification ("Mot."), at 2-10. Rule 23(c)(5) expressly authorizes courts to divide a class into subclasses where doing so ensures that each subset of the class presents legally uniform claims. Fed. R. Civ. P. 23(c)(5); *see Marisol A. by Forbes v. Giuliani*, 126 F.3d 372, 379 (2d Cir. 1997) (through the use of subclasses, "[t]he district court will be able to conduct the trial in a more orderly

6

manner, by tying the order of proof to particular claims raised by the individual subclasses"). That is precisely what Plaintiffs have done here. The DEI Subclass presents a uniform question about whether terminating grants because they promote DEI constitutes unconstitutional viewpoint discrimination, a violation of constitutional equal protection, or both. The Biden-Era Subclass presents a uniform question about whether presumptively terminating grants because they were awarded during a prior administration constitutes unconstitutional viewpoint discrimination. And because every grant in both subclasses was terminated at DOGE's direction, every class member necessarily presents a common question at large: whether DOGE possessed legal authority to direct the termination of NEH grants at all.

Typicality, which Defendants also challenge, follows from the same analysis, as the Government notes.  Opp. at 11 (citing *Wal-Mart* for proposition that commonality and typicality "tend to merge").  Each named Plaintiff received the same boilerplate notice, was subjected to the same so-called review process, and seeks the same declaratory and injunctive relief—as do the class and subclasses that they represent. And to the extent variation exists within the class, Plaintiffs have already done precisely what Rule 23(c)(5) contemplates: proposed subclasses that ensure each subset of the class presents legally uniform claims. Fed. R. Civ. P. 23(c)(5); *Marisol*, at 379 ("the identification of subclasses will allow the district court to weed out, and, if necessary, dismiss those claims for which no named plaintiff is an adequate representative"). The Second Circuit has recognized that plaintiffs may satisfy typicality even when the class representatives experience only a subset of a broad constellation of harms caused by the defendants' conduct. *Robidoux v. Celani*, 987 F.2d 931, 936-37 (2d Cir. 1993) ("[W]hen it is alleged that the same unlawful conduct was directed at or affected both the named plaintiff and the class sought to be represented, the typicality requirement is usually met irrespective of minor variations in the fact

7

patterns underlying individual claims"); *Marisol,* at 376-77; *see also Neal v. Casey*, 43 F.3d 48, 63 (3d. Cir. 1994) ("We emphasize that the individual differences in the children's circumstances might indeed militate against certification if the action sought certification under 23(b)(3) because a court would need to evaluate those differences in the event that the plaintiffs prevailed and were entitled to monetary damages. In fashioning injunctive relief, however, a court would focus on the defendants rather than on the plaintiffs"). Finally, this Court has already found those claims typical, *see* PI Order at 29, and the Government's opposition offers nothing that disturbs that finding.

### IV.    Certification Under Rule 23(b)(2) Is Appropriate

Rule 23(b)(2) requires that the Government have "acted or refused to act on grounds that apply generally to the class." Fed. R. Civ. P. 23(b)(2). The record establishes that it did. The Mass Termination was a single centrally executed government action applied categorically to a defined group of grantees. The relief Plaintiffs seek—vacatur of the Mass Termination and restoration of the unlawfully terminated grants—is indivisible. A declaration that the Mass Termination was unlawful would benefit every class member identically. An injunction requiring grant reinstatement on that basis would restore every class member's grant. That is precisely the "indivisible nature of the injunctive or declaratory remedy" that Rule 23(b)(2) is designed to address. *Wal-Mart*, 564 U.S. at 360. This Court recognized as much at the preliminary injunction stage, ECF No. 122, and no evidence garnered in discovery has shown otherwise.

The Government raises *Thakur v. Trump*, No. 25 Civ. 4737 (N.D. Cal. 2025), arguing that some proposed class members may have received reinstatement in that proceeding and that the Court would therefore need individualized inquiries to determine what relief to award here. ECF No. 268 at 14. This is a remedy question, not a certification question. Whether particular class members may have received some form of relief in a separate proceeding has no bearing on

whether Plaintiffs' class definition satisfies Rule 23's requirements. Rule 23(b)(2)'s certification inquiry specifically asks whether "the party opposing the class" (here, Defendants) acted on grounds generally applicable to the class, not how any individual member is currently situated. Concerns about individualized remedy complications are addressed after certification—not before it—through the court's management tools. *See Augustin v. Jablonsky (In re Nassau County Strip Search Cases)*, 461 F.3d 219, 231 (2d Cir. 2006) (instructing that individualized damages concerns are addressed through "bifurcation, the use of a magistrate or special master, alteration of the class definition, the creation of subclasses, or even decertification after a finding of liability," not by denying certification); *see also Gooch v. Life Investors Ins. Co. of Am.*, 672 F.3d 402, 428 (6th Cir. 2012) (overlapping class membership in separate proceedings does not defeat certification; duplicative recovery concerns are addressed at the remedy stage). The indivisibility of the injunctive remedy Plaintiffs seek is not diminished by the existence of a separate action.

## CONCLUSION

More than 1,400 NEH grants were terminated in a single week by four people through a single process. This Court previously found that no individualized assessment of class members' injuries is needed. The Government's opposition offers no reason to reach a different conclusion. The Court should certify the class.

Dated: March 24, 2026

Respectfully submitted,

/s/ *Yinka Onayemi*
Jamie Crooks
Michael Lieberman
Amanda Vaughn
Yinka Onayemi
FAIRMARK PARTNERS, LLP

400 7th Street NW, Suite 304
Washington, DC 20004
Telephone: (619) 507-4182


*Attorneys for Plaintiffs and the Proposed Class*