# EXHIBIT 1

**In the Matter Of:**

*The Authors Guild vs*

*National Endowment for the Humanities*

*NATHAN CAVANAUGH*

*January 23, 2026*



1

UNITED STATES DISTRICT COURT

for the

SOUTHERN DISTRICT OF NEW YORK

Civil Action No. 25-cv-3923

THE AUTHORS GUILD, et al.,

                Plaintiff,

          vs.

NATIONAL ENDOWMENT FOR THE HUMANITIES,
et al.,

                Defendant.


          T R A N S C R I P T of the deposition
of NATHAN CAVANAUGH taken stenographically before
Lisa Forlano, Registered Diplomate Reporter,
Certified Realtime Reporter, Certified Court
Reporter - NJ and Notary Public, held at the offices
of Schindler Cohen & Hochman LLP, 100 Wall Street,
Suite 1500, New York, New York 10005, on Friday,
January 23, 2026, commencing at 9:41 a.m.

Nathan Cavanaugh - January 23, 2026

2

A P P E A R A N C E S:


            JACOBSON LAWYERS GROUP PLLC
            BY:  JOHN ROBINSON, ESQUIRE
                 KYLA SNOW, ESQUIRE
            5100 Wisconsin Avenue, NW
            Suite 301
            Washington, DC  20016
            (301) 823-1148
            John@JacobsonLawyersGroup.com
            Kyla@JacobsonLawyersGroup.com
            ATTORNEYS FOR PLAINTIFF, ACLS


            FAIRMARK PARTNERS, LLP
            BY:  YINKA ONAYEMI, ESQUIRE
            400 7th Street, NW #304
            Washington, DC  20004
            (617) 642-5569
            yinka@fairmarklaw.com
            ATTORNEYS FOR THE PLAINTIFF,
            THE AUTHORS GUILD


            US ATTORNEYS' OFFICE
            BY:  RACHAEL DOUD, ESQUIRE
            86 Chambers Street
            New York, NY 10007
            (212) 637-2699
            rachael.doud@usdoj.gov
            ATTORNEYS FOR THE DEFENDANT


            ALSO PRESENT VIA ZOOM:

            DANIEL JACOBSON, ESQUIRE - JACOBSON
            LAWYERS

            LYNN EISENBERG, ESQUIRE - JACOBSON LAWYERS

            SARAH MARTIN, ESQUIRE - JACOBSON LAWYERS

            ANNIE CLEAVER, ESQUIRE - FAIRMARK PARTNERS

            JAMIE CROOKS, ESQUIRE - FAIRMARK PARTNERS

            AMANDA VAUGHN, ESQUIRE - FAIRMARK PARTNERS

Nathan Cavanaugh - January 23, 2026

3

ALSO PRESENT:

DYLAN BORSOS, VIDEOGRAPHER

36

A        I didn't work with James on any specific project, but he was a senior lawyer for the DOGE team.

Q        Did you work with him in connection with the NEH?

A        No.

Q        What did you work with him in connection with?

A        James served as an escalatory legal figure for the DOGE team.  He would generally get involved in projects, to the extent that one of the other mid-level attorneys could not answer a question.

Q        How often did that happen?

A        Infrequently.

Q        Would you go to him, then, or would someone -- one of the more junior lawyers escalate it to him?

A        It would mostly be a more junior lawyer would escalate to James.

Q        Okay.  Who's the next individual on this list that you worked with?

A        Steve Davis.

Q        And what did you do with Mr. Davis?

Nathan Cavanaugh - January 23, 2026

37

A       Steve was effectively my manager at DOGE.

Q       You said he was effectively your manager?

A       Yes.

Q       Did he oversee your work with the NEH project specifically?

A       No.

Q       Which projects did he oversee?

A       He assigned me to work and lead the small agencies team for DOGE.  Beyond assigning me that responsibility, he wasn't intimately involved in my day-to-day work.

Q       What was the small agencies team?

A       The small agencies team was the team at DOGE that was assigned and detailed from typically GSA to small Federal agencies in the Government, including NEH.

Q       Who was on that team?

A       Myself, Justin Fox, Ethan Shaotran.  And then later Marshall Wood, Jonathan Mendelson.  Initially Jacob Altik, although he wasn't after a couple of months. And then Justin Aimonetti took his place as the

38

new lawyer on our team.

Q      And what was the goal of the small agencies team?

A      It was to identify wasteful spend within the small agencies in the Federal Government.

Q      Which agencies were those?

A      There were about 100 small agencies on -- in our scope and purview, although we were mostly focused on agencies that were in executive orders, and those were the primary focus.

Q      How often did the small agencies team meet?

A      Daily.

Q      Was there a particular time of day?

A      No.  Most of the small agencies team, with the exception of Justin Aimonetti, were physically present at GSA as the home base.

Q      So you would meet at GSA every day, but the time varied?

A      Mostly business working hours.

Q      Okay.  And what would be

39

discussed at these daily meetings?

A    It wasn't a formal daily meeting.  It was you showed up to GSA for work. And the nature of our work was mostly focused on the status of projects regarding the small agencies.

Q    Okay.  We might return to that later, but I can move on for now.

I think we can take our -- no, we were still going through.  So let's move past Mr. Davis.

Who's the next individual on this list that you worked with?

A    I worked with Adam Ramada when I first joined the DOGE team, on the organizational chart that we referenced earlier.

Q    Did you work with him in any other capacity?

A    No.

Q    Who is the next individual?

A    Nobody else in a formal project capacity.

Q    Okay.  I think we can take this down, then.  Thank you.

105

MR. ROBINSON:  Let's take a look at the next document, which we'll mark as Plaintiff's Exhibit 9.

(E-mail dated 3/12/25, AR3, was marked P-9 for identification.)

BY MR. ROBINSON:

Q    This is Bates-labeled AR3.  This is a March 12, 2025, 3:11 p.m. e-mail from you to Mr. McDonald, copying Justin Fox.

Does this look familiar to you?

A    Yes.

Q    You recall sending this?

A    Yes.

Q    So the first paragraph says, "Attached is a list of grants that were awarded during President Biden's administration, January 20, 2021 through January 19, 2025, at NEH."  And then it's -- I'll skip the next sentence.  And then it says, "In summary, 1,295 grants, $376 million obligated, $54 million outlaid, spent, $322 million remaining can presumably be clawed back."

And then you say, "I also flagged the $25 million in grants that we referenced in our meeting in a separate tab."

Nathan Cavanaugh - January 23, 2026

106

So a few questions.

This summary information that you provide here in the bullet points, how did you get that information?

A       It's publicly available data.

Q       On USAspending?

A       Yes.

Q       What did you do to generate the attachment, the spreadsheet?  Did you run a report in USAspending or something else?

A       We searched for NEH, used a filter for the date range mentioned here, and then clicked to download.

Q       Okay.  Why did you only list grants that were awarded during President Biden's administration?

A       Because that was what was in reference to the executive order.

Q       What do you mean by that?

A       Let me find the -- in paragraph 6 of Mike's declaration, those are the executive orders in which I'm referencing.

Q       The executive orders referenced grants and contracts issued by the Biden Administration specifically or by -- or all

107

active grants and contracts?

A        I don't understand your question.

Q        There were grants or contracts issued in NEH and other agencies under the first Trump Administration, for example, correct?

A        I believe so, yes.

Q        So why did you attach a list of grants here that were issued only under the Biden Administration and not prior administrations?

A        We reviewed prior administration grants as well, but it was Mike's belief, and Adam's, that during the Biden Administration there was a significant number of grants related to these executive orders that were issued under those four years.  And so that was the primary initial focus that Mike and Adam asked us to focus on.

Q        When did they ask you to do that?

A        That would have been in our in-person meeting.

Q        And you then generated this

Nathan Cavanaugh - January 23, 2026

108

spreadsheet, correct?

A     Yes.

Q     Let's take a look at it. Actually, before we do, just a few more questions on this e-mail.

You say after the bullets, "I also flagged the 25 million in grants that we referenced in our meeting in a separate tab."

What was that 25 million?

A     I don't recall.  But if you pull up the spreadsheet, we can look at it.

Q     Okay.  Before we do, the meeting that's referenced in this e-mail, was that in person at NEH?

A     Yes.

Q     And who was at the meeting?

A     It was myself, Justin Fox, Mike McDonald, and Adam, his deputy or COO.  I don't remember Adam's last name.

Q     Wolfson?

A     Adam Wolfson.

Q     So the four of you?

A     I believe so, yes.

Q     And so this e-mail was sent on March 12th in the afternoon at 3:00.  Do you

109

know if the in-person meeting was earlier that day or --

A        It was the same day.

Q        Same day.

         About how long did the meeting last?

A        About an hour.

Q        And what was said at the meeting?

A        I don't recall all the details in the meeting.  We introduced ourselves, explained to Mike why we were there, to try and support him in reviewing the executive -- basically, to remain compliant with the executive orders that the White House had just signed.  Mike said he was excited to help us come in and help review the data.  And we promised him at the end of the day that we would send him a list of the grants that were outstanding under the Biden Administration initially, because Adam mentioned that their belief was that there was a large increase in the number of grants under this EO that were issued during that time.

Q        That was something that Adam

110

said?

A        I believe so, yes.

Q        Okay.

A        It was both of them mutually agreeing.  And I think Adam was the one that definitively said it and Mike agreed.

Q        Okay.  So at the end of the meeting -- who kicked off the meeting, was it you or Justin?

A        It was probably me, just introducing myself and Justin.  And then they provided an intro.

Q        Okay.  And what was their -- what did they say in their intro?

A        I don't recall exactly.  It was their background, how long they'd been at NEH, et cetera.  Just general information about their personal backgrounds.

Q        You say in this e-mail that 376 million had been obligated.  What's your understanding of the term "obligated" in this context?

A        Obligated means, as I understand it, when a grant is issued to a recipient, the obligated amount is the total, potential amount

113

orders.  And then if you scroll down further there were others that were also, in our view, potentially in violation of the EOs that we flagged for their team.

Q      And when you say "in our view," you're referring to yourself and Mr. Fox?

A      Yes.

Q      How did you come up with this list of craziest grants?

A      We looked at both the master list of grants on Tab 1 and the subset of grants under the Biden Administration on Tab 2.

Q      When you say you looked at the grants, what do you mean?

A      We read the description in the relevant column.

Q      So we could go back and look at that, but that's typically like a paragraph, right, a paragraph description?  Does that sound right?

A      You can go back and look.

Q      Yeah, let's look at one.

MR. ROBINSON:  So let's go to "Biden Grants" maybe.  And if we can scroll over to -- just look at Row 3

114

here.

BY MR. ROBINSON:

Q      So looking at Row 3, Column J, this is an example of a -- of a grant description, right?

A      Yes.

Q      I'll just read the first few words.  It says, "Documentary about Shirley Clarke, founder of American Independent Film. How do you break into the boys' club of film directing?"  And then it goes on for a few more sentences, right?

A      Yes.

Q      So you looked at this description.  Did you look at anything else?

A      The primary fields we were reviewing were the description column, the amount of the grant, and then whether there was still any funds associated with the grant that were outstanding.

Q      Did you look at anything outside the spreadsheet?

A      To instruct what was going on Tab 2 and Tab 3?

Q      Yes.

Nathan Cavanaugh - January 23, 2026

115

A        No.

Q        So you didn't look at like grant applications?

A        We did not.

Q        Or you didn't look at like the website for the grant project?

A        That's right.

Q        Your review was restricted to this spreadsheet in terms of identifying grants in Tab 3?

A        The description, as you can see, is quite exhaustive.  And so, yes, we referenced the description.

Q        In your view, that's an exhaustive --

A        Description?

Q        -- accounting of the grant?

A        I think it's a thorough description of what the grant is related to, yes.

Q        And then let's go back to the "Flagged Grants" tab.  There's a column on this tab called "Shorted Description"?

A        Yep.

Q        What's that?

116

A    It's a summarized version of the full description on the prior tab, so that it's easier for Mike and Adam to review what the grant is pertaining to.

Q    And that's something that you generated?

A    Myself and Justin split the list.

Q    Okay.  I want to ask you about a few of these.  So if we go to Row 15, the shorted description, yeah, is -- it says, "Examining experiences of LGBTQ military service."

MR. ROBINSON:  And then if we go -- go to the long description, which I think is the next column over maybe or -- you can stay in that "Flagged Grants" and just go one over maybe.  Yeah, long description.  If we can expand.  Perfect.

BY MR. ROBINSON:

Q    So I'll just read this one.  It says, "Examining military service from the margins [the complicated service discussion series will bring together veterans and community members to examine the experiences of

117

service members who identified themselves as female, black, Native American, LGBTQ, foreign immigrant, and the dynamics, reasoning, and strength behind serving a country that does not always serve you in return.]"

Did I read that correctly?

A    Yes.

Q    You and Mr. Fox identified this as one of the craziest grants at NEH?

A    I don't know.  Go to the left.

Yes, it appears so.

Q    Why did you do that?

A    Because it explicitly says LGBTQ.

Q    Let's look at another one, Row 20.  The shorted description here is "Legacies of HIV/AIDS Prison Movements in the United States."  And I'll just read the long description.

This says, "A history of the HIV/AIDS prison movement and its legacies in the United States.  My book project narrates how activists fought the convergence of HIV/AIDS and incarceration from inside and outside prisons across the Reagan through

Nathan Cavanaugh - January 23, 2026

118

Clinton years and argues that this organizing holds legacies in the prison abolition movement of the 1990s to today.  Drawing on archival and community-engaged research and oral history, I examine how incarcerated people organized HIV education and AIDS care work and how supporters collaborated in protests and advocacy campaigns.  The movement prolonged lives, changed policies and confronted state-sanctioned harms, with strategies for a freer and healthier society.  I argue that by fighting HIV/AIDS in prisons, activists came to confront incarceration itself, bringing feminist and queer insights into prison abolition.  My book will be of interest to scholars of history, gender and LGBQT studies and the medical humanities, general readers interested in incarceration, abolition and the impacts of HIV/AIDS and other pandemics."

Did I read that correctly?

A     Yes.

Q     This is one of the grants that you or Mr. Fox identified as craziest of NEH; is that right?

A     That's right.

Nathan Cavanaugh - January 23, 2026

119

Q    Do you recall whether you identified it as craziest or whether Mr. Fox did?

A    I don't recall.

Q    Why did you identify this as one of the craziest grants?

A    Because it references feminist and queer insights into prison abolition and LGBTQ studies.

Q    Any other reasons?

A    No.

Q    There's a section later on in this spreadsheet called "Bad Grants."  If we could scroll down to that.  It says "Other Bad Grants."

What were these?

A    So in addition to our work of identifying grants related to DEI or others in the executive orders that we referenced previously, we also helped Mike and Adam identify other potential wasteful grants outside of DEI that we thought were potential for being canceled.

Q    Let's take a look at Row 36.  So the short description here is "Documentary on

Nathan Cavanaugh - January 23, 2026

120

Shirley Clarke, founder of American Independent Film, DEI films."

And I'll just read the long description.  It says, "Documentary about Shirley Clarke:  Founder of American Independent Film.  [How you break into the boys' club of film directing?  Shirley Clarke was a groundbreaking artist and a leader of the movement that created independent film in the United States.  She declared war on Hollywood by telling stories about people who had always been excluded from the big screen.  Black stories, gay stories, true stories.  She was the only American to women -- to win recognition for her independent films in the 1960s, but then she was almost excluded herself, written out of film history.  In our film her contributions and extraordinary life come back to life.  The timely tale of cool, identity and struggle in New York City, Cannes and Los Angeles from the 1950s to 1980s with jazz.]"

Did I read that correctly?

A    Yes.

Q    Again, Mr. Fox identified this

121

as one of the bad grants, correct?

A    Correct.

Q    Why did you identify it as a bad grant?

A    We -- the same reason as previously.

Q    Could you just say it again?

A    Sure.

We felt that it was in violation of the White House executive orders.

Q    How so?

A    Can you read the description again and I'll catch you when it violates it?

Q    I'm happy to.  It's also on the screen, if you'd prefer to just take a look.

A    Can you go to the name of the grant again as well?

Q    The short description is, "Documentary on Shirley Clarke, founder of American Independent Film."

A    Yeah, we felt it was in violation of the Executive Order 14151.

Q    Why?

A    Ending radical and wasteful Government DEI programs and preferencing.

122

Q    Well, that's the name of the executive order.  Why did this grant violate that executive order?

A    Because it references DEI.  It's literally in the name of the grant.

Q    And the prior examples you also said were -- those were on the craziest list, you said that they were crazy because they referenced LGBTQ, correct?

A    Not LGBTQ specifically.

Q    Well, what specifically?  Let's take a -- let's just go back.  Let's go to Row 20.  This is "Legacy of HIV/AIDS prison movements in the United States."  And let's go to long description.

So I thought you had said that this one was crazy because it referenced LGBTQ, is that --

A    Among -- among other things.

Q    So what are the other things?

A    We felt the latter part of the description, specifically "bringing feminist and queer insights into prison abolition."  It goes on to say "gender and LGBTQ studies" and so forth.  So we felt that this referenced

Nathan Cavanaugh - January 23, 2026

123

LGBTQ preferencing and DEI altogether.

Q    And that made it one of the craziest grants the NEH had?

A    Craziest in the context of being in violation of the executive orders.

Q    And what's crazy about studying LGBTQ issues?

A    Nothing in -- on its surface, but it's craziest in its egregiousness of the violation of the executive order.

Q    For referencing LGBTQ studies?

A    Based on the executive order, yes.

Q    Okay.  Looking at that bad grant again, we were looking at Row 36.  This is the document around Shirley Clarke.

MR. ROBINSON:  Can we just go back to that long description?

BY MR. ROBINSON:

Q    I think you had said that this was bad because it referenced DEI, but it actually doesn't, I don't think.  Am I wrong about that?

MS. DOUD:  Objection.

THE WITNESS:  Can you go back to

Nathan Cavanaugh - January 23, 2026

124

the title of the grant?

BY MR. ROBINSON:

Q      So we don't have the title in this -- that's the shorted description, I believe.

MR. ROBINSON:  We can maybe go back to the title -- if we go to the "Biden Grants" tab.  Maybe search for "Shirley."  All right.  Maybe we'll come back to that.

BY MR. ROBINSON:

Q      But if we look at the long description at least, the term "DEI" or "diversity, equity and inclusion," that's not in the description?

A      The explicit term "DEI" is not in the description, correct.

Q      Was there something in the description that you thought made it one of the bad grants?

A      Yeah.  Can we read it again?

Q      Yes, please.

A      So I think the line about black stories, gay stories, true stories related to preferencing in the executive order that we

Nathan Cavanaugh - January 23, 2026

128

A        We read the program name, the recipient, the description and the award value to which -- to the extent that it existed.

Q        And what did you do with that information?

A        We looked at their -- I have not seen all the columns in this file.  I don't know.  Can you zoom out a little bit or go across the spreadsheet?

What did we do with it?  We read it.

Q        Yeah.  For what reason?

A        To determine whether we agreed or disagreed with their -- or I guess more specifically with Brett Bobley's review of the grants that were identified here for being in violation of the executive orders or referencing DEI or gender ideology or environmental justice.

Q        So this was a spreadsheet compiling information that NEH staff had put together; is that right?

A        Yes.

Q        And you were reviewing it to see whether you agreed or disagreed with their

Nathan Cavanaugh - January 23, 2026

129

designations?

A      Yes.

Q      Okay.  Did you talk to Mr. McDonald or Mr. Wolfson about this?

A      Yes.

Q      When?

A      I don't recall the exact date. It would have been in a subsequent meeting after the 13th of March.

Q      What was said at that meeting?

A      I don't recall exactly.

Q      What did you convey to them about your thoughts and suggestions about this spreadsheet?

A      So Justin and I compiled a list that you had just seen in the previous tab -- previous file.  And we basically reconciled their review of their own grants versus our review of their grants and then worked together to try and come up with a final list of grants that were either in violation because of DEI or because they were wasteful in Mike's view.

Q      The list that we were just looking at, you compiled that before reviewing this list, right?

Nathan Cavanaugh - January 23, 2026

130

A       That's right.

Q       And you sent it to Mr. McDonald and Mr. Wolfson before Mr. Wolfson sent you this list, right?

A       Yes.

Q       So you then took this spreadsheet, reviewed it and compared it to the list that you had done before seeing this?

A       Yes.  But the grants at NEH are exhaustive.  And we had the entire list before coming up with our own list.

Q       Okay.  But you didn't have the staff comments, right?

A       That's right.

MR. ROBINSON:  Okay.  All right. I think this is probably a logical place to break for lunch.  So we can go off the record.

VIDEO OPERATOR:  The time is 11:58 and we're now going off the record.

(Lunch recess.)

VIDEO OPERATOR:  The time is 12:51 and we're now back on the record.

BY MR. ROBINSON:

Q       Good afternoon, Mr. Cavanaugh.

Nathan Cavanaugh - January 23, 2026

144

like it would have been a meeting between the four of you?

A    Yes.

Q    Yourself, Mr. Fox, Mr. McDonald and Mr. Wolfson?

A    Yes.

Q    You don't recall anyone else at that meeting?  I know you said you didn't recall specifically, but --

A    Occasionally Mike would have brought in his -- I believe it was the director of HR or the interim acting general counsel, but I don't recall if she was in this meeting or not.

Q    What was her name?

A    I don't remember.

Q    Okay.  So this was a meeting that you had shortly after Mr. Fox sent over this spreadsheet.  Does that refresh your recollection as to what was discussed at this -- at this meeting?

A    I think it was a meeting in person to understand what Mike and Adam's view were of the grant recommendations we had proposed for termination.

Nathan Cavanaugh - January 23, 2026

145

Q      Okay.  Do you recall what they said?

A      They, I believe, were directionally in line with our recommendations, but had flagged that certain grants we flagged for termination were not only related to DEI, but they were also just generally, in our view, wasteful grants.  And so they were trying to understand why we had recommended grants outside of just DEI for termination, to which our response was, our mandate outside of just DEI is to help find wasteful spending within each agency, and these are additional ones we feel are wasteful.

Q      Do you remember specifically what Mr. McDonald and Mr. Wolfson said?

A      I don't specifically remember, no.

Q      And what you were saying just now about the difference between grants that might affect DEI, and grants that might not, but were otherwise wasteful, was that something that Mr. McDonald said, to your recollection, or Mr. Wolfson or --

A      I believe it was both of them.

Nathan Cavanaugh - January 23, 2026

146

Q      Okay.  And how did you respond when they said this?

A      When they said what?

Q      That, you know, they had seen the list and seen grants that were discussing DEI, but wanted to understand why there were other grants that didn't implicate DEI on the list, what did you say?

A      We -- we said what I just told you, which was that in addition to helping them stay compliant with the executive orders, there's another mandate separate from that, which is we're working with each agency head to identify potential wasteful spending, which included grants, contracts and personnel.  And so extending beyond the initial scope, which was DEI, we then went a step further to propose an incremental set of grants that were also, in our view, wasteful.

Q      You said incremental.  Do you have a sense of the scope offhand?

A      I don't.

Q      Do you have a sense if it was the majority of grants or --

A      I really don't.  It could have

Nathan Cavanaugh - January 23, 2026

152

us that he was going to talk to the board about cutting grants with respect to ones that related to the executive orders.

Q     Going back to the first page of this chain.  On March 27th, Justin Fox sends an e-mail and says, "Mike, do you have the consolidated list of grants you've approved for termination?  Let us know so we can be prepped for tomorrow."

And then McDonald says in response, and this is the top e-mail, "Adam and I were only able to complete our review this afternoon and we won't have a list ready until tomorrow morning.  We may be able to provide you with it before you arrive at 10:00.  If we can, we will.  Thanks."

Do you recall that -- that back-and-forth?

A     I mean, I'm copied.  I'm sure I saw the e-mail, yeah.

Q     Okay.  If you have that Thakur declaration still.  I have to find mine, actually.  Yeah, you have it.  If you go to paragraph 13.

A     Yep.

153

Q      Here McDonald says, "On March 17th to 18th, I worked with NEH Assistant Chairman for Programs, Adam Wolfson, to conduct a further individualized review of the spreadsheets of open grants created by program staff."

So is that something that you and Fox told McDonald and Wolfson to do on March 17th and 18th?

A      I don't recall explicitly telling them to -- to review those.  They were reviewing the grants that we had recommended for termination.

Q      And what did you tell him when you asked him to take a look at those grants?

A      I think this was Justin telling him, because he was running point on NEH for our team.  But it was something to the effect of review our recommendations and let us know which you agree with.

Q      And I know we talked about some, but can you just say again what the goal was or the guiding principle or the criteria that you were asking them to apply?

A      There were two guiding

Nathan Cavanaugh - January 23, 2026

154

principles.

One was through the lens of the executive orders that were signed with respect to DEI, preference, et cetera, on the pages we have not referenced.

The other was a list that we came up with, which, at our discretion, fell in the category of wasteful spending in the context of the broader deficit. And ones we felt did not align with the America250 initiative and the Garden of Heroes initiative. And here is the master list, review it, and let us know if there are any that you'd like to keep.

Q    Did you provide any further gloss or instruction on what was meant by "wasteful spending"?

A    No.

Q    What would you have expected them to do to determine whether something was wasteful?

A    The two priorities that we know were to be kept were anything around grants related to the founding of the country, related to this America250 initiative in 2026 and this

155

Garden of Heroes museum that the White House was interested in building with NEH funds.

So those were the cornerstones of what we knew to keep.  Otherwise, everything was up to be evaluated for potential termination.

Q    Okay.

A    We didn't recommend that, but that was the lens by which we were evaluating things through.

Q    Okay.  Because those ideas, America250, Garden of Heroes, those were things aligned with the Administration, in your view?

A    Yes.

Q    Okay.  Anything else would fall into the category of wasteful?

A    Not -- not explicitly, but potentially and subject to be reviewed.

Q    Okay.  What would be a reason why something would be saved if it didn't align with those two viewpoints?

A    Can we pull up the list of grants that were kept versus cut and we can go through each one?

Q    I don't know if that's a great

156

use of time, but we can.  But does any one come to mind right now, sitting here?

A    No.  There were 1,200 grants, roughly.

Q    Do you remember, roughly, how many were saved?

A    I don't.

Q    Okay.

A    A large percentage of outstanding grants were cut.

Q    Okay.  We might come back to that later, but I'll just -- we'll leave it there for now.

Okay.  Back to the Thakur declaration, which I think you have in front of you, paragraph 14.  He says, "On March 19, 2025, NEH CIO Bobley sent NEH Assistant Chair for Planning and Operations, Pranita," P-R-A-N-I-T-A, "Raghavan," R-A-G-H-A-V-A-N, "a final spreadsheet containing only those projects that I and Mr. Wolfson deemed to conflict with President Trump's executive orders."

And then in the following paragraph it says, "On March 20, 2025, Miss

Nathan Cavanaugh - January 23, 2026

181

justification for canceling the product's

funding and you should allow it to continue."

That's their recommendation.

Who rejected that recommendation?

MS. DOUD:  Objection.

THE WITNESS:  Justin and I both

rejected that recommendation.  Because if

you read his last paragraph, that's --

that's why.

BY MR. ROBINSON:

Q      Yeah, let's look at that last

paragraph.  So he says -- this is the last

sentence.  "Either way, as you've made clear,

it's your decision on whether to continue

funding any of the projects on this list."

A      I meant the sentence before

that.

Q      Okay.  But I want to ask you

just about that -- the second sentence.  So you

said, "as you've made clear."

So do you know what

conversations he's referring to here?

A      There is no specific

conversation, that I'm aware of, where we said

it's our decision to determine which projects

Nathan Cavanaugh - January 23, 2026

182

should be kept or not.

Q    Okay.  But you made it clear over the course of conversations?

MS. DOUD:  Objection.

THE WITNESS:  That was never explicitly stated or implicitly stated. Our understanding as DOGE was we had no authority to cancel projects or grants, RIFs, et cetera.  It was solely up to the head of the agency, based on our recommendations.

BY MR. ROBINSON:

Q    Then at 3:50 p.m., this is AR_22, the prior page, Fox responds, he copies you, you weren't included on the first e-mail.

Do you know why he copied you?

A    For visibility.

STENOGRAPHER:  For what?

THE WITNESS:  For visibilty. Just so I was aware of the communications.

BY MR. ROBINSON:

Q    And Fox says, "As discussed, we've collected the grants you flagged to keep and a few of those pertaining to America250 or

Nathan Cavanaugh - January 23, 2026

183

within priorities of the administration."  So he says "as discussed."

So was there a discussion with McDonald and Wolfson between these two e-mails that you recall?

A    I don't recall.  I -- if there was a conversation, I wasn't a party to it.  At this point, Justin was almost primarily running point on the remaining turns of grants for cancellation.

Q    All right.  So we have to ask Mr. Fox if he recalls that conversation?

A    Yes.

Q    Okay.

MR. ROBINSON:  Okay.  This might be a good time for a break, a 10-minute break.

VIDEO OPERATOR:  The time is 1:48.  We're now going off the record.

(Brief recess.)

VIDEO OPERATOR:  The time is 2:02 and we're now back on the record.

BY MR. ROBINSON:

Q    Good afternoon, again, Mr. Cavanaugh.  I'm marking Plaintiff's

Nathan Cavanaugh - January 23, 2026

241

Q      Okay.  Did Mr. Davis also tell you to read those?

A      He did not.

Q      Okay.  Did you read those?

A      I did not.

Q      Okay.  Why not?

A      Our judgment was that we could get a relatively thorough description of the grant purpose by reading the multi-sentence description that was listed in the export from their grant system and from USAspending.

Q      Okay.  So you thought it was proper to cancel grants based on one-paragraph descriptions?

MS. DOUD:  Objection.

THE WITNESS:  If they referenced explicitly executive orders that were signed by the White House, such as explicitly stating DEI, yes.  And to be clear, we weren't canceling them.  The head of the agency approved the cancellations and then submitted terminations.

STENOGRAPHER:  And then submitted?

Nathan Cavanaugh - January 23, 2026

243

BY MR. ONAYEMI:

Q    Okay.  What did you mean by "useless"?

MS. DOUD:  Objection.

THE WITNESS:  I believe this is privileged, actually, so I'm not going to answer this.

BY MR. ONAYEMI:

Q    You can't -- you can't actually create a privilege for yourself, so --

A    Okay.  I believe in a -- I believe there was a naming that I didn't come up with internally at DOGE that described the agencies that were in that Executive Order as "useless agencies."

Q    Okay.

A    When the official Executive Order actually came out, I believe the title -- I mean, if you have the EO in front of you, there was an official name for that Executive Order.

Q    Okay.

A    It said something about the -- commencing the reduction of the Federal bureaucracy, or something to that effect.

Nathan Cavanaugh - January 23, 2026

244

Q      Okay.  Okay.  So we've spoken about inside of DOGE -- this term "useless" was used inside of DOGE prior to --

A      By DOGE lawyers.

Q      Okay.  Prior to the --

MS. DOUD:  Okay.  I'm going to instruct you not to get further into what DOGE lawyers were saying.

BY MR. ONAYEMI:

Q      I'm sorry.  Which lawyers were these?

A      I don't know who created the draft of the Executive Order.

Q      Okay.  So this term "useless" came from lawyers, right?

A      I don't know who named it that.

Q      Okay.

MR. ONAYEMI:  You can't just actually claim privilege if you have no idea if lawyers were involved with this conversation.  I'm talking to you now, actually.

MS. DOUD:  Okay.  And that is inappropriate.

MR. ONAYEMI:  Right.

Nathan Cavanaugh - January 23, 2026

245

MS. DOUD: I can take a break with him and ask him to explain, you know, what he knows about lawyers involved. But the things you are saying are inappropriate. He just said he thought lawyers were involved, and you're sort of suggesting that he's making something up. And I do not think that's appropriate. But why don't we go off the record so I can discuss this with him.

MR. ONAYEMI: Right. So before that, though, I'd like to finish the conversation.

MS. DOUD: No. Because --

(Simultaneous crosstalk.)

MR. ONAYEMI: Okay. So to keep it on the record, okay, he -- he claimed privilege on it -- privilege on his own. And then I responded that he can't do that. And he never actually invoked or referenced any attorney being involved in the conversation.

MS. DOUD: He did.

MR. ONAYEMI: Okay. So I just want --

Nathan Cavanaugh - January 23, 2026

259

Executive Order 14151, ending radical and wasteful Government DEI programs and preferencing; Executive Order 14173, ending illegal discrimination and restoring merit-based opportunity.  And then the remainder in this paragraph, paragraph 6 of this declaration.

Q       All right.  Did they tell you why they believed that the Biden Administration had the most violative grants under the EO?

A       Did they say why?

Q       Yes.

A       They did not say why.  They just said as a matter of fact that they had actively promoted DEI policies over the last four years.

STENOGRAPHER:  They -- they what?

THE WITNESS:  Actively promoted and issued grants related to DEI over the last four years.

BY MR. ONAYEMI:

Q       Okay.  Did they ever mention anything about grants issued under the first Trump Administration?

A       They didn't explicitly, but

Nathan Cavanaugh - January 23, 2026

260

Justin and I went through the grants that were still outstanding under the first Trump Administration for review for waste and DEI as well.

Q    Okay.  What did you end up doing with those grants?

A    Most of them were already terminated, because grant terms are typically two- to four-year increments, so there was no balance remaining on the vast majority of them. But to the extent that there were any outstanding, we reviewed which of them could be cut for wasteful spending.  I don't have the list in front of me.

Q    Okay.  So earlier, again, you testified about a specific grant that was displayed by my colleague that was about stories about black people and gay people.  And you referred to them as preferencing black and gay people.

Do you remember that --

MS. DOUD:  Objection.

BY MR. ONAYEMI:

Q    -- testimony?

A    Yeah.

Nathan Cavanaugh - January 23, 2026

261

Q       Okay.  What did you mean by preferencing, as used there?

A       Preferencing on the matter of race or sexual orientation.

Q       Okay.  And preference means what exactly?

A       Preferencing means choosing one race over another based on race or sexual orientation.

Q       Okay.  So a grant -- in this context a grant about black people or gay people would be preferencing black people and gay people?

MS. DOUD:  Objection.

THE WITNESS:  That was the initial lens under which we reviewed that grant, yeah.

BY MR. ONAYEMI:

Q       Okay.  And so would, like, any story about a black or gay person be preferencing black people and gay people?

MS. DOUD:  Objection.

THE WITNESS:  No.

BY MR. ONAYEMI:

Q       Okay.  So why in this case was