# EXHIBIT 3



UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF NEW YORK


AMERICAN COUNCIL OF LEARNED SOCIETIES, et al.,

   Plaintiffs,   Case No. 1:25-cv-03657

vs.    Consolidated with No: 1:25-cv-03923

MICHAEL McDONALD, in his official capacity as

Acting Chairman of the National Endowment of

the Humanities, et al.,

   Defendants.

_____


VIDEOTAPED DEPOSITION OF

MICHAEL P. McDONALD


TAKEN ON

FRIDAY, JANUARY 30, 2026

9:33 A.M.


NATIONAL ENDOWMENT FOR THE HUMANITIES

400 SEVENTH STREET SOUTHWEST

WASHINGTON, DC 20004



NAEGELI DEPOSITION & TRIAL | (800) 528-3335 NAEGELIUSA.COM

MICHAEL MCDONALD                    January 30, 2026                    2
93097

APPEARANCES


Appearing on behalf of the Plaintiffs:

DANIEL F. JACOBSON, ESQUIRE

NINA CAHILL, ESQUIRE

KYLA M. SNOW, ESQUIRE (Via Zoom)

LYNN D. EISENBERG, ESQUIRE (Via Zoom)

JOHN ROBINSON, ESQUIRE (Via Zoom)

Jacobson Lawyers Group, PLLC

5100 Wisconsin Avenue Northwest, Suite 301

Washington, DC 20016

(301) 823-1148

daniel@jacobsonlawyersgroup.com

nina@jacobsonlawyersgroup.com

kyla@jacobsonlawyersgroup.com

lynn@jacobsonlawyersgroup.com

john@jacobsonlawyersgroup.com

MICHAEL MCDONALD                January 30, 2026                                    3
93097

APPEARANCES CONTINUED


Appearing on behalf of the Authors Guild Plaintiffs:

AMANDA VAUGHN, ESQUIRE

YINKA ONAYEMI, ESQUIRE (Via Zoom)

SARAH MARTIN, ESQUIRE (Via Zoom)

JAMIE CROOKS, ESQUIRE (Via Zoom)

Fairmark Partners, LLP

400 7th Street NW, Suite 304

Washington, DC 20004

(202) 417-7111

amanda@fairmarklaw.com

yinka@fairmarklaw.com

sarah@fairmarklaw.com

jamie@fairmarklaw.com

APPEARANCS CONTINUED


Appearing on behalf of the Defendants:

JONAKI SINGH, ESQUIRE

MARY ELLEN BRENNAN, ESQUIRE

RACHEL DOUD, ESQUIRE

U.S. Attorney's Office Southern District of New York

1 Saint Andrews Plaza

New York, New York 10007

(212) 637-2200

jonaki.singh@usdoj.gov

maryellen.brennan@usdoj.gov

rachel.doud@usdoj.gov


Also Present:

Annie Cleaver, Head of Research, Fairmark Partners

Kimberly Hylan, Attorney-Advisor, NEH

Elizabeth "Lisette" Voyatzis,

        Deputy General Counsel, NEH

Vincent Guerrera, Naegeli Technician

MICHAEL MCDONALD                 January 30, 2026                      96
93097

A.   At the time, I remember I didn't understand what he meant by clawed back.  I'm not sure I understand at this point, except -- so -- so at the time, I was -- I didn't know.  I think subsequently, what he was talking about, there's some website that one could go to, to see all outlays.  He was using some figures for -- to come up with that number.

Q.   Well, clawed back meant recouped by the government?

A.   Yeah, of course.

Q.   And when he says in this email, "I also flagged that roughly 25 million in grants that we referenced in our meeting in a separate tab." What -- what 25 million in grants was that referring to?

A.   I have -- I -- I have no recollection.

Q.   You don't recall it being discussed in the -- in your meeting with him?

MS. BRENNAN:  Objection.

THE DEPONENT:  He -- he clearly says it was discussed.  At this point, I'm not sure what he was referring to.

BY MR. JACOBSON:

Q.   Okay.  I am now going to hand you a document produced with Bates number US 41106, which

we'll mark as Exhibit 3.

THE REPORTER:  Exhibit 3 marked.

(WHEREUPON, Exhibit 3 was marked for identification.)

MR. JACOBSON:  Thank you.

BY MR. JACOBSON:

Q.    Do you recognize this email?

A.    Yes, I recognize it.

Q.    And you see where Mr. Wolfson says, "As discussed, I've copied the -- the link for the award spreadsheet created by Brett that the program directors used for the historical review of NEH grants since 2000 -- January 2021?"

A.    Yes.

Q.    And what historical review was that?

A.    This was the historical review that Chair Lowe instructed division directors to undertake in the wake of the president's executive orders in the area of DEI, gender ideology, and environmental justice.

Q.    And is that when Mr. Wolfson says, as discussed, what was discussed in that meeting about this spreadsheet?  Do you recall?

A.    I don't -- again, I don't have any firm recollection of these events from whatever it is,

nine or ten months ago.  But I imagine that what we told them was that we had already begun the process of scrutinizing awards in line with the president's executive order, and that we would -- we would provide them with that so they could use it as they saw fit -- fit for the work that they were doing.

Q.   And the three categories you mentioned, one was DEI/DEIA, the second was gender ideology, and the third was environmental justice; is that right?

A.   Yes.

Q.   I believe you've already given a definition for DEI.  How do you define gender ideology?

MS. BRENNAN:  Objection.

THE DEPONENT:  Well, that was defined for us in the president's executive order, which I don't have here before me, but we were working off of that definition.

BY MR. JACOBSON:

Q.   So -- so your definition for these purposes was solely the definition of the executive order?

MS. BRENNAN:  Objection.

THE DEPONENT:  I was trying to get in --

in my role, I was adhering to the definition and the guidance provided in the executive order, yes.

BY MR. JACOBSON:

Q.    And how about environmental justice?  How do you define environmental justice?

MS. BRENNAN:  Objection.

THE DEPONENT:  I -- just the same way.  I was -- I was working off of the executive orders that the president promulgated.

BY MR. JACOBSON:

Q.    And was there a specific definition of environmental justice in that executive order?

A.    I don't recall the wording of the order, but whatever it was, that was -- that was the road-map we were -- we were attempting to follow.

Q.    Well, how would you in your personal capacity, define environmental justice?

MS. BRENNAN:  Objection.

THE DEPONENT:  I would define it as crossing the line into advocacy and violating the agency's longstanding prohibitions against funding projects that are politically tendentious in nature. In this instance, you know, we have received -- we have received grant applications.  For example, I recall we received a grant application entitled

MICHAEL MCDONALD                 January 30, 2026                      100
93097

Hunger Studies.

And you took a look at the application, and it had a very activist component.  It was going to have university students engage in lobbying and letter writing campaigns to their state, local, and federal representatives, things of that nature.

A.   And you -- you've used several times the phrase politically tendentious; is that right?

BY MR. JACOBSON:

Q.   Yes.

A.   Can you explain what you mean by that?

Q.   Sure.  Scholarship -- a scholarship can have a -- can have a -- a scholarship can have a point of view.  But when we, for example, fund educational programs, teaching programs, we take a look at such things as who the participants are going to be, what the reading lists are going to be, is there a diversity of opinion, or is it all going to be a one-way street? So I think we were looking for environmental justice programs that -- that's -- that -- well, that's what I mean by tendentious, that they don't allow for a divergent point of view.

That, you know, there -- there continue to be divergences among scientists about the climate. There continue to be divergences about matters that

MICHAEL MCDONALD                January 30, 2026                        154
93097

Q.   Okay.  If we could go to the second page here, do you see there an email from Mr. Fox to you at 11:57 a.m. on March 28th?

A.   Yes.

Q.   And the email starts with saying, "Mike, Adam, thanks for the productive time today." Do you see that?

A.   Yes.

Q.   So that indicates that you met with him that day?

A.   Yes.

Q.   Do you recall that meeting?

A.   Yes.

Q.   And was that in person or was that remote?

A.   If my recollection is correct, that was an in-person meeting here in the chairman's office.

Q.   And was Mr. Cavanaugh there or just Mr. Fox?

A.   I believe, Mr. Cavanaugh, was there as well.

Q.   Anyone else from DOGE there?

A.   Justin, Nate, that was it.

Q.   And anyone else from NEH besides you and Mr. Wolfson who was in the room?

A.   I don't believe so, no.

MICHAEL MCDONALD                January 30, 2026                          155
93097

Q.    And was the topic of that meeting the grant termination process that you were undertaking?

A.    Yes.

Q.    And what did Mr. Fox say at that meeting?

A.    But that wasn't the exclusive topic.  I just add that -- I believe at that meeting, there were also discussions about the reduction in force.

Q.    So focusing just on the grant --

A.    Yeah.

Q.    -- terminations, do you recall what Mr. Fox said to you and Mr. Wolfson at that meeting?

A.    If I'm correct, I believe this was a meeting at which the the rationale for terminating grants expanded beyond DEI to consider administration -- Trump administration priorities, funding priorities, and also grants that could be terminated because they appeared to be too niche or too recondite or and -- and so could -- could be seen as constituting a waste.

Q.    And where it says here on the email from Mr. Fox, see attached active grants for your review for DEI or wasteful spend.

A.    Yeah.

Q.    About 440 grants.

A.    Yeah.

Q.    And what does wasteful spend mean there?

A.    Well, as I say, these -- these are subjective -- subjective determinations about the value of expending federal funds on -- on a grant project.  This is one -- one man's meat is another man's poison. One man's serious humanities project strikes another person as ridiculous.  And so this all -- these were determinations that in my capacity as acting chairman, I'd have to -- I'd have to make.

Q.    But -- but terminating on the basis of wasteful spend, whose idea was that?

A.    That -- that was -- that came from Nate and Justin.

Q.    And did they tell you why this -- the rationales for terminations were expanding at that point?

A.    I don't believe that they provided an explanation other than the fact that the whole -- the whole reason for the existence -- the whole reason for the President authorizing the existence of the -- of DOGE was in order to reduce wasteful spending.

Q.    And -- and even though that was -- that was the case since the founding of DOGE, right?  On January 20th, that that was the purpose of DOGE?

they were adding wasteful spend.  So -- so --

A.   No, they -- they didn't, I'm -- I'm just giving you my overall impression.

Q.   -- so you -- at that meeting, you were kind of just surmising for yourself why?

A.   They always talk -- they did bring up the administration's priority.  That was a leitmotif on -- on -- in these conversations.

Q.   Okay.  You weren't curious, though, why the scope was suddenly being changed?

MS. BRENNAN:  Objection.

THE DEPONENT:  I didn't see -- I wasn't curious because, as I said, having worked at the agency for over 20 years, seeing how different people, we get letters from the public, from senators, from congressmen, newspapers write articles about how silly and wasteful some of the things we are funding.  I understand that -- that people can reasonably hold that point of view.

BY MR. JACOBSON:

Q.   You were the head of the agency at this point?

A.   Mm-hmm.

Q.   Acting head?

A.   That's correct.

Q.   And somebody who's not at the agency comes in and says, you know, we're going to terminate a bunch of your agency's grants for a new reason we haven't given before.

A.   Mm-hmm.

Q.   You weren't at all curious as to why?

MS. BRENNAN:  Objection.

THE DEPONENT:  I think I've answered that not two times.  I was not curious.  I understand where they were coming from.

BY MR. JACOBSON:

Q.   Okay.  And so let's now pull up -- well, I'm sorry.  Back on that email.  You see Mr. Fox says, "Flagging, these are the ones NEH staff has marked as NA for DEI."

A.   Yes.

Q.   Okay.  And then at the bottom there, you see Mr. Fox wrote, could you put us in touch with someone who could help us gain admin access to Microsoft?

A.   Yes.

Q.   Did you have an understanding of why Mr. Fox was asking for admin access?

A.   That would have been in connection with the -- sending out the termination notices.

MICHAEL MCDONALD                January 30, 2026                    164
93097

Q.    And at what point did Mr. Fox tell you that he was going to be the one sending out the termination notices?

A.    I don't recall exactly.

MS. BRENNAN:  Objection.

BY MR. JACOBSON:

Q.    Okay.

A.    It was probably at this meeting.

Q.    Okay.  Well -- we'll come back to that one. So let's pull up the spreadsheet that Mr. Fox attached to this, which is marked as US 41 -- wait, did I just do the wrong one?  I just did the wrong one.  Sorry. It's marked as US 9583.

MR. JACOBSON:  And if we could go up to the top left, we'll mark this as Exhibit 14.

(WHEREUPON, Exhibit 14 was marked for identification.)

BY MR. JACOBSON:

Q.    And just like the spreadsheet that we looked at prior to this, you see on the top left corner, it says, Active grants flagged as NA for DEI?

A.    Yes.

MR. JACOBSON:  And if you scroll down to the Row 440 or so, Nina.  A little bit lower.

MICHAEL MCDONALD                 January 30, 2026                        165
93097

Sorry, just to, like, the yeses end.  There we go.
And go up a little bit.

BY MR. JACOBSON:

Q.    And you see the columns all look the same
as the prior spreadsheet did?

A.    Yes.

Q.    And you see at the bottom there, it says,
total 47,409,330?

A.    Yes.

Q.    And that's the exact same total as in the
prior spreadsheet we looked at, right?

A.    If you --

MR. JACOBSON:  Nina, do you want to pull
up the prior spreadsheet, if you have that one?

BY MR. JACOBSON:

Q.    This is the prior one.  It looks to be the
same?

A.    It's the same figure, yeah.

Q.    And is that the same row, Row 451?  Go
back to the other one.

A.    It appears to be, yeah.

Q.    And the prior spreadsheet we looked at,
that was at a point where Mr. Fox said he was just
flagging items that NEH staff had marked as not DEI,
but that DOGE had identified as being DEI, right?

A.   I do.

Q.   And then you see he writes, "We're getting pressure from the top on this, and we'd prefer that you remain on our side, but let us know if you're no longer interested."

A.   Mm-hmm.  Yes.

Q.   And who was he referring to when he said our side?

MS. BRENNAN:  Objection.

THE DEPONENT:  I could only speculate.  I do not know.

BY MR. JACOBSON:

Q.   Who do you think he was referring to?

A.   I believe he was --

MS. BRENNAN:  Objection.  You can answer, sir.

THE DEPONENT:  He was most likely referring to whoever he responded to above the chain of command at DOGE.

BY MR. JACOBSON:

Q.   So the -- the DOGE side, sort of, broadly speaking?

A.   Yes.

Q.   Okay.  And then he said -- when he says, "but let us know if you're no longer interested,"

what do you think he meant by that?

MS. BRENNAN:  Objection.

THE DEPONENT:  Again, I can only speculate.

BY MR. JACOBSON:

Q.    And what would that speculation be?

MS. BRENNAN:  Objection.

THE DEPONENT:  Speculation would be that -- you recall I mentioned patience earlier, in an earlier response, that he wanted to know if I was interested in continuing to work with DOGE to implement the -- to help them with their work.  I think Justin always had a concern.  It's again, more speculation, based upon his involvement in work at previous federal agencies, that career federal bureaucrats, such as myself, might be slow walking the process to disadvantage them in the goals that they were attempting to achieve.

BY MR. JACOBSON:

Q.    And did you think there was any basis for him to think that?  Factual basis?

A.    No.  I did not think that there was a factual basis for him to believe that.  I thought it was cooperating because I -- I believe that I had a responsibility, having accepted the position in

directing the agency, which in my view is part of the executive branch of government.  We were given instructions by the President to cooperate with DOGE in its work.  And no, I didn't feel that there were any reasons for obstruction, certainly on my part.

But I know that -- I believe, again, speculation, that Justin thought, given his previous work or perhaps talking with Nate, that career federal bureaucrats such as myself could try and put sticks in wheels and slow walk things.

Q.   I understand.  Go back to this.  And where he says here, we're getting pressure from the top office, who was he referring to?

MS. BRENNAN:  Objection.

THE DEPONENT:  I think I just answered that. I don't know who -- who he was referring to.

BY MR. JACOBSON:

Q.   At some point during this day, March 31st, did you connect with him on the phone?

A.   That's likely.  It's more than likely. I'm sure I did.

Q.   Okay.  And when he called you or when you call -- when you connected on the phone, did he say anything about the urgency -- the sudden urgency, that was behind these three emails?

MICHAEL MCDONALD                January 30, 2026                        190
93097

A.   I have no specific recollection of what he said.  But on the basis of these emails, I'm sure that was something that he -- he brought up.

Q.   Was he upset at you?

A.   No.  He wasn't upset with me.

Q.   Frustrated?

A.   No.  Justin was impatient, but he was always even keeled.

Q.   Okay.  And do you recall him saying anything about him getting pressure?

A.   I think he may have just simply -- but again, speculation.  He may have simply repeated what -- what he wrote in the email.

Q.   And he write -- when he wrote to you, we're getting pressure from the top?

A.   Yeah.

Q.   Were you curious who that was?

A.   I wasn't curious enough to ask if that's the question, no.

Q.   The question is, were you curious who it was?

A.   No.  I was not curious.

Q.   Somebody from -- associated with the White House emails you and says, I'm getting pressure from the top on something.  You're not curious who that

MS. DOUD:  I don't think you are having a hard time.  I -- I'm just making a very quiet comment to my colleague.  I clearly was not objecting on the record to that question.

MR. JACOBSON:  Okay.  I think it's confusing because if I could hear it, that means the reporter can hear it, and so instead of --

MS. DOUD:  I don't --

MR. JACOBSON:  -- small objections, I'd ask that just one counsel object.  Thank you.

MS. DOUD:  She is objecting.  I am -- you know, I will try to be quieter, but I think that was quite quiet and clearly not an objection on the record.

MR. JACOBSON:  So for the record, your objections are not on the record, but Ms. Brennan's objections are on the record.

MS. DOUD:  I haven't made any objections on the record.

MR. JACOBSON:  Okay.

BY MR. JACOBSON:

Q.    Mr. McDonald, is it possible that you had a phone call with Mr. Fox after that series of three emails, where he said something to you that then led you to write this email saying, "We were planning on

MICHAEL MCDONALD                   January 30, 2026                    197
93097

canceling them today, but understand that you will do so?"

A.   Yes, it certainly, it is possible.

Q.   Okay.  And when you said that you will do so, what did that mean?  What would they do?

A.   To -- to Nate and Justin, having canceled grants, other agencies had a process that the DOGE team used to effectuate grant terminations.  They had -- I believe they had by that point, they had canceled grants at USAID and at IMLS.  And so they had, if you will, they -- they had a process that they had used, and that would be so something similar would be used in this instance.

Q.   Okay.  Meaning they would send out the grant termination?

A.   Correct.

Q.   And that's -- that first paragraph we established is talking about the -- the NEH staff-generated spreadsheet.  And then, can you read into the record the next paragraph?

A.   "The attached is the second list." Excuse me. "Attached is the second list (the NAs) you prepared and that we reviewed today.  As you instructed, we have only excluded the ones that seem not to conflict with the administration's

priorities, such as the papers of George Washington. We understand that you will cancel this list of projects as well."

Q.    Okay.  So when you write, as you instructed, who is the you there?

A.    That's the DOGE team.

Q.    Okay.  You -- you mentioned earlier your definition of a consultant.

A.    Mm-hmm.

Q.    Do consultants typically instruct you on what to do?

MS. BRENNAN:  Objection.

THE DEPONENT:  There's no typical -- I don't -- I don't have any experience with consultants.

BY MR. JACOBSON:

Q.    Well, you provided a definition before of consultants.  You -- you have an idea, right?

A.    Consultants typically advise.

Q.    Right.

A.    And if it's -- depending on the situation, one is more inclined than not to take their advice. I used instruction, that's -- that's the word I wrote. Perhaps it was inappropriate.

Q.    Okay.  But you agree that in general, a

MICHAEL MCDONALD January 30, 2026 228
93097

Q. Do you see this is a grant -- this is again on the to cancel list titled, "My Underground Mother, a -- a feature length documentary that explores the lives and legacies of survivors of Jewish women slave labor during the Holocaust?"

A. Yes.

Q. And then could you read into the record the project description?

A. "Production of a feature length documentary about Jewish female slave labor during the Holocaust, using as a lens, one daughter's journey to uncover her mother's past."

Q. And do you believe -- scratch that. Do you believe this grant involves DEI?

A. No.

Q. So the fact that it's specific to Jewish people doesn't make it involve DEI?

A. That's not how I understand DEI.

Q. Okay. And the fact that it's specific to -- to women doesn't make it involve DEI?

A. No.

Q. What would you think if somebody said, yes, that did involve DEI?

MS. BRENNAN: Objection.

THE DEPONENT: Yes. Hypothetically, if

somebody were to say that they thought it involved DEI, I would think that they didn't -- their understanding of DEI was not the same as mine.

BY MR. JACOBSON:

Q.   Okay.  And it was Justin Fox who, again, he was the one who placed this grant on this list for termination?

MS. BRENNAN:  Objection.

THE DEPONENT:  Justin prepared the list, yes.

BY MR. JACOBSON:

Q.   Michael McDonald never said, I -- I'd really like to terminate the grant about Jewish female slave labor during the Holocaust.

A.   That's correct.

Q.   Okay.  And so it's Justin Fox who's responsible for this grant being terminated?

MS. BRENNAN:  Objection.

THE DEPONENT:  No.

BY MR. JACOBSON:

Q.   It's not -- he placed it on the list.

A.   I was the final decider.  I made that decision.

MS. BRENNAN:  Objection.

A.   You are the final decider for this

specific grant being terminated?

BY MR. JACOBSON:

Q.   In the end, yes.

A.   So do you recall reviewing this grant and thinking to yourself, I, Michael McDonald, decide to terminate the grant about Jewish female slave labor during the Holocaust?

MS. BRENNAN:  Objection.

THE DEPONENT:  Do I recall?

BY MR. JACOBSON:

Q.   Yeah.

A.   No.

Q.   So then how do you know you were the decider?

A.   The grant was terminated.  I approved all the grant terminations.

Q.   But you don't recall approving this one specifically?

A.   There are over 1,400 grants.  I don't recall the vast majority of them.

Q.   You don't -- just to make sure I understand, you don't recall approving the vast majority of them?

MS. BRENNAN:  Objection.

THE DEPONENT:  I'm not sure I understand

the question.

BY MR. JACOBSON:

Q.    So on this one, on an individualized basis, you don't recall approving the termination of this grant about Jewish female slave labor during the Holocaust?

A.    I do not recall approving the termination of this specific grant.

Q.    And if we went through a lot of other grants on this list, is it fair to say the same would be true?

A.    Yes.

Q.    Okay.  And just because you know I have to do it, I'll go through my three favorite grants again.

MR. JACOBSON:  Can we pull up 1144?

BY MR. JACOBSON:

Q.    And this was -- this, again, the grant is this one to the Modern Language Association?

A.    Yeah.

Q.    Again, you did not.  It was Justin Fox who put this grant on the list for termination?

MS. BRENNAN:  Objection.

THE DEPONENT:  Yes.

BY MR. JACOBSON:

Q.   Okay.  And is it the same answer that I just gave that you just gave before, that you don't recall specifically approving this grant for termination?

A.   That's correct.  I do not recall specifically approving this grant for termination.

Q.   And would the same be true of the the University of Minnesota flat book grant and the University of Riverside -- California Riverside grant that we've talked about today?

A.   Yes.

MS. BRENNAN:  Objection.

A.   Okay.  I'm now going to hand you -- I'm now going to go back.

MS. BRENNAN:  Can we also take a break at some point whenever you get --

MR. JACOBSON:  To a good spot.  Yeah.

MS. BRENNAN:  Yeah.

MR. JACOBSON:  What time is it?  2:43. I'm just figure out if we're at a good spot now. Give me another, like, 5, 10 minutes.  We'll take a break.

MS. BRENNAN:  Sure.

MR. JACOBSON:  Okay.  Thank you.

BY MR. JACOBSON:

Q.   So going back to Exhibit 19, this is the email chain that started with 5064.

A.   5064.  Got it.

Q.   Okay.  And you see --- and then if you go to the next page, 50605?

A.   Yes.

Q.   You see Mr. Fox emailed you at 4:17 p.m. saying, "Mike, update attached, call me once you receive."

A.   Yes.

Q.   And do you remember calling Mr. Fox then?

A.   No.  I don't remember, but I most likely did call.

Q.   Okay.  But you don't have any recollection of the conversation?

A.   No.

Q.   Okay.  And then do you see going up the chain that you emailed him back at 5:05 p.m. saying, "Hi, Justin, we've completed our review.  Our initial version is attached."

A.   All right.  Yes.

Q.   And so that was about, I'm getting my math right, 48 minutes later?

A.   I'll take you -- I take your word for that, yeah.

MICHAEL MCDONALD                 January 30, 2026                      258
93097

Q.   So the person who drafted this wasn't that intimately familiar with what was going on at NEH at the time?

MS. BRENNAN:  Objection.

THE DEPONENT:  I have no knowledge how intimately or not the person was.

BY MR. JACOBSON:

Q.   The person who drafted this thought there was an executive order to basically eliminate most of the agency?

MS. BRENNAN:  Objection.

THE DEPONENT:  I -- I have no way of knowing that.

BY MR. JACOBSON:

Q.   Okay.  That's what it would mean to eliminate all non-statutorily required activities and functions?

MS. BRENNAN:  Objection.

THE DEPONENT:  It's just speculation on my part.

BY MR. JACOBSON:

Q.   Okay.  It would be a pretty big deal to you as the acting chair if there was an executive order to eliminate all of your non-statutorily required activities and functions?

MICHAEL MCDONALD                January 30, 2026                          259
93097

MS. BRENNAN:  Objection.

THE DEPONENT:  If there were such an executive order, a big deal, yes.

BY MR. JACOBSON:

Q.   Okay.  And did you review this letter when Mr. Fox sent it to you?

A.   Yes.

Q.   Did you review it closely?

A.   In retrospect, not as closely as perhaps I should have.

Q.   Right.  Because certainly, if you had noticed this, you would have said, hey, there's no executive order eliminating our agency?

MS. BRENNAN:  Objection.

THE DEPONENT:  If -- if I had reviewed it more carefully, yes, that is correct.

BY MR. JACOBSON:

Q.   Okay.  And at the -- in the last sentence, it says, "Please contact," and then it lists your email address with urgent questions only -- or sorry, with -- with only urgent questions.  Do you see that?

A.   I do.

Q.   Okay.  And did your email address stay in the final version of this letter that went out?

MICHAEL MCDONALD                 January 30, 2026                          260
93097

A.   I am not sure what was in the final letter.

Q.   I'll hand you now what is US 03375, and I'll represent to you that this is a final version of the letter, one of the letters that went out. This will be Exhibit 24.

THE REPORTER:  Exhibit 24 marked.

(WHEREUPON, Exhibit 24 was marked for identification.)

BY MR. JACOBSON:

Q.   Looking at this letter, do you see whether it was your email address listed in that last line?

A.   In the -- the exhibit you just handed?

Q.   Correct.

A.   I do not see my email on this document.

Q.   Do you see it says, "Please contact grants_notifications@nehemail.onmicrosoft.com"?

A.   Yes.

Q.   And is that an email address you've ever seen before?

A.   Maybe not.

Q.   Before this -- before April 1st, 2025, had you ever seen that email address before?

A.   No.

Q.   Okay.  Is that a typical email address for

MICHAEL MCDONALD                January 30, 2026                    261
93097

a government email address, @microsoft.com?

A.    No.

MS. BRENNAN:  Objection.

BY MR. JACOBSON:

Q.    Okay.  And your email addresses all end with @neh.gov; is that right?

A.    That's correct.

Q.    Okay.  So at some point between the draft letter that Mr. Fox sent you that we looked at and this final version, your email address was swapped out for this email address; is that right?

A.    Yes.

Q.    Do you recall why?

A.    I don't recall.  No.

Q.    Did you --

A.    Other than the fact that the email address on the previous document was incorrect.

Q.    The one for you, that is?

A.    Yes.

Q.    Okay.  Do you recall ever asking that your email address not be listed on these termination letters?

A.    No.  I don't recall asking.  But normally, terminations would be handled through the Office of Grant Management.  And that would -- so in that --

in that instance, emails on grant terminations wouldn't be sent to the chairman.

Q. Okay.

A. Toward the chairman's office.

Q. So that's a no. You don't recall saying, "Please take out my email address"?

A. I don't recall.

Q. Okay. And your -- the signature that's typed at the bottom, /s/Michael McDonald, do you see that?

A. Yes.

Q. Did you write that there?

A. I approved the use of it.

Q. Did you write that there?

A. Did I write /s/McDonald? I don't -- I don't understand the question.

Q. Yeah. Did you type in /s/Michael McDonald?

A. No.

Q. Okay. Who typed that in?

A. Presumably the people at DOGE.

Q. Justin Fox?

A. I don't know.

Q. Can you think of a single government document in your entire government career where

you've ever signed an official document that way?

A.    No.

Q.    Okay.  Because you normally -- you have a specific way you like to sign your signatures and documents?

A.    Well, we have electronic signatures now. I don't know that it's specific -- I have a favorite or a specific way.

Q.    Okay.  But this is -- this is not something that -- this is --

A.    No, that's --

Q.    Is it an anomaly, fair to say?

A.    It would be an anomaly, yes.

Q.    Okay.  Do you think it's appropriate for a document notifying someone that they're going to -- their grant is being terminated to write, you know, /Michael McDonald --

MS. BRENNAN:  Objection.

BY MR. JACOBSON:

Q.    -- as a signature?

A.    I don't see why it would be considered inappropriate.

Q.    Okay.  I'm going to hand you these.  Now going to hand you a document produced as US 9562. There you go.  This will be Exhibit 25.

MICHAEL MCDONALD                January 30, 2026                       270
93097

you repeat the question?

BY MR. JACOBSON:

Q.    In the context of the email that's below --

A.    Yeah.

Q.    -- is Ms. Voyatzis telling Richard, you emailed me yesterday about --

A.    Right, right.

Q.    -- grant termination procedures.  You said, we're going to begin executing.

A.    Yeah.

Q.    And now she's saying, actually, no, it's DOGE who's going to do it, and agency leadership has agreed to that.  Is that a fair characterization?

MS. BRENNAN:  Objection.

THE DEPONENT:  From her -- from her sentence, she would -- she says she -- she -- he may have already been aware of the fact.  She's just reiterating it to him.

BY MR. JACOBSON:

Q.    So you think when Richard sent that email on April 1st, he was already aware that DOGE was executing the terminations?

A.    Well, there's -- there's a bit of a time lag between the two.  So sure, her email -- his

email is on Tuesday at 5:37.  She writes to him on Wednesday, April the 2nd, 2025.  He may have been informed by then that DOGE would be handling the terminations, is all I'm saying.

Q.    Okay.  And do you see on the -- the paragraph that has redactions, it says, "OGC has not seen the wording of the termination notice?"

A.    Yes.

Q.    So does that mean what it says, that Ms. Voyatzis and the Office of General Counsel had not seen the termination notices at that point?

A.    It says what it says.

Q.    And is that correct to your understanding?

A.    Yes.

Q.    And did they see the termination notices before they were sent out to the grantees?

A.    Yes.

Q.    And you'd agree that the termination -- when you terminate a grant, there's a legal aspect to that, the potential legal liability?  You would agree?

A.    Yes.

Q.    And it is unusual, in your experience, for the Office of General Counsel and the general counsel to not review a legal document like that

before it goes out at your agency?

MS. BRENNAN:  Objection.

THE DEPONENT:  I think I just said they did review it before it went out.

BY MR. JACOBSON:

Q.    I thought you said they didn't -- you said they did review it?

A.    Yes.

Q.    When did Ms. Voyatzis review this document before it went out?  That not -- sorry.  Let me rephrase the question.  When did she review the termination notice before it went out?

MS. BRENNAN:  Objection.

THE DEPONENT:  Again, I can't say with any precision.  Whenever the draft termination notices came in, I -- I recall going over them with her.

BY MR. JACOBSON:

Q.    Okay.  So we went over previously that they came in to you on April 1st, right?

MS. BRENNAN:  Objection.

THE DEPONENT:  If you --

BY MR. JACOBSON:

Q.    The email chain we were just looking at --

A.    Yeah.

Q.    -- was on April 1st, do you recall that?

A.    Yes.

Q.    Okay.  And then we just looked at the sample termination notices, right?  That listed your incorrect email address at the bottom?

A.    Yes.

Q.    Okay.  So this email from Ms. Voyatzis is sent on April 2nd, and it says 13:44.  I think there's actually a weird time difference issue.  I don't know if you guys have noticed this where it says 0:00. That's Greenwich Mean Time.  So I think it's actually -- it took me a while to figure this out.  I think it's actually four hours earlier.  So let's call it 9:30 a.m.  So at that point, on April 2nd, OGC had not seen the wording of the termination notice?

MS. BRENNAN:  Objection.

THE DEPONENT:  I have no way of knowing if -- what time zone we were operating under or when she got it based on -- based on this.

BY MR. JACOBSON:

Q.    At the time this email was sent, she had not seen the -- the wording of the termination notice?

MS. BRENNAN:  Objection.

THE DEPONENT:  She says as much, yes.

BY MR. JACOBSON:

Q.   Right.

THE DEPONENT:  -- of grants that NEH makes were -- were eliminated, yes.

BY MR. JACOBSON:

Q.   Okay.  And so you thought -- you decided to terminate grants that you thought it was unfortunate to terminate?

A.   There was a larger interest at stake, which was --

MS. BRENNAN:  Objection.  Go ahead.

THE DEPONENT:  A larger interest at stake, which was the administration's wish to eliminate waste. There was a competing interest.  DOGE was representing on its behalf, the administration, as I viewed it, and as between the competing priorities and the fact that I had agreed to serve as acting chairman.  And the question was --

BY MR. JACOBSON:

Q.   I'll take that as an answer.

A.   Yeah.

Q.   And then you say, "and they also felt there was a great urgency here." And for the record, "they" is referring to Mr. Cavanaugh and Mr. Fox?

A.   That's correct.

Q. Okay. And then you wrote, "as they said in the notification letter." Again, "they" is Mr. Fox and Cavanaugh?

A. Yes. As I had pointed out earlier, we -- we reviewed the notice and made some corrections to it. This is a -- what would I say? This was not a -- what's the word I'm looking for? It was not the most appropriate word to have used in that instance, since we did have input on it, and I certainly ratified the sending of the termination notice.

Q. Sure. But just when you said they said in the notification letter, you meant what Mr. Fox and what Mr. Cavanaugh said in the notification letter?

A. Yeah. With the input that we provided.

Q. Okay. What input was that in the termination letter?

A. I don't recall offhand, but I do recall that we made some suggestions for changing the wording of the termination letter, but there are obviously still mistakes in -- in the termination that we would have done well to have caught before it went out.

Q. Okay.

MR. JACOBSON: Let's -- can we pull back up the two exhibits that were termination letters?

NAEGELI | (800) 528-3335
DEPOSITION & TRIAL | NAEGELIUSA.COM

MICHAEL MCDONALD                January 30, 2026                        308
93097

I'm sorry you have to pull those back out.

BY MR. JACOBSON:

Q.    Okay.  These were Exhibits 23 and 24.

A.    So is this 3375?

Q.    3375 is 24.

A.    Yes.

Q.    Exhibit 24 and 50608 is the prior one.

A.    Yes.

Q.    Okay.  And 50608, I'll -- to recall, is the draft letter that Mr. Fox sent to you on the evening of April 1st.  That's why it has brackets at the top.

A.    Yes.

Q.    And the one on 3375 is a final letter that was sent out.

A.    Yes.

Q.    Does that seem correct?

A.    Yes.

Q.    Okay.  And you just testified that we, meaning -- I think you meant you and Mr. Wolfson, provided input on the termination letter and that they made some -- some changes were made as a result; is that right?

MS. BRENNAN:  Objection.

THE DEPONENT:  I don't -- I don't believe