**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| AMERICAN COUNCIL OF LEARNED SOCIETIES, *et al.*,<br><br>*Plaintiffs,*<br><br>v.<br><br>ADAM WOLFSON, in his official capacity as Acting Chairman of the National Endowment for the Humanities, *et al.*,<br><br>*Defendants.* | No. 25 Civ. 3657 (CM) |
| THE AUTHORS GUILD, *et al.*,<br><br>*Plaintiffs,*<br><br>v.<br><br>NATIONAL ENDOWMENT FOR THE HUMANITIES, *et al.*,<br><br>*Defendants.* | No. 25 Civ. 3923 (CM) |

**DEFENDANTS' RESPONSE TO PLAINTIFFS' RULE 56.1 STATEMENT AND RULE 56.1 STATEMENT**

Pursuant to Federal Rule of Civil Procedure 56, Local Civil Rule 56.1 of the Local Rules of the United States District Court for the Southern District of New York, and this Court's Individual Rules and Practices in Civil Cases V.E.2, Defendants submit the following counterstatement of material facts in response to the Rule 56.1 Statement filed by Plaintiffs, Dkt. No. 249 ("Plaintiffs' Statement") and statement of additional material facts.

**Response to Plaintiffs' Statement**

1.      The NEH Act, 20 U.S.C. §§ 951 et seq., provides that "it is the policy of the United States Government to support the exploration of human understanding through the humanities, including the fostering of mutual respect for the diverse beliefs and values of all persons and groups." 20 U.S.C. § 951(6).

**Defendants' response:**  Disputed.  The governing statute is titled the "National Foundation on the Arts and the Humanities,"  20 U.S.C. §§ 951 *et seq.*  The quoted section of the statute states: "The arts and the humanities reflect the high place accorded by the American people to the nation's rich cultural heritage and to the fostering of mutual respect for the diverse beliefs and values of all persons and groups."

2.      The NEH Act declares that "it is necessary and appropriate for the Federal Government to complement, assist, and add to programs for the advancement of the humanities." 20 U.S.C. § 951(1).

**Defendants' response:**  Disputed.  The cited section of the statute states:  "The arts and the humanities belong to the people of the United States."  The quoted language appears in the statute, but it appears in § 951(5), and Plaintiffs have omitted a large portion of the quoted sentence.

3.      The NEH Act specifies that no "department, agency, officer, or employee of the United States" shall "exercise any "direction, supervision, or control over the policy determination, personnel, or curriculum, or the administration or operation of any [grantee]." 20 U.S.C. § 953(c).

**Defendants' response:**  Admitted, except that the last clause states, "or the administration or operation of any school or other non-Federal agency, institution, organization, or association."

4.      NEH funds support grantees' private speech. Ex. 3, Deposition of Michael McDonald ("McDonald Dep."), at 65:5–16.

**Defendants' response:** Defendants object to Paragraph 4 on the ground that it offers a legal conclusion and inaccurately paraphrases the cited testimony. Defendants respectfully refer the Court to the testimony for a complete and accurate statement of its contents and admit the factual aspects of Paragraph 4 to the extent they accurately represent the content of the testimony.

5.    Prior to January 20, 2025, NEH grant applications underwent expert peer review, evaluation by NEH program officers, and advisory review by the National Council on the Humanities before final award decisions were made. Ex. 26, Deposition of Adam Wolfson ("Wolfson Dep."), at 23:23–24:14, 41:13–42:20.

**Defendants' response:** Admitted except to the extent Paragraph 5 suggests that NEH grant applications have not undergone the process described since January 20, 2025, which the cited testimony does not support.

6.    NEH has historically relied heavily on expert peer-review recommendations and career staff when making grant award decisions. *Id.*

**Defendants' response:** Disputed. The phrase "relied heavily" is subjective and not used in the cited testimony, which speaks for itself. Defendants respectfully refer the Court to the testimony for a complete and accurate statement of its contents and admit the factual aspects of Paragraph 6 to the extent they accurately represent the content of the testimony.

7.    Termination of awarded NEH grants historically occurred only in limited circumstances involving grantee noncompliance or material deviation from approved project objectives. Wolfson Dep. at 44:25–47:21.

**Defendants' response:** Disputed. Paragraph 7 misstates the cited testimony, which speaks for itself. Defendants respectfully refer the Court to the testimony for a complete and accurate statement of its contents and admit the factual aspects of Paragraph 7 to the extent they

accurately represent the content of the testimony.

8.      NEH has never before simultaneously terminated hundreds of grants. Wolfson Dep. at 63:22–25.

**Defendants' response:**  Admitted.

9.      On January 20, 2025, President Trump issued a series of executive orders directing federal agencies to eliminate grant funding associated with Diversity, Equity, and Inclusion ("DEI") programs, gender ideology, and what the Administration coined "wasteful spending." E.O. 14151, 90 Fed. Reg. 8339 (Jan. 20, 2025); E.O. 14222, 90 Fed. Reg. 11095 (Feb. 26, 2025).

**Defendants' response:**  Admitted that on January 20, 2025, President Trump issued Executive Order 14151, *Ending Radical and Wasteful Government DEI Programs an Preferencing*, 90 Fed. Reg. 8339 (Jan. 20, 2025), and Executive Order 14168, *Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government*, 90 Fed. Reg. 8615 (Jan. 20, 2025), and that on February 26, 2025, President Trump issued Executive Order 14222, *Implementing the President's "Department of Government Efficiency" Cost Efficiency Initiative*, 90 Fed. Reg. 14222 (Feb. 26, 2025), and disputed to the extent inconsistent with the actual dates or contents of those executive orders.

10.     E.O. 14151 required each agency to provide the Office of Management and Budget ("OMB") a list of all "grantees who received Federal funding to provide or advance DEI, DEIA, or 'environmental justice' programs, services, or activities." E.O. 14151 § 2(b)(ii).

**Defendants' response:**  Admitted.

11.     Shortly after the inauguration of President Trump, Defendants Justin Fox and Nathan Cavanaugh were contacted, interviewed, and hired by senior members of DOGE. Ex. 1, Deposition of Justin Fox ("Fox Dep.") at 56:25–57:11; Ex. 2, Deposition of Nathan Cavanaugh

4

("Cavanaugh Dep.") at 25:11–15.

**Defendants' response:** Admitted.

12.    Senior DOGE official Steve Davis hired Cavanaugh into government. Cavanaugh Dep. at 22:19–25.

**Defendants' response:** Admitted.

13.    Senior DOGE officials Anthony Armstrong and Joshua Gruenbaum recruited Fox into government. Fox Dep. at 32:10–23; 51:14–17.

**Defendants' response:** Admitted.

14.    Fox and Cavanaugh were hired officially as employees of the General Services Administration ("GSA") but self-identified as members of the "DOGE Team" during the relevant period. Fox Dep. at 68:7–10; Cavanaugh Dep. at 18:19–19:5.

**Defendants' response:** Admitted.

15.    Fox and Cavanaugh belonged to DOGE's "Small Agencies Team." Cavanaugh Dep. at 37:9–13; Fox Dep. at 104:11–16.

**Defendants' response:** Admitted.

16.    Cavanaugh led the Small Agencies Team. Cavanaugh Dep. at 55:9–15, 91:2–12.

**Defendants' response:** Admitted.

17.    Defendant Fox was the Small Agencies Team's primary operative at NEH. Cavanaugh Dep. at 55:9–15, 91:2–12. Fox followed Cavanaugh's direction and helped Cavanaugh "with whatever he was working on." Fox Dep. at 58:20–59:5; 103:14–23.

**Defendants' response:** Disputed. Paragraph 17 misstates the referenced testimony, which does not use the term "operative" and speaks for itself. Defendants respectfully refer the Court to the testimony for a complete and accurate statement of its contents and admit the factual aspects

of Paragraph 17 to the extent they accurately represent the content of the testimony.

18.    The DOGE Small Agencies Team's mission was to "reduce certain useless small agencies in the Federal Government," "find[ ] efficiencies," and "terminat[e] grants." Cavanaugh Dep. at 55:18–22; Fox Dep. at 88:6–17.

**Defendants' response:** Disputed. Paragraph 18 misstates the cited testimony which, *inter alia*, refers to "certain executive orders signed to reduce certain useless small agencies in the Federal Government" and speaks for itself. Cavanaugh Tr. 55:18-22. Defendants respectfully refer the Court to the testimony for a complete and accurate statement of its contents and admit the factual aspects of Paragraph 18 to the extent they accurately represent the content of the testimony.

19.    Cavanaugh was acting on behalf of DOGE and understood the scope of his responsibilities through some combination of Steve Davis's direction and Cavanaugh's own intuition. Cavanaugh Dep. at 55:16–22; 56:4–14; 63:14–5; 64:12–65:10; 66:6–17; 161:8–162:13; 239:22–240:11.

**Defendants' response:** Disputed. Paragraph 19 misstates the cited testimony which, *inter alia*, refers to Cavanaugh's reliance on the executive orders and speaks for itself. Cavanaugh Tr. 55:18-56:2. Defendants respectfully refer the Court to the testimony for a complete and accurate statement of its contents and admit the factual aspects of Paragraph 19 to the extent they accurately represent the content of the testimony.

20.    Davis was "effectively [Cavanaugh's] manager," appointed Cavanaugh to lead DOGE's Small Agencies Team, and initially directed Cavanaugh to focus on NEH. Cavanaugh Dep. at 36:24–37:2; 49:5–8; 49:12–15; 55:9–22; 64:18–65:10; 86:13–22.

**Defendants' response:** Disputed. Paragraph 20 inaccurately paraphrases the cited

6

testimony which, *inter alia*, states that it was Davis's "idea" that Cavanaugh reach out to the new acting chair of NEH, and speaks for itself.  Defendants respectfully refer the Court to the testimony for a complete and accurate statement of its contents and admit the factual aspects of Paragraph 20 to the extent they accurately represent the content of the testimony.

21.    While detailed to the Small Agencies Team, Cavanaugh reported supposed aggregate agency savings—including grant and contract terminations at NEH—to Davis and DOGE senior leadership on a weekly basis. Cavanaugh Dep. at 80:13–23; 81:24–82:13; 92:23–93:4; 272:20–273:13; *see also* Ex. 36, US-00009509.

**Defendants' response:**  Admitted that Cavanaugh reported "savings" concerning small agencies, including NEH, to Davis on a weekly basis and otherwise disputed on the ground that it inaccurately paraphrase the cited testimony.  Defendants respectfully refer the Court to the testimony and the cited document for a complete and accurate statement of their contents.

22.    Prior to joining the Administration, Cavanaugh had no prior government experience. Cavanaugh Dep. at 51:1–4.

**Defendants' response:**  Admitted.

23.    Prior to joining the Administration, Fox had no experience in government, public grant administration, private grant administration, or reviewing humanities projects for scholarly merit. Fox Dep. at 43:7–44:7.

**Defendants' response:**    Admitted.

24.    Before DOGE's arrival at NEH, agency staff had begun reviewing grants pursuant to Executive Orders 14151 and 14168 to identify for OMB grants that may conflict with those orders. McDonald Dep. at 138:13–23.

**Defendants' response:**  Admitted.

25.     NEH Chief Information Officer Brett Bobley directed NEH staff to identify grants issued "from 2021 to the present" based on whether they promoted "environmental justice," "diversity, equity, and inclusion," "diversity, equity, inclusion, and accessibility," or "gender ideology." Ex. 4, NEH_AR_000001; *see also* Ex. 8, NEH_AR_000005 (Wolfson describing "historical review of NEH's grants since January 2021"); Wolfson Dep. at 87:21–88:4 (describing "historical review of all grants starting [at] the start of the Biden administration").

**Defendants' response:**  Admitted that Brett Bobley sent the February 7, 2025, email included in Plaintiffs' filings as Exhibit 4, which speaks for itself.  Defendants respectfully refer the Court to Exhibit 4 for a complete and accurate statement of its contents and admit the factual aspects of Paragraph 25 to the extent they accurately represent the content of the document.

26.     NEH staff reviewed all awards made over the preceding four years and rated them "high, medium, or low" in terms of promoting DEI. Ex. 5, NEH_AR_000022; Ex. 6, NEH_AR_000006; McDonald Dep. at 101:7–11.

**Defendants' response:**  Admitted.

27.     NEH staff rated a grant for a book about Black and indigenous farmers in the rural Midwest as "high" for DEI because it "discusses racial discrimination and land appropriation from Indigenous people, as well as environmental justice." NEH_AR_000006 at R61. This grant was later terminated. Ex. 25, NEH_AR_0000136.

**Defendants' response:**  Admitted that the referenced grant was rated "high" for DEI by NEH staff, that the quoted text appears in the "Comments about DEIA" column of the cited spreadsheet, and that the grant was terminated.  Defendants otherwise respectfully refer the Court to the spreadsheets included as Plaintiffs' Exhibits 6 and 25 for a complete and accurate statement of their contents and admit the factual aspects of Paragraph 27 to the extent they accurately

represent the content of the documents.

28.    NEH staff rated a grant to named (and Authors Guild member) Plaintiff Nicole Jenkins as "medium" for DEI because it "discusses white supremacy and Black women's experience of discrimination." NEH_AR_000006 at R56. This grant was later terminated. Ex. 25, NEH_AR_0000136.

**Defendants' response:** Admitted that the referenced grant was rated "medium" for DEI by NEH staff, that the quoted text appears in the "Comments about DEIA" column of the cited spreadsheet, and that the grant was terminated. Defendants otherwise respectfully refer the Court to the spreadsheets included as Plaintiffs' Exhibits 6 and 25 for a complete and accurate statement of their contents and admit the factual aspects of Paragraph 28 to the extent they accurately represent the content of the documents.

29.    NEH staff rated a grant to the American Historical Association as "high" for promoting environmental justice because it "violated the administration's views" on climate change. McDonald Dep. at 104:13–107:1. This grant was later terminated. Ex. 25, NEH_AR_0000136.

**Defendants' Response:** Admitted that the cited grant was rated "high" for promoting environmental justice by NEH staff, that they provided the explanation that "the administration's position" was that funding for this type of project "should not continue because it violated the administration's view on this very controversial issue," and that the grant was terminated, and otherwise disputed. Defendants respectfully refer the Court to the testimony and to the spreadsheet included as Plaintiffs' Exhibit 25 for a complete and accurate statement of their contents.

30.    Grants that NEH staff determined were at no risk of promoting DEI, environmental justice, or gender ideology were marked as "N/A." Ex. 5, NEH_AR_000022.

**Defendants' Response:** Admitted.

31.    Fox and Cavanaugh first met Acting NEH Chairman Michael McDonald and Chair for Programs Adam Wolfson on March 12, 2025. Fox Dep. at 127:20–25.

**Defendants' Response:** Admitted.

32.    Before the March 12 meeting, Fox searched the public repository at www.grants.gov for all active NEH grant descriptions containing keywords including "gay," "BIPOC (Black, Indigenous, People of Color)," "indigenous," "tribal," "melting pot," and "equality." Ex. 9, US-000016154 ("Detection List" tab); Fox Dep. at 229:20–230:17; 236:22–237:10.

**Defendants' Response:** Admitted.

33.    Fox's keyword list did not include analogous terms for majority or non-protected groups, including "white," "heterosexual," and "Caucasian." Fox Dep. at 241:21–243:14.

**Defendants' Response:** Admitted that Fox's keyword list did not include the terms "white," "heterosexual," and "Caucasian." Defendants dispute Paragraph 33 to the extent it refers to "analogous terms." Defendants respectfully refer the Court to the cited testimony for a complete and accurate statement of its contents.

34.    Fox labeled his keyword search terms as "Detection Codes" and used them to identify grants he dubbed the "Craziest Grants" and "Other Bad Grants." Ex. 9, US-000016154 ("Detection List" tab); Fox Dep. at 276:16–277:2.

**Defendants' Response:** Admitted.

35.    An ACLS member had a grant placed on Fox's list of "Craziest Grants" or "Other Bad Grants" because it included the term "LGBTQ" in its description. Ex. 9, US-000016154, "NEH Grants (JF)" tab, row 11.

**Defendants' Response:** Admitted that Row 11 of the referenced spreadsheet includes a grant containing the term "LGBTQ," which was one of the keywords Fox used. Defendants respectfully refer the Court to Exhibit 9 for a complete and accurate statement of its contents and admit the factual aspects of Paragraph 35 to the extent they accurately represent the content of the document but otherwise dispute this paragraph.

36. The keyword designations and "craziest grant" labels were based entirely on Fox's and Cavanaugh's subjective views, without reference to any standard developed by NEH program officers, peer reviewers, or agency attorneys. Fox Dep. at 232:18–233:14.

**Defendants' Response:** Disputed. Paragraph 33 is vague as it fails to identify the "subjective views" and inaccurately paraphrases the cited testimony, which reflects that Fox used the label "craziest grants" to refer to grants that, in his view, were "the most obviously infringing on the Eos." Fox. Tr. 232:18-233:14. Defendants respectfully refer the Court to the cited testimony for a complete and accurate statement of its contents and admit the factual aspects of Paragraph 36 to the extent they accurately represent the content of the testimony.

37. Fox preserved the keyword-based spreadsheet and emailed it from his NEH address to his GSA address on April 3, 2025. Ex. 10, US-000016153.

**Defendants' Response:** Admitted that Fox emailed the referenced spreadsheet from his NEH address to his GSA address on April 3, 2025. Defendants respectfully refer the Court to Exhibit 10 for a complete and accurate statement of its contents and admit the factual aspects of Paragraph 37 to the extent they accurately represent the content of the document.

38. To identify grants for termination, Fox and Cavanaugh focused their review on grants that were awarded during the Biden administration. Ex. 27, NEH_AR_000003 (Cavanaugh sending McDonald "a list of grants that were awarded during President Biden's administration . .

. at NEH" and suggesting that all funds awarded during President Biden's administration that had yet to be distributed "can presumably be clawed back"); Ex. 28, NEH_AR_000004 (spreadsheet attached to Ex. 27 in which grants uniformly tagged as "Biden Grants"); McDonald Dep. at 372:19–23 (McDonald testifying to his "understanding" from interactions with DOGE that "the presumption was that … open grants that were made under the Biden administration needed to be reviewed."); *id.* at 226:12–227:1 ("Basically, we were looking at the last four years of open grants from the Biden administration. My understanding was we wanted to start afresh, a … clean slate as much as possible.").

**Defendants' Response:** Admit that Fox and Cavanaugh reviewed grants awarded during the Biden administration and otherwise dispute Plaintiffs' characterization of the testimony, which speaks for itself.  Defendants respectfully refer the Court to the testimony and to the spreadsheets included as Plaintiffs' Exhibits 27 and 28 for a complete and accurate statement of their contents and admit the factual aspects of Paragraph 38 to the extent they accurately represent the content of the testimony and the documents.

39.    After the March 12 meeting, Wolfson sent Fox and Cavanaugh the DEI and gender ideology ratings that NEH staff had prepared. Ex. 8, NEH_AR_000005; Fox Dep. at 165:23–166:2.

**Defendants' Response:** Admitted.

40.    For the 1,162 grants that NEH staff had rated "N/A" for DEI or gender ideology, Fox used ChatGPT "[t]o highlight why [a] grant may relate to DEI" and "to pull out anything related to DEI." Fox Dep. at 204:20–23; 209:25–210:1; *see also* Fox Dep. at 159:2–11, 193:20–23.

**Defendants' Response:** Admitted that Fox used ChatGPT to generate the "DEI rationale"

that was included on the list of grants for NEH's review and otherwise dispute Plaintiffs'

characterization of the testimony, which speaks for itself.  Defendants respectfully refer the Court

to the testimony for a complete and accurate statement of its contents and admit the factual aspects

of Paragraph 40 to the extent they accurately represent the content of the testimony.

41.     Fox submitted each grant description to ChatGPT with the following prompt:

"Does the following relate at all to DEI? Respond factually in less than 120 characters. Begin with

'Yes.' or 'No.' followed by a brief explanation. Do not use 'this initiative' or 'this description' in

your response." Ex. 11, US-000062485 (tab "Sheet3") at C2–C1163; Fox Dep. at 204:20–206:5,

209:25–210:1.

**Defendants' Response:** Admitted.

42.     Fox believed any grant about a specific "minority group," meaning any particular

"ethnicity, culture … race or gender or religion" was DEI. Fox Dep. at 183:14–16; id. at 191:19–

25.

**Defendants' Response:**   Disputed.   Paragraph 42 inaccurately paraphrases the cited

testimony, in which Fox states, *inter alia*, that determining whether a grant about a minority group

conflicts with the Executive Orders is a "subjective" inquiry "based on the interpretation of each

grant and the details of it."  *See* Defendants' Ex. 2, (Fox. Tr.) 183:17-184:2.[1]    Defendants

respectfully refer the Court to the testimony for a complete and accurate statement of its contents

and admit the factual aspects of Paragraph 42 to the extent they accurately represent the content of

the testimony.

43.     Fox did not instruct ChatGPT on what definition of "DEI" to apply and did not

---

[1] All "Defendants' Ex." are to the Declaration of Rachael Doud dated March 27, 2026, filed
herewith.

verify what the model understood the term to mean. Fox Dep. at 206:6–8.

**Defendants' Response:** Admitted that Fox did not provide ChatGPT with a definition of "DEI" and that Fox was unsure of ChatGPT's understanding of the term "DEI." Defendants dispute the remainder of Paragraph 43 on the ground that it inaccurately paraphrases the cited testimony, which speaks for itself. Defendants respectfully refer the Court to the testimony for a complete and accurate statement of its contents and admit the factual aspects of Paragraph 43 to the extent they accurately represent the content of the testimony.

44.    Fox took no steps to ensure that ChatGPT's conception of DEI would not discriminate on the basis of race or sex. Fox Dep. at 207:11–15, 209:11–17.

**Defendants' Response:** Disputed. Paragraph 44 cites to an incomplete excerpt of Fox's testimony. Defendants respectfully refer the Court to the testimony for a complete and accurate statement of its contents and admit the factual aspects of Paragraph 44 to the extent they accurately represent the content of the testimony.

45.    ChatGPT classified as DEI a grant to fund a documentary about the Colfax Massacre on the ground that "[t]he documentary explores a historical event that significantly impacted Black civil rights, making it relevant to the topic of DEI." Ex. 11, US-000062485 (tab "Sheet3") at I4.

**Defendants' Response:** Admitted that ChatGPT responded "Yes" to the question of whether the referenced grant was related to DEI, and that the quoted text appears in the "Rationale" column of the cited spreadsheet. Disputed on the ground that Paragraph 45 suggests that ChatGPT "classified" grants as DEI. Defendants otherwise respectfully refer the Court to the spreadsheet included as Plaintiffs' Exhibit 11 for a complete and accurate statement of its contents and admit the factual aspects of Paragraph 45 to the extent they accurately represent the content of the

14

document.

46.    Fox believed that the Colfax Massacre grant was properly labeled as DEI—and thus terminated—because "[i]t focuses on . . . a specific race, here being Black." Fox Dep. at 220:16–18.

**Defendants' Response:** Admitted that Fox believed that the referenced grant implicated DEI for the reasons quoted in Paragraph 46. Disputed on the ground that Paragraph 46 suggests that ChatGPT "labeled" grants as DEI. Defendants respectfully refer the Court to the testimony for a complete and accurate statement of its contents and admit the factual aspects of Paragraph 46 to the extent they accurately represent the content of the testimony.

47.    ChatGPT classified as DEI a grant to fund a biography of Oscar Adams Jr. on the ground that "[t]his biography explores the life and accomplishments of . . . a Black lawyer and jurist." Ex. 11, US-000062485 (tab "Sheet3"), at I707.

**Defendants' Response:** Admitted that ChatGPT responded "Yes" to the question of whether the referenced grant was related to DEI, and that the quoted text appears in the "Rationale" column of the cited spreadsheet. Disputed on the ground that Paragraph 47 suggests that ChatGPT "classified" grants as DEI. Defendants otherwise respectfully refer the Court to the spreadsheet included as Plaintiffs' Exhibit 11 for a complete and accurate statement of its contents and admit the factual aspects of Paragraph 47 to the extent they accurately represent the content of the document.

48.    ChatGPT classified as DEI a grant to fund a project titled "In the Shadow of the Holocaust: Short Fiction by Jewish Writers from the Soviet Union" on the ground that "[t]his anthology explores Jewish writers' engagement with the Holocaust in the USSR." *Id*. at I316.

**Defendants' Response:** Admitted that ChatGPT responded "Yes" to the question of

whether the referenced grant was related to DEI, and that the quoted text appears in the "Rationale" column of the cited spreadsheet. Disputed on the ground that Paragraph 48 suggests that ChatGPT "classified" grants as DEI. Defendants otherwise respectfully refer the Court to the spreadsheet included as Plaintiffs' Exhibit 11 for a complete and accurate statement of its contents and admit the factual aspects of Paragraph 48 to the extent they accurately represent the content of the document.

49.    Fox believed that ChatGPT properly classified a grant about violence against women during the Holocaust as involving DEI—and thus slated it for termination—because it was "specifically focused on Jewish cultures" and "the voices of the females in that culture." Fox Dep. at 191:5–9.

**Defendants' Response:** Disputed on the ground that Paragraph 49 suggests that ChatGPT "classified" grants as DEI. Defendants respectfully refer the Court to the testimony for a complete and accurate statement of its contents and admit the factual aspects of Paragraph 49 to the extent they accurately represent the content of the testimony.

50.    ChatGPT classified as DEI a grant awarded to *Authors Guild* named Plaintiff Benjamin Holtzman on the ground that "[t]his book project explores the grassroots activist network that challenged white power in the late 20th century US, highlighting diverse groups joining forces to challenge white supremacists and transform understandings of racism." Ex. 11, US-000062485 (tab "Sheet3"), at H592.

**Defendants' Response:** Admitted that ChatGPT responded "Yes" to the question of whether the referenced grant was related to DEI, and that the quoted text appears in the "Rationale" column of the cited spreadsheet. Disputed on the ground that Paragraph 50 suggests that ChatGPT "classified" grants as DEI. Defendants otherwise respectfully refer the Court to the spreadsheet

16

included as Plaintiffs' Exhibit 11 for a complete and accurate statement of its contents and admit the factual aspects of Paragraph 50 to the extent they accurately represent the content of the document.

51.    ChatGPT classified as DEI a grant to fund a book on deaths in the Native American boarding school system, because it "sheds light on the dark history of Native American boarding schools, revealing their lethal impact" and "addressing the erasure of lives and the need for awareness in education systems. *Id*. at D638.

**Defendants' Response:** Admitted that ChatGPT responded "Yes" to the question of whether the referenced grant was related to DEI, and that the quoted text appears in the "Rationale" column of the cited spreadsheet. Disputed on the ground that Paragraph 51 suggests that ChatGPT "classified" grants as DEI. Defendants otherwise respectfully refer the Court to the spreadsheet included as Plaintiffs' Exhibit 11 for a complete and accurate statement of its contents and admit the factual aspects of Paragraph 51 to the extent they accurately represent the content of the document.

52.    ChatGPT classified as DEI a grant to the Modern Language Association on the ground that it "aims to align humanities courses with career outcomes for under-served students." McDonald Dep. at 127:16–20; Ex. 31, US-000061583.

**Defendants' Response:** Admitted that ChatGPT responded "Yes" to the question of whether the referenced grant was related to DEI, and that the quoted text appears in the "Rationale" column of the cited spreadsheet. Disputed on the ground that Paragraph 52 suggests that ChatGPT "classified" grants as DEI. Defendants otherwise respectfully refer the Court to the cited testimony and spreadsheet included as Plaintiffs' Exhibit 31 for a complete and accurate statement of their contents and admit the factual aspects of Paragraph 52 to the extent they accurately represent the

content of the document.

53.    ChatGPT classified as DEI a grant to an ACLS member to digitize mid 20th century African American newspapers on the ground that it "contributes to inclusivity by preserving and sharing underrepresented voices." McDonald Dep. at 121:9–14; Ex. 31, US-000061583.

**Defendants' Response:** Admitted that ChatGPT responded "Yes" to the question of whether the referenced grant was related to DEI, and that the quoted text appears in the "Rationale" column of the cited spreadsheet. Disputed on the ground that Paragraph 53 suggests that ChatGPT "classified" grants as DEI. Defendants otherwise respectfully refer the Court to the cited testimony and spreadsheet included as Plaintiffs' Exhibit 31 for a complete and accurate statement of their contents and admit the factual aspects of Paragraph 53 to the extent they accurately represent the content of the document and the testimony.

54.    ChatGPT classified as DEI a grant to an ACLS member to digitize and display anatomical flap books, on the ground that it "promot[ed] inclusivity in digitization efforts." McDonald Dep. at 122:19–25.

**Defendants' Response:** Admitted that ChatGPT responded "Yes" to the question of whether the referenced grant was related to DEI. Disputed on the ground that Paragraph 54 suggests that ChatGPT "classified" grants as DEI. Defendants otherwise respectfully refer the Court to the cited testimony for a complete and accurate statement of its contents and admit the factual aspects of Paragraph 54 to the extent they accurately represent the content of the document.

55.    There is not a single instance in the record where ChatGPT classified a grant as DEI because it involved a white, male, heterosexual, or other majority group. Fox Dep. at 242:20–243:19; Ex. 11, US-000062485 (tab "Sheet3").

**Defendants' Response:** Disputed on the ground that Paragraph 55 suggests that ChatGPT

18

"classified" grants as DEI. Defendants respectfully refer the Court to the cited testimony and spreadsheet included as Plaintiffs' Exhibit 31 for a complete and accurate statement of their contents and admit the factual aspects of Paragraph 55 to the extent they accurately represent the content of the document and the testimony.

56. For grants that NEH staff had flagged as at risk of promoting DEI or gender ideology, Fox designated all of them as involving DEI. *Compare* Ex. 12, US-000000936 *with* Ex. 6, NEH_AR_000006; *see also* Ex. 30, US-000000839 (email to which Ex. 12 is attached). There is no evidence that NEH leadership ever made a final determination whether those grants actually involved DEI or gender ideology.

**Defendants' Response:** Defendants dispute Paragraph 56's statement that "Fox designated all of [the grants] as involving DEI." The referenced spreadsheet at Plaintiffs' Exhibit 12 shows that for grants that NEH staff had flagged as at risk of promoting DEI or gender ideology, Fox noted that the grant had "NEH identified DEI involvement," reflecting that NEH staff also designated certain grants as implicating DEI. *See* Plaintiffs' Exhibit 12 at Column K. Defendants further dispute that "[t]here is no evidence that NEH leadership ever made a final determination whether those grants actually involved DEI or gender ideology." All four witnesses testified that McDonald personally approved the termination of each grant. Defendants' Ex. 1 (Cavanaugh Tr.) 182:5-11, 241:19-23; Defendants' Ex. 2 (Fox Tr.) 322:24-323:3; Defendants' Ex. 3 (McDonald Tr.) 229:12-230:16; Defendants' Ex. 4 (Wolfson Tr.) 256:6-12. Defendants otherwise respectfully refer the Court to the cited spreadsheets included as Plaintiffs' Exhibits 12, 6, and 30 for a complete and accurate statement of their contents and admit the factual aspects of Paragraph 56 to the extent they accurately represent the content of the documents.

57. Fox combined the ChatGPT designations with NEH's risk designations to produce

a spreadsheet identifying 1,057 grants as "DEI." Ex. 12, US-000000936; Ex. 13, US-000041372; McDonald Dep. at 143:11–18; Ex. 30, US-000000839 (email to which Ex. 12 is attached).

**Defendants' Response:** Defendants dispute Paragraph 57's description of the facts concerning Fox's use of ChatGPT. Fox did not ask ChatGPT to identify grants for termination, and instead only asked ChatGPT to describe how, if at all, a grant "related to DEI." *See* US-000062485. Defendants otherwise respectfully refer the Court to the cited spreadsheets included as Plaintiffs' Exhibits 12, 6, and 30 for a complete and accurate statement of their contents and admit the factual aspects of Paragraph 57 to the extent they accurately represent the content of the documents.

58.    The resulting spreadsheet catalogued grants "by DEI involvement and Division" and marked each of the 1,057 "DEI" grants as "Yes" in the column titled "Yes/No DEI?" Ex. 12, US-000000936 ("NEH Grant Summary" tab).

**Defendants' Response:** Defendants incorporate herein their response to Paragraph 57 and respectfully refer the Court to the cited spreadsheet included as Plaintiffs' Exhibit 12 for a complete and accurate statement of its contents and admit the factual aspects of Paragraph 58 to the extent they accurately represent the content of the document.

59.    The "DEI Rationale" column in the spreadsheet contained either the notation that "NEH identified DEI involvement" or the verbatim rationale that ChatGPT had provided to Fox. Ex. 12, US-000000936 ("NEH Grant Detail" tab); *see also* Ex. 11, US-00006285.

**Defendants' Response:** Disputed on the grounds that Fox testified, *inter alia*, that he and Cavanaugh made edits to the DEI rationales generated by ChatGPT. Defendants' Ex. 2 (Fox Tr.) 178:9-16. Defendants respectfully refer the Court to the cited spreadsheets included as Plaintiffs' Exhibits 11 and 12 for a complete and accurate statement of their contents and admit the factual

20

aspects of Paragraph 59 to the extent they accurately represent the content of the document.

60.    It was DOGE's "decision" whether to terminate any grants, and NEH was limited to making "recommendations." Ex. 5 at NEH_AR_0000023.

**Defendants' Response:** Disputed.  All four witnesses testified that McDonald personally approved the termination of each grant and was the final decision maker.  Defendants' Ex. 1 (Cavanaugh Tr.) 182:5-11, 241:19-23; Defendants' Ex. 2 (Fox Tr.) 322:24-323:3; Defendants' Ex. 3 (McDonald Tr.) 229:12-230:16; Defendants' Ex. 4 (Wolfson Tr.) 256:6-12.

61.    Neither McDonald nor anyone else at NEH knew that Fox had used ChatGPT to generate DEI rationales. McDonald Dep. at 117:1–6, 126:9–19.

**Defendants' Response:** Admitted that McDonald did not know about Fox's use of ChatGPT.  Defendants dispute the remainder of Paragraph 61 on the ground that there is no evidence in the record supporting the fact that "[no one] else at NEH knew" about Fox's use of ChatGPT.

62.    McDonald does not believe using ChatGPT is an appropriate method for identifying grants for termination. McDonald Dep. at 131:12–25.

**Defendants' Response:** Disputed.  Fox did not ask ChatGPT to identify grants for termination, and instead only asked ChatGPT to describe how, if at all, a grant "related to DEI." *See* US-000062485; Defendants' Ex. 2 (Fox Tr.) 204:9-13; 204:20-23.  Fox did not prompt Chat GPT to make any decisions about whether a particular grant should be terminated.  Defendant's Ex. 2 (Fox Tr.) 207:9-10; 207:23-25; 208:23-209:3.

63.    McDonald agreed that the DOGE and NEH grant review process "was specifically to identify grants for potential termination." McDonald Dep. at 144:6–15.

**Defendants' Response:** Disputed.  Paragraph 63 inaccurately paraphrases the cited

21

testimony, which reflects McDonald's statements that NEH's grant review process was undertaken to ensure that NEH's grants were "in line with the president's executive order."  Defendants' Ex. 3 (McDonald Tr.) 98:1-6.  Defendants respectfully refer the Court to the testimony for a complete and accurate statement of its contents and admit the factual aspects of Paragraph 63 to the extent they accurately represent the content of the testimony.

64.     The DEI rationales often made no sense to McDonald and McDonald did not think grants he reviewed at his deposition should have been terminated on the stated bases. McDonald Dep. at 119:3–123:8, 128:21–129:15, 130:1–131:11.

**Defendants' Response:** Disputed.   Paragraph 64 inaccurately paraphrases the cited testimony regarding McDonald's opinion about the soundness of the DEI rationales and whether particular grants should have been terminated on particular bases.  Defendants respectfully refer the Court to the testimony for a complete and accurate statement of its contents and admit the factual aspects of Paragraph 64 to the extent they accurately represent the content of the testimony.

65.     Fox and Cavanaugh followed DOGE's timelines for terminating grants by moving to terminate grants "quickly," because "[t]he general pacing of DOGE was to try and make decisions and act quickly to avoid Government employees dragging their feet on cancellations." Cavanaugh Dep. at 134:24–135:4.

**Defendants' Response:** Defendants dispute Paragraph 65 to the extent it suggests that Fox and Cavanaugh executed or were the final decision makers with respect to the grant terminations. All four witnesses testified that McDonald personally approved the termination of each grant and was the final decision maker.   Defendants' Ex. 1 (Cavanaugh Tr.)  182:5-11, 241:19-23; Defendants' Ex. 2 (Fox Tr.) 322:24-323:3; Defendants' Ex. 3 (McDonald Tr.) 229:12-230:16; Defendants' Ex. 4 (Wolfson Tr.) 256:6-12.   Defendants respectfully refer the Court to the

testimony for a complete and accurate statement of its contents and admit the factual aspects of Paragraph 65 to the extent they accurately represent the content of the testimony.

66. Fox and Cavanaugh used "pressure tactics" at NEH to execute the terminations as quickly as possible. Cavanaugh Dep. at 170:3–8.

**Defendants' Response:** Defendants dispute Paragraph 66 to the extent it suggests that Fox and Cavanaugh executed or were the final decision makers with respect to the grant terminations. All four witnesses testified that McDonald personally approved the termination of each grant and was the final decision maker. Defendants' Ex. 1 (Cavanaugh Tr.) 182:5-11, 241:19-23; Defendants' Ex. 2 (Fox Tr.) 322:24-323:3; Defendants' Ex. 3 (McDonald Tr.) 229:12-230:16; Defendants' Ex. 4 (Wolfson Tr.) 256:6-12. Defendants respectfully refer the Court to the testimony for a complete and accurate statement of its contents and admit the factual aspects of Paragraph 66 to the extent they accurately represent the content of the testimony.

67. Fox falsely represented to McDonald and Wolfson that the White House was making demands regarding the grant terminations. *Id*.

**Defendants' Response:** Disputed. Paragraph 67 inaccurately paraphrases the cited testimony by stating that Fox "falsely" represented that the White House was "making demands regarding grant terminations." Defendants respectfully refer the Court to the testimony for a complete and accurate statement of its contents and admit the factual aspects of Paragraph 67 to the extent they accurately represent the content of the testimony.

68. On March 31, 2025, Fox emailed McDonald: "We're getting pressure from the top on this and we'd prefer that you maintain on our side but let us know if you're no longer interested." Ex. 15, US-000050717; Fox Dep. at 305:8–17. By "our side," Fox was referring to him and Cavanaugh. Id.

**Defendants' Response:** Admitted.

69.     On March 31, 2025, Fox sent several emails to McDonald demanding that McDonald contact Fox as soon as possible. Ex. 16, NEH_AR_000010. The urgency Fox conveyed to McDonald in the emails was a fabricated "time pressure tactic" to effectuate the terminations. Cavanaugh Dep. at 169:10–171:5.

**Defendants' Response:** Disputed.  Paragraph 69 inaccurately paraphrases the cited testimony.   Defendants further dispute Paragraph 69 to the extent it suggests that Fox and Cavanaugh executed or were the final decision makers with respect to the grant terminations.  All four witnesses testified that McDonald personally approved the termination of each grant and was the final decision maker.  Defendants' Ex. 1 (Cavanaugh Tr.) 182:5-11, 241:19-23; Defendants' Ex. 2 (Fox Tr.) 322:24-323:3; Defendants' Ex. 3 (McDonald Tr.) 229:12-230:16; Defendants' Ex. 4 (Wolfson Tr.) 256:6-12.  Defendants respectfully refer the Court to the testimony and document included as Plaintiffs' Exhibit 16 for a complete and accurate statement of their contents and admit the factual aspects of Paragraph 69 to the extent they accurately represent the content of the testimony and the document.

70.     After speaking with McDonald on March 31, Fox made clear that DOGE—not NEH—would be carrying out the grant terminations. Ex. 17, NEH_AR_000013.

**Defendants' Response:** Defendants dispute Paragraph 70 to the extent it suggests that Fox and Cavanaugh executed or were the final decision makers with respect to the grant terminations. All four witnesses testified that McDonald personally approved the termination of each grant and was the final decision maker.  Defendants' Ex. 1 (Cavanaugh Tr.) 182:5-11, 241:19-23; Defendants' Ex. 2 (Fox Tr.) 322:24-323:3; Defendants' Ex. 3 (McDonald Tr.) 229:12-230:16; Defendants' Ex. 4 (Wolfson Tr.) 256:6-12.  Admitted that Fox and Cavanaugh transmitted the

termination notices to grant recipients.  Defendants respectfully refer the Court to the document included as Plaintiffs' Exhibit 17 for a complete and accurate statement of its contents and admit the factual aspects of Paragraph 70 to the extent they accurately represent the content of the document.

71.    For the list NEH staff had marked as "N/A" for DEI, Fox directed McDonald and Wolfson to identify grants that "seem not to conflict with the Administration's priorities" and DOGE would cancel grants on the list that they did not mark. Ex. 17, NEH_AR_000013.

**Defendants' Response:** Defendants dispute Paragraph 71 to the extent it suggests that Fox and Cavanaugh executed or were the final decision makers with respect to the grant terminations. All four witnesses testified that McDonald personally approved the termination of each grant and was the final decision maker.  Defendants' Ex. 1 (Cavanaugh Tr.) 182:5-11, 241:19-23; Defendants' Ex. 2 (Fox Tr.) 322:24-323:3; Defendants' Ex. 3 (McDonald Tr.) 229:12-230:16; Defendants' Ex. 4 (Wolfson Tr.) 256:6-12.  Defendants respectfully refer the Court to the document included as Plaintiffs' Exhibit 17 for a complete and accurate statement of its contents and admit the factual aspects of Paragraph 71 to the extent they accurately represent the content of the document.

72.    On April 1, 2025, McDonald emailed Fox urging that grants NEH staff had marked "N/A" for DEI not be terminated, stating that "we think these projects are harmless when it comes to promoting DEI." Ex. 5, NEH_AR_000022.

**Defendants' Response:** Admitted that the quoted language appears in the cited document. Defendants dispute Paragraph 72 to the extent it suggests that Fox and Cavanaugh executed or were the final decision makers with respect to the grant terminations.  All four witnesses testified that McDonald personally approved the termination of each grant and was the final decision maker.

Defendants' Ex. 1 (Cavanaugh Tr.) 182:5-11, 241:19-23; Defendants' Ex. 2 (Fox Tr.) 322:24-323:3; Defendants' Ex. 3 (McDonald Tr.) 229:12-230:16; Defendants' Ex. 4 (Wolfson Tr.) 256:6-12. Defendants respectfully refer the Court to the document included as Plaintiffs' Exhibit 5 for a complete and accurate statement of its contents and admit the factual aspects of Paragraph 72 to the extent they accurately represent the content of the document.

73.     In that same communication, McDonald acknowledged that the decision whether to discontinue funding any project on DOGE's list was DOGE's to make. *Id*. at NEH_AR_000023.

**Defendants' Response:** Defendants dispute Paragraph 73 to the extent it suggests that Fox and Cavanaugh executed or were the final decision makers with respect to the grant terminations. All four witnesses testified that McDonald personally approved the termination of each grant and was the final decision maker. Defendants' Ex. 1 (Cavanaugh Tr.) 182:5-11, 241:19-23; Defendants' Ex. 2 (Fox Tr.) 322:24-323:3; Defendants' Ex. 3 (McDonald Tr.) 229:12-230:16; Defendants' Ex. 4 (Wolfson Tr.) 256:6-12. Defendants respectfully refer the Court to the document included as Plaintiffs' Exhibit 5 for a complete and accurate statement of its contents and admit the factual aspects of Paragraph 73 to the extent they accurately represent the content of the document.

74.     McDonald recommended that "wherever the 'DEI Rationale' on the spreadsheet makes clear that there is no DEI component to the project, there is no justification for canceling the project's funding and you should allow it to continue." *Id*.

**Defendants' Response:** Admitted that the quoted language appears in the cited document. Defendants dispute Paragraph 74 to the extent it suggests that McDonald solely made "recommendations" to Fox and Cavanaugh or that Fox and Cavanaugh executed or were the final decision makers with respect to the grant terminations. All four witnesses testified that McDonald

personally approved the termination of each grant and was the final decision maker. Defendants' Ex. 1 (Cavanaugh Tr.) 182:5-11, 241:19-23; Defendants' Ex. 2 (Fox Tr.) 322:24-323:3; Defendants' Ex. 3 (McDonald Tr.) 229:12-230:16; Defendants' Ex. 4 (Wolfson Tr.) 256:6-12. Defendants respectfully refer the Court to the document included as Plaintiffs' Exhibit 5 for a complete and accurate statement of its contents and admit the factual aspects of Paragraph 74 to the extent they accurately represent the content of the document.

75.    Fox and Cavanaugh rejected McDonald's recommendation not to terminate grants NEH staff had marked "N/A." McDonald Dep. at 214:2–6; Cavanaugh Dep. at 180:19–181:9.

**Defendants' Response:** Defendants dispute Paragraph 75 to the extent it suggests that Fox and Cavanaugh executed or were the final decision makers with respect to the grant terminations, and on the ground that it mischaracterizes the cited testimony. All four witnesses testified that McDonald personally approved the termination of each grant and was the final decision maker. Defendants' Ex. 1 (Cavanaugh Tr.) 182:5-11, 241:19-23; Defendants' Ex. 2 (Fox Tr.) 322:24-323:3; Defendants' Ex. 3 (McDonald Tr.) 229:12-230:16; Defendants' Ex. 4 (Wolfson Tr.) 256:6-12. Defendants respectfully refer the Court to the cited testimony for a complete and accurate statement of its contents.

76.    Fox and Cavanaugh also reviewed approximately 400 Biden-era grants that had not been flagged as DEI by NEH staff or ChatGPT. Ex. 39, NEH_AR_000085; Ex. 32, US-000041206; McDonald Dep. at 225:2–6.

**Defendants' response:** Admitted that Fox and Cavanaugh reviewed grants that had not been flagged by NEH as implicating DEI and that Fox and Cavanaugh did not themselves identify as implicating DEI, and that approximately 400 grants that were not flagged as implicating DEI were terminated, and otherwise disputed.

77.     Biden-era grants that had not been marked as "DEI" were treated as presumptively "wasteful" and marked for termination unless they "aligned with the [Trump] Administration." Cavanaugh Dep. at 155:11–13; *see also* McDonald Dep. at 302:21–25; Ex. 17, NEH_AR_000013. DOGE solely made the decision to terminate these additional grants. McDonald Dep. at 155:10–19, 156:10–13, 179:18–180:3, 226:6–11, 229:5–10, 231:21–24.

**Defendants' response:**  Disputed.  Paragraph 77 mischaracterizes the cited testimony by stating that "Biden-era grants . . . were treated as presumptively wasteful." Defendants further dispute Paragraph 77 to the extent it suggests that Fox and Cavanaugh executed or were the final decision makers with respect to the grant terminations.  All four witnesses testified that McDonald personally approved the termination of each grant and was the final decision maker.  Defendants' Ex. 1 (Cavanaugh Tr.) 182:5-11, 241:19-23; Defendants' Ex. 2 (Fox Tr.) 322:24-323:3; Defendants' Ex. 3 (McDonald Tr.) 229:12-230:16; Defendants' Ex. 4 (Wolfson Tr.) 256:6-12. Defendants respectfully refer the Court to the cited testimony for a complete and accurate statement of its contents and admit the factual aspects of Paragraph 77 to the extent they accurately represent the content of the testimony.

78.     Fox and Cavanaugh permitted McDonald and Wolfson to recommend grants for removal from the termination list subject to two constraints: (i) any grant related to DEI could not be removed; and (ii) recommendations were limited to grants relating to the American Revolution or those whose termination "would not reflect well" on the Administration. Cavanaugh Dep. at 202:14–20; McDonald Dep. at 238:10–239:4; Ex. 5 at NEH_AR_000023.

**Defendants' response:**  Disputed.  Paragraph 78 mischaracterizes the cited testimony to the extent it suggests that Fox and Cavanaugh executed or were the final decision makers with respect to the grant terminations.  All four witnesses testified that McDonald personally approved

28

the termination of each grant and was the final decision maker. Defendants' Ex. 1, (Cavanaugh Tr.) 182:5-11, 241:19-23; Defendants' Ex. 2, (Fox Tr.) 322:24-323:3; Defendants' Ex. 3, (McDonald Tr.) 229:12-230:16; Defendants' Ex. 4, (Wolfson Tr.) 256:6-12. Defendants respectfully refer the Court to the cited testimony for a complete and accurate statement of its contents and admit the factual aspects of Paragraph 78 to the extent they accurately represent the content of the testimony.

79. In total, approximately 40 Biden-era grants were ultimately saved from termination. Ex. 14, US-000061492

**Defendants' response:** Admitted that approximately 40 open grants were not terminated and that those grants were awarded during the Biden administration.

80. DOGE terminated over 1,400 grants that had been awarded during the Biden administration. Ex. 25, NEH_AR_0000136; Ex. 39, NEH_AR_000085.

**Defendants' response:** Defendants admit that approximately 1,400 grants were terminated but dispute that DOGE terminated the grants and that all the grants that were terminated were awarded during the Biden administration.

81. Of the grants that were ultimately terminated and kept, McDonald did not approve each specific grant to be terminated and did not know why certain grants had been terminated or kept. McDonald Dep. at 179:1–17, 231:7–232:11, 238:2–239:4, 248:5–19, 249:9–253:11, 253:23–55:11.

**Defendants' response:** Disputed. Paragraph 81 mischaracterizes the cited testimony. Defendants respectfully refer the Court to the cited testimony for a complete and accurate statement of its contents and admit the factual aspects of Paragraph 81 to the extent they accurately represent the content of the testimony.

82.    NEH employees, including senior officers, were not informed about the grant terminations as they were occurring and were unable to prevent grants from being canceled by DOGE or to reinstate them once terminated. Ex. 18, US-000064982; Ex. 19, US-000065114.

**Defendants' response:**  Defendants object to Paragraph 82 as vague and on the ground that Plaintiffs generalize about the knowledge and experiences of "NEH employees" generally on the basis of emails from two staff members.  Defendants dispute that no NEH employees were aware of the grant terminations and that the grants were terminated by DOGE.

83.    NEH Chief Information Officer Brett Bobley communicated to Dartmouth-affiliated grantees: "I'm terribly sorry to tell you that DOGE did indeed cancel your award. NEH staff, like myself, didn't realize it was happening." Ex. 18, US-000064982.

**Defendants' response:**  Admitted that the cited email contains the quoted text.

84.    NEH Director of the Division of Research Programs Christopher Thornton communicated to affected grantees that five NEH-JUSFC fellowships had been "terminated by DOGE" and that the termination "was not an agency decision." Ex. 19, US-000065114.

**Defendants' response:**  Admitted that the cited email contains the quoted text.

85.    Fox worked with DOGE lawyer Justin Aimonetti to draft termination notices to be sent to grant recipients. Fox Dep. at 288:5–15; McDonald Dep. at 257:12–13.

**Defendants' response:**  Admitted.

86.    The termination notices stated as a basis for termination that an Executive Order mandated that NEH "eliminate all non-statutorily required activities and functions." Ex. 20, US-000050608 (citing E.O. 14217, 90 FR 10577 (Feb. 19, 2025)).

**Defendants' response:**  Admitted.

87.    The Executive Order cited in the termination notices said nothing about NEH.

McDonald Dep. at 257:14–25; *see also* E.O. 14217.

**Defendants' response:**  Admitted.

88.    Fox—not McDonald—inserted the signature "/s/ Michael McDonald" on the termination notices. Ex. 33, Defs.' Responses to Pls.' Requests for Admission No. 36; McDonald Dep. at 262:8–263:2; Fox Dep. at 282:20–21; McDonald Dep. at 262:17–21.

**Defendants' response:**  Admitted.

89.    Fox obtained administrative access to a Microsoft email account and used it to send the termination notices. Fox Dep. at 321:19–23; McDonald Dep. at 163:22–25; Ex. 16 at NEH_AR_000011.

**Defendants' response:**  Admitted.

90.    Fox sent the termination notices to more than 1,400 organizations and individuals. Fox Dep. at 279:18–280:9; Ex. 22, US-000057526; Ex. 25, NEH_AR_0000136.

**Defendants' response:**  Admitted.

91.    The termination notices were not sent from an official NEH email address, but from the address grants_notifications@nehemail.onmicrosoft.com. McDonald Dep. at 260:16–261:14; see, e.g., Ex. 35, NEH_AR_000091.

**Defendants' response:**  Admitted.

92.    McDonald could not recall any other time in his over twenty years at NEH where a person not employed by NEH executed an NEH function in this manner. McDonald Dep. at 243:1–6.

**Defendants' response:**  Disputed.  Paragraph 92's reference to "in this manner" is vague and  inaccurately paraphrases the cited testimony.  Defendants respectfully refer the Court to the testimony for a complete and accurate statement of its contents and admit the factual aspects of

31

Paragraph 92 to the extent they accurately represent the content of the testimony.

93.    Fox began sending termination notices on April 2, 2025—one day short of his first full month in government. Ex. 22, US-000057526; Fox Dep. at 38:11–12; 279:18–280:9; 322:8–14.

**Defendants' response:**  Admitted.

94.    Every termination notice used substantially the same boilerplate language, was sent during the same window of time, and was sent from the same unofficial email address. Ex. 23, US-000050461; Ex. 25, NEH_AR_0000136. *See also e.g.*, Ex. 37, NEH_AR_000092; Ex 38, NEH_AR_000094.

**Defendants' response:**  Admitted.

95.    At a meeting with NEH staff on April 3, 2025, McDonald described DOGE as having written and transmitted the terminations, saying that "they said in the notification letter . . . [that] they would not be adhering to the traditional notification processes." McDonald Dep. at 303:14–18; McDonald Dep. at Ex. 30 (transcript).

**Defendants' response:**  Admitted that the quoted language appears in the cited portion of the testimony.  Disputed to the extent Paragraph 95 suggests that Fox and Cavanaugh executed or were the final decision makers with respect to the grant terminations.  All four witnesses testified that McDonald personally approved the termination of each grant and was the final decision maker. Defendants' Ex. 1 (Cavanaugh Tr.) 182:5-11, 241:19-23; Defendants' Ex. 2 (Fox Tr.) 322:24-323:3; Defendants' Ex. 3 (McDonald Tr.) 229:12-230:16; Defendants' Ex. 4 (Wolfson Tr.) 256:6-12.  Defendants respectfully refer the Court to the testimony for a complete and accurate statement of its contents and admit the factual aspects of Paragraph 95 to the extent they accurately represent the content of the testimony.

96.     McDonald described the rationale for the terminations as "because that's the way DOGE had operated at other agencies and they applied the same methodology here." McDonald Dep. at 315:23–316:1; McDonald Dep. at Ex. 30 (transcript).

**Defendants' response:**  Admitted that the quoted language appears in the cited portion of the testimony.  Disputed to the extent Paragraph 96 suggests that Fox and Cavanaugh executed or were the final decision makers with respect to the grant terminations.  All four witnesses testified that McDonald personally approved the termination of each grant and was the final decision maker. Defendants' Ex. 1 (Cavanaugh Tr.) 182:5-11, 241:19-23; Defendants' Ex. 2 (Fox Tr.) 322:24-323:3; Defendants' Ex. 3 (McDonald Tr.) 229:12-230:16; Defendants' Ex. 4 (Wolfson Tr.) 256:6-12.  Defendants respectfully refer the Court to the testimony for a complete and accurate statement of its contents and admit the factual aspects of Paragraph 96 to the extent they accurately represent the content of the testimony.

97.     McDonald could not answer a question about the number of grants terminated at the April 3 staff meeting, stating that it would be "conjecture" on his part. McDonald Dep. at 312:20–23.

**Defendants' response:**  Disputed. Paragraph 97 inaccurately paraphrases the cited testimony, which reflects that McDonald did respond to the referenced question by stating that "upwards of 80 to 90 percent of previously-approved awards went by the wayside."  McDonald Tr. 312:20-23.  Defendants respectfully refer the Court to the testimony for a complete and accurate statement of its contents and admit the factual aspects of Paragraph 97 to the extent they accurately represent the content of the testimony.

98.     The Mass Termination was the largest mass termination of grants in the history of NEH. McDonald Dep. at 66:13–67:12.

**Defendants' response:**  Admitted, on information and belief.

99.    In total, more than 1,400 active grants—representing over \$100 million in congressionally appropriated funds—were canceled. McDonald Dep. at 66:13–67:12; Ex. 39, NEH_AR_000085.

**Defendants' response:**  Admitted.

100.    The terminated grants spanned every NEH program and included oral history projects, archival preservation efforts, fellowships, documentary projects, and hundreds of other scholarly projects.  Ex. 39, NEH_AR_000085.

**Defendants' response:**  Admitted that the terminated grants spanned every NEH program office and division, and that the terminated grants included oral history projects, archival preservation efforts, fellowships, documentary projects, and other scholarly projects.

101.    Shortly after the terminations, Wolfson sent McDonald a text message stating that "it is the case that DOGE cut grants having nothing to do with DEI." Ex. 34, US-000062916.

**Defendants' response:**  Admitted that Wolfson sent McDonald the quoted text message, which speaks for itself.  Defendants respectfully refer the Court to the text message for a complete and accurate statement of its contents and admit the factual aspects of Paragraph 101 to the extent they accurately represent the content of the document.

102.    McDonald responded to Wolfson's text with a "thumbs up," which McDonald testified meant that he agreed with Wolfson's statement. McDonald Dep. at 326:15–19.

**Defendants' response:**  Admitted that McDonald responded to Wolfson's text message with a thumbs up but otherwise dispute on the grounds that Plaintiffs refer to only a portion of the referenced text message in paragraph 101.    Defendants respectfully refer the Court to the testimony for a complete and accurate statement of its contents and admit the factual aspects of

34

Paragraph 102 to the extent they accurately represent the content of the testimony.

103.    DOGE posted from its official account on X (formerly Twitter) that "[d]uring the previous administration, the National Endowment for the Humanities (NEH) awarded the following grants to spend taxpayer dollars, all of which have been cancelled ($163M in overall savings)" before listing five grants explicitly related to LGBTQ+ topics. Post, DOGE (@DOGE), X (May 20, 2025, 3:45 PM) https://x.com/doge/status/1924944059153670530.

**Defendants' response:**    Admitted that the referenced post was made to DOGE's X account.  Defendants respectfully refer the Court to the post for a complete and accurate statement of its contents and admit the factual aspects of Paragraph 103 to the extent they accurately represent the content of the testimony.

### Defendants' Statement of Additional Material Undisputed Facts

1.    NEH was created by statute in 1965.  *See* National Foundation on the Arts and the Humanities Act, Pub. L. 89-209, 20 U.S.C. § 951(1) (Sept. 29, 1965) ("NEH Act").

2.    The NEH Act provides that "[t]he Endowment shall be headed by a chairperson, who shall be appointed by the President, by and with the advice and consent of the Senate" and that "[t]he Chairperson, with the advice of the National Council on the Humanities . . . , is authorized to enter into arrangements, including contracts, grants, loans, and other forms of assistance, to" carry out various specified purposes, including to "initiate and support research and programs to strengthen the research and teaching potential of the United States in the humanities by making arrangements with individuals or groups to support such activities . . ." and to "initiate and support programs and research which have substantial scholarly and cultural significance and that reach, or reflect the diversity and richness of our American cultural heritage, including the culture of, a minority, inner city, rural, or tribal community."  20 U.S.C. § 956(b)-(c).

3.    On January 20, 2025, President Trump issued Executive Order 14151, *Ending Radical and Wasteful Government DEI Programs and Preferencing*, which stated that the Biden administration had instituted diversity, equity, and inclusion ("DEI") programs in "virtually all aspects of the Federal Government" and required federal agencies to provide the Office of Management and Budget ("OMB") a list of all "grantees who received Federal funding to provide or advance DEI, [diversity, equity, inclusion, and accessibility ("DEIA")], or 'environmental justice' programs, services, or activities since January 20, 2021."  E.O. 14151, 90 Fed. Reg. 8339 (Jan. 20, 2025).

4.    On January 20, 2025, President Trump issued Executive Order 14168, *Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government*, which among other things directed agencies to "ensure grant funds do not promote gender ideology."  E.O. 14168 § 3(g), 90 Fed. Reg. 8615 (Jan. 20, 2025).

5.    On January 27, 2025, OMB issued a memorandum to the heads of Executive Branch departments and agencies instructing them to, among other things, "identify and review all Federal financial assistance programs and supporting activities consistent with the President's policies and requirements," including the recently issued Executive Orders.  *See* https://www.whitehouse.gov/wp-content/uploads        /2025/03/M-25-13-Temporary-Pause-to-Review-Agency-Grant-Loan-and-Other-Financial-Assistance-Programs.pdf.

6.    On February 11, 2025, President Trump issued Executive Order 14210, *Implementing the President's "Department of Government Efficiency" Workforce Optimization Initiative*, which established the Department of Government Efficiency ("DOGE") and stated that it was intended to "commence[] a critical transformation of the Federal Bureaucracy" and "eliminat[e] waste, bloat, and insularity.  E.O. 14210, 90 Fed. Reg. 9669 (Feb. 11, 2025).

7.      In early February 2025, NEH's program directors began the process of reviewing all grant awards from 2021 to the present pursuant to OMB's January 27, 2025, Memorandum. Ex. 5 (NEH_AR_000001).[2]

8.      The program directors were instructed to "identify grants that focus on or promote (in whole or in part): (i) 'environmental justice'; (ii) 'diversity, equity, and inclusion' or 'diversity, equity, inclusion, and accessibility' (even if these exact terms are not used); and (iii) 'gender ideology,' which, according to the Executive Order, replaces sex with 'an internal, fluid, and subjective sense of self unmoored from biological facts' or with 'an ever-shifting concept of self-assessed gender identity.'"  Ex. 5 (NEH_AR_000001).

9.      Pursuant to those instructions, "[NEH] staff reviewed all the awards made over the past four years and rated them 'high, medium, or low' in terms of promoting" these concepts, collectively referred to as "DEI."  Ex. 6 (NEH_AR_000021) at NEH_AR_000022; *see also* Ex. 8 (NEH_AR_000006) (spreadsheet with NEH staff annotations).

10.      In March 2025, Nate Cavanaugh and Justin Fox, two members of a DOGE team assigned to "identify wasteful spend within small agencies in the Federal Government," were detailed to NEH to work with the agency to implement the Executive Orders.  Ex. 1 (Cavanaugh Tr.) 37:10-38:12.

11.      Fox and Cavanaugh first met Acting NEH Chairman Michael McDonald and Assistant Chair for Programs Adam Wolfson on March 12, 2025.  Ex. 2 (Fox Tr.) 127:20-25.

12.      In advance of the meeting, Fox created a spreadsheet in which he sorted grants into the categories "Craziest Grants" and "Other Bad Grants."  *See* Ex. 9 (US-000016154); Ex. 2 (Fox

---

[2] All exhibits cited in Defendants' Statement of Additional Material Undisputed Facts are to the Declaration of Rachael Doud dated March 27, 2026, filed herewith.

Tr.) 228:2-230:17.  The creation of that spreadsheet was a "preliminary exercise" and the list was "not used in the context of deciding what grants to keep or not."  Ex. 2 (Fox. Tr.) 232:2-4, 243:25-244:3, 244:20-25.

13.    After the March 12, 2025, meeting, Wolfson sent Cavanaugh and Fox the spreadsheet reflecting the NEH program directors' review of grants pursuant to the OMB Memorandum.  Ex. 7 (NEH_AR_000005).

14.    Using NEH's spreadsheet as a starting point, Fox and Cavanaugh identified additional grants that, in their view, implicated DEI, and sent spreadsheets of those grants to McDonald and Wolfson for their review and consideration.  *See* Ex. 10 (US-000000839) (March 17, 2025, email attaching list); Ex. 11 (US-000000847) (attachment to March 17, 2025, email); Ex. 12 (US-000000936) (attachment to March 17, 2025, email); Ex. 13 (US-000041372) (March 19, 2025, email attaching updated list); Ex. 14 (US-000041427) (attachment to March 19, 2025, email).

15.    For purposes of generating the lists they sent to McDonald and Wolfson, Fox and Cavanaugh expanded their review to all active grants, not just the grants awarded beginning in January 2021.  *See* Ex. 10 (March 17, 2025, email noting that Fox and Cavanaugh reviewed "all active grants"); Ex. 1 (Cavanaugh Tr.) 107:13-14 ("We reviewed prior administration grants as well . . . .").

16.    In the course of generating the lists sent to McDonald and Wolfson, Fox used ChatGPT by inputting grant descriptions into ChatGPT to generate a "DEI rationale."  Ex. 15 (US-000062485).  Fox did not use ChatGPT as a substitute for personally reviewing grant descriptions to determine which grants potentially implicated DEI, or to make decisions about whether a particular grant should be terminated.  Ex. 2 (Fox Tr.) 207:9-10, 208:23-209:3.

17. Fox asked McDonald and Wolfson to review active grants for "wasteful spend" as well "DEI." Ex. 16 (NEH_AR_000013).

18. McDonald and Wolfson reviewed the lists sent by Fox and identified grants that they did not think should be terminated. Ex. 16 (NEH_AR_000013); *see also* Ex. 17 (NEH_AR_000024) (spreadsheet reflecting McDonald and Wolfson's notations).

19. On April 1, 2026, Fox sent McDonald proposed lists of grants to keep and cancel and requested McDonald's final approval on which grants to keep. Ex. 22 (US-000061330 & US-000061332); Ex. 6 (NEH_AR_000021) at NEH_AR_000022.

20. Fox sent McDonald an "[u]pdated" list at 4:17 pm on April 1, 2026. Ex. 23 (US-000000756); Ex. 24 (US-000000758); Ex. 6 (NEH_AR_000021) at NEH_AR_000022.

21. McDonald and Wolfson reviewed the list sent by Fox at 4:17 pm on April 1, 2026, and, at 5:05pm on the same day, sent back an initialed version. Ex. 25 (US-000061427); Ex. 26 (US-000061429).

22. At 7:55pm on April 1, 2026, Fox sent final lists of grants to keep and cancel to McDonald for his review and approval. Ex. 27 (US-000061430 & US-000061432); Ex. 6 (NEH_AR_000021).

23. McDonald reviewed the final list of grants to terminate and approved it. Ex. 6 (NEH_AR_000021); *see also* Ex. 3 (McDonald Tr.) 229:12-230:16; Ex. 4 (Wolfson Tr.) 256:6-12; Ex. 1 (Cavanaugh Tr.) 182:5-11, 241:19-23; Ex. 2 (Fox Tr.) 322:24-323: 3, 143:23-144:2, 158:4-9, 160:8-13, 184:18-22, 192:20-24, 193:8-15, 194:3-6, 214:18-21, 296:2-4.

24. McDonald reviewed and approved grant termination letters drafted by Fox. Ex. 29 (US-000002717 & attachments); Ex. 30 (US-000050461); Ex. 3 (McDonald Tr.) 259:5-7, 262:8-13, 271:23-272:16, 307:4-10; Ex. 4 (Wolfson Tr.) 234:14-21.

25.     McDonald and Fox agreed that Fox would send out the termination letters and, on April 2, 2025, Fox sent them out by email.  Ex. 2 (Fox Tr.) 284:7-285:16, 322:24-323:3; Ex. 3 (McDonald Tr.) 163:22-164:8, 197:4-16.

26.     The final list of grants that was terminated included approximately 1,000 grants that Defendants identified as implicating DEI and approximately 400 grants that Defendants did not identify as implicating DEI.  *See* Ex. 12 (US-000000936) (listing grants flagged as implicating DEI); Ex. 32 (NEH_AR_0000136) (final list of terminated grants).

27.     Those grants that Defendants did not identify as implicating DEI were terminated on the basis that they were identified as wasteful.  *See, e.g.*, Ex. 1 (Cavanaugh Tr.) 129:15-22,145:3-14; Ex. 3 (McDonald Tr.) 155:12-19.

28.     The final list of terminated grants included grants that had been awarded during both the first Trump administration and the Biden administration.  *See* Ex. 28 (US-000061492) (reflecting that multiple grants on the final list of grants to be terminated had performance start dates prior to Biden taking office or at the beginning of his term, *see, e.g.*, Rows 64, 68, 70, 81, 90, 233, 256, 258, 300, 301, 338, 352, 365, 481 of "To Cancel (Orgs)" tab)).

Dated:  New York, New York
        March 27, 2026

                            Respectfully submitted,

                            JAY CLAYTON
                            United States Attorney for
                            the Southern District of New York
                            Attorney for Defendants


                        By: /s/ *Jonaki Singh*
                            MARY ELLEN BRENNAN
                            RACHAEL DOUD
                            JONAKI SINGH
                            Assistant United States Attorneys
                            86 Chambers Street, 3rd floor
                            New York, New York 10007
                            Telephone: (212) 637-2785
                            jonaki.singh@usdoj.gov