**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

AMERICAN COUNCIL OF LEARNED SOCIETIES,
     633 Third Avenue, 8th Floor New York, NY 10017,

AMERICAN HISTORICAL ASSOCIATION,
     400 A Street SE Washington, DC 20003,

MODERN LANGUAGE ASSOCIATION,
     85 Broad Street, New York, NY 10004,

          *Plaintiffs,*

       v.

ADAM WOLFSON, in his official capacity as Acting
Chairman of the National Endowment for the Humanities,
     400 7th St SW, Washington, DC 20506,

NATIONAL ENDOWMENT FOR THE HUMANITIES,
     400 7th St SW, Washington, DC 20506,

UNITED STATES DOGE SERVICE,
     736 Jackson Pl NW Washington, DC 20503,

AMY GLEASON, in her official capacity as Acting
Administrator of the United States DOGE Service,
     736 Jackson Pl NW Washington, DC 20503,

NATE CAVANAUGH, in his official capacity as an employee
of the U.S. DOGE Service or the General Services
Administration,
     1800 F St NW Washington, DC 20006,

JUSTIN FOX, in his official capacity as an employee of the
U.S. DOGE Service or the General Services Administration,
     1800 F St NW Washington, DC 20006,

          *Defendants*.

No. 25 Civ. 3657 (CM)

THE AUTHORS GUILD, WILLIAM GOLDSTEIN,
ELIZABETH KADETSKY, VALERIE ORLANDO,
KATALIN BALOG, BENJAMIN HOLTZMAN,
LEE JASPERSE, and NICOLE JENKINS,
on behalf of themselves and all others similarly situated,

> *Plaintiffs,*

> v.

NATIONAL ENDOWMENT FOR THE HUMANITIES;                No. 25 Civ. 3923 (CM)

ADAM WOLFSON, in his official capacity as Acting
Chairman of the National Endowment for the Humanities;

UNITED STATES DOGE SERVICE;

AMY GLEASON, in her official capacity as Acting
Administrator of the United States DOGE Service;

NATE CAVANAUGH, in his official capacity as an employee
of the U.S. DOGE Service or the General Services
Administration; and,

JUSTIN FOX, in his official capacity as an employee of the
U.S. DOGE Service or the General Services Administration,

> *Defendants.*

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

JAY CLAYTON
United States Attorney for the
Southern District of New York
86 Chambers Street, 3rd Floor
New York, New York 10007
Tel.: (212) 637-2699
Email: maryellen.brennan@usdoj.gov

MARY ELLEN BRENNAN
RACHAEL DOUD
JONAKI SINGH
Assistant United States Attorneys
– Of Counsel –

## TABLE OF CONTENTS

**PAGE**

PRELIMINARY STATEMENT ...................................................................................................1

BACKGROUND ..........................................................................................................................2

    I.      Factual Background ..........................................................................................................2

    II.     Procedural History ...........................................................................................................9

ARGUMENT ..............................................................................................................................10

    I.      Standard on a Motion for Summary Judgment ..............................................................10

    II.     The Court Lacks Subject Matter Jurisdiction Over Plaintiffs' Claims ........................10

        A.  The Court Lacks Jurisdiction over the Authors Guild Plaintiffs' APA Claim ......11

        B.  The Court Lacks Jurisdiction Over Plaintiffs' Other Claims................................13

    III.    The Grant Terminations Did Not Violate the First Amendment ..................................16

        A.  The Termination of So-Called "DEI Grants" Did Not Violate the First Amendment..................................................................................................................17

            1.   The First Amendment Does Not Require the Government to Fund Particular NEH Grants...................................................................................................17

            2.   The Grant Terminations Do Not Restrict or Relate to Plaintiffs' Speech Outside the Context of the Funded Grants.........................................................18

            3.   When Engaged in Selective Grant Funding, the Government Need Not Be Viewpoint Neutral...................................................................................22

        B.  The Termination of So-Called "Biden-Era Grants" Did Not Violate the First Amendment..................................................................................................................25

    IV.   The Grant Terminations Did Not Violate Equal Protection Principles ......................30

    V.    Plaintiffs' *Ultra Vires* Claim Fails...............................................................................35

    VI.   To the Extent Plaintiffs Still Assert an APA Claim That Claim Fails........................40

CONCLUSION...........................................................................................................................42

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Adarand Constructors, Inc. v. Pena*,
515 U.S. 200 (1995)........................................................................................................ 31

*Agency for Int'l Dev. v. Alliace for Open Soc'y Int'l, Inc.*,
570 U.S. 205 (2013)........................................................................................................ 19

*Am. Ass'n of Univ. Professors v. Trump*,
Case No. 25-cv-07864-RFL, 2025 WL 3187762 (N.D. Cal. Nov. 14, 2025).......................... 40

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)........................................................................................................ 10

*Berenson v. Biden*,
791 F. Supp. 3d 398 (S.D.N.Y. 2025) ................................................................................ 1

*Biden v. Texas*,
597 U.S. 785 (2022)........................................................................................................ 34

*Board of Regents of the Univ. of Wis. Sys. v. Southworth*,
529 U.S. 217 (2000)........................................................................................................ 22

*Branti v. Finkel*,
445 U.S. 507 (1980)................................................................................................... 28, 29

*Buckley v. Valeo*,
424 U.S. 1 (1976)............................................................................................................ 18

*California ex rel. Becerra v. Azar*,
950 F.3d 1067 (9th Cir. 2020) ......................................................................................... 20

*California v. Dep't of Education*,
Civil Action No. 25-CV-10548-AK, 2025 WL 3165713 (D. Mass. Nov. 13, 2025) .............. 15

*City of Chicago v. U.S. Department of Homeland Security*,
No. 25-C-5463, 2025 WL 3043528 (N.D. Ill. Oct. 31, 2025) ....................................... 14, 15

*City of Saint Paul v. Wright*,
No. 25 Civ. 03899 (APM), 2026 WL 88193 (D.D.C. Jam 12, 2026).................................... 35

*Climate United Fund v. Citibank, N.A.*,
154 F. 4th 809 (D.C. Cir. 2025)....................................................................................... 15

*Davis v. Passman,*
   442 U.S. 228 (1979)..................................................................................................... 30

*DCH Reg'l Med. Ctr. v. Azar,*
   925 F.3d 503 (D.C. Cir. 2019)................................................................................... 35

*Department of Education v. California,*
   604 U.S. 650 (2025)............................................................................................. 11, 12

*Elrod v. Burns,*
   427 U.S. 347 (1976)................................................................................................ 28, 29

*Finley v. National Endowment for the Arts,*
   100 F.3d 671 (9th Cir. 1996) ..................................................................................... 23

*Harris v. McRae,*
   448 U.S. 297 (1980).................................................................................................... 18

*Hartz Mountain Corp. v. Dotson,*
   727 F.2d 1308 (D.C. Cir. 1984).................................................................................. 36

*Hayden v. Cty. of Nassau,*
   180 F.3d 42 (2d Cir. 1999) ......................................................................................... 30

*Heckler v. Chaney,*
   470 U.S. 821 (1985).................................................................................................... 41

*Heller v. Doe,*
   509 U.S. 312 (1993).................................................................................................... 34

*Holley v. United States,*
   124 F.3d 1462 (Fed. Cir. 1997) ................................................................................. 14

*Lamb's Chapel v. Center Moriches Union Free Sch. Dist.,*
   508 U.S. 384 (1993).................................................................................................... 23

*LeBlanc v. United States,*
   50 F.3d 1025 (Fed. Cir. 1995) ................................................................................... 14

*Legal Services Corp. v. Velazquez,*
   531 U.S. 533 (2001).................................................................................................... 22

*Lyng v. International Union, United Auto., Aerospace & Agr. Implement Workers of Am.,*
   485 U.S. 360 (1988).................................................................................................... 18

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,*
   475 U.S. 574 (1986).................................................................................................... 10

*Motor Vehicle Manufacturers Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983)...................................................................................................... 34

*National Association of Diversity Officers in Higher Education v. Trump*,
    167 F.4th 86 (4th Cir. 2026) ............................................................................... 17, 18, 19

*National Endowment for the Arts v. Finley*,
    524 U.S. 569 (1998).............................................................................................. passim

*National Institutes of Health ("NIH") v. American Public Health* Association,
    606 U.S. ----, 145 S. Ct. 2658 (Aug. 21, 2025) ..................................................... passim

*National Urban League v. Trump*,
    783 F. Supp. 3d 61 (D.D.C. May 2, 2025)............................................................... 17, 20

*Nat'l Rifle Ass'n of Am. V. Vullo*,
    602 U.S. 175 (2024)..................................................................................................... 17

*New York v. Nat'l Sci. Found.*,
    793 F. Supp. 3d 562 (S.D.N.Y. 2025) .......................................................................... 14

*Nuclear Regul. Comm'n v. Texas*,
    605 U.S. 665 (2025).................................................................................................. 35, 40

*Perry v. Sindermann*,
    408 U.S. 593 (1972)................................................................................................. 20, 21

*Regan v. Taxation With Representation of Washington*,
    461 U.S. 540 (1983)................................................................................................. 17, 18

*Rhode Island v. Trump*,
    155 F. 4th 35 (1st Cir. Sept. 11, 2025).......................................................................... 15

*Roberts v. U.S. Jaycees*,
    468 U.S. 609 (1984)..................................................................................................... 34

*Rosenberger v. Rector and Visitors of University of Virginia*,
    515 U.S. 819 (1995)......................................................................................... 22, 23, 24, 25

*Rust v. Sullivan*,
    500 U.S. 173 (1991)................................................................................................ passim

*San Francisco A.I.D.S. Foundation v. Trump*,
    786 F. Supp. 3d 1184 (N.D. Cal. June 9, 2025)............................................................ 22

*Sealed v. Sealed*,
    332 F.3d 51 (2d Cir. 2003) ........................................................................................... 42

iv

*Speiser v. Randall*,
  357 U.S. 513 (1958) ...................................................................................................... 20

*Steenholdt v. FAA*,
  314 F.3d 633 (D.C. Cir. 2003) ...................................................................................... 41

*Stephens v. United States*,
  165 Fed. Cl. 341 (2023) ................................................................................................ 14

*Suburban Mortg. Assocs., Inc. v. U.S. Dep't of Housing and Urban Dev.,*
  *et al.*, 480 F.3d 1116 (Fed. Cir. 2007) ........................................................................ 14

*Sustainability Institute v. Trump*,
  165 F. 4th 817 (4th Cir. 2026) ................................................................................ 39, 40

*Thakur v. Trump*,
  163 F.4th 1198 (9th Cir. 2025) ................................................................................ 18, 22

*Thakur v. Trump*,
  Case No. 25-cv-04737-RFL, 2025 WL 2696424 (N.D. Cal. Sept. 2, 2025) ........................... 15

*Trump v. Boyle*,
  145 S. Ct. 2653 (2025) .................................................................................................. 12

*United States v. American Libr. Ass'n*,
  539 U.S. 194 (2003) ...................................................................................................... 20

*Vt. Yankee Nuclear Power Corp. v. Natural Resources Defense Fund*,
  435 U.S. 519 (1978) ................................................................................................ 41, 42

*Webster v. Doe*,
  486 U.S. 592 (1988) ...................................................................................................... 41

*Windsor v. U.S.*,
  699 F.3d 169 (2012) ...................................................................................................... 34

*Yale New Haven Hosp. v. Becerra*,
  56 F.4th 9 (2d Cir. 2022) .............................................................................................. 35

**Regulations**

2 C.F.R. § 200.340(a)(4) ................................................................................................ 34

**Rules**

Fed. R. Civ. P. 25(d) ........................................................................................................ 1

Fed R. Civ. P. 56(a) ....................................................................................................... 10

**Statutes**

5 U.S.C. § 701 ................................................................................................................ 41

5 U.S.C. § 704 ................................................................................................................ 41

5 U.S.C. § 706 ................................................................................................................ 11

20 U.S.C. § 951 ................................................................................................................ 2

20 U.S.C. § 956 ............................................................................................ 2, 3, 36, 41, 42

20 U.S.C. §§ 951-960 ...................................................................................................... 41

U.S. CONST. AMEND. XIV ................................................................................................ 31

**Other Authorities**

Executive Order 14217 ..................................................................................................... 7

Executive Order 13985 ................................................................................................... 24

Executive Order 14151 ............................................................................................. passim

Executive Order 14168 ................................................................................... 3, 16, 27, 28

Executive Order 14210 .................................................................................................. 3, 4

Defendants National Endowment for the Humanities; Adam Wolfson, in his Official Capacity as Acting Chairman of the National Endowment for the Humanities; United States DOGE Service; Amy Gleason, in her Official Capacity as Acting Administrator of the United States DOGE Service; Nate Cavanaugh, in his official capacity as an employee of the General Services Administration; and Justin Fox, in his official capacity as an employee of the General Services Administration (the "Government")[1] respectfully submit this memorandum of law in support of their motion for summary judgment and in opposition to the motion for summary judgment filed by the plaintiffs in *American Council of Learned Societies v. McDonald*, No. 25-cv-3657 (CM) ("ACLS Plaintiffs") and *The Authors Guild v. National Endowment for the Humanities*, No. 25-cv-3923 (CM) ("Authors Guild Plaintiffs") (collectively, "Plaintiffs").

## PRELIMINARY STATEMENT

Plaintiffs in these consolidated actions challenge the termination of grants awarded by the National Endowment for the Humanities ("NEH") and move for summary judgment on their claims. Plaintiffs' motion should be denied, and Defendants' motion for summary judgment should be granted, for several reasons.

First, the Court lacks jurisdiction over Plaintiffs' claims, because the Tucker Act vests the Court of Federal Claims with exclusive jurisdiction over claims related to grant agreements, which

---

[1] When a public officer who is a party in an official capacity ceases to hold office while the action is pending, the officer's successor is automatically substituted as a party. Fed. R. Civ. P. 25(d). Michael McDonald is no longer the Acting Chairman of the National Endowment for the Humanities, and Adam Wolfson, who now holds that position, is automatically substituted as a defendant in his place. Additionally, Nate Cavanaugh and Justin Fox no longer occupy the positions in which they were sued in their official capacities, and there is no successor to those positions. Accordingly, the United States should be substituted for these officials as a defendant. *See Berenson v. Biden*, 791 F. Supp. 3d 398, 405 (S.D.N.Y. 2025), *appeal docketed*, No. 25-2709 (Oct. 28, 2025) (substituting United States for defendant sued in their official capacity who no longer held position but for whom no successor had been named).

are contracts. Second, the grant terminations did not infringe grantees' First Amendment rights because the government is entitled to cease funding grants the government no longer believes are in the public interest, and the terminations do not restrict, and were not motivated by, grantees' speech outside the context of the government-funded grants. The First Amendment does not require the government to subsidize projects that the government no longer believes to be in the public interest. Third, the grant terminations did not violate equal protection principles because Defendants did not use classifications based on protected characteristics to select grants for termination. Defendants are also entitled to summary judgment on Plaintiffs' *ultra vires* claim, because there is no genuine dispute that Michael McDonald, the Acting Chairman of NEH with authority to award or terminate grants, approved the grant terminations. Finally, to the extent the Authors Guild Plaintiffs are still pursuing a claim that the grant terminations were arbitrary and capricious in violation of the Administrative Procedure Act ("APA"), which they do not address in their motion for summary judgment, that claim fails because review is not available under the APA.

## BACKGROUND

### I.    Factual Background

NEH was created by statute in 1965. *See* National Foundation on the Arts and the Humanities Act, Pub. L. 89-209, 20 U.S.C. § 951(1) (Sept. 29, 1965). The statute provides that "[t]he Endowment shall be headed by a chairperson, who shall be appointed by the President, by and with the advice and consent of the Senate." 20 U.S.C. § 956(b). "The Chairperson, with the advice of the National Council on the Humanities . . . , is authorized to enter into arrangements, including contracts, grants, loans, and other forms of assistance, to" carry out various specified purposes, including to "initiate and support research and programs to strengthen the research and

2

teaching potential of the United States in the humanities by making arrangements with individuals or groups to support such activities . . ." and to "initiate and support programs and research which have substantial scholarly and cultural significance and that reach, or reflect the diversity and richness of our American cultural heritage, including the culture of, a minority, inner city, rural, or tribal community." *Id.* § 956(c).

On January 20, 2025, President Trump issued Executive Order 14151, *Ending Radical and Wasteful Government DEI Programs and Preferencing*. E.O. 14151, 90 Fed. Reg. 8339 (Jan. 20, 2025). The Executive Order stated that the Biden administration had instituted diversity, equity, and inclusion ("DEI") programs in "virtually all aspects of the Federal Government" and required federal agencies to provide the Office of Management and Budget ("OMB") a list of all "grantees who received Federal funding to provide or advance DEI, [diversity, equity, inclusion, and accessibility ("DEIA")], or 'environmental justice' programs, services, or activities since January 20, 2021." *Id.* §§ 1, 2(b)(ii). President Trump also issued Executive Order 14168, *Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government*, which among other things directed agencies to "ensure grant funds do not promote gender ideology." E.O. 14168 § 3(g), 90 Fed. Reg. 8615 (Jan. 20, 2025). On January 27, 2025, OMB issued a memorandum to the heads of Executive Branch departments and agencies instructing them to, among other things, "identify and review all Federal financial assistance programs and supporting activities consistent with the President's policies and requirements," including the recently issued Executive Orders. *See* https://www.whitehouse.gov/wp-content/uploads/2025/03/M-25-13-Temporary-Pause-to-Review-Agency-Grant-Loan-and-Other-Financial-Assistance-Programs.pdf. On February 11, 2025, President Trump issued Executive Order 14210, *Implementing the President's "Department of Government Efficiency" Workforce*

*Optimization Initiative,* which established the Department of Government Efficiency ("DOGE"). E.O. 14210, 90 Fed. Reg. 9669 (Feb. 11, 2025). Executive Order 14210 stated that it was intended to "commence[] a critical transformation of the Federal Bureaucracy" and "eliminat[e] waste, bloat, and insularity." *Id.* § 1.

In early February 2025, NEH's program directors began the process of reviewing all grant awards from 2021 to the present. Declaration of Rachael Doud Ex. 5 (NEH_AR_000001).[2] The program directors were instructed to "identify grants that focus on or promote (in whole or in part): (i) 'environmental justice'; (ii) 'diversity, equity, and inclusion' or 'diversity, equity, inclusion, and accessibility' (even if these exact terms are not used); and (iii) 'gender ideology,' which, according to the Executive Order, replaces sex with 'an internal, fluid, and subjective sense of self unmoored from biological facts' or with 'an ever-shifting concept of self-assessed gender identity.'" *Id.* Pursuant to those instructions, "[NEH] staff reviewed all the awards made over the past four years and rated them 'high, medium, or low' in terms of promoting" these concepts, collective referred to as "DEI." Ex. 6 (NEH_AR_000021) at 2; *see also* Ex. 7 (NEH_AR_000005) & Ex. 8 NEH_AR_000006 (spreadsheet with NEH staff annotations).

In March 2025, Nate Cavanaugh and Justin Fox, two members of a DOGE team assigned to "identify wasteful spend within small agencies in the Federal Government," were detailed to NEH to work with the agency to implement the Executive Orders. Ex. 1 (Cavanaugh Tr.) 37:10-38:12. Fox and Cavanaugh first met Acting NEH Chairman Michael McDonald and Assistant Chair for Programs Adam Wolfson on March 12, 2025. Ex. 2 (Fox Tr.) 127:20-25. In advance of the meeting, Fox and Cavanaugh reviewed publicly available data about active NEH grants to

---

[2] Unless otherwise specified, all exhibits are to the Declaration of Rachael Doud dated March 27, 2026, submitted herewith.

"identif[y] areas to discuss with [McDonald and Wolfson] about compliance with the EO, and make sure we had discussion points." Ex. 2 (Fox Tr.) 229:25-230:2-8. In the course of that preparation, Fox created a spreadsheet in which he sorted grants into categories including "Craziest Grants" and "Other Bad Grants." *See* Ex. 9 (US-000016154); Ex. 2 (Fox Tr.) 228:2-230:17. Fox testified that the creation of that spreadsheet was a "very preliminary exercise" and that the list was "not used in the context of deciding what grants to keep or not." Ex. 2 (Fox Tr.) 232:2-4, 243:25-244:3, 244:20-25.

After the meeting, Wolfson sent Cavanaugh and Fox the spreadsheet reflecting the NEH program directors' review of grants pursuant to the OMB Memorandum. Ex. 7 (NEH_AR_000005). Using NEH's spreadsheet as a starting point, Fox and Cavanaugh identified additional grants that, in their view, implicated DEI, and sent spreadsheets of those grants to McDonald and Wolfson for their review and consideration. *See* Ex. 10 (US-000000839) (March 17, 2025, email attaching list; included in Plaintiffs' filings without attachment as Ex. 30); Ex. 11 (US-000000847) (pdf attached to March 17, 2025, email); Ex. 12 (US-000000936) (excel attached to March 17, 2025, email); Ex. 13 (US-000041372) (March 19, 2025, email attaching updated list; included as Plaintiffs' Ex. 13, excluding attachments); Ex. 14 (US-000041427) (excel attached to March 19, 2025, email). For purposes of generating these lists, Fox and Cavanaugh expanded their review to all active grants, not just the grants awarded beginning in January 2021. *See* Ex. 10 (US-000000839) (March 17, 2025, email noting that Fox and Cavanaugh reviewed "all active grants"); Ex. 1 (Cavanaugh Tr.) 107:13-14 ("We reviewed prior administration grants as well . . . ."). In the course of this process, Fox input grant descriptions into ChatGPT to generate a "DEI rationale" using the following prompt: "Does the following relate at all to DEI? Respond factually in less than 120 characters. Begin with 'Yes.' or 'No.' followed by a brief explanation. Do not

use 'this initiative' or 'this description' in your response." Ex. 15 (US-000062485).  Fox explained

at his deposition in this case that the ChatGPT-generated DEI rationales were "a tool" to assist in

NEH's analysis of grants that conflicted with the Executive Orders, Ex. 2 (Fox Tr.) 206:17-19,

207:9-10, and to "give context to Adam [Wolfson] and Mike [McDonald] on why [a] grant may

be related to DEI," *id.* 204:20-23.

Fox asked McDonald and Wolfson to review active grants for "wasteful spend" as well

"DEI."  Ex. 16 (NEH_AR_000013); Ex. 1 (Cavanaugh Tr.) 119:17-23 ("in addition to our work

of identifying grants related to DEI or [other subjects] in the executive orders, we also helped Mike

and Adam identify other potential wasteful grants outside of DEI").  McDonald and Wolfson

reviewed the lists and identified grants that they did not think should be terminated, noting, in a

March 31, 2025, email, "[a]s you instructed, we only excluded the ones that seem not to conflict

with the Administration's priorities – such as the Papers of George Washington."  Ex. 16

(NEH_AR_000013); *see also id.* Ex. 17 (NEH_AR_000024 (spreadsheet reflecting McDonald and

Wolfson's notations)).[3]  Fox then "collected the grants [McDonald and Wolfson] flagged to keep

and a few of those pertaining to America 250th or within priorities of the administration," and told

McDonald in an April 1, 2025, 3:50 pm email, "[w]e need your final approval on grants to keep

which are related to America 250, otherwise they will be terminated."  Ex. 22 (US-000061330 &

US-000061332); Ex. 28 (US-000061492); Ex. 6 (NEH_AR_000021) at NEH_AR_000022.  Fox

sent McDonald an "[u]pdated" list at 4:17 pm the same day.  Ex. 23 (US-000000756) & Ex. 24

---

[3] In his March 31, 2025, email, Ex. 16 (NEH_AR_000013), McDonald inadvertently attached the original version of the spreadsheet sent by Fox, without his and Wolfson's annotations.  *See* Ex. 18 (US-000054016) & Ex. 19 (US-000054017).  Because he had not saved a copy of the spreadsheet with those annotations, he and Wolfson reviewed the spreadsheet again and McDonald sent Fox the version with McDonald and Wolfson's annotations on April 1, 2025.  Ex. 6 (NEH_AR_000021) at NEH_AR_000021; Ex. 20 (US-000065318) & Ex. 21 (US-000065319).

(US-000000758); Ex. 6 (NEH_AR_000021) at NEH_AR_000022.  McDonald and Wolfson reviewed the list and sent back an "initialed version."  Ex. 25 (US-000061427) & Ex. 26 (US-000061429).

Fox then sent a final list back to McDonald, stating "please see attached for your review," and "[i]n accordance with the President's February 19, 2025 EO to eliminate all non-statutorily required activities and functions (See Commencing the Reduction of the Federal Bureaucracy, E.O. 14217), we will begin to execute the attached with your permission."  Ex. 27 (US-000061430 and US-000061432); Ex. 6 (NEH_AR_000021).  McDonald then responded:  "I've looked over the two attachments and I don't have any questions or concerns."  Ex. 6 (NEH_AR_000021).  McDonald also reviewed and approved termination letters drafted by Fox.  Ex. 29 (US-000002717, US-00002720 & US-00002721); Ex. 30 US-000050461; Ex. 3 (McDonald Tr.) 259:5-7, 262:8-13, 271:23-272:16, 307:4-10; Ex. 4 (Wolfson Tr.) 234:14-21.  As McDonald and Fox had previously arranged, on April 2, 2025, Fox sent out the termination notices by email.  Ex. 2 (Fox Tr.) 284:7-285:16, 322:24-323:3; Ex. 3 (McDonald Tr.) 163:22-164:8, 197:4-16.

The final list of grants that were terminated included approximately 1,000 grants that Defendants flagged as implicating DEI and approximately 400 grants that Defendants did not flag as implicating DEI.  *See* Ex. 12 (US-000000936) (listing grants flagged as implicating DEI); Ex. 17 (NEH_AR_0000024) (same); Ex. 31 (NEH_AR_0000135); Ex. 32 (NEH_AR_0000136) (final list of terminated grants).  Those grants that Defendants did not flag as implicating DEI were terminated on the basis that they were "wasteful."  *See, e.g.*, Ex. 1 (Cavanaugh Tr.) 129:15-22 (explaining that "final list of grants" included grants "that were either in violation because of DEI or because they were wasteful in Mike's view"); *id.* 145:3-14 (referring to subset of "additional [grants] we feel are wasteful"); Ex. 3 (McDonald Tr.) 155:12-19 (explaining that the "rationale for

7

terminating grants expanded beyond DEI to consider . . . grants that could be terminated because they . . . could be seen as constituting a waste").

Further, the final list of terminated grants included grants that NEH awarded during the first Trump administration, as well as the Biden administration. *See* Ex. 28 (US-000061492) (reflecting that multiple grants on the final list of grants to be terminated had performance start dates prior to Biden taking office or at the beginning of his term, *see, e.g.*, Rows 64, 68, 70, 81, 90, 233, 256, 258, 300, 301, 338, 352, 365, 481 of "To Cancel (Orgs)" tab). Because the performance period of NEH grants typically spans just a few years, the majority of grants that remained open in March 2025 had been awarded over the prior four years, during the Biden administration. *See* Ex. 1 (Cavanaugh Tr.) 260:1-13 (explaining that there was "no balance remaining on the vast majority" of Trump-era grants because "grant terms are typically two- to four-year increments"); Ex. 33 (NEH_AR_000017 and NEH_AR_000020) (listing performance start and end dates for specific grants). Forty-two active grants were not terminated, and, as Plaintiffs acknowledge, those grants were awarded during the Biden administration. *See* Ex. 28 (US-000061492 (listing grants "To Keep")); Pls' Statement of Material Facts ("Pls.' 56.1 Statement") ¶ 79, Dkt. No. 249 (stating that "approximately 40 Biden-era grants were ultimately saved from termination").

McDonald, Wolfson, Cavanaugh, and Fox all testified at their depositions in this case that McDonald approved the grant terminations. Ex. 3 (McDonald Tr.) 229:12-230:16 (testifying, "I was the final decider. I made the decision" to terminate the grants and "I approved all the grant terminations"); Ex. 4 (Wolfson Tr.) 256:6-12 (testifying that McDonald "was the final decision-maker. That's my understanding"); Ex. 1 (Cavanaugh Tr.) 182:5-11, 241:19-23 (testifying that it was "up to the head of the agency" to terminate grants based on his team's "recommendations"

8

and "[t]he head of the agency approved the cancellations"); Ex. 2 (Fox Tr.) 322:24-323:3 (testifying that he sent out the grant termination notices "[a]fter getting the full guarantee and approval from Mike [McDonald]"); *see also* Ex. 2 (Fox Tr.) 143:23-144:2, 158:4-9, 160:8-13, 184:18-22, 192:20-24, 193:8-15, 194:3-6, 214:18-21, 296:2-4.

## II.    Procedural History

On May 1, 2025, the ACLS Plaintiffs filed suit. Dkt. No. 1.[4] On May 12, 2025, the Authors Guild Plaintiffs filed suit. Case No. 1:25-cv-3923 (CM), Dkt. No. 1. On May 14, 2025, the Court consolidated the two cases. Dkt. No. 52. The Authors Guild Plaintiffs filed an amended complaint on May 23, 2025. Dkt. No. 75. On May 30, 2025, Defendants moved to dismiss both sets of plaintiffs' complaints. Dkt. No. 76.

In its July 25, 2025, Decision and Order, the Court granted in part and denied in part Defendants' motion to dismiss. Dkt. No. 116 ("Motion to Dismiss Opinion" or "MTD Op."). Specifically, the Court dismissed Counts I through VII of the ACLS Plaintiffs' complaint and Counts II (as it relates to the Impoundment Control Act), III, and IV of the Authors Guild Plaintiffs' amended complaint, leaving the following claims to be decided: Count VIII of the ACLS Plaintiffs' complaint, alleging violation of the First Amendment; Count IX of the ACLS Plaintiffs' complaint, alleging *ultra vires* action; Count I of the Authors Guild Plaintiffs' amended complaint, alleging arbitrary and capricious action in violation of the APA; Count II of the Authors Guild Plaintiffs' amended complaint, alleging actions contrary to law, including the First Amendment, in violation of the APA; Count V of the Authors Guild Plaintiffs' amended complaint, asserting an implied right of action for violation of the First Amendment; and Count VI of the Authors Guild Plaintiffs' amended complaint, alleging *ultra vires* action. MTD Opp. at

---

[4] Unless otherwise indicated, docket numbers cited are those in Case No. 1:25-cv-03657 (CM).

9

33-34, 51-52.  In the same opinion, the Court granted the Authors Guild Plaintiffs' motion for a preliminary injunction based on a finding that they were likely to succeed on their First Amendment claim.  *Id.* at 53-67.  By contrast, the Court found that Plaintiffs were not likely to succeed on their *ultra vires* claims.  *Id.* at 67-70.

On February 24, 2026, the ACLS Plaintiffs filed an amended complaint adding an equal protection claim.  Dkt. Nos. 230 ("ACLS Compl.").  On March 4, 2026, the Authors Guild Plaintiffs filed a second amended complaint adding an equal protection claim.  Dkt. No. 240 ("Authors Guild Compl.").

ARGUMENT

### I.    Standard on a Motion for Summary Judgment

Summary judgment is appropriate where the movant shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed R. Civ. P. 56(a).  "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.  If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986) (citations omitted); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts").

### II.    The Court Lacks Subject Matter Jurisdiction Over Plaintiffs' Claims

The Court lacks jurisdiction over Plaintiffs' claims because they seek to enforce a contractual obligation to pay money and accordingly may only be heard in the Court of Federal Claims.

10

### A.  The Court Lacks Jurisdiction over the Authors Guild Plaintiffs' APA Claim

As an initial matter, the Court lacks jurisdiction over the Authors Guild Plaintiffs' claim that the grant terminations were arbitrary and capricious in violation of the APA.  Indeed, Plaintiffs do not appear to dispute this or otherwise pursue that claim at this point.

In its Motion to Dismiss Opinion, the Court denied Defendants' motion to dismiss as to Count I of the Authors Guild Plaintiffs' amended complaint, which alleges that the grant terminations were "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" and thus violated the APA, 5 U.S.C. § 706(2)(A).  The Court noted, however, that while the Authors Guild Plaintiffs' APA claim "remains in the case," the Court was not relying on that claim for purposes of issuing a preliminary injunction and that claim "is virtually identical to the claim" underlying the district court decision overruled by the Supreme Court in *Department of Education v. California*, 604 U.S. 650 (2025).  MTD Op. at 52 n.15.  Indeed, *California*, as well as the Supreme Court's later decision in *National Institutes of Health ("NIH") v. American Public Health Association*, 606 U.S. ----, 145 S. Ct. 2658 (Aug. 21, 2025), dictate that the Court lacks jurisdiction over the Authors Guild Plaintiffs' APA claim.  Notably, Plaintiffs do not seem to dispute this, as their summary judgment motion does not argue that the Court has jurisdiction over the remaining APA claim or otherwise address that claim at all.

In ruling on Defendants' Motion to Dismiss, the Court rightfully rejected Plaintiffs' argument that their grants were not contracts.  MTD Op. at 45-47.  In staying the district court's injunction in a challenge to programmatic grant terminations in *California*, the Court explained that "the Government is likely to succeed in showing the District Court lacked jurisdiction to order the payment of money under the APA" because "the Tucker Act grants the Court of Federal Claims jurisdiction over suits based on 'any express or implied contract with the United States.'" 604 U.S.

11

at 651 (quoting 28 U.S.C. § 1491(a)(1)).  In *NIH*, the Supreme Court expanded on this ruling, making clear that "[t]he Administrative Procedure Act's 'limited waiver of [sovereign] immunity' does not provide the District Court with jurisdiction to adjudicate claims 'based on' the research-related grants or to order relief designed to enforce any 'obligation to pay money' pursuant to those grants."  145 S. Ct. at 2659 (citing *California*, 604 U. S. at 651).  The Court overturned the First Circuit's denial of a stay on jurisdictional grounds, finding that "the District Court likely lacked jurisdiction to hear challenges to the grant terminations, which belong in the Court of Federal Claims (CFC)."  *Id.* at 2661 (Barrett, J., concurring).  Justice Barrett explained further that, insofar as claims challenge agency guidance documents, those claims can be disaggregated from "a claim 'founded . . . upon' contract that only the [Court of Federal Claims] can hear." *Id.* (Barrett, J., concurring) (citation omitted).  Although *NIH* and *California* were decided in an emergency posture, their "reasoning . . . carries precedential weight [that] binds lower courts." *Id.* at 2663-64 (Gorsuch, J., concurring) (internal quotations omitted); *see also Trump v. Boyle*, 145 S. Ct. 2653, 2654 (2025) (Mem.) (while "interim orders are not conclusive as to the merits, they inform how a court should exercise its equitable discretion in like cases").

Applying the reasoning of these cases, the Court lacks jurisdiction over the Authors Guild Plaintiffs' APA claim.  Plaintiffs do not appear to dispute this, and instead argue only that the Court has jurisdiction over Plaintiffs' Constitutional and *ultra vires* challenges to the grant terminations.  Memorandum in Support of Plaintiffs' Motion for Summary Judgment, Dkt. No. 247 ("Pls.' Br.") at 38.  Accordingly, the Court should grant Defendants' motion for summary judgment as to the Authors Guild Plaintiffs' APA claim.

12

### B. The Court Lacks Jurisdiction Over Plaintiffs' Other Claims

While *NIH* did not involve constitutional claims, its reasoning extends to such claims. Accordingly, the Court also lacks jurisdiction over those claims.

In *NIH*, the Court made clear that the central question determining the court's jurisdiction is whether the plaintiff's claims are "based on" the termination of federal government grants, in which case they implicate the Tucker Act and its limitation on district court jurisdiction. *NIH*, 145 S. Ct. at 2658 (internal quotation marks omitted). Here, however styled, all of Plaintiffs' surviving claims are "based on" grant terminations. *Id.* Further, unlike *NIH*, this case does not involve binding agency guidance; rather, in connection with their remaining claims, Plaintiffs challenge only individual grant terminations.

Plaintiffs frame the relief they seek as a request to "[d]eclare as unlawful and *ultra vires* Defendants' terminations of grants" and "[e]njoin Defendants from enforcing and giving effect to the termination notices of Plaintiffs' grants and the grants of Plaintiffs' members." ACLS Compl. Prayer for Relief; *see also* Authors Guild Compl. Prayer for Relief (asking the Court to "[d]eclare as unlawful and set aside" the grant terminations and "[e]njoin Defendants from giving effect" to them). While styled as injunctive relief, this is, in effect, a request to reinstate the grants and resume payment thereunder. *See generally* Dkt. Nos. 126, 137 (letters from Authors Guild Plaintiffs seeking clarification regarding the preliminary injunction entered by the Court and arguing that NEH violated it by not resuming payment under the terminated grants). The Court of Federal Claims has made clear that, "in determining whether a plaintiff's suit is to be heard in district court or the Court of Federal Claims, we must look beyond the form of the pleadings to the substance of the claim. We have cautioned litigants that dressing up a claim for money as one for equitable relief will not remove the claim from Tucker Act jurisdiction and make it an APA case."

13

*Suburban Mortg. Assocs., Inc. v. U.S. Dep't of Housing and Urban Dev. et al.*, 480 F.3d 1116, 1124 (Fed. Cir. 2007).

Plaintiffs argue that this Court must have jurisdiction over their constitutional claims because the Court of Federal Claims would not have jurisdiction to hear those claims. *See* Pls.' Br. at 39. In fact, however, the Court of Federal Claims can hear constitutional claims where, as here, the plaintiff effectively seeks relief in the form of money payment. *See Holley v. United States*, 124 F.3d 1462, 1466 (Fed. Cir. 1997) ("The presence of a constitutional issue does not erase the jurisdiction of the Court of Federal Claims based on a properly brought claim under the Tucker Act, or bar the court from considering the constitutional issue in the course of determining whether the [challenged action] was wrongful."). In *LeBlanc v. United States*, 50 F.3d 1025 (Fed. Cir. 1995), the case Plaintiffs cite for the proposition that the Court of Federal Claims does not have jurisdiction over First Amendment and equal protection claims, the court held that the Court of Federal Claims did not have jurisdiction over any of the plaintiff's claims, which in addition to the constitutional claims included wrongful discharge claims. *Id.* at 1028-31. That is not the case here. *See also Stephens v. United States*, 165 Fed. Cl. 341, 347-49 (2023) (court lacked jurisdiction over constitutional claims where plaintiff failed to plausibly allege contract with the United States).

As in *NIH* and *California*, Plaintiffs' "injury and alleged right to payment stem from the government's refusal to pay promised grants according to the terms and conditions that accompany them." *NIH*, 145 S. Ct. at 2664 (Gorsuch, J., concurring); *see also, e.g.*, *New York v. Nat'l Sci. Found.*, 793 F. Supp. 3d 562, 590 (S.D.N.Y. 2025) (cleaned up) (holding that the court likely lacked jurisdiction over the plaintiffs' grant termination claims under the Tucker Act, explaining that "here there is more than a possibility that injunctive relief would result in the disbursement of funds; it is the explicit relief sought by plaintiffs"); *City of Chicago v. U.S. Department of*

14

*Homeland Security*, No. 25-C-5463, 2025 WL 3043528, at *4, *12 (N.D. Ill. Oct. 31, 2025) (holding that municipalities' claims that termination of their grants violated the Constitution and the APA and constituted *ultra vires* action were claims for money damages, and thus were within Court of Federal Claims' exclusive jurisdiction under the Tucker Act because "they seek to overturn past grant terminations or otherwise seek money past due," and explaining that *NIH* and *California* "cannot be limited to APA claims alleging arbitrary and capricious action"); *see also, generally, California v. Dep't of Education*, Civil Action No. 25-CV-10548-AK, 2025 WL 3165713, *14-15 (D. Mass. Nov. 13, 2025) (holding that court lacked jurisdiction over plaintiffs' claims concerning terminated grant agreements, and explaining that "the grant agreements are contractual in nature," and while the plaintiffs characterized the relief they sought as "vacat[ing] an unlawful agency action," it was "not just a reopening of the grant agreements that must occur," but "the enforcement of rights—monetary damages—asserted in the grant agreements," and "even though Plaintiff States point to statutes, regulations, and the Constitution, their ultimate request is one that requires a court to look at the underlying grant agreements to enforce their rights").[5]

---

[5] In *Thakur v. Trump*, Case No. 25-cv-04737-RFL, 2025 WL 2696424 (N.D. Cal. Sept. 2, 2025), which, *inter alia*, asserts claims against NEH for grant terminations, the court held that *NIH* did not alter its conclusion that the Tucker Act did not divest it of jurisdiction. The court's analysis relied on the fact that the plaintiffs in that case are researchers who are not themselves parties to the grant agreements, explaining that *NIH* "did not consider or address the key issue here: that non-parties to the contracts cannot bring claims in the CFC, and thus are not within the Tucker Act." *Id.* at *9. Additionally, Plaintiffs cite a handful of cases that purportedly held that "district courts necessarily have jurisdiction over constitutional challenges to grant terminations." Pls.' Br. at 38. However, at least some of those cases do not stand for that broad proposition. Indeed, two of those cases do not include any reasoning concerning *NIH*'s effect on constitutional claims. In *Climate United Fund v. Citibank, N.A.*, 154 F. 4th 809 (D.C. Cir. 2025), *reh'g en banc granted, opinion vacated*, No. 25-5122, 2025 WL 3663661 (D.C. Cir. Dec. 17, 2025), the court simply stated, without discussion, that "the district court had jurisdiction over the grantees' constitutional claim," but concluded that claim was in any event "meritless." *Id.* at *1. In *Rhode Island v. Trump*, 155 F. 4th 35, 46 (1st Cir. Sept. 11, 2025), the court noted that the government defendants "make no argument that the Tucker Act precludes the District Court's jurisdiction over the plaintiffs' constitutional claims" and did not meaningfully discuss the issue.

15

### III.    The Grant Terminations Did Not Violate the First Amendment

Plaintiffs argue that NEH's termination of their grants violated the First Amendment.  In particular, Plaintiffs assert that (1) the termination of certain grants on the basis that Defendants determined that the subject matter of such grants implicated DEI constitutes impermissible viewpoint discrimination, Pls.' Br. at 19-23, and (2) the government ran afoul of the First Amendment by terminating certain grants because they were awarded during the Biden administration. *Id*. at 23-25.  Defendants do not dispute that, pursuant to Executive Orders 14151 and 14168 and OMB's January 27, 2025, Memorandum, NEH personnel reviewed open grants to identify those that might conflict with executive orders concerning environmental justice, DEI, and gender ideology, and that, after further review of the open grants by McDonald, Wolfson, Cavanaugh, and Fox, McDonald terminated certain grants on the basis that they viewed such grants as implicating DEI.  *See supra* pages 4-8.  Nor do Defendants dispute that, pursuant to the Executive Orders and the OMB Memorandum, NEH used a list of grants awarded during the Biden administration as a starting point for identifying grants implicating DEI, or that many of the grants awarded during the Biden administration were included on the final list of grants that were terminated.  *See supra* pages 4-5, 8.

Defendants' actions did not, however, violate the First Amendment.  The First Amendment does not require the government to subsidize projects that the government no longer believes to be in the public interest.  The grants at issue were terminated based on the subject matter of the government-funded projects, and the terminations do not restrict or relate to recipients' speech outside of the funded initiatives.  As for Plaintiffs' claims with respect to "Biden-era grants," Plaintiffs have not pointed to any specific evidence that any grants were terminated due to political party affiliation.

16

**A. The Termination of So-Called "DEI Grants" Did Not Violate the First Amendment**

    1. <u>The First Amendment Does Not Require the Government to Fund Particular NEH Grants</u>

The government is not required to subsidize particular projects or to do so on a content- or viewpoint-neutral basis. The Supreme Court has long made clear that the First Amendment provides the government significant flexibility when it acts as a patron to subsidize speech, as opposed to when it acts as a sovereign to regulate it. The "decision not to subsidize the exercise of a fundamental right does not infringe the right," *Regan v. Taxation With Representation of Washington*, 461 U.S. 540, 549 (1983), and "[t]he Government can, without violating the Constitution, selectively fund a program to encourage certain activities it believes to be in the public interest," *Rust v. Sullivan*, 500 U.S. 173, 193 (1991). The government may permissibly "cho[ose] to fund one activity to the exclusion of the other," *id.*, and "may allocate competitive funding according to criteria that would be impermissible were direct regulation of speech or a criminal penalty at stake." *National Endowment for the Arts v. Finley*, 524 U.S. 569, 587-88 (1998); *National Association of Diversity Officers in Higher Education v. Trump*, 167 F.4th 86, 103 (4th Cir. 2026) (vacating an injunction against two executive orders that directed termination of DEI-related grants and acknowledging that "the government 'has wide latitude to set spending priorities'") (quoting *Finley*, 524 U.S. at 588). For this reason, contrary to Plaintiffs' contention, Pls' Br. at 15-16, the "decision to stop funding" certain speech "is not an example of the government doing 'indirectly what' it 'is barred from doing directly'" because "the government is not constitutionally obligated to fund Plaintiffs' preferred speech or to contract with them for certain purposes." *National Urban League v. Trump*, 783 F. Supp. 3d 61, 100 (D.D.C. May 2, 2025) (quoting *Nat'l Rifle Ass'n of Am. V. Vullo*, 602 U.S. 175, 190 (2024)). The government can,

for example, refrain from funding abortions, *Harris v. McRae*, 448 U.S. 297, 315 (1980), from subsidizing government lobbying, *Regan*, 461 U.S. at 550, and from subsidizing striking employees, *Lyng v. International Union, United Auto., Aerospace & Agr. Implement Workers of Am.*, 485 U.S. 360, 371 (1988), and can withhold funding from political candidates who do not enter party primaries, *Buckley v. Valeo*, 424 U.S. 1, 105 (1976) (per curiam), without offending the Constitution.

The government is likewise entitled to cease funding grants that the government no longer believes are in the public interest because they focus on DEI-related topics. *National Association of Diversity Officers in Higher Education*, 167 F.4th at 101 ("The President may determine his policy priorities and instruct his agents to make funding decisions based on them."). Indeed, choosing not to fund topics that the government disfavors does not infringe the First Amendment. The government recognizes that the Ninth Circuit recently concluded, in upholding a district court's grant of a preliminary injunction, that grant terminations on the basis of DEI, including grant terminations at NEH, were "aimed at the suppression of speech that views DEI, DEIA, and environmental justice favorably." *Thakur v. Trump*, 163 F.4th 1198, 1207 (9th Cir. 2025). Defendants respectfully submit that the Ninth Circuit's analysis was incorrect. When the Government chooses to stop subsidizing an activity, there inevitably may be less of that activity, but that reduction alone does not equate to suppression of protected activity. *Cf. Lyng*, 485 U.S. at 371 (acknowledging that a constitutionally permissible spending statute "works at least some discrimination" against the otherwise protected activity).

2. <u>The Grant Terminations Do Not Restrict or Relate to Plaintiffs' Speech Outside the Context of the Funded Grants</u>

As the Court recognized in its July 25, 2025, Order, the First Amendment precludes the government from using its regulatory power to "drive 'certain ideas or viewpoints from the

18

marketplace,'" and any regulation that "ai[ms] at the suppression of dangerous ideas" is subject to the most stringent First Amendment scrutiny. *Finley*, 524 U.S. at 587 (citations omitted); *see* MTD Op. at 55-56. These concerns generally are not implicated, however, by selective government funding that leaves private entities free to express themselves as they wish using their own resources. Thus, the Supreme Court explained in *National Endowment for the Arts v. Finley* that "cho[osing] to fund one activity to the exclusion of the other" is permissible. *Id.* at 588 (citation omitted); *see also National Association of Diversity Officers in Higher Education*, 167 F. 4th at 103 (quoting *Finley*).

Indeed, although the government "may allocate competitive funding according to criteria that would be impermissible were direct regulation of speech or a criminal penalty at stake," *Finley*, 524 U.S. at 587-88, funding decisions are subject to a constitutional constraint insofar as the government cannot leverage its funding power to impose an unconstitutional condition—such as conditioning grants on refraining from expressive conduct "that [is] separate and independent from the project that receives . . . funds." *Rust*, 500 U.S. at 196. But this constitutional concern arises only when Congress is using the funding to affect speech outside of the funded program. For example, while limitations on the use of federal funds for a specific purpose—such as "promot[ing] or advocat[ing] [for] the legalization or practice of prostitution or sex trafficking"— are constitutionally permissible, *Agency for Int'l Dev. v. Alliace for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 217-18 (2013) (quotation omitted), conditioning federal funds on a pledge to adopt a policy "explicitly opposing prostitution and sex trafficking" is not, *id.* at 210 (quotation omitted).

Here, the government chose to stop funding DEI-related grants. Plaintiffs have not pointed to any evidence that the grant terminations were rooted in anything other than consideration of the subject matter of the grants themselves, as opposed to an assessment of the grant holders' speech

19

or activities outside the context of the grants. If the government had refused to provide any funding to entities that engaged in DEI activities using their own funds—assuming those DEI activities constituted protected expression—this case would implicate the constitutional rules that apply when the Government "seek[s] to leverage funding" to limit or penalize "speech outside the contours of the program itself." *Id.* at 214-15; *see Speiser v. Randall*, 357 U.S. 513, 519 (1958) (conditioning "tax exemption" on refraining from "certain speech necessarily will have the effect of coercing the claimants to refrain from the proscribed speech").

Here, however, the Government choosing to stop funding DEI-related projects does not plausibly "aim at the suppression of dangerous ideas" in the sense of driving the idea from the marketplace. *Finley*, 524 U.S. at 587. The Government "does not 'penalize'" institutions that choose to do DEI research, or "deny them the right to" do that research; it has merely made a constitutionally permissible "decision not to subsidize their doing so." *United States v. American Libr. Ass'n*, 539 U.S. 194, 212 (2003) (plurality opinion). "The Supreme Court has repeatedly reaffirmed . . . that the government may constitutionally preclude recipients of federal funds from addressing specified subjects so long as the limitation does not interfere with a recipient's conduct outside the scope of the federally funded program." *California ex rel. Becerra v. Azar*, 950 F.3d 1067, 1093 n.24 (9th Cir. 2020); *Nat'l Urban League*, 783 F. Supp. 3d at 99 (concluding that certain provisions of DEI-related Executive Orders do not violate the First Amendment because they "do not on their face restrict speech outside the scope of the federal funds or contract").

For these reasons, Plaintiffs' reliance on *Perry v. Sindermann*, 408 U.S. 593, 597 (1972), is misplaced. Defendants acknowledge that, at the preliminary injunction stage, the Court premised its conclusion that Plaintiffs were likely to succeed on their First Amendment claim in part on the Supreme Court's pronouncement in *Perry* that the Government "may not deny a benefit

to a person on a basis that infringes his constitutionally protected interests." *Id.* at 597; *see* MTD

Op. at 58. Defendants respectfully submit, however, that since deciding *Perry*, the Supreme Court

has rejected the broad reading of *Perry* that the Court suggests and that Plaintiffs advocate. In

*Rust v. Sullivan*, the petitioners, like Plaintiffs here, invoked *Perry* to contend that the restrictions

on the subsidization of abortion-related speech contained in challenged regulations were

impermissible because they "condition[ed] the receipt of a benefit . . . on the relinquishment of a

constitutional right." *Rust*, 500 U.S. at 196. The Supreme Court rejected that argument and

clarified that "insisting that public funds be spent" only for certain purposes is not the same as

"denying a benefit" in a way that infringes speech where the government does not "force the . . .

grantee to give up [protected] speech" that is "separate and distinct" from the activities the

government is funding. *Id.* The Supreme Court further explained that so-called "'unconstitutional

conditions' cases" like *Perry* "involve situations in which the Government has placed a condition

on the *recipient* of the subsidy rather than on a particular program or service, thus effectively

prohibiting the recipient from engaging in the protected conduct outside the scope of the federally

funded program." *Id.* at 197 (emphasis in original). In *Perry*, for instance, a teacher in the state

college system was denied employment because of critical statements he had made about the

college in instances where he "left his teaching duties" to "testify before the committees of the

Texas Legislature" in his capacity as president of a state teachers association. *Perry*, 408 U.S. at

594-95. The speech at issue was thus speech that the teacher engaged in outside the context of his

government job. Although *Rust* involved a facial challenge to Government regulations, rather than

an as-applied challenge to a denial of a particular benefit, its reasoning is relevant here. NEH

grantees "may receive funds from a variety of sources for a variety of purposes" and the

21

termination of their grants did not restrict them from pursuing DEI-related subjects "unfettered in [their] other activities." *Rust*, 500 U.S. at 196.

### 3.  When Engaged in Selective Grant Funding, the Government Need Not Be Viewpoint Neutral

When the Government decides to "selectively fund a program," as here, it may choose grants that advance its policy goals and reject grants that do not. *Finley*, 524 U.S. at 588 (quoting *Rust*, 500 U.S. at 193); *accord id.* at 590 (Scalia, J., concurring in the judgment) (evaluating "grant applications" on "content- and viewpoint-based criteria" is "perfectly constitutional"). In making a contrary argument, Plaintiffs misconstrue *Finley* and rely on a misreading of *Rosenberger v. Rector and Visitors of University of Virginia*, 515 U.S. 819 (1995), and *Legal Services Corp. v. Velazquez*, 531 U.S. 533 (2001), interpreting such decisions to stand for the proposition that, even in the context of funding conditions, the government cannot make content- or viewpoint-based distinctions. *See* Pls' Br. at 17-19.[6]

*Velazquez* and *Rosenberger* turned on the Supreme Court's conclusions in those cases that the grant programs at issue effectively created limited public forums. *Velazquez*, 531 U.S. at 536-37; *Rosenberger*, 515 U.S. 827, 843. On that basis, the Supreme Court has held that certain funding programs open to all comers must comply with "[t]he standard of viewpoint neutrality found in the public forum cases." *Board of Regents of the Univ. of Wis. Sys. v. Southworth*, 529 U.S. 217, 230 (2000). Those cases draw on the principle that when the government creates a "limited public

---

[6] For the reasons explained here, the Ninth Circuit's recent decision in *Thakur* was wrongly decided. *See Thakur*, 163 F.4th at 1205-06. In *Thakur*, a group of plaintiffs contended that grant terminations on the basis of DEI at various agencies, including NEH, violated their First Amendment rights, and the district court concluded that plaintiffs were likely to succeed on the merits of that First Amendment claim and issued a preliminary injunction. *Id.* at 1203. In upholding the district court's decision, the Ninth Circuit wrongly analogized the challenge in *Thakur* to the challenge at issue in *Rosenberger*. *Id.* at 1205-06; *see also San Francisco A.I.D.S. Foundation v. Trump*, 786 F. Supp. 3d 1184, 1219 (N.D. Cal. June 9, 2025).

22

forum," open to discussion of a particular "subject matter"—such as an in-person space for discussion or a bulletin board—the government must be "viewpoint neutral." *Lamb's Chapel v. Center Moriches Union Free Sch. Dist.*, 508 U.S. 384, 389, 393 (1993).

The "limited public forum" doctrine does not apply here. Where, as here, the government decides to "selectively fund a program," it may choose grants that advance its policy goals and reject grants that do not. *Finley*, 524 U.S. at 588 (quoting *Rust*, 500 U.S. at 193); *accord id.* at 590 (Scalia, J., concurring in the judgment) (evaluating "grant applications" on "content- and viewpoint-based criteria" is "perfectly constitutional").

The Supreme Court extended the "limited public forum" doctrine to certain government "funding decisions" in *Rosenberger*, even though funding programs are "a forum more in a metaphysical than in a spatial or geographic sense." 515 U.S. at 830. That case involved a public university's funding of a variety of student groups in order to provide "a wide range of opportunities for its students." *Id.* at 824 (quotation omitted). The Court emphasized that it addressed a situation in which "the University . . . expends funds to encourage a diversity of views from private speakers." *Id.* at 834.

The Supreme Court's subsequent decision in *Finley* was a direct response to an opinion by a divided panel of the Ninth Circuit that applied *Rosenberger*'s viewpoint-neutrality requirement to the National Endowment of the Arts' selective grant program. *Finley v. National Endowmnt for the Arts*, 100 F.3d 671, 683 (9th Cir. 1996) ("Although NEA awarded only 88 grants from an applicant pool of 5,168, it cannot provide those scarce grants to favor a particular viewpoint."), *rev'd*, 524 U.S. 569 (1998). The Supreme Court held that the Ninth Circuit majority's "reliance on . . . *Rosenberger* . . . [was] misplaced," reasoning that NEA's grant program was "distinguish[ed] . . . from *Rosenberger*" because of "the competitive process according to which

23

the grants are allocated." *Finley*, 524 U.S. at 586.  Under circumstances like those in *Finley*, where "the Government does not indiscriminately 'encourage a diversity of views from private speakers'" and is not making similarly "objective decisions on allocating public benefits," *Rosenberger* is inapplicable. *Id.* (quoting *Rosenberger*, 515 U.S. at 834).  Thus, unless the provision at issue in *Finley* was "applied in a manner that raises concern about the suppression of disfavored viewpoints," it was constitutional.  *Id.* at 587.  Such suppression could not be attributed merely to selective funding decisions, the validity of which the Court reaffirmed. *Id.* at 588.

Through this series of cases, the Supreme Court has clarified that as a general matter, when engaged in selective funding, the government need not be agnostic about whether it supports the activity being funded.  Indeed, that principle gave rise to the grants at issue here in the first place. The government previously favored promoting certain objectives like equity and addressing climate change in its grantmaking.  *See, e.g.*, Executive Order 13985, § 1, 86 Fed. Reg. 7009, 7009 (Jan. 20, 2021) ("It is therefore the policy of [the Biden] Administration that the Federal Government should pursue a comprehensive approach to advancing equity … ."); Ex. 4 (Wolfson Tr.) 70:10-22 (explaining that "the main priorities" for NEH under the Biden administration were "strengthening democracy, addressing our changing climate, and . . . advancing equity for racially underserved groups").  If the government was entitled to award grants because it wished to subsidize grants that promoted these objectives, the First Amendment does not prevent the government from terminating them if it no longer wishes to do so.

For similar reasons, the Government respectfully submits that this Court's suggestion, echoed by Plaintiffs, that viewpoint-neutrality principles and cases like *Velazquez* and *Rosenberger* apply unless the speech at issue is "governmental speech" conveying a specific governmental message, is at odds with Supreme Court precedent.  MTD Op. at 61-63; Pls' Br. at 16.  Such a

24

reading of *Velazquez* and *Rosenberger* finds no support in *Finley*, where the Government had conceded that "the artistic expression funded by an NEA grant is not the government's own speech; the NEA's award of the grant does not constitute government approval of a particular message or point of view that may be communicated by the work of art."  Respondent's Brief at 29, *Finley*, No. 97-371, 1998 WL 47281, at \*29; *cf. Finley*, 524 U.S. at 598-99 (Scalia, J., concurring in the judgment) ("*Rosenberger*, as the Court explains . . . found the viewpoint discrimination unconstitutional, not because funding of 'private' speech was involved, but because the government had established a limited public forum—to which the NEA's granting of highly selective (if not highly discriminating) awards bears no resemblance."  (citation omitted)).

Finally, there is no plausible argument in this case that the Government has created a public forum or limited public forum through a set of disparate grants to grantees around the country on a wide variety of contracts.  The funded activities do not share an audience, a means of communication, or anything else that would suggest that the Government is creating a forum.

### B.  The Termination of So-Called "Biden-Era Grants" Did Not Violate the First Amendment

Plaintiffs also have not shown that the termination of grants awarded during the Biden administration violated the First Amendment.  Plaintiffs claim that Defendants violated the First Amendment by terminating Biden-era grants 1) because the Government "perceived the grantees viewpoints to be aligned with the Biden Administration, and accordingly disfavored them"; and 2) "because they were awarded by the Democratic administration."  Pls' Br. 23.  Neither of Plaintiffs' claims is supported by the evidence, and Plaintiffs have not sufficiently articulated which terminations of which Biden-era grants violated the First Amendment, and why.

Indeed, Plaintiffs have not shown that Defendants terminated Biden-era grants for either of the claimed reasons.  First, while lists of Biden grants were used as starting points for identifying

25

grants for termination, Defendants subsequently expanded their review of grants for termination to the universe of all open grants, and, in the end, terminated a number of grants that were awarded during the first Trump administration. *See* Ex. 5 (NEH_AR_000001) (instructing NEH Program Directors on February 7, 2025 to review "all the awards from 2021 to the present"), Ex. 7 (NEH_AR_000005) (Wolfson, on March 13, 2025, providing Fox and Cavanaugh with spreadsheet encompassing NEH program directors' "historical review of NEH's grants since January 2021"); Ex. 10 (US-000000839) (Fox informing McDonald and Wolfson on March 17, 2025, that he and Cavanaugh "reviewed all active grants for DEI involvement" and providing list), Ex. 11 (US-000000847) (list attached to Fox's March 16, 2025, email); Ex. 27 (US-000061430 and US-000061432 (reflecting that multiple grants on the final list of grants to be terminated had performance start dates prior to Biden taking office or at the very beginning of his term); Ex. 28 (US-000061492) (same, *see, e.g.*, Rows 64, 68, 70, 81, 90, 233, 256, 258, 300, 301, 338, 352, 365, 481 of "To Cancel (Orgs)" tab)). And as Plaintiffs acknowledge, the grants that were not terminated were Biden-era grants. *See* Pls.' 56.1 Statement ¶ 79; Ex. 28 (US-000061492 (*see* "To Keep" tab)). While more Biden-era grants than Trump-era grants were terminated, that is not surprising because most grants that remained open by March 2025 had been awarded during the Biden administration, Ex. 33 (NEH_AR_000017 and NEH_AR_000020) (list of active awards immediately prior to April 2025 grant terminations, reflecting performance periods for open grants); *see supra* page 8. The facts thus cut against any conclusion that Defendants engaged in a targeted effort to cancel all grants awarded during the Biden administration and keep any grants awarded during the Trump administration.

Second, even to the extent Defendants initially focused on Biden-era grants and terminated a higher volume of Biden-era grants than Trump-era grants, Plaintiffs have not shown that any

26

Biden-era grants were terminated based on (1) a general perception of the "grantees' viewpoints" or (2) the grant recipients' association with a particular political party, *i.e.*, the Democratic party. *See* Pls' Br. at 23.  Instead, after extensive discovery, the record reflects that Defendants focused initially on Biden-era grants pursuant to relevant presidential executive orders, which directed agencies to compile lists of grantees who "received Federal funding to provide or advance DEI, DEIA, or 'environmental justice' programs, services, or activities since January 20, 2021."  E.O. 14151; *see also* E.O. 14168 (referring to Executive Orders issued by President Biden pertaining to gender-related issues); Ex. 4 (Wolfson Tr.) 87:18-88:1 (explaining that "the executive order made clear" that NEH was "to do a historical review of all grants starting in . . . the Biden administration, January of 2021"); Ex. 1 (Cavanaugh Tr.) 106:14-18 (explaining that Cavanaugh and Fox initially pulled up a list of only Biden-era grants "[b]ecause that was what was in reference to the executive order").  While Plaintiffs assert that the Government terminated "Biden-era grants" in part because "'they were awarded by the Democratic administration,'" Pls.' Br. at 23 (quoting MTD Op. at 60-61),[7] they point to no specific evidence that agencies were directed to terminate grants awarded by the Biden administration because of its Democratic party affiliation or due to a perception that the grant holders were likely to be Democrats.  Similarly, they have identified no evidence that decisionmakers considered the "viewpoints" of particular grantees, outside the context of reading and reviewing the subject matter descriptions for the grants.  Rather, the evidence and the executive orders reflect that Defendants initially focused on grants awarded during the Biden administration

---

[7] Plaintiffs cite only this Court's opinion for the proposition that grants were terminated because they were awarded during a Democratic administration—but the Court came to that conclusion when it was evaluating Plaintiffs' likelihood of success at the preliminary injunction stage, before Defendants produced the administrative record and before the parties engaged in discovery.  The evidence the Court cited in reaching that conclusion included declarations from anonymous witnesses whose identities Plaintiffs objected to disclosing in discovery and, accordingly, are not relying on as evidence at summary judgment.  *See* MTD Op. at 60-61.

due to the likelihood that the subject matter of Biden-era grants implicated DEI and other disfavored subjects that Biden had prioritized through his own executive orders and policy positions. *See* E.O. 14151, § 1 (referring to executive order issued by Biden pertaining to the advancement of "Racial Equity and Support for Underserved Communities"); E.O. 14168 (referring to positions taken by the "prior Administration" pertaining to gender ideology). In other words, the focus on and review of Biden-era grants related to the subject matter of the grants, not the characteristics or affiliations of the grantholders. *See* Ex. 1 (Cavanaugh Tr.) 114:14-115:20 (explaining that reviewing grants for termination involved looking at "what the grant is related to" based on spreadsheet descriptions and did not involve reviewing grant applications or grant websites).

Putting aside the evidentiary deficiencies in Plaintiffs' arguments, Plaintiffs cite no cases for the proposition that termination of a grant on the basis of alignment with a political party violates the First Amendment. They cite to *Elrod v. Burns*, 427 U.S. 347 (1976), and *Branti v. Finkel*, 445 U.S. 507 (1980), but those cases arose in a very different context, involving government employees who alleged they were terminated or threatened with termination from their jobs due to their political party affiliations. In *Elrod*, for instance, "to maintain their jobs, respondents were required to pledge their political allegiance to the Democratic Party, work for the election of other candidates of the Democratic Party, contribute a portion of their wages to the Party, or obtain the sponsorship of a member of the Party." 427 U.S. at 355. The Court explained in these cases that requiring non-policymaking employees to do such things is likely to impact the employees' "ability to act according to [their] beliefs," as well as the "free functioning of the electoral process," as such employees may be deterred from associating with members of their own parties or contributing to their parties and may have less time and less money available to do

28

so. *Id.* at 355-56; *see also Branti*, 445 U.S. at 516-17. As discussed above, Plaintiffs have pointed to no evidence here that grants were cancelled due to consideration of *grantees'* political party affiliations, and there is no evidence or basis to conclude that the grant terminations would impact grantees' abilities to freely associate or participate in the political process.

Ultimately, Plaintiffs' contentions with respect to the termination of "Biden-era" grants amount to a vague claim of viewpoint discrimination.[8] Plaintiffs ambiguously refer to "other Biden-era grants" and "these grants," without specifying which grants they mean. Pls' Br. at 23-24. They seem to seek to use their "Biden-Era grants" argument as a catch-all, to contend that any grants not terminated for promoting DEI were cancelled because of party affiliation. *Id.* at 24. But Plaintiffs do not reconcile that argument with the fact that all open grants were ultimately reviewed, a number of Trump-era grants were terminated, and all of the grants that were not terminated were Biden-era grants. Rather, without specifying which viewpoints were being targeted with respect to each grant, Plaintiffs have asked the Court to simply assume that every termination of every Biden-era grant that was *not* identified as implicating DEI was nevertheless cancelled on the basis of some undefined, viewpoint-based animus. Moreover, Plaintiffs' vague assertion that Biden-era grants "were uniformly tagged as 'Biden Grants'" is inaccurate. Pls' Br. at 24. For that proposition, Plaintiffs cite a single spreadsheet, compiled by Cavanaugh and Fox around the time of their initial meeting with McDonald and Wolfson on March 12, 2025. Pls.' Br. at 24 (citing Pls.' Ex. 28 (NEH_AR_000004)); *see also* Pls.' Ex. 27 (NEH_AR_000003 (email attaching spreadsheet)). Cavanaugh explained at his deposition that he and Fox sent that spreadsheet to

---

[8] To the extent the Court concludes that certain Biden-era grants not flagged as implicating DEI were cancelled due to a perception that the subjects of the grants were likely to implicate DEI and other disfavored subjects, that would not violate the First Amendment for the same reasons discussed in Part III.A.

McDonald and Wolfson after their initial meeting "because Adam mentioned that" he believed there may have been a "large increase in the number of grants [implicating the] EO that were issued during [the Biden administration]." Ex. 1 (Cavanaugh Tr.) 109:17-24. The spreadsheets compiled by NEH personnel during the initial historical review of grants that potentially conflicted with executive orders, as well as the spreadsheets exchanged and edited by Fox, Cavanaugh, McDonald, and Wolfson that were ultimately used to compile the final list of grants for termination, did not refer to "Biden" or "Trump" grants. *See, e.g.*, Ex. 8 (NEH_AR_000006); Ex. 12 (US-000000936); Ex. 14 (US-000041427); Ex. 27 (US-000061430 and US-000061432); Ex. 26 (US-000061429).

### IV.    The Grant Terminations Did Not Violate Equal Protection Principles

Plaintiffs contend that "Defendants violated the equal protection guarantee of the Fifth Amendment in terminating grants through classifications based on race, ethnicity, national origin, religion, sex, and sexual orientation." Pls.' Br. at 33. The Due Process Clause of the Fifth Amendment "forbids the Federal Government to deny equal protection of the laws." *Davis v. Passman*, 442 U.S. 228, 234 (1979). To prove an equal protection violation, Plaintiffs must show that "a government actor intentionally discriminated against them on the basis of race, national origin or gender." *Hayden v. Cty. of Nassau*, 180 F.3d 42, 48 (2d Cir. 1999). "Such intentional discrimination can be demonstrated in several ways": (1) "a law or policy [that] is discriminatory on its face" and "expressly classifies persons on the basis of" protected characteristics; (2) a law or policy which is "facially neutral" but "applied in a discriminatory fashion"; or (3) a "facially neutral statute . . . [that] was motivated by discriminatory animus and its application results in a discriminatory effect." *Id.*

As an initial matter, there is no evidence in the record that Defendants considered any of the *grantees'* protected characteristics in determining whether to terminate a particular grant.

30

Rather, Plaintiffs argue that the grants themselves were subject to discriminatory treatment. Pls.' Br. at 33. But federal grants are not protected by the Equal Protection Clause. U.S. CONST. AMEND. XIV, § 1 ("No state shall make or enforce any law which shall . . . deny to any *person* within its jurisdiction the equal protection of the laws.").[9] Moreover, as discussed below, Plaintiffs also have not shown that the grant terminations were discriminatory or motivated by discriminatory animus.

Plaintiffs also do not challenge the Executive Orders themselves on equal protection grounds. Nor could they, as the Executive Orders are facially neutral and do not expressly apply only to individuals with certain protected characteristics. Instead, Plaintiffs assert that Defendants violated the equal protection guarantee of the Fifth Amendment because "Defendants unambiguously employed . . . suspect classifications to identify grants for placement on the termination list." Pls.' Br. at 34. In particular, Plaintiffs hinge their equal protection claim on Fox's use of "Detection Codes" to create a list of so-called "Craziest Grants" as well as Fox's use of ChatGPT in creating the "DEI rationale" on the list of grants for McDonald's and Wolfson's review. Pls.' Br. at 34.

That argument misconstrues the evidence in this case. Fox's testimony is clear—neither the "Craziest Grants" list nor ChatGPT were used to select grants for termination. The "Craziest Grants" list was merely Fox's initial assessment of grants that might conflict with the Executive Orders. Indeed, Fox testified that his creation of the "Craziest Grants" list was "a very preliminary exercise" in advance of "the initial meeting with Mike [McDonald] and Adam [Wolfson]." Ex. 2 (Fox Tr.) 232:2-4. Fox labeled the grants on this list as the "Craziest Grants" as a shorthand for

---

[9] "[T]he equal protection obligations imposed by the Fifth and Fourteenth Amendments" are "indistinguishable." *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 217 (1995).

grants that were "most obviously infringing on the [Executive Orders]." *Id.* 232:18-23; *see also id.* at 231:22-232:4 ("craziest grants" referred to grants that were "[t]he most blatantly misaligned with the latest [Executive Orders]"); *see also* Ex. 1 (Cavanaugh Tr.) 123:4-10 ("craziest" grants referred to a grant's "egregiousness of the violation of the executive order."). And he repeatedly testified that this exercise was used to preliminarily "identify[] grants that may relate or conflict with [Executive Orders]"—not to ultimately identify grants to terminate. Ex. 2 (Fox Tr.) 239:8-12; *see also id.* 243:25-244:3 ("This list was not used in the context of deciding which grants to keep or not."); *id.* 244:20-25 (Q: "So this list was not used . . . in determining which grants to keep or not? A: No.).

In addition, Fox only used ChatGPT "[t]o look at the . . . full grant descriptions and bring out the context of which a DEI grant may relate" and to "inform DEI rationale." *Id.* 204:9-13. Fox input grant descriptions into ChatGPT to generate a "DEI rationale" using the following prompt: "Does the following relate at all to DEI? Respond factually in less than 120 characters. Begin with 'Yes.' or 'No.' followed by a brief explanation. Do not use 'this initiative' or 'this description' in your response." Ex. 15 (US-000062485). The ChatGPT-generated DEI rationales were simply "a tool" to assist in NEH's analysis of grants that conflicted with the Executive Orders, Ex. 2 (Fox Tr.) 207:2-10, and to "give context to Adam [Wolfson] and Mike [McDonald] on why [a] grant may be related to DEI," *id.* 204:20-23. Notably, Fox did not use ChatGPT as a substitute for personally reviewing grant descriptions to determine which grants potentially implicated DEI, or to make any decisions about whether a particular grant should be terminated. *Id.* 206:17-207:10 (DEI rationale summary "didn't end up with the final decisions"); 207:23-25 (DEI rationales were "not the ultimate decision-making factor"); 208:23-209:3 (same). Accordingly, Plaintiffs cannot point to the "Craziest Grants" list or Fox's use of ChatGPT to show

32

that the grant terminations were applied in a discriminatory fashion—indeed, these tools were not used to select grants for termination.

Nor can Plaintiffs show that the grants were terminated with discriminatory animus. All four witnesses testified that the decision to terminate certain grants was made to comply with the Executive Orders and to generally align NEH's grants with the administration's priorities. *See, e.g.*, Ex. 1 (Cavanaugh Tr.) 153:21-155:6 (testifying that the "two guiding principles" of selecting grants for termination were DEI and grants which "fell in the category of wasteful spending" and that other than "grants related to the founding of the country . . . [the] America250 initiative and [the] Garden of Heroes initiative . . . everything was up to be evaluated for potential termination."); Ex. 2 (Fox Tr.) 108:5-10 ("[A]ny time that we would look at a grant through the lens of complying with an executive order, we would just refer back to the EO and assess if this grant had relation to it."); Ex. 3 (McDonald Tr.) 97:21-99:15 (stating that NEH scrutinized grants "in line with the president's executive order"), 155:12-19 ("the rationale for terminating grants expanded beyond DEI to consider . . . Trump administration priorities . . . and also grants that could be terminated because they appeared to be too niche"); Ex. 4 (Wolfson Tr.) 84:18-85:18 ("some [grants] were terminated because they were related to these categories that the executive orders had made clear were not among their priorities," as well as "grants that didn't fit the priorities of the new administration."). In fact, contrary to Plaintiffs' assertions, NEH did terminate several grants that focused on "majority group[s]" or that "mentioned a national origin in Western Europe," as well as grants that had no relation to race, gender, or other protected characteristics. Pls.' Br. at 37; *see* Ex. 27 (US-000061430 and US-000061432) (terminated grants included: "Immanuel Kant's philosophy of mathematics as grounded in ordinary human experience"; "Research and writing . . . examining cadaverous rhetorics"; "Research and writing . . . on the collaborative nature of

construction in 16th-century Rome"; "Research and writing . . . on the cultural history of the German manufacturer Braun from the beginning of the Nazi regime through the 1970s").

Because Plaintiffs have failed to show that grants were terminated through classifications based on protected characteristics, the terminations must be reviewed under rational basis review. In undertaking this review, the Court must consider whether the terminations "bear[] a rational relationship to a legitimate governmental objective." *Windsor v. U.S.*, 699 F.3d 169, 180 (2012). "'[T]he burden is on [Plaintiffs] to negative every conceivable basis which might support [the grant terminations],' whether or not the basis has a foundation in the record." *Heller v. Doe*, 509 U.S. 312, 320-21 (1993) (citation omitted). Under this standard, the Court must not "judge the wisdom, fairness, or logic of [the Executive's] choices.'" *Id.* at 319 (citation omitted). Moreover, the government "has no obligation to produce evidence to sustain the rationality of" the grant terminations. *Id.* at 320.

The grant terminations satisfy this highly deferential standard. The government has a legitimate interest in administering federal programs consistent with goals set by a democratically elected political branch. *See Motor Vehicle Manufacturers Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 59 (1983) ("A change in administration brought about by the people casting their votes is a perfectly reasonable basis for an executive agency's reappraisal of the costs and benefits of its programs and regulations.") (Rehnquist, J., concurring in part and dissenting in part) (cited favorably in *Biden v. Texas*, 597 U.S. 785, 812 (2022)). And the terminations were made pursuant to NEH's authority under 2 C.F.R. § 200.340(a)(4) to terminate any award that "no longer effectuates the program goals or agency priorities." *See, e.g.*, Ex. 34 (NEH_AR_000094). The goals of prioritizing merit, eliminating preferential treatment, and reducing wasteful spending are plainly legitimate governmental interests, *see Roberts v. U.S. Jaycees*, 468 U.S. 609, 623

34

(1984), and the grant terminations rationally furthered those goals by reallocating government funding.

Plaintiffs rely on *City of Saint Paul v. Wright* to argue that grant terminations are unconstitutional even under rational-basis review.  No. 25 Civ. 03899 (APM), 2026 WL 88193 (D.D.C. Jan. 12, 2026); Pls.' Br. at 38.  But in that case, the Department of Energy's termination of grants was based on whether the grantees were located in "Blue States" (states that tend to elect Democratic candidates), while similar grants whose recipients lived in "Red States" (states that supported President Trump in the 2024 election) were not terminated.  *Id.* at *2-3.  The court concluded that terminating grants awarded to recipients in Blue States while maintaining similar grants whose recipients lived in Red States did not "further[] the agency's energy priorities" or fulfill the purpose of "administering grant programs consistent with the agency's priorities."  *Id.* at *5.  In this case, as discussed above, the grant terminations were not based on *any* classifications and were selected for termination if they were implicated by the Executive Orders or did not align with the administration's priorities.  Accordingly, Defendants are entitled to summary judgment on the equal protection claim.

## V.    Plaintiffs' *Ultra Vires* Claim Fails

Plaintiffs assert that "DOGE terminated NEH grants without legal authority" and the grant terminations were therefore *ultra vires*.  Pls.' Br. at 25; *see also* ACLS Compl. Count IX; Authors Guild Compl. Count VI.  *Ultra vires* review "applies only when an agency has taken action entirely in excess of its delegated powers and contrary to a specific prohibition in a statute."  *Nuclear Regul. Comm'n v. Texas*, 605 U.S. 665, 682 (2025); *see also Yale New Haven Hosp. v. Becerra*, 56 F.4th 9, 26-27 (2d Cir. 2022).  An *ultra vires* claim has been referred to as "essentially a Hail Mary pass," *DCH Reg'l Med. Ctr. v. Azar*, 925 F.3d 503, 509 (D.C. Cir. 2019) (citation omitted), because

35

of its "extraordinarily narrow" scope, *Hartz Mountain Corp. v. Dotson*, 727 F.2d 1308, 1312 (D.C. Cir. 1984).

In its Motion to Dismiss Opinion, the Court held that Plaintiffs had failed to demonstrate that they were likely to succeed on the merits of their *ultra vires* claims. MTD Op. at 53, 67-70. Specifically, the Court indicated that to satisfy the "rigorous standard" needed to succeed on those claims, "Plaintiffs must prove that Cavanaugh and Fox effectively usurped the legal authority to terminate grants that Congress had expressly conferred on the NEH Chairperson." *Id.* at 68. The Court held that Plaintiffs had not shown that they were likely to meet that proof because, while "[t]he record evidence certainly indicates that persons associated with DOGE were involved in the Mass Termination," even the declarations submitted by Plaintiffs in support of their motion for a preliminary injunction were "not inconsistent" with McDonald's assertion "that *he* made the final decision." *Id.* at 68-69. While Plaintiffs have now had the opportunity to take broad discovery, the situation has not changed: the evidence shows that while DOGE personnel were involved in the grant termination process (which Defendants have never disputed), McDonald approved the grant terminations.

NEH's originating statute provides that "[t]he Endowment shall be headed by a chairperson, who shall be appointed by the President, by and with the advice and consent of the Senate," and that "[t]he Chairperson, with the advice of the National Council on the Humanities . . . , is authorized to enter into arrangements, including contracts, grants, loans, and other forms of assistance, to" carry out the agency's mission. 20 U.S.C. §§ 956(b), 956(c). Plaintiffs do not dispute that if McDonald—then the Acting Chairman of NEH—terminated the grants, that would not constitute an unlawful *ultra vires* action. *See, e.g.*, Pls.' Br. at 26. Instead, Plaintiffs claim that, contrary to the testimony of Fox, Cavanaugh, Wolfson, and McDonald himself as well as

36

documents showing that McDonald approved the grant terminations, McDonald did not do so. Plaintiffs' theory is contrary to the evidence and cannot be credited.

The evidence shows that, before DOGE personnel came to NEH, NEH staff reviewed open grants awarded since January 2021 to identify those that might conflict with the recent executive orders concerning environmental justice; diversity, equity, and inclusion; and gender ideology, rating them as "'high, medium, or low' in terms of promoting" those concepts (collectively referred to as "DEI").    Ex. 5 (NEH_AR_000001); Ex. 8 (NEH_AR_000006); Ex. 6 (NEH_AR_000021).  On March 12, 2025, two members of the DOGE small-agency team, Nate Cavanaugh and Justin Fox, met with NEH Acting Chairman McDonald, as well as Assistant Chair for Programs Adam Wolfson, and began working with McDonald and Wolfson to identify grants to terminate pursuant to the executive orders.  Ex. 2 (Fox Dep.) at 127:20-25.  Cavanaugh and Fox used NEH's spreadsheet as a starting point, but identified additional grants that, in their view, implicated the executive orders, or, more generally, "wasteful spend," and should potentially be terminated.[10]  Ex. 7 (NEH_AR_000005); Ex. 16 (NEH_AR_000013); Ex. 10 (US-000000839) & Ex. 12 (US-000000936) (email sent by Fox on March 17, 2025, and attached spreadsheet listing grants where "NEH identified DEI involvement" (*see* DEI Rationale column) and other grants identified as implicating DEI (*see* Yes / No DEI? column)).  Cavanaugh and Fox sent those additional lists to McDonald and Wolfson for their review.  Ex. 10 (US-000000839 (March 17, 2025, email attaching list; included in Plaintiffs' filings as Ex. 30 but without attachment); Ex. 13 (US-000041372) & Ex. 14 (US-000041427) (March 19, 2025, email attaching updated list;

---

[10] Plaintiffs' description of the timeline is incorrect.  As evidenced by Fox's March 28, 2025, email to McDonald and Wolfson attaching a list of "active grants for your review for DEI or wasteful spend," Ex. 16 (NEH_AR_000013), Defendants did not, as Plaintiffs claim, add "non-DEI, Biden-era grants for termination" at "the last minute" on April 1, 2025, Pls.' Br. at 30.

included as Plaintiffs' Ex. 13, again excluding attachments); Ex. 16 (NEH_AR_000013) (March 28 and 30, 2025, emails).  Indeed, contrary to Plaintiffs' assertion that "Fox and Cavanaugh took over the termination selection process as soon as they were sent to NEH," Pls.' Br. at 27, the record reflects that, throughout their time at NEH, Cavanaugh and Fox worked closely with McDonald and Wolfson and asked for their input and approval each step of the way.  Ex. 10 (US-000000839); Ex. 13 (US-000041372); Ex. 16 (NEH_AR_000013); Ex. 6 (NEH_AR_000021) at NEH_AR_000022.

Critically, moreover, McDonald reviewed the final list of grants to terminate and approved it.  Ex. 6 (NEH_AR_000021).  McDonald also reviewed and approved the draft termination letter Fox had prepared, authorized Fox to include McDonald's e-signature, and agreed that Fox would send out the termination emails.  Ex. 30 (US-000050461); Ex. 3 (McDonald Tr.) 259:5-7, 262:8-13, 271:23-272:16, 307:4-10; Ex. 4 (Wolfson Tr.) 234:14-21.  Plaintiffs simply ignore these crucial details.  *See* Pls.' Br. at 28-32.  While McDonald did not personally identify each grant for termination, and did not necessarily agree with Fox and Cavanaugh's rationale for adding some of the grants to the list, *see* Pls.' Br. at 30-31, the fact remains that he approved terminating all of them.  McDonald's testimony on this point was clear.  *See* Ex. 3 (McDonald Tr.) 229:16-230:16 (testifying, "I was the final decider" and "I approved all the grant terminations").[11]  As McDonald explained:  "I believe that I had a responsibility, having accepted the position in directing the agency, which in my view is part of the executive branch of government. We were given

---

[11] To the extent Plaintiffs attempt to suggest, in reliance on McDonald's deposition testimony, that he may not have approved termination of some of the grants, Pls.' Br. at 30, McDonald's testimony supports no such conclusion.  McDonald simply testified that he did not, at the time of his deposition nine months after the terminations, remember each of the grants that was terminated. *See* Ex. 3 (McDonald Tr.) 230:17-232:11 (testifying that he "approved all the grant terminations" but "[t]here were over 1,400 grants" and he "d[idn't] recall the vast majority of them").

38

instructions by the President to cooperate with DOGE in its work.  And no, I didn't feel that there were any reasons for obstruction, certainly on my part." *Id.* 188:24-189:5.  Plaintiffs make no effort to square their assertion that "DOGE, and not McDonald or anyone else at NEH, terminated the grants," Pls.' Br. at 32, with McDonald's testimony or the other evidence—including the testimony of every other witness to be deposed and the email in which McDonald gave his approval—that shows that McDonald approved the terminations. *See* Ex. 6 (NEH_AR_000021); Ex. 4 (Wolfson Tr.) 256:6-12; Ex. 1 (Cavanaugh Tr.) 182:5-11, 241:19-23; Ex. 2 (Fox Tr.) 143:23-144:2, 158:4-9, 160:8-13, 184:18-22, 192:20-24, 193:8-15, 194:3-6, 214:18-21, 296:2-4; 322:24-323:3.  Plaintiffs cannot write this evidence out of the record.

Finally, Plaintiffs appear to argue that there "are two distinct types of 'non-statutory review' claims," which Plaintiffs assert "in the alternative":  claims that a "a federal actor has violated a federal statute," which are subject to strict requirements," and "[n]onstatutory review claims alleging a constitutional violation," which purportedly are not.  Pls.' Br. at 25.  Other than the fact that they wish to avoid the stringent requirements for review of an *ultra vires* claim, it is unclear how Plaintiffs believe this distinction bears on their claims, as they seem to concede that, either way, they must show that DOGE and not NEH terminated the grants.  *Compare* Pls.' Br. at 26 *with* id. at 33.  At any rate, Plaintiffs' description of the applicable legal standards is inaccurate, and not supported by the cases they cite.

In *Sustainability Institute v. Trump*, 165 F. 4th 817, 829-30 (4th Cir. 2026), the court addressed its jurisdiction to decide claims based on an implied nonstatutory exception to sovereign immunity.  The court explained that "[t]he availability of nonstatutory review depends largely on whether the claimed violation is statutory or constitutional," and "[t]he implied nonstatutory exception for claims alleging that a federal actor has violated a federal statute—often called ultra

vires claims—is necessarily narrow." *Id.* (internal quotation marks omitted).  The court noted, however, that "[a]s the Supreme Court recently explained, '[b]ecause ultra vires review could become an easy end-run around' limitations imposed by statutes, the Court's 'cases have strictly limited nonstatutory ultra vires review'" which "applies only when an agency has taken action entirely 'in excess of its delegated powers and contrary to a specific prohibition' in a statute." *Id.* (quoting *Nuclear Regul. Comm'n*, 605 U.S. at 681).  The court explained that while the plaintiffs in that case attempted to cast their claims as constitutional, and not statutory, by describing the grant freezes and terminations they challenged as violating the Constitution's "separation of powers" and the Presentment Clauses, "the Supreme Court has foreclosed efforts to recast statutory claims as constitutional ones, and that precedent applies here." *Id*. at 830-31.  The plaintiffs in essence claimed that the government had exceeded its statutory authority, which is a statutory claim. *Id.* at 831; *see also Am. Ass'n of Univ. Professors v. Trump*, Case No. 25-cv-07864-RFL, 2025 WL 3187762, at \*22 (N.D. Cal. Nov. 14, 2025) (cited in Pls.' Br. at 25-26) (not discussing finding necessary to support ultra vires claim).

This reasoning is equally applicable in this case and forecloses Plaintiffs' attempt to recast their *ultra vires* claim as a constitutional claim subject to a more forgiving standard.  To be sure, Plaintiffs do assert constitutional claims under the First Amendment and Equal Protection Clause—but their separate argument that the grants were terminated without legal authority is a classic *ultra vires* claim.  And for the reasons discussed, Defendants are entitled to summary judgment on that claim.

## VI.   To the Extent Plaintiffs Still Assert an APA Claim That Claim Fails

As noted in Section II, *supra*, it appears the Authors Guild Plaintiffs are no longer pursuing their APA claim, which they do not address in their summary judgment papers.  At any rate, that

claim fails because Plaintiffs' claims are not reviewable under the APA.

First, APA review is not available to the extent that other "statutes preclude judicial review," 5 U.S.C. § 701(a)(1), and the APA only provides a cause of action where "there is no other adequate remedy in a court," 5 U.S.C. § 704. For the reasons discussed in Part II, *supra*, the Tucker Act precludes APA claims challenging grant terminations.

Second, APA review is also unavailable to Plaintiffs because the actions Plaintiffs challenge are "committed to agency discretion by law." 5 U.S.C. § 701(a)(2). Courts have explained that agency action is "committed to agency discretion by law" when a "statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion," rendering "meaningful judicial review . . . impossible." *Steenholdt v. FAA*, 314 F.3d 633, 638 (D.C. Cir. 2003) (quoting *Heckler v. Chaney*, 470 U.S. 821, 830 (1985)). This is true "even where Congress has not affirmatively precluded review." *Heckler*, 470 U.S. at 830. Hallmarks of a decision committed to agency discretion include a statute that puts the onus on the agency, not the courts, to apply a standard, *see Webster v. Doe*, 486 U.S. 592, 600 (1988), and general criteria that make it difficult for courts to meaningfully second-guess an agency determination, *see id.*

The Act establishing NEH, the National Foundation on the Arts and Humanities Act of 1965, 20 U.S.C. §§ 951-960, is such a statute. For one thing, it authorizes the NEH Chairperson to "enter into arrangements, including contracts, grants, loans, and other forms of assistance" aimed at various humanities-related objectives—but does not require NEH to enter into particular grants, maintain specific levels of staffing, create or retain the programs or departments that Plaintiffs identify in their complaints, or fund particular grants or a certain number of grants within a given time frame. 20 U.S.C. § 956(c); *see Vt. Yankee Nuclear Power Corp. v. Natural Resources*

41

*Defense Fund*, 435 U.S. 519, 545 (1978) (explaining that a court may not "dictat[e] to the agency the methods, procedures, and time dimension" to make an agency decision); *see also Sealed v. Sealed*, 332 F.3d 51, 56 (2d Cir. 2003) (distinguishing between a statute that "channels official discretion by mandating a defined administrative outcome" and a statute that "merely authorizes particular actions"). Moreover, the statute's authorization to fund grants encompasses broadly drawn topics and guidelines that would not provide a meaningful rubric for court review. For example, it authorizes—but does not require—the chairperson to administer grants pertaining to: "the pursuit of a national policy for the promotion of progress and scholarship in the humanities"; "research and teaching potential of the United States in the humanities"; "training and workshops in the humanities"; "programs and research" with "substantial scholarly and cultural significance"; and programs and research that "reach, or reflect the diversity and richness of our American cultural heritage," including "a minority, inner city, rural, or tribal community." 20 U.S.C. § 956(c). The statute thus gives the agency wide latitude to enter into grant agreements that serve any of several expansive statutory goals like supporting "scholarship in the humanities," "research and teaching potential of the United States in the humanities," and "interchange of information in the humanities." *Id.*

Accordingly, to the extent the Authors Guild Plaintiffs are still pursuing their APA claim, Defendants are entitled to summary judgment on that claim.

## CONCLUSION

For the foregoing reasons, the Court should grant the Defendants' motion for summary judgment and deny Plaintiffs' motion.

42

Dated: New York, New York
       March 27, 2026

Respectfully submitted,

JAY CLAYTON
United States Attorney for
the Southern District of New York
Attorney for Defendants


By:   /s/ Mary Ellen Brennan
      MARY ELLEN BRENNAN
      RACHAEL DOUD
      JONAKI SINGH
      Assistant United States Attorneys
      86 Chambers Street, 3rd floor
      New York, New York 10007
      Telephone: (212) 637-2652/2699/2785
      MaryEllen.Brennan@usdoj.gov
      Rachael.Doud@usdoj.gov
      Jonaki.Singh@usdoj.gov