**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| AMERICAN COUNCIL OF LEARNED SOCIETIES, *et al.*,<br><br>       *Plaintiffs*,<br><br>    v.<br><br>ADAM WOLFSON, in his official capacity as Acting Chairman of the National Endowment for the Humanities, *et al.*,<br><br>       *Defendants*. | Case No. 25-cv-03657 |

| | |
|---|---|
| THE AUTHORS GUILD *et al.*,<br><br>       *Plaintiffs*,<br><br>    v.<br><br>NATIONAL ENDOWMENT FOR THE HUMANITIES, *et al.*,<br><br>       *Defendants*. | Case No. 25-cv-3923 |

**OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND
REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................. 1

ARGUMENT ....................................................................................................................... 2

    I.    The Tucker Act Does Not Strip This Court of Jurisdiction ................................................. 2

    II.    The Mass Termination Violated the First Amendment .......................................................... 6

        A.    Defendants Illegally Terminated the DEI Subclass's Grants Based on Viewpoint......... 6

        B.    Targeting Grants Based on Political Association Violates the First Amendment. ........ 13

    III.    DOGE Terminated NEH Grants without Legal Authority ................................................. 16

    IV.    Many of the Grant Terminations Violated the Equal Protection Clause .......................... 20

    V.    The Court Should Enter Multiple Forms of Relief to Fully Remedy the Harms to Plaintiffs and their Members .......................................................................................... 25

CONCLUSION ................................................................................................................... 25

## TABLE OF AUTHORITIES

**Cases**

*789 Ninth & 414 E. 74th Assocs. LLC v. Hundalani*,
No. 21-cv-5314, 2023 WL 4472162 (S.D.N.Y. July 11, 2023) ................................................... 19

*Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*,
570 U.S. 205 (2013) .................................................................................................................. 11

*Alexander v. S.C. State Conf. of the NAACP*,
602 U.S. 1 (2024) ..................................................................................................................... 24

*Am. Council of Learned Socies. v. McDonald*,
792 F. Supp. 3d 448 (S.D.N.Y. 2025) ..................................................................................... 6, 8

*Branti v. Finkel*,
445 U.S. 507 (1980) .................................................................................................................. 13

*Carruth v. United States*,
627 F.2d 1068 (Ct. Cl. 1980) ...................................................................................................... 2

*City of Cleburne, Tex. v. Cleburne Living Ctr.*,
473 U.S. 432 (1985) .................................................................................................................. 25

*City of Saint Paul v. Wright*,
No. 25-cv-3899, 2026 WL 88193 (D.D.C. Jan. 12, 2026) .................................................... 24, 25

*Climate United Fund v. Citibank N.A.*,
No. 25-5122 (D.C. Cir. Jan. 9, 2026) .......................................................................................... 4

*Dalton v. Specter*,
511 U.S. 462 (1994) .................................................................................................................. 19

*Dreebs v. Alstom Transp., Inc.*,
346 F. App'x 654 (2d Cir. 2009) ............................................................................................... 19

*Dreni v. PrinterOn Am. Corp.*,
No. 18-cv-12017, 2021 WL 4066635 (S.D.N.Y. Sept. 3, 2021) ............................................. 19

*Elrod v. Burns*,
427 U.S. 347 (1976) .............................................................................................................. 13, 14

*Fisher v. United States*,
402 F.3d 1167 (Fed. Cir. 2005) ................................................................................................... 1

*Hamlet v. United States*,
63 F.3d 1097 (Fed. Cir. 1995) ..................................................................................................... 2

iii

*Heffernan v. City of Paterson*,
578 U.S. 266 (2016) ............................................................................................... 13

*Holley v. United States*,
124 F.3d 1462 (Fed. Cir. 1997) ............................................................................... 2

*Johnson v. California*,
543 U.S. 499 (2005) ............................................................................................... 24

*LeBlanc v. United States*,
50 F.3d 1025 (Fed. Cir. 1995) ................................................................................. 2

*Legal Servs. Corp. v. Velazquez*,
531 U.S. 533 (2001) ............................................................................................ 8, 9

*Liffiton v. Keuker*,
850 F.2d 73 (2d Cir. 1988) ...................................................................................... 3

*Massapequa Union Free Sch. Dist. v. N.Y. State Bd. of Regents*,
809 F. Supp. 3d 33 (E.D.N.Y. 2025) ..................................................................... 23

*Matal v. Tam*,
582 U.S. 218, 243 (2017) ......................................................................................... 9

*Nat'l Ass'n of Diversity Officers in Higher Education v. Trump*,
167 F.4th 86 (4th Cir. 2026) .................................................................................. 10

*Nat'l Endowment for the Arts v. Finley*,
524 U.S. 569 (1998) ......................................................................................... 5, 7, 9

*Nat'l Institutes of Health v. Am. Pub. Health Ass'n*,
145 S. Ct. 2658 (2025) ............................................................................................. 3

*Nat'l Public Radio v. Trump*,
2026 WL 877434 (D.D.C. Mar. 31, 2026) ........................................................... 6, 7

*Palmieri v. Lynch*,
392 F. 3d 73, 87 (2d Cir. 2004) ....................................................................... 21, 26

*Palmore v. Sidoti*,
466 U.S. 429 (1984) ......................................................................................... 23, 24

*Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*,
551 U.S. 701 (2007) ............................................................................................... 25

*Regan v. Taxation With Representation of Washington*,
461 U.S. 540 (1983) ................................................................................................. 6

*Rhode Island v. Trump*,
  2025 WL 3251113 (D.R.I. Nov. 21, 2025) .................................................. 4

*Rick's Mushroom Serv., Inc. v. United States*,
  521 F.3d 1338 (Fed. Cir. 2008) ................................................................. 1

*Romer v. Evans*,
  517 U.S. 620 (1996) ................................................................................ 25

*Rosenberger v. Rector & Visitors of Univ. of Va.*,
  515 U.S. 819 (1995) .............................................................................. 8, 9

*Rust v. Sullivan*,
  500 U.S. 173 (1991) ................................................................................. 8

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*,
  600 U.S. 181 (2023) ............................................................................... 24

*Sustainability Inst. v. Trump*,
  165 F.4th 817 (4th Cir. 2026) ................................................................ 19

*Thakur v. Trump*,
  163 F.4th 1198 (9th Cir. 2025) ............................................................ 6, 7

*Thakur v. Trump*,
  787 F. Supp. 3d 955 (N.D. Cal. 2025) ..................................................... 5

*United States v. Connolly*,
  716 F.2d 882 (Fed. Cir. 1983) .............................................................. 2, 3

*Webster v. Doe*,
  486 U.S. 592 (1988) ................................................................................. 1

**Statutes**

20 U.S.C. § 951 ....................................................................................... 11

20 U.S.C. § 956 ....................................................................................... 11

28 U.S.C.§ 1331 ........................................................................................ 3

37 U.S.C. § 204 ......................................................................................... 3

**INTRODUCTION**

The Government does not dispute any of the material facts necessary to grant Plaintiffs summary judgment. As to Plaintiffs' First Amendment claim, the Government does not dispute that it terminated "DEI" grants to suppress disfavored viewpoints. It does not dispute that these grants funded the grantees' own speech, rather than the Government's. And it does not dispute that it terminated hundreds of Biden-era grants without regard for the underlying merits of the grants. The Government instead advances the same erroneous legal argument that this Court previously rejected—that it may engage in viewpoint discrimination in subsidizing private speech. That argument has not improved with age. To the contrary, the Ninth Circuit and other courts have recently rejected the same argument in the same or similar funding contexts.

Nor does the Government point to any genuine factual dispute on Plaintiffs' claim that DOGE terminated the grants without legal authority. The Government does not dispute that DOGE lacked legal authority to terminate NEH grants, and all of the record evidence shows DOGE did the terminating. DOGE chose which grants to terminate. It drafted the termination letters to grantees and it executed the terminations. Along the way, DOGE rejected the plea of NEH's Chair McDonald that DOGE "should allow [many grants]  to continue." Defendants cannot avoid summary judgment merely because McDonald said at his deposition, *post hoc*, that he was the "decider." All of the record evidence shows otherwise, including a contemporaneous email from McDonald to DOGE stating "it's your decision" on which grants to terminate.

There is also no dispute as to the facts underlying Plaintiffs' equal protection claim. The Government does not meaningfully deny that Justin Fox selected many grants for termination solely because they involved people of a particular race, ethnicity, national origin, religion, sex, or sexual orientation. The Government's only real defense is a legal one—that there was no equal protection violation because Defendants did not consider the *grantees*' characteristics, but

rather the characteristics of the subjects of the grants. But the Supreme Court rejected that argument over forty years ago, holding that strict scrutiny applies where the Government takes adverse action against a person because of their affiliation with a person of a particular race. The Government's view has stunning implications—*e.g.*, public libraries could ban all books about women, or a state legislature could prohibit theaters from showing any movies about black history—and is antithetical to the Constitution's equal protection guarantees. It also contravenes the Supreme Court's repeated admonitions that *all* racial classifications by the government are subject to heightened scrutiny.

Unable to dispute the factual bases for Plaintiffs' claims, Defendants' principal argument is that the Court lacks jurisdiction based on the Tucker Act. This Court has already rightly rejected that argument. The Government suggests that Plaintiffs could pursue their constitutional claims in the Court of Federal Claims, but the Federal Circuit has repeatedly and unambiguously held otherwise. The overwhelming majority of courts that have addressed constitutional challenges to grant terminations since the Supreme Court's NIH decision have recognized the same and held that the Tucker Act does not preclude constitutional claims in district court.

## ARGUMENT

### I.    The Tucker Act Does Not Strip This Court of Jurisdiction

The Tucker Act does not strip this Court of jurisdiction over Plaintiffs' constitutional claims. Defendants do not dispute that *Webster v. Doe*, 486 U.S. 592 (1988), and its progeny govern the jurisdiction-stripping analysis for the constitutional claims. Defendants do not contest that, under *Webster*, if Plaintiffs cannot bring their constitutional claims in the Court of Federal Claims, then Congress's intent to strip Plaintiffs of any forum to challenge the constitutionality of their grant terminations "must be clear." *Id.* at 603; *see* Pls. Br. 39–40. And Defendants do not

2

deny that the Tucker Act lacks any clear statement that Congress intended to deprive grantees of any forum to bring constitutional claims against grant terminations. The dispositive question, then, is whether Plaintiffs could in fact bring their First Amendment and equal protection claims in the Court of Federal Claims if jurisdiction were lacking here. The Federal Circuit has conclusively held that the answer is no.

The Tucker Act is merely a jurisdictional statute, and therefore plaintiffs filing suit in the Court of Federal Claims must identify "a substantive source of law that creates the right to recovery of money damages against the United States." *Rick's Mushroom Serv., Inc. v. United States*, 521 F.3d 1338, 1343 (Fed. Cir. 2008). The source of law must be "money-mandating," *id.*, which for a constitutional or statutory claim means that the relevant provision mandates the government to pay the particular plaintiff a particular amount of money, *Fisher v. United States*, 402 F.3d 1167, 1173 (Fed. Cir. 2005).

The Federal Circuit has squarely held that the First Amendment and the Equal Protection Clause "do not mandate payment of money by the government," and therefore plaintiffs may *not* bring First Amendment or equal protection claims in the Court of Federal Claims. *LeBlanc v. United States*, 50 F.3d 1025, 1028 (Fed. Cir. 1995). The Government acknowledges *LeBlanc* but notes that the Federal Circuit held there was no jurisdiction "over any of the plaintiff's claims," which also "included wrongful discharge claims." Gov't Br. 14. That is a non-sequitur. The Federal Circuit first held there was no jurisdiction over the constitutional claims, and then separately held "[n]or is there jurisdiction over the wrongful discharge claims." *LeBlanc*, 50 F.3d at 1028. And the Federal Circuit has held in other cases that contractors may not bring First or Fifth Amendment claims in the Court of Federal Claims. *See Hamlet v. United States*, 63 F.3d 1097, 1107 (Fed. Cir. 1995) ("[T]he First and Fifth Amendments of the Constitution . . . standing

3

alone, . . . cannot be interpreted to command the payment of money, and therefore cannot support the Court of Federal Claims' jurisdiction under the Tucker Act." (cleaned up)); *United States v. Connolly*, 716 F.2d 882, 887–88 (Fed. Cir. 1983) ("[O]n any theory, the Claims Court lacks jurisdiction over appellee's first amendment claim."); *Carruth v. United States*, 627 F.2d 1068, 1081 (Ct. Cl. 1980) (same for "Equal Protection guarantees of the Fifth Amendment").

Citing *Holley v. United States*, 124 F.3d 1462 (Fed. Cir. 1997), the Government argues that "the Court of Federal Claims can hear constitutional claims where . . . the plaintiff effectively seeks relief in the form of money payment." Gov't Br. 13. That is flat wrong. In *Holley*, the plaintiff sued under a money-mandating *statute*, 37 U.S.C. § 204, which entitles military personnel to damages where they are wrongfully discharged. 124 F.3d at 1465. That "money-mandating statute" is what gave rise to Court of Federal Claims jurisdiction. *Id.* at 1465–66. The Federal Circuit held that the Court of Federal Claims could determine whether the plaintiff's discharge was unconstitutional for purposes of determining whether there was a wrongful discharge and hence a *statutory violation*. *Id.* The Federal Circuit has consistently distinguished claims under money-mandating statutes like 37 U.S.C. § 204 and the Back Pay Act—for which a "constitutional issue" may be relevant to the statutory claims—from constitutional claims themselves, which cannot be brought in the Court of Federal Claims. *See Holley*, 124 F.3d at 1465; *Connolly*, 716 F.2d at 887–88. The Government points to no money-mandating statute under which Plaintiffs would be entitled to money damages if the terminations were unconstitutional, and that would be irrelevant under *Webster* in any event. Plaintiffs have a right to bring constitutional claims against unconstitutional government actions.

Defendants also offer no response to the other reason why jurisdiction is proper: unlike with Administrative Procedure Act (APA) claims, sovereign immunity is no barrier for equitable

4

constitutional claims and *ultra vires* claims based on statutory violations. *See* Pls. Br. 40.

Defendants do not dispute this legal principle, nor could they under Second Circuit precedent.

*Liffiton v. Keuker*, 850 F.2d 73, 78 (2d Cir. 1988). For this reason, *NIH* and *California* do not

control. Pls. Br. 40. And without sovereign immunity, Defendants cite no legal or doctrinal basis

upon which this Court would lack jurisdiction to hear Plaintiffs' claims under 28 U.S.C. § 1331.

Defendants insist that *NIH*'s "reasoning extends to [constitutional] claims," Gov't Br. 13, but

they obscure that the reasoning they rely upon was focused solely on "[t]he Administrative

Procedure Act's limited waiver of sovereign immunity." *Nat'l Institutes of Health v. Am. Pub.*

*Health Ass'n* ("*NIH*"), 145 S. Ct. 2658, 2659 (2025) ("The Administrative Procedure Act's

'limited waiver of sovereign immunity' does not provide the District Court with jurisdiction to

adjudicate claims 'based on' the research-related grants[.]" (citation omitted)).

Defendants also ignore the overwhelming majority of courts that have held, following

*NIH*, that the Tucker Act does not preclude constitutional claims in district court. *See* Pls. Br.

38–39. Defendants note that for one of the district court decisions Plaintiffs cited, *Rhode Island*

*v. Trump*, 2025 WL 3251113, at \*16 (D.R.I. Nov. 21, 2025), the government on appeal "ma[de]

no argument that the Tucker Act precludes the District Court's jurisdiction over the plaintiffs'

constitutional claims," Gov't Br. 15 n.5 (quoting *Rhode Island v. Trump*, 155 F.4th 35, 46 (1st

Cir. 2025)). But that just shows that the Government itself knows that it has no good arguments

against jurisdiction over constitutional claims. Indeed, in appeals involving constitutional

challenges to grant terminations, the Civil Division's Appellate Staff has consistently not argued

that the Tucker Act strips jurisdiction over the constitutional claims, and instead has focused its

arguments on the merits. *See, e.g.*, *id.*; En Banc Br. for the United States at 20, *Climate United*

*Fund v. Citibank N.A.*, No. 25-5122 (D.C. Cir. Jan. 9, 2026); Br. for Appellants at 37–38,

5

[1]*Sustainability Inst. v. Trump*, No. 25-1575 (4th Cir. June 20, 2025); Br. for Appellants at 12–38, *Thakur v. Trump*, No. 25-4249 (9th Cir. Aug. 7, 2025). That speaks volumes.

In short, the Tucker Act does not strip this Court of jurisdiction over Plaintiffs' constitutional or *ultra vires* statutory claims. Sovereign immunity is no bar to either claim, and Plaintiffs could not assert these claims in the Court of Federal Claims. And to the extent the Court applies the "source of the rights" and "relief sought" test for these claims—which Defendants do not even argue is applicable—the same conclusion follows. PI Op. 44–51. The source of Plaintiffs' rights is the Bill of Rights of the Constitution, and Plaintiffs do not seek any order compelling the government to pay Plaintiffs' money. *See* Pls. Br. 40.

## II.    The Mass Termination Violated the First Amendment

### A.    Defendants Illegally Terminated the DEI Subclass's Grants Based on Viewpoint.

The Government does not deny that it terminated the purportedly DEI-related grants because it believed the grant projects promoted disfavored viewpoints. And critically, the government concedes that the speech at issue is the grantees' own speech, not government speech. Gov't Br. 23–24. It is accordingly undisputed that the Government terminated the grants labelled as DEI based on disfavor for the viewpoints expressed in the grantees' speech.

Indeed, the terminations reflected deep animus toward the grantees' speech and were "aim[ed] at the suppression of dangerous ideas." *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 587 (1998) (quotations omitted). Fox testified that he considered awards reflecting DEI to be "not for the benefit of humankind." Fox Dep. 220:13–18. Cavanaugh considered them

---

[1] Authors Guild Plaintiffs acknowledge that the cases the Government cites appear to foreclose this Court's jurisdiction over their APA claims. *See* Opp. at 11-12. Plaintiffs maintain that jurisdiction is proper, however, and expressly preserve this issue for appeal or in the event there is an intervening change of law.

"wasteful." Cavanaugh Dep. 264:1–5. And NEH's leadership were just as hostile: now-Acting Chair Wolfson wrote—and then Acting Chair McDonald agreed—immediately following the terminations that "the progressive version of the humanities" had "destroy[ed] independent thought." Pls. Ex. 34.[2]

Rather than dispute that the termination of DEI-related grants reflected abject viewpoint discrimination, the government relies entirely on the legal argument that it is *allowed* to discriminate against grantees' speech on the basis of viewpoint. *See, e.g.*, Gov't Br. at 22 ("the Government need not be viewpoint neutral"). That argument is wrong and, indeed, has already been rejected three times with respect to the NEH Mass Termination: in *Thakur v. Trump*, 787 F. Supp. 3d 955 (N.D. Cal. 2025), Judge Lin enjoined Defendants' termination of NEH grants held by the plaintiffs there because it was "quintessential viewpoint discrimination." *Id.* at 978. This Court likewise rejected the Government's argument in its preliminary injunction *See Am. Council of Learned Socies. v. McDonald*, 792 F. Supp. 3d 448, 488-93 (S.D.N.Y. 2025). Most recently, the Ninth Circuit affirmed Judge Lin's order, rejecting the Government's argument that it "is free to terminate funding even when it does so based on viewpoint." *Thakur v. Trump*, 163 F.4th 1198, 1206 (9th Cir. 2025). The argument has also been repeatedly rejected in similar cases. Just two weeks ago, for example, in the context of public broadcasting funding, Judge Moss of the District Court for the District of Columbia rejected the very argument Defendants make here—that the government may "consider the content and viewpoint of the [speech that] it

---

[2] All citations to Plaintiffs' Exhibits are to exhibits attached to the Declaration of Yinka Onayemi filed in support of Plaintiffs' motion for summary judgment, Dkt. 248, and to the Declaration of Yinka Onayemi filed herewith.

7

is subsidizing" and therefore discriminate based on viewpoint in cutting off funding to particular recipients. *Nat'l Public Radio v. Trump*, 2026 WL 877434, at \*20–26 (D.D.C. Mar. 31, 2026).

The Government's arguments should fare no better here. The Government's core error is in conflating its power to selectively fund programs that advance its policy goals with a power to discriminate based on viewpoint within programs.

The Government's reliance on *Regan v. Taxation With Representation of Washington*, 461 U.S. 540 (1983), illustrates the error. *Regan* held that the Government did not violate the First Amendment by declining to subsidize 501(c)(3) organizations' lobbying activities. 461 U.S. at 543–45. But the Court made clear that if the Government had subsidized such lobbying, it could not discriminate among organizations based on their viewpoints: "The case would be different if Congress were to discriminate invidiously in its subsidies in such a way as to aim at the suppression of dangerous ideas." *Id.* at 548 (internal quotations omitted). That is exactly what occurred here. Congress chose to subsidize exemplary works in the humanities, and NEH may not discriminate within that program among qualified works based on their viewpoints. *Id.*

As the Ninth Circuit recently held, "the government misreads *Finley*." *Thakur*, 163 F.4th at 1205. The critical fact is one the Government does not dispute: NEH had already determined that every grantee terminated on DEI grounds satisfied the merit-based conditions of their respective programs. *Finley*'s recognition that the government may choose to fund only arts projects that surpass a "content-based 'excellence' threshold," 524 U.S. at 586, is therefore not in play. These grants had already cleared that threshold. What happened next was not a funding prioritization; it was a hunt for disfavored viewpoints among grants that had already been deemed meritorious, followed by their termination on the basis of their viewpoints alone. That is precisely what *Finley* forbids: the government "leverag[ing] its power to award subsidies on the

8

basis of subjective criteria into a penalty on disfavored viewpoints." *Id.* at 587 (quotation omitted); *see Thakur*, 163 F.4th at 1205 (holding that the government unlawfully "selected particular grants for termination regardless of the programs through which they were funded, based on their connection to DEI"); *Nat'l Public Radio*, 2026 WL 877434, at *26 ("The [Supreme] Court has never . . . upheld executive action targeting specific speakers on viewpoint-based grounds for exclusion from programs funding First Amendment activities that Congress has already chosen to subsidize and for which those speakers are otherwise eligible.").

Indeed, the Government tellingly cites Justice Scalia's separate opinion in *Finley* for the proposition that "evaluating 'grant applications' on 'content- and viewpoint-based criteria' is 'perfectly constitutional.'" Gov't Br. at 22, 23 (quoting *Finley*, 524 U.S. at 590 (Scalia, J., concurring in the judgment)). That was indeed Justice Scalia's view, but it directly contradicted the majority opinion, which made clear that "even in the provision of subsidies, the Government may not aim at the suppression of dangerous ideas" by engaging in "viewpoint discrimination." *Finley*, 524 U.S. at 587. The Government's felt need to rely on a concurrence that openly disagreed with the binding majority opinion underscores the lack of support for its position.

The Government's reliance on *Rust v. Sullivan*, 500 U.S. 173 (1991), is also flawed. *Rust* holds that the government can "selectively fund a program to encourage certain activities it believes to be in the public interest, without at the same time funding an alternative program." 500 U.S. at 193. But *Rust* applies only to government speech, which Defendants concede is not at issue here. As the Supreme Court later explained, *Rust* applies "when the government disburses public funds to private entities to convey a governmental message." *Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 541 (2001) (discussing *Rust*); *accord Am. Council of Learned Socies.*, 792 F. Supp. 3d at 490. "[I]t does not follow… [from *Rust*], that viewpoint-based

9

restrictions are proper when the [Government] does not itself speak or subsidize transmittal of a message it favors but instead expends funds to encourage a diversity of views from private speakers." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 834 (1995). That "is precisely what the NEH does—expends funds to encourage a diversity of views (as statutorily mandated) from private speakers—speaker[s] who are not delivering a message either for or from the Government." *Am. Council of Learned Socies.*, 792 F. Supp. 3d at 490.

The Government accuses Plaintiffs of "misreading" *Rosenberger* and *Velazquez* by "interpreting such decisions to stand for the proposition that even in the context of funding conditions, the government cannot make content- or viewpoint-based distinctions." Gov't Br. at 22. But that is *exactly* what those cases say, in almost those exact words. In *Rosenberger*, the Supreme Court held that "attempts to suppress a particular point of view are presumptively unconstitutional in funding, as in other contexts." 515 U.S. at 830. Likewise in *Velazquez*, the Court held that the government's "funding decision[s] cannot be aimed at the suppression of ideas thought inimical to the Government's own interest." 531 U.S. at 549. Both cases involved government-subsidized speech, and both directly contradict the Government's position here. There is no question that the Mass Termination aimed to suppress works promoting DEI.

The Government's attempt to dismiss *Rosenberger* and *Velazquez* as "limited public forum" cases, Gov't Br. at 22–25, fares no better. *Velazquez* was not a limited public forum case at all; the Court merely looked to cases involving limited public forums to confirm the broader principle that the government may not engage in viewpoint discrimination even within a subsidy program: "As this suit involves a subsidy, limited forum cases … may not be controlling in a strict sense, yet they do provide some instruction." *Velazquez*, 531 U.S. at 544. And *Rosenberger*'s core holding—that the government "may not discriminate based on the viewpoint

10

of private persons whose speech it facilitates," 515 U.S. at 834—has never been understood as a public-forum-only rule. The Supreme Court has relied on *Rosenberger* for that proposition in several cases not involving public forums. *See, e.g.*, *Matal v. Tam*, 582 U.S. 218, 243, 248 (2017) (opinions of Alito, J., and Kennedy, J.); *Velazquez*, 531 U.S. at 542.

The Government is also wrong to claim that *Finley* disavowed *Rosenberger* in the subsidy context. *See* Gov't Br. at 23–24. In *Finley*, the Court explained merely that *Rosenberger* does not require the government to always open its programs to all comers. The university in *Rosenberger* offered subsidies "to all student organizations," and having done so, it could not then reject organizations based on their viewpoints. *Finley*, 524 U.S. at 586. *Finley* held that NEA was permitted to limit subsidies to projects that surpassed an "inherently content-based 'excellence' threshold" rather than funding all applicants. *Id.* But *Finley* expressly held that, among qualified applicants, the government may not "leverage its power to award subsidies … into a penalty on disfavored viewpoints." *Id.* at 587. Here, NEH did not reassess the merit of the grants terminated for DEI, but terminated them solely because of the viewpoints they expressed.

The Government's reliance on *Nat'l Ass'n of Diversity Officers in Higher Education v. Trump*, 167 F.4th 86 (4th Cir. 2026) ("*NADOHE*"), is misplaced. As Chief Judge Diaz explained in a concurrence to his own majority opinion, what "ma[de] all the difference" to the court's decision was that the court was "presented … with a facial challenge to two Executive Orders . . . , not the legality of termination of any particular DEI program." *Id.* at 104 (Diaz, C.J., concurring). The court held that plaintiffs' remedy for specific unconstitutional terminations would be to "sue *those* actors for terminating *those* contracts," *id.* at 102, which is precisely what Plaintiffs have done here. Nor did *NADOHE* foreclose the rule that governs here: the Fourth Circuit reaffirmed that even in the funding context, "the Government may not aim at the

11

suppression of dangerous ideas." *Id*. at 103 (quoting *Finley*, 525 U.S. at 587). That rule squarely applies to a record showing grants terminated by keyword searches, ChatGPT ideological filters, and a press release announcing the cancellation of DEI awards—exactly the "sinister story" Chief Judge Diaz acknowledged but left for another day. *Id.* at 104 (concurring opinion).

The Government's invocation of the unconstitutional conditions doctrine does not help it. That doctrine governs restrictions imposed as conditions on the receipt of funding, *i.e.*, prerequisites the government attaches before disbursing a grant. It does not give the Government authority to revoke or terminate already-awarded grants mid-performance based on the viewpoints expressed in the funded work. The grantees whose awards were terminated because they related to DEI did not fail any condition of their grants. They received their awards through a competitive, expert-led process, performed in accordance with their grant terms, and had their funding stripped because Defendants decided, after the fact, that their scholarship expressed disfavored viewpoints. The unconstitutional conditions cases simply do not address that scenario.

In any event, the doctrine independently condemns Defendants' conduct, as it prohibits conditions that are "not relevant to the objectives of the program," *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 214–15 (2013), including conditions that "single[] out particular applicants based on their viewpoints," *Nat'l Pub. Radio*, 2026 WL 877434, at *26. Congress defined NEH's mission as "promot[ing] progress and scholarship in the humanities," 20 U.S.C. § 956(c)(1), specifically requiring the agency's work to "reflect the diversity and richness of our American cultural heritage," 20 U.S.C. § 956(c)(4). Needless to say, a "condition" prohibiting DEI viewpoints is not relevant to NEH objectives as defined by Congress. Defendants terminated the "DEI" grants not because those projects failed to promote

12

progress and scholarship in the humanities—they were already determined to be exemplary—but because Defendants believed their scholarship conflicted with their preferred viewpoint.

**B.      Targeting Grants Based on Political Association Violates the First Amendment.**

With respect to the Biden-Era Subclass, the undisputed facts establish that Biden-era association was the operative criterion for termination. When NEH staff began reviewing grants, they were directed to review only grants issued "from 2021 to the present." NEH_AR_000001. Cavanaugh sent McDonald a list of grants explicitly titled "Biden Admin" and suggested that DOGE "can presumably claw back" $322M in NEH funds "awarded during President Biden's administration (Jan 20, 2021 through Jan 19, 2025)." NEH_AR_000003. McDonald explained under oath that he understood from DOGE that "open grants made under the Biden administration needed to be reviewed." McDonald Dep. at 372:18–23. A subset of those grants was then selectively saved from termination, but only those that "aligned with the [Trump] Administration['s]" priorities. Cavanaugh Dep. at 155:11–13; *see* NEH_AR_000013 ("[W]e have only excluded [from termination] the ones that seem not to conflict with the Administration's priorities."); Cavanaugh Dep. at 199:21–25 ("The other lens was, is this broadly a wasteful program in the context of the Administration's priorities, which is a judgment call that we made […]"). Wolfson also confirmed this privately, texting McDonald that "DOGE cut grants having nothing to do with DEI. As they said it was a government wide effort to claw back money," *see* Pls. Ex. 34, US-000062916; McDonald Dep. at 326:15–19: an admission that Biden-era provenance, not subject matter, was doing the work for a portion of the grant terminations. None of this touched on the merits of the grants, or even their subject matter. The review was essentially a political filter: gather grants by presidential term, terminate by

13

association with that president, and save only those grants that happen to align with the Trump administration's perceived priorities.

Defendants argue that *Elrod v. Burns*, 427 U.S. 347 (1976), and *Branti v. Finkel*, 445 U.S. 507 (1980), cited by Plaintiffs in their opening brief, are inapposite because those cases involved employees coerced into pledging party allegiance or contributing wages to a party. That reading mistakes the mechanism for the principle. *Elrod* and *Branti* rest on a broader proposition: the government may not condition benefits or the revocation of benefits on political alignment. *Branti*'s test does not ask whether a formal party pledge was exacted as a threshold; it asks whether the adverse action was based on political beliefs or associational conduct. *See Branti*, 445 U.S. at 517. Moreover, the Supreme Court has since confirmed that "the employer's motive"—not its stated justification—"is what counts," and that a First Amendment violation occurs when the government acts "based on" a perceived political affiliation even if the perception is mistaken. *Heffernan v. City of Paterson*, 578 U.S. 266, 272–73, 276 (2016). Whether or not every grantee personally supported the prior administration is therefore constitutionally irrelevant. What matters is that Defendants treated Biden-era provenance as a proxy for political association and terminated those grants on that basis.

Defendants' attempt to reframe the Biden-era targeting as a neutral subject-matter judgment also fails. Their theory is that Biden-era grants were reviewed because Biden's executive orders had prioritized DEI, making those grants more likely to implicate disfavored content. *See* Gov't Br. at 27–28. But that inference (*i.e.*, Biden-era equals presumptively disfavored) is itself an admission of the associational basis *Elrod* and *Branti* condemn. Defendants acknowledge they treated grants as presumptively suspect because of their association with the prior administration and its policy preferences, reviewed them through this

14

political lens, and terminated them. Moreover, Defendants' contention that they "focused on grants awarded during the Biden administration due to the likelihood that the subject matter of Biden-era grants implicated DEI," *id.* at 27–28, is belied by the fact that Defendants terminated even those Biden-era grants they determined *did not* implicate DEI. While Defendants certainly did engage in viewpoint discrimination with respect to hundreds of "DEI" grants, *see supra*, they terminated hundreds more simply because of their association with the Biden administration.

The Government points out that some Trump-era grants were terminated and that a handful of Biden-era grants were retained. *See* Gov't Br. at 27. That also confirms rather than refutes Plaintiffs' claim. Critically, every Biden-era grant spared was one that "aligned with the Administration's priorities." Those grants did not clear any independent merit review—NEH's peer-review process was bypassed entirely. They cleared a viewpoint filter. The selective reprieve confirms that Biden-era provenance was a mark against a grant, rebuttable only by demonstrating ideological alignment with the current administration. The fact that a handful of grants awarded during the first Trump administration (and thus not part of the proposed class in this case) were also swept up in the termination changes precisely nothing about the explicit manner in which Defendants isolated, reviewed, and terminated the grants "awarded during President Biden's administration (Jan 20, 2021 through Jan 19, 2025)." NEH_AR_000003.

The systemic harm *Elrod* identified, that conditioning benefits on political alignment "starve[s] political opposition," 427 U.S. at 356, is present here in full force. A federal agency has purged its grant portfolio along political lines, leaving a body of funded scholarship that reflects not the judgments of peer reviewers and subject-matter experts, but the ideological preferences of two DOGE operatives who, by their own admission, had no prior experience in

15

government, grant administration, or humanities scholarship. The First Amendment does not permit the government to purge its grant portfolio based on perceived political association.

### III.    DOGE Terminated NEH Grants without Legal Authority

The Government does not dispute that DOGE lacked any constitutional or statutory authority to terminate NEH grants. The only question is whether DOGE in fact "did the terminating," PI Op. 69, Dkt. 116, and the record leaves no genuine question that it did.

Defendants choose to simply ignore the smoking gun evidence in the record. That includes McDonald's crystal clear email to  Fox and Cavanaugh the day before Fox terminated the grants, stating: "it's your decision on whether to discontinue funding any of the projects," "as you've made clear." Pls. Ex. 5, NEH_AR_0000023. Defendants do not deny that this statement was accurate. Nor do Defendants deny that McDonald unsuccessfully pleaded with Fox and Cavanaugh to *not* terminate many grants. McDonald wrote, the same day before the terminations, that for many grants "there is no justification for canceling the project's funding," and McDonald implored Fox and Cavanaugh: "you should allow it to continue." *Id.* Thus, it is undisputed that Fox and Cavanaugh did not "allow" the grants to continue for which McDonald believed "there is no justification for canceling the [grant]." *Id.*

Defendants also do not dispute that Fox and Cavanaugh took all of the acts underlying the terminations. They affirmatively chose the grants to put on the list of grants "to cancel," personally selecting the 1,057 grants to put on the cancellation list for involving DEI, and the 420 grants to add to the list for purportedly being wasteful spending. *See* McDonald Dep. at 229:9, 231:21–24. They drafted the termination letters to grantees. *See id.* at 257:12–13. And critically, Fox personally executed the terminations by sending the termination notices to grantees. Fox Dep. at 279:18–280:9. That alone renders the terminations unlawful; Defendants

16

cite no legal authority for members of the DOGE team at GSA to take the legally operative action of executing terminations of NEH grants.

Rather than dispute any of the above facts, Defendants selectively pluck portions of the timeline of events and point to witnesses' self-serving statements that contradict that record evidence. Defendants note that NEH staff had already begun reviewing open grant awards in January 2025 to identify those that might conflict with the President's executive orders. Gov't Br. 37. NEH staff rated grants as "high, medium, or low" in terms of promoting DEI, gender ideology, or environmental justice. Pls. Ex. 6, NEH_AR_000006. But McDonald never decided to terminate even the grants that NEH staff had flagged as promoting DEI. Pls. Ex. 49 at 193:16–23 ("[M]y recollection is not that we were getting – we, being the NEH agency, w[ere] getting ready to cancel the grants.").

Although Fox stated that he "consolidated" the NEH list with the results of his ChatGPT query to generate his initial list of 1,057 grants to terminate, Pls. Ex. 13, US-000041372, Fox exercised his own discretion as to which grants tagged by NEH as "high, medium, or low" to include on the termination list. Fox included some (but not all) grants that NEH staff had identified as "medium" or "low" risk for DEI. *See, e.g.*, Pls. Ex. 6, NEH_AR_000006 at R55. And Fox then added 830 grants for termination—a majority of the total terminated—that NEH staff had *not* flagged as possibly conflicting with the Executive Order. The evidence thus demonstrates that Fox and Cavanaugh were set on terminating all grants that *they* believed promoted DEI, regardless of what anyone at NEH thought. Fox and Cavanaugh used *their* own "personal judgment" to decide which grants to terminate. Pls. Ex. 48 at 267:16–268:18.

McDonald's views mattered little to Fox and Cavanaugh. The input he gave to them at the end of the process was limited to identifying grants about the Revolutionary period that he

17

thought would be in line with the administration's views, and he could not save any grants that Fox and Cavanaugh deemed to promote DEI. Cavanaugh Dep. at 202:14–20 ("Q: [I]f a grant related to DEI, it couldn't be kept on the 'keep' list, right? A: That's correct."). When McDonald did try to provide broader input on grants not to terminate, his "recommendations" were swiftly rejected by DOGE. Pls. Ex. 5, NEH_AR_0000023 (McDonald recommending that "wherever the 'DEI Rationale' on the spreadsheet makes clear that there is no DEI component to the project, . . . you should allow it to continue"); McDonald Dep. at 214:2–6 ("Q: And did they take your recommendation? A: I don't believe they did, no."); Cavanaugh Dep. at 181:3–9 ("Q: Who rejected that recommendation? A: Justin and I both rejected that recommendation.").

The result was that DOGE terminated scores of grants that McDonald believed had nothing to do with DEI and that McDonald thought should not have been terminated on that basis. Pls. Br. 28; McDonald Dep. 119:3–127:20. This included the 440 grants that NEH staff had coded as "N/A" for DEI, as well as hundreds more Biden-era grants that DOGE added to the termination list on April 1. Pls. Ex. 32, US-000041206; McDonald Dep. at 225:2–6. Defendants suggest that Plaintiffs' "description of the timeline is incorrect," asserting that "Fox's March 28, 2025, email" included these 420 "wasteful spend" grants. Gov't Br. 37 n.10. But it is Defendants who have the timeline wrong. Fox's March 28 email proposed only 1,057 grants for termination, all marked as "Yes" for DEI. *See* Pls. Ex. 44, US-000061323 ("NEH Grant Detail" tab). It was not until April 1 that Fox added an additional 420 grants for termination that had not been designated as DEI. *See* Pls. Ex. 32, US-000041206 (proposing 1,490 grants for termination).

Nor can Defendants rely on McDonald's assertion now in litigation that he was the "decider." Gov't Br. 38. All of the record evidence shows otherwise. Take, for example, the Modern Language Association's $60,000 grant to support a  workshop to help align humanities

courses with career-minded outcomes that benefit underserved students. Pls. Ex. 49 at 118:11–20. McDonald did not believe that this grant promoted DEI, McDonald Dep. at 119:3–8, and NEH staff had rated it as "N/A" for DEI. Pls. Ex. 45, NEH_AR_000006 ("Education" tab, row 257). But, according to ChatGPT, this grant promoted DEI because it "aims to align humanities courses with career outcomes for under-served students," and Fox copied that "DEI rationale" verbatim over to his list of 1,057 "DEI" grants. McDonald Dep. at 127:16–128:6, 145:8–19, 176:25–177:14, 231:18–24 ("Q: It was Justin Fox who put this grant on the list for termination? A: Yes."). McDonald did not believe that using ChatGPT in this way was an appropriate way to identify grants for termination, *id.* at 131:12–25, and did not believe the grant should be terminated for promoting DEI, *id.* at 119:9–23. McDonald recommended to DOGE that they allow this grant, *id.* at 219:5–220:9, but DOGE decided otherwise, *id.* at 214:2–6. And Fox drafted the termination letter and sent it to the Modern Language Association. *Id.* at 257:12–13; Fox Dep. at 279:18–280:9. McDonald had no role in the decision to terminate this grant.

In contending that McDonald was still the "decider" for this grant and the other 1,476 terminated, Defendants rely on the April 1 email chain between McDonald and DOGE. Gov't Br. 38 (citing NEH_AR_000021). But that email chain shows the opposite—that McDonald saw no justification for DOGE's termination of at least the "N/A" grants and recommended against it. Pls. Ex. 5. McDonald told DOGE that he "didn't have any questions or concerns" about the final list and signed off on the language in the termination letters only after DOGE rejected McDonald's recommendation. *Id.* Defendants cannot rely on McDonald's *post hoc*, self-serving assertions that he was, in fact, the "decider," Gov't Br. 38, when that assertion is unsupported by the record evidence. *See, 789 Ninth & 414 E. 74th Assocs. LLC v. Hundalani*, No. 21-cv-5314, 2023 WL 4472162, at *4 (S.D.N.Y. July 11, 2023) ("[S]elf-serving declarations, not supported

by evidence, are generally not sufficient to create an issue of material fact."); *Dreni v. PrinterOn Am. Corp.*, No. 18-cv-12017, 2021 WL 4066635, at \*13 (S.D.N.Y. Sept. 3, 2021) (same).

Finally, Defendants are wrong as to the applicable legal standard. Defs.' Mem. 39–40. As Plaintiffs have explained, their DOGE separation-of-powers claim is constitutional in nature because there is a "conceded *absence* of *any* statutory authority" for DOGE to terminate NEH grants. *Dalton v. Specter*, 511 U.S. 462, 473 (1994). The claim is not that DOGE "exceeded [its] statutory authority." *Id.* DOGE has no statutory authority at all. That is what distinguishes this separation-of-powers claim from the one rejected in *Sustainability Inst. v. Trump*, 165 F.4th 817, 829–31 (4th Cir. 2026), where the claim turned entirely on whether executive officials violated statutory responsibilities they had under particular statutes. Defendants are thus wrong that *Sustainability Institute*'s "reasoning is equally applicable in this case." Gov't Br. 40. Plaintiffs' DOGE separation-of-powers claim is therefore not "subject to the same restrictions" as an *ultra vires* claim for statutory violations. *Sustainability Institute*, 165 F.4th at 829–30. Regardless, even if the more stringent standard applied here, the claim would succeed. Pls. Br. 33.

## IV. Many of the Grant Terminations Violated the Equal Protection Clause

Defendants' brief lays bare the equal protection violations that occurred here. Perhaps uniquely in the 21st century for federal actors, Defendants made overt racial classifications in taking action, *expressly* selecting grantees for termination because their work involved people who are "black," "women," "Jewish," "gay," "Native," or members of other specific races and ethnicities. Defendants offer no meaningful factual rebuttal that this occurred, and their actions were unconstitutional even under their own view of the law, which is mistaken in any event.

On the facts, Defendants do not deny that ChatGPT and NEH staff designated many grants as "Yes" for DEI solely because the grant involved people of a particular race, ethnicity,

20

national origin, religion, sex, and sexual orientation. Plaintiffs attached to their opening brief a list of 110 specific grants of ACLS Plaintiffs, their members, and members of the DEI Subclass that Defendants identified for termination on the basis of race and other protected characteristics. *See* Pls. Ex. 24. Defendants do not deny that ChatGPT and NEH staff classified each of these grants as involving impermissible DEI solely based on race or other protected characteristics. Defendants have waived any argument to the contrary by not disputing such in their opposition brief. *See Palmieri v. Lynch*, 392 F. 3d 73, 87 (2d Cir. 2004) (party who fails to raise an "argument in his opposition to [a motion for] summary judgment" waives that argument). Nor could Defendants deny that fact, given that the explicit "Rationale" for designating many of the grants as DEI was the race, gender, ethnicity, religion, or sexual orientation of the grant subjects.

Defendants' only factual response is that, for the grants that ChatGPT classified as DEI, Fox purportedly "personally review[ed]" ChatGPT's "DEI Rationales" and the relevant grant descriptions to come to his own determinations. Gov't Br. 32. The record shows otherwise. Fox copy-and-pasted ChatGPT's DEI Rationales verbatim into his spreadsheets listing which grants purportedly involved DEI, and those same DEI Rationales were included in Fox's spreadsheets throughout the process of selecting grants to terminate, including in the lists that Fox sent to McDonald for his purported review in the last few days prior to the terminations. *See, e.g.*, Pls. Ex. 45, US-000009583 ("NEH Grant Detail" tab); Pls. Ex. 12 (US-000000936). Although Fox said at his deposition that ChatGPT's answers were just an "intermediary step," Fox Dep. at 210:12–25, he did not identify a single example where he reviewed ChatGPT's DEI Rationale, disagreed with its assessment, and chose not to terminate the award.

In any event, even if Fox did review ChatGPT's determinations and then made his own assessments of whether a grant involved DEI, that would not help Defendants, because Fox

testified that he *also* classified grants as DEI solely on the basis of race, ethnicity, gender, and so on. Fox testified that he classified any grant "focused on a specific race" as DEI and subject to termination. Fox Dep. 220:13–14. For instance, Fox identified a grant about the history of "Black civil rights" for the termination list because it was about "a specific race, here being Black." *Id.* at 220:17–18. Fox testified that he chose another grant to terminate because it was about "anti-Black violence, which is a race." Pls. Ex. 47 at 223:11–12. Fox did the same, per his own testimony, for grants about "Jewish culture," "women," and the "Alaskan Native Language." Fox Dep. at 183:10–16, 191:5–9. Fox bluntly testified that he classified any and all grants about a particular "minority culture" or "minority group" as DEI and in need of termination. Pls. Ex. 47 at 185:12–18. Defendants do not and cannot deny that these are explicit classifications based on race, ethnicity, religion, gender, and so on. Accordingly, no matter whether grants were identified for termination by ChatGPT on its own or ChatGPT with Fox's review, there can be no genuinely disputed fact that many grantees had their awards chosen on the basis of race, national origin, ethnicity, religion, gender, or sexual orientation. As mentioned, Defendants nowhere deny that was the case for each of the 110 grants in Exhibit 24 to Plaintiffs' motion.

Unable to genuinely dispute the facts, Defendants' main argument on equal protection is purely legal. They contend that there is no equal protection issue because Defendants allegedly did not "consider[] any of the *grantees'* protected characteristics in determining whether to terminate a particular grant"; instead, Defendants assert that they considered the characteristics of the subjects of the grants, and they argue that "federal grants are not protected by the Equal Protection Clause." Gov't Br. 30–31. On this basis, they argue that rational basis review rather than heightened scrutiny applies. Defendants are wrong on the law, and even if they were right that heightened scrutiny does not apply, the terminations would still violate equal protection.

22

The Supreme Court has rejected Defendants' view that heightened scrutiny does not apply where a person is subject to disfavored treatment because of their affiliation with people of a particular race. In *Palmore v. Sidoti*, 466 U.S. 429 (1984), a state court had granted custody to a child's father because the mother remarried a Black man. *Id.* at 430. The Supreme Court held that adverse treatment of the mother because of her affiliation with a Black person was a "racial classification": it was "clear that the outcome would have been different had petitioner married a Caucasian." *Id.* at 432–34. "Such classifications are subject to the most exacting scrutiny," the Court held, and the state court's action violated equal protection. *Id.* at 432–33; *see also, e.g.*, *Massapequa Union Free Sch. Dist. v. N.Y. State Bd. of Regents*, 809 F. Supp. 3d 33, 51 (E.D.N.Y. 2025) ("[A] regulation that bans the use of Native American symbols and imagery as public schools mascots . . . appears to enact a legal classification based on race or ancestry.").

*Palmore* dictates that heightened scrutiny applies here. Defendants targeted many grantees for termination because the grantees' projects were about a person or persons of a particular race or other protected characteristic. Defendants chose to terminate Dr. Bertis Deon English's grant because she wrote a biography about "a Black lawyer and jurist." Pls. Ex. 24 at 3. Vanderbilt University lost its grant because the project leader sought to "restore the legacy of a marginalized woman writer." *Id.* at 43. And anyone who chose to focus their grants on Native American tribes or cultures had their grant picked for termination. Pls. Br. 37; Pls. Ex. 14, US-000061492. Plaintiffs do not argue, as Defendants claim, that "the grants themselves were subject to discriminatory treatment." Gov't Br. 31. The *grantees* were subject to discriminatory treatment. Their grants were terminated solely because they—the grantees—affiliated their projects with people of a particular race, national origin, ethnicity, religion, gender, or sexual

23

orientation. Under *Palmore*, these are racial classifications that the grantees may challenge for violating their own equal protection rights, and heightened scrutiny applies.

Any other conclusion would produce absurd consequences. In the Government's view, a public library could ban all books about Black people, or Jews, and heightened scrutiny would not apply. The Library of Congress could limit its historical collections solely to books, movies, and other works about white men, and any suit by any party would be subject to rational basis review, because books and movies "are not protected by the Equal Protection Clause." Gov't Br. 31. That is not and cannot be the law. "[T]he 'core purpose' of the Equal Protection Clause [is] 'doing away with all governmentally imposed discrimination based on race.'" *SFFA v. Harvard*, 600 U.S. 181, 206 (2023) (quoting *Palmore*, 466 U.S. at 432). Courts "apply strict scrutiny to *all* racial classifications to smoke out illegitimate uses of race," *Johnson v. California*, 543 U.S. 499, 505–06 (2005) (emphasis added), because a "racial classification itself" causes significant harm, *Alexander v. S.C. State Conf. of the NAACP*, 602 U.S. 1, 38 (2024). The Government's cramped view of equal protection cannot be reconciled with these core constitutional principles.

Even if rational basis review applied, Defendants must show that the terminations furthered a legitimate government interest, and that the classification was rationally related to that legitimate government interest. *City of Saint Paul v. Wright*, 25-cv-3899, 2026 WL 88193, at *5–7 (D.D.C. Jan. 12, 2026). Defendants assert that the legitimate government interest here is "administering federal programs consistent with goals set by a democratically elected political branch." Gov't Br. 34. But Defendants make no claim that classifying grants for termination based on the bare race, gender, or other protected characteristics of the grants' subjects is rationally related to the administration's goals. They do not claim, for example, that terminating a grant about a "Black lawyer"—solely because it is about a "Black lawyer"—is rationally

related to advancing the administration's policy goals. Pls. Ex. 24 at 3. Although rational basis review is deferential, "[t]he State may not rely on a classification whose relationship to an asserted goal is so attenuated as to render the distinction arbitrary or irrational." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 446 (1985); *see also City of Saint Paul*, 2026 WL 88193, at *6 (whether a grantee resides in a state that voted for the President "is [not] rationally related to DOE's stated objective of aligning grant funding with the new administration's priorities").

Finally, Defendants' discussion of whether the terminations were "motivated by discriminatory animus" is a red herring for purposes of Plaintiffs' summary judgment motion. Plaintiffs seek summary judgment on their equal protection claim on the basis that Defendants made classifications based on race and other protected classifications. Where such classifications occur, the government's "motives" are irrelevant to "the strict scrutiny analysis." *Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 741–42 (2007).[3]

## V.    The Court Should Enter Multiple Forms of Relief

Plaintiffs in their opening brief explained why at least three forms of relief are appropriate. Pls. Br. 41–45. Defendants do not respond at all to these arguments in their opposition brief, and thus any argument to the contrary is waived. *See Palmieri*, 392 F.3d at 87.

## CONCLUSION

The Court should grant Plaintiffs' summary judgment motion and deny Defendants' cross-motion.

---

[3] If the Court does not grant summary judgment to Plaintiffs on their racial classifications equal protection theory, Defendants cannot obtain summary judgment on whether they acted with animus, which is an alternative path to establishing an equal protection violation. *See Romer v. Evans*, 517 U.S. 620, 632–35 (1996). The record contains ample evidence that Defendants acted with animus. *See, e.g.*, Pls. Ex. 9, US-000016154 (Fox's "Detection List" tab); Pls. Ex. 48 at 116:21–119:11(smirking when asked about a grant on the history of the HIV/AIDS prison movement and answering that another grant was crazy because it references "LGBTQ").

April 13, 2026                          Respectfully submitted,

                                        /s/ Daniel F. Jacobson
                                        Daniel F. Jacobson
                                        Lynn D. Eisenberg
                                        John Robinson
                                        Kyla M. Snow
                                        JACOBSON LAWYERS GROUP PLLC
                                        5100 Wisconsin Ave NW, Suite 301
                                        Washington, D.C. 20016
                                        (301) 823-1148
                                        dan@jacobsonlawyersgroup.com

                                        *Counsel for ACLS Plaintiffs*


                                        /s/ Jamie Crooks
                                        Jamie Crooks
                                        Amanda R. Vaughn
                                        Michael Lieberman
                                        Yinka Onayemi

                                        FAIRMARK PARTNERS, LLP
                                        400 7th Street, NW, Suite 304
                                        Washington, DC 20004
                                        Ph: (619) 507-4182
                                        Email: jamie@fairmarklaw.com
                                        amanda@fairmarklaw.com
                                        michael@fairmarklaw.com
                                        yinka@fairmarklaw.com

                                        *Counsel for Authors Guild Plaintiffs and the Proposed Class*

26