**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

AMERICAN COUNCIL OF LEARNED SOCIETIES,
     633 Third Avenue, 8th Floor New York, NY 10017,

AMERICAN HISTORICAL ASSOCIATION,
     400 A Street SE Washington, DC 20003,

MODERN LANGUAGE ASSOCIATION,
     85 Broad Street, New York, NY 10004,

          *Plaintiffs,*

          v.

WILLIAM ENGLISH,* in his official capacity as Acting
Chairman of the National Endowment for the Humanities,
     400 7th St SW, Washington, DC 20506,

NATIONAL ENDOWMENT FOR THE HUMANITIES,
     400 7th St SW, Washington, DC 20506,

UNITED STATES DOGE SERVICE,
     736 Jackson Pl NW Washington, DC 20503,

AMY GLEASON, in her official capacity as Acting
Administrator of the United States DOGE Service,
     736 Jackson Pl NW Washington, DC 20503,

NATE CAVANAUGH, in his official capacity as an employee
of the U.S. DOGE Service or the General Services
Administration,
     1800 F St NW Washington, DC 20006,

JUSTIN FOX, in his official capacity as an employee of the
U.S. DOGE Service or the General Services Administration,
     1800 F St NW Washington, DC 20006,

          *Defendants*.

No. 25 Civ. 3657 (CM)

---

* William English, the current Acting Chairman of the National Endowment for the Humanities, is automatically substituted for Michael McDonald, the former Acting Chairman of the National Endowment for the Humanities, as a defendant in this action pursuant to Rule 25(d) of the Federal Rules of Civil Procedure.

| | |
|---|---|
| THE AUTHORS GUILD, WILLIAM GOLDSTEIN, ELIZABETH KADETSKY, VALERIE ORLANDO, KATALIN BALOG, BENJAMIN HOLTZMAN, LEE JASPERSE, and NICOLE JENKINS, on behalf of themselves and all others similarly situated, <br><br> *Plaintiffs,* <br><br> v. <br><br> NATIONAL ENDOWMENT FOR THE HUMANITIES; <br><br> WILLIAM ENGLISH, in his official capacity as Acting Chairman of the National Endowment for the Humanities; <br><br> UNITED STATES DOGE SERVICE; <br><br> AMY GLEASON, in her official capacity as Acting Administrator of the United States DOGE Service; <br><br> NATE CAVANAUGH, in his official capacity as an employee of the U.S. DOGE Service or the General Services Administration; and, <br><br> JUSTIN FOX, in his official capacity as an employee of the U.S. DOGE Service or the General Services Administration, <br><br> *Defendants.* | No. 25 Civ. 3923 (CM) |

**REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

JAY CLAYTON
United States Attorney for the
Southern District of New York
86 Chambers Street, 3rd Floor
New York, New York 10007
Tel.: (212) 637-2699
Email: rachael.doud@usdoj.gov

MARY ELLEN BRENNAN
RACHAEL L. DOUD
JONAKI M. SINGH
Assistant United States Attorneys
– Of Counsel –

**TABLE OF CONTENTS**

**PAGE**

ARGUMENT ..........................................................................................................................1

    I.     The Court Lacks Subject Matter Jurisdiction Over Plaintiffs' Claims ...........................1

    II.    The Grant Terminations Did Not Violate the First Amendment ..................................3

    III.   The Grants Were Not Terminated Without Authority ...................................................6

    IV.   The Grant Terminations Did Not Violate Equal Protection Principles .........................7

CONCLUSION.....................................................................................................................10

# TABLE OF AUTHORITIES

**CASES**                                                       **PAGE(s)**

*Agency for Int'l Dev. v. Alliance for Open Soc'y Int'l, Inc.*,

    570 U.S. 205 (2013) ........................................................................................... 4

*Branti v. Finkel*,

    445 U.S. 507 (1980) ........................................................................................... 6

*Carruth v. United States*,

    627 F.2d 1068 (Ct. Cl. 1980) ............................................................................ 2

*Christopher Vill., L.P. v. United States*,

    360 F.3d 1319 (Fed. Cir. 2004) ........................................................................ 3

*Consol. Edison Co. of New York v. U.S., Dep't of Energy*,

    247 F.3d 1378 (Fed. Cir. 2001) ........................................................................ 2

*Elrod v. Burns*,

    427 U.S. 347 (1976) ........................................................................................... 6

*Hamlet v. United States*,

    63 F.3d 1097 (Fed. Cir. 1995) ........................................................................... 1

*Hayden v. Cty. of Nassau*,

    180 F.3d 42 (2d Cir. 1999) ............................................................................... 10

*Holley v. United States*,

    124 F.3d 1462 (Fed. Cir. 1997) ........................................................................ 2

*LeBlanc v. United States*,

    50 F.3d 1025 (Fed. Cl. 1995) ............................................................................ 1

*Legal Services Corp. v. Velazquez*,

    531 U.S. 533 (2001) .................................................................................................... 5

*Nat'l Assoc. of Diversity Officers in Higher Educ. v. Trump*,

    No. 25-1189 (4th Cir. March 14, 2025)......................................................................... 5

*Nat'l Endowment for the Arts v. Finley*,

    524 U.S. 569 (1998) ............................................................................................. passim

*Palmore v. Sidoti*,

    466 U.S. 429 (1984) .................................................................................................... 8

*Rosenberger v. Rector & Visitors of Univ. of Va*,

    531 U.S. 533 (2001) .................................................................................................... 5

*Rust v. Sullivan*,

    500 U.S. 173 (1991) ................................................................................................. 3, 5

*Tucson Airport Auth. v. Gen. Dynamics Corp.*,

    136 F.3d 641 (9th Cir. 1998) ...................................................................................... 2

*United States v. Connolly*,

    716 F.2d 882 (Fed. Cir. 1983) ..................................................................................... 2

**Regulations**

2 C.F.R. § 200.340(a)(4) ...................................................................................................... 9

**Statutes**

20 U.S.C. § 956(c)(1)............................................................................................................ 9

Defendants submit this reply memorandum of law in response to Plaintiffs' Opposition to Defendants' Motion for Summary Judgment, Dkt. No. 283 ("Opposition" or "Pls.' Opp.") and in further support of Defendants' motion for summary judgment. For the reasons set forth herein and in Defendants' memorandum in support of their motion for summary judgment and in opposition to Plaintiffs' motion for summary judgment, Defendants' motion should be granted and Plaintiffs' motion should be denied.

## ARGUMENT

### I.    The Court Lacks Subject Matter Jurisdiction Over Plaintiffs' Claims

The Court lacks jurisdiction over Plaintiffs' claims, all of which flow from the termination of their contractual grant agreements and thus may only be heard in the Court of Federal Claims ("CFC").[1] Plaintiffs' central argument is that First Amendment and Equal Protection claims cannot be brought in the CFC. *See* Pls.' Opp. at 2-3. The cases Plaintiffs cite, however, did not involve challenges arising from contracts within the CFC's purview, and do not stand for that broad proposition. *See LeBlanc v. United States*, 50 F.3d 1025, 1027-31 (Fed. Cl. 1995) (no basis for jurisdiction in CFC where plaintiff brought challenge to termination of employment, over which jurisdiction was preempted by the Civil Service Reform Act, and what amounted to a tort claim over which CFC lacked jurisdiction); *Hamlet v. United States*, 63 F.3d 1097, 1101-1107 (Fed. Cir. 1995) (holding plaintiff's claims challenging termination of employment did not flow from any contract with the United States, and that claims under the First and Fifth Amendments did not, in that circumstance, independently confer jurisdiction in CFC); *United States v. Connolly*, 716 F.2d 882, 885-88 (Fed. Cir. 1983) (holding CFC lacked jurisdiction over suit by former

---

[1] In their Opposition, Plaintiffs confirm that they do not dispute that binding Supreme Court precedent dictates that the Court lacks jurisdiction over their Administrative Procedure Act ("APA") claims. Pls.' Opp. at 6 n.1.

probationary employee challenging validity of his dismissal because he did not "invoke substantive rights grounded expressly or by implication in a contract, an act of Congress or a regulation of an executive department"); *Carruth v. United States*, 627 F.2d 1068, 1070, 1081-82 (Ct. Cl. 1980) (plaintiff, who did not have a contract with the United States, asserted that regulation operated to deny them due process and equal protection). Here, by contrast, all of Plaintiffs' claims flow from their grants, and indeed the Authors Guild Plaintiffs brought APA claims challenging those terminations that they now acknowledge are, pursuant to binding precedent, barred by the Tucker Act. Plaintiffs' attempt to distinguish *Holley v. United States*, 124 F.3d 1462 (Fed. Cir. 1997), on the ground that the plaintiff invoked a "money-mandating *statute*," Pls.' Opp. at 4, is also unavailing. The Tucker Act confers jurisdiction in the CFC where "the prospective claimant . . . invoke[s] substantive rights grounded expressly or by implication in *a contract*, an act of Congress *or* a regulation of an executive department." *Connolly*, 716 F.2d at 885 (emphasis added). Here, Plaintiffs' claims flow from their contracts with the Government.

Ultimately, Plaintiffs' constitutional claims are premised on the notion that the Government has a contractual obligation to provide funding. If NEH had no such obligation, Defendants would owe no duty to Plaintiffs giving rise to the alleged constitutional violations. In short, "[b]ecause the United States's obligation is in the first instance dependent on the contract, these claims are contractually-based," and "the district court lacks jurisdiction under the Tucker Act." *Tucson Airport Auth. v. Gen. Dynamics Corp.*, 136 F.3d 641, 647 (9th Cir. 1998) (concluding district court lacked jurisdiction under the Tucker Act over due process claim because it was contractually based); *see also, e.g.*, *Consol. Edison Co. of New York v. U.S., Dep't of Energy*, 247 F.3d 1378, 1385-86 (Fed. Cir. 2001) (directing district court to transfer case sounding in contract but asserting constitutional claims to CFC because "the Court of Federal Claims can

2

supply an adequate remedy to prevent the constitutional wrongs alleged by [plaintiff]").[2]

## II.    The Grant Terminations Did Not Violate the First Amendment

Plaintiffs' Opposition does not alter the conclusion that the grant terminations did not violate the First Amendment.  First, the Government has "wide latitude" to "allocate competitive funding according to criteria that would be impermissible were direct regulation of speech or a criminal penalty at stake." *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 587-88 (1998); *see* Defs.' Br. at 17-18.  Plaintiffs do not appear to dispute this, but instead argue that despite having broad discretion to choose which projects to fund, the Government cannot *terminate* funding for projects it no longer wishes to support.  Pls.' Opp. at 8-9.  This distinction does not make sense.  Under Plaintiffs' view, an entity that was not awarded a grant because its project did not align with the Government's priorities would have no recourse under the First Amendment, but the First Amendment would prevent the Government from discontinuing funding based on changed priorities.  *See* Defs.' Br. at 24.

Second, Plaintiffs' attempt to cast the grant terminations as being aimed at "the suppression of dangerous ideas," Pls.' Opp. at 6-7, 9, is unavailing.  It is well established that declining to fund certain projects—or choosing to fund some projects instead of others—is not akin to stifling the content implicated by such projects.  Defs.' Br. at 18-20; *see Rust v. Sullivan*, 500 U.S. 173, 196-

---

[2] Plaintiffs argue that Defendants "offer no response to the other reason why jurisdiction is proper: . . . sovereign immunity is no barrier for equitable constitutional claims and *ultra vires* claims based on statutory violations."  Pls.' Opp. at 4-5.  But this is not a separate argument for jurisdiction.  Where the Tucker Act provides for jurisdiction in the CFC, that jurisdiction is exclusive, *see, e.g.*, *Christopher Vill., L.P. v. United States*, 360 F.3d 1319, 1332–33 (Fed. Cir. 2004), regardless of whether plaintiffs could bring suit elsewhere in a case not falling within the CFC's jurisdiction.  Plaintiffs also contend that Defendants have not argued that the "source of rights" and "relief sought" test for determining Tucker Act jurisdiction applies.  Pls.' Opp. at 6. This is incorrect.  Defendants explicitly argued that Plaintiffs' claims flow from their grants, which are contracts, and effectively seek reinstatement of those grants and payment thereunder.  Mem. of Law in Support of Defs.' Mot. ("Defs.' Br."), Dkt. No. 278, at 13.

97 (1991) (explaining that federal grantees could "continue to . . . engage in abortion advocacy," but were required to do so "through programs that are separate and independent from the project that receives [Government] funds"). Plaintiffs make no effort to explain why the Government's choice not to subsidize their ideas equates to suppression of those ideas. They rely on dicta from *Finley*, which Plaintiffs inaccurately describe as its holding, reserving the question of whether the Government may "leverage its power to award subsidies on the basis of subjective criteria into a penalty on disfavored viewpoints." 524 U.S. at 587. But as the Supreme Court later elaborated, this kind of constitutional concern arises only when the Government "seek[s] to leverage funding to regulate speech outside the contours of the program itself." *Agency for Int'l Dev. v. Alliance for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 214-15 (2013).

Plaintiffs have not claimed and could not show that the Government attempted to regulate their speech or conduct beyond the grant agreements themselves. Their assertion that the grant terminations reflect "a 'condition' prohibiting DEI viewpoints," Pls.' Opp. at 12, distorts relevant caselaw. In *Agency for International Development*, the Supreme Court distinguished between "conditions that . . . specify the activities Congress wants to subsidize" and "conditions that seek to leverage funding to regulate speech outside the contours of the program itself." 570 U.S. at 214-15. The condition that the Supreme Court deemed unconstitutional specified that no federal funding could be made available to groups or organizations that "d[id] not have a policy explicitly opposing prostitution and sex trafficking." *Id.* at 210. Here, the Government did not "seek to leverage funding to regulate speech outside the contours" of the grants. *Id.* at 214-15.

The Executive Orders at issue reflect the President's determination that, as a policy matter, the Government no longer seeks to fund DEI-related projects, and the terminations reflect NEH's efforts to comply with the President's policy priorities. *See* Defs.' Br. at 3-6. That kind of policy

decision concerning the allocation of federal funds falls squarely within the Government's discretion and does not implicate the First Amendment—even if based on viewpoint. *See Rust*, 500 U.S. at 193; Order Granting Stay, *Nat'l Assoc. of Diversity Officers in Higher Educ. v. Trump*, No. 25-1189, ECF No. 29, at 7 (4th Cir. Mar. 14, 2025) (Harris, J., concurring) (explaining that a challenged Executive Order did not contemplate "termination of grants based on a grantee's speech or activities outside the scope of the funded activities," and thus likely did not violate the First Amendment). Certainly, any decision to fund projects expressing certain viewpoints and not others could be characterized as penalizing disfavored viewpoints—but making such decisions is a necessary aspect of Government funding determinations.

Third, Plaintiffs' reliance on *Legal Services Corp. v. Velazquez*, 531 U.S. 533 (2001), and *Rosenberger v. Rector & Visitors of Univ. of Va.*, 531 U.S. 533 (2001), is misplaced. *See* Defs.' Br. at 22-25. Whether or not *Velazquez* can technically be categorized as a "limited public forum" case,[3] the competitive, selective nature of the funding in this case distinguishes it from cases like *Velazquez* and *Rosenberger*, *see Finley*, 524 U.S. at 586, and Plaintiffs fail to engage with or address this distinction in their Opposition, *see* Pls'. Opp. at 10-11.

Finally, Plaintiffs' contention that grants were targeted "Based on Political Association" is unsupported by the evidence. *See* Defs.' Br. at 25-30. Plaintiffs do not appear to dispute that Trump-era grants were terminated or that Biden-era grants were retained, and they do not attempt to square that reality with their assertion that "Biden-era association" was "the operative criterion"

---

[3] Although the Court acknowledged in *Velazquez* that "limited forum cases" may not control its holding "in a strict sense," the Court relied on the analyses in limited public forum cases, as Plaintiffs acknowledge. *Velazquez*, 531 U.S. at 543-44; *see* Pls.' Br. at 10. That makes sense, as *Velazquez* involved a funding program that was tasked with distributing funds to eligible local organizations for the purpose of providing financial support for legal assistance in certain circumstances. 531 U.S. at 536. As in *Rosenberger*, *Velasquez* did not involve a program with competitive selection criteria, as this case does and as the program in *Finley* did.

for the termination of the subset of grants that were not cancelled due to affiliation with DEI.  Pls.'

Opp. at 13-15.  Moreover, Plaintiffs do not point to any specific evidence that "Defendants treated

Biden-era provenance as a proxy for political association and terminated those grants on that

basis."  Pls.' Opp. at 14.  Indeed, nowhere in the thousands of documents produced in discovery

or the hours of deposition testimony did any individuals involved in the relevant grant termination

decisions refer to consideration of, let alone animus toward, the perceived political affiliation of

grantees.    Rather, the evidence on which Plaintiffs rely for this point refers generally to

wastefulness and Government efforts to save money.  *See* Pls.' Opp. at 13.  For this reason,

Plaintiffs' continued arguments regarding the applicability of *Elrod v. Burns*, 427 U.S. 347 (1976),

and *Branti v. Finkel*, 445 U.S. 507 (1980), fail.  As Plaintiffs themselves acknowledge, *Branti*'s

test . . . "asks whether the adverse action was based on political beliefs or associational conduct."

Pls.' Opp. at 14.  There is no evidence here that any grant terminations were based on the political

beliefs or associational conduct of grantees.  *See* Defs.' Br. at 25-30.[4]

### III.    The Grants Were Not Terminated Without Authority

As Defendants explained in their opening brief, Plaintiffs cannot meet the high bar needed

to succeed on their *ultra vires* claim because Michael McDonald, the Acting Chairman of NEH,

approved the grant terminations.  Defs.' Br. at 36.  In their Opposition, Plaintiffs do not

---

[4] Moreover, Defendants did not, as Plaintiffs misleadingly assert, "acknowledge they treated grants as presumptively suspect because of their association with the prior administration and its policy preferences, reviewed them through this political lens, and terminated them."  Pls.' Opp. at 14-15. While Defendants used lists of Biden-era grants as starting points for reviewing grants pursuant to relevant Executive Orders, the evidence makes clear that Defendants subsequently expanded their review of grants for termination to the universe of all open grants, that multiple Biden-era grants were not terminated, and that the spreadsheets compiled by NEH personnel during the initial historical review of grants, as well as the spreadsheets exchanged and edited by Fox, Cavanaugh, McDonald, and Wolfson that were ultimately used to compile the final list of grants to terminate, did not even identify grants as "Biden" or "Trump" grants.  Defs.' Br. at 25-30.

meaningfully address this fact, but rather assert in a conclusory manner that "[a]ll of the record evidence shows otherwise." Pls.' Opp. at 18. In addition to the consistent testimony of all four witnesses deposed in this case, *see* citations at Defs.' Br. at 38-39, which Plaintiffs write off as "post-hoc, self-serving assertions," Pls.' Opp. at 19, contemporaneous emails show McDonald approving the grant terminations. Declaration of Rachael Doud dated March 27, 2026, ECF No. 276 ("Doud Decl.") Ex. 6 (NEH_AR_000021); Ex. 30 (US-000050461). Plaintiffs simply ignore this evidence.[5] Plaintiffs also fail to explain why, if McDonald did not, despite appearances to the contrary, approve the grant terminations, he would now claim that he did. Nor do Plaintiffs cite any authority for their assertion that the fact that Fox sent the grant termination emails is "alone" sufficient to render "the terminations unlawful." Pls. Opp. at 16. The Government is aware of no support for the proposition that whether an action was carried out with or without authority hinges on who physically sent a communication, as opposed to who approved the action.

Finally, Plaintiffs' argument that their claim that the grants were terminated without legal authority is not an *ultra vires* claim continues to be unpersuasive. Plaintiffs claim that the terminations were carried out by DOGE-affiliated personnel, and not the Chairman of NEH, and thus were not carried out in accordance with the authorities provided by NEH's originating statute. This claim is based on statutory authority and is an *ultra vires* claim.

### IV.    The Grant Terminations Did Not Violate Equal Protection Principles

Plaintiffs continue to contort the evidence in this case to argue that Defendants violated

---

[5] Plaintiffs are mistaken that "Defendants . . . have the timeline wrong." Pls.' Opp. at 18. Fox's March 28 email attached lists that included grants that had been designated "No" for DEI, to review for wasteful spend. Ex. 16 (NEH_AR_000013); US-000061323 (attachment to March 28, 2026, email). The pdf excerpt of US-00061323 that Plaintiffs designate as Exhibit 44 appears to reflect a collapsed version of the spreadsheet omitting the grants designated "No" for DEI. The native version of the spreadsheet that Plaintiffs emailed to the Court on April 21, 2026, includes these additional rows (starting at row 1084 of the NEH Grant Detail tab).

their equal protection rights.  This argument is unpersuasive.

As an initial matter, Plaintiffs' insistence that "ChatGPT and NEH staff" classified grants for termination "solely based on race or other protected characteristics" misconstrues the evidence. Pls.' Opp. at 21.  As set forth in Defendants' opening brief, Fox used ChatGPT only to generate the "DEI rationale" to assist with NEH's exercise of identifying grants that conflicted with the Executive Orders.  *See* citations in Defs.' Br. at 32-33.  The record is clear that ChatGPT did not select grants for termination.  Nor do Plaintiffs cite any evidence indicating that "NEH staff" selected grants for termination on the basis of race or other protected characteristics.

Moreover, Plaintiffs do not dispute that Defendants did not consider the grantees' protected characteristics in selecting grants for termination or that federal grants are not protected by the Equal Protection Clause.  Pls.' Opp. at 22.  Instead, Plaintiffs assert that heightened scrutiny, rather than rational basis review, applies because Defendants selected grantees' projects for termination because those projects "were about a person . . . of a particular race or other protected characteristic."  Pls.' Opp. at 22-24 (discussing *Palmore v. Sidoti*, 466. U.S. 429 (1984)).  This argument is similarly unsupported by the record.  There were only two criteria for termination: (1) whether the grants were implicated by the Executive Orders or (2) whether the grants did not align with the administration's priorities more broadly.  *See* citations at Defs.' Br. at 33.  As discussed in Defendants' opening brief, NEH terminated grants that focused on "majority groups" as well as grants that had no relation to race, gender, or other protected characteristics.  Defs.' Br. at 33-34.  Defendants also preserved several grants focused on racial, gender, and religious minority groups.  Doud Decl. Ex. 28 (US-000061492) (grants on "To Keep" tab included: "the arrangement and description of . . . Council of Jewish Federations records from 1916 to 1999"; "a critical edition of . . . . A Vindication of the Rights of Woman by philosopher Mary

Wollstonecraft"; "Freedom: A Documentary History of Emancipation, 1861-1867"; "exhibition on the history of Black Revolutionaries in New Hampshire"). Accordingly, Plaintiffs' reliance on *Palmore* is misguided, and rational basis review, rather than heightened scrutiny, applies.

Plaintiffs incorrectly argue that the grant terminations cannot satisfy rational basis review because "classifying grants for termination based on the bare race, gender, or other protected characteristics" is not rationally related to the Government's goals. Pls.' Opp. at 24-25. As discussed above, however, the grant terminations were carried out to ensure compliance with the Executive Orders and align NEH-funded grants with the administration's priorities. Federal regulations allow the agency to terminate any award that "no longer effectuates the program goals or agency priorities." 2 C.F.R. § 200.340(a)(4). Accordingly, the Government has a legitimate interest in ensuring that public funds allocated to a federal agency are spent in a manner that aligns with the goals of a democratically elected political branch. *See* Defs.' Br. at 34-35.

Plaintiffs' argument that allowing the Government to terminate grants in this manner would lead to extreme results like public libraries banning books on certain subjects or restricting their collections, Pls.' Opp. at 24, is misplaced. NEH's grantmaking process is an exercise of the agency's prerogative to fund grants that advance the agency's priorities and reject grants that do not. *See* 20 U.S.C. § 956(c)(1) (authorizing NEH Chairperson to enter into grants to "develop and encourage the pursuit of a national policy for the promotion of progress and scholarship in the humanities"); 2 C.F.R. § 200.340(a)(4) (allowing agency to terminate any award that "no longer effectuates the program goals or agency priorities."). NEH's grant application process is a highly selective process designed to ensure that the agency awards public funds only to those projects that meet stringent criteria and are, in the agency's view, likely to promote humanities scholarship. That is different from other Government-funded institutions, such as libraries, that offer a wide

9

variety of materials to the public at large without making judgments on the subject matter or quality of those materials.  The Supreme Court's decision in *Finley* supports this distinction.  *See Finley*, 524 U.S. at 586 (distinguishing agency's ability to make content-based, selective funding decisions through the competitive grantmaking process from other Government subsidies that create a broader public forum intended to "encourage a diversity of views from private speakers").  To be sure, *Finley* involved claims of viewpoint discrimination in violation of the First Amendment, rather than equal protection violations.  But the Supreme Court's analysis is nevertheless instructive: a grantmaking agency's ability to fund some grant subjects over others is distinct from the Government's obligation to ensure that other funding programs that invite participation from the broader public are administered in a neutral manner.

Finally, Plaintiffs have not shown that Defendants acted with discriminatory intent.  *See* Defs.' Br. at 30 (citing *Hayden v. Cty. of Nassau*, 180 F.3d 42, 48 (2d Cir. 1999)).  All four witnesses testified that the grant terminations were carried out to ensure compliance with the Executive Orders and to align NEH grants with the incoming administration's priorities.  *See* citations in Defs.' Br. at 33-34.  Plaintiffs' cited examples of purported animus do not prove otherwise.  Pls.' Opp. at 25 n.3.  Fox's spreadsheet containing the "Detection Codes" was a "preliminary exercise" that was not used in selecting grants for termination.  Defs.' Br. at 31-32.  Nor does Fox's perceived "smirk" at his deposition nearly one year after the grant terminations constitute evidence of Defendants' alleged discriminatory intent.

## CONCLUSION

For the foregoing reasons, the Court should grant Defendants' motion for summary judgment.

10

Dated:  New York, New York
        April 22, 2026

                            Respectfully submitted,

                            JAY CLAYTON
                            United States Attorney for
                            the Southern District of New York
                            Attorney for Defendants


                     By:    /s/*Jonaki M. Singh*___
                            MARY ELLEN BRENNAN
                            RACHAEL L. DOUD
                            JONAKI M. SINGH
                            Assistant United States Attorneys
                            86 Chambers Street, 3rd floor
                            New York, New York 10007
                            Telephone: (212) 637-2652/2699/2785
                            MaryEllen.Brennan@usdoj.gov
                            Rachael.Doud@usdoj.gov
                            Jonaki.Singh@usdoj.gov

11