UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————————————————— x

AMERICAN COUNCIL OF LEARNED
SOCIETIES, *et al.*,

             Plaintiffs,

    -against-

NATIONAL ENDOWMENT FOR THE
HUMANITIES, *et al.*,

             Defendants.

———————————————————————————————— x

THE AUTHORS GUILD, *et al.*,

             Plaintiffs,

    -against-

NATIONAL ENDOWMENT FOR THE
HUMANITIES, *et al.*,

             Defendants.

———————————————————————————————— x

25-cv-3657 (CM)

25-cv-3923 (CM)

**OPINION AND ORDER GRANTING PLAINTIFFS' MOTION FOR SUMMARY
JUDGMENT AND DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

McMahon, J.:

These consolidated actions challenge the largest mass termination of previously awarded

grants in the history of the National Endowment for the Humanities ("NEH") since its

establishment in 1965. At issue is the termination, in early April 2025, of more than 1,400 grants,

representing over $100 million in congressionally appropriated funds awarded to scholars, writers,

research institutions, and other humanities organizations. In one action, the organizational

plaintiffs are the American Council of Learned Societies ("ACLS"), the American Historical

Association ("AHA"), and the Modern Language Association of America ("MLA") (collectively,

"ACLS Plaintiffs").  In the other, the plaintiffs are The Authors Guild and individual NEH grantees William Goldstein, Elizabeth Kadetsky, Valerie Orlando, Katalin Balog, Benjamin Holtzman, Lee Jasperse, and Nicole Jenkins (collectively, "Authors Guild Plaintiffs") who sue on behalf of themselves and a proposed class of similarly situated grantees.

The defendants are NEH; Adam Wolfson, sued in his official capacity as Acting Chairman of NEH; the United States Department of Government Efficiency Service ("DOGE"); Amy Gleason, sued in her official capacity as Acting Administrator of DOGE; and Nate Cavanaugh and Justin Fox, sued in their official capacities as employees of both DOGE and the General Services Administration ("GSA") (collectively, "Defendants" or the "Government").  The ACLS Plaintiffs allege injury both to themselves and to their members, who have long relied on NEH funding.  The Authors Guild Plaintiffs allege that the challenged terminations swept in named individual grantees and at least 1,400 other recipients of NEH grants who received materially identical termination notices between April 1 and April 3, 2025 (the "Mass Termination").

Plaintiffs argue that Defendants (i) engaged in arbitrary and capricious agency action by terminating grants *en masse* without individualized consideration, *see* 5 U.S.C. § 706(2)(A); (ii) acted without statutory authorization and effectively displaced the National Endowment for the Humanities Chair and the grantmaking process Congress prescribed by effectuating terminations outside the statutory scheme set forth in 20 U.S.C. §§ 956(c), 957(f); and (iii) discriminated on the basis of viewpoint and protected characteristics by targeting projects associated with "diversity, equity, and inclusion," "gender ideology," and other subject matter that the Trump Administration regarded as inconsistent with its priorities.

Defendants deny those allegations and contend that the review and terminations were lawful efforts to implement presidential directives, eliminate grants associated with "diversity,

equity, inclusion, and accessibility" ("DEIA"), "diversity, equity, and inclusion" ("DEI"), "environmental justice," and "gender ideology," and reduce discretionary spending in accordance with the priorities of the new administration.

The matter is before the Court on cross-motions for summary judgment and is resolved on the basis of the full record, including contemporaneous emails, spreadsheets, deposition testimony, and the parties' Local Civil Rule 56.1 statements and counterstatements. For the reasons that follow, the Court concludes that Plaintiffs are entitled to judgment as a matter of law on their claims that the Government's Mass Termination of National Endowment for the Humanities grants (i) violated the First Amendment, (ii) violated the equal protection component of the Fifth Amendment, and (iii) was *ultra vires,* because, on the undisputed evidence, DOGE officials exercised decisive authority over the selection and termination of NEH grants without any statutory authority to do so.

## I.    Background

### A.  The National Foundation on the Arts and the Humanities Act

Congress created the National Endowment for the Humanities ("NEH") in 1965 as part of the National Foundation on the Arts and the Humanities. 20 U.S.C. §§ 951–960. Congress declared that, "The arts and the humanities belong to all the people of the United States," that federal support for the humanities is "necessary and appropriate," and that such support must be administered with sensitivity to "the nature of public sponsorship." 20 U.S.C. § 951(1), (5).

Congress further found that the humanities "reflect the high place accorded by the American people to the nation's rich cultural heritage" and help foster "mutual respect for the diverse beliefs and values of all persons and groups." 20 U.S.C. § 951(6). It also emphasized that

the Federal Government should help create and sustain "a climate encouraging freedom of thought, imagination, and inquiry."  20 U.S.C. § 951(7).

The statute repeats these themes throughout.  Congress found that "national progress and scholarship in the humanities and the arts" are matters of federal concern; that, "Democracy demands wisdom and vision in its citizens"; and that federal support should "complement, assist, and add to" existing programs.  20 U.S.C. § 951(2), (4), (5).  Of great significance for this case, the statute stressed that the humanities promote "mutual respect for *the diverse beliefs and values of all persons and groups,*" and announced that federal support should help create both a climate of intellectual freedom and the "material conditions" necessary for creative work.  *Id.*, § 951(6), (7) (emphasis added).

Congress also defined the term "humanities" broadly.  It includes "the study and interpretation of" language, literature, history, jurisprudence, philosophy, archaeology, comparative religion, and ethics.  20 U.S.C. § 952(a).  It also encompasses "those aspects of the social sciences which have humanistic content and employ humanistic methods," as well as the "application of the humanities to the human environment."  *Id.*  The statutory definition expressly highlights the relevance of the humanities to "our diverse heritage, traditions, and history" and to "current conditions of national life."  *Id.*

Within the Foundation, Congress established NEH itself.  "There is established within the Foundation the National Endowment for the Humanities."  20 U.S.C. § 956(a).  The NEH "shall be headed by a chairperson, who shall be appointed by the President, by and with the advice and consent of the Senate."  20 U.S.C. § 956(b)(1).

Although the Chairperson has ultimate authority to award grants, Congress did not vest that authority in him either alone or without condition.  Instead, it authorized the Chairperson,

"with the advice of the National Council on the Humanities," to enter into "contracts, grants, loans, and other forms of assistance" for specified purposes. 20 U.S.C. § 956(c). Those purposes are extensive and varied and reflect Congress's commitment to the fostering of diverse points of view and the exploration of all the varied and diverse aspects of American culture. The Chairperson is authorized to:

(1) develop and encourage the pursuit of a national policy for the promotion of progress and scholarship in the humanities;

(2) initiate and support research and programs to strengthen the research and teaching potential of the United States in the humanities by making arrangements with individuals or groups to support such activities; any loans made by the Endowment shall be made in accordance with terms and conditions approved by the Secretary of the Treasury;

(3) initiate and support training and workshops in the humanities by making arrangements with institutions or individuals (fellowships awarded to individuals under this authority may be for the purpose of study or research at appropriate nonprofit institutions selected by the recipient of such aid, for stated periods of time);

*(4)* initiate and support programs and research which have substantial scholarly and cultural significance and that reach, *or reflect the diversity and richness of our American cultural heritage, including the culture of, a minority, inner city, rural, or tribal community;*

(5) foster international programs and exchanges;

(6) foster the interchange of information in the humanities;

(7) foster, with groups, education in, and public understanding and appreciation of the humanities;

(8) support the publication of scholarly works in the humanities;

(9) insure that the benefit of its programs will also be available to our citizens where such programs would otherwise be unavailable due to geographic or economic reasons; and

(10)  foster programs and projects that provide access to, and preserve materials important to research, education, and public understanding of, the humanities.

20 U.S.C. § 956(c) (emphasis added).

Congress also established the National Council on the Humanities. "There is established in the National Endowment for the Humanities a National Council on the Humanities." 20 U.S.C. § 957(a). The Council consists of the Chairperson and twenty-six private citizens appointed by the President, selected from persons "recognized for their broad knowledge of, expertise in, or commitment to the humanities," with records of "distinguished service" and appointed so as to provide "comprehensive representation" of scholarly, professional, and public viewpoints. 20 U.S.C. § 957(b).

The Council's role is not merely advisory in a general sense; it has specific statutory responsibilities. It "shall advise the Chairperson with respect to policies, programs, and procedures" for carrying out the Chairperson's duties. 20 U.S.C. § 957(f)(1). It must also "review applications for financial support and make recommendations thereon to the Chairperson." *Id.* § 957(f)(2).

The statute then imposes concrete procedural constraints on the Chairperson's authority. The Chairperson "shall not approve or disapprove any such application until the Chairperson has received the recommendation of the Council on such application," unless "the Council fails to make a recommendation thereon within a reasonable time." *Id.* § 957(f). The statute allows the Council to delegate its authority to the Chairperson, but only in cases involving small grants: "In the case of any application involving $30,000, or less, the Chairperson may approve or disapprove such request if such action is taken pursuant to the terms of a delegation of authority from the Council to the Chairperson." Even then, the Chairperson's unilateral action "shall be reviewed by the Council." *Id.* And even then, "the terms of any such delegation of authority shall not permit obligations for expenditure of funds under such delegation for any fiscal year which exceed an

- 6 -

amount equal to 10 per centum of the sums appropriated for that fiscal year," pursuant to 20 U.S.C. § 960(a)(1)(B). *Id.*

Section 957(f) thus does not make the Council's recommendation binding in all respects. Unlike the corresponding provision in the enabling statute for the National Council on the Arts, *see* 20 U.S.C. § 955(f), the Humanities provision does not state that the Chairperson may approve only the amount recommended by the Council, or may not approve an application that receives a negative recommendation. But it does require, absent the statute's narrow exceptions, that the Chairperson receive and consider the Council's recommendation before acting.

The summary-judgment record confirms that NEH historically operated in accordance with this structure. Wolfson testified that proposals typically proceed through peer-review panels, followed by staff recommendations, Council review, and then final action by the Chair. Dkt. No. 248-26, Wolfson Dep., 41:18–25. He explained that, by the time a proposal reaches the Chair, it has already undergone multiple layers of expert evaluation. *Id.*, 42:1–8. In practice, Chairs have accepted the Council's recommendations "more than 90 percent of the time," because they trust "the peer-review process*." Id.*, 42:13–20; 62:4–16.

The statute also addresses post-award compliance and potential termination, but it does so in specific, enumerated ways. It does not authorize the wholesale revocation of grants already awarded simply because a new administration disagrees with the decisions of a previous administration or prefers to redirect funds elsewhere. Section 959 requires recipients of Endowment assistance to submit financial and project reports to the Chairperson, including a financial report containing information necessary to ensure that the assistance was expended "in accordance with the terms and conditions under which it is provided." 20 U.S.C. § 959(f)(2)(A)(i). If the recipient "substantially fails to satisfy the purposes for which such financial assistance is

provided," as determined by the Chairperson, Congress identified particular post-award

consequences the Chairperson may impose: the Chairperson may take the results of the post-award

evaluation into account in deciding whether to provide future assistance, may prohibit the recipient

from using the Endowment's name in connection with the project, and, if the project is published,

may require a disclaimer that the views expressed do not reflect those of NEH. *Id.* § 959(f)(3)(A)–

(C).[1]

These provisions do not make Council consultation a prerequisite to every post-award

enforcement action. But they do show that Congress addressed post-award compliance in grantee-

specific, *Chair-centered* terms, tied to compliance with award purposes, statutory criteria, and

grant terms – not to a new administration's ideological disagreement with previously awarded

projects.

### B. The Parties

1. The ACLS Plaintiffs

The organizational plaintiffs in Case No. 25-cv-3657 (the "ACLS Plaintiffs") are three of

the nation's leading scholarly associations in the humanities: the American Council of Learned

Societies ("ACLS"), the American Historical Association ("AHA"), and the Modern Language

Association of America ("MLA"). Dkt. No. 230, ¶¶ 12–14.

Plaintiff ACLS is a nonprofit organization headquartered in New York whose members

include 81 scholarly organizations spanning a wide range of disciplines within the humanities.

---

[1] The statute also contains provisions outlining the consequences for non-compliance with grant awards made to states and their humanities councils pursuant to 20 U.S.C. § 956(f). However, those grants are not at issue in this case. They are the subject of a case pending in the District of Oregon, brought by a state humanities council and related entities to challenge the termination of grants made to States under the "Federal/State Partnership" provisions of the National Foundation on the Arts and the Humanities Act. *See Oregon Council for the Humanities v. United States DOGE Service*, 794 F. Supp. 3d 840 (D. Or. 2025).

Dkt. No. 230, ¶ 12.  Founded in 1919, ACLS is dedicated to advancing understanding of human culture and experience through the support and dissemination of scholarship.  *Id.*  It carries out that mission both by conducting programs directly and by funding research conducted by scholars and institutions.  *Id.*  ACLS itself has received 144 direct grants from NEH since the agency's founding, and its member organizations have likewise been frequent recipients of NEH funding.  *Id.*

Plaintiff AHA is a nonprofit organization founded in 1884 and incorporated by Congress in 1889 for the promotion of historical studies.  Dkt. No. 230, ¶ 13.  Headquartered in Washington, D.C., AHA is the largest membership association of historians in the world, with more than 10,400 members representing a wide range of historical fields and professions.  *Id.*  AHA alleges that its members have received more than 300 NEH awards in the past five years, and AHA itself has received nearly 50 grants since NEH's founding.  *Id.*

Plaintiff MLA is a nonprofit organization founded in 1883 and headquartered in New York.  Dkt. No. 230, ¶ 14.  MLA serves as a leading professional association for the study and teaching of languages and literature and operates a substantial publishing program in the humanities.  *Id.*  It has more than 20,000 members and supports them through professional initiatives, including collaborative research networks and institutional partnerships.  *Id.*  MLA's members have received more than 180 NEH awards in the past three years, and MLA itself has received nearly 50 NEH grants since NEH's founding.  *Id.*

These plaintiffs bring claims both on their own behalf and in an associational capacity on behalf of their members, many of whom are current or recent NEH grantees whose awards were affected by the challenged terminations.  Dkt. No. 230, ¶¶ 12–14.

2.      The Authors Guild Plaintiffs

The plaintiffs in Case No. 25-cv-3923 (the "Authors Guild Plaintiffs") include both an associational plaintiff – the Authors Guild – and a group of individual NEH grant recipients whose awards were terminated in early April 2025. Dkt. No. 240, ¶¶ 11–24.

The Authors Guild is a national nonprofit membership association founded in 1912 and headquartered in New York City. *Id.*, ¶ 11. It represents more than 14,000 professional writers, including historians, biographers, journalists, academics, and other authors of fiction and non-fiction. *Id.* The Guild works to promote the professional and legal interests of authors, including in areas such as copyright, freedom of expression, and fair contracts. *Id.* It alleges that many of its members have received NEH grants, including under programs such as Public Scholars, Fellowships, and Summer Stipends, and that those members were among the recipients of the challenged terminations. *Id.* Unlike the ACLS Plaintiffs, the Authors Guild does not allege that it has itself received NEH funding; it brings this action solely in its associational capacity on behalf of its members. *Id.*

The individual plaintiffs are scholars and writers who received NEH grants for specific research and writing projects and whose awards were terminated before the completion of their funded work. *Id.*, ¶¶ 12–24. In each instance, the award specified a defined "grant period," meaning the fixed period of performance during which the recipient was authorized – and, in some cases, required – to devote time to the funded project in exchange for the grant funds. *Id.*

Plaintiff Elizabeth Kadetsky, a professor in the English Department at Pennsylvania State University, was awarded a $60,000 Public Scholars grant to support a book project examining a 1962 temple theft and the international antiquities trade. Dkt. No. 240, ¶¶ 2, 12. Her grant period was scheduled to run from May 1, 2025 through April 30, 2026, but the award was terminated before it began on April 3, 2025. *Id.*, ¶¶ 2–5.

- 10 -

Plaintiff Valerie Orlando, Head of Department and Professor of French & Francophone Literatures and Cultures at the University of Maryland, College Park, was awarded an NEH Summer Stipend to support research on history and memory in contemporary Algerian literature. *Id.*, ¶¶ 13–14.  The stipend, scheduled for disbursement in June 2025 to support concentrated research during a defined period, was terminated before any funds were paid on April 3, 2025.  *Id.*

Plaintiff Katalin Balog, a professor of philosophy at Rutgers University–Newark, received a $60,000 NEH Fellowship for a book project on the philosophy of mind and consciousness, with a grant period from January 1, 2025 through December 31, 2025.  *Id.*, ¶¶ 15–16.  Although she received a portion of the award, the remainder was terminated during her grant period on April 3, 2025.  *Id.*

Plaintiff Benjamin Holtzman, an assistant professor of history at Lehman College, was awarded a $60,000 grant under NEH's Awards for Faculty at Hispanic-Serving Institutions program to support a book project examining resistance to white supremacist organizing in the late twentieth century.  *Id.*, ¶¶ 17–18.  His grant period ran from September 1, 2024 through August 31, 2025, but the award was terminated, before full disbursement, on April 3, 2025.  *Id.*

Plaintiff William Goldstein is a writer, editor, and longtime publishing professional who has served in senior editorial roles, including as founding editor of the books website of *The New York Times*.  *Id.*, ¶ 19.  He was awarded a $60,000 Public Scholars grant to support the writing of a biography of Larry Kramer, the playwright and AIDS activist.  *Id.*, ¶ 20. The grant period ran from September 1, 2024 through August 31, 2025.  While he received $50,000 of the award, the remaining $10,000 – scheduled for disbursement in July 2025 – was never paid because the grant was terminated on April 3, 2025.  *Id.*

Plaintiff Lee Jasperse, a Teaching Fellow in the Department of English Language and Literature at the University of Chicago, was selected for a fellowship at the Massachusetts Historical Society that was contingent on NEH funding in the amount of $30,000. *Id.*, ¶¶ 21–22. That funding was terminated effective April 2, 2025, resulting in the loss of the fellowship itself. *Id.*

Plaintiff Nicole Jenkins, an assistant professor at Howard University and a Visiting Faculty Fellow at Harvard University, was awarded a $60,000 grant to support a book project examining Black women's experiences and social institutions. *Id.*, ¶¶ 23–24. Her grant period was scheduled to run from August 1, 2025 through July 31, 2026, but the award was terminated in April 2025 before any funds were disbursed. *Id.*

These individual plaintiffs allege concrete professional, financial, and scholarly harms resulting from the terminations, including disruption of ongoing research, loss of anticipated funding, and the inability to complete projects within the defined grant periods for which support had been awarded. *Id.*, ¶¶ 12–24. In several instances, the terminations occurred after the grant period had begun and after recipients had undertaken work in reliance on the awards. The complaint alleges that several named plaintiffs structured their employment and professional lives around the grants. For example, Kadetsky alleges that, because her grant was a "full-time" award, she was "required by NEH to take a year-long leave of absence from her employment to work on the project." *Id.*, ¶ 4. Balog similarly alleges that, "As a condition of her grant, she was required to take a leave of absence from her teaching job." *Id.*, ¶ 16. Holtzman alleges that he was "prohibited from teaching or engaging in 'other major activities,' leaving him without other income sources," *id.* ¶ 18, and Jasperse alleges that he "forewent taking on any other major assignments, leaving him almost entirely dependent on the NEH award for income," *id.*, ¶ 22.

Jenkins alleges that she was "approved for leave from Howard University" and "forwent other fellowship, funding, research, and professional development opportunities" in reliance on the award. *Id.*, ¶¶ 23–24.

Collectively, the ACLS Plaintiffs and the Authors Guild Plaintiffs challenge a series of actions undertaken in late March and early April 2025 – culminating in the mass termination of more than 1,400 NEH grants nationwide – following a review process in which DOGE personnel played a central role in identifying and implementing the challenged terminations.

### 3.     Defendants

The defendants are the National Endowment for the Humanities ("NEH"); Adam Wolfson, sued in his official capacity as Acting Chairman of NEH; the United States DOGE Service ("DOGE"); Amy Gleason, sued in her official capacity as Acting Administrator of DOGE; and Nate Cavanaugh and Justin Fox, sued in their official capacities as employees of DOGE or the General Services Administration. Dkt. No. 230, ¶¶ 15–20; Dkt. No. 240, ¶¶ 25–30.

NEH is a federal agency headquartered in Washington, D.C., responsible for administering the grant programs at issue in this litigation. Dkt. No. 240, ¶ 25. Michael McDonald served as Acting Chairman of NEH at the time the termination notices were issued to grantees. *Id.*, ¶ 26.

DOGE is a component of the Executive Office of the President, created in 2025. It was established by Executive Order 14158, *Establishing and Implementing the President's "Department of Government Efficiency."* Cavanaugh and Fox acted on behalf of DOGE at the NEH. Dkt. No. 230, ¶¶ 19–20. Defendant Gleason is the Acting Administrator of DOGE. *Id.*, ¶ 18.

Defendants Cavanaugh and Fox were assigned to operate across federal agencies, including NEH, in connection with DOGE's activities.

### C. Historical Practice at NEH

The record reflects that NEH did not historically terminate grants in the manner challenged here. Wolfson testified that, during his previous thirteen- to fourteen-month period as Acting Chair, he did not recall the agency terminating any awarded grant. Dkt. No. 248-26, Wolfson Dep., 45:1–7. Over roughly two decades working at NEH, he could think of only "a couple" of grant terminations, Dkt. No. 248-26, Wolfson Dep., 46:2–11, and the few examples he recalled involved circumstances in which the grantee had failed to comply with the terms of the grant. *Id.*, 46:22–47:21. He further testified that he was not aware of any grants being canceled because "a new administration disagreed with the topic being studied or written about." *Id.*, 48:2–14, 49:5–10. And he confirmed that, throughout his career at NEH, no administration had ever "canceled the vast majority of grants that were already awarded." Dkt. No. 248-26, Wolfson Dep., 63:18–25.

The historical practice at NEH is consistent with Wolfson's testimony about the ordinary review process, as well as with the record evidence showing that NEH's grantmaking was staff-intensive and structured around expert review, program-officer recommendations, and repeated Council involvement. Dkt. No. 248-26, Wolfson Dep., 23:23–24:14, 41:18–42:20.

### D. The Executive Orders

The agency review at issue here followed the issuance of several Executive Orders shortly after President Trump took office in January 2025.

On January 20, 2025, the President issued Executive Order 14151, *Ending Radical and Wasteful Government DEI Programs and Preferencing*. The Order declared that the prior administration had forced "diversity, equity, and inclusion" ("DEI") into "virtually all aspects of the Federal Government," and directed agency heads to "terminate, to the maximum extent

- 14 -

allowed by law," all DEI, "diversity, equity, inclusion, and accessibility" ("DEIA"), and "environmental justice" offices, programs, grants, and related activities. Exec. Order No. 14151, §§ 1, 2(b)(i), 90 Fed. Reg. 8339, 8339–40 (Jan. 20, 2025). The same Order directed agencies to identify federal grantees that had received funding to provide or advance DEI, DEIA, or environmental justice programs, services, or activities since January 20, 2021. Exec. Order No. 14151, § 2(b)(ii)(C), 90 Fed. Reg. at 8340.

Also on January 20, 2025, the President issued Executive Order 14168, *Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government*. That Order defined "gender ideology," directed agencies to remove messages and policies that "promote or otherwise inculcate gender ideology," and stated that agencies "shall take all necessary steps, as permitted by law, to end the Federal funding of gender ideology." Exec. Order No. 14168, §§ 2(f), 3(e), (g), 90 Fed. Reg. 8615, 8615–16 (Jan. 20, 2025).

On February 26, 2025, the President issued Executive Order 14222, *Implementing the President's "Department of Government Efficiency" Cost Efficiency Initiative*. That Order directed each agency head, "in consultation with the agency's DOGE Team Lead," to "review all existing covered contracts and grants and, where appropriate and consistent with applicable law, terminate or modify . . . such covered contracts and grants to reduce overall Federal spending or reallocate spending to promote efficiency and advance the policies of my Administration." Exec. Order No. 14222, § 3(b), 90 Fed. Reg. 11095, 11095–96 (Feb. 26, 2025). It required that the process "commence immediately" and that it be completed within 30 days. *Id.*

### E. NEH's Internal Review and DOGE's Arrival

The events leading to the challenged terminations began with a first stage of internal review undertaken by NEH in response to newly issued Executive Orders in early 2025. That internal

process was soon followed – and ultimately overtaken – by the involvement of personnel associated with the United States DOGE Service.

At the start, NEH staff were directed to conduct a retrospective review of active grants. That review focused on awards issued during the Biden Administration. Dkt. No. 276-4, Wolfson Dep., 87:21–88:4 (describing it as a "historical review of all grants starting" in January 2021). Staff were instructed to evaluate whether those grants implicated the subject areas identified in the Executive Orders – namely, "diversity, equity, and inclusion" ("DEI"), "diversity, equity, inclusion, and accessibility" ("DEIA"), "environmental justice," and "gender ideology." *Id.*, at 86:21–87:4; *see also* Dkt. No. 277 at 8, ¶¶ 25–26; Dkt. No. 276-6 at 1, NEH_AR_000022.

The review resulted in the creation of a spreadsheet compiled by NEH personnel, including Brett Bobley, the NEH's Chief Information Officer. Dkt. No. 276-4, Wolfson Dep., 87:22–88:4. Each grant was assigned a categorical rating – "low," "medium," "high," or "not applicable" – based on its perceived relationship to DEI, DEIA, environmental justice and gender ideology. *Id.* at 88:5–89:19. McDonald, who was at the time the Acting Chairman of the NEH, testified that NEH staff conducted this rating as part of an effort "to identify grants for potential termination." Dkt. No. 248-3, McDonald Dep., 101:7–11; *id.* at 144:6–15.

This initial review did not itself result in any terminations. Rather, it produced an internal inventory of grants organized by subject-matter classifications, which was then passed on to DOGE for further review.

The second stage of the grant termination process began on March 12, 2025, when Justin Fox and Nate Cavanaugh – identified in the record as members of DOGE's "Small Agencies Team" – met with NEH leadership, including McDonald and Wolfson. Dkt. No. 277 at 37–38, ¶¶ 11, 14–15. Both individuals testified that they joined DOGE shortly after the President's

January 2025 inauguration, after being recruited by senior DOGE officials and hired through the General Services Administration ("GSA"), where Fox and Cavanaugh both served as political appointees working on DOGE initiatives.  Dkt. No. 248-2, Cavanaugh Dep., 19:1–20:15 (stating that he was recruited by DOGE official Steve Davis); 26:16–27:3; Dkt. No. 248-1, Fox Dep., 44:19–47:19 (stating that he was recruited by DOGE officials Anthony Armstrong and Joshua Gruenbaum).  Prior to joining the Trump Administration, neither Fox nor Cavanaugh had any experience in government, public grant administration, private grant administration, or reviewing humanities projects for scholarly merit.  Dkt. No. 248-1, Fox Dep., 43:7–44:6; Dkt. No. 248-2, Cavanaugh Dep., 51:1–4.  In fact, as both were in their twenties, they did not have much experience in anything at all – certainly not in anything remotely related to the humanities.

Cavanaugh testified that DOGE official Steve Davis – whom he described as "effectively [his] manager" – hired him to lead what was known as the "Small Agencies Team."  Dkt. No. 276-1, Cavanaugh Dep., 36:21–37:11.  That team, he explained, consisted of DOGE personnel "assigned and detailed from typically GSA to small Federal agencies in the Government, including NEH," and included both Cavanaugh and Fox.  *Id.*, 37:14–24.  The team operated out of GSA and met regularly as it carried out its work.  *Id.*, 38:13–24.

According to Cavanaugh, the purpose of the "Small Agencies Team" was to reduce the spending of "useless small agencies in the Federal Government," with a particular focus on agencies implicated by the Executive Orders.  Dkt. No. 244-3, Cavanaugh Dep., 55:18–22, *see also* Dkt. No. 276-1, 38:2–11.  In practice, that assignment translated into reviewing congressionally authorized agency programs – including grants – in light of the President's priorities.  *Id.*

By the time Fox and Cavanaugh first met with NEH leadership, including McDonald and Wolfson, on March 12, 2025, Fox had already begun independently reviewing NEH grants using keyword searches of grant descriptions, employing terms such as "gay," "BIPOC," "indigenous," "tribal," "melting pot," and "equality," and had created his own spreadsheet, which sorted all NEH grants from the Biden years into categories called "Craziest Grants" and "Other Bad Grants." Dkt. No. 249, at 6, ¶¶ 32–36; Dkt. No. 277, at 37–38, ¶ 12. The spreadsheet included a tab labeled "Detection Codes," listing terms such as "Tribal," "Immigrants," "diversity," "inclusion," "Indigenous," "Native," "Equity," "Equality," "Marginalized," "BIPOC (Black, Indigenous, People of Color)," "Solidarity," "Citizenship," "Melting Pot," "Social Justice," and "Gay." Dkt. No. 248-9, at 25. Fox admitted that the labels "Craziest Grants" and "Other Bad Grants" reflected his and Cavanaugh's own "subjective" views. Dkt. No. 248-1, Fox Dep., 232:18–233:14. Nothing in the record indicates that either Fox or Cavanaugh read NEH's authorizing statute or understood that Congress itself had identified many of the subjects swept up by those search terms as proper objects of NEH support.

Examples from that "Craziest Grants" illustrate the types of projects DOGE was flagging. One "crazy grant" was a joint project between the Henry E. Huntington Library and Art Gallery and the University of Southern California, which was designed to encourage public engagement with themes including "national identities," "the struggle for democracy" from the perspective of California and the West, and "the nation's uneven journey to an equitable and just society." Dkt. No. 248-9, at 3. The period to be studied ran from 1450 to 1850, when California became a state.

Another "Craziest Grants" entry described a funded project that would employ virtual reality so participants could "explor[e] indigenous knowledge, culture, and climate" at Mesa Verde National Park and Wupatki National Monument. Dkt. No. 248-9 at 3. The project's goal was to

allow participants, "guided by voices from Native American descendant communities," to "grow their understanding of these storied landscapes," reflect on their own relationship to changes in the American Southwest, and "challenge stereotypes of Native Americans historically and today." *Id.*

A third "Craziest Grant" funded the writing of a book on the "Legacies of HIV/AIDS prison movements in the US," examining activism surrounding the intersection of incarceration and public health. *Id.* at 11.

The day after the March 12 meeting, Wolfson sent Fox and Cavanaugh the spreadsheet that NEH staff had created. Dkt. No. 277 at 38, ¶ 13; Dkt. No. 276-7, NEH_AR_000005. Fox and Cavanaugh used that spreadsheet "as a starting point," supplemented it with their own identifications of grants they believed implicated the President's executive orders, and circulated a revised spreadsheet back to NEH leadership. Dkt. No. 277 at 38, ¶ 14.

Cavanaugh's testimony establishes how that review was conducted in practice. When asked how they determined which grants to flag, he testified: "We read the description [of the project] in the relevant column [of the NEH spreadsheet]." Dkt. No. 276-1, Cavanaugh Dep., 113:13–16. Their review focused on "the description column, the amount of the grant, and then whether there was [*sic*] still any funds associated with the grant that were outstanding." *Id.*, 114:16–20.

Critically, Cavanaugh confirmed that they did not examine any of the applications or underlying materials that had been submitted when applying for the grants or any materials generated by NEH staff when those applications were reviewed. When asked whether they reviewed grant applications or other external sources, he answered: "We did not." *Id.*, 115:2–4. He likewise testified that they did not consult project websites or other supplementary materials, but limited themselves to the short project descriptions that appeared in the spreadsheet. *Id.*,

- 19 -

114:21–115:20 ("Q: In your view, [the spreadsheet description's] an exhaustive description? A: I think it's a thorough description of what the grant is related to, yes."); *see also id.*, 113:14–16, *id.*, 115:3–4; Dkt. No. 248-1, Fox Dep., 204:20–23; *id.* at 209:25–210:2. Cavanaugh also acknowledged that the resulting categorizations reflected his and Fox's own judgment, testifying that the determinations about which grants to flag were made "in our view." *Id.*, 113:1–7.

Wolfson, who observed the termination process from within NEH, testified that it evolved over time. At the outset, he understood the review to be focused on identifying grants that implicated DEI – which is what NEH staff had done, and provided to DOGE on March 12. But he testified that Fox and Cavanaugh later "made clear at various points that it wasn't just grants related to DEI, but just grants that didn't fit the priorities of the new administration." Dkt. No. 276-4, Wolfson Dep., 85:13–18. Thus, what began as an internal NEH effort to catalogue grants in light of the Executive Orders was overtaken by a DOGE-directed process – led by a DOGE-led "Small Agencies Team," relying on spreadsheet descriptions rather than underlying grant applications, and guided by the team's own assessment about which projects were inconsistent with the administration's priorities. Dkt. No. 276-1, Cavanaugh Dep., 37:1–24; 113:13–16; 114:16–20; 115:2–4; Dkt. No. 276-4, Wolfson Dep., 85:13–18. This process set the stage for the mass terminations that followed.

### F. ChatGPT, the "DEI Rationales," and the Final Termination Lists

Fox and Cavanaugh focused their efforts on grants awarded during the Biden Administration. On March 12, 2025 – the same day they first met with NEH leadership – Cavanaugh sent McDonald a spreadsheet identifying 1,295 grants awarded during "President Biden's administration," totaling approximately $322 million in funds "remaining (can presumably be clawed back)." Dkt. No. 249 at 7, ¶ 38; Dkt. No. 248-27, Ex. 27,

NEH_AR_000003.   The spreadsheet was titled "Biden Grants."   Dkt. No. 248-28, Ex. 28, NEH_AR_000004.  McDonald testified that the "presumption was that . . . open grants that were made under the Biden administration needed to be reviewed," and that the objective was to "start afresh" with "a clean slate."  Dkt. No. 248-3, McDonald Dep., 372:19–23; *id.* at 226:12–227:1.

Fox began a second stage review of grants that NEH staff had not identified as implicating DEI or related categories – *i.e.*, that were labelled on NEH's spreadsheet "N/A," or not applicable, to the goals outlined in the Executive Order.  Fox testified that this review was designed to identify additional grants that could be placed "[o]n the road to termination" and to "isolate" additional grants "to terminate."   Dkt. No. 248-1, Fox Dep., 159:2–11; *id.* at 193:20–23.   In order to accomplish this goal, Fox used ChatGPT – an artificial-intelligence tool that generates text in response to user prompts – to create what the parties call "DEI rationales" that might arguably pertain to the "N/A" grants.  Dkt. No. 249 at 7, ¶ 41; Dkt. No. 277 at 12–13, ¶¶ 40–41; *id.* at 38–39, ¶ 16.

Fox testified that he used ChatGPT "[t]o highlight why [a] grant may relate to DEI" and "to pull out anything related to DEI."  Dkt. No. 248-1, Fox Dep., 204:20–23; *id.* at 209:21–210:2. To do so, he submitted each cursory grant description from the NEH spreadsheet to ChatGPT using a standardized prompt: "Does the following relate at all to DEI? Respond factually in less than 120 characters. Begin with 'Yes.' or 'No.' followed by a brief explanation."  Dkt. No. 277 at 13, ¶ 41; Dkt. No. 249 at 7, ¶ 41; Dkt. No. 248-11, Ex. 11, US-000062485 (tab "Sheet3") at C2–C1163. Fox testified that he did not define "DEI" for ChatGPT and that he did not have the slightest idea how ChatGPT understood the term.  Dkt. No. 277 at 13–14, ¶ 43 ("Admitted that Fox did not provide ChatGPT with a definition of "DEI" and that Fox was unsure of ChatGPT's understanding

of the term 'DEI.'"). Nor did Fox ask ChatGPT to factor in the purpose, methodology or scholarly substance of a project – which would have required familiarity with the underlying grant materials.

Because the inquiry was framed only in terms of whether a project "relate[d] at all to DEI" (whatever that might mean to ChatGPT), projects whose abbreviated descriptions contained general references to "history," "culture," or "identity" were frequently identified by ChatGPT as relating to DEI. For example, a project to recover and analyze ancient writings attributed to Moses but excluded from the canonical Hebrew Bible and preserved in fragmentary form (*e.g.*, the Book of Jubilees and the Testament of Moses) was classified as DEI because it claimed to "provide important insight into *Jewish* thought from two thousand years ago, complementary to insight from the Dead Sea Scrolls and the New Testament." Dkt. No. 248-11, at 99, C461–I461 (emphasis added). The project description reflects a highly technical effort involving multispectral imaging, textual reconstruction, and the recovery of deteriorated source materials. *Id.* Yet, the assigned rationale consists of a single sentence linking the project to "Jewish thought," which ChatGPT considered to be aligned with "DEI" goals. *Id.*

Another project, titled "How the City Became Plastic," examines the emergence of a coalition of plastics industry participants who, according to the project description, "pop up in cities all across the country to convince, cajole, or force municipal government officials to overhaul building codes, infrastructure codes, and solid waste programs, to the advantage of plastics." Dkt. No. 248-11 at 235, C1101–I1101. The description explains that, "In the decades between 1950 to 1980, municipal code updates opened the flood gates for new plastic products in buildings and infrastructure, amid simultaneous failed efforts to reduce the torrent of consumer plastics entering the municipal waste stream." *Id.* Drawing on evidence from cities including New York, Los Angeles, Cleveland, and Pittsburgh, the project "demonstrates how shifting power dynamics,

- 22 -

smooth salesmanship, and legal strong-arming produced cities, and a whole world, inundated with plastic." *Id.* The project's actual focus was the historical development of industrial policy and municipal regulation. Nevertheless, ChatGPT classified the project as "DEI," producing the following rationale: "Yes. This description highlights how the plastics industry influenced municipal government officials to favor plastics, impacting waste management and infrastructure codes. #DEI." *Id.*

Another grant supported a study of the Chinese government's persecution of the Uyghur people. As described in the spreadsheet, the project documented surveillance practices, detention facilities, coercive assimilation policies, restrictions on language, religion, and cultural practice, and the effects of those policies on Uyghur communities in China and in the diaspora. In other words, the project concerned state policy, human-rights conditions, and the preservation of cultural and religious identity under conditions of repression by the Chinese government. Yet ChatGPT classified the project as "DEI," Dkt. No. 248-11, at 22, apparently because it concerned the threatened erasure of a particular ethnic and religious group, albeit one located in a foreign country. Disfavoring this grant on "DEI" grounds, or any grounds, is especially difficult to square with the United States' longstanding, bipartisan condemnation of China's treatment of the Uyghurs, including during the first Trump Administration. *See, e.g.*, *Addressing China's Oppression of Uyghurs*, Nat'l Sec. Inst., Geo. Mason Univ. Antonin Scalia L. Sch., (2021) ("Two successive administrations—Republican and Democratic alike—have recognized the oppression of Uyghurs by China as a modern-day genocide and have imposed key sanctions on China and the Chinese Communist Party (CCP).").

Finally, another grant sought to examine the cultural and intellectual experience of American women in Paris from the late nineteenth century through the mid-twentieth century. The

proposal for the grant (which Fox and Cavanaugh admittedly never read) describes a scholarly monograph tracing "the long and tangled love affair between American women and Paris," beginning with "the aspiring artists who flocked to Parisian academies in the 1890s," moving "through World War I and Edith Wharton's reports from the front lines," and into "the myth-saturated 1920s, when Josephine Baker stormed the cabaret stage and sang of her 'deux amours' for her home and Paris," capturing the "conflicted emotions of expatriate American women." Dkt. No. 248-11, at 126, C584–I584. It further explains that, "In the wake of another war, the 1950s saw a resurgent transatlantic exchange of ideas and culture," culminating in "the youth-led revolts of May 1968." *Id.* The proposal situates these narratives within broader developments in artistic production, intellectual exchange, and the evolving political status of women in the United States and France. It was classified by Fox's ChatGPT-driven review as "DEI" – apparently because it related to the interests and cultural accomplishments of women. *Id.*

The record reflects that these ChatGPT determinations were generated without any additional context beyond the cursory spreadsheet descriptions themselves. Given what courts now know about the hallucinatory propensities of ChatGPT and similar generative-AI tools, it would hardly be surprising if ChatGPT inferred, from DOGE's repeated requests, that Fox and Cavanaugh were looking for reasons why grants could be characterized as DEI – and therefore terminable – and supplied "rationales" simply in order to satisfy the user's perceived demand. The utter lack of reasoning behind so many of its "rationales" certainly suggests as much.

Fox incorporated the ChatGPT-generated determinations into the spreadsheets that were used to identify grants for termination – combining NEH's initial ratings ("low," "medium," "high," or N/A) with ChatGPT's output to produce final lists cataloguing grants "by DEI involvement and Division," with each grant marked "Yes" or "No" and accompanied by a brief

explanation, or "DEI Rationale." Dkt. No. 249, at 10, ¶¶ 57–59; Dkt. No. 277, at 12–13, ¶¶ 40–41; Dkt. No. 248-12, Ex. 12, US-000000936; Dkt. No. 248-13, Ex. 13, US-000041372. These lists were then presented to McDonald, the Acting Chairperson of NEH.

McDonald was not told how the termination rationales had been generated. He testified that he did not know ChatGPT had been used and that he did not believe AI was an appropriate tool for identifying grants to terminate. Dkt. No. 249, at 10, ¶¶ 61–62. When shown examples from the final spreadsheet during his deposition, McDonald acknowledged that, in certain instances, the stated rationales were insufficient, irrational, or simply did not make sense. *See* Dkt. No. 248-3, McDonald Dep., 119:3–123:8 ("If it were terminated on that grounds . . . I would say it should not be terminated [as] DEI"), *id.*, 128:21–129:15 ("Q: Do you agree that this grant involved DEI? A: No, I do not."), *id.*, 131:3–131:7 ("I have no basis on which to conclude that the – the grant money would have been used to advance a particular social or political point of view that I would normally associate with DEI[.]"). But, as explained below, McDonald was not the person who decided which NEH grants would be terminated.

There can be no serious dispute that the review process implemented by DOGE did not conform to, or even resemble, NEH's ordinary grant-review process, which itself was designed to comply with the mandates of its authorizing statute. The statutory process contemplates individualized evaluation by subject-matter experts, advisory review, Council involvement, and final action by the Chairperson. *See supra* Sections I(A), (C). And once grants had been awarded, the Act does not authorize a wholesale post-award revocation based on new ideological criteria. Rather, for awards made under § 956(c), the Act provides for post-award evaluation, financial and project reporting, and potential termination only when the Chairperson determines that a recipient

- 25 -

has substantially failed to satisfy the purposes for which the assistance was provided or the applicable statutory criteria. *See* 20 U.S.C. § 959(f)(1)–(3).

DOGE's process, by contrast, rested on abbreviated spreadsheet descriptions and a binary ChatGPT prompt asking whether each project "relate[d] at all to DEI." Fox then folded the ChatGPT-generated rationales into the final spreadsheets used to identify grants for termination, thereby combining DOGE's AI-generated classifications with NEH staff recommendations. *Compare* Dkt. No. 248-12, Ex. 12, US-000000936 (combined list of ChatGPT-generated recommendations and NEH recommendations), *with* Dkt. No. 248-11 (ChatGPT-generated recommendations); *see also* Dkt. No. 248-1, Fox Dep., 204:20–206:8; *id.* at 209:21–210:2; Dkt. No. 248-2, Cavanaugh Dep., 134:14–19 ("The final list that we ended up recommending to Mike and Adam were a combination of both our original list and their employee reviewed list."); *see also* Dkt. No. 248-12, Ex. 12, US-000000936. Nothing in the record suggests that NEH had ever before employed such a process before March 2025. And nothing in the authorizing statute permitted it.

### G. DOGE's Final Decisionmaking and the Issuance of Termination Notices

DOGE drove the final push leading up to the grant terminations. Cavanaugh testified that, "The general pacing of DOGE was to try and make decisions and act quickly to avoid Government employees dragging their feet on cancellations," and that he and Fox used "pressure tactics" to execute the terminations quickly. Dkt. No. 248-2, Cavanaugh Dep., 134:24–135:4; 170:3–8; *id.*, 165:16–21 ("[O]ur general operating procedure at DOGE was to try and get this work done quickly. And this had now been dragging out for two or three weeks with NEH. And so we were trying to push Michael on to move faster with agreeing on a plan.").

Fox's internal communications reflect this urgency to terminate previously awarded grants. On March 31, 2025, Fox wrote to McDonald: "We're getting pressure from the top on this and

we'd prefer that you remain on our side but let us know if you're no longer interested."  Dkt. No. 248-15, Ex. 15, US-000050717.  Cavanaugh testified that, in reality, they did not receive any such "pressure" from the White House, the Executive Office of the President, or the Office of Management and Budget.  Dkt. No. 248-2, Cavanaugh Dep., 171:1–5.  It was just a "time pressure tactic" on DOGE's part.  *Id.*, 170:7–8.

McDonald tried to spare some of the grants from being terminated.  In an April 1 email to Fox, he wrote that "wherever the 'DEI Rationale' on the spreadsheet makes clear that there is no DEI component to the project, there is no justification for canceling the project's funding and *you should allow it to continue*."  Dkt. No. 248-5, Ex. 5, NEH_AR_000023 (emphasis added).  In his deposition, McDonald clarified that this reflected his concern that, in some instances, the proffered ChatGPT-generated "DEI rationales" did not supply a sufficient basis for concluding that a grant implicated DEI, particularly given the limited information on which those rationales were generated.  Dkt. No. 248-3, McDonald Dep., 213:9–214:14.

For example, when shown some of the "DEI rationales" during his deposition, McDonald agreed that a ChatGPT-generated rationale evaluating a grant proposal focused on aligning humanities curricula with career outcomes for students at small and mid-sized institutions, including "underserved students," did not identify any DEI component.  *Id.*, 119:3–8, 127:16–20; Dkt. No. 248-31, Ex. 31, US-000061583.  Fox's use of ChatGPT likewise produced another rationale that identified a proposal seeking "to digitize mid-twentieth-century African-American newspapers from Los Angeles and the Bay Area and contribute them to the National Digital Newspaper Program" as "DEI" because the project "contributes to inclusivity by preserving and sharing underrepresented voices."  Dkt. No. 248-31, Ex. 31, US-000061583.  McDonald did not believe this grant – which fell comfortably within Congress's express direction that NEH support

programs and research that "reflect the diversity and richness of our American cultural heritage," including the culture of "a minority . . . community," and give "particular regard" to scholars and institutions that have "traditionally been underrepresented," 20 U.S.C. § 956(c)(4); *id.*, § 956(c) – implicated DEI either. Dkt. No. 248-3, McDonald Dep., 121:15–17.

Another proposal described a technical and scholarly initiative to "pilot a process to digitize and display flap books such that their interactive nature is preserved for users," using materials from the Wangensteen Historical Library of Biology and Medicine at the University of Minnesota. Dkt. No. 248-31, Ex. 31, US-000061583. Fox's ChatGPT-generated DEI rationale concluded, in conclusory terms, that the project "aims to address a gap in current digitization practices . . . promoting inclusivity in digitization efforts." *Id.* McDonald agreed that this rationale did not identify any DEI component or support treating the proposal as DEI-related. Dkt. No. 248-3, McDonald Dep., 123:1–8 (stating that it "mischaracterizes the grant").

Nevertheless, in the same April 1 email in which he urged that certain grants not be terminated, McDonald acknowledged, "Either way, as you've made clear, it's *your decision* on whether to discontinue funding any of the projects." Dkt. No. 248-5, Ex. 5, NEH_AR_000023 (emphasis added). In other words, the Acting Chair of NEH recognized that he had no meaningful control over the fate of the grants. The ultimate decision whether to continue or terminate funding for previously awarded grants rested, not with him or with anyone else at NEH, but with DOGE.

McDonald's plea that DOGE spare certain grants was, predictably, ignored. McDonald testified that Fox and Cavanaugh did not follow his recommendations. Dkt. No. 248-3, McDonald Dep., 214:2–6. Cavanaugh testified: "Justin and I both *rejected* [McDonald's] recommendation." Dkt. No. 276-1, Cavanaugh Dep., 181:3–9 (emphasis added). When shown McDonald's statement that "*it's your decision*," Wolfson acknowledged that the statement was "hard to reconcile" with

any suggestion that McDonald was the final decisionmaker – the position the Government has consistently taken in this litigation, despite what the record shows. Dkt. No. 276-4, Wolfson Dep., 255:1–256:16.

Contemporaneous communications from other NEH officials reflect a consistent understanding that DOGE personnel were the ultimate decisionmakers. Brett Bobley, NEH's Chief Information Officer, wrote to one grantee: "DOGE did indeed cancel your award. NEH staff, like myself, didn't realize it was happening." Dkt. No. 248-18, at 1. Christopher Thornton, NEH's Director of the Division of Research Programs, likewise wrote that fellowships had been "terminated by DOGE" and that "this was *not an agency decision*." Dkt. No. 248-19 at 1 (emphasis added).

### H. The Termination Notices

The record reflects that Fox executed the bulk of the terminations on April 2, 2025. Dkt. No. 248-22, US-000057526; *see also* Dkt. No. 248-25, Ex. 25, NEH_AR_0000136. On April 3, 2025, Fox informed McDonald that "1,208 of 1,220 grants to organizations were delivered tonight with effective terminations as of April 2, 2025." Dkt. No. 248-25, at 2.

To be sure, the final termination notices were sent out over McDonald's signature. But the record reflects that McDonald's involvement in that process was limited to permitting his name to be used. The notices themselves were drafted and sent by DOGE personnel. *See* Dkt. No. 248-1, Fox Dep., 286:2–9. Wolfson testified that the notices were "drafted by the DOGE folks or others" and sent out under McDonald's name. Dkt. No. 276-4, Wolfson Dep., 234:14–21. McDonald confirmed that the termination notices were sent by DOGE from email addresses outside of NEH's official channels. Dkt. No. 248-3, McDonald Dep., 257:12–13, 260:16–261:14, 262:8–263:2; Dkt. No. 248-1, Fox Dep., 322:8–14 ("Q: And when the notices were sent on April 1 from that [non-

NEH] account, did you send those notices? [Justin Fox's Answer]: Did I send the termination notices? Q: Yes. A: Yes.").

One version of the termination notice, dated April 1, 2025, stated:

Dear NEH Grantee,

This letter provides notice that the National Endowment for the Humanities (NEH) is terminating your federal grant (Grant Application No. [GrantExternal]) effective April 1, 2025, in accordance with the termination clause in your Grant Agreement.

Your grant no longer effectuates the agency's needs and priorities, materially fails to comply with the terms and conditions of the Grant Agreement, and is subject to termination due to several reasonable causes. For instance, the NEH has reasonable cause to terminate your grant in light of the fact that the NEH is repurposing its funding allocations in a new direction in furtherance of the President's agenda. The President's February 19, 2025 executive order mandates that the NEH eliminate all non-statutorily required activities and functions. *See Commencing the Reduction of the Federal Bureaucracy*, E.O. 14217 (Feb. 19, 2025). Your grant's immediate termination is necessary to safeguard the interests of the federal government, including its fiscal priorities. The termination of your grant represents an urgent priority for the administration, and due to exceptional circumstances, adherence to the traditional notification process is not possible. Therefore, the NEH hereby terminates your grant in its entirety effective April 1, 2025.

Please remember that your obligations under the Grant Agreement continue to apply. Additionally, an audit may be conducted by the NEH after the termination of your grant.

Please contact mcdonaldm@neh.gov with only urgent questions. We wish you well.

Sincerely,

/s/ Michael McDonald
Michael McDonald
Acting Chairman, National Endowment for the Humanities
mcdonaldm@neh.gov
400 7th Street S.W., Washington, DC 20506

Dkt. No. 248-20, at 2.  The signature appearing on these notices – "/s/ Michael McDonald" – was placed there by DOGE personnel, not by McDonald himself.  Dkt. No. 248-3, McDonald Dep.,

262:8–21 ("Q: Did you type in /s/ Michael McDonald? A: No. Q: Okay. Who typed that in? A: Presumably the people at DOGE.").

The DOGE terminations were sweeping. Approximately 1,477 grants were placed on DOGE's "to cancel" lists; only about 40 grants awarded during the Biden Administration were ultimately spared. Dkt. No. 248-14, Ex. 14, US-000061492; Dkt. No. 248-25, Ex. 25, NEH_AR_0000136. The "To Keep" list in the record consists largely of archival projects such as the Papers of George Washington, the Papers of Thomas Jefferson, the Adams Papers, and the Einstein papers. Dkt. No. 248-14, at 1–3.

The undisputed record thus establishes three facts that drive the legal analysis.

*First,* NEH historically awarded and administered grants through a statutory process centered on expert review, Council involvement, and final action by the Chairperson. And, historically, NEH terminated previously awarded grants only in the rare case involving a grantee's failure to comply with the terms or conditions of the award.

*Second,* the April 2025 terminations were not made through any comparable grant-specific process and were not based on recipient-specific findings of noncompliance of the sort contemplated by the statute and governing grant-termination regulations.

*Third,* DOGE personnel did not merely advise NEH about policy priorities. They overtook the agency's post-award administration, directed the termination process, and exercised decisive control over which grants would be terminated, using Biden-era status, DEI classifications, keyword searches, and ChatGPT-generated rationales to select grants for termination.

## II.    Procedural History

The first action by the ACLS Plaintiffs was filed on May 1, 2025, asserting claims under the APA, the First Amendment, and nonstatutory *ultra vires* theories that challenged both the mass

termination of grants and the broader alleged restructuring of NEH.  Dkt. No. 1, ¶¶ 94–99, 178–189.  The second action by the Authors Guild Plaintiffs was filed on May 12, 2025, alleging that Defendants indiscriminately terminated the vast majority of the grants through a process that bypassed statutory grantmaking requirements and targeted disfavored subject matter.  Dkt. No. 240, ¶¶ 6–8, 100–12.

By Order dated May 14, 2025, the Court consolidated the two lawsuits.  Dkt. No. 52.  Plaintiffs moved for preliminary injunctive relief, and Defendants moved to dismiss.  The Court resolved both motions in a single opinion in *American Council of Learned Societies v. McDonald*, 792 F. Supp. 3d 448 (S.D.N.Y. 2025).  That opinion narrowed the issues in the case and granted interim relief.

Specifically, the Court dismissed all claims directed at alleged "institutional dismantling" of NEH – claims based on program closures, staffing reductions, and ostensible impact on future funding of projects – on both standing and justiciability grounds.  *Am. Council of Learned Societies*, 792 F. Supp. 3d at 477–79.  The Court allowed the case to proceed only on claims tied to the termination of grants that had already been awarded: the Authors Guild Plaintiffs' APA claims, both sets of Plaintiffs' First Amendment claims, and both sets of Plaintiffs' *ultra vires* claims.

As to standing, the Court made specific findings.  It held that individual grantees whose awards were terminated suffered a concrete economic injury sufficient to confer Article III standing.  *Id.* at 476.  It further held that the Authors Guild, ACLS, AHA, and MLA satisfied associational standing requirements, because their members' claims were germane and did not require individualized participation.  *Id.* at 476–77.  It rejected standing on claims asserting broader institutional harms.  *Id.* at 477–79.

- 32 -

The Court granted the motions for preliminary injunctive relief in substantial part. It held that Plaintiffs were likely to succeed on their First Amendment claim because the Mass Termination targeted grants based on the viewpoints expressed in the funded projects and the fact that they were associated with the prior administration. *Id.* at 484–86. It also held, on the record then available (which was limited and included none of the detailed information about DOGE's role in the grant termination process or the use of ChatGPT in connection therewith), that Plaintiffs were likely to succeed on their APA claim to the extent that claim was based on that constitutional violation. *Id.* at 493. But the Court concluded that neither the Authors Guild nor the ACLS Plaintiffs had, prior to the taking of any discovery, demonstrated a likelihood of success on the merits of their claims that DOGE's actions were *ultra vires*. *Id.* at 493–94.

The Court entered a preliminary injunction staying the April 1–3 Mass Termination of grants and prohibiting the re-obligation of funds associated with those grants pending final resolution on the merits. *Id.* at 457. It applied that relief to putative class members because the challenged action operated uniformly and the merits showing did not vary across recipients. *Id.* at 497–98.

After issuing the preliminary injunction, the Court addressed litigation over the scope and content of the administrative record. The Government initially produced 27 documents as the administrative record. The Court readily concluded that this production was not the "whole record" required for review under the APA. *Authors Guild v. Nat'l Endowment for the Humanities*, 2025 WL 3678097, at *4–7 (S.D.N.Y. Dec. 18, 2025). The Court explained that APA review must proceed on "the whole record," meaning "all documents and materials directly or indirectly considered by agency decisionmakers." *Id.* at *4 (quoting *Oceana, Inc. v. Ross*, 290 F. Supp. 3d 73, 77 (D.D.C. 2018)). It further held that where the record produced did not include the materials

that actually informed the agency's decision, "supplementation is not only permissible – it is required." *Id.*

Applying those principles, the Court found that the record "contains no contemporaneous explanation of how grants were selected for termination, who applied any selection criteria, or what information was reviewed in making those determinations," and therefore the proffered administrative record did not permit meaningful judicial review. *Id.* at *6. The Court further explained that review could not proceed on a record that omitted "the contemporaneous reasoning and materials on which the agency relied," because an agency's action must be judged on the basis it invoked and may not be sustained on *post hoc* rationalizations. *Id.* at *5–6.

The Court further held that, in the absence of a record that disclosed the materials and reasoning on which the agency actually relied, it could not assess whether the agency had "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action," or instead "entirely failed to consider an important aspect of the problem," as required under *Motor Vehicle Manufacturers Association v. State Farm Mutual Automobile Insurance Co.*, 463 U.S. 29, 43 (1983). *Id.* at *4.

The Government's production was woefully incomplete. It consisted only of NEH-generated materials and did not include documents reflecting the role of other actors identified in the record, including DOGE. *Id.* at *6–7. It also contained no materials identifying the criteria used to select grants for termination, no documents reflecting who applied any such criteria, and no materials reflecting the use of keyword screening, automated processes, or generative AI tools in that process. The Court ordered supplementation of the administrative record and permitted discovery to identify and obtain materials considered by all relevant decisionmakers.

The Government thereafter produced approximately 3,700 additional documents and a privilege log. Those materials included, for the first time, documents and testimony describing the criteria and methods used to identify grants for termination, including keyword-based screening and the use of generative AI tools such as ChatGPT, as well as materials reflecting the involvement of actors outside NEH. None of those categories of information appeared in the original administrative record. The production confirmed that the original record was incomplete and that misrepresentations that it was complete had been made to the Court. Indeed, the supplemental production confirmed that the Government had not conducted a good-faith search of all relevant custodians and sources. *See id.* at *5–7.

The full record confirms that the omissions from the original production were anything but insignificant. The original record did not include the materials that actually informed the Mass Termination, including the criteria used to select grants and the methods by which those criteria were applied. Without those materials, the Court could not determine whether the agency's stated justifications reflected its actual decisionmaking.

That is the circumstance in which supplementation is required. The "reasoned explanation" requirement demands "genuine justifications for important decisions" that can be scrutinized by courts and the "interested public," and accepting incomplete or contrived explanations would "defeat the purpose of the enterprise." *Department of Commerce v. New York*, 588 U.S. 752, 785 (2019). The Court is not obliged to proceed on a record that omits the materials that actually informed the decision; to do so would reduce judicial review to the very "empty ritual" the Supreme Court has rejected. *Id.* Supplementation was therefore required, just as in *Department of Commerce*, which likewise found extra-record development warranted where the administrative record did not reflect the agency's real decisionmaking. *Id.*

After discovery concluded, Plaintiffs moved for summary judgment, supported by a Rule 56.1 statement and evidentiary submissions. During the pendency of summary judgment briefing, Plaintiffs amended their pleadings. The ACLS Plaintiffs added a claim under the Equal Protection component of the Fifth Amendment, Dkt. No. 230, ¶ 207, and the Authors Guild Plaintiffs' amended complaint alleged that Defendants identified grants for termination using criteria tied to race, gender, and subject matter, including keyword searches and automated AI tools, and similarly asserted Equal Protection claims on that basis. Dkt. No. 240, ¶¶ 100–12, 174–75.

Defendants opposed the motions for summary judgment and cross-moved for summary judgment dismissing the case. The motions are now fully submitted. The record includes materials that were considered by the relevant agency decisionmakers, directly or indirectly. *Oceana*, 290 F. Supp. 3d at 77; *see also Nat. Res. Def. Council, Inc. v. Train*, 519 F.2d 287, 291 (D.C. Cir. 1975).

### III.    Legal Standards

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law," and a dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Conversely, "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation omitted).

The moving party bears the initial burden of demonstrating the absence of a genuine dispute of material fact by "citing to particular parts of materials in the record," including

depositions, documents, and affidavits.  Fed. R. Civ. P. 56(c)(1)(A).  Once that burden is met, the nonmoving party "must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment."  *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)).  If the nonmoving party's evidence "is merely colorable, or is not significantly probative, summary judgment may be granted."  *Anderson,* 477 U.S. at 249–50 (internal citations omitted).

In evaluating a motion for summary judgment, the Court's role is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  *Id.* at 249.  The Court must construe the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor.  *Matsushita*, 475 U.S. at 599.

Where, as here, the parties have filed cross-motions for summary judgment, the same standard applies.  *Morales v. Quintel Ent., Inc.*, 249 F.3d 115, 121 (2d Cir. 2001).  The filing of cross-motions does not itself require the Court to enter judgment for either side.  *Heublein, Inc. v. United States*, 996 F.2d 1455, 1461 (2d Cir. 1993).  Rather, "each party's motion must be examined on its own merits," and in each instance "all reasonable inferences must be drawn against the party whose motion is under consideration."  *Morales*, 249 F.3d at 121.

## IV.    Discussion

This case presents a threshold question of jurisdiction and, if jurisdiction lies, a set of merits questions concerning the lawfulness of the Government's mass termination of the previously awarded grants.  The Court begins by rejecting Defendants' contention that the Tucker Act deprives it of subject-matter jurisdiction.

### A.  The Tucker Act Does Not Deprive This Court of Jurisdiction Over Plaintiffs' Constitutional and *Ultra Vires* Claims

Before reaching the merits, the Court must address Defendants' threshold contention that this action falls outside its jurisdiction.  That argument implicates two related but distinct principles: sovereign immunity and the allocation of jurisdiction between the district courts and the Court of Federal Claims.

The United States and its agencies are "immune from suit in federal court absent a clear and unequivocal waiver of sovereign immunity." *Crowley Gov't Servs., Inc. v. Gen. Servs. Admin.*, 38 F.4th 1099, 1105 (D.C. Cir. 2022).  But that principle is not absolute.  Under the *Larson–Dugan* exception, "suits for specific relief against officers of the sovereign" allegedly acting "beyond statutory authority or unconstitutionally" are not barred by sovereign immunity.  *Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682, 689, 693 (1949); *see Dugan v. Rank*, 372 U.S. 609, 621–22 (1963).  The logic of the exception is based on the understanding that *ultra vires* action by a federal officer "is beyond the officer's powers and is, therefore, not the conduct of the sovereign." *Larson*, 337 U.S. at 690.

Defendants do not seriously dispute that Plaintiffs' claims – constitutional and *ultra vires* challenges – fall within that exception.  Instead, they contend that a separate statute, the Tucker Act, divests this Court of jurisdiction, notwithstanding the availability of that waiver.  The Tucker Act provides that the United States Court of Federal Claims "shall have jurisdiction to render judgment upon any claim against the United States founded . . . upon any express or implied contract with the United States."  28 U.S.C. § 1491(a)(1).  For such claims – particularly those seeking more than $10,000 in damages – that jurisdiction is exclusive and may "impliedly forbid" parallel suits in district court.  *Crowley*, 38 F.4th at 1106 (citing *Perry Cap. LLC v. Mnuchin*, 864 F.3d 591, 618 (D.C. Cir. 2017)).

From that premise, Defendants take a further step. They argue that, because this case arises from the termination of federal grants, it is in substance a contract dispute and therefore belongs in the Court of Federal Claims. They urge that the relief Plaintiffs seek would effectively require the Government to satisfy an obligation to pay money under those grants, bringing the case within the Tucker Act's exclusive domain.

That contention does not withstand scrutiny.

The Court applies the "longstanding test for determining whether a claim falls within the exclusive jurisdiction of the Claims Court pursuant to the Tucker Act," articulated by the D.C. Circuit in *Megapulse, Inc. v. Lewis*, 672 F.2d 959 (D.C. Cir. 1982). *Crowley*, 38 F.4th at 1106. *Megapulse* rejected the proposition that "any case requiring some reference to or incorporation of a contract is necessarily on the contract and therefore directly within the Tucker Act." 672 F.2d at 967–68. Instead, the inquiry turns on two considerations: (i) "the source of the rights upon which the plaintiff bases its claims," and (ii) "the type of relief sought." *Id.* at 968; *Atterbury v. U.S. Marshals Serv.*, 805 F.3d 398, 406 (2d Cir. 2015). Both considerations must point toward a contract-based claim before the Tucker Act divests a district court of jurisdiction.

Put simply, the Court of Federal Claims has exclusive jurisdiction of an action pursuant to the Tucker Act only if a plaintiff's "asserted right is based in contract" *and* "seeks 'in essence' more than $10,000 in monetary relief from the federal government." *Crowley*, 38 F.4th at 1113. The *Megapulse* test is conjunctive and both conditions must be met. *See id.* Applied here, neither condition is satisfied. Plaintiffs' claims arise from the Constitution, not from any grant agreement, and the relief they seek is equitable, not compensatory.

### 1.    Source of Rights Asserted

"The Tucker Act, of course, is itself only a jurisdictional statute; it does not create any substantive right enforceable against the United States for money damages." *United States v. Testan*, 424 U.S. 392, 398 (1976).  For that reason, the first *Megapulse* factor requires the Court to identify "the source of the rights upon which plaintiff bases its claims."  672 F.2d at 968.

Writing for the D.C. Circuit, Judge Robert Bork explained that the Tucker Act does not displace district court jurisdiction unless the plaintiff's claims themselves fall within its scope – that is, unless they are properly understood as claims founded upon an "express or implied contract" with the United States.  *Maryland Dep't of Hum. Res. v. Dep't of Health & Hum. Servs.*, 763 F.2d 1441, 1449 (D.C. Cir. 1985).  Where, by contrast, "a plaintiff's substantive claim—apart from the type of relief the complaint seeks—is [not] a claim over which Tucker Act jurisdiction could be invoked," there is "no possibility that the preclusive effects of the Tucker Act . . . can come into play."  *Id.*

The Tucker Act does not sweep in claims merely because they arise in the context of a contractual relationship; the question is whether the rights asserted themselves sound in contract. *Transohio Sav. Bank v. Dir., Off. of Thrift Supervision*, 967 F.2d 598, 610 (D.C. Cir. 1992), *abrogated on other grounds as recognized in Perry Cap. LLC v. Mnuchin*, 864 F.3d 591, 620 (D.C. Cir. 2017) ("[L]itigants may bring statutory and constitutional claims in federal district court even when the claims depend on the existence and terms of a contract with the government.").  Courts must therefore avoid giving "an overly expansive scope to the notion of claims 'founded upon' a contract," particularly where a plaintiff invokes independent statutory or constitutional constraints on government action.  *Id.* at 611.  And where a plaintiff relies on such independent constitutional constraints, the claims rest on "truly independent legal grounds," even if a contractual relationship forms part of the factual background.  *Crowley Gov't Servs., Inc. v. Gen. Servs. Admin.*, 38 F.4th

1099, 1107 (D.C. Cir. 2022) (quoting *Megapulse*, 672 F.2d at 970).  The Court must "make rational distinctions between actions sounding genuinely in contract and those based on truly independent legal grounds."  *Megapulse*, 672 F.2d at 969–70.

Applying these principles, Plaintiffs' claims are not contractual in any meaningful sense.  They do not arise from any alleged entitlement to payment under the grant agreements.  Plaintiffs do not allege breach of contract, do not seek specific performance according to any contractual provision, and do not ask the Court to interpret the terms of any grant.  Instead, they challenge the legality of the Government's conduct – specifically, the asserted authority to select and terminate grants based on viewpoint and protected characteristics.  The suit only seeks redress for constitutional violations and *ultra vires* government action, not enforcement of any contractual obligation.

The complaints plead those theories with specificity.  *Greenhill v. Spellings*, 482 F.3d 569, 573 (D.C. Cir. 2007) ("Jurisdiction is determined by looking to the complaint.").  The ACLS Plaintiffs allege that Defendants – acting through the United States DOGE Service – "used AI searches focused on race, sex, immigration status, and other characteristics to identify grants that must be terminated," and then terminated those grants *en masse*.  Dkt. No. 230, Compl., ¶ 5.  They further allege that those actions "violate[] the constitutional separation-of-powers," *id.*, ¶ 7, and that DOGE "has no lawful authority to carry out the work of another agency, let alone to dismantle it."  *Id.*, ¶ 9.

The Authors Guild Plaintiffs advance parallel claims grounded in the same alleged course of conduct.  They assert that Defendants implemented a "blanket campaign to cancel most or all NEH grants," terminating more than 1,400 awards through standardized notices.  Dkt. No. 240, Compl., ¶ 6.  They further allege that the terminations violated the First Amendment because the

Government "disfavors the grantees' speech based on its assessment of that speech's content and viewpoint," *id.*, ¶ 7, and violated the equal protection component of the Fifth Amendment by selecting grants for termination based on protected characteristics. *Id.*

The causes of action pleaded in the complaints confirm that these claims arise on non-contractual grounds. In the ACLS Plaintiffs' complaint, Plaintiffs assert, among other claims, a First Amendment claim (Count VIII) and an *ultra vires* claim (Count IX), alleging that Defendants acted without statutory authority and in violation of constitutional limits. *See* Dkt. No. 230, ¶¶ 189–200. The Authors Guild Plaintiffs likewise assert a First Amendment claim (Count V) and an *ultra vires* claim (Count VI), each challenging the *legality* of Defendants' conduct rather than any contractual entitlement. *See* Dkt. No. 240, ¶¶ 189–201. As narrowed by this Court's prior ruling on Defendants' motion to dismiss, the claims that remain operative, and inform the Tucker Act analysis, are the ACLS Plaintiffs' First Amendment (Count VIII) and *ultra vires* (Count IX) claims, and the Authors Guild Plaintiffs' First Amendment (Count V) and *ultra vires* (Count VI) claims. None of these claims seeks to enforce a contractual right to payment; each instead challenges the *legality* of Defendants' actions under the Constitution and the National Foundation on the Arts and the Humanities Act, 20 U.S.C. §§ 951 *et seq.*, which defines both the scope of the agency's authority and the limits on the exercise of that authority.

In short, Plaintiffs do not seek to vindicate their contractual rights at all; they allege that Defendants exceeded constitutional and statutory limits on federal power. *See Megapulse*, 672 F.2d at 969 (stating that the Tucker Act "does not necessarily apply where the government defendants are charged with having acted beyond the scope of their statutory authority"). The fact that this case rests on the First Amendment, equal protection principles, and statutory limits on agency authority constitutes "truly independent legal grounds" supporting the exercise of

- 42 -

jurisdiction by this Court. *Crowley*, 38 F.4th at 1107 (quoting *Megapulse*, 672 F.2d at 969–70); *Washington v. United States Dep't of Educ.*, 161 F.4th 1136, 1140 (9th Cir. 2025); *Khalil v. The Trustees of Columbia University in the City of New York*, 2026 WL 775813, at *10–11 (S.D.N.Y. Mar. 19, 2026); *Am. Acad. of Pediatrics v. U.S. Dep't of Health & Hum. Servs.*, 2026 WL 80796, at *11 (D.D.C. Jan. 11, 2026).

Because both conditions must be met, this conclusion alone defeats the Government's Tucker Act argument. *See Crowley*, 38 F.4th at 1113.

### 2.        Nature of the Relief Sought

The second *Megapulse* factor examines "the type of relief sought." 672 F.2d at 968. This inquiry asks whether Plaintiffs seek "money damages" – the hallmark of Tucker Act jurisdiction – or instead seek specific equitable relief directed at allegedly unlawful government action. Plaintiffs may not "disguise[] a money claim as a claim requesting a form of equitable relief." *Kidwell v. Dep't of Army, Bd. for Correction of Mil. Recs.*, 56 F.3d 279, 284 (D.C. Cir. 1995) (internal quotation marks omitted).

The Supreme Court's decision in *Bowen v. Massachusetts*, 487 U.S. 879 (1988) is instructive. There, the Commonwealth of Massachusetts sought review of a federal agency's disallowance of Medicaid reimbursements, challenging the Secretary's determination that certain expenditures were not reimbursable under federal law. *Id.* at 887. The State asked the district court to "set aside" that determination. *Id.* at 887–88. The Court held that such a suit is not one for "money damages," even if prevailing on the merits will lead to the release of funds. *Id.* at 893–95. The State sought not "money in compensation for the losses" caused by the Government's conduct, but "to enforce the statutory mandate itself, which happens to be one for the payment of money." *Id.* at 900–01. The Court emphasized that the district court's judgment "did not order

that [any] amount . . . be paid," and that any reimbursement was "a mere by-product of that court's primary function of reviewing the Secretary's interpretation of federal law." *Id.* at 909–10.

Thus, the Court drew a clear line between compensatory relief and relief that sets aside unlawful action with financial consequences. "The fact that a judicial remedy may require one party to pay money to another is not a sufficient reason to characterize the relief as 'money damages.'" *Bowen*, 487 U.S. at 893. That same reasoning governs here. Plaintiffs do not seek a judgment awarding money past due under their grant agreements. They seek to invalidate the Government's decision to terminate their grants and to enjoin further action taken on allegedly unlawful grounds. Any downstream financial consequences follow from the legal effect of that determination, not from an award of compensatory damages.

Consistent with this distinction, the possibility that funds may ultimately have to be disbursed to Plaintiffs if they prevail does not control the jurisdictional analysis. *See Katz v. Cisneros*, 16 F.3d 1204, 1208 (Fed. Cir. 1994) ("That a payment of money may flow from a decision that [an agency] has erroneously interpreted or applied its regulation does not change the nature of the case."). As the Supreme Court has explained elsewhere, "not every claim invoking the Constitution . . . is cognizable under the Tucker Act," because the asserted right "must be one for money damages against the United States." *United States v. Mitchell*, 463 U.S. 206, 216 (1983) (citation omitted). Here, a judgment for Plaintiffs would set aside allegedly unconstitutional government action; it would not itself award compensatory damages or require payment of sums presently due. *Cf. Nat'l Institutes of Health v. Am. Pub. Health Ass'n*, 145 S. Ct. 2658, 2673 (2025) ("[A] mere 'by-product' of APA review does not send a case to the Court of Federal Claims." (Jackson, J., concurring)).

And the Supreme Court's emergency-docket decision in *Department of State v. AIDS Vaccine Advocacy Coalition*, 145 S. Ct. 753, 755–56 (2025) does not suggest otherwise. There, and unlike here, the district court had ordered the Government to "pay all invoices and letter of credit drawdown requests" for completed work – relief requiring the immediate disbursement of funds. Addressing that posture, Justice Alito recognized the critical limiting principle applicable in this case: "after a court sets aside an agency action, a natural consequence may be the release of funds to the plaintiff down the road." *Id.* at 756. That observation reinforces the same distinction drawn in *Bowen*: relief that directly compels the payment of money falls within the Tucker Act, but relief that merely sets aside unlawful agency action – while it may have downstream financial consequences – does not. Here, Plaintiffs seek only the latter. *Compare Sustainability Inst. v. Trump*, 165 F.4th 817, 828–29 (4th Cir. 2026) (concluding that the district court lacked jurisdiction to adjudicate plaintiff's APA claims because it had "directed the Government to restore Plaintiffs' access to their grant funds immediately" (citation modified)), *with Widakuswara v. Lake*, 2025 WL 1288817, at *10–13 (D.C. Cir. May 3, 2025) (Pillard, J., dissenting) (criticizing the majority's "restrictive" interpretation of the district court's jurisdiction over plaintiff's constitutional and *ultra vires* claims, particularly when plaintiffs did not seek monetary damages and concluding that "The fact that a judicial remedy may require one party to pay money to another is not a sufficient reason to characterize the relief as 'money damages'" (citing *Bowen*, 487 U.S. at 893)), *on reconsideration en banc*, 2025 WL 1521355, at *1 (D.C. Cir. May 28, 2025) (vacating the panel majority's grant of the government's motion for a stay pending appeal for "substantially . . . the reasons explained by Judge Pillard" in her dissenting opinion).

This Court has jurisdiction to grant the purely equitable relief Plaintiffs seek. *See also Council for Opportunity in Educ. v. U.S. Dep't of Educ.*, 2026 WL 120984, at *7 (D.D.C. Jan. 16,

2026). To the extent any additional relief would require the Government to disburse funds in a manner that amounts to enforcing a payment obligation, the Tucker Act might well require a separate suit in the Court of Federal Claims rather than this Court. But that possibility does not defeat this Court's jurisdiction over the constitutional and *ultra vires* claims properly before it.

The Supreme Court recognizes that litigation against the United States may need to be resolved in multiple forums, depending on the nature of the right asserted and the particular type of relief sought. *See United States v. Tohono O'Odham Nation*, 563 U.S. 307, 314 (2011). *Tohono* interpreted 28 U.S.C. § 1500, which bars the Court of Federal Claims from exercising jurisdiction over a claim when the plaintiff has another suit pending "for or in respect to" the same claim. *Id.* at 311–12. In that context, two suits are the same "claim" when they are based on "substantially the same operative facts," even if they seek different forms of relief. *Id.* at 317. Applying that rule, the Court held that the Court of Federal Claims lacked jurisdiction over the plaintiff's suit while a factually overlapping action remained pending in federal district court.

The Supreme Court in *Tohono* was clear-eyed about the practical consequence of its holding: plaintiffs may be required "to choose between partial remedies available in different courts." *Id.* at 316; *see also id.* at 323 (recognizing that "The jurisdictional scheme governing actions against the United States often requires other plaintiffs to file two actions in different courts to obtain complete relief in connection with one set of facts." (Sotomayor, J., concurring)). Assuming, as Defendants contend, that Plaintiffs' constitutional challenges to the mass termination of grants arise from the same underlying conduct that could support claims for monetary relief in the Court of Federal Claims, that factual overlap, at most, means that Plaintiffs may have to pursue distinct claims in different forums and decide which claims they seek to pursue first.

Plaintiffs here have already made that choice. They have asserted their constitutional claims, not contract claims, in this Court. The Court must respect that selection. As Justice Barrett observed in her controlling concurrence in *National Institutes of Health v. American Public Health Association*, "the statutory scheme puts plaintiffs to precisely this choice." 145 S. Ct. 2658, 2662 (2025) (citing *Tohono*, 563 U.S. at 316–17). If the Government is dissatisfied with that arrangement, it is "free to direct [its] complaints to Congress." *Tohono*, 563 U.S. at 317. But far from undermining jurisdiction here, that congressionally mandated choice confirms that this Court is the proper forum for the particular equitable relief Plaintiffs have chosen to pursue here. *See California*, 604 U.S. at 651.

Moreover, the Government's position – that all claims arising from the challenged grant terminations must be brought, if at all, in the Court of Federal Claims – would raise a "serious constitutional question" identified by the Supreme Court in *Webster v. Doe*, 486 U.S. 592 (1988). There, the Supreme Court held that any intent by Congress to preclude judicial review of constitutional claims, its "intent to do so must be clear," in part to avoid the "serious constitutional question" that would arise if a statute were construed to deny "any judicial forum for a colorable constitutional claim." *Id.* at 603. Adopting the Government's reading of the Tucker Act would have exactly that effect.

Unlike the district courts, the Court of Federal Claims "has no general power to provide equitable relief against the Government or its officers." *Tohono*, 563 U.S. at 313; *see also Bowen*, 487 U.S. at 905 ("[T]he Court of Claims has no power to grant equitable relief."). Throughout its entire history, "the only judgments which the Court of Claims [has been] authorized to render against the government . . . are judgments for money found due from the government to the petitioner." *United States v. Alire*, 73 U.S. 573, 575 (1867). The Court of Federal Claims lacks

- 47 -

jurisdiction over constitutional claims under the First Amendment, the Equal Protection Clause of the Fourteenth Amendment, and the Due Process Clauses of the Fifth and Fourteenth Amendments. *See LeBlanc v. United States*, 50 F.3d 1025, 1028 (Fed. Cir. 1995); *United States v. Connolly*, 716 F.2d 882, 887 (Fed. Cir. 1983). So if Plaintiffs cannot obtain equitable relief in the Court of Federal Claims – and if we accept, as the Government contends, not in this Court either – where could they?

The Supreme Court has rejected the jurisdictional limbo the Government's position would create. In *United States v. King*, 395 U.S. 1, 1–2 (1969), a retired Army officer sought to recover money from the Government on the theory that he had been improperly classified for retirement purposes. But the Court explained that his claim could not be heard in the Court of Claims because it depended on first establishing that the Government's underlying decision was unlawful. As the Court put it, the plaintiff's "claim is not limited to actual, presently due money damages from the United States." *King*, 395 U.S. at 3. Instead, "Before he is entitled to such a judgment he must establish in some court that his retirement by the Secretary of the Army for longevity was legally wrong and that he is entitled to a declaration of his right to have his military records changed to show that he was retired for disability." *Id.* That relief, the Court held, "is essentially equitable of a kind that the Court of Claims has held throughout its history . . . that it does not have the power to grant." *Id.* As then-Judge Scalia explained for the D.C. Circuit, suits seeking "only equitable relief from allegedly unlawful" government action – rather than money damages – have historically proceeded in the district courts, not the Court of Federal Claims. *Sharp v. Weinberger*, 798 F.2d 1521, 1523 (D.C. Cir. 1986).

The same rule applies here. In this Court, Plaintiffs do not seek payment of the money that they claim is presently due under their grant agreements. Rather, they challenge the *legality* of the

Government's decision to terminate their grants.  As in *King*, any potential monetary consequences are contingent on first establishing that the Government's underlying conduct was unlawful.  The relief Plaintiffs seek thus has "'considerable value' independent of . . . any monetary recovery [Plaintiffs] may ultimately attain in other proceedings."  *Crowley*, 38 F.4th at 1102, 1107–08 (quoting *Kidwell*, 56 F.3d at 284).  The threshold determination of whether Defendants acted in violation of the Constitution or without statutory authority is not "money-mandating" and is "essentially equitable" in nature.  *King*, 395 U.S. at 2.  Plaintiffs' constitutional and statutory claims lie beyond the jurisdiction of the Court of Federal Claims.

Channeling Plaintiffs' claims to that court would therefore repeat the very problem identified in *King*.  It would require a plaintiff to seek relief in a forum that lacks authority to decide the predicate legal question on which any entitlement to money ultimately depends. Construing the Tucker Act to require dismissal of Plaintiffs' constitutional claims – where the Court of Federal Claims lacks jurisdiction over non-money-mandating constitutional claims and cannot grant the predicate equitable relief necessary to establish any entitlement to payment – would preclude judicial review of constitutional claims entirely.  Such a result would effectively foreclose any forum capable of adjudicating Plaintiffs' constitutional claims and thus implicates the "serious constitutional question" identified by the Supreme Court in *Webster v. Doe*, 486 U.S. 592, 603 (1988).  Under *Webster*, such a construction may not be adopted absent a clear statement from Congress.  486 U.S. at 603; *see also Correctional Services Corp. v. Malesko*, 534 U.S. 61, 74 (2001) (stating that equitable relief "has long been recognized as the proper means for preventing entities from acting unconstitutionally").  Nothing in the Tucker Act reflects the clear congressional command required to justify such a reading.  Instead, constitutional challenges enjoy a strong presumption of reviewability.  *See, e.g.*, *Bell v. Hood*, 327 U.S. 678, 684 (1946) ("[I]t is

established practice for this Court to sustain the jurisdiction of federal courts to issue injunctions to protect rights safeguarded by the Constitution").

In sum, the Tucker Act has nothing to do with this case. Plaintiffs' claims rest on "truly independent legal grounds," not on any contractual entitlement to money damages. *See Megapulse*, 672 F.2d at 970. Because the source of the rights asserted is constitutional and statutory – not contractual – the Government cannot satisfy either of the two *Megapulse* factors.

> 3.    The Supreme Court's Recent Emergency Orders Do Not Displace Settled Jurisdictional Principles

The Government relies principally on two Supreme Court orders issued on its emergency docket – *Department of Education v. California*, 604 U.S. 650 (2025), and *National Institutes of Health v. American Public Health Association*, 145 S. Ct. 2658 (2025). Those decisions warrant careful consideration. Properly understood, however, they do not control the jurisdictional question presented here.

In *California*, the district court – proceeding under the Administrative Procedure Act ("APA") – entered relief that not only enjoined grant terminations but also required the Government to "pay out past-due grant obligations and to continue paying obligations as they accrue." *See* 604 U.S. at 650–51. The Supreme Court stayed that order, explaining that the APA's waiver of sovereign immunity does not extend to claims seeking to enforce "a contractual obligation to pay money." 604 U.S. at 651 (citing 28 U.S.C. § 1491(a)(1)). The Court acknowledged that "a district court's jurisdiction 'is not barred by the possibility' that an order setting aside an agency's action may result in the disbursement of funds." *Id.* (quoting *Bowen*, 487 U.S. at 910). The decision thus reflects a majority disposition addressing a specific and narrow question: whether an APA-based order that directly compels the Government to satisfy asserted payment obligations may proceed in district court. It does not purport to resolve – much less

- 50 -

foreclose – jurisdiction over the claims presented here, which arise under the Constitution and seek only declaratory and injunctive relief invalidating unlawful executive action, rather than an order requiring the Government to pay a sum certain.

*National Institutes of Health v. American Public Health Association* arose in a related but materially more complex posture. The Court granted a stay in part and denied it in part – staying the district court's order setting aside the Government's decision to terminate certain grants while leaving undisturbed the order setting aside the internal agency guidance used in making those determinations. 145 S. Ct. at 2659, 2661 (Barrett, J., concurring). The Court divided 4–1–4 on whether to stay each component of the district court's relief. Although a majority formed as to the disposition of each component, no single rationale commanded a majority. Justice Barrett provided the controlling vote, staying the relief as to the grant terminations themselves but declining to disturb the relief as to the agency guidance. *Id.* at 2661.

Justice Barrett concluded that the district court likely lacked jurisdiction over the challenges to the grant terminations, but likely possessed jurisdiction over the APA challenge to the agency guidance. *Id.* at 2661–62 (Barrett, J., concurring). In doing so, she emphasized that "[t]he claims are legally distinct," that courts must attend to the legal character of each claim, and that plaintiffs may be required to "choose between partial remedies available in different courts," proceeding "sequentially rather than simultaneously" where necessary. *Id.* (citing *Tohono*, 563 U.S. at 316–17).

A separate opinion by the Chief Justice, joined by Justices Sotomayor, Kagan, and Jackson, would have denied the application in full. In their view, "if the District Court had jurisdiction to vacate the directives, it also had jurisdiction to vacate the 'Resulting Grant Terminations,'" and is "not 'required . . . to split [the case] into two parts.'" *NIH*, 145 S. Ct. at 2662–63 (Roberts, C.J.,

concurring in part and dissenting in part) (citing *Bowen*, 487 U.S. at 911). That disagreement reflects an unresolved question about the proper forum and scope of relief for challenges to grant terminations and related agency action, and further underscores that no single rationale commanded a majority of the Court to guide lower courts on this issue.

Justice Gorsuch, joined by Justice Kavanaugh, concurred in the judgment in part and dissented in part, emphasizing that lower courts must adhere to the Supreme Court's precedents and criticizing what he viewed as the failure of lower courts to respect principles of "vertical *stare decisis*" following *California*. *Id.* at 2663–65 (Gorsuch, J.). This Court certainly agrees with that premise. Lower courts are not free to disregard controlling Supreme Court decisions, even if only interim and on an emergency basis. But lower courts must follow what the Supreme Court has actually held – not extend emergency interim orders beyond their facts. *Trump v. Boyle*, 145 S. Ct. 2653, 2654 (2025) ("Although our interim orders are not conclusive as to the merits, they inform how a court should exercise its equitable discretion *in like cases*." (emphasis added)).

Justice Jackson's dissent in *NIH* emphasized that the case arose under the APA and that monetary consequences may arise as a "by-product" of setting aside unlawful agency action without converting the claim into one for money damages. *Id.* at 2673. That observation aligns with the principle articulated in *Bowen* and reinforces the distinction between relief that compels payment and relief that merely invalidates unlawful action.

Taken together, these various opinions confirm that *NIH* does not establish a single, controlling rationale in support of the sweeping jurisdictional rule the Government advances. Under *Marks v. United States*, 430 U.S. 188, 193 (1977), "when a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, 'the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on

the narrowest grounds.'"  Here, the narrowest grounds are those articulated by Justice Barrett, which turn on the distinct legal character of different claims – not on any rule requiring all disputes arising from grant terminations to be brought in the Court of Federal Claims.  *Accord Council for Opportunity in Educ.*, 2026 WL 120984, at \*7 (D.D.C. Jan. 16, 2026) ("[T]he Court did not go so far as to suggest that the Tucker Act precludes federal district court jurisdiction over all claims relating to grant terminations.").

What is more, Justice Barrett's analysis appears to presuppose the continued availability of district courts to hear non-contractual claims.  *NIH*, 145 S. Ct. at 2662 (recognizing that "[t]wo-track litigation results from '[t]he jurisdictional scheme governing actions against the United States,' which 'often requires . . . plaintiffs to file two actions in different courts to obtain complete relief in connection with one set of facts." (citing *Tohono*, 563 U.S. at 323)).  That reasoning supports the exercise of jurisdiction here, because Plaintiffs assert constitutional and *ultra vires* claims arising from independent constitutional constraints on governmental action – not from any asserted entitlement to payment under a contract.  Grantees seeking to enforce contractual rights to payment must proceed in the Court of Federal Claims, while parties asserting non-contractual constitutional claims that are not cognizable there must proceed in district courts.  "Each forum has the authority to fully adjudicate the claims over which it has jurisdiction."  *Id.* at 2662 n.1 (Barrett, J.).

Recent district court decisions addressing materially similar grant-termination challenges confirm that such claims do not fall within the Tucker Act's exclusive domain.  In *American Bar Association v. U.S. Department of Justice*, 783 F. Supp. 3d 236, 239–40 (D.D.C. 2025), a First Amendment retaliation challenge to the termination of federal grants, the court held that the Tucker Act did not divest jurisdiction because the claim "springs from the First Amendment to the

Constitution, not the relevant grant agreements." Likewise, in *City of Saint Paul, Minnesota v. Wright*, 2026 WL 88193, at 3 (D.D.C. Jan. 12, 2026) (quoting *Transohio*, 967 F.2d at 610), a constitutional challenge to federal grant terminations from the United States Department of Energy, the court reaffirmed that "litigants may bring statutory and constitutional claims for specific relief in federal district court," even where "the claims depend on the existence and terms of a contract" and even where "the relief sought is an order forcing the government to obey the terms of a contract." The court further emphasized that "[t]he fact that a favorable outcome might require the payment of money is no impediment to jurisdiction." *Id.* (citation omitted).

In *Southern Education Foundation v. United States Department of Education*, 784 F. Supp. 3d 50, 64 (D.D.C. 2025), a constitutional and statutory challenge to the termination of a federal grant brought by a nonprofit advancing fair education policies for students from low-income families in the South, the court likewise exercised jurisdiction and rejected the government's argument that the suit belonged in the Court of Federal Claims because plaintiff only sought "equitable relief vindicating its rights under federal statutes and the Constitution." And, finally, in *Vera Institute of Justice v. U.S. Department of Justice*, 805 F. Supp. 3d 12 (D.D.C. 2025), a challenge to the Department of Justice's Office of Justice Programs' mass termination of more than 370 multi-year grants and cooperative agreements totaling over $820 million, the court squarely rejected the contention that such claims sound in contract for purposes of the Tucker Act. The plaintiffs – nonprofit organizations whose grants funded, among other things, community violence prevention, anti-trafficking initiatives, and public safety programs – asserted constitutional and *ultra vires* claims and sought declaratory and injunctive relief restoring their awards. Applying *Megapulse*, the court held that where "the source of the rights upon which the plaintiff bases its claims" is constitutional or statutory, such claims "belong in federal district

court," even when they arise in the context of government grants. *Vera Inst. of Just.*, 805 F. Supp. at 24–25 (quoting *Megapulse*, 672 F.2d at 968).

These decisions confirm that claims such as those presented here – grounded in the Constitution and in limits on statutory authority – remain within the jurisdiction of the district courts even when they arise in the context of federal grant agreements. *See also Pacito v. Trump*, 169 F.4th 895, 929 (9th Cir. 2026) (holding that district court properly exercised jurisdiction where, "[u]nlike the grantees in *Department of Education* and [*NIH*], Plaintiffs do not seek backpay of funds or a guarantee of continued funding").

Finally, the emergency stay posture of *California* and *NIH* bears emphasis. Both decisions were rendered on applications for emergency relief, without full merits briefing or argument. As Justice Kagan observed in *California*, such orders are issued with "barebones briefing, no argument, and scarce time for reflection." 604 U.S. at 653 (Kagan, J., dissenting). This Court accords those orders the appropriate degree of respect. But, at the same time, lower courts are not tasked with divining the Supreme Court's unstated intentions about how each of the Justices might rule in the future. To read *NIH* and *California* as silently displacing *Bowen* and *Megapulse* would require the Court to conclude that the Supreme Court has overruled longstanding precedent *sub silentio* – an inference this Court declines to draw, especially in light of the fractured emergency (and interim) order in *NIH* and the unresolved questions it leaves regarding the proper forum and scope of relief for challenges to grant terminations. *See Shalala v. Ill. Council on Long Term Care, Inc.*, 529 U.S. 1, 18 (2000) ("The Court does not normally overturn, or so dramatically limit, earlier authority *sub silentio*.").

In fact, the Supreme Court has instructed lower courts to do precisely the opposite: "If a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in

- 55 -

some other line of decisions," lower courts must "follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions." *Rodriguez de Quijas v. Shearson/Am. Exp., Inc.*, 490 U.S. 477, 484 (1989). Consistent with that command, this Court looks first to the governing principles set forth in the Supreme Court's decision in *Bowen v. Massachusetts*, 487 U.S. 879 (1988) – and then to the settled body of subsequent authority applying those principles, including *Megapulse* and *Crowley*. Speculation about potential shifts on this otherwise well-settled jurisdictional question is not a substitute for longstanding precedent, and this Court will not treat it as one. *See Urb. Sustainability Directors Network v. United States Dep't of Agric.*, 2025 WL 2374528, at *14 (D.D.C. Aug. 14, 2025) (recognizing the "paucity of clear reasoning" to apply from *California*).

The Supreme Court expressed incredulity nearly four decades ago "that Congress intended judicial review of these complex questions of [constitutional law] to be reviewed in a specialized forum such as the Court of Claims." *Bowen*, 487 U.S. at 908. That observation remains as true today as when it was written.

*     *     *

In sum, the Government's reliance on *California* and *NIH* rests on a category error – they conflate claims seeking to compel the Government to satisfy alleged payment obligations under federal grant agreements with claims challenging the legality of executive action under the Constitution. As explained above, *see* Section IV(A)(1)–(2), Plaintiffs' claims arise from independent constitutional limits on governmental authority, not from any contractual entitlement, and the relief they seek is equitable in nature rather than compensatory. Neither the source of the right nor the nature of the relief brings this action within the Tucker Act.

Absent a clear command to the contrary, this Court must exercise the jurisdiction Congress has conferred. Federal courts have "a 'virtually unflagging obligation' to exercise the jurisdiction given them." *McCarthy v. Madigan*, 503 U.S. 140, 146 (1992) (citation omitted).

Because Plaintiffs ultimately prevail on their constitutional and *ultra vires* claims, and because the same equitable relief is available on those claims, the Court does not reach the issue of whether any claim under the Administrative Procedure Act could be adjudicated by this Court after *Department of Education v. California*, 604 U.S. 650 (2025), and *National Institutes of Health v. American Public Health Association*, 145 S. Ct. 2658 (2025). The Authors Guild Plaintiffs acknowledge that "the cases the Government cites appear to foreclose this Court's jurisdiction over their APA claims," while "expressly preserv[ing] this issue for appeal or in the event there is an intervening change of law." Dkt. No. 283, Pls.' Mem. L. Opp'n to Defs.' Cross-Mot. for Summ. J., at 11 n.1. Given that no additional relief would turn on resolution of Plaintiffs' APA claims, the Court will await a Supreme Court decision on the merits before deciding them.

### B. The Mass Termination Was *Ultra Vires*

#### 1.    Nonstatutory *Ultra Vires* Review

"Literally translated, the Latin phrase '*ultra vires*' means 'beyond the powers (of),' and as a legal term, the phrase means 'unauthorized' or 'beyond the scope of power allowed or granted by law.'" *Adamski v. McHugh*, 304 F. Supp. 3d 227, 236 (D.D.C. 2015) (citation modified) (quoting *Black's Law Dictionary* 1755 (10th ed. 2014)). Federal courts have long exercised equitable authority to restrain executive action that exceeds the scope of statutory limits. The Supreme Court has explained that the principle that the conduct of officials of the Executive Branch is subject to judicial review is well established, and that such review extends to claims that an officer acted in excess of his delegated powers. *Dalton v. Specter*, 511 U.S. 462, 472 (1994);

*Larson*, 337 U.S. at 691.  "If an agency action is unauthorized by the statute under which the agency assumes to act, the agency has violated the law and the courts generally have jurisdiction to grant relief."  *Fed. Express Corp. v. U.S. Dep't of Com.*, 39 F.4th 756, 763 (D.C. Cir. 2022) (citation modified).

But *ultra vires* review outside an express statutory cause of action – that is, so-called "nonstatutory *ultra vires* review" – is narrow.  In *Nuclear Regulatory Commission v. Texas*, 605 U.S. 665, 681 (2025), the Supreme Court emphasized that, "Because *ultra vires* review could become an easy end-run around" statutory limits on judicial review, the Court's cases have "strictly limited" its availability.  Such review applies only where an agency has acted "in excess of its delegated powers and contrary to a specific prohibition" in the governing statute.  *Id.* (internal quotation marks omitted).

Where, as here, the Government acts in the complete absence of *any* statutory authority, the case does not implicate any argument that the government misapplied delegated power, *see id.* at 682 (cautioning that parties may not "dress up a typical statutory-authority argument as an ultra vires claim"); instead, it involves the exercise of power that Congress never conferred at all.  And "If no statute confers authority to a federal agency, it has none."  *Rotenberg Educ. Ctr., Inc. v. United States Food & Drug Admin.*, 3 F.4th 390, 399 (D.C. Cir. 2021); *see also Arlington v. F.C.C.*, 569 U.S. 290, 297 (2013) ("Both [a government entity's] power to act and how [it is] to act is authoritatively prescribed by Congress, so that when [it] act[s] improperly, no less than when they act beyond [its] jurisdiction, what [it] do[es] is ultra vires.").  In such circumstances, courts have the equitable power to restrain *ultra vires* action.  *Am. Sch. of Magnetic Healing v. McAnnulty*, 187 U.S. 94, 110 (1902).

To prevail on a nonstatutory *ultra vires* claim, a plaintiff must show that "(i) there is no express statutory preclusion of all judicial review; (ii) there is no alternative procedure for review of the statutory claim; and (iii) the agency plainly acts in excess of its delegated powers and contrary to a specific prohibition in the statute that is clear and mandatory." *Fed. Express Corp.*, 39 F.4th at 763 (citation modified); *Yale New Haven Hosp. v. Becerra*, 56 F.4th 9, 26–27 (2d Cir. 2022).

Each of these requirements ensures that *ultra vires* review remains confined to its proper role of enforcing the limits of delegated authority, not reweighing policy judgments. *First,* the absence of express statutory preclusion ensures that *ultra vires* review operates only where Congress does not foreclose all judicial review, while still permitting courts to compare agency action with "plain statutory commands." *Fed. Express Corp.*, 39 F.4th at 765 (citation omitted). *Second,* the requirement that no adequate alternative remedy exist demands that plaintiffs be "wholly deprived of a meaningful and adequate means of vindicating their alleged statutory rights." *Nat'l Air Traffic Controllers Ass'n AFL-CIO v. Fed. Serv. Impasses Panel*, 437 F.3d 1256, 1264–65 (D.C. Cir. 2006) (citation modified) (quoting *Bd. of Governors of Fed. Rsrv. Sys. v. MCorp Fin., Inc.*, 502 U.S. 32, 43 (1991)); *see also Leedom v. Kyne*, 358 U.S. 184, 190 (1958). *Third*, the requirement that the agency have plainly exceeded its authority imposes a stringent merits threshold. The agency must have "plainly and openly crossed a congressionally drawn line in the sand." *Fed. Express Corp.*, 39 F.4th at 765.

That demanding standard reflects constitutional separation-of-powers concerns. Courts do not use *ultra vires* review to second-guess judgments committed to agency discretion, or to recast ordinary statutory disputes as free-standing equitable claims. *See id.*; *Masroor v. Noem*, 2025 WL 2439176, at *2–3 (D.D.C. Aug. 25, 2025). Rather, the question is whether the challenged action

falls within the authority Congress actually conferred.  An agency's power to act on the President's behalf "must stem either from an act of Congress or from the Constitution itself."  *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952).  After all, an agency is a creature of statute; it "literally has no power to act . . . unless and until Congress confers power upon it."  *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986).

Thus, this case presents the antecedent question whether the officials who caused these grant terminations possessed the statutory authority to do so, and whether they acted on grounds permitted by the governing statute.  If not, the action is *ultra vires* and must be declared unlawful and of no legal force or effect.  *See Larson*, 337 U.S. at 689; *Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322, 1328 (D.C. Cir. 1996) ("When an executive acts *ultra vires*, courts are normally available to reestablish the limits on his authority.").

2.       Application to the Challenged Terminations

a)  No Express Statutory Preclusion of Review

Plaintiffs readily satisfy the first requirement.  There is no statute that expressly precludes judicial review of whether Defendants acted beyond the authority Congress conferred.  The National Foundation on the Arts and the Humanities Act, 20 U.S.C. §§ 951–960, contains no provision insulating the challenged conduct (involving post-award grant terminations) from review.  "When Congress intends to bar judicial review altogether," it knows how to say so by "employ[ing] . . . unambiguous and comprehensive" language.  *Lindahl v. Office of Personnel Mgmt.*, 470 U.S. 768, 779–80 (1985).  For example, 26 U.S.C. § 7421(a) states, "no suit for the purpose of restraining the assessment or collection of any tax shall be maintained in any court by any person."  Such language bars judicial review in unmistakable terms.  *See Summerour v.*

*Internal Revenue Serv.*, 2024 WL 3443604, at *4–5 (D.D.C. July 16, 2024).  Congress included no comparable language here.  That silence matters.

Moreover, courts "ordinarily presume that Congress intends the executive to obey its statutory commands and, accordingly, that it expects the courts to grant relief when an executive agency violates such a command." *Bowen v. Michigan Acad. of Fam. Physicians*, 476 U.S. 667, 681 (1986).  Absent an express statutory command to the contrary – of which there is none here – courts retain authority to review whether executive officials have exceeded the limits Congress imposed.

Nor does the absence of a private right of action under 5 U.S.C. § 3161 – which authorizes the creation and staffing of "temporary organizations" within the federal government for limited-duration projects, including the temporary entity invoked by DOGE here – alter that conclusion. As the D.C. Circuit has stated, it has "never held that a lack of a statutory cause of action is *per se* a bar to judicial review." *Chamber of Com. of U.S.*, 74 F.3d at 1328.  The first requirement is satisfied.

### b)  No Adequate Alternative Avenue for Review

Plaintiffs also satisfy the second requirement.  There is no "alternative procedure for review" of the claim asserted here.  *Changji Esquel Textile Co. v. Raimondo*, 40 F.4th 716, 722 (D.C. Cir. 2022).

*First,* the Court disabuses any notion that Plaintiffs' *ultra vires* claim is precluded based on any supposed availability of the Court of Federal Claims as a forum pursuant to the Tucker Act. As discussed, *see* Section IV(A)(2), the Court of Federal Claims, as that court itself has recognized, "may not provide equitable relief." *Larkin v. United States*, 177 Fed. Cl. 17, 22 (2025); *see also Bowen*, 487 U.S. at 905 ("[T]he Court of Claims has no power to grant equitable relief.").  Because

Plaintiffs' claims do not fall within the bounds of the Tucker Act, the Court of Federal Claims does not provide an adequate alternative forum in which Plaintiffs can obtain the equitable relief they seek, and its potential jurisdiction therefore does not displace this Court's authority to adjudicate Plaintiffs' *ultra vires* claim.

*Second,* any suggestion that Plaintiffs in this case might proceed against the agencies under the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq.*, is equally unavailing. Plaintiffs' claims are directed, not at ordinary agency action by the NEH, but at conduct undertaken by DOGE and by officials acting under color of DOGE authority. The President's Executive Order establishes DOGE "in the Executive Office of the President." Exec. Order No. 14158, *Establishing and Implementing the President's "Department of Government Efficiency"*, § 3(a), 90 Fed. Reg. 8441, 8441 (Jan. 20, 2025). And the same Order expressly *excludes* the Executive Office of the President and its components from the incorporated APA definition of "agency": "'Agency' has the meaning given to it in section 551 of title 5, United States Code, except that such term does not include the Executive Office of the President or *any components thereof.*" *Id.* § 2(a), 90 Fed. Reg. at 8441 (emphasis added). DOGE, as a component of the Executive Office of the President, is therefore, according to the Government and the terms of the Order, exempted from APA review. *See id.*, §§ 2(a), 3(a), 90 Fed. Reg. at 8441; *see also Nat'l Tr. for Historic Pres. in the United States v. Nat'l Park Serv.*, 2026 WL 533420, at *6 (D.D.C. Feb. 26, 2026) ("As a general matter, the Executive Office of the President is not an "agency" under the APA." (citation omitted)).[2]

---

[2] Because Plaintiffs are not seeking relief pursuant to the APA on their summary judgment motions, this Court need not, and does not, decide whether DOGE is an "agency" for purposes of the APA. *See* 5 U.S.C. § 701(b)(1).

Moreover, APA review applies only to "agenc[ies]," 5 U.S.C. § 701(b)(1), and its availability therefore turns on whether DOGE constitutes an "authority of the Government of the United States." *Id.* § 551(1). That question, which is unsettled, has "flummoxed many a court." *Groce v. Rodriguez*, 743 F. Supp. 3d 244, 250 (D.D.C. 2024). The Government, for its part, does not meaningfully address in its submissions whether DOGE qualifies as an "agency" within the meaning of the APA. This itself underscores that the availability of APA review is, at best, uncertain.

In another DOGE-related action, *American Federation of Labor and Congress of Industrial Organizations v. Department of Labor*, 766 F. Supp. 3d 105 (D.D.C. 2025), the Government adopted a contradictory and self-serving position on DOGE's "agency" status. There, plaintiffs challenged the legality of DOGE personnel accessing agency records from the Department of Labor, the Department of Health and Human Services, and the Consumer Financial Protection Bureau, arguing that DOGE was not an "agency" capable of lawfully detailing employees under the Economy Act. The Government responded by asserting that DOGE was an "agency" for purposes of the Economy Act – thereby authorizing its personnel to operate within other agencies – while declining to take the position that DOGE qualified as an "agency" under statutes such as FOIA, the Privacy Act, or the APA, which would have subjected it to disclosure obligations, statutory constraints, and judicial review. *See Am. Fed'n of Lab. & Cong. of Indus. Orgs.*, 766 F. Supp. 3d at 112–13. The court aptly described that position as one in which DOGE is "not an agency when it is burdensome but an agency when it is convenient." *Id.* at 112–13.

That same issue arose in parallel Freedom of Information Act litigation brought by Citizens for Responsibility and Ethics in Washington ("CREW"), which sought records from DOGE. There, the Government refused to process CREW's FOIA requests on the ground that DOGE is

not an "agency." The district court rejected that position at the preliminary stage and later authorized limited expedited discovery to determine whether DOGE "wield[s] substantial authority independently of the President" or instead merely "advise[s] and assist[s] the President." *Citizens for Resp. & Ethics in Washington v. U.S. DOGE Serv.*, 349 F.R.D. 1, 4–6 (D.D.C. 2025). The court explained that the "structure of USDS and the scope of its authority are critical" to that inquiry and that the existing record was "unclear," warranting discovery into USDS's operations and recommendations. *Id.* at 6–7.

The Government sought mandamus in the D.C. Circuit to halt that discovery, arguing that such inquiry impermissibly intruded on a presidential advisory body. The D.C. Circuit denied relief, concluding that the "agency" determination turns on a "functional analysis" that depends on the "practical realities of the entity's role," including whether it exercises "substantial independent authority" or merely "advise[s] and assist[s] the President." *In re U.S. DOGE Serv.*, 2025 WL 1393222, at *1 (D.C. Cir. May 14, 2025).

Before the Supreme Court, however, the Government both sought emergency relief and asked that the Court treat its application as a petition for a writ of certiorari, which the Court granted. In its application for a stay of the district court's orders, the United States Solicitor General D. John Sauer emphasized that DOGE is a "presidential advisory body within the Executive Office of the President" that "has no organic statute and is not created by Congress," and whose role is limited to making "recommendations to [the President] and to federal agencies." Appl. to Stay Pending Certiorari or Mandamus at 5, *In re U.S. DOGE Serv.*, No. 24A1122. The Government further asserted that "*USDS is exempt from the Freedom of Information Act . . . as a matter of law*" because it performs only advisory functions. *Id.* at 2 (emphasis added). In its reply, the Government reiterated that "presidential advisory bodies are *not 'agenc[ies]' subject to the*

*Freedom of Information Act* when they are responsible for making recommendations, not exercising significant independent powers of their own." Reply in Supp. of Stay, at 1 (emphasis added).

Moreover, the Government's position in *U.S. Doge Service v. Citizens for Responsibility and Ethics in Washington*, 145 S. Ct. 1981 (2025) fairly implies that APA review of DOGE's conduct would not be available. The Freedom of Information Act "incorporates and expands on the APA's definition of agency," such that an entity excluded from FOIA's definition of "agency" necessarily falls outside the APA's as well. *Am. Oversight v. Biden*, 2021 WL 4355576, at *6 n.6 (D.D.C. Sept. 24, 2021). Thus, if DOGE is not an "agency" for purposes of FOIA – as the Government repeatedly insists – it is, *a fortiori*, not an "agency" whose actions could be reviewed under the APA. That is precisely why nonstatutory *ultra vires* review is necessary here. The Government cannot simultaneously deny that DOGE is subject to APA review and then invoke the supposed availability of APA review as a reason to foreclose equitable review of DOGE's allegedly *ultra vires* conduct.

More broadly, the Supreme Court's recent emergency-docket orders underscore that the availability of district-court review under the APA remains unsettled, particularly in cases involving federal grant terminations where the requested relief may have financial consequences. *See Dep't of Educ. v. California*, 604 U.S. 650 (2025); *Nat'l Institutes of Health v. Am. Pub. Health Ass'n*, 145 S. Ct. 2658 (2025). Both interim orders indicate that, in at least some circumstances, the Tucker Act may divest the district court of jurisdiction over APA claims that implicate the payment of funds, even if only indirectly.[3]

---

[3] But the Supreme Court's emergency orders do not establish a clear rule, and they certainly do not resolve how that principle applies to constitutional and *ultra vires* claims such as those asserted here. *See supra* Section IV(A)(3). This Court has, in any event, declined to exercise jurisdiction over Plaintiffs' APA claims.

Taken together, these considerations establish that the APA does not provide Plaintiffs with an adequate alternative avenue of relief for challenging DOGE's authority to undertake the actions at issue in this suit.

*First,* if DOGE is not an "agency," the APA does not apply.

*Second,* if courts cannot examine the implementation of its recommendations, *see U.S. Doge Serv. v. Citizens for Resp. & Ethics in Washington*, 145 S. Ct. 1981 (2025), then DOGE's agency status cannot be meaningfully tested in practice.

*Third,* if Tucker Act principles displace jurisdiction in cases implicating federal funds *in toto*, APA review may be unavailable regardless of whether DOGE qualifies as an agency. Taken together, these considerations establish – and at least strongly suggest – that the APA is foreclosed as an adequate alternative for review of DOGE action. Accordingly, APA review is, at best, uncertain and, at worst, unavailable, and therefore cannot preclude Plaintiffs' *ultra vires* claim.

Absent review here, Plaintiffs would be "wholly deprived of a meaningful and adequate means of vindicating [their] statutory rights." *Nat'l Air Traffic Controllers Ass'n AFL-CIO*, 437 F.3d at 1264–65 (citation modified) (quoting *MCorp*, 502 U.S. at 43). That is the circumstance in which nonstatutory review remains available to avoid "'a sacrifice or obliteration of a right which Congress' has given." *MCorp*, 502 U.S. at 43 (quoting *Kyne*, 358 U.S. at 190). The right implicated here is the right not to be subjected to executive action that exceeds the authority Congress has conferred. *See Kyne*, 358 U.S. at 188–89 (exercising jurisdiction where agency action was "in excess of its delegated powers and contrary to a specific prohibition in the Act" and "deprived [affected parties] of a 'right' assured to them by Congress").

### c) DOGE Acted Without Statutory Authority

The third requirement is also satisfied. DOGE had no statutory authority to terminate NEH grants. And on the undisputed evidence, DOGE – not the NEH Chairperson or anyone else at NEH – effectuated the terminations at issue here.

This is not a case involving a routine disagreement over how to interpret a statute. Nonstatutory *ultra vires* claims are reserved for extraordinary cases in which "the agency action go[es] beyond mere legal or factual error and amount[s] to a clear departure by the [agency] from its statutory mandate." *Fed. Express Corp.*, 39 F.4th at 764 (quoting *Oestereich v. Selective Serv. Sys. Loc. Board No. 11*, 393 U.S. 233, 238 (1968)). They require a showing that the agency "plainly acts in excess of its delegated powers and contrary to a specific prohibition in the statute that is clear and mandatory." *Id.* at 763 (quoting *Nyunt v. Chairman, Broad. Bd. of Governors*, 589 F.3d 445, 449 (D.C. Cir. 2009)).

This case presents something more basic. It is not that DOGE misconstrued a statutory provision conferring authority on it; it is that Congress conferred no authority on DOGE at all with respect to the awarding, continuation, or termination of NEH grants. *Am. Fed'n of Lab. & Cong. of Indus. Organizations v. Dep't of Lab.*, 778 F. Supp. 3d 56, 89 (D.D.C. 2025) (concluding that plaintiffs were not required to plead a specific statutory provision where they alleged that DOGE acted in complete absence of any lawful authority).[4]

The Constitution allocates the power to create offices and governmental entities to Congress, *Myers v. United States*, 272 U.S. 52, 130 (1926). Executive power exercised on the President's behalf "must stem either from an act of Congress or from the Constitution itself."

---

[4] Fox and Cavanaugh's formal GSA employment does not change the analysis. They were recruited and hired by senior DOGE officials, Dkt. No. 277, Defs.' 56.1 Statement of Undisputed Material Fact, ¶¶ 12–13, and "belonged to DOGE's 'Small Agencies Team,'" *id.*, ¶ 15.

*Youngstown*, 343 U.S. at 585.  That principle reflects both a structural limit on executive power and the constitutional command – one of Article II's most fundamental commands – that the President "shall take Care that the Laws be faithfully executed." U.S. Const. art. II, § 3.

*Youngstown* illustrates the force of that limitation.  The case did not arise in ordinary circumstances.  It arose during the Korean War, after failed efforts to resolve a nationwide labor dispute in the steel industry, and on the eve of a threatened strike that President Truman believed would jeopardize the Nation's defense. *See Youngstown*, 343 U.S. at 582–83.  Hours before the strike was to begin, the President issued Executive Order 10340, directing the Secretary of Commerce to take possession of privately owned steel mills in order to "assure the continued availability of steel." *Id.* at 583.  The Government defended the seizure as necessary to avert a national catastrophe and as an exercise of the President's authority as Chief Executive and Commander in Chief. *Id.* at 582–84.

The Supreme Court rejected that argument.  President Truman lacked statutory authority because "there is no statute that expressly authorizes the President to take possession of property as he did here," and no act of Congress from which such authority "can fairly be implied." *Id.* at 585.  Nor could the seizure be sustained as an exercise of the President's Article II powers.  The Court rejected the proposition that the Take Care Clause authorizes the President to make law, explaining that, "In the framework of our Constitution, the President's power to see that the laws are faithfully executed refutes the idea that he is to be a lawmaker." *Id.* at 587.

If the President could not act beyond statutory or constitutional authority even to seize steel mills that he deemed indispensable to national defense during an ongoing armed conflict, then he cannot do so to implement domestic policy priorities that Congress has not enacted. *Youngstown*'s holding does not turn on the President's unilateral assessment of the importance of his objective.

It turns on the source of legal authority on which he acts. The President may execute congressional policy, but he may not replace it with his own. As *Youngstown* put it, the problem with the President's seizure order was that it "does not direct that a congressional policy be executed in a manner prescribed by Congress—it directs that a presidential policy be executed in a manner prescribed by the President." *Id.* at 588.

The same reasoning applies here. The Executive Orders and DOGE-directed termination process did not carry out the NEH grantmaking scheme Congress prescribed by law in a duly enacted statute. They displaced it. Congress vested funding authority in the NEH Chairperson. DOGE substituted a presidential policy judgment for a statute duly enacted by Congress. That is not faithful execution of law; it is executive lawmaking in precisely the sense *Youngstown* forbids. *See id.* at 589 ("The Founders of this Nation entrusted the law making power to the Congress alone in both good and bad times.").

This same constraint on executive power applies with equal force to executive actors operating through subordinate entities or advisory bodies. As the Supreme Court has explained, "The legislative power of the United States is vested in the Congress, and the exercise of quasi-legislative authority by governmental departments and agencies must be rooted in a grant of such power by the Congress and subject to the limitations which that body imposes." *Chrysler Corp. v. Brown*, 441 U.S. 281, 302 (1979); U.S. Const. art. I, § 1 ("All legislative Powers herein granted shall be vested in a Congress of the United States, which shall consist of a Senate and House of Representatives."). An agency – or any entity acting with or through it – may not exercise binding authority affecting private rights or federal programs unless it possesses powers that Congress confers upon it. *See Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988).

- 69 -

These principles foreclose the possibility that executive action can be justified solely by reference to an Executive Order. An Executive Order can organize the Executive Branch and direct the exercise of *existing* authority, but it cannot create new authority where none exists. *See Youngstown*, 343 U.S. at 585. And the statutory structure governing the National Endowment for the Humanities confirms the limits of the President's authority here.

Congress established NEH as an independent federal agency within the National Foundation on the Arts and the Humanities. 20 U.S.C. § 956(a). The NEH "shall be headed by a chairperson, who shall be appointed by the President, by and with the advice and consent of the Senate," *id.*, § 956(b)(1). But the fact that the Chairperson is appointed by the President does not enlarge the substantive authority of the Executive Branch. Congress, which created NEH and appropriates the funds that it grants, was quite specific about who could exercise NEH's funding authority and the conditions under which that authority was to be exercised. The Chairperson "is authorized to enter into arrangements, including contracts, grants, loans, and other forms of assistance," and even that authority must be exercised "with the advice of the National Council on the Humanities." *Id.*, § 956(c). Congress further required that the Council "review applications for financial assistance . . . and make recommendations to the Chairperson," and directed that, "The Chairperson shall not approve or disapprove any such application until the Chairperson has received the recommendation of the Council." *Id.*, § 957(f). Admittedly, those provisions address the award of grants, not their termination. But they identify the statutory decisionmaker Congress empowered: the Chairperson, acting within the limits and procedures Congress prescribed – not DOGE, and not officials operating under an Executive Order.

The statute's post-award provisions governing potential termination point in the same direction. They do not authorize anyone, let alone DOGE, to revisit already awarded NEH grants

*en masse* based on ideological criteria found nowhere in the statute. Rather, they tie post-award consequences to grantee-specific compliance findings made by the Chairperson. Section 959 requires recipients of Endowment assistance to submit financial and project reports, including a financial report sufficient to ensure that federal funds are expended "in accordance with the terms and conditions under which" the assistance was provided. 20 U.S.C. § 959(f)(2)(A)(i). And where a recipient "substantially fails to satisfy the purposes for which such financial assistance is provided," Congress identified particular consequences that the *Chairperson* may impose. *Id.*, § 959(f)(3). Congress was more explicit as to state humanities grants: if the Chairperson, "after reasonable notice and opportunity for hearing," finds substantial noncompliance or diversion of funds, the Chairperson may halt further grants until the default is cured or improperly expended funds are repaid or repayment is arranged. *Id.*, § 956(f)(7).

These provisions confirm that Congress addressed post-award compliance in specific, limited, and Chair-centered terms. They leave no room for DOGE to cancel previously awarded grants wholesale based on nonstatutory criteria Congress never enacted. The President's duty is to execute the laws Congress has enacted, not to rewrite them or replace them. *Kendall v. U.S. ex rel. Stokes*, 37 U.S. 524, 525 (1838) ("To contend that the obligation imposed on the President to see the laws faithfully executed implies a power to forbid their execution, is a novel construction of the Constitution, and entirely inadmissible."); *see also Reich*, 74 F.3d at 1332. The Government's position would permit the President, acting through an entity with no statutory authority over NEH grants, to bypass the limits Congress imposed on the administration of federal funds. The Court rejects that position.

Nor does any regulatory authority cited by the Government fill the gap. Section 200.340(a)(4) provides that a federal award may be terminated "[b]y the Federal agency or pass-

through entity pursuant to the terms and conditions of the Federal award," including, "*to the extent authorized by law*," where "an award no longer effectuates the program goals or agency priorities." 2 C.F.R. § 200.340(a)(4) (emphasis added). The limiting phrase matters. The regulation does not authorize anyone to terminate a federal award except "*to the extent authorized by law*," and it certainly does not confer termination authority on DOGE. Nor does it permit the Executive Branch to define "program goals or agency priorities" in a manner that contradicts the statute Congress enacted. Whatever authority § 200.340(a) may give an agency head to terminate an award in appropriate circumstances, it does not permit DOGE to cancel already awarded NEH grants wholesale based on nonstatutory criteria that Congress never adopted and that, in significant respects, treat as disqualifying the very subjects Congress made relevant to NEH's mission. As explained below, DOGE selected grants for termination in a manner that was not only unauthorized by law, but contrary to law – violating both the First Amendment and the equal-protection component of the Fifth Amendment. Actions that violate the Constitution – the "supreme Law of the Land" – can never be "authorized by law." *See* U.S. Const. art. VI, cl. 2.

The relevant point is not that the Chairperson is appointed by the President, but that neither the NEH statute nor § 200.340(a) confers on DOGE any authority to terminate NEH grants – least of all by applying criteria that Congress did not enact, that in significant respects contradict the authorizing statute, and that, as explained below, violate the Constitution.

This conclusion is reinforced by the statute's text. Congress did not merely omit the anti-"DEI" criterion DOGE applied; it affirmatively instructed NEH to support programs and research that "reflect the diversity and richness of our American cultural heritage," including the culture of "a minority, inner city, rural, or tribal community," and to give "particular regard" to scholars and institutions "that have traditionally been underrepresented." 20 U.S.C. § 956(c)(4). Congress also

defined the humanities to include work undertaken "with particular attention to reflecting our diverse heritage, traditions, and history and to the relevance of the humanities to the current conditions of national life." *Id.*, § 952(a). The Executive Branch is not allowed to ignore, and treat as disqualifying, Congress's statutory directives. *Cf. City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1235 (9th Cir. 2018) ("Absent congressional authorization, the Administration may not redistribute or withhold properly appropriated funds in order to effectuate its own policy goals.").

DOGE, a self-described advisory body within the Executive Office of the President, is "subject to the limitations" Congress imposed on this statutory scheme. *Chrysler Corp.*, 441 U.S. at 302. It may not assume authority that Congress vested elsewhere, nor may it disregard the conditions Congress attached to that authority. *See Youngstown*, 343 U.S. at 585. Indeed, even where Congress has enacted a comprehensive statutory scheme, an agency "has no constitutional or common law existence or authority, but only those authorities conferred upon it by Congress," and may not rely on generalized statutory purposes or "overarching authority" to expand its power beyond those limits. *Michigan v. E.P.A.*, 268 F.3d 1075, 1081 (D.C. Cir. 2001).

That principle applies with greater force to DOGE. As the Solicitor General represented to the Supreme Court, "USDS is a presidential advisory body within the Executive Office of the President" and "*USDS has no organic statute and is not created by Congress.*" Appl. to Stay Pending Certiorari or Mandamus and Request for Immediate Administrative Stay at 5, 21, *In re U.S. DOGE Serv.*, No. 24A1122 (emphasis added). If DOGE "has no organic statute and is not created by Congress," then it necessarily lacks any statutory delegation of authority to terminate NEH grants. And it certainly cannot exercise such authority in derogation of the very purposes that Congress wrote into the agency's authorizing statute.

When the President acts contrary to Congress's expressed or implied will, "his power is at its lowest ebb." *Youngstown*, 343 U.S. at 637 (Jackson, J., concurring). That is this case. DOGE lacked statutory authority to decide which NEH grants would be terminated or to devise the criteria used to effect those terminations. And the Government's reliance on the DOGE Executive Orders to compensate for that lack of authority is, therefore, unavailing for two reasons.

*First,* an Executive Order cannot supply authority that Congress withheld or vested in a different statutory decisionmaker. Just as Congress may not intrude upon powers the Constitution commits to the President, the President and his subordinates may not use an Executive Order to set aside the laws Congress has passed. As then-Judge Garland put it for the D.C. Circuit, "the President is without authority to set aside congressional legislation by executive order." *In re United Mine Workers of Am. Int'l Union*, 190 F.3d 545, 551 (D.C. Cir. 1999). That principle applies with particular force here because this case concerns the termination of grants already awarded. The governing regulation permits termination only by the "Federal agency or pass-through entity," and only in specified circumstances – including when the recipient fails to comply with the award's terms and conditions, 2 C.F.R. § 200.340(a)(1), or, "to the extent authorized by law," when the award no longer effectuates program goals or agency priorities, *id.* § 200.340(a)(4). It also requires the agency to specify termination provisions in the award terms and preserves the recipient's opportunity to object or challenge certain termination decisions. *Id.* § 200.340(b), (c)(1); *see also id.* § 200.342. DOGE did not examine whether recipients had failed to comply with their grant terms, did not make grantee-specific compliance findings, and did not follow a process designed to test whether particular awards were lawfully terminable. Instead, DOGE imposed nonstatutory criteria – Biden-era status and perceived association with DEI, environmental justice, gender ideology, or other ideas disfavored by the Administration – and

selected grants for termination on that basis.  The President cannot override the statutory and regulatory scheme governing NEH funding and grant termination by Executive Order, and DOGE cannot do so in the President's name.

*Second,* the Executive Orders, read on their own terms, confirm the absence of any operative grant-termination authority in DOGE.  Executive Order 14158, *Establishing and Implementing the President's "Department of Government Efficiency,"* first creates the principal DOGE entity by renaming the United States Digital Service as the "United States DOGE Service (USDS)" and providing that it "shall be established in the Executive Office of the President."  Exec. Order No. 14158 § 3(a), 90 Fed. Reg. at 8441.  It then separately creates, "within USDS," a "temporary organization known as 'the U.S. DOGE Service Temporary Organization'" and states that this temporary organization is created "in accordance with section 3161 of title 5, United States Code."  *Id.*, § 3(b), 90 Fed. Reg. at 8441.  But the only reference to a statute in the Order – to 5 U.S.C. § 3161 – attaches to the temporary organization, not to the principal DOGE entity.

Section 3161 itself does not confer any substantive policymaking power on DOGE.  It defines a "temporary organization" as an organization "established by law or Executive order for a specific period not in excess of three years for the purpose of performing a specific study or other project," and grants personnel, detail, compensation, and travel authority to staff such an organization.  5 U.S.C. § 3161(a)–(e).  Nothing in that provision authorizes DOGE to exercise independent executive power, direct the functioning of a federal agency, terminate grants, halt payments, or impose binding decisions on statutory officers.  At most, it permits the creation and staffing of a temporary body for a "specific study or other project."  *Id.*, § 3161(a).  The Government's reliance on § 3161 thus does not support the authority DOGE exercised here.

Executive Order 14158 itself confirms the same point.  The temporary organization is "dedicated to advancing the President's 18-month DOGE agenda," Executive Order 14158 § 3(b), 90 Fed. Reg. at 8441, but the Order does not give DOGE any independent decisionmaking authority.  Instead, section 3(c) provides that, "In consultation with USDS, each Agency Head shall establish" a DOGE Team within the agency, and that those teams shall "*advise* their respective Agency Heads on implementing the President's DOGE Agenda." *Id.*, § 3(c), 90 Fed. Reg. at 8441 (emphasis added).  Section 4(a) directs that "The USDS Administrator shall commence a Software Modernization Initiative." *Id.*, § 4(a), 90 Fed. Reg. at 8441–42.  Section 4(b) further provides that "Agency Heads shall take all necessary steps, in coordination with the USDS Administrator and to the maximum extent consistent with law, to ensure USDS has full and prompt access to all unclassified agency records, software systems, and IT systems." *Id.*, § 4(b), 90 Fed. Reg. at 8442.  Thus, the operative legal authority remains with agency heads.  DOGE Teams – including those in which individuals such as Justin Fox or Nate Cavanaugh serve – are expressly created "within" agencies and function to "advise" agency heads – not to exercise independent decisionmaking authority. *Id.*, § 3(c).

Other DOGE-related Executive Orders confirm the same distinction between advice and decisionmaking.  Executive Order 14218, *Ending Taxpayer Subsidization of Open Borders*, directs that "the Director of the Office of Management and Budget and the Administrator of the United States DOGE Service" shall "identify all other sources of Federal funding for illegal aliens" and "*recommend* additional agency actions."  Exec. Order No. 14218 § 2(b), 90 Fed. Reg. 10581, 10581 (Feb. 19, 2025) (emphasis added).  Executive Order 14219, *Ensuring Lawful Governance and Implementing the President's "Department of Government Efficiency" Deregulatory Initiative*, directs that "Agency heads shall, in coordination with their DOGE Team Leads,"

undertake regulatory review.  Exec. Order No. 14219 § 2(a), 90 Fed. Reg. 10583, 10583 (Feb. 19, 2025).  Executive Order 14210, *Implementing the President's "Department of Government Efficiency" Workforce Optimization Initiative*, similarly provides that agency hiring decisions shall be made "*in consultation* with the agency's DOGE Team Lead, consistent with applicable law." Exec. Order No. 14210 § 3(b)(i), 90 Fed. Reg. 9669, 9670 (Feb. 11, 2025) (emphasis added). And Executive Order 14222, *Implementing the President's "Department of Government Efficiency" Cost Efficiency Initiative*, provides that "Each Agency Head, *in consultation* with the agency's DOGE Team Lead, shall review all existing . . . covered contracts and grants and, where appropriate and consistent with applicable law, terminate or modify" them.  Exec. Order No. 14222 § 3(b), 90 Fed. Reg. 11095, 11095–96 (Feb. 26, 2025) (emphasis added).  In every instance, operative authority is supposed to remain with agency heads; DOGE's role is expressly advisory.

The Executive Orders thus do not help the Government.  They underscore the problem. The Government has itself described the President's executive orders in exactly those "purely advisory" terms.  In its Supreme Court stay application, the Solicitor General represented that the relevant executive orders only "place *advisory* responsibilities on USDS or its administrator." Appl. to Stay Pending Certiorari or Mandamus and Request for Immediate Administrative Stay at 5, *In re U.S. DOGE Serv.*, No. 24A1122 (emphasis added).  The Solicitor General further represented that "USDS is obviously not an 'agency' for FOIA purposes, because its authority is *purely advisory*." *Id.* at 15 (emphasis added).  But the record here demonstrates that DOGE's role was anything but advisory.  DOGE made the decisions for NEH.

Any suggestion that DOGE merely advised NEH is belied by the undisputed record.  They did not simply provide policy advice for NEH leadership to accept or reject after their review. Before ever meeting with NEH leadership, Fox had already begun reviewing NEH grants using

keyword searches and DOGE-generated categories to identify grants he considered objectionable. DOGE then used ChatGPT-generated "DEI" rationales, combined those classifications with NEH staff ratings, and generated the final spreadsheets used to identify grants for termination. *See supra* Sections I(E)–(G). Cavanaugh and Fox then "both *rejected* [the NEH Chair's] recommendation" to continue funding certain grants, Dkt. No. 276-1, Cavanaugh Dep., 181:3–9, and added still more grants for termination – grants that NEH staff had identified as "N/A" – on the eve of the April 2, 2025 mass termination, Dkt. No. 248-32, US-000041206. The appearance of Chairperson McDonald's name on the termination letters does not alter the substance of what occurred. Fox, not McDonald, drafted and sent the termination notices under McDonald's name.

Just days before the Mass Termination, Fox told McDonald, "We need a game plan for effectuating . . . final grant terminations and contract cancellations by tomorrow AM. We will carry these plans out before the end of the week. We're getting pressure from the top on this and we'd prefer that you remain on our side but *let us know if you're no longer interested.*" Dkt. No. 248-15, Ex. 15, US-000050717 (emphasis added). That is not the language of an adviser awaiting a decision from the statutory decisionmaker. Fox told McDonald that "we" (*i.e.*, Fox and Cavanaugh) would carry the terminations out, invoked "pressure from the top" (*i.e.*, the White House), and framed McDonald's participation as simply optional. *See* Dkt. No. 248-1, Fox Dep., 305:8–17. His reference to whether McDonald was "no longer interested" makes clear that DOGE understood the terminations would proceed with or without him. No reasonable factfinder could read that communication as evidence of a "purely advisory" role. Fox's message leaves no serious doubt about who was directing the process.

This DOGE-directed process displaced the statutory official responsible for NEH's post-award administration, applied nonstatutory criteria, and selected grants for termination without the

recipient-specific compliance findings contemplated by the statute.  That is not giving advice.  It is exercising termination authority over NEH's grant program – authority Congress vested elsewhere and never conferred on DOGE.

Among the grants DOGE added to the slate of grants to be terminated was a proposal by the National Catholic Center for Holocaust Education at Seton Hall University to provide educational programming about the Holocaust.  Dkt. No. 248-32, US-000041206, at 130; Dkt. No. 248-3, McDonald Dep., 225:7–226:19.  McDonald was not the one who selected that grant for termination, and he did not believe it implicated DEI.  *See* Dkt. No. 248-3, McDonald Dep., 226:6–11 ("Q: And in your view, does this grant relate to DEI? A: No. Q: Would you consider this to be wasteful spend[ing]? A: I would not, no.").  It was DOGE personnel – specifically Justin Fox – who sent McDonald and Wolfson the final list of all grants "to cancel" and all grants "to keep."  Dkt. No. 248-5, Ex. 5, NEH_AR_000022; Dkt. No. 248-32, Ex. 32, US-000041206.

McDonald testified that "Justin [Fox] prepared the list" of all grants "to cancel," and it was Fox "who put [] particular grant[s] on the list for termination."  Dkt. No. 248-3, McDonald Dep., 229:9–10 ("Justin [Fox] prepared the list, yes.").  Although McDonald claims *post hoc* that he "was the final decider," *id.*, 229:22, the contemporaneous record and his own testimony undermine that claim.  *Id.*, 227:8–13 ("Q: But just to clarify, notwithstanding your answer a moment ago, it was Justin Fox who placed this grant on this list to terminate it, right? THE DEPONENT: I'd say it's likely that Justin developed the list, so yes."); *id.*, 229:12–15 ("Q: Michael McDonald never said, I'd really like to terminate the grant about Jewish female slave labor during the Holocaust. A: That's correct.").

Whatever formal role McDonald now claims he had, the record shows that he could not, and did not, make authoritative decisions on his own during the grant termination process.  *See*

*Woodman v. WWOR-TV, Inc.*, 411 F.3d 69, 84 (2d Cir. 2005) (stating that district courts are entitled to draw upon their "common sense" and are "not required to operate in an experiential vacuum"). McDonald could recommend that particular grants be spared, but he could not overrule DOGE's contrary determinations.

McDonald, for his part, admits that many of the DOGE terminations "did not reflect well" on NEH. *Id.*, 227:2–7. Despite his claim that he "was the final decider," McDonald could not explain the criteria DOGE used to distinguish between grants "to keep" and those "to cancel." *See, e.g.*, Dkt. No. 248-3, McDonald Dep., 248:5–19 (stating that he did not know why a project proposing to study "Council of Jewish Federation records dating 1916 to 1999" was kept). When asked why a grant to add 200 entries to the Encyclopedia Virginia about the Revolutionary Era was kept, McDonald did not know either. *Id.*, 253:23–255:11 ("Q: So sitting here today, you have no idea why this grant was kept while others that related to inclusiveness were terminated? A: No."). That testimony is telling. A "decisionmaker" who cannot explain why grants were spared while others were cancelled plainly is not one who exercises meaningful decisionmaking authority.

But in the end, McDonald himself admitted the truth: "Either way, as you've made clear, *it's your decision on whether to discontinue funding any of the projects on this list*." Dkt. No. 248-5, Ex. 5, NEH_AR_000023 (emphasis added). That admission is incompatible with any claim that DOGE was merely acting in an advisory capacity. It is the language of an agency head acknowledging that the authority Congress vested exclusively in him had, in practical effect, been taken out of his hands.

The record admits of only one conclusion. DOGE was calling the shots. DOGE controlled the lists, DOGE rejected McDonald's suggestions, DOGE added additional grants for termination, DOGE drafted and sent the notices, and DOGE dictated which previously awarded grants would

live or die.  McDonald's one and only decision – to allow his name to appear at the bottom of the termination letters – alters none of that.  His signature did not transform DOGE's decision into an NEH decision; his name was simply a fig leaf designed to make it appear like the official authorized by law to terminate grants was the official who had done so.  If DOGE were in fact limited to an advisory role, Fox and Cavanaugh could not have directed NEH to terminate specific grants over the objections of its Chair.  But they did.  And they did so, without any statutory delegation of power.  The challenged conduct cannot be reconciled with the National Foundation on the Arts and the Humanities Act or the constitutional requirement that executive action be grounded in lawful authority.  It cannot stand.

Ironically, this conclusion is reinforced by the text of the executive orders the Government invokes.  Executive Order 14151, *Ending Radical and Wasteful Government DEI Programs and Preferencing*, provides that agencies shall act only "to the maximum extent allowed by law."  Exec. Order No. 14151 § 2(b)(i), 90 Fed. Reg. 8339, 8339–40 (Jan. 20, 2025).  Executive Order 14168, *Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government*, likewise directs that agencies act "as permitted by law."  Exec. Order No. 14168 § 3(e), 90 Fed. Reg. 8615, 8616 (Jan. 20, 2025).  And Executive Order 14222, *Implementing the President's "Department of Government Efficiency" Cost Efficiency Initiative*, conditions termination authority on action by "Each Agency Head" and only "consistent with applicable law."  Exec. Order No. 14222 § 3(b), 90 Fed. Reg. 11095, 11095–96 (Feb. 26, 2025).  These provisions confirm that the Executive Orders do not themselves purport to supply independent authority; they presuppose that any action must already be authorized by law.

In sum, the challenged DOGE conduct cannot be traced to any lawful source of authority.  As the Supreme Court explained in *American School of Magnetic Healing v. McAnnulty*, 187 U.S.

94, 108, 110 (1902), executive action "must be justified by some law," because otherwise "the individual is left to the absolutely uncontrolled and arbitrary action of a public and administrative officer." That is precisely the situation presented, where DOGE exercised unbounded authority without any statutory source and imposed binding consequences on Plaintiffs without lawful constraint. Fox and Cavanaugh, as members of DOGE's "Small Agencies Team," were the *de facto* ultimate decisionmakers – not McDonald or anyone at NEH. They selected the grants using their own ChatGPT-derived methodology (which they admit they did not understand), overruled the NEH Chair's express objections to terminating certain grants, and were the ones who ultimately drafted and sent out the termination notices. NEH's Director of Research Programs Christopher Thornton communicated to affected grantees that their fellowships were "terminated by DOGE." Dkt. No. 248-19, Ex. 19, US-000065114. And NEH's Chief Information Officer, Brett Bobley, admitted to a grantee that "DOGE did indeed cancel your award" and that "NEH staff, like myself, *didn't realize it was happening.*" Dkt. No. 248-18, US-000064982 (emphasis added). These admissions accord with the undisputed record evidence and confirm what the contemporaneous evidence already demonstrates. DOGE, not the NEH Chair, exercised decisive control over which grants would be terminated.

McDonald's *post hoc* assertion that he "was the final decider" rings hollow. The evidence shows that McDonald was powerless. Fox and Cavanaugh dictated the termination decisions, rejected McDonald's suggestions, and used his signature to execute decisions they had already made. Testimony to the contrary is not enough to create a genuine dispute of material fact when documentary evidence clearly, and overwhelmingly, indicates the opposite. *See Bentley v. AutoZoners, LLC*, 935 F.3d 76, 86 (2d Cir. 2019) (explaining that self-serving testimony need not be credited when it is "so compromised and contradicted" by the record). The DOGE conduct at

issue is not the execution of lawful authority. It is action "unauthorized by any law." *McAnnulty*, 187 U.S. at 110.

*        *        *

Plaintiffs have satisfied each element of *ultra vires* review. No statute expressly precludes judicial review; the Government certainly identifies none. No alternative procedure appears capable of adjudicating DOGE's conduct. And the challenged actions reflect a plain excess of lawful authority. Indeed, the record demonstrates a complete absence of statutory authorization for DOGE's conduct.

The National Foundation on the Arts and the Humanities Act does not authorize DOGE to do what it did. The President's Executive Orders do not authorize DOGE to do what it did. And even if the Executive Orders purported to do so, they could not supply the authority that Congress withheld. The President cannot confer upon an executive entity legal authority that neither Congress nor the Constitution has conferred. Where, as here, "there is no statute that expressly authorizes" DOGE's conduct, and no basis from which such authority "can fairly be implied," DOGE cannot act. *Youngstown*, 343 U.S. at 585.

Because Congress vested NEH funding authority in the Chairperson and addressed post-award consequences through specific, Chair-centered mechanisms, DOGE had no power to identify, select, or direct the termination of NEH grants; no power to override the statutory decisionmaker; and no power to substitute its own criteria for those Congress prescribed. DOGE's determination of which NEH grants would be terminated was therefore *ultra vires*, unlawful, and without legal effect.

### C. The Mass Termination Violated the First Amendment

1. Governing Principles

The First Amendment, applicable to the federal government through the Fifth Amendment, prohibits the government from "abridging the freedom of speech." U.S. Const. amend. I. At its core, the Amendment bars the government from regulating or penalizing expression based on the ideas or viewpoints it conveys. *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 828–29 (1995) ("Discrimination against speech because of its message is presumed to be unconstitutional."). When the government targets "particular views taken by speakers on a subject," the violation is "all the more blatant." *Id.* at 829.

This prohibition extends beyond direct regulation of speech. The government may not accomplish indirectly – through the allocation or withdrawal of benefits – what it is forbidden to do directly. Thus, "even though a person has no 'right' to a valuable governmental benefit and even though the government may deny him the benefit for any number of reasons, there are some reasons upon which the government may not rely." *Perry v. Sindermann*, 408 U.S. 593, 597 (1972). Namely, the government "may not deny a benefit to a person on a basis that infringes his constitutionally protected interests—especially, his interest in freedom of speech." *Id.* That principle – often described as the doctrine of unconstitutional conditions – applies with particular force where the government conditions funding decisions on the expression or suppression of ideas. *See Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 214 (2013).

At the same time, the Supreme Court has recognized that the government possesses some latitude in administering programs that involve the distribution of public funds. Where the government itself is speaking – or using private actors to convey its own message – it may define that message and fund speech that advances its chosen objectives. In *Rust v. Sullivan*, 500 U.S. 173 (1991), the Court upheld restrictions on federally funded family-planning projects, explaining

that the government may "selectively fund a program to encourage certain activities it believes to be in the public interest." *Id.* at 193.  In that circumstance, the government is not regulating private speech, but ensuring that public funds are used to convey the government's own policy message. Likewise, Congress may decide not to subsidize particular activities without thereby infringing the First Amendment.  *See Regan v. Tax'n With Representation of Wash.*, 461 U.S. 540, 549 (1983).

But that discretion does not apply when the government creates and funds a program that is expressly designed to facilitate private expression.  The constitutionality of public funding decisions turns on whether the government is itself speaking, or is instead facilitating private speech.  When the government speaks for itself, it "is entitled to say what it wishes," *Rosenberger*, 515 U.S. at 833 (citation omitted); *see also Walker v. Texas Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 208 (2015).  But when it creates a program that facilitates private speech, it "may not favor one speaker over another."  *Rosenberger*, 515 U.S. at 828.

For example, in *Legal Services Corp. v. Velazquez*, 531 U.S. 533 (2001), Congress had created a program to fund legal representation for indigent clients in civil cases, directing that recipients provide "legal assistance to eligible clients."  42 U.S.C. § 2996f(a)(1).  The Court held that attorneys in this program do not speak on behalf of the government, but instead speak on behalf of their clients.  *Velazquez*, 531 U.S. at 542.  Because the program was "designed to facilitate private speech," *id.* at 541–42, it depended on the "traditional role of the attorney as an independent professional," advancing client-directed arguments within the judicial process.  *Id.* at 545.  The restriction at issue – prohibiting challenges to existing welfare laws – therefore imposed a viewpoint-based limitation on that private advocacy, forbidding attorneys from advancing certain arguments on behalf of their clients.  The Court reasoned that this limitation "distort[ed] the legal system" by excluding disfavored viewpoints and "insulat[ing]" governmental policies from

judicial review. *Id.* at 544. In doing so, it "prohibit[ed] speech and expression upon which courts must depend for the proper exercise of the judicial power." *Id.* at 545.

Conversely, in *National Endowment for the Arts v. Finley*, 524 U.S. 569, 572–73 (1998), the Court rejected a facial challenge to statutory criteria requiring the NEA Chairperson to consider "general standards of decency and respect for the diverse beliefs and values of the American public" in awarding grants. The Court emphasized that the statute did not "inherently interfere[] with First Amendment rights" and did not, on its face, impose viewpoint-based exclusions on private speech. *Id.* at 571, 587. But the Court cautioned that funding decisions would raise serious constitutional concerns if applied in a manner that penalizes or excludes speech based on viewpoint. *Id.* at 587–88. Thus, *Finley* confirms that, while Congress may confer some discretion in administering grant programs, that discretion does not extend to viewpoint discrimination.

In sum, while the government retains some discretion in administering grant programs, that discretion is bounded by the First Amendment. It may define programmatic objectives and allocate resources accordingly, but it may not deny or withdraw funding because it disagrees with the ideas expressed. "[I]deologically driven attempts to suppress a particular point of view are presumptively unconstitutional[.]" *Rosenberger*, 515 U.S. at 830. Where, as here, the government funds a program that facilitates private expression, it may not act where "the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *Id.* at 829.

### 2.    Application

#### a)    NEH Grants Fund Private Expression, Not Government Speech

The Court first addresses whether NEH-funded work is government speech or private speech. *See Pleasant Grove City v. Summum*, 555 U.S. 460, 467 (2009) ("The Free Speech Clause restricts government regulation of private speech; it does not regulate government speech.").

When the government invites private parties to participate in a public funding program, the line between government and private speech "can blur." *Shurtleff v. City of Bos., Massachusetts*, 596 U.S. 243, 252 (2022). Courts therefore consider "the history of the expression at issue; the public's likely perception as to who (the government or a private person) is speaking; and the extent to which the government has actively shaped or controlled the expression." *Id.* All three considerations confirm that NEH grants fund private expression, not government speech.

"[T]he history of the expression at issue" confirms that, from the outset, Congress designed NEH to support independent, private expression rather than to convey a governmental message. *Id.* Since its inception, the statute has reflected a deliberate choice to foster, not control, intellectual and cultural production. Congress declared that, "The arts and the humanities belong to all the people of the United States," 20 U.S.C. § 951(1), and that federal support should "complement, assist, and add to programs for the advancement of the humanities and the arts by local, State, regional, and private agencies and their organizations," *id.*, § 951(5). Most tellingly, Congress recognized that, "While no government can call a great artist or scholar into existence," it can foster "a climate encouraging freedom of thought, imagination, and inquiry" and provide "the material conditions facilitating the release of this creative talent." *Id.*, § 951(7).

These founding declarations of purpose define the program's historical character. NEH was not created as a vehicle for government expression. It was created to support the intellectual and cultural work of private citizens, scholars, teachers, writers, and institutions. This history alone forecloses any argument that NEH-funded work constitutes government speech.

"[T]he public's likely perception as to who (the government or a private person) is speaking" likewise confirms the private nature of NEH-funded work. *Shurtleff*, 596 U.S. at 252. Congress expressly contemplated that NEH-funded works would not be attributed to the

Government.    It authorized disclaimers that "the opinions, findings, conclusions, and recommendations expressed herein *do not reflect the views of the National Endowment for the Arts or the National Endowment for the Humanities*."   20 U.S.C. § 959(c)(3)(C) (emphasis added). NEH's own grant terms implement that directive, requiring acknowledgment of federal support while making clear that "[a]ny views, findings, conclusions, or recommendations expressed in this (publication) (program) (exhibition) (website) do not necessarily represent those of the National Endowment for the Humanities."   Nat'l Endowment for the Humanities, *General Terms and Conditions for Awards to Organizations* 11–12 (for grants and cooperative agreements issued between Jan. 1, 2022, and Sept. 30, 2024), https://perma.cc/H9TB-L78T.

These disclaimers reinforce the understanding that NEH-funded work is the product of the grantee, not the government.   Members of the public encountering a book, article, archive, documentary, or educational program supported by NEH funding would reasonably attribute its content to its author or sponsoring institution, not to NEH.   *See Rhode Island Latino Arts v. Nat'l Endowment for the Arts*, 800 F. Supp. 3d 351, 366 (D.R.I. 2025) (finding it "unlikely that members of the public would think that NEA-funded artists speak for anyone but themselves, and certainly not for the government").

Finally, "the extent to which the government has actively shaped or controlled the expression" confirms that NEH does not exercise the type of editorial or expressive control characteristic of government speech.   *Shurtleff*, 596 U.S. at 252.   NEH's terms provide that "title to intangible property acquired under the award belongs to the recipient or subrecipient," and that the recipient "may copyright any work that is subject to copyright and was developed, or for which ownership was acquired, under the award."   Nat'l Endowment for the Humanities, *General Terms and Conditions for Awards to Organizations* 35 (for grants and cooperative agreements issued

between Jan. 1, 2022, and Sept. 30, 2024), https://perma.cc/H9TB-L78T; *see also* Nat'l Endowment for the Humanities, *General Terms and Conditions for Awards to Organizations* 34 (for awards issued Oct. 1, 2024, or later), https://perma.cc/GZH2-R92G. NEH retains only "a royalty-free, nonexclusive and irrevocable right to reproduce, publish, or otherwise use the work for federal purposes," not the right to control its content. *Id.*; *see also* Dkt. No. 253, Declaration of Jason Rhody, ¶ 2 ("NEH-funded projects are the work of the funded individuals and institutions, not NEH.").

Taken together, these considerations establish that NEH grants fund private expression, not government speech. The Government therefore cannot avoid First Amendment scrutiny by recasting privately authored scholarship, writing, teaching, and cultural work as its own message. When private expression is involved, the First Amendment forbids "the government from tilting public debate in a preferred direction," and "that is so even when those actors possess enviable vehicles for expression." *Moody v. NetChoice, LLC*, 603 U.S. 707, 741 (2024) (citation modified).

b)  <u>The Terminations Constitute Unconstitutional Viewpoint Discrimination</u>

i.    DEI-Based Viewpoint Discrimination

This case presents a textbook example of unconstitutional viewpoint discrimination.

DEI is, of course, a viewpoint. It "inherently convey[s] the viewpoint that the exclusion of historically disadvantaged groups is undesirable." *Thakur*, 163 F.4th at 1206; *see also diversity, equity and inclusion*, Merriam-Webster, https://perma.cc/84ZW-7JSR ("a set of values and related policies and practices focused on establishing a group culture of equitable and inclusive treatment and on attracting and retaining a diverse group of participants, including people who have historically been excluded or discriminated against"); *see also diversity, equity and inclusion*, Cambridge English Dictionary, https://perma.cc/M2GS-L4UT ("the idea that all people should

have equal rights and treatment and be welcomed and included, so that they do not experience any disadvantage because of belonging to a particular group, and that each person should be given the same opportunities as others according to their needs"). The only remaining question is whether "the specific motivating ideology or the opinion or perspective of" the grantees "[was] the rationale for the restriction." *Rosenberger*, 515 U.S. at 830. It was.

The record establishes that the termination decisions were driven by an expressly ideological method of classification. There can be no genuine dispute about this point. Indeed, the Government has all but admitted as much. *Accord Thakur v. Trump*, 163 F.4th 1198, 1206 (9th Cir. 2025) ("The government does not dispute that it terminated the subject grants because they promoted DEI, DEIA, or environmental justice.").

During the first stage of grant review, NEH staff "reviewed all awards made over the preceding four years and rated them 'high, medium, low' in terms of promoting DEI." Dkt. No. 277, ¶ 26 (Defendants' response: "Admitted."); *see also* Dkt. No. 248-5, Ex. 5, NEH_AR_000022. That DEI rating was reflected in a spreadsheet identifying whether each grant was "related to DEI" and recorded a corresponding "Rationale." *Id.*, ¶¶ 45, 47, 48, 50–53 (Defendants admitting that "ChatGPT responded 'Yes' to the question of whether the referenced grant was related to DEI, and that the quoted text appears in the 'Rationale' column of the cited spreadsheet"). The "Rationale" column did not describe neutral, statutorily required review criteria; it captured the perceived ideological content of the funded work based on its relation to "DEI." One need not look any further than the titles and columns of the spreadsheets themselves. They are labeled "DEI Grant Summary," and include a "Yes / No DEI?" column for each grant slated for termination, alongside a "DEI Rationale" column explaining why the grant is related to DEI – even if, as is true

in many cases, it was not. *See, e.g.*, Dkt. No. 248-12, Ex. 12; Dkt. No. 248-13, Ex. 13; Dkt. No. 284-1, Ex. 44, US-000061323.

During the second stage of grant review, after NEH handed over its "Yes / No DEI?" spreadsheets, DOGE continued to review grants for perceived affiliation with DEI. Fox conducted this review by using ChatGPT. He entered each grant's description into ChatGPT, with the following prompt: "Does the following relate at all to DEI? Respond factually in less than 120 characters. Begin with 'Yes.' or 'No.' followed by a brief explanation." Dkt. No. 248-11, Ex. 11, US-000062485 (tab "Sheet3"), at C2–C1163. Fox testified that he used ChatGPT in this way "[t]o highlight why this grant may relate to DEI," Dkt. No. 248-1, Fox Dep., 204:20–23, and "to pull out anything related to DEI," *id.*, 209:21–210:6. Asking whether a grant "relate[s] at all to DEI" reflects a purely ideological filter that has no other purpose than to identify disfavored viewpoints the Government wants to suppress.

Some of these AI outputs identify subject matter that, in a broad sense, could be associated with themes commonly discussed under the rubric of "DEI" – which is to say, subject matter expressing the view that "the exclusion of historically disadvantaged groups is undesirable." Others plainly do not. In either case, the classification – and the resulting termination decision – turned on DOGE's perception that the grantee was expressing a DEI-related viewpoint, not on any neutral, statutorily grounded criterion. *See Heffernan v. City of Paterson*, 578 U.S. 266, 272 (2016).

The record illustrates the constitutional infirmity of the termination process. For example, the Government, using ChatGPT, classified as DEI an anthology titled *In the Shadow of the Holocaust: Short Fiction by Jewish Writers from the Soviet Union*. The stated rationale was that the project "explores Jewish writers' engagement with the Holocaust in the USSR, highlighting

themes of witnessing, memory, and resilience." Dkt. No. 248-11 at 69, H316. The project reflects a scholarly effort to recover suppressed literature, confront the legacy of the Holocaust, and examine how communities reckon with the trauma of mass violence. The work sought to address "how to witness and provide testimony, how to remember victims, and how to live on in the face of overwhelming destruction." *Id.* at 69, C316. Revoking a federal grant solely because it discusses and illuminates historical injustice against a minority group is plainly viewpoint discrimination. But, according to the Government, the project was "#DEI" because it "explores Jewish writers" and "highlight[s] themes of witnessing, memory, and resilience." *Id.* at 69, I316.

The Government, again using ChatGPT, also classified as DEI a project examining graphic narratives created by Jewish women survivors of Nazi persecution in the immediate aftermath of the Holocaust. The project reflects a scholarly effort to recover "overlooked works in which survivors documented their experiences of persecution" that "sought to counter perpetrator and liberator sources and represent their own histories of Jewish suffering." Dkt. No. 248-11, at 235, C1098. Because the project "highlights the overlooked graphic narratives by Jewish women survivors, revealing diverse, gendered ways of experiencing and representing the Holocaust," it was deemed "#DEI," apparently on both "Jewish" and "woman" grounds. Dkt. No. 248-11, at 235, H1098.

Third example: the Government, using ChatGPT, classified as DEI a documentary project titled *My Underground Mother*, which explores "the untold story of Jewish women's slave labor during the Holocaust" through survivor testimony, personal archives, and a daughter's effort to reconstruct her mother's past. Dkt. No. 248-11 at 4, C16. The project endeavors to recover suppressed histories of violence against women during the Holocaust. But the project was classified by DOGE as "DEI" because it "addresses gender-based violence and overlooked

histories" and "amplif[ies] marginalized voices." *Id.* That classification, once again, does not identify any deficiency in statutory eligibility or scholarly merit. It identifies a perspective – one that seeks to document persecution, recover the long overlooked voices of Jewish women, which illuminate the human experience of violence and survival – and treats that viewpoint as a basis for termination.

The Government suggests that there is no real constitutional problem here because any viewpoint-based classification was ChatGPT's doing, rather than the Government's. *See* Dkt. No. 278, Defs.' Mem. L. Opp'n to Pls.' Mot. for Summ. J., at 38–40 ("Fox only used ChatGPT '[t]o look at the . . . full grant descriptions and bring out the context of which a DEI grant may relate' and to 'inform DEI rationale.'"). That argument brings to mind, for someone of my generation, the great comedian Flip Wilson, whose character "Geraldine Jones" would excuse her behavior by saying, "The devil made me do it." That excuse did not work for Geraldine Jones, and it does not work for the Government. There is no distinction to be drawn here between the Government and ChatGPT. ChatGPT was the Government's chosen instrument for purposes of this project, and DOGE's use of AI to identify DEI-related material neither excuses presumptively unconstitutional conduct nor gives the Government *carte blanche* to engage in it.

Here, DOGE selected the AI tool, formulated the prompt, and defined the operative viewpoint-based criterion: whether a grant "relate[s] at all to DEI." DOGE adopted the classifications and supporting rationales that were generated by ChatGPT to justify terminating grant after grant. The Government actors who made the decisions here – DOGE personnel – followed the classifications and rationales produced by the process they created. There is not a scintilla of evidence that Fox or Cavanaugh, having obtained a "DEI" rationale from ChatGPT, undertook any meaningful review of whether that rationale made sense. Although Fox

states that ChatGPT's answers were just an "intermediary step," neither Fox nor the Government has identified a single example where Fox reviewed ChatGPT's DEI rationale, disagreed with its assessment, and chose not to terminate a particular grant. Dkt. No. 248-1, Fox Dep., 210:25. DOGE simply adopted ChatGPT's rationales wholesale as their own.

Therefore, one cannot treat ChatGPT and the Government as distinct actors for constitutional purposes. Any argument to the contrary is unworthy of representatives of the Department of Justice. Every lawyer who has been called out and sanctioned for incorporating into briefs hallucinated case citations that were generated by AI could have said the same: "It wasn't me; it was ChatGPT." That those lawyers have, for the most part, thrown themselves at the mercy of the deluded court and accepted their punishment demonstrates the absurdity of the Government's argument.

In any event, as Fox testified, the DOGE representatives agreed with ChatGPT's "recommendations." He averred that ChatGPT properly classified the grant to study Jewish slave labor because it "is related to DEI." Dkt. No. 248-1, Fox Dep., 190:15. DOGE slated it for termination because it was "specifically focused on Jewish cultures and amplifying the marginalized voices of the females in that culture." *Id.* at 191:5–9. "It's inherently related to DEI" because it is about "marginalized female voices during the Holocaust[.]" *Id.* at 191:8–12. Put simply, the Government terminated the grant because the grant sought to empower and amplify the voices of Jewish women who were victims of Nazi persecution. The Government may have its reasons for disfavoring that perspective, but the First Amendment does not permit it to divest someone of a government benefit.

Yet another example: the Government, acting through DOGE, classified as DEI a scholarly project titled *A Lethal Education*, which examined boarding schools maintained by the

Government to educate Indigenous youth between 1819 and 1934 – a period when the federal government "took guardianship of Native American youth and sent them to schools established to 'civilize' them." Dkt. No. 248-11, at 513, C638. The project "sheds light on the dark history of Native American boarding schools," "uncovers that the schools were far more lethal than previously known," and "mak[es] visible lives erased by unscrupulous bureaucrats." *Id.* As with the prior examples, DOGE identified the project as "DEI" because it concerned the historical mistreatment of Indigenous children by the federal government and sought to educate the public about that injustice. Disfavoring that perspective because it brings to light historical injustice is viewpoint discrimination.

At least these aforementioned grants bore some logical relationship to themes disfavored by the current administration. The record reflects countless other grants identified by ChatGPT as "DEI" that bore no discernible relationship to any coherent definition or understanding of that term. Nonetheless, they were terminated, based solely on Fox and Cavanaugh's perception that they implicated disfavored DEI-related ideas. A few examples to illustrate the incoherence of DOGE's classifications:

- DOGE flagged as DEI a grant to the Whaling Museum & Education Center, which sought funds to support the museum's "site interpretation about whaling history and [to] design a visitor-responsive, inclusive, inquiry-based and impactful experience in a new 1300-square foot pavilion housing a full-size whale skeleton." Dkt. No. 248-11, Ex. 11, US-000062485 (tab "Sheet3"), at D1015. According to DOGE, the program was "DEI" because it seeks to "create an inclusive and impactful experience, which is aligned with DEI principles." *Id.* This must represent the first time in history that an exhibit about the whaling industry – a cornerstone of New England's economy during the 19th and early 20th centuries – has been thought to fall under the banner of "diversity, equity and inclusion" – unless the whales' status as a species endangered by the whalers places them in a "marginalized" status.

- DOGE flagged as DEI a grant to the Philosophy and Literature Circle, a lifelong learning public humanities program in Texas. The funded program

offered a reading, discussion, and writing program involving "celebrated works in philosophy and literature in order to develop capacities in critical thinking." Dkt. No. 248-11, Ex. 11, US-000062485 (tab "Sheet3"), at D1040. According to DOGE, the program was "DEI" because it aims "to engage and exchange ideas [and] develop critical thinking." *Id.* It is an unfortunate sign of the times if promoting critical thought is politically disfavored.

- DOGE flagged as DEI a grant to the Historic Albany Foundation which sought funds to restore and rehabilitate the Van Ostrande-Radliff House, the oldest building in Albany, New York that is extant from the Dutch colonial period. According to DOGE, the restoration of the house "relates to DEI by preserving and celebrating the historic architecture and culture of Dutch colonial period in Albany." Dkt. No. 248-11, Ex. 11, US-000062485 (tab "Sheet3"), at D19. Architecture has not historically been thought to implicate diversity, equity, or inclusion principles or to deal with historically marginalized groups – and the Dutch settlers in colonial Albany were most assuredly not a historically marginalized group.

- DOGE flagged as DEI a grant that sought to "produce the first comprehensive, accurate, scholarly, and freely-available edition of all surviving inscribed legislation from classical Rome," and would have "double[d] the amount of Latin and Greek text contained in the last major work" in the fields of Roman history and Roman law. Dkt. No. 248-11, Ex. 11, US-000062485 (tab "Sheet3"), at D247. This was "DEI" because it "contributes to understanding Roman history and law" – which is ironic, since many well-known opponents of DEI-related programs would applaud a project devoted to classical Western (*i.e.*, Greek and Roman) languages, law, and history.

- DOGE flagged as DEI a grant to the Boston Symphony Orchestra that sought to digitize at-risk audio reels representing radio broadcasts of live Boston Pops concerts between 1958 and 1979 – a period covering the last 20 years of the great and beloved Arthur Fiedler's tenure as the Pops conductor. According to DOGE, "Preserving and making accessible historical recordings promotes diversity, equity, and inclusion by sharing valuable cultural heritage." Dkt. No. 248-11, Ex. 11, US-000062485 (tab "Sheet3"), at D434. This surely represents an unwarranted expansion of any definition of DEI, since ChatGPT utterly failed to explain why preserving Boston Pops broadcasts from the Fiedler era had anything to do with advancing the interests of any historically disfavored group, though many a professional musician might well feel marginalized. In fact, the "valuable cultural heritage" that would be shared by preserving these

broadcasts includes innumerable performances of John Philip Sousa's patriotic marches, played regularly to enthusiastic audiences.[5]

- DOGE flagged as DEI a grant to the National Ornamental Metal Museum in Memphis, Tennessee, which would have used the funds "for the preservation, promotion, and advancement of the field of fine metalwork." Dkt. No. 248-11, Ex. 11, US-000062485 (tab "Sheet3"), at D120. According to DOGE, "The Metal Museum's commitment to educating and contextualizing the roles and history of metalwork aligns with DEI principles by promoting understanding and inclusivity in the field." *Id.* Neither DOGE nor ChatGPT identified what possible DEI concern there could be about any aspect of fine metalwork.

- Finally, DOGE flagged as DEI a grant to Georgetown University to implement a new Medical Humanities Minor featuring cross-campus programming with the University's medical school. It sought to "contribute to scholarship in the field of medical humanities [and] change the patient/clinician encounter from a grassroots level, by shaping the training of health care professionals." According to DOGE, this was DEI because it would have "enhanc[ed] [the] well-being of pre-health students." Dkt. No. 248-11, Ex. 11, US-000062485 (tab "Sheet3"), at D476. It is simply impossible to know what to say about this one.

Regardless of whether DOGE's classifications were coherent (obviously, many of them were not), what matters is that it deliberately sought to single out and eliminate grants based on its perception that they implicated disfavored ideas. *See* Dkt. No. 248-17, Ex. 17, NEH_AR_000013 ("[W]e have only excluded [from termination] the ones that seem not to conflict with the Administration's priorities[.]"). The Government's actions cannot stand. It may not "restrict the speech of some elements of our society in order to enhance the relative voice of others." *Buckley v. Valeo*, 424 U.S. 1, 48–49 (1976) (*per curiam*). Yet, 1,057 grants[6] were identified as related to

---

[5] This project would also have ensured the preservation of the live broadcast of the Pops' historic Bicentennial Concert, broadcast live from Boston's Esplanade on the evening of July 4, 1976 – which ended with the bells of all of Boston's historic churches ringing to celebrate the 200th anniversary of the signing of the Declaration of Independence, while fireworks exploded and Fiedler conducted the climactic ending of Tchaikovsky's *1812 Overture*. It was a terrific and patriotic musical moment.

[6] The awardees of these grants, except for those held by ACLS Plaintiffs or their members, are part of the Authors Guild Plaintiffs' proposed DEI Subclass. *See infra* Section IV(F).

DEI in this manner and were terminated on that basis and that basis alone. *See* Dkt. No. 248-25, Ex. 25, NEH_AR_0000136; Dkt. No. 248-3, Ex. 3, McDonald Dep., 144:6–15 (agreeing that the result of this DEI-based flagging process "was specifically to identify grants for potential termination").

The Government, for its part, has never claimed that these grants were reviewed for their humanistic merit or that they were terminated for any reason other than the DOGE decisionmakers' perception that they espoused, reflected, or related to the disfavored "DEI" viewpoint. To the contrary, the Government admits that these grants were terminated because they were deemed to promote DEI. *See, e.g.*, Dkt. No. 248-2, Ex. 2, Cavanaugh Dep., 202:18–20 ("Q: [I]f a grant related to DEI, it couldn't be on the 'keep' list, right? A: That's correct."). DOGE itself publicly characterized the terminations as "DEI," posting from its official account on X (formerly Twitter) that "During the previous administration, the National Endowment for the Humanities (NEH) awarded the following grants to spend taxpayer dollars, all of which have been cancelled ($163M in overall savings). NEH grants will be merit-based and awarded to *non-DEI*, pro-America causes." Post, DOGE (@DOGE), X (May 20, 2025, 3:45 PM), https://x.com/doge/status/1924944059153670530 (emphasis added). The Government's own public statements confirm what the record otherwise makes clear: DEI, the disfavored viewpoint, was the reason why the majority of Plaintiffs' grants were terminated. The Government engaged in blatant viewpoint discrimination.

The Government cannot avoid that conclusion by invoking the familiar principle that it need not subsidize every form of protected expression. *See, e.g., Rust*, 500 U.S. at 194 (rejecting the proposition that "if the government chooses to subsidize one protected right, it must subsidize analogous counterpart rights"). That principle has its place. Congress may define the subjects and

activities that federal funds will support, and an agency acting pursuant to statutory authority may implement those limits.  But that is not what happened here.  This case involves DOGE's post-award cancellation of grants that had already been approved under NEH's statutory program, based on nonstatutory criteria that Congress did not enact – indeed, that are antithetical to what Congress did enact – and that targeted projects because they were perceived to express a disfavored viewpoint.

*Regan v. Taxation With Representation of Washington*, 461 U.S. 540 (1983), illustrates the difference.  There, a nonprofit corporation, Taxation With Representation of Washington, sought § 501(c)(3) status so that it could use tax-deductible contributions to support substantial lobbying activities.  *Id.* at 542–44.  The Internal Revenue Service denied the application because "a substantial part of TWR's activities would consist of attempting to influence legislation," which § 501(c)(3) did not permit.  *Id.* at 542; *see* 26 U.S.C. § 501(c)(3).  The Supreme Court upheld that statutory scheme, because "Congress has merely refused to pay for the lobbying out of public monies," *Regan*, 461 U.S. at 545, and because TWR remained free to lobby through a § 501(c)(4) affiliate using non-deductible contributions, *id.* at 544–46.  As the Court put it, "Congress has not infringed any First Amendment rights or regulated any First Amendment activity"; it had "simply chosen not to pay for TWR's lobbying."  *Id.* at 546.

*Regan* thus involved a statutory funding limitation imposed by Congress, the entity that, under our Constitution, decides how to spend taxpayer money.  It did not involve the Executive Branch imposing its own preferred funding limitation after Congress had authorized something else.  Nor did it involve the suppression of disfavored ideas.  Indeed, the Court emphasized that the case would have been different if Congress had "discriminate[d] invidiously in its subsidies in

such a way as to 'aim[] at the suppression of dangerous ideas.'" *Id.* at 548 (quoting *Cammarano v. United States*, 358 U.S. 498, 513 (1959)).

The same is true of *Rust v. Sullivan*, 500 U.S. 173 (1991). There, Congress enacted Title X, which explicitly authorized the United States Secretary of Health and Human Services to "make grants to and enter into contracts with public or nonprofit private entities" for voluntary family-planning projects, 42 U.S.C. § 300(a), and provided that such grants and contracts must "be made in accordance with such regulations as the Secretary may promulgate," *id.* § 300a-4(a). *Rust*, 500 U.S. at 178. Congress also enacted an express funding limitation: "None of the funds appropriated under this subchapter shall be used in programs where abortion is a method of family planning." *Id.* at 178–79 (quoting 42 U.S.C. § 300a-6). The challenged regulations implemented that statutory limitation by defining the permissible scope of Title X projects. *Id.* at 179–81. In that context, the Court held that the Government had not discriminated on the basis of viewpoint; it had "merely chosen to fund one activity to the exclusion of the other." *Id.* at 193.

The distinction is not that Title X grant applicants faced no funding consequences under *Rust*. They plainly did. The distinction is that *Rust* involved a facial, pre-enforcement challenge to prospective regulations, promulgated by the statutorily authorized official, defining the permissible scope of a federal program pursuant to an express statutory funding restriction. *See id.* at 181–83. The Supreme Court emphasized that the Government was "not denying a benefit to anyone," but was "instead simply insisting that public funds be spent for the purposes for which they were authorized." *Id.* at 196. The regulations governed the scope of the federally funded Title X project and left grantees "unfettered" in their other activities. *Id.*

Here, the Government's analogy to *Rust* and *Regan* fails twice over.

- 100 -

*First,* Congress enacted no comparable statutory limitation for DOGE – or anyone else – to implement.  Congress did not provide that NEH funds could not be used for programs concerning DEI, race, gender, religion, minority communities, historical injustice, or any comparable category.  To the contrary, Congress created NEH to support private humanistic inquiry, including scholarship and programs reflecting "*the diversity and richness of our American cultural heritage.*"  20 U.S.C. § 956(c)(4) (emphasis added).  Congress expressly authorized NEH to support "programs and research which have substantial scholarly and cultural significance and that reach, or reflect the diversity and richness of our American cultural heritage, *including the culture of, a minority, inner city, rural, or tribal community,*" *id.* § 956(c)(4), and directed that, "[i]n selecting individuals and groups of exceptional talent as recipients of financial assistance," the Chairperson "shall give particular regard to scholars, and educational and cultural institutions, that have *traditionally been underrepresented,*" *id.* § 956(c) (emphasis added).  "Particular regard" to groups that have been traditionally "underrepresented" is, of course, the hallmark of DEI.  Congress made those considerations directly relevant; DOGE treated them as disqualifying.

*Second,* DOGE was not the official or agency to which Congress delegated authority to define the scope of NEH's program or to award or terminate NEH grants.  *See supra* Section IV(B)(2)(c).  DOGE was therefore not insisting that NEH funds be spent for the purposes Congress authorized; the Government does not even attempt to argue as much.  It cancelled grants because the funded projects were perceived to implicate subjects and viewpoints that Congress not only did not prohibit, but, in many instances, expressly made relevant to NEH's mission.  Congress never authorized DOGE to impose new ideological criteria, redefine NEH's statutory purposes, or terminate already-awarded grants because DOGE perceived them to implicate DEI.

Thus, for both reasons, this case bears no resemblance to either *Rust* or *Regan*.

*Agency for International Development v. Alliance for Open Society International, Inc.* ("*AOSI*"), 570 U.S. 205 (2013), is of no help to the Government either. *AOSI* recognizes that the Government can impose funding limits to ensure that federal funds are used for the purposes Congress authorized. *See id.* at 213. But it also makes clear that the Government "'may not deny a benefit to a person on a basis that infringes his constitutionally protected . . . freedom of speech even if he has no entitlement to that benefit.'" *Id.* at 214 (citation omitted). There, Congress had authorized federal funds to support nongovernmental organizations combating HIV/AIDS overseas, while imposing two conditions: (1) funds could not be used to "promote or advocate the legalization or practice of prostitution or sex trafficking," and (2) recipients had to maintain "a policy explicitly opposing prostitution and sex trafficking." *Id.* at 208, 210. The Supreme Court drew a constitutional line between those two conditions. The first permissibly governed the use of federal funds within the program. The second, the Court held, impermissibly required recipients themselves to affirm the government's preferred view as their own. *Id.* at 213. The relevant distinction is between permissible conditions that define the limits of a government spending program and impermissible conditions that "seek to leverage funding to regulate speech outside the contours of the program itself." *Id.* at 214–15. The latter category is implicated here.

DOGE did not show up at the NEH and "advise" the agency on what kinds of projects to fund. It reexamined grants that had already been awarded, identified projects that expressed or reflected certain viewpoints, principally viewpoints associated with DEI, and terminated the grants already awarded for that reason. Like the policy requirement in *AOSI*, DOGE's termination criterion did not keep federal funds within the boundaries of a congressionally defined program. It used funding leverage to penalize private speakers for failing to conform to the Government's

preferred ideological position – here, the Administration's anti-DEI stance – even though that stance, as applied here, contradicts the statutory priorities Congress enacted.

*National Public Radio v. Trump*, 2026 WL 877434, at \*1 (D.D.C. Mar. 31, 2026), is instructive. There, the challenged Executive Order – Executive Order 14290, titled "*Ending Taxpayer Subsidization of Biased Media*" – announced that NPR and PBS did not, in the President's view, "present[] a fair, accurate, or unbiased portrayal of current events," and instructed federal agencies to end "direct or indirect [federal] funding of NPR and PBS." *Nat'l Pub. Radio*, 2026 WL 877434, at \*1. The accompanying Fact Sheet made the viewpoint-based rationale explicit, asserting that "NPR and PBS have fueled partisanship and left-wing propaganda with taxpayer dollars" and that such funding was "highly inappropriate and an improper use of taxpayers' money." *Id.*

The Executive Order was sweeping. It instructed the Corporation for Public Broadcasting to "cease direct funding to NPR and PBS" and to "cancel existing direct funding to the maximum extent allowed by law and [to] decline to provide future funding." *Id.* at \*7. It also directed all federal agencies to "identify and terminate, to the maximum extent consistent with applicable law, any direct or indirect funding of NPR and PBS." *Id.* The court held that this crossed the constitutional line because the Order did not "define or regulate the content of government speech or ensure compliance with a federal program," and did not "set neutral and germane criteria that apply to all applicants for a federal grant program." *Id.* at \*1. Instead, it singled out particular speakers "on the basis of their speech" and barred them from federal funding. *Id.*

The same line was crossed here. As in *National Public Radio,* the Government did not merely define neutral program criteria or ensure compliance with statutory grant conditions. It identified funded private expression it disfavored – there, speech deemed "biased"; here,

scholarship and humanities projects deemed "DEI" – and used federal funding authority to terminate or deny support on that basis. The label differs, but the constitutional infirmity is the same. The Government used the power of the purse "to punish or suppress disfavored expression." *Id.* at *1. That is exactly what happened here.

DOGE did not adopt neutral, prospective, germane criteria governing the use of NEH funds pursuant to any statutory limitation enacted by Congress. Unlike in *Regan* and *Rust*, there was no express congressional funding restriction for DOGE to effectuate. Instead, DOGE identified already-awarded grants as objectionable because they were perceived to relate to DEI; generated "DEI Rationales" to explain why those projects implicated that disfavored viewpoint; and then clawed back funding on that basis. That is neither a *Regan*-style refusal by Congress to subsidize a category of activity nor a *Rust*-style definition of program scope by a statutorily authorized agency implementing an express statutory funding limitation. It is the imposition of a nonstatutory penalty by a nonstatutory entity on disfavored private expression – precisely the sort of funding-based viewpoint discrimination that *AOSI* forbids.

In sum, every aspect of the termination process – the NEH DEI ratings, DOGE's DEI-based ChatGPT filter, and the spreadsheet sorting grants by "DEI Rationale" – reflects a single, unconstitutional purpose: to drive a particular disfavored viewpoint from the marketplace of humanistic inquiry. *Accord Thakur*, 163 F.4th at 1207 ("[T]he current record suggests that the government aimed at the suppression of speech that views DEI, DEIA, and environmental justice favorably.").

There are a "few historic and traditional categories of expression" where content-based restrictions on speech will not automatically trigger strict scrutiny – categories that include fraud, defamation, and "fighting words." *United States v. Alvarez*, 567 U.S. 709, 717 (2012) (plurality

opinion) (citation modified).  Suffice it to say, none of the grants discussed in the preceding pages, and none of the other grants that were terminated on the same basis, threaten to incite an "immediate breach of the peace."  *Chaplinsky v. State of New Hampshire*, 315 U.S. 568, 572 (1942).  The Government has engaged in viewpoint discrimination in its most "blatant" form. *Rosenberger*, 515 U.S. at 829–30.  Such discrimination is presumptively unconstitutional.  *Id.* at 830.

### ii.    Political-Association Discrimination

The Government likewise violated the First Amendment when it terminated grants based on their perceived association with the Biden Administration.

The government may not "leverage its power to award [or deny] subsidies on the basis of subjective criteria into a penalty on disfavored viewpoints."  *Finley*, 524 U.S. at 587.  Even where the government is not obligated to confer a benefit, "there are some reasons upon which the government may not rely" in denying the benefit.  *Perry*, 408 U.S. at 597.  For example, the government "may not deny a benefit to a person on a basis that infringes his constitutionally protected interests—especially, his interest in freedom of speech."  *Id.*  Political association is one of those protected interests.  *See Buckley*, 424 U.S. at 15; *Kusper v. Pontikes*, 414 U.S. 51, 56–57 (1973).  Accordingly, the Government may not condition the receipt or retention of a public benefit – including a federal grant – on political affiliation, non-affiliation, or perceived political alignment.

As Justice Harlan explained in *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 460 (1958), "Effective advocacy of both public and private points of view, particularly controversial ones, is undeniably enhanced by group association."  The Supreme Court has repeatedly applied that principle in the political context: "There can no longer be any doubt that freedom to associate

with others for the common advancement of political beliefs and ideas is a form of 'orderly group activity' protected by the First and Fourteenth Amendments." *Kusper*, 414 U.S. at 56–57 (citation omitted). And "The right to associate with the political party of one's choice is an integral part of this basic constitutional freedom." *Id.* at 57. For this reason, "The First Amendment protects political association as well as political expression." *Buckley*, 424 U.S. at 15.

When the government funds private speech, it must do so in a viewpoint-neutral manner and may not skew the marketplace of ideas by penalizing disfavored political associations. *See id.* at 48–49. After all, the First Amendment was designed "to secure 'the widest possible dissemination of information from diverse and antagonistic sources.'" *New York Times Co. v. Sullivan*, 376 U.S. 254, 266 (1964) (quoting *Associated Press v. United States*, 326 U.S. 1, 20 (1945)). But DOGE crossed that constitutional line. DOGE specifically sought to terminate grants because they were "Biden-era" grants.

The record makes this abundantly clear. When NEH's Chief Information Officer first directed NEH staff to start reviewing grants, he directed them to review only grants issued since "the start of the Biden administration." Dkt. No. 248-26, Ex. 26, Wolfson Dep., 87:21–88:4; Dkt. No. 248-4, Ex. 4, NEH_AR_000001; *see also* Dkt. No. 248-8, Ex. 8, NEH_AR_000005 (Wolfson describing "historical review of NEH's grants since January 2021"). And as soon as DOGE arrived at NEH, Cavanaugh sent McDonald "a list of grants that were awarded during President Biden's administration" and suggested that all funds awarded during President Biden's administration that had yet to be distributed "can presumably be clawed back." Dkt. No. 248-27, Ex. 27, NEH_AR_000003. McDonald testified to his "understanding" from interactions with DOGE that "the presumption was that . . . open grants that were made under the Biden administration needed to be reviewed." Dkt. No. 248-3, McDonald Dep., 372:19–23.

As McDonald laid bare, "Basically, we were looking at the last four years of open grants from the Biden administration. My understanding was we wanted to start afresh, a . . . clean slate . . . as much as possible." *Id.*, 226:12–227:1. Again, the Government makes no attempt to argue that these grants were terminated based on their humanistic merit or statutory criteria. The reality is that they were uniformly flagged for termination because they were "Biden Grants." *See, e.g.*, Dkt. No. 248-28, Ex. 28, NEH_AR_000004.

Such grants were treated as suspect because they were associated with the prior administration and so were presumed to not "align[] with the [Trump] Administration." Dkt. No. 248-2, Cavanaugh Dep., 155:11–13; *see also* Dkt. No. 248-29, Ex. 29, US-000064703 (McDonald's talking points stating that "the President does not like" the terminated grants).

That is not a permissible funding criterion. It is discrimination based on perceived political association. The First Amendment does not permit the Government to terminate grants previously awarded because they are associated, or perceived to be associated, with a political opponent. *See Perry*, 408 U.S. at 597; *Heffernan v. City of Paterson*, 578 U.S. 266, 272 (2016). To allow the Government to make "selections among recipients of public subsidies that favor and strengthen those friendly to the government's message while placing at a disadvantage and thus weakening the opponents and skeptics" is to permit it to dictate which voices may remain in the public discourse – precisely what the First Amendment forbids. *Alliance for Open Soc'y Int'l, Inc. v. USAID*, 430 F. Supp. 2d 222, 258 (S.D.N.Y. 2006).

There can be no genuine dispute that the Government's rationale was "the specific motivating ideology or the opinion or perspective of the speaker." *Rosenberger*, 515 U.S. at 829. Far be it for this Court to deny the Government its right to advocate for its own policies and establish lawful prospective priorities. *See Regan*, 461 U.S. at 542–46. But what the Government

may not do is weaponize public funding to penalize disfavored political associations. *Rosenberger*, 515 U.S. at 828; *Perry*, 408 U.S. at 597.

*    *    *

In sum, the perceived relationship of a grant to DEI or to the Biden Administration was the very *raison d'être* for the challenged terminations. Taken together, the DEI-based terminations and the Biden-era terminations reflect the same fundamental constitutional error, though they do so in distinct ways. The former penalized grants because they were perceived to express or reflect disfavored viewpoints; the latter penalized grants because they were perceived to be associated with a disfavored administration. The First Amendment forbids both.

The Government may believe that its policy choices are urgent, prudent, and necessary to advance the priorities of the Administration. That is its prerogative. *See Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 187–88 (2024). The Court is under no illusion that a new administration may prefer, on a going-forward basis, to fund certain kinds of scholarly programs over others. But lawful priority-setting is one thing; depriving someone of a benefit previously conferred based on viewpoint and perceived political association is something else entirely. Consistent with *Regan* and *Rust*, a new administration may pursue lawful funding priorities within the bounds of the NEH statute and the Constitution. But it has no license to suppress disfavored ideas. *See Rosenberger*, 515 U.S. at 830. Nor do *Regan* or *Rust* permit the Executive Branch to disregard the statute Congress enacted and substitute its own funding criteria in its place.

The conclusion follows from first principles. "[I]f there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics[.]" *West Virginia Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943); *see also Chiles v. Salazar*, 146 S. Ct. 1010, 1021 (2026) ("In this Nation, no official—'high or petty'—may

command our tongues or silence our voices."). That command admits of no exception for the distribution of public funds that subsidize private speech. *See Perry*, 408 U.S. at 597. Viewpoint discrimination is "an egregious form of content regulation" from which "governments in this country must nearly always abstain." *Chiles v. Salazar*, 146 S. Ct. 1010, 1021 (2026) (citation modified).

At bottom, "the First Amendment envisions the United States as a rich and complex place where all persons are free to think and speak as they wish, *not as the government demands*." *303 Creative LLC v. Elenis*, 600 U.S. 570, 603 (2023) (emphasis added). That promise is no less vital in the humanities, where the work of scholarship, writing, preservation, and independent inquiry depends on freedom from state-imposed ideological conformity and from the uncertain whims of those who happen to hold power at a given moment. Because DOGE's decision to terminate these grants would deny that constitutional promise, it cannot stand.

### D. The Mass Termination Violated the Equal Protection Component of the Fifth Amendment

The Due Process Clause of the Fifth Amendment provides that "No person shall be . . . deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V. Although the Fifth Amendment does not contain an Equal Protection Clause, the Supreme Court has long held that its Due Process Clause incorporates an equal protection component applicable to the federal government. *Bolling v. Sharpe*, 347 U.S. 497, 499–500 (1954) ("[I]t would be unthinkable that the same Constitution would impose a lesser duty on the Federal Government."). Our approach to Fifth Amendment equal protection claims "has always been precisely the same as to equal protection claims under the Fourteenth Amendment," *Weinberger v. Wiesenfeld*, 420 U.S. 636, 638 n.2 (1975), and precedents decided under the latter are controlling when considering claims under the former. *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 217 (1995).

The Government can violate the Equal Protection Clause in several ways, including by (1) expressly classifying individuals based on their race, *see Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 712, 716, 720 (2007); (2) applying facially neutral policies in an intentionally discriminatory manner, *see Yick Wo v. Hopkins*, 118 U.S. 356, 373–74 (1886); or (3) adopting policies that have a disparate impact and are motivated by discriminatory purpose. *Adarand*, 515 U.S. at 213.  This case implicates the first category of explicit classifications.

The equal protection component of the Fifth Amendment "prohibit[s] the United States from invidiously discriminating between individuals or groups." *Washington v. Davis*, 426 U.S. 229, 239 (1976).  In particular, drawing distinctions between citizens solely because of their race or ancestry "are by their very nature odious to a free people whose institutions are founded upon the doctrine of equality." *Hirabayashi v. United States*, 320 U.S. 81, 100 (1943).  Here, the Government has done more.  In all, it employed explicit classifications based on race, ethnicity, national origin, religion, sex, and sexual orientation.

When the government uses race to create a classification for purposes of official action, the government must satisfy strict scrutiny.  *Adarand*, 515 U.S. at 227.  Strict scrutiny is "the most demanding test known to constitutional law." *City of Boerne v. Flores*, 521 U.S. 507, 534 (1997).  Racial classifications are constitutional "only if they are narrowly tailored to further compelling governmental interests." *Grutter v. Bollinger*, 539 U.S. 306, 326 (2003).  The government's exact "motives" to classify based on race do not "affect the strict scrutiny analysis." *Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 741–42 (2007).  Rather, courts "apply strict scrutiny to all racial classifications to smoke out illegitimate uses of race by assuring that government is pursuing a goal important enough to warrant use of a highly suspect tool." *Johnson v. California*, 543 U.S. 499, 505–06 (2005) (quotations omitted).

The same demanding test governs classifications based on ethnicity, national origin, and religion, which likewise trigger strict scrutiny. *See Graham v. Richardson*, 403 U.S. 365 (1971) (alienage, nationality, and race); *Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 18 (2020) (religion). Classifications based on sex are subject to intermediate scrutiny, under which the Government must show that the classification "serves important governmental objectives, and the discriminatory means employed must be substantially related to the achievement of those objectives." *Nevada Dep't of Hum. Res. v. Hibbs*, 538 U.S. 721, 728 (2003) (citation modified). And the Second Circuit, where this Court sits, applies heightened scrutiny to classifications based on sexual orientation. *Windsor v. United States*, 699 F.3d 169, 185 (2d Cir. 2012), *aff'd on other grounds*, 570 U.S. 744 (2013).

The record demonstrates that the Government expressly employed all of the above classifications to identify grants for placement on the termination list. After being deployed from DOGE to NEH, Justin Fox used search terms, which he labeled as "Detection Codes," to identify grants that he dubbed the "Craziest Grants" and "Other Bad Grants." Dkt. No. 248-9, Ex. 9, US-000016154 ("Detection List" tab). The search terms included, among other terms, "BIPOC (Black, Indigenous, People of Color)," "Minorities," "Native," "Tribal," "Indigenous," "Immigrant," "LGBTQ," "Homosexual," and "Gay." Dkt. No. 248-9, Ex. 9, US-000016154; Dkt. No. 248-1, Fox Dep., 236:22–237:10. When Fox was asked whether he "r[a]n this list of words through every grant description" he received from NEH, he confirmed, "yes." Dkt. No. 248-1, Fox Dep., 276:16–277:2. In this way, Fox constructed and applied explicit classifications based on protected characteristics and used them as the operative criteria for revoking federal grants.

That classification scheme was then layered on top of another layer of classification, albeit through unconventional means. Fox introduced additional classifications through his use of

ChatGPT. Although he directed ChatGPT to identify grants involving DEI, he did not instruct it to avoid reliance on protected characteristics. Dkt. No. 248-1, Ex. 1, Fox Dep. at 207:11–214:21. As a result, the ChatGPT-generated "DEI Rationales" repeatedly classified grants as DEI precisely because they involved specific races, ethnicities, religions, or genders. As described, ChatGPT provided a "DEI Rationale" that explained why it answered "Yes" for each particular grant involving DEI.

In hundreds of instances in the record, the resulting DEI Rationale makes clear that ChatGPT made the classification solely because a grant involved a particular race, gender, or other protected trait. For example, one grant would have funded a documentary about the Colfax Massacre, "the single greatest incidence of anti-Black violence during Reconstruction." Dkt. No. 248-11, at 2, C4. ChatGPT classified that grant as DEI because "The documentary explores a historical event that significantly impacted Black civil rights." *Id.* This classification rests solely on the project's focus on a particular race, and it became the operative rationale for the grant's termination.

The same pattern appears throughout the record. The Government relied on ChatGPT to generate rationales such as:

- "This biography explores the life and accomplishments of . . . a Black lawyer and jurist."

- "The documentary explores a historical event that significantly impacted Black civil rights."

- "This project analyzes the experiences and contributions of Black children in the Atlantic world, shedding light on their perspectives and resistance to slavery."

- "The Kansas City workshop highlights diverse histories, including Black and Latinx communities, in the Jazz Age and Great Depression."

- "This proposal aims to expand understanding of Black life and geography during slavery."

- "This project focuses on the history and experiences of a Black community."

- "The book explores a Black-led project."

- "The SNCC discussion series engages historically marginalized communities and highlights Black history and activism."

- "The project uses historical research and Augmented Reality to showcase a demolished Chinatown, inviting reflection on the Asian American experience."

- "This anthology explores Jewish writers' engagement with the Holocaust in the USSR."

- "This project aims to restore the legacy of a marginalized woman writer."

Dkt. No. 248-21, Ex. 21, NEH_AR_000024 (Rows 346, 130, 298, 205, 417, 267, 255, 156, 158, 258, 260, respectively). The full list of grants awarded to ACLS Plaintiffs and their members subject to these improper classifications, and for which ACLS Plaintiffs assert equal protection violations, is set out in Exhibit 24. *See* Dkt. No. 248-24.

The record reflects systematic disparities in how the Government treated projects involving different national origins and genders. The Government terminated grants involving countries in Africa, Asia, or South America, while retaining grants involving Western European subjects, including "Victorian poets," a "German theologian," a "German philosopher," "British philosophers," an "English philosopher and mathematician," and an "Italian composer." Dkt. No. 248-14, Ex. 14, US-000061492. The Government likewise appears to have terminated every grant relating to Indigenous Americans; none remained on the "To Keep" list. *See id.*

When asked about the grant funding a project on Jewish women subjected to slave labor during the Holocaust, *see supra* Section IV(C)(2)(b)(i), Fox testified that ChatGPT properly classified the grant as involving DEI, and thus correctly slated it for termination, because it was "specifically focused on Jewish cultures" and the "voices of the *females* in that culture." Dkt. No.

- 113 -

248-1, Fox Dep., at 191:5–9 (emphasis added). That testimony is chilling. At a time when the specter of antisemitism has reemerged from the shadows, for our Government to deem a project about Jewish women disfavored because it centered on "Jewish cultures" and "female" voices is deeply troubling.

Nor is it any easier to reconcile DOGE's wholesale elimination of grants dedicated to African American history with any legitimate determination that scholarship about Black life, culture, exclusion, achievement, or the civil-rights struggle is unworthy of federal funding. What mattered to DOGE was not whether a grant lacked scholarly merit, failed to comply with its terms, or fell outside NEH's statutory purposes. What mattered was that the grant concerned a "minority group." *See id.* at 183:14–16, 191:19–192:2 ("Q: So how did you go about determining what was a minority [ . . . ]? A: Inherently focused on any ethnicity, culture, gender[.]"). DOGE blatantly used protected characteristics as criteria for grant termination.

The point is underscored by the Colfax Massacre grant. Although McDonald testified that he disagreed with Fox's determination that the grant implicated DEI, the race-based rationale generated by ChatGPT and adopted by Fox was carried through to termination anyway. *Id.* at 129:11–20. This is because Fox affirmatively endorsed ChatGPT's race-based classifications. *See, e.g.*, Dkt. No. 248-1, Ex. 1, Fox Dep., 220:8–12, ("Q: Do you agree with ChatGPT's assessment here that the document is DEI if it explores historical events that significantly impacted Black civil rights? A: Yes. Q: Why would that be DEI? A: *It's focused on a singular race.*" (emphasis added)). Fox testified that the Colfax Massacre grant was properly labeled as DEI because "[i]t focuses on . . . a specific race, here being Black." *Id.*, at 220:16–18. Fox affirmatively endorsed and adopted ChatGPT's race-based classifications. On this record, the Government cannot satisfy strict scrutiny – or any level of scrutiny – to justify these terminations.

The Government's response is that rational basis review, rather than strict scrutiny, applies because, in its view, the "grants were [not] terminated through classifications based on protected characteristics." Dkt. No. 278, Defs.' Mem. L. Supp. Cross-Mot. for Summ. J., at 34. Until now, it had not been the Court's experience that the United States Attorney's Office in this district would advance an argument that was so blatantly contradicted by the evidence – but it certainly has done so here. The record establishes, beyond any dispute, that the Government used protected characteristics as criteria for identifying grants for termination. DOGE swept in race and ethnicity – including grants concerning Black, Asian, Latino, and Indigenous communities – as well as national origin and immigration status; religion and religious identity (including Jewish, Christian, and Muslim subjects); sex; and sexual orientation, as criteria for grant termination. Rational basis review does not apply to the racial, ethnic, national-origin, or religious classifications; strict scrutiny does. Nor does rational basis review apply to sex-based classifications, which require an "exceedingly persuasive justification." *United States v. Virginia*, 518 U.S. 515, 524 (1996).

The Supreme Court's most recent discussion of race-based governmental decisionmaking makes the Government's position difficult to sustain. In *Louisiana v. Callais*, No. 24–109, 2026 WL 1153054 (U.S. Apr. 29, 2026), Louisiana invoked compliance with the Voting Rights Act – a federal civil-rights statute enacted under Congress's Reconstruction Amendment enforcement authority – as a justification for race-conscious districting. Even then, Justice Alito, writing for the Court, began from the premise that "the Constitution almost never permits the Federal Government or a State to discriminate on the basis of race," and that "Such discrimination triggers strict scrutiny." *Id*. at *10. The Court further emphasized that "Our acceptance of race-based state action has been rare for a reason." *Id.* If strict scrutiny applies with such force to race-conscious

districting undertaken in purported compliance with the Voting Rights Act – that is, to an effort designed by Congress to preserve equal electoral opportunity and prevent racial exclusion from the political process – then it must apply with at least equal if not more force here, where race was used to exclude disfavored scholarship about historically marginalized groups from public support.

Unlike the asserted VRA-compliance rationale in *Callais*, DOGE's use of race was not designed to open public institutions to equal participation. DOGE's use of race was certainly not remedial. It was punitive. DOGE, relying on ChatGPT and on Fox's and Cavanaugh's understanding of the Administration's hostility to "DEI," treated race as a criterion for disqualification. The Government's asserted interests for terminating grants – administrative convenience, merit, and waste reduction – do not justify making race, ethnicity, national origin, religion, sex, or sexual orientation the determinative grounds for terminating previously awarded grants.

The Government does not come close to satisfying strict scrutiny or heightened scrutiny, and it makes no serious attempt to do so. Unable to explain away its crude "Detection Codes," including "Tribal," "Black," and "Gay," the Government still maintains that its classifications should nevertheless be upheld as rationally related to a clearly legitimate governmental interest. But DOGE's actions fail even under rational basis review.

The Government argues that the rational bases for terminating the grants clawed back by DOGE include "administering federal programs consistent with goals set by a democratically elected political branch," "prioritizing merit," "eliminating preferential treatment," and "reducing wasteful spending." Dkt. No. 278, at 35. Those interests may well be legitimate in the abstract. But the "mere recitation of a 'benign' or legitimate purpose[s] for a racial classification is entitled to little or no weight." *City of Richmond, Virginia v. J.A. Croson Co.*, 488 U.S. 469, 500 (1989).

As explained in *City of Cleburne, Texas v. Cleburne Living Center*, 473 U.S. 432, 440 (1985), the ordinary rational-basis rule "gives way" when the Government "classifies by race, alienage, or national origin" because "[t]hese factors are *so seldom relevant to the achievement of any legitimate state interest* that laws grounded in such considerations are deemed to reflect *prejudice and antipathy*—a view that those in the burdened class are not as worthy or deserving as others."

That principle makes easy work of the Government's "merit" and "waste" arguments. Race, ethnicity, national origin, religion, and sex do not measure humanistic merit. And they do not measure waste either. Treating Black civil-rights history, Jewish testimony about the Holocaust testimony, the oft-forgotten Asian American experience, the shameful treatment of the children of Native tribes, or the mere mention of a woman as a marker of lack of merit or wastefulness is not lawful.

Two examples are illustrative. DOGE terminated a grant for an English translation of the works of Anne de Graville, a French Renaissance poet, because she "had an enduring impact on the literary and social women's movements, which relates to DEI." Dkt. No. 248-11, at 96, C445. DOGE also terminated a grant for the preparation of a critical edition of Harriet Beecher Stowe's religious writings for Oxford University Press. *Id.*, at 126, C739. Stowe, as the author of the bestselling anti-slavery novel *Uncle Tom's Cabin* (1852), viewed slavery as a "dishonor to Christianity" and wrote extensively on religious topics and on the Christian obligation of self-sacrificing love for the most marginalized members of society. DOGE terminated this grant because it "focus[es] on women and female religious experience." *Id.*

It could not be more obvious that DOGE used the mere presence of particular, protected characteristics to disqualify grants from continued funding. Whatever lawful priorities the Executive Branch may pursue in administering federal grants, it may not implement those

priorities by making race, ethnicity, national origin, religion, or sex the determinative factor for its termination decisions.

Nor is there any evidence in this record that "prioritizing merit" or "eliminating preferential treatment" played any meaningful role in DOGE's grant-termination process. There is no evidence that more meritorious applicants lost out to Plaintiffs when the grants were awarded. There is no evidence that any Plaintiff received preferential treatment over an equally worthy applicant on any prohibited basis. And there is no evidence that DOGE undertook any comparative assessment of merit before deciding which grants to terminate. Rather, DOGE appears to have presumed that grants funding projects that mention race, ethnicity, national origin, religion, gender, sexuality – or even subjects bearing no plausible connection to any protected characteristic – were suspect because they were awarded during the Biden Administration or because DOGE associated them with "DEI." But DOGE did not review the underlying grant applications. And it did not identify any applicant who had been displaced by DEI-based preferential treatment. On this record, the Government cannot credibly maintain that cancelling these particular grants either promoted merit or eliminated preferential treatment.

The Government's reliance on *Motor Vehicle Manufacturers Association of the United States, Inc. v. State Farm Mutual Automobile Insurance Co.*, 463 U.S. 29, 59 (1983) proves too much. As the Government notes, Justice Rehnquist stated, in his concurring and dissenting opinion, that a "change in administration brought about by the people casting their votes is a perfectly reasonable basis for an executive agency's reappraisal of the costs and benefits of its programs and regulations." *Id.* But, of course, when the Court issues a majority decision, a justice's opinion concurring in part and dissenting in part is not binding precedent. *See United States v. Duvall*, 740 F.3d 604, 610 (D.C. Cir. 2013) (Kavanaugh, J., concurring) ("Justices who

join the majority may of course express additional thoughts in a concurrence, but concurrences do not bind lower courts in cases where there is a majority opinion."). And, second, a "reappraisal of the costs and benefits" of programs and regulations does not confer on the Government a blank check to sort grant recipients by race and other protected characteristics.

Justice Rehnquist's own formulation is immediately followed by an obvious caveat, which the Government all too conveniently omits. "[I]n light of the philosophy of the administration," an agency may reassess records and priorities, "[a]s long as the agency remains *within the bounds established by Congress*." 463 U.S. at 59 (Rehnquist, J.) (emphasis added). The words "within the bounds established by Congress" go to the heart of this case. Congress did not define NEH's mission in a manner that permits the Executive to treat projects involving diversity, underrepresentation, minority communities, tribal communities, multicultural heritage, or freedom of inquiry as vices and unworthy of funding. Congress did precisely the opposite.

Congress authorized NEH to support "programs and research which have substantial scholarly and cultural significance and that reach, or reflect the diversity and richness of our American cultural heritage, including the culture of, a minority, inner city, rural, or tribal community." 20 U.S.C. § 956(c)(4). And Congress directed that, "In selecting individuals and groups of exceptional talent as recipients of financial assistance," the Chairperson "shall give particular regard to scholars, and educational and cultural institutions, that have traditionally been underrepresented." *Id.*, § 956(c).

Therefore, the Government has it altogether backwards. The very subjects DOGE treated as markers of waste, lack of merit, or ideological contamination are the subjects that Congress made expressly germane to NEH's mission. There is no question that an administration may pursue whatever lawful policy goals it wishes. But it may not invoke a change in administration

- 119 -

to disregard the priorities Congress enacted, or use protected characteristics as criteria for terminating public benefits in violation of the Constitution.

The same point defeats the Government's asserted interest in reducing wasteful spending. As the Supreme Court held in *Cleburne*, "The State may not rely on a classification whose relationship to an asserted goal is so attenuated as to render the distinction arbitrary or irrational." 473 U.S. at 446. Here, the relationship is not merely attenuated; it is *nonexistent*. A grant funding the study of the civil rights movement is not wasteful because it concerns Black people. A grant funding the study of the experience of Jewish women during the Holocaust is not wasteful because it concerns Jewish women. A grant studying the treatment of indigenous children at Government-run boarding schools is not wasteful because it concerns Native Americans. And a grant commemorating the military service of Asian American veterans is not wasteful because it concerns Asian Americans. Yet that is precisely how DOGE treated them – deeming grants wasteful because they related to Blacks, women, Jews, Asian Americans, and Indigenous people.

The record makes the point concrete. DOGE flagged as DEI – and the Government ultimately terminated – a grant to the WWII Chinese American GI Project for a series of discussions titled "War Heroes: Chinese American Experiences." Dkt. No. 248-11, at 97, C449. The project would have explored "Chinese American veteran experiences in WWII, the Korean War, the Vietnam War, Gulf and Afghanistan Wars" and "recognize[d] their service and contributions to America." *Id.*, at 97, C451. ChatGPT classified the project as DEI because "[t]his collaboration aims to uplift and recognize the contributions and experiences of Chinese American veterans, which is in line with the principles of DEI." *Id.*, at 97, I451.

By contrast, DOGE did not flag as DEI a grant involving "[v]eterans, active military, and (in separate forums) the West Texas community," who would "engage in war-themed literature,"

including graphic novels, comics, poems, non-fiction, and fiction, with a focus on the Vietnam War and the wars in Iraq and Afghanistan. *Id.* ChatGPT answered "No" as to that project because "[t]his initiative focuses on veterans." *Id.*

Both projects were about veterans. But the project recognizing Chinese American veterans for their service during a global conflagration was marked for termination, while the project involving veterans who lived in a West Texas community was not. The difference was not waste. And it was not any difference in the merit of the veterans' service. It was the fact that one grant planned to explore the experience of Asian American veterans. That is not a rational basis for terminating a federal humanities grant. It is precisely the sort of race-based distinction the Equal Protection Clause forbids. *See Fisher v. Univ. of Texas at Austin*, 570 U.S. 297, 310 (2013). "[R]acial characteristics so seldom provide a relevant basis for disparate treatment." *City of Richmond*, 488 U.S. at 505.

*City of Saint Paul* confirms the point in the closely analogous context of federal grant terminations. There, the government asserted a legitimate interest in "administering grant programs consistent with the agency's priorities," but the court rejected that asserted justification because there was "no reason to believe" that terminating grants to recipients in disfavored democratic-leaning states furthered the agency's stated priorities more than terminating comparable grants elsewhere. *City of Saint Paul*, 816 F. Supp. 3d 65, 72 (D.D.C. 2026). That reasoning applies with even greater force here. The challenged classification in *City of Saint Paul* was based on political geography. The challenged classifications, here, are of a different order; they are based on race, ethnicity, national origin, religion, and sex – criteria that are not merely irrational proxies for merit, waste, or program alignment, but constitutionally suspect grounds for any governmental decisionmaking. *See, e.g., Fullilove v. Klutznick*, 448 U.S. 448, 537 (1980)

- 121 -

(Stevens, J., dissenting) ("Racial classifications are simply too pernicious to permit any but the most exact connection between justification and classification.").

The Government's argument under rational basis review also ignores what *City of Cleburne, Texas v. Cleburne Living Center*, 473 U.S. 432, 440 (1985), *Romer v. Evans*, 517 U.S. 620 (1996), and *Palmore v. Sidoti*, 466 U.S. 429 (1984) teach about impermissible governmental purposes. Even under rational basis review, "some objectives—such as 'a bare . . . desire to harm a politically unpopular group'—are not legitimate state interests." *Cleburne*, 473 U.S. at 446–47 (quoting *U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528, 534 (1973)). *Romer* applied that principle to invalidate an amendment to Colorado's state constitution, which excluded gay and lesbian persons from the protections of the state's anti-discrimination laws, explaining that the Equal Protection Clause embodies "a commitment to the law's neutrality where the rights of persons are at stake." *Romer v. Evans*, 517 U.S. 620, 623 (1996). And *Palmore* held that the existence of private racial prejudice cannot inform a court's assessment of "the best interests" of a child, because "[p]rivate biases may be outside the reach of the law, but the law cannot, directly or indirectly, give them effect." *Palmore*, 466 U.S. at 433. Those principles are as applicable today as when they were first articulated.

Finally, the Government invokes *Heller v. Doe by Doe*, 509 U.S. 312 (1993), to argue that rational basis review does not permit courts to "judge the wisdom, fairness, or logic of [the Executive's] choices." Dkt. No. 278, at 34 (quoting *Heller*, 509 U.S. at 319). That principle applies to "legislative policy determinations made in areas that neither affect fundamental rights nor proceed along suspect lines." *Heller*, 509 U.S. at 319 (emphasis added). But this case is not *Heller*. There, the Court reviewed Kentucky's different rules for involuntary commitment proceedings involving persons with intellectual disabilities – a classification the Court had already

- 122 -

held was neither suspect nor quasi-suspect.  *See Heller*, 509 U.S. at 314–18, 321; *Cleburne*, 473 U.S. at 442–47.  This case, by contrast, proceeds along traditionally recognized "suspect lines" and burdens fundamental First Amendment interests.  The Court is therefore not sitting as a "superlegislature" or second-guessing the wisdom of ordinary policy choices.  It is simply identifying the "odious" criteria the Executive Branch chose to use in furtherance of its policies. *Hirabayashi*, 320 U.S. at 100.

Accordingly, the Government's asserted interests fail twice over.  It does not satisfy strict scrutiny or heightened scrutiny because it identifies no compelling or important governmental objective served by using protected characteristics as criteria for termination, and no tailoring – narrow, substantial, or otherwise – connecting those classifications to any lawful objective.  And, even if rational basis review applied, the terminations would still fail because the relationship between the classifications used and the interests asserted is, at best, "so attenuated as to render the distinction arbitrary or irrational."  *Cleburne*, 473 U.S. at 446.

The Government cannot escape liability for DOGE's work by scapegoating ChatGPT.  Fox copy-and-pasted ChatGPT's "DEI Rationales" *verbatim* into his spreadsheets listing which grants purportedly involved DEI, and Fox included those same DEI Rationales in spreadsheets throughout the process of selecting grants to terminate.  These spreadsheets, which discriminated on the basis of protected characteristics, formed the basis of the final list Fox sent to McDonald for his purported review in the final days before the Mass Termination.  *See, e.g.*, Dkt. No. 284-46, Ex. 46, US-000009583; Dkt. No. 248-12, Ex. 12, US-000000936 ("NEH Grant Detail" tab); *see also* Dkt. No. 248-3, McDonald Dep., 126:21–127:11 ("Q: And so you would agree based on that, that it appears to be the case that Mr. Fox copied the results produced in this spreadsheet over to that spreadsheet that he sent to you [. . .]? A: Yes.").  According to McDonald's testimony,

"*Justin [Fox]* prepared the list" of all grants "to cancel," and it was Fox "who put [] particular grant[s] on the list for termination."   Dkt. No. 248-3, McDonald Dep., 229:5–231:24; *id.*, McDonald Dep., 229:9–10 ("Justin [Fox] prepared the list, yes.").   For all practical purposes, DOGE made ChatGPT's classifications its own classifications.

The Government cannot treat AI output as the act of some independent, intervening actor. The constitutional injury lies in the Government's use of those AI-generated classifications to decide which grants would be terminated.   When the Government adopts AI-generated classifications as part of its official actions, those classifications are the Government's own for constitutional purposes.   And here, DOGE made no effort to ensure that the classifications it adopted would avoid discrimination on the basis of race.   Dkt. No. 248-1, Fox Dep., 207:16 ("Q: Did you do anything to ensure that ChatGPT's conception of DEI in this task wouldn't discriminate on the basis of race?   A: No.").

\*       \*       \*

"[W]henever the government treats any person unequally because of his or her race, that person has suffered an injury that falls squarely within the language and spirit of the Constitution's guarantee of equal protection."   *Adarand*, 515 U.S. at 229–30.   Although the Government is free to reappraise priorities, administer grant programs, and reduce waste consistent with lawful policy objectives, it may not do so by making race, ethnicity, religion, sex, or sexual orientation the basis for terminating public benefits.   There is no federal-funding exception to the Equal Protection Clause.

### E.  Spoliation Sanctions

The ACLS Plaintiffs move for spoliation sanctions pursuant to Federal Rule of Civil Procedure 37(e), based on alleged failures to preserve Signal messages and other electronic

communications used by Michael McDonald, Nate Cavanaugh, and Justin Fox during the period leading up to the Mass Termination.  Dkt. No. 220.

Spoliation involves "the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." *West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776, 779 (2d Cir. 1999).  Federal Rule of Civil Procedure 37(e) governs claims of spoliation from the loss of electronically stored information ("ESI").

Rule 37(e) applies only where (i) "electronically stored information that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it," and (ii) the information "cannot be restored or replaced through additional discovery."  Fed. R. Civ. P. 37(e).  If those requirements are satisfied, a court may award sanctions in accordance with subsections (1) or (2).  The two subsections read as follows:

(1) upon finding prejudice to another party from loss of the information, [the Court] may order measures no greater than necessary to cure the prejudice; or

(2) only upon finding that the party acted with the intent to deprive another party of the information's use in the litigation[, the Court] may:

   (A) presume that the lost information was unfavorable to the party;

   (B) instruct the jury that it may or must presume the information was unfavorable to the party; or

   (C) dismiss the action or enter a default judgment.

*Id.*  Thus, whether to impose sanctions under Rule 37(e) involves a three-part inquiry:

> The first is to decide if the rule applies at all—that is, if a party failed to take "reasonable steps" to preserve electronically stored information "that should have been preserved in the anticipation or conduct of litigation."  Fed. R. Civ. P. 37(e).  If so, then the second step is to decide if there has been "prejudice to another party from loss of the information," in which case the Court "may order measures no greater than necessary to cure the prejudice."  Fed. R. Civ. P. 37(e)(1).  Lastly, the third step to consider—regardless of prejudice to any other party—is whether the destroying party "acted with the intent to deprive another party of the information's use in the litigation," in which event a court may consider whether to impose the

most severe of measures such as mandatory presumptions or instructions that the lost information was unfavorable or the entry of default judgment.

*Karsch v. Blink Health Ltd.*, 2019 WL 2708125, at *13 (S.D.N.Y. June 20, 2019) (citation omitted).  The moving party bears the burden of establishing the Rule 37(e) requirements by a preponderance of the evidence.  *See Hoffer v. Tellone*, 128 F.4th 433, 439 (2d Cir. 2025).  And the Court has broad discretion in deciding whether to impose sanctions.  *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 436 (2d Cir. 2001); *see Lore v. City of Syracuse*, 670 F.3d 127, 175 (2d Cir. 2012).

For purposes of this motion, the Court assumes without deciding that Rule 37(e)'s threshold requirements are satisfied – that is, that some electronically stored information should have been preserved, was lost because reasonable steps were not taken, and cannot now be restored or replaced through additional discovery.  Even on that assumption, the motion fails.  Plaintiffs have not shown prejudice from the loss of any information, and they have not shown by a preponderance of the evidence that Defendants acted with the intent to deprive Plaintiffs of the information's use in this litigation.

1.    ACLS Plaintiffs Have Not Shown Prejudice

"[A] court should never impose spoliation sanctions of any sort unless there has been a showing—inferential or otherwise—that the movant has suffered prejudice."  *GenOn Mid– Atlantic, LLC v. Stone & Webster, Inc.*, 282 F.R.D. 346, 353 (S.D.N.Y. 2012).  That requirement is not satisfied by speculation that the missing materials might have been helpful.  The movant must identify some concrete way in which the loss of information impaired its ability to prove its claims, respond to its adversary's defenses, or obtain relief.

That showing is absent here.  The theory of prejudice advanced by the ACLS Plaintiffs is that deleted Signal or text messages might have corroborated their principal merits

theories – namely, that DOGE drove the terminations, that grants were selected based on perceived DEI affiliation and other impermissible criteria, and that the process was not genuinely controlled by NEH's statutory decisionmaker.  But Plaintiffs have already prevailed on those very theories on the current summary judgment record.   The record contains contemporaneous emails, spreadsheets, deposition testimony, termination notices, and DOGE/NEH materials sufficient to establish the constitutional and *ultra vires* violations identified above.  Whatever additional Signal messages may once have existed, their absence did not prevent Plaintiffs from prevailing on their claims or obtaining merits relief.  Therefore, ACLS Plaintiffs cannot demonstrate that they suffered prejudice.  Absent such a showing, there is no basis for the Court to impose any curative or punitive measures.

The record also does not support Plaintiffs' assertion that the deleted messages likely contained material evidence unavailable elsewhere.  Cavanaugh testified that he used Signal for only limited updates to DOGE leadership, including updates that he had first forwarded from his GSA email account, meaning copies were preserved in email and produced.  *See* Dkt. No. 237-1, Declaration of Rachael Doud ("Doud Decl."), Ex. A, Cavanaugh Dep., 80:13–81:10.  Cavanaugh also testified that he did not otherwise have substantive discussions with DOGE official Steve Davis about NEH via Signal, did not consult with anyone other than Fox, McDonald, and NEH personnel in determining which grants to recommend for termination, and did not communicate with McDonald through Signal.  *Id.*, 303:23–306:11, 307:10–15.

The same is true as to Fox and McDonald.  Fox testified that "Signal was used to coordinate where we were" and that "[t]he real work about each of these agencies was done over e-mail or our GSA phones."  Dkt. No. 237-2, Fox Dep., 101:18–25.  He also testified that he did not have substantive discussions about NEH grant terminations via Signal.  *Id.*  McDonald, for his part,

used Signal primarily to communicate with members of the National Council on the Humanities, who, as the Government concedes, "were not involved in the grant terminations."  Dkt. No. 237-3, McDonald Dep., 81:15–24; 152:23–153:12; Dkt. No. 236, McDonald Decl., ¶¶ 14–15; Dkt. No. 235, Defs.' Mem. L. Opp'n to Pls.' Mot. for Spoliation Sanctions.  In the Government's own words, "Defendants do not dispute that NEH grants were terminated based on their perceived relation to DEI–indeed, grants were explicitly identified for termination on that basis pursuant to an Executive Order."  Dkt. No. 235, Defs.' Mem. L. Opp'n to Pls.' Mot. for Spoliation Sanctions. The ACLS Plaintiffs cannot demonstrate prejudice when the Government has all but conceded the material issues of fact.

Because Plaintiffs have not shown prejudice from the loss of any ESI, no curative measures are warranted under Rule 37(e)(1).  For the same reason, Plaintiffs are not entitled to fees or costs. Rule 37(e)(1) permits measures no greater than necessary to cure prejudice.  Where there is no prejudice to cure, there is no basis for imposing a monetary sanction.

### 2.    ACLS Plaintiffs Have Not Shown Intent to Deprive

In *Hoffer v. Tellone*, 128 F.4th 433 (2d Cir. 2025), the Second Circuit clarified the "intent to deprive" standard.  It held that "to impose sanctions pursuant to Rule 37(e)(2), a district court or a jury must find, by a preponderance of the evidence, that a party acted with an 'intent to deprive' another party of the lost information."  *Id.* at 435.  *Hoffer* further held that "the lesser 'culpable state of mind' standard, which includes negligence, *see Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 108 (2d Cir. 2002), does not apply to the imposition of sanctions under Rule 37(e)(2)." *Id.*  Thus, after the 2015 Amendment to Rule 37(e), negligence, gross negligence, or even knowing loss of ESI is insufficient to support the sanctions enumerated in Rule 37(e)(2). The moving party must prove by a preponderance of the evidence an "intent to deprive."

That showing has not been made.  The record supports criticism of the Government's preservation practices.  Government officials conducting official business on Signal or through personal devices during reasonably foreseeable litigation invites exactly the sort of dispute presented here.  But Rule 37(e)(2) requires more than poor judgment, negligence, or even a serious preservation failure.  It requires proof that the relevant actors caused the loss of ESI for the purpose of depriving Plaintiffs of its use in this litigation.  The record does not establish that purpose.

As to McDonald, Plaintiffs rely on his use of Signal and his statement that he wanted communications to be "protected."  Dkt. No. 222-4, McDonald Dep., 366:13–19.  But McDonald testified that, although he was generally familiar with the Federal Records Act, he was not aware of any obligation to preserve personal text messages.  *Id.*, 352:12–20.  Further, McDonald states that he does not recall having substantive discussions about grant terminations through Signal.  Dkt. No. 236, McDonald Decl., ¶ 14–15.  These facts do not excuse McDonald's failure to preserve records, but they do not prove that McDonald used Signal or deleted messages with the specific intent to deprive Plaintiffs of evidence in this case.

The same conclusion follows as to Cavanaugh and Fox.  They both used Signal because other DOGE-affiliated personnel had chosen to communicate that way, not because they personally selected the platform to shield NEH-related communications from discovery.  Dkt. No. 237-1, Cavanaugh Dep., 249:15–24; Dkt. No. 237-2, Fox Dep., 32:10–20.  Fox testified that substantive work concerning agencies occurred over email or GSA phones, and that Signal was used to coordinate logistics.  Dkt. No. 237-2, Fox Dep., 101:18–25.  Cavanaugh testified that Signal was used for limited updates to DOGE leadership and that at least some of the materials sent by Signal were also preserved through email.  Dkt. No. 237-1, Cavanaugh Dep., 80:13–81:7;

96:9–25.  This record does not establish, by a preponderance of the evidence, that either Fox or Cavanaugh intended to deprive Plaintiffs of evidence concerning the NEH grant terminations.

Plaintiffs' contrary inference rests largely on the nature of Signal itself and the fact that messages were auto-deleted.  But *Hoffer* forecloses any rule under which the mere loss of ESI, or even the knowing use of a deletion function, automatically supplies the intent required by Rule 37(e)(2).  *See* 128 F.4th at 438; *see also* Fed. R. Civ. P. 37(e)(2) advisory committee's note to 2015 amendment ("Subdivision (e)(2) limits the ability of courts to draw adverse inferences based on the loss of information in these circumstances, permitting them only when a court finds that the information was lost with the intent to prevent its use in litigation.").  The required intent is not simply the intent to use a platform with disappearing messages; it is the intent to deprive another party of information for use in litigation.  On this record, the Court cannot make that finding.

Plaintiffs ask the Court to infer that the deleted messages would have corroborated their core allegations.  They may well be right.  But the Court does not need the deleted messages to resolve Plaintiffs' claims on the merits.  The existing record is damning enough without the deleted Signal messages.  The requested adverse inference would not cure an evidentiary imbalance; it would add an unnecessary and speculative gloss to a record that already supports judgment for Plaintiffs.

Because Plaintiffs have shown neither prejudice nor intent to deprive, sanctions are not warranted under Rule 37(e).  Accordingly, the ACLS Plaintiffs' motion for spoliation sanctions is DENIED.

### F.  Class Certification

The Authors Guild Plaintiffs move pursuant to Federal Rule of Civil Procedure 23 to certify a class and two subclasses of National Endowment for the Humanities grant recipients whose

awards were terminated as part of the Mass Termination. They also seek appointment of the named plaintiffs as class representatives and Fairmark Partners, LLP as class counsel pursuant to Rule 23(g).

The proposed class is defined as follows:

All National Endowment for the Humanities grant recipients whose grants were awarded on or after January 20, 2021 and terminated as part of the Mass Termination.

For purposes of that definition, "Mass Termination" refers to the conduct described in Part IV(C) of the Authors Guild Plaintiffs' second amended complaint, Dkt. No. 240, ¶ 96–126, which was implemented through termination notices sent on April 1 through April 3, 2025. The definition excludes American Council of Learned Societies and its members; American Historical Association and its members; and Modern Language Association and its members.

Plaintiffs also seek certification of two subclasses:

DEI Subclass: All class members whose grants were marked by Defendants for termination as "DEI."

Biden-Era Subclass: All class members whose grants were terminated without being marked as "DEI."

"A party seeking class certification must affirmatively demonstrate his compliance" with Rule 23. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). A district court may certify a class only after determining that the proposed class satisfies the requirements of Federal Rule of Civil Procedure 23(a). *Roach v. T.L. Cannon Corp.*, 778 F.3d 401, 405 (2d Cir. 2015). Those requirements are that: (1) "the class is so numerous that joinder of all members is impracticable"; (2) "there are questions of law and fact common to the class"; (3) "the claims or defenses of the representative parties are typical of those of the class"; and (4) "the representative parties will fairly and adequately protect the interests of the class." *Id.* (quoting Fed. R. Civ. P. 23(a)).

Additionally, the district court must ensure that the proposed class is appropriate under at least one subsection of Rule 23(b). *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013). At issue here, Rule 23(b)(2) provides for certification where "the party opposing the class has acted or refused to act on grounds that apply generally to the class," such that "final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). The Court conducts the required "rigorous analysis," *Wal-Mart*, 564 U.S. at 350–51, addressing numerosity, commonality, typicality, and adequacy under Rule 23(a), before turning to Rule 23(b)(2), the proposed subclasses, and appointment of class counsel.

### 1.    Rule 23(a) Factors

#### a) Numerosity

Rule 23(a)(1) requires that "the class is so numerous that joinder of all members is impracticable." That requirement is satisfied here. Plaintiffs' proposed class consists of NEH grant recipients whose awards were terminated as part of the Mass Termination. The record reflects that the challenged action affected approximately 1,400 grantees. Joinder of all such entities in a single action would be impracticable. The Second Circuit has made clear that "numerosity is presumed at a level of 40 members." *Consol. Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 483 (2d Cir. 1995). "Impracticable does not mean impossible," but only that joinder would be difficult or inconvenient. *Robidoux v. Celani*, 987 F.2d 931, 935 (2d Cir. 1993).

Defendants do not meaningfully dispute that the proposed class is sufficiently numerous. To the extent they argue that the class definition excludes certain grantees or may require refinement, that contention goes to the scope of the class, not to whether joinder is impracticable. *See In re Nassau Cnty. Strip Search Cases*, 461 F.3d 219, 228 (2d Cir. 2006). Accordingly, Rule 23(a)(1) is satisfied.

- 132 -

b) <u>Commonality</u>

Rule 23(a)(2) requires that "there are questions of law or fact common to the class." Commonality requires more than the mere recitation of common questions; it requires the capacity to generate "common answers apt to drive the resolution of the litigation." *Wal-Mart*, 564 U.S. at 350. What matters, in other words, is not simply that class members have all suffered a violation of the same law, but that their claims "depend upon a common contention" that is "of such a nature that it is capable of classwide resolution." *Id.* A contention is capable of classwide resolution where "determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.* That requirement is satisfied here.

This case does not involve a series of individualized determinations made by different decisionmakers exercising local discretion. *Cf. Wal-Mart*, 564 U.S. at 355 (finding no commonality where employment decisions were "left to the discretion of local supervisors"). Unlike the discretionary decisionmaking at issue there, where "dissimilarities within the proposed class" precluded common answers, *id.* at 350, Plaintiffs challenge a single, top-down policy applied uniformly across the class. The alleged constitutional injury does not depend on how discretion was exercised in individual cases; it flows from the existence and execution of the Mass Termination itself. The Mass Termination arose from a single, centralized course of conduct, directed by the same actors, implemented through materially identical procedures, carried out in a matter of days, and undertaken without any meaningful individualized review.

Plaintiffs' claims turn on common questions that are susceptible to classwide resolution, including whether Defendants' Mass Termination violated the First Amendment, whether it constituted impermissible viewpoint discrimination, whether it unlawfully discriminated based on political association, and whether DOGE possessed lawful authority to direct or effectuate the

termination of NEH grants.  Each of those questions presents a "common contention" within the meaning of *Wal-Mart*.  Their answers do not depend on the individualized characteristics of particular grantees or the particular content of individual grants; they depend on the legality of Defendants' common course of conduct.

The extensive record before the Court confirms the existence of the necessary "glue."  Plaintiffs have proffered evidence that the challenged terminations were the product of a centralized review process, conducted using common criteria, and implemented through a uniform set of termination decisions and notices.  The alleged constitutional violations – whether framed as viewpoint discrimination, political-association discrimination, or *ultra vires* action – derive from that same process.  That determination "will resolve an issue that is central to the validity" of every class member's claim "in one stroke."  *Id.* at 350.

Defendants' arguments to the contrary are unpersuasive.  They contend that individualized inquiries would be required to determine whether particular grants were properly characterized as "DEI" or whether particular terminations were justified on other grounds.

But Plaintiffs' theory does not require the Court to assess the objective merits or characteristics of each grant.  The relevant question is whether Defendants acted on impermissible grounds (*i.e.*, whether they terminated grants because of their perceived association with disfavored viewpoints or political actors).  That question is common across the class.  *See Heffernan v. City of Paterson, New Jersey*, 578 U.S. 266, 272 (2016).  Nor do purported differences among grants "impede the generation of common answers."  *Wal-Mart*, 564 U.S. at 350 (citation omitted).  Even if grants varied in subject matter, the legality of terminating them pursuant to a single policy turns on Defendants' conduct, not on grant-specific facts.

- 134 -

It is particularly specious for the Government to insist that individualized inquiries are necessary to determine whether particular grants were properly characterized as DEI.  Of course many grants were improperly characterized as DEI.  *See supra* Section IB(C)(2)(b)(i).  But that only underscores why individualized merits review is beside the point.  It did not matter whether the characterization was correct.  What mattered was that someone – DOGE, ChatGPT, or DOGE using ChatGPT – identified the grant as having DEI implications.  Once that label attached, the grant was marked for termination.  The challenged injury therefore flows from a common process and a common criterion, not from the actual content or merit of any individual grant.

To the extent different rationales are implicated – DEI-based classification and "Biden-era" targeting – those differences are addressed through the proposed subclasses.  Rule 23(c)(5) expressly permits such an approach.  The existence of subclasses does not defeat commonality; it confirms that Plaintiffs have identified coherent groups bound together by common contentions capable of classwide resolution.  That the claims of the proposed class "stem from the same alleged unconstitutional conduct of the defendants" demonstrates the presence of common questions of law or fact.  *Daniels v. City of New York*, 198 F.R.D. 409, 417 (S.D.N.Y. 2001).  Accordingly, Rule 23(a)(2) is satisfied.[7]

### c)  Typicality

Rule 23(a)(3) requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class."  Typicality is satisfied when each class member's claim

---

[7] The Court notes that the proposed class is already limited to grants awarded on or after January 20, 2021.  The proposed "Biden-Era Subclass" is therefore something of a misnomer.  It consists, not of all Biden-era grants in the class, but of those class members whose grants were terminated without being marked as "DEI."  In substance, the proposed subclasses separate DEI-marked grants from non-DEI-marked grants within an already Biden-era class.  That nomenclature issue is immaterial to certification, because both subclasses are defined by common features of the Mass Termination and both theories are susceptible to classwide proof.

"arises from the same course of events and each class member makes similar legal arguments to prove the defendant's liability." *Robidoux*, 987 F.2d at 936. Commonality and typicality "tend to merge." *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 157 n.13 (1982).

That requirement is met here. The named plaintiffs' claims arise from the same Mass Termination challenged by the class. They allege that their grants were terminated through the same centralized process, pursuant to the same criteria, and in violation of the same constitutional and statutory constraints. Their claims do not depend on individualized proof; they depend on the legality of Defendants' uniform course of conduct. For grants awarded during the Biden Administration – which appears to include all grants at issue here – the relevant fact is not the particular subject matter of any individual grant, but that the grant was selected for termination because it was a Biden-era award. For grants terminated because they were perceived to implicate disfavored speech or viewpoints – including DEI, gender, environmental justice, or similar targeted subjects – the relevant fact is likewise not whether that characterization was accurate, but that Defendants treated the perceived association as a ground for termination.

This is a paradigmatic case of typicality. Each plaintiff was subjected to the same challenged action and advances the same theory of liability. To the extent Defendants argue that differences among grants defeat typicality, that argument fails for the same reasons it fails under commonality. Differences in the characteristics of particular grants "do not mandate a finding of a lack of typicality, as long as the claims arise out of the same legal or remedial theory." *Escobar Molina v. U.S. Dep't of Homeland Sec.*, 811 F. Supp. 3d 1, 59 (D.D.C. 2025). And here, the actual nature of the grants is beside the point. Accordingly, Rule 23(a)(3) is satisfied.

d) Adequacy

Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect the interests of the class." This requirement is satisfied where (1) the class representatives do not have interests antagonistic to those of the class, and (2) class counsel is qualified, experienced, and able to conduct the litigation. *Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 222 F.3d 52, 60 (2d Cir. 2000).

There is no indication of any conflict between the named plaintiffs and absent class members. All seek the same relief: a declaration that the Mass Termination was unlawful and injunctive relief preventing its enforcement. Class counsel is also adequate. Plaintiffs seek appointment of Fairmark Partners, LLP, which has investigated the claims, litigated this action, and demonstrated familiarity with the applicable law. Fairmark Partners further confirms that counsel is "prepared and equipped to commit the professionals and resources necessary to litigate this class action through judgment and any appeal(s) that may arise." Dkt. No. 245, Declaration of Jamie Crooks, ¶ 6. Accordingly, Rule 23(a)(4) is satisfied.

2.    Rule 23(b)(2) Requirements

Certification under Rule 23(b)(2) is appropriate. Rule 23(b)(2) applies where "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." "The key to the (b)(2) class is the indivisible nature of the injunctive or declaratory remedy warranted—the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them." *Wal-Mart*, 564 U.S. at 360 (internal quotation marks omitted).

That standard is met here. Plaintiffs challenge a single course of conduct – the Mass Termination – that was applied uniformly to the proposed class. The relief sought is declaratory and injunctive, not individualized damages. *See supra* Section IV(A). Claims for monetary relief may not be certified under Rule 23(b)(2), at least where the monetary relief is not incidental to the requested injunctive or declaratory relief. *See Wal-Mart*, 564 U.S. at 365. Here, Plaintiffs do not seek classwide monetary relief, and the Court does not award any damages. The relief ordered is exclusively equitable in nature.

And the Court's equitable ruling on the legality of the Mass Termination is a question capable of resolution "in one stroke," the answer to which applies equally to all class members alike. There is no possibility of class member–specific variation in the remedy. Further, as the Supreme Court has recognized, Rule 23(b)(2) is particularly appropriate in cases seeking to remedy uniform conduct violating civil rights. *See Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 614 (1997) ("Civil rights cases against parties charged with unlawful, class-based discrimination are prime examples."); *see also DL v. D.C.*, 860 F.3d 713, 726 (D.C. Cir. 2017) ("Rule 23(b)(2) exists so that parties and courts, especially in civil rights cases like this, can avoid piecemeal litigation when common claims arise from systemic harms that demand injunctive relief."). Accordingly, certification under Rule 23(b)(2) is warranted.

Rule 23(c)(5) provides that "When appropriate, a class may be divided into subclasses that are each treated as a class under this rule." The proposed subclasses are appropriate. The DEI Subclass and the Biden-Era Subclass reflect distinct, though related, theories of liability arising from the same course of conduct. The subclasses promote clarity by aligning particular groups of class members with the specific bases on which Plaintiffs challenge the Mass Termination. Each

- 138 -

subclass independently satisfies the requirements of Rule 23(a) and Rule 23(b)(2) for the reasons set forth above.

Rule 23(g) requires the Court to appoint class counsel. In doing so, the Court considers counsel's work in identifying and investigating the claims, counsel's experience in handling class actions and complex litigation, counsel's knowledge of the applicable law, and the resources counsel will commit. For the reasons stated above, the named plaintiffs are appropriate class representatives, and Fairmark Partners, LLP is appointed as class counsel.

The Authors Guild Plaintiffs' motion for class certification is GRANTED. The Court certifies the proposed class, the DEI Subclass, and the Biden-Era Subclass under Rule 23(b)(2); appoints the named Authors Guild Plaintiffs as class representatives; and appoints Fairmark Partners, LLP as class counsel pursuant to Rule 23(g).

### G. Permanent Injunction

Both sets of plaintiffs seek injunctive relief. A permanent injunction is governed by the traditional four-factor test. A plaintiff seeking such relief must demonstrate: "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006). The decision whether to grant permanent injunctive relief lies within the Court's equitable discretion. *See id.* These requirements are satisfied.

*First,* Plaintiffs have prevailed on the merits. As explained above, the Mass Termination violated the First Amendment and the equal protection component of the Fifth Amendment, and

was carried out by DOGE officials who lacked statutory authority to effectuate those terminations. Plaintiffs have established actual success on the merits.

*Second,* Plaintiffs have suffered irreparable injury for which legal remedies are inadequate. As of the date of this Opinion and Order, the challenged terminations remain in effect. Plaintiffs continue to be deprived of grants that were awarded to support time-sensitive scholarly, literary, archival, educational, and public-humanities projects. The injury is not limited to the loss of money; it includes the disruption of protected expression, the interruption of ongoing research and publication, the cancellation or suspension of humanities programming, and the chilling effect caused by the Government's use of viewpoint-based and unauthorized criteria to terminate federal grants. Monetary damages would not adequately remedy these harms. *New York Magazine v. Metropolitan Transp. Auth.*, 136 F.3d 123, 127 (2d Cir. 1998) (stating that the "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury"). Nor would damages cure the continuing legal effect of termination notices that were issued without authority and on unconstitutional grounds.

*Third,* the balance of hardships favors Plaintiffs. Plaintiffs face the continued loss of grant support, disruption of their work, and impairment of protected expression. The Government, by contrast, has no cognizable interest in enforcing grant terminations that were unauthorized by statute and infected by viewpoint discrimination. *N.S. v. Hughes*, 335 F.R.D. 337, 355 (D.D.C. 2020) ("[T]he government has no legitimate interest in acting unlawfully."). The injunction does not prevent NEH from administering its grant programs, enforcing lawful grant conditions, or taking future action on lawful and individualized grounds. It simply prevents Defendants from giving effect to the Mass Termination challenged and adjudicated in this action.

*Fourth,* the public interest favors permanent relief.  The public has a strong interest in ensuring that federal officials act within the bounds set by Congress and the Constitution.  *See Washington v. Reno*, 35 F.3d 1093, 1102 (6th Cir. 1994); *see also Hughes*, 335 F.R.D. at 355 ("The public has a clear interest in seeing that government officials do not exceed their statutory authority.").  That interest is especially acute where the challenged action involved the mass cancellation of congressionally authorized humanities grants based on perceived viewpoint and protected expression.  *Media Matters for Am. v. Paxton*, 138 F.4th 563, 585 (D.C. Cir. 2025) ("[T]here is always a strong public interest in the exercise of free speech rights otherwise abridged by an unconstitutional government action." (internal quotation and citation omitted)).  Nor is the public interest served by permitting unauthorized officials to displace the statutory decisionmaker Congress selected, or by allowing the Government to enforce viewpoint-based terminations of public grants.

Defendants' conduct also presents a sufficient basis for prospective relief.  This is not a case in which Plaintiffs rely solely on a past wrong or a speculative fear of recurrence.  The terminations remain in effect, and Defendants have not disavowed the authority to take the same action again on the same grounds.  *City of Los Angeles v. Lyons*, 461 U.S. 95 (1983) therefore does not bar injunctive relief.  *Lyons*, 461 U.S. at 102 (1983) (requiring an injury that is "real and immediate," not "conjectural" or "hypothetical").  Unlike in *Lyons*, where the plaintiff's future injury depended on a speculative chain of events involving a future police encounter, Plaintiffs here challenge an ongoing legal consequence of Defendants' completed action: the continued enforcement of termination notices that remain operative today.  Prospective relief is therefore appropriate.

Accordingly, Defendants are permanently enjoined from enforcing or giving effect to the Mass Termination of NEH grants at issue in this action. Defendants shall rescind the termination notices issued pursuant to the Mass Termination and shall treat those notices as without legal effect. Defendants shall not reallocate, obligate, or otherwise dispose of funds associated with those awards on the basis of the Mass Termination or the unlawful grounds adjudicated in this Opinion and Order. For the avoidance of doubt, nothing in this injunction or in the Court's prior preliminary relief requires the immediate payment of grant funds, adjudicates any contractual entitlement to money, or prevents NEH from administering grants prospectively in accordance with lawful statutory authority, applicable grant terms, and the Constitution.

Because the Court has certified the class and subclasses, *see* Section IV(F), this relief applies to Plaintiffs and to the certified class and subclasses. The challenged action was undertaken pursuant to a uniform process and affected grant recipients in the same legally relevant manner. Uniform relief is therefore appropriate to redress the constitutional violations and *ultra vires* action identified in this Opinion and Order.

## Conclusion

For the foregoing reasons, Plaintiffs' motion for summary judgment is GRANTED, and the Government's cross-motion for summary judgment is DENIED.

It is hereby ORDERED, ADJUDGED, AND DECREED as follows:

1. Declaratory Judgment. The Mass Termination is DECLARED unlawful, unconstitutional, *ultra vires*, and without legal effect. The termination of National Endowment for the Humanities grants challenged in this action was unlawful because it was undertaken in violation of the First Amendment, in violation of the equal protection component of the Fifth Amendment, and without statutory authority. The Court further DECLARES that DOGE officials lacked statutory authority to identify, select, or direct the termination of NEH grants, and that the resulting terminations were *ultra vires*.

2. Injunctive Relief.  The Government, along with its officers, agents, servants, employees, and all persons acting in concert with them, is PERMANENTLY ENJOINED from enforcing, implementing, or giving any effect to the Mass Termination.  This injunction applies to all termination notices issued as part of the Mass Termination, including all grants identified in Plaintiffs' Exhibit 12, NEH_AR_0000136.  The Government is further PERMANENTLY ENJOINED from terminating those grants on the same or substantially similar impermissible bases identified in this Opinion and Order.

3. The Government shall provide written notice of this Opinion and Order to all affected grant recipients whose awards were terminated as part of the Mass Termination.

4. This Court shall retain jurisdiction to enforce this Opinion and Order.

The Clerk of Court is respectfully directed to terminate the motions at Docket Numbers 220, 242, 246, and 275 in *American Council of Learned Societies v. National Endowment for the Humanities*, No. 25-cv-3657 and Docket Numbers 134 and 162 in *The Authors Guild v. National Endowment for the Humanities*, No. 25-cv-3923; to enter judgment in favor of Plaintiffs; and to close the file.

This constitutes the decision and order of the Court.  It is a written decision.

Dated: May 7, 2026
    New York, New York

U.S.D.J.